**21-1460**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

TIFFANY POTTER,

Petitioner,

v.

DEPARTMENT OF VETERANS AFFAIRS,

Respondent.

**Petition For Review From The Merit Systems Protection Board
In Case No. DE-1221-18-0165-M-1**

**BRIEF OF PETITIONER TIFFANY POTTER**

A. MARQUES PITRE
PITRE & ASSOCIATES, LLC
Ronald Reagan Building and
International Trade Center
1300 Pennsylvania Avenue, N.W.
Suite 700
Washington, D.C. 20004
 (202) 204-3006
ampitre@ampitreassociates.com

*Attorney for Petitioner*

March 27, 2021

## CERTIFICATE OF INTEREST

Counsel for Petitioner, Tiffany Potter, certifies the following:

1. The full name of every party represented by me is:

   Tiffany Potter.

2. The names of the real parties in interest, if different from the parties named above, are:

   Not applicable.

3. The names of all parent corporations and any publicly held companies that own 10% or more of the stock of the party represented by me are:

   Not applicable.

4. The names of all law firms and the partners and associates that appeared for Petitioner in the trial court or agency or are expected to appear in this court are:

   Not applicable.

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

   Not applicable.

Date: <u>March 27, 2021</u>                Respectfully submitted,

/s/ A. Marques Pitre

_____

A. MARQUES PITRE
Pitre & Associates, LLC
Ronald Reagan Building and
International Trade Center
1300 Pennsylvania Avenue, N.W., Suite 700
Washington, DC 20004
Phone: 202-204-3006
Direct: 202-840-6797
Email: ampitre@ampitreassociates.com

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................. ii

TABLE OF CONTENTS ....................................................................... iv

TABLE OF AUTHORITIES ................................................................... v

STATEMENT OF RELATED CASES ..................................................... vi

JURISDICTIONAL STATEMENT ......................................................... vi

STATEMENT OF THE ISSUES .......................................................... viii

STATEMENT OF THE CASE .............................................................. 1

SUMMARY OF THE ARGUMENT .................................................... 10

ARGUMENT ..................................................................................... 11

   A. Legal Standard ............................................................................ 11

   B. The Board's Final Decision is Unsupported by Substantial Evidence ......... 12

   C. The Board's Final Decision is Based on an Abuse of Discretion or is Otherwise not in Accord with the Law ...................................................... 17

CONCLUSION ................................................................................. 32

ADDENDUM ................................................................................... 35

# TABLE OF AUTHORITIES

## CASES

*Carr v. Soc. Sec. Admin.*, 185 F.3d 1318 (Fed. Cir. 1999) ..................................... 18

*Chambers v. Dep't of the Interior*, 116 M.S.P.R. 24 (2011) ................................. 28

*Colorado v. New Mexico*, 467 U.S. 310 (1983) ..................................................... 13

*Costin v. Dep't of Health and Human Serv.*, 72 M.S.P.R. 525 (1996).................. 28

*Miller v. Dep't of Justice*, 842 F.3d 1252 (Fed. Cir. 2016) ................. 14, 23, 24, 30

*Miller v. Dep't of Veterans Affairs,* 92 M.S.P.R. 610 (2002)..................... 23, 28, 29

*Powers v. Dep't of the Navy*, 69 M.S.P.R. 150 (1995)........................................... 28

*Price v. Symsek*, 988 F.2d 1187 (Fed. Cir. 1993) .................................................. 13

*Rumsey v. Dep't of Justice*, 120 M.S.P.R. 259 (2013) ........................................... 29

*Scott v. Dep't of Justice*, 69 M.S.P.R.  211 (1995)................................................. 28

*Terban v. Dep't of Energy*, 216 F.3d 1021 (Fed. Cir. 2000) .................................. 12

*Whitmore v. Dep't of Labor*, 680 F.3d 1353 (Fed. Cir. 2012).................... 13, 18, 28

*Wojcicki v. Dep't of the Air Force*, 72 M.S.P.R. 628 (1996) ................................. 28

## STATUTES

5 U.S.C. § 7703 ......................................................................................................... 1

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Ms. Potter filed an Appeal before this court under the same caption as this matter on March 22, 2019; the case number for this prior proceeding was 19-1541; the panel consisted of Chief Judge Sharon Prost, and Circuit Judges Todd M. Hughes and Kimberly A. Moore; and a decision was issued on February 13, 2020.

## JURISDICTIONAL STATEMENT

The Merit Systems Protection Board had jurisdiction over Ms. Potter's Individual Right of Action (IRA) appeal pursuant to 5 U.S.C. §1221(a). After this Court affirmed-in-part, vacated-in-part, and remanded the Board's December 13, 2018 Initial Decision ("ID #1"), which concluded that the Board's determination Ms. Potter did not establish a prima facie whistleblower reprisal claim related to her November 2015 nonselection was not supported by substantial evidence, Ms. Potter's IRA appeal was remanded to the Board for further proceedings related to the November 2015 failure to hire.

On September 16, 2020, the Board issued an Initial Decision ("ID #2") on the November 2015 failure to hire, which became final on October 21, 2020, with a finding that (1) Ms. Potter established her prima facie claim of whistleblower reprisal for the November 2015 nonselection, but (2) the Agency met its burden to show that it would have taken the same actions absent her

whistleblowing, and again denied Ms. Potter's request for corrective action in its entirety.

This court has jurisdiction over this appeal pursuant to 5 U.S.C. § 7703(b)(1)(A).

## STATEMENT OF THE ISSUES

1. Whether the Board erred in finding that the Agency met their burden to establish by clear and convincing evidence that it would have taken the same actions absent Ms. Potter's protected disclosures?

## STATEMENT OF THE CASE

Ms. Potter submits this Second Appeal of the Final Order issued by the Merit Systems Protection Board ("MSPB" or "Board") in Ms. Potter's Individual Right of Action (IRA) appeal in accordance with 5 U.S.C. § 7703. The Board's findings were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; or, unsupported by substantial evidence; and should therefore be vacated.

### 1. Procedural History

On March 17, 2017, Ms. Potter, filed a Complaint with the U.S. Office of Special Counsel ("OSC") against officials at the Department of Veteran's Affairs, Phoenix VA Health Care System ("Phoenix VA" or "Agency") for engaging in prohibited personnel practices and activities which included: (1) detailing Ms. Potter to the Chief Nurse IV position for 33 days on October 28, 2015, without any higher-graded compensation; (2) detailing Ms. Potter for 120 days on January 17, 2017, to unclassified duties; (3) requiring Ms. Potter to perform the duties of Chief Nurse IV from April 5, 2012, until March 19, 2015, without any official detail, promotion, or higher-graded compensation; (4) demoting Ms. Potter from Chief Nurse IV to a Nurse Manager position in March 2015; (5) failing to promote or hire Ms. Potter as the Chief Nurse IV in November 2015, or the equivalent position of Deputy Associate Chief of Staff/Chief of Purchased Care position in March 2017; and (6)

forcing Ms. Potter to resign from the Phoenix VA in retaliation for her whistleblowing and protected activity.

On November 15, 2017, the OSC issued a Final Decision and decided to take no further action on Ms. Potter's Complaint, erroneously concluding that Ms. Potter was never demoted, that Ms. Potter was not entitled to additional compensation while she acted as Chief Nurse IV, and that Ms. Potter voluntarily resigned her position at the Phoenix VA.

On January 24, 2018, Ms. Potter filed an Individual Right of Action (IRA) Appeal with the Board seeking Corrective Action.

On December 13, 2018, the Board issued its Initial Decision, which was scheduled to become final on January 17, 2019, finding that: (1) Ms. Potter met only four of five whistleblowing allegations; (2) Ms. Potter established whistleblowing was a contributing factor to only one of three covered personnel actions, thereby ruling that she established only one prima facie case of whistleblower reprisal; (3) Ms. Potter did not establish that her April 2017 transfer to an out-of-state position in California was involuntary; (4) the Agency met its burden by clear and convincing evidence that it would have taken the same action on the one accepted prima facie case of whistleblower reprisal; and (5) Ms. Potter being forced to perform duties above and beyond the scope of work as outlined within the Functional Statement of her position of record, without additional compensation, could not be considered

"intolerable and coercive" working conditions in support of her involuntary resignation.

On March 22, 2019, Ms. Potter filed an appeal with this Court for review of the Board's December 13, 2018 Initial Decision, and this Court concluded that the Board's finding that Ms. Potter did not establish a prima facie whistleblower reprisal claim related to her November 2015 nonselection was not supported by substantial evidence, thus Ms. Potter's IRA appeal was remanded to the Board for further proceedings related to the November 2015 failure to hire.

On September 16, 2020, the Board issued an Initial Decision ("ID #2") on the remanded November 2015 failure to hire issue, which became final on October 21, 2020, with a finding that (1) Ms. Potter established her prima facie claim of whistleblower reprisal for the November 2015 nonselection, but (2) the Agency met its burden to show that it would have taken the same actions absent her whistleblowing, and again denied Ms. Potter's request for corrective action in its entirety.

Ms. Potter now timely submits this appeal for review of ID #2.

## 2. Statement of Facts

A.     Ms. Potter began working for the Department of Veterans Affairs ("DVA" or "Agency") on December 17, 2004, as a Student Nurse Technician Valor

Student. Appx#0746.[1]  Ms. Potter became a Registered Nurse with the Agency on July 9, 2006, at the Puget Sound VA Healthcare System. *Id.* Ms. Potter transferred to the Phoenix VA on January 3, 2010, as a Nurse II in Quality Management Service. *Id.* On March 13, 2011, Ms. Potter was promoted to Nurse III in Quality Management Service, and then to a Nurse Manager in September 2011. *Id.*

B.      In April 2012, Ms. Potter began performing the duties of Chief Nurse IV due to an organizational change which removed Gail Smith as her Chief Nurse. Appx#0111-112. In 2013, Dr. Robbi Venditti ("Dr. Venditti") attempted to get a Chief Nurse IV position classified and posted for Ms. Potter to apply for, and hopefully fill. Appx#0451-452. In 2014, Dr. Venditti was promoted from Chief of Purchased Care to Associate Chief of Staff, and Ms. Potter took over additional responsibilities as the Chief of Purchase Care in addition to Chief Nurse IV. Appx#0124.

C.      On May 28, 2014, Ms. Potter made a report to Dr. Venditti about her concerns about treatments for Urology patients diagnosed with cancer that had gone unaddressed for over two years due to the cancelling of consults/appointments, which resulted in three patient deaths. Appx#0748. On July 10, 2014, Ms. Potter reported a list of one hundred and twenty-eight (128) patients who were awaiting psychotherapy treatment - ninety-six (96) of which were never sent to TriWest for

---

[1] All stipulations appear at Appx#0746-0747.

care despite clear instructions on their consults to do so - to the Office of Inspector General ("OIG"). Appx#0749. That same day, Ms. Potter emailed Dr. Venditti, Dr. Darren Deering ("Dr. Deering"), and Dr. Blanca Vela, to report her concerns about the patient care delays. Appx#0748; Appx#0750-753. On August 7 and 8, 2014, Ms. Potter reported the fatal mishandling of Urology patients and her concerns about providers turning off their alerts, which resulted in patient care and follow-up requests going unanswered, to OIG. Appx#0754-763. Ms. Potter originally reported this concern to facility leadership on June 27, 2014. Appx#0737.

D.    On August 20, 2014, Ms. Potter began communicating with OIG to provide further testimony regarding the mishandling of Urology patients by Dr. Deering and Dr. Venditti. Appx#0764. Then, on January 23, 2015, Dr. Venditti and Edmund Lowe ("Mr. Lowe") accused Ms. Potter of filing an anonymous OIG hotline complaint regarding significant delays by non-VA Care admin staff. Appx#0201-202.

E.    On October 28, 2014, Ms. Potter received a Temporary Detail as Acting Chief of Purchased Care. Appx#0769-770.

F.    On January 29, 2015, the OIG released the results of its review of the Phoenix VA's Urology Department, which included a significant amount of information that Ms. Potter provided to the OIG. Appx#0331.

G.      On March 19, 2015, former Phoenix VA Medical Center Director, Glenn Grippen ("Mr. Grippen"), approved an organizational chart ("Org. Chart") reassigning Ms. Potter from Chief Nurse Manager to Nurse Manager. As a result, Ms. Potter lost oversight of the department and went from managing 45 full-time employees to supervising only 14 full-time employees and was no longer able to report further concerns to the OIG as she was no longer privy to the handing of patient care referrals. Appx#0801.

H.      On April 14 and 29, 2015, Mr. Grippen and Dr. Deering informed Ms. Potter that the Chief Nurse IV position was being urgently expedited to be filled, and that Mr. Grippen would write a letter requesting a rushed recruitment as the position was essential to the department. This urgency action was done with the hope that it would resolve Ms. Potter's complaint of retaliation. Appx#0150-151. However, on May 29, 2015, Mr. Lowe told Ms. Potter that her staff held animosity towards her due to her involvement with the OIG investigation. Appx#0165-166; Appx#0342-347.

I.      On August 10, 2015, the Chief Nurse IV of Administrative Medicine Service position was posted for recruitment. Ms. Potter applied and was considered a highly qualified candidate. Appx#0163-0164.

J.      On September 28, 2015, Ms. Potter informed Dr. Deering that she could no longer perform the duties of a Chief Nurse IV without the official title and

requested a detail (or for the Agency to complete the hiring process) to that position or to the position Chief of Purchased Care, for which she was also performing the duties. Appx#0767-768.

K.      On November 1, 2015, after being informed that Ms. Potter's complaint against the agency became formal, Dr. Deering canceled the Chief Nurse IV recruitment, and also cancelled the Chief of Purchased Care recruitment after Ms. Potter inquired about applying to that position as well. Appx#0169-170; Appx#0558-560; Appx#0747; Appx#0804-806.

L.      On February 28, 2017, Ms. Potter emailed Rima Ann O. Nelson ("Ms. Nelson"), Medical Center Director, regarding the retaliatory actions against her due to her participation in the OIG investigation, the unsuitable detail that she was assigned, and the effect it was having on her health, family life, and education. Appx#0795-800.

M.      On March 2, 2017, as her only way to escape the retaliation against her at the Phoenix VA, Ms. Potter accepted a temporary, lower-level position, which equated to a demotion, at the VA Northern California Health Care System, VISN 21, where she relocated without her husband and young children, for a reduced salary, and lost two steps from her SF-50. Appx#0229-230.

N.      On March 3, 2017, Ms. Potter spoke to Ms. Nelson to inform her that she had no choice but to resign due to the hostile work environment, the illegal

actions she was being required to perform, and the retaliation against her from Phoenix VA leadership. *Id.*

O.    On March 9, 2017, after learning from HR that Ms. Potter was resigning, Dr. Smith requested that the Chief Nurse IV position be issued as an Automated Request for Personnel Action ("ARPA") and that it be posted immediately for recruitment. That same day, the Chief Nurse IV position was re-posted for recruitment after 1 year, 4 months, and 4 days (or 490 days) of being originally cancelled. Appx#0083-84; Appx#0812. Ms. Potter then filed a Complaint with the U.S. Office of Special Counsel ("OSC") presenting these allegations against the DVA on March 21, 2017. Appx#0837-0863.

P.    On November 20, 2017, the OSC issued a letter notifying Ms. Potter that the OSC had terminated the inquiry into her allegations, and that she may seek corrective action from the MSPB within 65 days of the date of the letter. Appx#0899-890.

Q.    On February 13, 2018, Ms. Potter timely filed her Individual Right of Action (IRA) Appeal with the MSPB's Denver Field Office. Appx#0864. The hearing for this matter took place on October 22 and 23, 2018, and the Record closed on November 14, 2018. The Board issued ID #1 on December 13, 2018 and determined that it would become final on January 17, 2019. Appx#0906.

R.    On March 22, 2019, Ms. Potter filed an appeal with this Court for review of the Board's December 13, 2018 Initial Decision. With regards to the Board's decision related to the November 2015 failure to hire, this Court found that the administrative judge erred in not analyzing Dr. Deering's knowledge of the July 10, 2014 email when considering whether, by a preponderance of the evidence, Ms. Potter had shown that her protected disclosure contributed to the agency's alleged reprisal. And by not doing so, the administrative judge did not resolve the separate question of whether, by clear and convincing evidence, the agency established that it would have taken the November 2015 personnel action regardless of Ms. Potter's second protected disclosure. Therefore, because the administrative judge never considered whether the agency would have taken the same November 2015 personnel action absent Ms. Potter's second protected disclosure, this Court remanded the November 2015 failure to hire issue to the Board for further proceedings.  Appx#0946.

S.    On September 16, 2020, the Board issued an Initial Decision (ID #2) on the remanded November 2015 failure to hire issue, which became final on October 21, 2020. The administrative judge stated the burdens of proof applicable to Ms. Potter and the Agency as follows:

> The appellant has the burden to establish, by preponderant evidence, two elements: (1) she made a protected disclosure, and (2) her disclosure was a contributing factor to the agency's decision to take

a statutorily covered personnel action against her. *Id.*; 5 U.S.C. § 1221(e)(1); 5 C.F.R. § 1209.2(e)(1). One way the appellant may demonstrate her disclosure was a contributing factor is by evidence that (A) the official taking the personnel action knew of the disclosure, and (B) the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action. 5 U.S.C. § 1221(e)(1)(A)-(B).

If the appellant meets her burden as described above, then she has established a prima facie case of whistleblower reprisal, and the burden passes to the agency, such that the Board will order corrective action, unless the agency demonstrates by clear and convincing evidence that it would have taken the same personnel action in the absence of the disclosure. 5 U.S.C. § 1221(e)(2); 5 C.F.R. § 1209.2(e)(2).

The administrative judge then found that (1) Ms. Potter established her prima facie claim of whistleblower reprisal for the November 2015 nonselection, but (2) the Agency met its burden to show that it would have taken the same actions absent her whistleblowing, and again denied Ms. Potter's request for corrective action in its entirety; for which this Petition for Review is hereby timely submitted in response.

## SUMMARY OF THE ARGUMENT

The Board correctly concluded that Ms. Potter met her burden to establish a prima facie case that her July 10, 2014 disclosure was a contributing factor to her November 2015 nonselection, however, it erred in finding that the Agency met its burden to show by clear and convincing evidence that it would have taken the same actions absent Ms. Potter's whistleblowing.

In analyzing the Agency's burden of proof, the Board misapplied the *Carr* factors when considering: (1) the strength of the Agency's evidence in support of its action; (2) the existence and strength of any motive to retaliate against Ms. Potter; and (3) failed to effectively assess the Agency's burden of conclusively proving that it has treated similarly situated employees who have not blown the whistle similarly to Ms. Potter. Additionally, the Board failed to consider substantial evidence that fairly detracted from the weight of the Agency's proffered reasons for the November 1, 2015 failure to hire.

Therefore, since the Board did not correctly apply the *Carr* standards in its finding that the Agency met the clear and convincing evidence burden of proof and did not take into consideration substantial evidence that fairly detracted from the weight of the evidence provide by the Agency for its actions, the Board's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, is unsupported by substantial evidence, and its decision should be vacated.

## ARGUMENT

### A. Legal Standard

Under 5 U.S.C. § 7703, the Court may set aside a final decision of the Board if the decision is "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or

regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703 (c) (1994).[2]

## B. The Board's Final Decision is Unsupported by Substantial Evidence.

1. <u>The Board's finding that the Agency met its burden of proof and would have taken the same actions absent Potter's whistleblowing does not hold sufficient weight to overcome the burden of clear and convincing Evidence, and therefore was arbitrary and capricious, and failed to consider evidence that detracted from the weight of Agency's proffered reasoning for its action, and thus, is unsupported by substantial evidence.</u>

The administrative judge found that Ms. Potter proved by a preponderance of the evidence that her July 10, 2014 disclosure was protected and was a contributing factor to her November 2015 nonselection to the Chief Nurse IV position; and therefore, she established a prima facie case of whistleblower reprisal. Appx#0004. The DVA also conceded the same. *Id*. However, the Board's finding that the DVA met its burden to demonstrate that it would have taken the same action absent the appellant's disclosure failed to appropriately apply the *Carr* factors when considering: (1) the strength of the Agency's evidence in support of its action; (2) the existence and strength of any motive to retaliate against Ms. Potter; and (3) failed to effectively assess the Agency's burden of conclusively proving that it has treated similarly situated employees who have not blown the whistle similarly to Ms. Potter.

---

[2] *Terban v. Dep't of Energy*, 216 F.3d 1021, 1024 (Fed. Cir. 2000).

Additionally, the Board failed to consider substantial evidence that fairly detracted from the weight of the Agency's proffered reasons for it actions.

The burden lies with the employee to "prove by a preponderance of the evidence that he or she made a protected disclosure under § 2302(b)(8) that was a contributing factor to the employee's [personnel action]".[3] Once that was accomplished, the burden shifts to the DVA to prove by "Clear and convincing evidence" that they "would have taken the same personnel action" despite Potter's whistleblower disclosures. *Id.* "'Clear and convincing' evidence has been described as evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is 'highly probable.'"[4] It "imposes a heavier burden upon a litigant than that imposed by requiring proof by preponderant evidence but a somewhat lighter burden than that imposed by requiring proof beyond a reasonable doubt."[5] Evidence only clearly and convincingly supports a conclusion when it does so in the aggregate considering all the pertinent evidence in the record, and despite the evidence that fairly detracts from that conclusion.[6]

---

[3] *Whitmore v. Dep't of Labor*, 680 F.3d 1353, 1367 (Fed. Cir. 2012).

[4] *Price v. Symsek*, 988 F.2d 1187, 1191 (Fed. Cir. 1993) (quoting *Buildex, Inc. v. Kason Indus., Inc.*, 849 F.2d 1461, 1463 (Fed. Cir. 1988)); *see also Colorado v. New Mexico*, 467 U.S. 310, 316 (1983).

[5] *Price*, 988 F.2d at 119.

[6] *Whitmore,* 680 F.3d at 1368.

In the instant matter, the Board failed to consider substantial evidence in the record that fairly detracted from the weight of the Agency's reasoning for its decision to cancel the recruitment of the Chief Nurse IV position on November 1, 2015, and its failure to hire regarding the same, and thus, its finding was an abuse of discretion and unsupported by law.[7]

For example, after Ms. Potter's May 28, 2014 and August 7 and 8, 2014 protected disclosures, and Ms. Potter's further participation in the OIG investigation beginning in August 20, 2014, but prior to the November 1, 2015 failure to hire, the following occurred: (1) On January 23, 2015, Mr. Lowe informed Ms. Potter that staff had animosity against nurses, and particularly against her, due to her participation in OIG complaints (Appx#0122); (2) On January 29, 2015, the OIG released the results of its review of the Phoenix VA's Urology Department, which included a significant amount of information that Ms. Potter provided to the OIG (Appx#0331); (3) On March 19, 2015, Mr. Grippen approved an Org Chart reassigning Ms. Potter from Chief Nurse Manager to Nurse Manager, which removed her from the oversight of the department and prevented her from being able

---

[7] "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. Any determination by an AJ that is based on findings made in the abstract and independent of the evidence which fairly detracts from his or her conclusions is unreasonable and, as such, is not supported by substantial evidence." *Miller v. Dep't of Justice*, 842 F.3d 1252, 1258 (Fed. Cir. 2016) (citing *Whitmore*, 680 F.3d at 1376).

to report further concerns to the OIG as she was no longer privy to the handing of patient care referrals (Appx#0801); (4) On April 1, 2015, Mr. Grippen expressed to staff that he wanted "to resolve more issues in-house and try to resolve things before they went out to the media." (Appx#0151); (5) On September 24, 2015, Ms. Potter participated in ADR Mediation, where she informed Ms. Marian Tademy (EEO Program Manager) that she was being retaliated against for her OIG disclosures (Appx#0088). Ms. Tademy testified that she spoke to Dr. Deering and Mr. Grippen about these concerns (Appx#0130); (6) On September 28, 2015, Ms. Potter informed Dr. Deering that she could no longer perform the duties of a Chief Nurse IV without the official title, and requested a detail to that position; however, that request was denied (Appx#0091); and (7) On November 1, 2015, after being informed that Ms. Potter's EEO complaint against the Agency became formal, Dr. Deering canceled the Chief Nurse IV recruitment, and also cancelled the Chief of Purchased Care recruitment after Ms. Potter inquired about applying to that position as well. Appx#0169-170; Appx#0558-560; Appx#0747; Appx#0804-806. On November 5, 2015, Ms. Potter was notified that the Chief Nurse IV position was cancelled for recruitment. Appx#0255-256. Ms. Potter proffers this was suspicious considering Dr. Deering testified that at the same time the decision was made not to fill the position, "there was a lot of discussion about whistleblower reports." Appx#0196. Moreover, Ms. Potter testified that she had been performing the duties of Chief

Nurse IV with the direction and approval from Dr. Venditti and Dr. Deering, but shortly before the change to the org. chart on March 19, 2015, Dr. Deering was required to participate in Congressional Hearings for the OIG investigation, which included information from her protected disclosures. Appx#0191. As a result, Dr. Venditti was detailed to another agency because of her involvement in the Phoenix VA "scandal." Appx#0089-0090. In response to questions regarding the Phoenix VA "scandal", Dr. Deering testified that Congress asked him, "why hasn't he been fired yet?"; and he also testified to the fact that he had been receiving death threats; how as a result of the "scandal" upper management was either fired or put on leave, and how "the crises" eventually led to his removal. Appx#0191-192; Appx#0221. He also testified, "I was feeling frustrated because people were going to the OIG and I just wished they would come to me and say here's what it is so we could tackle it together. But, you know, when the OIG gets involved, it just adds multiple layers of complexity trying to solve the problem." Appx#0193.

Finally, the Board included in its analysis  factors completely unrelated to those facts for which a *Carr* analysis would rely. For example, the Board cited to the removal of Dr. Deering in June 2016, in an action evidently related to the "crisis" that had emerged at the Phoenix VA (Appx#0011); and Ms. Potter's tentative job offer in California on February 8, 2017 (*Id.*); and the fact that she received a confirmed job offer March 9, 2017. (*Id.*) It is unclear how those facts, which all took

place after Dr. Deering's November 1, 2015 decision to cancel the recruitment, would assist the Board in concluding that the Agency met its clear and convincing evidence burden.

The Board's findings were made in the abstract, independent of evidence which fairly detracts from its conclusion, therefore it was unreasonable,  not supported by substantial evidence, and should be vacated.

## C. The Board's Final Decision is Based on an Abuse of Discretion or is Otherwise not in Accord with the Law

1. <u>The Board's conclusion that *Carr* factor 1 weighed heavily in favor of the Agency was not in accord with the law and is unsupported by substantial evidence.</u>

In *Whitmore*, when discussing the clear and convincing evidence burden, the Court stated:

> "Clear and convincing evidence" is a high burden of proof for the Government to bear. It is intended as such for two reasons. First, this burden of proof comes into play only if the employee has established by a preponderance of the evidence that the whistleblowing was a contributing factor in the action — in other words, that the agency action was "tainted." Second, this heightened burden of proof required of the agency also recognizes that when it comes to proving the basis for an agency's decision, the agency controls most of the cards — the drafting of the documents supporting the decision, the testimony of witnesses who participated in the decision, and the records that could document whether similar personnel actions have been taken in other cases. In these circumstances, it is entirely

appropriate that the agency bear a heavy burden to justify its actions.[8]

In determining whether an agency has shown by clear and convincing evidence that it would have taken the same personnel action in the absence of whistleblowing, the Board will consider the following factors: (1) the strength of the agency's evidence in support of its action; (2) the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and (3) any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated.[9]

First, the AJ in his analysis of the *Carr* factors mischaracterizes, and therefore misapplies, the first factor of the test by incorrectly stating that "the first factor is the strength of the agency's *reasons* for its action." (emphasis added). Appx#0012. Application of the first *Carr* factor does not call for an analysis of the agency's reasons – it calls for an analysis of the agency's *evidence* – and the record reflects that the Agency did not provide one piece of credible evidence to substantiate their claims that they would have still cancelled their recruitment efforts for the Chief Nurse IV position, notwithstanding Ms. Potter's

---

[8] *Whitmore*, 680 F.3d at 1367 (quoting 135 Cong. Rec. H747-48 (daily ed. Mar. 21, 1989) (explanatory statement on Senate Amendment to S. 20)).

[9] *Carr v. Soc. Sec. Admin.*, 185 F.3d 1318, 1323 (Fed. Cir. 1999) ("*Carr* factors").

whistleblower disclosures. Instead, the Board is simply relying on the Agency's word, even though their word is contradicted by, and in clear conflict with, Ms. Potter's evidence.

The only evidence the Agency provided is one email from Dr. Deering to Human Resources requesting that the recruitment effort be cancelled, which stated, "We need to have more discussion about the best way to structure this service (*i.e.*, what sections should be in this service, where the nurse 4 should report, etc[.]) before we move toward a selection." Appx#0804-806. Dr. Deering appeared to corroborate this reasoning when he testified that he did not initially fill the position due to reorganization, and they were unsure who the position would report to. Appx#0602-605. However, Mr. Grippen testified that in 2015, while he was the Director, he considered filling the Chief Nurse IV position to be a priority. Appx#0504-505. He also stated that, during that time, even though there were several reorganizations happening, there were not any impediments on hiring, and in fact, the department "increased staffing levels multiple times." Appx#0520.

Moreover, even though the Agency claims that the basis of its decision to cancel the Chief Nurse IV position was due to a reorganization of departments, the Agency has provided zero evidence to show how reorganizations of the department prevented them from filling a universally agreed upon "essential" and "critically important" position, such as Chief Nurse IV, until March 9, 2017, *after* learning of

Ms. Potter's resignation/transfer from the Agency. They similarly have provided no evidence to show that the position needed reclassifying after already being classified in August 2015. There is not one email, one document, or one copy of the "reworded" Functional Statement in the record to show that the position was ever sent back to VISN for reclassification. According to Dr. Duarte, during his time as the ACOS, he was not aware of the Chief Nurse IV going through reclassification. Appx#0713-714. Additionally, Dr. Deering testified that [if the position was not reclassified] since it had already gone through the classification process at VISN, it could have been reposted for fulfillment at any time. Appx#0714-716. Yet, the Agency relies on the Board to believe that it took them one year, ten months, and 10 days, or exactly 681 days - the length of time between April 29, 2015 (when Mr. Grippen said he would expediate the fulfillment of the Chief Nurse IV position) and March 9, 2017 (the date the position was reposted) - to figure out the simple task of who the Chief Nurse IV position was "going to report to." Appx#0801.

Despite the fact that the record is flush with evidence showing that before and during this time period, Ms. Potter was intermittingly performing the duties of a Chief Nurse IV and reporting to several different management officials without complication. Despite that fact, the AJ was convinced and relied soley on the testimony of Dr. Deering, even though he conceded his recollection of the "precise

series of events leading up to his November 2015 decision to cancel the vacancy" was "admittedly less than certain". Appx#0013-14. However, he explained away that lack of recollection by stating, "[b]ut that was hardly surprising: the appellant did not challenge Deering's November 2015 vacancy cancellation until (i) sixteen months after Deering's decision and (ii) ten months after Deering's removal, and Deering's decision was never overtly personal to the appellant or any individual. That passage of time, along with Deering's departure from the agency, gives me no reason to assume that Deering would have a firm handle of the nuances of his decision to cancel a vacancy in November 2015. I simply find no basis to conclude that Deering's November 2015 decision stood out in his memory in the same manner as it did for the appellant." This analysis completely ignores the fact that Ms. Potter, upon learning that the Chief Nurse IV position was reposted for recruitment on March 9, 2017 - the same day she resigned from the Phoenix VA - filed her Complaint with OSC on March 21, 2017, a mere 11 days after the Agency's last retaliatory act. Appx#0837-0863. Additionally, his finding that Deering's decision was "never overtly personal to the appellant or any individual" is also contradicted by the record. In fact, the AJ cited just how personal it was to Ms. Potter when discussing why Ms. Potter was the most qualified candidate for the position.[10] The

---

[10] Also, according to Deering: "I can't imagine somebody that would've been more qualified for it off the top of my head, but I don't think I ever promised that position to anyone", (Appx#0545),"hard to find anyone more qualified", (Appx#0572)

record shows that Ms. Potter helped draft the Functional Statement that would be used to get the Chief Nurse IV position certified at the VISN. Appx#0202-203. On August 10, 2015, the position was posted to USAJOBS, and Ms. Potter applied and was deemed a "Highly Qualified," "Priority A" candidate, and had already been performing the duties of the position since 2012. Appx#0111-112; Appx#0164-165.

The AJ further justified his reliance on Dr. Deering's testimony by stating "I found Deering's overall picture of events to be consistent, both internally and when compared with the testimony of Venditti and Grippen." Appx#0014. He then referenced Dr. Venditti's testimony that "12/8/14 [organization chart] … was trying to get Tiffany recognition . . . because we had been blocked at every avenue on getting a chief nurse position", and that "Darren had went to other nurse executives and was told the same thing, that there was not enough complexity in the department. For a nurse 4." *Id.* However, this analysis overlooks the fact that these statements referenced a period of time prior to the Nurse IV position being approved by VISN and advertised for recruitment in August of 2015. Therefore, they had no relation to Dr. Deering's decision to cancel the recruitment on November 1, 2015. The AJ also claimed that he found no basis to doubt Dr. Deering's testimony because "based on the agency's actions in March 2017 to re-post the vacancy, since Deering had been

---

"couldn't think of anybody more qualified", Appx#0598, "don't know of anyone else . . . more qualified", (Appx#0010).

gone from the agency for nine months by that time and has not been shown to have any role in the agency's March 2017 actions." Appx#0015. However, this reasoning is not in accord with the law.

When confronted with a weak evidentiary showing by the Agency, the Court in *Miller* stated, "To be clear, we do not hold that testimony must be corroborated to support a showing of independent causation, although that is one of many ways that the Government could have made its weak evidentiary showing stronger . . . ."[11] Moreover, the court in *Whitmore* invalidated a similar argument used by the AJ and admonished the lack of direct evidence and "dismissive approach to the retaliatory motive *Carr* factor merely because a supervisor isn't directly involved."[12] Considering the suspect timing and the lack of evidence to support their claim that there was a reclassification of the position prior to the posting, that there was further discussion of whom the position would report to, or that the department needed to be reorganized before the position could be filled, the AJ should have found, as the Court did in *Miller*, that the Agency didn't present any robust evidence, and thus, as a matter of law, didn't meet their burden of providing "clear and convincing

---

[11] *Miller v. Dep't of Justice*, 842 F.3d at 1261 (finding that the government did not present *strong* evidence of independent causation and as such, the first *Carr* factor did not cut in the governments favor) (emphasis added).

[12] *See Miller v. Dep't of Veterans Affairs,* 92 M.S.P.R. 610 (2002) (*citing Whitmore,* 680 F.3d at 1370-72) ("[t]hose responsible for the agency's performance overall may well be motivated to retaliate even if they are not directly implicated by the disclosures.").

evidence" that they would have not selected Ms. Potter for the Chief Nurse IV position in November 2015 (or thereafter) despite her whistleblower disclosures and activities.[13] The AJ's reliance solely on Dr. Deering's testimony and the fact that he was no longer at the Agency when the vacancy was reposted is misplaced and does not meet the burden of proof required to cut in the Agency's favor.[14]

   2. <u>The Board's finding that *Carr* factor 2 weighed only modestly in Ms. Potter's favor is unsupported by any substantial evidence within the record.</u>

Second, even though the Board found that "Deering had an ostensible motive to retaliate against the appellant for her disclosure, because the problems she raised tended to reflect unfavorably upon Deering's management and put Deering in the place of having to choose between working to try to address her concerns, or doing nothing and fearing further consequences," (Appx#0015), he nevertheless arbitrarily found that the "existence of agency motive to retaliate, comes down to

---

[13] *See Miller v. Dep't of Justice*, 842 F.3d at 1260-1261 ("The Government also failed to present any documentary evidence supporting its position. Mr. Miller was repeatedly reassigned over the course of a four-and-a-half year period, and for each step, the Government did not present a single email, memorandum, or personnel action form documenting or providing the bases for the agency's action. Common sense tells us that these repeated reassignments, occurring over a significant span of time, are the types of personnel actions for which papers would normally attach.")

[14] *See Id.* at 1261 ("[E]ven taking the Warden's testimony at face value, we conclude that his bare testimony about what OIG directed him to do affords only minimal support for Mr. Miller's removal when considered in light of the remainder of the record in this case . . . there is a significant weakness in the quantum of the Government's evidence going towards the first *Carr* factor.")

[only] Deering's motive to retaliate against the appellant for her July 10, 2014 disclosure." *Id.* This conclusion is unsupported by any substantial evidence within the record. As previously shown, Dr. Deering and other VA management officials were also copied on the emails containing Ms. Potter's protected whistleblowing disclosures. The AJ's analysis that Dr. Deering's motive to retaliate against Ms. Potter weighs only modestly in Ms. Potter's favor because he expressed gratitude to Ms. Potter for her disclosures, he pledged to take corrective action, and he approved a new organization chart in December 2014, which Ms. Potter considered to be favorable, is flawed because it ignores the chronological order of events that occurred prior to the November 2015 cancellation.

As explained above in Section B, after Dr. Deering signed off on the December 14, 2014 org. chart, but prior to the nonselection, the following events occurred: (1) On January 23, 2015, Mr. Lowe informed Ms. Potter that staff had animosity against nurses, and particularly against her, due to her participation in OIG complaints (Appx#0122); (2) On January 29, 2015, the OIG released the results of its review of the Phoenix VA's Urology Department, which included a significant amount of information that Ms. Potter provided to the OIG (Appx#0331); (3) On March 19, 2015, Mr. Grippen approved an Org Chart reassigning Ms. Potter from Chief Nurse Manager to Nurse Manager, which removed her from the oversight of the department and prevented her from being

able to report further concerns to the OIG as she was no longer privy to the handing of patient care referrals (Appx#0801); (4) On April 1, 2015, Mr. Grippen expressed to staff that he wanted "to resolve more issues in-house and try to resolve things before they went out to the media." (Appx#0151); (5) On September 24, 2015, Ms. Potter participated in ADR Mediation, where she informed Ms. Marian Tademy (EEO Program Manager) that she was being retaliated against for her OIG disclosures (Appx#0088). Ms. Tademy testified that she spoke to Dr. Deering and Mr. Grippen about these concerns (Appx#0130); (6) On September 28, 2015, Ms. Potter informed Dr. Deering that she could no longer perform the duties of a Chief Nurse IV without the official title, and requested a detail to that position; however, that request was denied (Appx#0091); and (7) On November 1, 2015, after being informed that Ms. Potter's EEO complaint against the agency became formal, Dr. Deering canceled the Chief Nurse IV recruitment, and also cancelled the Chief of Purchased Care recruitment after Ms. Potter inquired about applying to that position as well. Appx#0169-170; Appx#0558-560; Appx#0747; Appx#0804-806. On November 5, 2015, Ms. Potter was notified that the Chief Nurse IV position was cancelled for recruitment. Appx#0255-0256. Ms. Potter proffers this was suspicious considering Dr. Deering testified that at the same time the decision was made not to fill the position, "there was a lot of discussion about whistleblower reports." Appx#0622. Moreover, Ms. Potter testified that she had been performing

the duties of Chief Nurse IV with the direction and approval from Dr. Venditti and Dr. Deering, but shortly before the change to the org. chart on March 19, 2015, Dr. Deering was required to participate in Congressional Hearings for the OIG investigation, which included information from her protected disclosures. Appx#0330. As a result, Dr. Venditti was detailed to another agency because of her involvement in the Phoenix VA "scandal." Appx#0168-169. In response to questions regarding the Phoenix VA "scandal", Dr. Deering testified that Congress asked him, "why hasn't he been fired yet?"; and he also testified to the fact that he had been receiving death threats; how as a result of the "scandal" upper management was either fired or put on leave, and how "the crises" eventually led to his removal. Appx#0587-588; Appx#0713. He also testified, "I was feeling frustrated because people were going to the OIG and I just wished they would come to me and say here's what it is so we could tackle it together. But, you know, when the OIG gets involved, it just adds multiple layers of complexity trying to solve the problem." Appx#0595.

Thus, there is ample evidence to deduce that Dr. Deering and other Agency Management Officials had more than enough motive to retaliate against Ms. Potter, and even if the AJ arbitrarily concluded that Dr. Deering was not motivated by actions taken against him personally, it is well established that "[m]otive may be imputed upon a deciding official for a variety of reasons, including the general desire

senior managers have to appear competent."[15] Therefore, the action of Agency officials in the reposting of the Chief Nurse IV position on the same day Ms. Potter resigned on March 9, 2017, (Appx#0083-84), should have been considered in the analysis of *Carr* factor 2. The fact that the Chief Nurse IV position was hastily reposted for recruitment on the same day that the Agency learned of Ms. Potter's resignation is extremely suspicious and should have weighed heavily in Ms. Potter's favor.[16]

Therefore, finding that *Carr* factor 2 only *modestly* weighed in Ms. Potter's favor is unsupported by  substantial evidence within the record, and thus, the decision should be vacated.

---

[15] *See Whitmore*, 650 F.3d at 1370-71 ("When a whistleblower makes . . . highly critical accusations of an agency's conduct, an agency official's merely being outside that whistleblower's chain of command, not directly involved in alleged retaliatory actions, and not personally named in the whistleblower disclosure is insufficient to remove the possibility of a retaliatory motive or retaliatory influence on the whistleblower's treatment."); *See also Chambers v. Dep't of the Interior*, 116 M.S.P.R. 24, ¶ 69 (2011) (finding proposing and deciding officials had motive to retaliate because they were high level officials and the disclosures "reflected on both of them as representatives of the general institutional interests of the agency"); *Miller v. Dep't of Veterans Affairs*, 92 M.S.P.R. 610, ¶ 20 (2002) (finding that when misconduct was directed and condoned by the proposing official, a motive to retaliate may be imputed upon the deciding official).

[16] *See e.g., Scott v. Dep't of Justice*, 69 M.S.P.R.  211 (1995); *Powers v. Dep't of the Navy*, 69 M.S.P.R. 150 (1995); *Wojcicki v. Dep't of the Air Force*, 72 M.S.P.R. 628 (1996) (two months between protected disclosure and non-selection for position); *Costin v. Dep't of Health and Human Serv.*, 72 M.S.P.R. 525 (1996) (closeness in time between disclosure and non-referrals found suspicious).

3. **The Board's Analysis of *Carr* Factor 3 is Not in Accordance with the Law.**

The AJ's finding concerning *Carr* factor 3, which was based on the arbitrary analysis that because neither party had submitted evidence for this factor, it was therefore unlikely that there *would* be similarly situated individuals who did not blow the whistle and were treated similarly, is nonsensical at best. Appx0016. The Court in *Miller* deemed *Carr* factor 3 important in determining whether an agency has shown by "clear and convincing" evidence that it would have taken the same personnel action in the absence of whistleblowing. In fact, the Court stated that even while "the absence of any evidence relating to *Carr* factor three can effectively remove that factor from the analysis, we further explained that the Government's failure to produce evidence on this factor 'may be at the agency's peril' considering the Government's advantage in accessing this type of evidence."[17]

Notably, even though the AJ recognized that Courts have determined the introduction of evidence showing that the Agency treated similarly situated employees (*i.e.*, other individuals who were not whistleblowers) similarly to Ms. Potter would be highly beneficial in determining whether the Agency has met its

---

[17] *Miller v. Dep't of Veterans Affairs*, 92 M.S.P.R. 610 (2002) (*citing Whitmore*, 680 F.3d at 1374) ("[T]he absence of any evidence concerning *Carr* factor three may well cause the agency to fail to prove its case overall.") (internal citations omitted); *see also Rumsey v. Dep't of Justice*, 120 M.S.P.R. 259 (2013) (*citing Whitmore*, 680 F.3d at 1367 ("discussing legislative history showing that Congress intended the clear and convincing evidence standard to be a heavy burden to meet").

"Clear and convincing" evidence burden of proof, the AJ subsequently absolves the Agency from this burden by concluding, without any supportive evidence, that there wouldn't be other comparators because of the "unique stature" of Ms. Potter on the organizational chart, (Appx#0932), and that even though the record contains evidence that three other individuals also applied for the vacancy, and thus were also affected by Deering's November 2015 vacancy cancellation, the AJ stated, "neither party adduced any evidence as to those other applicants' qualifications or status as whistleblowers or non-whistleblowers." Appx#0016. The burden of producing evidence on the three additional applicant's qualifications, and their status as whistleblowers or non-whistleblowers, should have been placed solely on the Agency, as "the Government has the advantage in accessing this type of evidence."[18] The AJ's failure to apply the standard in *Miller,* that recognizes the Agency was in the best position to provide evidence of the existence of other similarly situated applicants with the same experience, expertise, and/or knowledge of the role of a Chief Nurse IV, who were not themselves whistleblowers, but treated similarly to Ms. Potter, was not in accord with the law.

Finally, Ms. Potter testified that there were similarly situated individuals who were not whistleblowers, that were treated differently than her during the time period in which she made her protected disclosures; Mr. Gregory Crenshaw, who she

---

[18] *Miller v. Dep't of Justice*, 842 F.3d at 1262.

testified was given the title of "Chief" when he was unqualified to possess it; Ms. Leslie Lockridge and Ms. Ann Wilford, who were both hired as Chief Nurse IV's despite ongoing reorganizations within the Agency. Appx#0236-237; Appx#0295. The Agency produced no evidence to contradict Ms. Potter's assertions.

Therefore, in concluding that there were no applicable comparators by removing consideration of the three additional applicants for the 2015 Chief Nurse IV vacancy because "neither party adduced any evidence as to those other applicants' qualifications or status as whistleblowers or non-whistleblowers;" ignoring Ms. Potter's testimony as to the three similarly situated employees who were not whistleblowers, whom she believed were treated differently; and removing the Agency's obligation to produce evidence of the whistleblower or non-whistleblower status of the individual who was ultimately hired for the Chief Nurse IV position in 2017, the AJ's finding that *Carr* factor 3 was neutral was not in accord with the law, was an arbitrary and capricious, and an abuse of discretion. This factor should have also weighed heavily in favor of Ms. Potter and therefore, the Board should have found the Agency failed to meet their burden by clear and convincing evidence that they would have taken the same personal action absent Ms. Potter's whistleblowing, and thus, the Board's decision should be vacated.

## CONCLUSION

For the foregoing reasons, this Court should find that the Board's findings on the claims herein did not meet the clear and convincing evidence burden. Rather they were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law which should be vacated and remanded to the Board for a decision comporting with the precepts delineated herein.

Respectfully submitted,

/s/ A. Marques Pitre

_____

A. MARQUES PITRE, Esq.
Pitre & Associates, LLC
Ronald Reagan Building and
International Trade Center
1300 Pennsylvania Avenue, N.W.,
Suite 700
Washington, DC 20004
Phone: 202-204-3006
Direct: 202-840-6797
Email: ampitre@ampitreassociates.com

## **CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

1.    This brief complies with the type-volume limitation of Federal Circuit Rule 32(a). This brief contains 7,821 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

3.    This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

Date: <u>March 27, 2021</u>                    Respectfully submitted,

/s/ A. Marques Pitre
_____
A. MARQUES PITRE
Pitre & Associates, LLC
Ronald Reagan Building and
International Trade Center
1300 Pennsylvania Avenue, N.W., Suite 700
Washington, DC 20004
Phone: 202-204-3006
Direct: 202-840-6797
Email: ampitre@ampitreassociates.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on this 27th day of March 2021, I served a copy of *Petitioner's Opening Brief* electronically via the Court's CM/ECF system, which gave notice to all counsel of record.

Respectfully submitted,

/s/ A. Marques Pitre

_____

A. Marques Pitre, Esq.

# ADDENDUM

# UNITED STATES OF AMERICA
## MERIT SYSTEMS PROTECTION BOARD
### DENVER FIELD OFFICE

| | |
|---|---|
| TIFFANY POTTER,<br>    Appellant, | DOCKET NUMBER<br>DE-1221-18-0165-M-1 |
| v. | |
| DEPARTMENT OF VETERANS<br>    AFFAIRS,<br>        Agency. | DATE: September 16, 2020 |

<u>Marques Pitre</u>, Esquire, Washington, D.C., for the appellant.

<u>Michelle De Vera</u>, Washington, D.C., for the appellant.

<u>Scott MacMillan</u>, Phoenix, Arizona, for the agency.

**BEFORE**
David S. Brooks
Administrative Judge

## INITIAL DECISION

## INTRODUCTION

In this individual right of action (IRA) appeal, appellant Tiffany Potter alleges, *inter alia*, whistleblower reprisal in the agency's November 2015 cancellation of a vacancy. After my first decision found that prima facie claim unsubstantiated, the Federal Circuit vacated that finding and remanded. *Potter v. Department of Veterans Affairs*, 949 F.3d 1376, 1380 (Fed. Cir. 2020); MSPB Docket No. DE-1221-18-0165-M-1, Remand Appeal File (RAF). Subsequently, the appellant requested a decision based on the written record, which closed on June 24, 2020. RAF, Tab 15.

As analyzed below, I find (1) the appellant established her prima facie claim of whistleblower reprisal for the November 2015 nonselection, but (2) the agency met its burden to show that it would have taken the same actions absent her whistleblowing. Consequently, I must DENY the appellant's request for corrective action.

## ANALYSIS AND FINDINGS

### A. <u>Background</u>

The appellant was a Nurse III for the Phoenix V.A. Healthcare System. MSPB Docket No. DE-1221-18-0165-W-1, Initial Appeal File (IAF), Tab 67 at 2-3 (December 13, 2018 initial decision ("ID")). On February 13, 2018, the appellant filed this IRA appeal, DE-1221-18-0165-W-1 (W-1), alleging several instances of whistleblower reprisal.

For the W-1, I convened a hearing on October 22 and 23, 2018, and I issued an initial decision on December 13, 2018. ID at 1 (W-1). My December 13, 2018 initial decision found the appellant met her burden, under 5 U.S.C. § 1221(e)(1), to establish a statutory presumption that her whistleblowing was a contributing factor to her March 2015 change in duties, but that the agency met its burden, under 5 U.S.C. § 1221(e)(2), to show that it would have taken the same action (changed her duties) absent her whistleblowing. ID at 2. My December 13, 2018 initial decision found the appellant did *not* meet her burden to establish a statutory presumption that her whistleblowing was a contributing factor to the November 2015 vacancy cancellation, January 2017 detail and April 2017 reassignment/resignation. ID at 2. Based on those findings, my December 13, 2018 initial decision denied the appellant's request for corrective action. ID at 2 (W-1).

On appeal at the U.S. Court of Appeals for the Federal Circuit, the Court vacated my December 13, 2018 initial decision's conclusion that the appellant did not establish a prima facie whistleblower reprisal claim related to her November

2015 nonselection, because that conclusion was based upon an incorrect finding. *Potter*, 949 F.3d at 1379-80 (citing ID at 15-16, and stating that "the parties agree that the administrative judge incorrectly found that [Chief of Staff] Dr. [Darren] Deering did not have knowledge of Ms. Potter's second protected disclosure, i.e., her July 10, 2014 email"). Indeed, my factual error was clear and not simply a matter of opinion; as the Federal Circuit noted, my own December 13, 2018 initial decision had first stated the relevant fact correctly, before it later stated it incorrectly. *Id.* (Federal Circuit's reference to my ID at 8, which had stated, "The appellant established that she made a protected disclosure to Venditti and others on July 10, 2014. … Tab 63 at 28 (Venditti), 154 (Deering);" and to my ID at 15-16, which later stated, "The appellant did not establish that Deering had any knowledge of any of the appellant's disclosures before he made his decision to cancel the vacancy in November 2015"). I confess my error, and now retrace the steps prescribed by 5 U.S.C. § 1221(e).

In this remand proceeding, DE-1221-18-0165-M-1, I applied the Federal Circuit's decision and found two issues before me:

> Whether, in view of Dr. Deering's knowledge of Ms. Potter's July 10, 2014 email, Ms. Potter presented evidence sufficient to satisfy the knowledge-timing test, or if Ms. Potter otherwise presented evidence sufficient to demonstrate a prima facie case of whistleblower reprisal. [5 U.S.C. § 1221(e)(1).]

> If so, whether the government can meet its burden of showing that it would have taken the same November 2015 personnel action ("failure to hire") regardless of Ms. Potter's protected disclosure. [5 U.S.C. § 1221(e)(2).]

RAF, Tab 5 at 1-2. After conferring with the parties, I ordered a June 24, 2020 close of record for any further submissions. RAF, Tab 15 at 2. Although neither party made any substantive submission in response to my order,[1] they had already

---

[1] On the close of record date, June 24, 2020, the agency did not submit any new evidence but requested an extension to do so. RAF, Tab 16. I denied that request. RAF, Tab 18.

submitted exhibits from their Federal Circuit litigation in this case, which I have considered in rendering the instant initial decision.

B. Burdens of Proof and Applicable Law

The Whistleblower Protection Act (WPA) prohibits an agency from taking a personnel action because of any whistleblowing "disclosure" or activity. 5 U.S.C. § 2302(b)(8)-(9). The appellant has the burden to establish, by preponderant evidence, two elements: (1) she made a protected disclosure, and (2) her disclosure was a contributing factor to the agency's decision to take a statutorily covered personnel action against her. *Id.*; 5 U.S.C. § 1221(e)(1); 5 C.F.R. § 1209.2(e)(1). One way the appellant may demonstrate her disclosure was a contributing factor is by evidence that (A) the official taking the personnel action knew of the disclosure, and (B) the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action. 5 U.S.C. § 1221(e)(1)(A)-(B).

If the appellant meets her burden as described above, then she has established a prima facie case of whistleblower reprisal, and the burden passes to the agency, such that the Board will order corrective action, unless the agency demonstrates by clear and convincing evidence that it would have taken the same personnel action in the absence of the disclosure. 5 U.S.C. § 1221(e)(2); 5 C.F.R. § 1209.2(e)(2).

C. The appellant MET her burden to establish a prima facie case that her July 10, 2014 disclosure was a contributing factor to her November 2015 nonselection.

As explained below, I find a preponderance of the evidence establishes that the appellant's July 10, 2014 disclosure was protected and was a contributing factor to her November 2015 nonselection; in other words, I find she has established a prima facie case of whistleblower reprisal. The agency essentially concedes the same. RAF, Tab 9 at 53 ("If the AJ had applied the board's

precedent with regard to timing, Ms. Potter would likely have satisfied the knowledge/timing test and states a prima facie case of whistleblower reprisal").

Pertinent to the appellant's prima facie case are five issues: (i) was the disclosure protected; (ii) was the nonselection a covered "personnel action;" (iii) did Deering know of the appellant's disclosure; (iv) did Deering know the appellant had applied for the vacancy; and (v) did Deering make the nonselection decision (by canceling the vacancy) in November 2015 in a period of time such that a reasonable person could conclude that the appellant's July 10, 2014 disclosure was a contributing factor to his decision? 5 U.S.C. § 1221(e)(1)(A)-(B).

Regarding issue (i) – was the disclosure protected – I find, as my previous initial decision found, that the appellant's July 10, 2014 email was a disclosure protected by 5 U.S.C. § 2302(b)(8). ID at 8. It bears repeating that the appellant's July 10, 2014 email was addressed to Fee Manager Ed Lowe, with a carbon copy to the appellant's supervisor, Dr. Robbi Venditti, D.O., and her email stated:

> Attached is part of the OIG spreadsheet for the patients awaiting psychotherapy. Of the 128 patients reviewed, 96 were never sent to Triwest by the authorization staff although the consult instructed to send to Triwest. 9 cases were sent to Triwest but never received by Triwest or loaded by the Triwest staff into their system. So only 23 of the 128 Psychotherapy patients were processed (oldest consult date 5/7/14). Many of these are suicidal and otherwise high risk cases per OIG notes. Please get the 96 cases sent to Triwest and the 9 other cases re-sent as soon as possible.

RAF, Tab 10 at 248-49. The Federal Circuit did not disturb my finding that the appellant's July 10, 2014 email was protected, and I see no reason to revisit the issue. *Potter*, 949 F.3d at 1379-80; ID at 8-9. Thus, I find, once again, that the appellant's July 10, 2014 email was a protected disclosure.

Regarding issue (ii) – was the November 2015 nonselection a covered "personnel action" – my previous initial decision assumed, without finding, that it was a personnel action under the WPA. ID at 15; 5 U.S.C. § 2302(A)(2)(A)(i)

("an appointment")-(ii) ("a promotion"). Complicating the issue of whether the nonselection was a personnel action is the fact that the agency cancelled the vacancy altogether, such that its action, facially, was not personal to the appellant. However, the Federal Circuit has found a cognizable personnel action "when the agency declines to hire an applicant pursuant to a vacancy announcement, but instead of hiring a different person cancels the vacancy announcement and hires no one for the position at that time." *Ruggieri v. Merit Systems Protection Board*, 454 F.3d 1323, 1325 (Fed. Cir. 2006). For such an action to be cognizable, the agency "must take some identifiable step that constitutes a decision not to hire the complainant," such as deciding "to terminate the hiring process that it had put into effect, by canceling the vacancy announcement," and sending the applicant "a letter advising him that he was not selected for the advertised position." *Id.* at 1326. There is no dispute that in the instant case, the appellant applied for the vacancy, and on November 5, 2015, she received an email stating, "The hiring office has decided not to fill the position at this time." RAF, Tab 10 at 263-64. Based on these circumstances, I find that the November 2015 vacancy cancellation was a covered personnel action. 5 U.S.C. § 2302(A)(2)(A)(i)-(ii).

Regarding issue (iii) – did Deering (who cancelled the vacancy) know of the appellant's July 10, 2014 email disclosure – I find he did. As my initial decision noted – before forgetting – Deering was in fact aware of the appellant's email disclosure. ID at 8, 15-16. That is because later the same day of July 10, 2014, the appellant forwarded her email disclosure to Deering, among others. RAF, Tab 10 at 247-49. Notably, at the end of the appellant's July 10, 2014 email forward, the appellant stated to Venditti: "With respect I bring this to your attention first without fear of reprisal or negative consequences, but faith the right decision will be made in a supportive and proactive way." *Id.* at 248. Notably, later the same day of July 10, 2014, Deering responded by email privately to the appellant, stating:

Tiffany,

Thanks for bringing this to my attention.

This sounds like you need more frontline help with workload and we have approved additional FTEE (I sent you that email).

It may take some time to recruit them, so let me speak to nursing to see who we can detail over quickly on a temporary basis.

I'll also explore the possibility of using TNC staff to support us until our permanent positions are hired.

Let's sit down and look at your proposals regarding restructuring of leadership roles again.

I don't think – by HR regulations – we can just grant someone an ACNS role. If we are able to get it approved, I believe it would have to be competed. But, let me double check on that.

I'm not sure why you feel there might be reprisal, so please stop by so we can discuss this so I can determine if there are other issues I need to intervene on.

I appreciate everything you are doing for our veterans.

Darren

*Id.* at 247. The parties agreed that Deering learned of the appellant's July 10, 2014 email disclosure, and the Federal Circuit did not disturb my initial statement that Deering was forwarded the same email on the same date (save my later discrepant finding), and so I see no reason to revisit that particular finding. ID at 8,15. Thus, I find Deering knew of the appellant's July 10, 2014 disclosure.

Regarding issue (iv) – did Deering know the appellant had applied for the vacancy, I consider this question material because if Deering did not know or believe the appellant had applied, then Deering could not be said to have canceled the vacancy with the goal of keeping the appellant from getting the job. Upon my re-review of the W-1 hearing transcript, I see that Deering testified that his "assumption" was that the appellant had applied for the vacancy. IAF, Tab 56 at 224-25. Based on that, I find Deering believed the appellant had applied for the vacancy, and so I find this issue answered in favor of the appellant's prima facie case.

Regarding issue (v) – did Deering make his nonselection in a period of time such that a reasonable person could conclude that the disclosure was a contributing factor – the time gap is approximately sixteen months between the appellant's July 10, 2014 email disclosure and Deering's November 1, 2015 direction for the agency to cancel the vacancy. I find a reasonable person could conclude that these two events were connected. Therefore, I find the appellant satisfied the knowledge/timing test and – reaching the ultimate issue of this part of the appeal – I find the appellant satisfied her burden to establish her prima facie case that Deering's November 2015 nonselection was whistleblower reprisal for her July 10, 2014 disclosure. 5 U.S.C. § 1221(e)(1)(A)-(B).

D. The agency MET its burden to demonstrate that it would have taken the same action absent the appellant's disclosure.

Because the appellant established a prima facie case of whistleblower reprisal, linking her July 10, 2014 disclosure to her November 2015 nonselection, the burden shifts to the agency to establish by clear and convincing evidence that it would have taken the same action in the absence of those disclosures. 5 U.S.C. § 1221(e)(2); 5 C.F.R. § 1209.2(e)(2). Clear and convincing evidence – that measure or degree of proof that produces in the mind of the trier of fact a firm belief as to the allegations sought to be established – is a higher standard than the "preponderance of the evidence" standard. 5 C.F.R. § 1209.4(e); 5 C.F.R. § 1201.4(q). Evidence only clearly and convincingly supports a conclusion when it does so in the aggregate considering all the pertinent evidence in the record, and despite the evidence that fairly detracts from that conclusion. *Whitmore v. Department of Labor*, 680 F.3d 1353, 1368 (2012). In determining whether an agency has shown by clear and convincing evidence that it would have taken the same personnel action in the absence of whistleblowing, the Board will consider the following factors: (1) the strength of the agency's evidence in support of its action; (2) the existence and strength of any motive to retaliate on the part of the

agency officials who were involved in the decision; and (3) any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated. *Carr v. Social Security Administration*, 185 F.3d 1318, 1323 (Fed. Cir. 1999) ("*Carr* factors").

1. <u>Findings of Fact</u>

The below facts overlap somewhat with the above, but they are pertinent to the discrete issues now before the Board in applying the *Carr* factors to Deering's November 2015 cancellation of the vacancy.

On July 10, 2014, the appellant made her email disclosure about a majority of a group of "suicidal and otherwise high risk" patients not being referred, as instructed, for psychotherapy. RAF, Tab 10 at 248-49 (July 10, 2014 disclosure). On the same day, the appellant forwarded that disclosure to Deering. *Id.* at 247. On the same day, Deering sent two private responses to the appellant: (1) thanking her (as quoted above), and (2) stating: "p.s. can you please bring the OIG notes and p[atien]t names you [are] referencing below when we meet so I can review and make sure we have a plan for them?" *Id.* at 247, 250.

Five months later, on December 8, 2014, the Phoenix VA's leadership recognized the appellant on its new organization chart as "Chief Nurse Manager," under Purchased Care, and the appellant considered the "Chief Nurse Manager" title to be beneficial to her. ID at 3; IAF, Tab 44 at 50 (December 2014 chart). Among the leadership officials who signed the new organization chart were: Venditti, on October 7, 2014; Deering, on November 24, 2014; and Grippen, on December 8, 2014. *Id.*

Three months later, on March 19, 2015, the agency took back the "Chief Nurse Manager" title in a revised organization chart, and recognized the appellant as "Nurse Manager" over Utilization Review.  ID at 12; IAF, Tab 44 at 51 (March 2015 chart). Once again, the reorganization chart was signed by Venditti, Deering, Grippen, as well as other individuals. *Id.* (March 19, 2015). The

appellant alleged this was whistleblower reprisal, and I found a prima facie case of that, but I also found that the agency met its burden to demonstrate by clear and convincing evidence that it would have taken the same action regardless of the appellant's whistleblowing. ID at 12-14, 28. The Federal Circuit affirmed that finding. *Potter*, 949 F.3d at 1381.

Five months later, on or about August 10, 2015, the agency posted a vacancy for "Registered Nurse, Chief Nurse Administrative Medicine Service." ID at 3; RAF, Tab 10 at 263-64. The appellant and three others applied for the vacancy, and the agency's recruitment for the vacancy closed on August 24, 2015. ID at 3; IAF, Tab 53 at 298; RAF, Tab 10 at 243. According to Deering: "I don't remember a specific conversation [with Potter about her applying] but I'm sure – my assumption was then that she applied." IAF, Tab 56 at 225 (Deering).[2] Also according to Deering: "I can't imagine somebody that would've been more qualified for it off the top of my head, but I don't think I ever promised that position to anyone." *Id.* at 168; *see also Id.* at 195 ("hard to find anyone more qualified"), 221 ("couldn't think of anybody more qualified"), 242 ("don't know of anyone else … more qualified").

Two months later, on November 1, 2015, Deering emailed Juanita Landry, Alyshia Smith, and others, stating of the vacancy:

> Juanita,
>
> I'm not sure who in HR to ask, but I need to close this cert with a non-selection.
>
> We need to have more discussion about the best way to structure this service (i.e. what sections should be in this service, where the nurse 4 should report, etc, etc) before we move toward a selection.

---

[2] Consistent with that recollection by Deering, Deering also testified: "I don't recall getting a cert list for this position. I remember that we got … what I seem to recall is that this got pulled back before we ever got to the point of even looking at who had applied or who had gone that pathway." IAF, Tab 56 at 180 (Deering); RAF, Tab 11 at 13 ("I don't believe I have access to selection manager").

ID at 15; RAF, Tab 11 at 14-15. The appellant did not allege that Venditti had any role in the vacancy cancellation, "because she was gone at the time." IAF, Tab 53 at 276. On November 5, 2015, the appellant received an automated email from OPM stating, "The hiring office has decided not to fill the position at this time." RAF, Tab 10 at 264.

The next year and a half saw changes to the status of three things: Deering's employment, the appellant's employment, and the agency's interest in advertising for the vacancy. First, in June 2016, the agency removed Deering, in an action evidently related to the "crisis" that had emerged at the Phoenix VA. IAF, Tab 53 at 155, 213, 336; ID at 19. Second, on February 8, 2017, the appellant received a tentative job offer in California, and on March 9, 2017, she received a confirmed job offer. ID at 26; IAF, Tab 45 at 80, 83. Third, on March 9, 2017, the agency directed an administrative officer to "enter an ARPA for Chief Nurse IV," which was a step in recruiting for the position. RAF, Tab 10 at 273 ("Master Smith gave the order" … "Belen [Ochoa] just e-mailed it to me five minutes ago and said Dr. Smith wants this today"). The appellant, responding to her learning of the agency's March 9, 2017 action, wrote, "Wouldn't that just be too convenient? I give my 2 week notice, and THEN they recruit for the Chief Nurse IV?" *Id.* Although the appellant alleges whistleblower reprisal in the timing of that last event, as explained below, I am convinced otherwise, and I find the agency met its burden to demonstrate by clear and convincing evidence that Deering would have cancelled the vacancy in November 2015 even if the appellant had never made her July 10, 2014 disclosure.

On March 17, 2017, the appellant filed her Office of Special Counsel complaint alleging whistleblower reprisal. IAF, Tab 1 at 18, 21.  In February 2018, the appellant filed the instant IRA appeal. IAF, Tabs 1 and 2.

2. *Carr* factor 1, agency reasons, weighs strongly in the agency's favor.

Returning to the *Carr* factors, the first factor is the strength of the agency's reasons for its action. *Carr*, 185 F.3d at 1323. This first of the three *Carr* factors does not apply straightforwardly when the personnel action is not disciplinary and, therefore, does not require supporting evidence of misconduct. *Azbill v. Department of Homeland Security*, 105 M.S.P.R. 363, ¶ 18 (2007); *Gonzales v. Department of the Navy*, 101 M.S.P.R. 248, ¶ 12 (2006). Deering's November 2015 vacancy cancellation was neither disciplinary nor personal to the appellant, and thus, is such an action. In such circumstances, when addressing the strength of the agency's evidence in support of its action, the Board considers the broader question of whether the agency had legitimate reasons for its action. *Id*.

In our 2018 hearing, Deering testified without dispute that he had tried, earnestly but unsuccessfully, to obtain agreement from multiple stakeholders, including the Office of Nursing Services, on the question of to whom the Chief Nurse would report, and Deering testified that lack of agreement on the answer to that question led him to indefinitely delay hiring anybody for the vacant position:

> A: I don't recall what precipitated this. I just know that we had had lots of discussion around – as a leadership team about how this should be structured, how it should be ran as a service, whether we get approval for a Nurse 4 or not, was in (indiscernible) whoever approved that. So I don't remember specifically what caused us to pull it back, but I know that there – we decided before we moved forward, that we needed to have some discussion about the reporting. As I recall at the time I think that, and I could be wrong on the date, but I seem to recall that – I don't (indiscernible) stuff here at that time. But I think there was discussion about whether or not there should be a dyad structure or not. I think that was a lot of discussion about how that works, who reports to whom, and we wanted to get that clarified before we went forward with the selection, as I recall.
>
> Q: Do you recall… there being [a] push – that Administrative Medicine said this was one of the first, if you recall, it was one of the first departments at the Phoenix VA to try and use the dyad structure?

A: Well, gosh, as I recall, I mean, I think this was one of the first ones we tried to reorganize to get, you know, the – their structure in place.

Q: Was it your understanding that Mr. Grippen had hoped to use the dyad structure, not only in Administrative Service – Administrative Medicine service, but [in] other areas of the ~~8~~ organization?

A: Yeah, he was – he was a fan of the dyad structure, and I think that's what he wanted to see incorporated. But I – I remember we kept getting feedback from other leaders who were rotating through, there were just so many people coming from the leadership team. And we kept getting feedback that that's not an ideal structure, that there are lots of concerns with that and – and I just remember lots and lots of – what that structure looks like, not who's in it but what does that look like for each service and, you know, if you have that then does the – the Nurse Exec, you know, the Chief Nurse report to the Nurse Exec, or to a physician. I mean there was just tons and tons of discussion around that, which kept being a burr, if you would, and us getting some of this, you know, finalized.

\* \* \*

Q: Do you recall if the dyad structure that Mr. Grippen had proposed – if the nurse and the physician chief were supposed to be co-equals?

A: [A]s I recall, that's what Mr. Grippen had embraced, was this idea where they were – they were co-leaders of the section. There was a lot of consternation from Nursing Service that they didn't want their – their nursing supervisors reporting, you know, to the Chief of Staff. They thought that they should report to the Nursing Service. And the part of this discussion was then we'd end up with an executive leader who didn't have oversight of the service. So we'd end up with a Nurse Exec and the Chief of Staff trying to manage every service, which would be very unwieldy. So there was a lot of discussion on that throughout this whole course of restructuring the services and how do we structure to their lateral function and Nursing Service would maintain their scope of responsibility in the hospital.

IAF, Tab 56 at 182-85 (Deering testimony).

In weighing Deering's testimony about the above matters, I have considered the fact that his recollection was admittedly less than certain as to the precise series of events leading up to his November 2015 decision to cancel the

vacancy. But that was hardly surprising: the appellant did not challenge Deering's November 2015 vacancy cancellation until (i) sixteen months after Deering's decision and (ii) ten months after Deering's removal, and Deering's decision was never overtly personal to the appellant or any individual. That passage of time, along with Deering's departure from the agency, gives me no reason to assume that Deering would have a firm handle of the nuances of his decision to cancel a vacancy in November 2015. I simply find no basis to conclude that Deering's November 2015 decision stood out in his memory in the same manner as it did for the appellant.

In weighing Deering's testimony, I found Deering's overall picture of events to be consistent, both internally and when compared with the testimony of Venditti and Grippen. IAF, Tab 56 at 45 (Venditti, "12/8/14 [organization chart] … was trying to get Tiffany recognition … because we had been blocked at every avenue on getting a chief nurse position"); 75-76 (Venditti, "I was making efforts to get approval to start the process to get a chief nurse position … So we obviously didn't have one [a process] … Darren had went to other nurse executives and was told the same thing, that there was not enough complexity in the department. For a nurse 4"); 124 (Grippen, "the organizational chart in Milwaukee … I was looking at trying to implement something similar"); 144 (Grippen, "the Milwaukee model was controversial … nurses report to physicians, and we were making them full equals").

In considering Deering's credibility overall, I found him to be a quite credible witness, consistent in his testimony, and sincere, even in the face of difficult questioning by the appellant. ID at 31. Credibility determinations properly made in one matter may be weighed in determining a speaker's credibility in another matter. *Hawkins v. Smithsonian Institution*, 73 M.S.P.R. 397, 403-04 (1997). I found Deering credible in his non-retaliatory explanation of why he participated in changing the appellant's duties in March 2015, in part because the appellant's theory that her March 2015 duties change was motivated

by reprisal was inconsistent with Deering's November 2014 approval of the organization chart that had a position title the appellant actually preferred. ID at 14, 29. I also find *no* basis to doubt the sincerity of Deering's reasoning based on the agency's actions in March 2017 to re-post the vacancy, since Deering had been gone from the agency for nine months by that time and has not been shown to have any role in the agency's March 2017 actions. In sum, I found Deering's recollection of why he cancelled the vacancy in November 2015 was quite credible, and I conclude that *Carr* factor 1 – the agency's reasons – weighs heavily in the agency's favor.

3. *Carr* factor 2, retaliatory motive, weighs only modestly in the appellant's favor.

In evaluating whether the agency met its burden of defense, the second of the three *Carr* factors, existence of agency motive to retaliate, comes down to Deering's motive to retaliate against the appellant for her July 10, 2014 disclosure.

Conceptually, I accept that Deering had an ostensible motive to retaliate against the appellant for her disclosure, because the problems she raised tended to reflect unfavorably upon Deering's management and put Deering in the place of having to choose between working to try to address her concerns, or doing nothing and fearing further consequences. But at the same time, I cannot ignore the evidence contrary to an inference that Deering bore animus against the appellant for her July 10 2014 disclosure. Specifically, on July 10, 2014, Deering immediately expressed appreciation to the appellant for her disclosure and pledged to take corrective action. RAF, Tab 10 at 247, 250. Moreover, four months later, on November 24, 2014, Deering signed to approve an organization chart that the appellant preferred. ID at 14; IAF, Tab 44 at 50. Those are not the actions one would expect of a man determined to retaliate against the appellant for her July 10, 2014 disclosure. Nonetheless, taking a straitjacketed approach to

the question of motive, I accept that Deering had a motive – albeit slight – to retaliate.

Based on the foregoing, I conclude that *Carr* factor 2 – motive to retaliate – weighs modestly in the appellant's favor.

4. *Carr* Factor 3, Similarly Situated Individuals

Lastly, the third of the three *Carr* factors, whether there is evidence that similarly situated individuals who did not blow the whistle were treated similarly – neither party has submitted evidence for this factor. To be sure, I considered the fact that the record contains evidence that three other individuals also applied for the vacancy and thus were also affected by Deering's November 2015 vacancy cancellation. ID at 3; IAF, Tab 53 at 298; RAF, Tab 10 at 243. However, neither party adduced any evidence as to those other applicants' qualifications or status as whistleblowers or non-whistleblowers.

In *Whitmore*, the Federal Circuit stated that "Carr does not impose an affirmative burden" on the Government to produce evidence regarding each factor, and stated that the factors are "appropriate and pertinent considerations" to be used in determining if the agency carries its burden of establishing by clear and convincing evidence that it would have taken the same action had the protected disclosures not occurred. *Whitmore*, 680 F.3d at 1374. Here, I find that the last *Carr* factor is neutral.

In considering all three factors together, I find that *Carr* factor 1 weighs heavily in the agency's favor, *Carr* factor 2 weighs only modestly in the appellant's favor, and *Carr* factor 3 is neutral. Therefore, I conclude that the evidence as a whole leans strongly in the agency's direction, and that the agency thus met its burden to prove by clear and convincing evidence that it would have cancelled the November 2015 vacancy even if the appellant had never made her July 10, 2014 disclosure. 5 U.S.C. § 1221(e)(2). Thus, I must deny corrective action for the nonselection.

E. Conclusion

Having reviewed the claims of the appellant, but finding no prima facie cases of whistleblower reprisal for which the agency did not meet its burden of defense, I must deny the appellant's request for corrective action. 5 U.S.C. § 1221(e)(1)-(2).

## DECISION

The appellant's request for corrective action is DENIED.

FOR THE BOARD:                          /S/
                                    David S. Brooks
                                    Administrative Judge

## NOTICE TO APPELLANT

This initial decision will become final on **October 21, 2020**, unless a petition for review is filed by that date. This is an important date because it is usually the last day on which you can file a petition for review with the Board. However, if you prove that you received this initial decision more than 5 days after the date of issuance, you may file a petition for review within 30 days after the date you actually receive the initial decision. If you are represented, the 30-day period begins to run upon either your receipt of the initial decision or its receipt by your representative, whichever comes first. You must establish the date on which you or your representative received it. The date on which the initial decision becomes final also controls when you can file a petition for review with one of the authorities discussed in the "Notice of Appeal Rights" section, below. The paragraphs that follow tell you how and when to file with the Board or one of those authorities. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

## BOARD REVIEW

You may request Board review of this initial decision by filing a petition for review.

If the other party has already filed a timely petition for review, you may file a cross petition for review.  Your petition or cross petition for review must state your objections to the initial decision, supported by references to applicable laws, regulations, and the record.  You must file it with:

The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW.
Washington, DC 20419

A petition or cross petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing.  A petition submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and may only be accomplished at the Board's e-Appeal website (https://e-appeal.mspb.gov).

## NOTICE OF LACK OF QUORUM

The Merit Systems Protection Board ordinarily is composed of three members, 5 U.S.C. § 1201, but currently there are no members in place.  Because a majority vote of the Board is required to decide a case, *see* 5 C.F.R. § 1200.3(a), (e), the Board is unable to issue decisions on petitions for review filed with it at this time.  *See* 5 U.S.C. § 1203.  Thus, while parties may continue to file petitions for review during this period, no decisions will be issued until at least two members are appointed by the President and confirmed by the Senate.  The lack of a quorum does not serve to extend the time limit for filing a petition or cross petition. Any party who files such a petition must comply with the time limits specified herein.

For alternative review options, please consult the section below titled "Notice of Appeal Rights," which sets forth other review options.

### **Criteria for Granting a Petition or Cross Petition for Review**

Pursuant to 5 C.F.R. § 1201.115, the Board normally will consider only issues raised in a timely filed petition or cross petition for review. Situations in which the Board may grant a petition or cross petition for review include, but are not limited to, a showing that:

(a) The initial decision contains erroneous findings of material fact. (1) Any alleged factual error must be material, meaning of sufficient weight to warrant an outcome different from that of the initial decision. (2) A petitioner who alleges that the judge made erroneous findings of material fact must explain why the challenged factual determination is incorrect and identify specific evidence in the record that demonstrates the error. In reviewing a claim of an erroneous finding of fact, the Board will give deference to an administrative judge's credibility determinations when they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing.

(b) The initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case. The petitioner must explain how the error affected the outcome of the case.

(c) The judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case.

(d) New and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. To constitute new evidence, the information contained in the documents, not just the documents themselves, must have been unavailable despite due diligence when the record closed.

As stated in 5 C.F.R. § 1201.114(h), a petition for review, a cross petition for review, or a response to a petition for review, whether computer generated, typed, or handwritten, is limited to 30 pages or 7500 words, whichever is less. A

reply to a response to a petition for review is limited to 15 pages or 3750 words, whichever is less. Computer generated and typed pleadings must use no less than 12 point typeface and 1-inch margins and must be double spaced and only use one side of a page. The length limitation is exclusive of any table of contents, table of authorities, attachments, and certificate of service. A request for leave to file a pleading that exceeds the limitations prescribed in this paragraph must be received by the Clerk of the Board at least 3 days before the filing deadline. Such requests must give the reasons for a waiver as well as the desired length of the pleading and are granted only in exceptional circumstances. The page and word limits set forth above are maximum limits. Parties are not expected or required to submit pleadings of the maximum length. Typically, a well-written petition for review is between 5 and 10 pages long.

If you file a petition or cross petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record. A petition for review must be filed with the Clerk of the Board no later than the date this initial decision becomes final, or if this initial decision is received by you or your representative more than 5 days after the date of issuance, 30 days after the date you or your representative actually received the initial decision, whichever was first. If you claim that you and your representative both received this decision more than 5 days after its issuance, you have the burden to prove to the Board the earlier date of receipt. You must also show that any delay in receiving the initial decision was not due to the deliberate evasion of receipt. You may meet your burden by filing evidence and argument, sworn or under penalty of perjury (*see* 5 C.F.R. Part 1201, Appendix 4) to support your claim. The date of filing by mail is determined by the postmark date. The date of filing by fax or by electronic filing is the date of submission. The date of filing by personal delivery is the date on which the Board receives the document. The date of filing by commercial delivery is the date the document was delivered to the commercial delivery

service.  Your petition may be rejected and returned to you if you fail to provide a statement of how you served your petition on the other party.  *See* 5 C.F.R. § 1201.4(j).  If the petition is filed electronically, the online process itself will serve the petition on other e-filers.  *See* 5 C.F.R. § 1201.14(j)(1).

A cross petition for review must be filed within 25 days after the date of service of the petition for review.

## NOTICE TO AGENCY/INTERVENOR

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.

## NOTICE OF APPEAL RIGHTS

You may obtain review of this initial decision only after it becomes final, as explained in the "Notice to Appellant" section above.  5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file.  5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction.  If you wish to seek review of this decision when it becomes final, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements.  Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case.  If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

**(1) Judicial review in general**.  As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be <u>received</u> by the court within **60 calendar days** of <u>the date this decision becomes final</u>.  5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

> U.S. Court of Appeals
> for the Federal Circuit
> 717 Madison Place, N.W.
> Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

**(2) Judicial or EEOC review of cases involving a claim of discrimination**.  This option applies to you <u>only</u> if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination.  If so, you may obtain judicial review of this decision—<u>including a disposition of your discrimination claims</u>—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** <u>after this</u>

decision becomes final under the rules set out in the Notice to Appellant section, above.   5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. ____ , 137 S. Ct. 1975 (2017). If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security. *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of your discrimination claims only, excluding all other issues.   5 U.S.C. § 7702(b)(1).   You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** after this decision becomes final as explained above.   5 U.S.C. § 7702(b)(1).

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C.  20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C.  20507

**(3) Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012**.   This option applies to you only if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or

other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D). If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8) or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.  The court of appeals must <u>receive</u> your petition for review within **60 days** of <u>the date this decision becomes final</u> under the rules set out in the Notice to Appellant section, above.  5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx