2021-1460

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

TIFFANY POTTER,

Petitioner,

v.

DEPARTMENT OF VETERANS AFFAIRS,

Respondent.

Appeal from the Merit Systems Protection Board
Case No. DE-1221-18-0165-M-1

**BRIEF FOR RESPONDENT**

BRIAN M. BOYNTON
Acting Assistant Attorney General

MARTIN F. HOCKEY, JR.
Acting Director

ALLISON KIDD-MILLER
Assistant Director

BRYAN M. BYRD
Trial Attorney
Commercial Litigation Branch, Civil Division
U.S. Department of Justice
P.O Box 480, Ben Franklin Station
Washington, DC 20044
Tel: (202) 305-7607
Email: Bryan.M.Byrd@usdoj.gov

May 6, 2021                    Attorneys for Respondent

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................... iii

STATEMENT OF RELATED CASES .....................................................v

INTRODUCTION ................................................................................1

STATEMENT OF THE ISSUE..............................................................2

STATEMENT OF THE CASE................................................................2

    I.    Nature Of The Case ................................................................2

    II.    Statement Of Facts And Course Of Proceedings .......................3

        A.    Background .......................................................3

        B.    Ms. Potter's July 10, 2014 Disclosure ...........................4

        C.    Ms. Potter's March 2015 Change In Duties And Phoenix VA Reorganizations.................................................................5

        D.    The November 2015 Cancellation Of The Chief Nurse IV Vacancy .......................................................8

        E.    Ms. Potter's Acceptance Of A Transfer To California .................11

        F.    The 2018 Board Decision...............................12

        G.    The Federal Circuit Appeal And Remand Order ...........................13

        H.    The 2020 Board Decision On Remand .........................13

SUMMARY OF THE ARGUMENT .......................................................20

ARGUMENT .......................................................22

    I.    Standard Of Review And Applicable Law................................22

i

A.     Standard Of Review ......................................................... 22

B.     The Whistleblower Protection Act ................................. 23

II.    Substantial Evidence Supports The Board's Finding That Dr.
       Deering Would Have Cancelled The Chief Nurse IV Vacancy
       Regardless of Ms. Potter's July 10, 2014 Protected Disclosure ............. 25

A.     *Carr* Factor One Weighs "Heavily In The Agency's Favor" ........ 25

B.     *Carr* Factor Two Weighs "Modestly" In Ms. Potter's Favor ........ 38

C.     The Board Did Not Err In Finding *Carr* Factor Three Is Neutral . 48

CONCLUSION ..................................................... 51

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Azbill v. Dep't of Homeland Sec.,*
   105 M.S.P.R. 363 (2007) ..................................................................27

*Bieber v. Dep't of the Army,*
   287 F.3d 1358 (Fed. Cir. 2002) ................................................ 22, 28

*Bolton v. MSPB,*
   154 F.3d 1313 (Fed. Cir. 1998) .........................................................22

*Briley v. Nat'l Archives & Records Admin.,*
   236 F.3d 1373 (Fed. Cir. 2001) ................................................ 23, 33

*Carr v. Social Security Administration,*
   185 F.3d 1318 (Fed. Cir. 1999) ......................................... *passim*

*Consol. Edison Co. v. NLRB,*
   305 U.S. 197 (1938) ..........................................................................23

*Gonzales v. Dep't of the Navy,*
   101 M.S.P.R. 248 (2006) ..................................................................27

*Jones v. Dep't of Health & Human Servs.,*
   834 F.3d 1361 (Fed. Cir. 2016) ................................................ 22, 28

*Kahn v. Dep't of Justice,*
   618 F.3d 1306 (Fed. Cir. 2010) .........................................................22

*Lyons v. Dep't of Veterans Affairs,*
   273 F. App'x 929 (Fed. Cir. 2008) ...................................................38

*Miller v. Dep't of Justice,*
   842 F.3d 1252 (Fed. Cir. 2016) ......................................... *passim*

*Parker v. United States Postal Serv.,*
   819 F.2d 1113 (Fed. Cir. 1987) .........................................................22

*Potter v. Dep't of Veterans Affairs*,
  949 F.3d 1376 (Fed. Cir. 2020) .................................................... *passim*

*Rogers v. Dep't of Def. Dep. Sch.*,
  814 F.2d 1549 (Fed. Cir. 1987) ..............................................................23

*Sacco v. Dep't of Justice*,
  317 F.3d 1384 (Fed. Cir. 2003) ..............................................................23

*Salmon v. Soc. Sec. Admin.*,
  663 F.3d 1378 (Fed. Cir. 2011) ..............................................................22

*Simpson v. Office of Pers. Mgmt.*,
  347 F.3d 1361 (Fed. Cir. 2003) ..............................................................23

*Whitmore v. Dep't. of Labor*,
  680 F.3d 1353 (Fed. Cir. 2012) ........................................... 24, 49, 50

**Statutes**

5 U.S.C. § 1221(e)(1) .................................................................................23

5 U.S.C. § 1221(e)(2) .................................................................................24

5 U.S.C. § 7703(c) .....................................................................................22

5 U.S.C. §§ 7501-7543 ..............................................................................28

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Rule 47.5, respondent's counsel states that he is aware of the following appeal in or from this action that previously was before this Court or any other appellate court under the same or similar title:

*Tiffany Potter v. Department of Veterans Affairs*,
Case No. 2019-1541 (Fed. Cir.), decided Feb. 13, 2020,
before Circuit Judges Prost, Moore, and Hughes.
Opinion reported at 949 F.3d 1376 (Fed. Cir. 2020).

Respondent's counsel also states that he is unaware of any case pending in this or any other court that may directly affect or be affected by this Court's decision in this appeal.

2021-1460

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

TIFFANY POTTER,

Petitioner,

v.

DEPARTMENT OF VETERANS AFFAIRS,

Respondent.

---

## BRIEF FOR RESPONDENT

---

## <u>INTRODUCTION</u>

In this individual right of action (IRA) appeal that is before this Court for a second time, petitioner, Tiffany Potter, continues to allege that the November 2015 decision of Dr. Darren Deering to cancel a vacancy was reprisal for a July 2014 protected disclosure.  After the Merit Systems Protection Board (MSPB or board) found that Ms. Potter failed to establish a *prima facie* whistleblower claim, this Court vacated that finding and remanded.  Ms. Potter now challenges the board's remand decision, which acknowledged the board's previous error and found that Ms. Potter had established a *prima facie* case, but denied corrective action because the Department of Veterans Affairs (VA or agency) established by clear and

convincing evidence that Dr. Deering would have cancelled the vacancy even absent Ms. Potter's disclosure.

## STATEMENT OF THE ISSUE

Whether substantial evidence supports the board's determination that the VA established by clear and convincing evidence that Dr. Deering would have cancelled a Chief Nurse IV vacancy in November 2015 regardless of Ms. Potter's July 10, 2014 protected disclosure.

## STATEMENT OF THE CASE

### I.    Nature Of The Case

Following an initial decision by the board in December 2018 that denied Ms. Potter's request for corrective action for several alleged whistleblower reprisals, Appx#0906-940,[1] Ms. Potter petitioned for review of that decision in this Court.  In February 2020, this Court issued an order remanding the matter to the board for consideration of whether (1) given Dr. Deering's knowledge of Ms. Potter's July 10, 2014 protected disclosure, Ms. Potter stated a *prima facie* case of whistleblower reprisal for Dr. Deering's November 2015 decision to cancel a Chief Nurse IV vacancy; and (2) if so, whether the agency could establish that Dr. Deering would have cancelled the vacancy regardless of that disclosure.  *Potter*

---

[1] "Appx__" refers to pages of the joint appendix.

*v. Dep't of Veterans Affairs*, 949 F.3d 1376 (Fed. Cir. 2020).  Ms. Potter now

petitions for review of the administrative judge's September 16, 2020 initial

decision on remand, which became the final decision of the board on October 21,

2020, denying corrective action for the November 2015 decision to cancel the

vacancy.  Appx#0001-16.

## II.   <u>Statement Of Facts And Course Of Proceedings</u>

### A.   <u>Background</u>

At the time of the events at issue in this appeal, Ms. Potter was a Nurse III

with the official title of "Nurse Manager" in the area of "Purchased Care" – the

referral of veteran patients to third-party community providers to obtain care – in

the Administrative Medicine Service department of the Phoenix Veterans Affairs

Health Care System (Phoenix VA).  *Potter*, 949 F.3d at 1377-378; Appx#0902-

903; Appx#0407 (Tr. 27:16 (Venditti)) (describing Purchased Care).  Also at that

time, the Phoenix VA's difficulty keeping up with the workload of veterans' care

resulted in a patient access crisis that was expansively investigated by the VA's

Office of Inspector General (OIG), and caused "an enormous amount of turnover

in executive leadership."  *Potter*, 949 F.3d at 1377-378; Appx#0497 (Tr. 117:13-21

(Grippen)); Appx#0532-533 (Tr. 152:20-153:5) (Deering)).  In all, "the OIG

investigations seemingly involved more Phoenix VA employees than they did *not*

involve."  Appx#0902.

3

## B.   <u>Ms. Potter's July 10, 2014 Disclosure</u>

On July 10, 2014, Ms. Potter copied her supervisor, Dr. Robbi Venditti, on an email to Fee Manager Edmund Lowe, attaching a portion of a spreadsheet from OIG listing patients seeking psychotherapy treatment who were not seen by a private sector physician despite a consult being prepared. *Potter*, 949 F.3d at 1377; Appx#0009; Appx#0751-752. Ms. Potter subsequently sent this message to Dr. Venditti (again), this time copying Chief of Staff Dr. Darren Deering. *Potter*, 949 F.3d at 1377; Appx#0009; Appx#0750-751. This email was one of the five alleged whistleblowing activities over which the board found jurisdiction in 2018. *See* Appx#0905.[2]

Dr. Deering then sent two private responses to Ms. Potter: one thanking her and pledging corrective action, and the other asking her to bring the OIG notes about the patients to their forthcoming meeting. Appx#0009; Appx#0750 (thank you/corrective action email); Appx#0753 (email requesting notes).

---

[2] The other four activities over which the board found jurisdiction were: (1) a May 28, 2014 email to Dr. Venditti regarding cancellations of appointments and consults not being completed for urology patients; (2) an August 8, 2014 report to OIG about concerns related to medical providers not receiving important information; (3) August 20, 2014 cooperation with OIG about the mishandling of urology patients; and (4) a December 1, 2016 complaint to OIG regarding issues with timely community care for eligible veterans. *See* Appx#0905.

4

### C.    Ms. Potter's March 2015 Change In Duties And Phoenix VA Reorganizations

Five months later, on December 8, 2014, Phoenix VA leadership – Interim Medical Center Director Glen Grippen, Dr. Deering, and Dr. Venditti – recognized Ms. Potter as "Chief Nurse Manager," under Purchased Care, on its new organizational chart.  Appx#0009; Appx#0802.  Ms. Potter preferred this over her official title, "Nurse Manager."  *Id.*; *see also Potter*, 949 F.3d at 1378.

Three months later, on March 19, 2015, the agency changed back the "Chief Nurse Manager" title in a revised organizational chart, and recognized Ms. Potter as "Nurse Manager" over Utilization Review, a subcomponent of Purchased Care. Appx#0009; Appx#0803; *see also Potter*, 949 F.3d at 1378.[3]  Before the board in 2018, Ms. Potter alleged this change was whistleblower reprisal.  Appx#0906. However, crediting the testimony of Dr. Venditti, Dr. Deering, and Mr. Grippen, the board concluded that the agency established that it would have changed Ms. Potter's duties in March 2015 regardless of her whistleblowing activities. Appx#0927-932.[4]

---

[3]  Ms. Potter's pay and official position of record as a Nurse III remained unchanged during these reorganizations.  Appx#0903.

[4]  Because Ms. Potter's duties as the "Chief Nurse Manager" over Purchased Care were broader than her duties as "Nurse Manager" over Utilization Review (a subcomponent of Purchased Care), her designation as "Nurse Manager" on the March 2015 revised organizational chart resulted in a change in duties.  *See*

5

Drs. Venditti and Deering had testified that they gave Ms. Potter the title Chief Nurse Manager in recognition of her hard work and leadership in Purchased Care at that time. Appx#0413-414 (Tr. 33:23-34:20 (Venditti)); Appx#0549 (Tr. 169:4-21 (Deering)). They further testified that they bestowed the Chief Nurse Manager title even though Ms. Potter could not be promoted to a Chief Nurse IV position. *Id.* They explained that the Phoenix VA's Nursing Service had not allowed the creation of a Chief Nurse IV position in Purchased Care because the Purchased Care department alone lacked sufficient complexity (*i.e.*, a Chief Nurse over that department would not oversee a sufficient level of patient services). *Id.*

Around the same time, from late 2014 to early 2015, the title "Chief Nurse" was applied to all Nurse IV positions in the Phoenix VA. Appx#0422-423 (Tr. 42:23-43:4 (Venditti)). When the Nurse Executive at the time, Marva Greene, learned that Ms. Potter, a Nurse III, was using the job title "Chief," Ms. Greene relayed to Dr. Venditti that Ms. Potter's use of "Chief" was creating confusion. Appx#0422 (Tr. 43:2-4) (Venditti)). Dr. Venditti testified that "the only reason [she] kn[e]w that [Ms. Potter's] title was changed" from Chief Nurse Manager back to Nurse Manager was "nursing['s] [statement that] they didn't authorize the first change to chief, and they couldn't have a nurse 3 as a chief, and nurse 4 as

---

Appx#0009.

being a chief" without it being "confusing for the organization."  Appx#0443 (Tr. 63:11-19 (Venditti)).

Additionally, Mr. Grippen came out of retirement in November 2014 to become the interim director of the Phoenix VA because it was experiencing numerous workload problems.  Appx#0496-498 (Tr. 116:14-16, 117:13-118:2 (Grippen)).  Dr. Venditti, Dr. Deering, and Mr. Grippen testified that Purchased Care grew a great deal to remedy the delays in patient care that had garnered national attention, and there were ongoing efforts to organize the Administrative Medicine Service department in a manner that would optimize its operations. Appx#0408 (Tr. 28:1-25 (Venditti)); Appx#0416 (Tr. 36:5-25 (Venditti)); Appx#0532-533 (Tr. 152:14-153:16 (Deering)); Appx#0499-501 (Tr. 119:21-121:22 (Grippen)).

Mr. Grippen testified that he favored the March 2015 organizational chart's inclusion of a co-equal Chief Nurse IV and physician at the top of the chart, because he had used such a "dyad" model successfully at his previous duty station in Milwaukee.  Appx#0500-501 (Tr. 120:11-121:13 (Grippen)).  However, Mr. Grippen testified that the Chief Nurse position "would have needed to [have] been competitively announced," and that nobody was performing the duties of "Chief Nurse" because of the problems that Mr. Grippen and Dr. Deering had discussed with the model regarding to whom the Chief Nurse IV would report.  Appx#0520-

7

521 (Tr. 140:21-141:8); Appx#0525-526 (Tr. 145:5-146:9).  Mr. Grippen described

the model as "controversial" because "traditionally, nurses report to physicians,

and we were making them full equals."  Appx#0520-521 (Tr. 140:21-141:4)).

### D.    <u>The November 2015 Cancellation Of The Chief Nurse IV Vacancy</u>

Five months after the March 2015 revised organizational chart was

published, on or about August 10, 2015, the Phoenix VA posted a vacancy for

"Registered Nurse, Chief Nurse Administrative Medicine Service."  *See*

Appx#0010.[5]  Ms. Potter and three others applied for the vacancy, which closed on

August 24, 2015.  Appx#0010.  As is evident from the position title, during his

testimony before the board in 2018, Dr. Deering described this position as a Chief

Nurse IV with management responsibilities over the entire Administrative

Medicine Service, not just the Purchased Care component that Ms. Potter had been

working in as a Nurse Manager.  Appx#0584-585 (Tr. 204:17-206:5) (Deering)).

---

[5]  Dr. Deering testified that before the position was advertised, it would have needed to have gone through classification for approval by the nursing board, which involves a review of, among other things, "the complexity of that role, the breadth of the scope of what they're doing, the supervision."  Appx#0549 (Tr. 169:1-25) (Deering)).  He further explained that he understood a functional statement to be a component of the request for classification/approval of a position. Appx#0551 (Tr. 171:17-21) (Deering)).  A functional statement "outlines the roles and responsibilities of the role that an employee is in."  Appx#0062 (Tr. 30:16-20) (Nelson)).

8

Two months after the position was posted, on November 1, 2015, Dr. Deering directed the closure of the vacancy via email to Human Resources, explaining: "We need to have more discussion about the best way to structure this service (*i.e.*, what sections should be in this service, where the nurse 4 should report, etc[.], etc[.]) before we move toward a selection." Appx#0010; Appx#0805-806. On November 5, 2015, Ms. Potter received an automated email from the Office of Personnel Management stating: "The hiring office has decided not to fill the position at this time." Appx#0010; Appx#0771-772.

Dr. Deering corroborated the reasons provided for the cancellation during his 2018 testimony before the board. As an initial matter, Dr. Deering testified that he was a "champion for getting a nurse IV" over the Administrative Medicine Service and "for [Ms. Potter] being in that role." Appx#0572-573 (Tr. 192:17-193:4 (Deering)). Dr. Deering did not remember a specific conversation with Ms. Potter about her applying for the position, but he assumed that she applied and "couldn't think of anybody more qualified" within the Phoenix VA. Appx#0598 (Tr. 218:5-11), Appx#0601-602 (Tr. 221:25-222:4) (Deering)). Even though Dr. Deering had received and responded to Ms. Potter's July 10, 2014 disclosure, Dr. Deering did not consider Ms. Potter to be a whistleblower. *See* Appx#0622 (Tr. 242:19-20) (Deering)).

9

Regarding the vacancy cancellation, among other things, he recalled that, although he did not "remember specifically what caused us to pull it back," there were substantial questions about whether the organization structure that Mr. Grippen favored should have been implemented, including "about how that works, who reports to whom, and we wanted to get that clarified before we went forward with the selection." Appx#0559 (Tr. 179:3-19) (Deering)). He further recalled that: "we kept getting feedback that that's not an ideal structure, that there are lots of concerns with that and . . . what that structure looks like, not who's in it but what does that look like for each service and . . . if you have that then does the . . . Chief Nurse report to the Nurse Exec, or to a physician." Appx#0560 (Tr. 180: 5-21) (Deering)). He also explained that these challenges persisted through and after the vacancy cancellation. *See* Appx#0621-622 (Tr. 241:12-242:10) (Deering)).

Dr. Venditti did not have "any role in the vacancy cancellation, 'because she was gone at that time.'" Appx0011 (quoting Appx#0304 (Tr. 272:1-6) (Potter)). Mr. Grippen, who also was not responsible for recruiting for the Chief Nurse IV position, Appx#0505 (Tr. 125:9-13) (Grippen)), retired at the end of November 2015, Appx#0497 (Tr. 117:10-12) (Grippen)). In June 2016, the agency removed Dr. Deering, "in an action evidently related to the 'crisis' that had emerged at the Phoenix VA." Appx0011.

10

### E.    Ms. Potter's Acceptance Of A Transfer To California

Ms. Potter began looking for opportunities to transfer out of the Phoenix VA "at the end of 2016." *Potter*, 949 F.3d at 1378; Appx#0320 (Tr. 288:11-16 (Potter)).  On February 8, 2017, Ms. Potter received a tentative job offer for a transfer to the VA Northern California Healthcare System.  Appx#0011; Appx#0809-810.  On March 6, 2017, Ms. Potter informed RimaAnn Nelson (then Director of the Phoenix VA) that she was accepting this offer.  *Potter*, 949 F.3d at 1378; Appx#0811.  The offer was confirmed on March 9, 2017.  Appx#0011; Appx#0812.

Also on March 9, 2017, the agency moved forward with recruiting for the Chief Nurse IV position, at the direction of Dr. Alyshia Smith, then the Chief Nurse Executive.  Appx0011; Appx#0801; Appx#0683 (Tr. 303:2) (Duarte) (Dr. Smith's title)).  On March 17, 2017, Ms. Potter filed an Office of Special Counsel (OSC) complaint alleging whistleblower reprisal.  *See* Appx#0011.[6]

---

[6] Ms. Potter contended before the board in 2018 that her transfer out of the Phoenix VA was an involuntary resignation.  Appx#0906.  In addition to the March 2015 change in duties, November 2015 vacancy cancellation, and alleged March 2017 involuntary resignation, the board in 2018 also found jurisdiction over Ms. Potter's allegation that the agency retaliated against her by assigning her to a detail in January 2017.  *See id.*

## F.    **The 2018 Board Decision**

In February 2018, Ms. Potter filed this IRA appeal before the board.

Appx#0011.  Following a two-day hearing in October 2018 at which 11 witnesses

testified (*see* Appx#0034, Appx#0382), the administrative judge issued an initial

decision in December 2018 denying Ms. Potter's request for corrective action.

Appx#0906-940.

In that decision, which was the subject of the previous appeal to this Court,

the administrative judge found that Ms. Potter did not establish that her July 10,

2014 disclosure was a contributing factor to Dr. Deering's November 2015

decision to cancel the vacancy.  Appx#0914.  However, as discussed below, that

conclusion was based upon an incorrect finding that Dr. Deering lacked knowledge

of Ms. Potter's July 10, 2014 disclosure.

Although the administrative judge found that Ms. Potter met her burden to

establish a statutory presumption that her whistleblowing was a contributing factor

to her March 2015 change in duties, Appx#0912-914, he determined that the

agency met its burden to show that it would have taken the same action (changed

her duties) absent her whistleblowing for the reasons – the reorganizations of the

Phoenix VA and needing to determine to whom the Chief Nurse IV would report –

discussed above, Appx#0927-932.  The administrative judge further found that Ms.

Potter did *not* meet her burden to establish a statutory presumption that her

12

whistleblowing was a contributing factor to the January 2017 detail and April 2017 resignation.  Appx#0914-927.

### G.    The Federal Circuit Appeal And Remand Order

Ms. Potter appealed the board's 2018 decision to this Court, which affirmed-in-part, vacated-in-part, and remanded.  *Potter*, 949 F.3d 1376.  This Court vacated the board's conclusion that Ms. Potter did not establish a *prima facie* claim of whistleblower reprisal related to the November 2015 vacancy cancellation because that conclusion was based upon an incorrect finding.  *Id.* at 1379-380.  Specifically, "the parties agree[d] that the administrative judge incorrectly found that Dr. Deering did not have knowledge of Ms. Potter's second protected disclosure, *i.e.*, her July 10, 2014 email."  *Id.* at 1379.  This Court concluded that the administrative judge's decision as to the remaining alleged reprisals – the March 2015 change in duties, the January 2017 detail, and the April 2017 "involuntary resignation" – was in accordance with the law and supported by substantial evidence.  *Id.* at 1381.

### H.    The 2020 Board Decision On Remand

On remand, the board issued a decision in September 2020 that denied corrective action for the vacancy cancellation.  Appx#0001-17.  After acknowledging the error identified in this Court's remand order, the administrative judge quoted this Court's summary of the two issues to be considered on remand:

13

Whether, in view of Dr. Deering's knowledge of Ms. Potter's July 10, 2014 email, Ms. Potter presented evidence sufficient to satisfy the knowledge-timing test, or if Ms. Potter otherwise presented evidence sufficient to demonstrate a *prima facie* case of whistleblower reprisal.

If so, whether the government can meet its burden of showing that it would have taken the same November 2015 personnel action ('failure to hire') regardless of Ms. Potter's protected disclosure.

Appx#0003 (quoting *Potter*, 949 F.3d at 1380).

Regarding the first remand issue, the administrative judge found that Ms. Potter established a *prima facie* case of whistleblower reprisal regarding the November 2015 vacancy cancellation because "a preponderance of the evidence establishes that the appellant's July 10, 2014 disclosure was protected and was a contributing factor to her November 2015 nonselection." Appx#0004. The administrative judge: (1) reaffirmed his conclusion in the 2018 decision that the July 10, 2014 disclosure was protected; (2) explained why his assumption in that decision that the cancellation/nonselection was a covered "personnel action" was correct; (3) corrected his previous finding concerning Dr. Deering's knowledge of Ms. Potter's July 10, 2014 disclosure; (4) found that Dr. Deering knew Ms. Potter had applied for the vacancy; and (5) found that Dr. Deering made the nonselection decision (by cancelling the vacancy) in November 2015 within a time such that a reasonable person could conclude that Ms. Potter's July 10, 2014 disclosure was a contributing factor to his decision. Appx#0005-8.

14

The administrative judge then applied all three of the factors set out in *Carr v. Social Security Administration*, 185 F.3d 1318 (Fed. Cir. 1999), to conclude that the agency met its responsive burden to prove by clear and convincing evidence that Dr. Deering would have cancelled the vacancy in November 2015 regardless of Ms. Potter's July 10, 2014 protected disclosure. Appx#0012-16.

***Carr factor one.*** The administrative judge found that the first *Carr* factor – in this case, the strength of the reasons for the cancellation decision – "weighs heavily in the agency's favor." Appx#0015.

As an initial matter, the administrative judge concluded that, because Dr. Deering's November 2015 vacancy cancellation was not disciplinary, *Carr* factor one "does not require supporting evidence of misconduct." Appx#0012 (citation omitted). Rather, the administrative judge explained that, "[i]n such circumstances, when addressing the strength of the agency's evidence in support of its action, the Board considers the broader question of whether the agency had legitimate reasons for its action." *Id.*

Then, to support his finding that *Carr* factor one strongly favors the agency, the administrative judge found that, during the 2018 hearing, Dr. Deering "testified without dispute that he had tried, earnestly but unsuccessfully, to obtain agreement from multiple stakeholders, including the Office of Nursing Services, on the question of to whom the Chief Nurse would report, and Deering testified that lack

15

of agreement on the answer to that question led him to indefinitely delay hiring

anybody for the vacant position." Appx#0012 (summarizing Dr. Deering's

testimony before quoting it at length).

In weighing Dr. Deering's testimony about the reasons for the cancellation,

the administrative judge specifically noted that he "considered the fact that [Dr.

Deering's] recollection was admittedly less than certain as to the precise series of

events leading up to his November 2015 decision to cancel the vacancy."

Appx#0013-14. However, the administrative judge found that to be "hardly

surprising" because Ms. Potter "did not challenge Deering's November 2015

vacancy cancellation until (i) sixteen months after Deering's decision and (ii) ten

months after Deering's removal, and Deering's decision was never overtly

personal to [Ms. Potter] or any individual." Appx#0014. The administrative judge

"simply [found] no basis to conclude that Deering's November 2015 decision

stood out in his memory in the same manner as it did for [Ms. Potter]." *Id.*

Moreover, the administrative judge "found Deering's overall picture of

events to be consistent, both internally and when compared with the testimony of

Venditti and Grippen." Appx#0014. Indeed, the administrative judge credited Dr.

Venditti's testimony that (1) the informal change in Ms. Potter's title on the

December 2014 organizational chart "was trying to get Tiffany [Potter] recognition

. . . because we had been blocked at every avenue on getting a chief nurse

16

position," *id.* (quoting Appx#0422 (Tr. 42:15-23 (Venditti))); and (2) Dr. Venditti

"was making efforts to get approval to start the process to get a chief nurse position

[but was rebuffed].  [. . .]  Darren [Deering] had went to other nurse executives and

was told the same thing, that there was not enough complexity in the department.

For a nurse 4," *id.* (quoting Appx#0452-453 (Tr. 72:7-73:8) (Venditti))).  The

administrative judge also credited Mr. Grippen's testimony that he was trying to

implement an organizational structure that mimicked the one in Milwaukee, where

the office would be headed by a doctor and nurse, but this was "controversial"

because "traditionally, nurses report to physicians, and we were making them full

equals."  Appx#0014 (quoting Appx#0500-501 (Tr. 120:19-121:9), Appx#0520-

521 (Tr. 140:21-141:4) (Grippen))).

Regarding Dr. Deering's credibility overall, the administrative judge "found

him to be a quite credible witness, consistent in his testimony, and sincere, even in

the face of difficult questioning by [Ms. Potter]."  Appx#0014 (citing Appx#0931).

Particularly, the administrative judge "found Deering credible in his non-

retaliatory explanation of why he participated in changing [Ms. Potter]'s duties in

March 2015, in part because [her] theory that her March 2015 duties change was

motivated by reprisal was inconsistent with Deering's November 2014 approval of

the organizational chart that had a position title [Ms. Potter] actually preferred."

Appx#0014-15 (citing Appx#0914, 929).

17

The administrative judge found "*no* basis to doubt the sincerity of Deering's reasoning based on the agency's actions in March 2017 to re-post the vacancy, since Deering had been gone from the agency for nine months by that time and ha[d] not been shown to have any role in the agency's March 2017 actions." Appx#0015. Accordingly, having "found Deering's recollection of why he cancelled the vacancy in November 2015 was quite credible," the administrative judge found that *Carr* factor one "weighs heavily in the agency's favor." *Id.*

**Carr factor two.** The administrative judge found that the second *Carr* factor – retaliatory motive – weighs "modestly" in Ms. Potter's favor. Appx#0015-16. In doing so, the administrative judge discerned that the "existence of agency motive to retaliate[] comes down to Deering's motive to retaliate against [Ms. Potter] for her July 10, 2014 disclosure." Appx#0015. Although the administrative judge accepted that Dr. Deering "had an ostensible motive to retaliate against [Ms. Potter] for her disclosure, because the problems she raised tended to reflect unfavorably upon Deering's management and put Deering in the place of having to choose between working to try to address her concerns, or doing nothing and fearing the consequences," the administrative judge explained that he could not "ignore the evidence contrary to an inference that Deering bore animus against [Ms. Potter] for her July 10, 2014 disclosure." Appx#0015.

18

Particularly, the administrative judge noted that Dr. Deering had

(1) "immediately expressed appreciation to [Ms. Potter] for her disclosure and

pledged to take corrective action," *id.* (citing Appx#0750); and (2) four months

after the disclosure, "signed to approve an organization chart that [Ms. Potter]

preferred," *id.* (citing Appx#0802).  Reasoning that "[t]hose are not the actions one

would expect of a man determined to retaliate against [Ms. Potter] for her July 10,

2014 disclosure," the administrative judge, "[n]onetheless, taking a straitjacketed

approach to the question of motive, . . . accept[ed] that Deering had a motive –

albeit slight – to retaliate."  Appx#0015-16.

**_Carr factor three._**  The administrative judge found the third *Carr* factor –

evidence regarding similar actions the agency has taken against employees who are

not whistleblowers – to be neutral.  Appx#0016.  The administrative judge

"considered the fact that the record contains evidence that three other individuals

also applied for the vacancy and thus were also affected by Deering's November

2015 vacancy cancellation."  *Id.*  However, "neither party adduced any evidence as

to those other applicants' qualifications or status as whistleblowers or non-

whistleblowers."  *Id.*

Weighing all three factors, the administrative judge found that the "evidence

as a whole leans strongly in the agency's direction, and that the agency thus met its

burden to prove by clear and convincing evidence that it would have cancelled the

November 2015 vacancy even if [Ms. Potter] had never made her July 10, 2014

disclosure." Appx#0016.  Accordingly, corrective action was denied.  *Id.*

## SUMMARY OF THE ARGUMENT

The Court should affirm the board's remand decision denying Ms. Potter's

request for corrective action for Dr. Deering's November 2015 decision to cancel

the Chief Nurse IV vacancy.  Substantial evidence supports the board's decision

that the agency met its burden to establish that Dr. Deering would have cancelled

that vacancy regardless of Ms. Potter's July 10, 2014 protected disclosure.  The

Court should decline Ms. Potter's invitation to reweigh the evidence, including the

board's credibility determinations.

*First*, the administrative judge reasonably concluded that the first *Carr*

factor strongly favors the agency.  He properly applied this factor by assessing the

reasons for the vacancy cancellation.  That assessment is consistent with this

Court's first decision in this case and board precedent.  The administrative judge

also properly applied the clear and convincing evidence standard by finding that

the agency had strong, legitimate reasons for the November 2015 cancellation,

given the need for the agency to determine the reporting structure for the position.

That finding is amply supported by Dr. Deering's contemporaneous email directing

Human Resources to cancel the vacancy, Dr. Deering's corroborating testimony,

and the consistent testimony of Dr. Venditti and Mr. Grippen concerning the obstacles to filling the position.

*Second*, the administrative judge properly considered the evidence in finding that *Carr* factor two weighs only modestly in Ms. Potter's favor. Even though he accepted that Dr. Deering had an ostensible motive to retaliate for the July 10, 2014 disclosure, the administrative judge appropriately considered the record evidence that diminishes any retaliatory motive that Dr. Deering may have had. Ms. Potter does not explain how the motive of any other Phoenix VA official is relevant. Moreover, the events that Ms. Potter identifies as occurring after the late 2014 initial change in duties but before the November 2015 cancellation neither detract from Dr. Deering's reasons for cancelling the vacancy nor mean that the cancellation was in retaliation for the July 10, 2014 disclosure.

*Third*, although there is record evidence demonstrating that the agency treated all applicants for the cancelled vacancy the same way, the administrative judge did not err in finding that the third *Carr* factor is neutral in this case. Although neither party adduced any evidence as to the three other applicants' qualifications or status as whistleblowers or non-whistleblowers, Ms. Potter's contention that the agency was required to adduce such evidence to meet its burden lacks a basis in law. Her contention that the administrative judge ignored her

21

alleged evidence concerning the other applicants when considering whether the record contains evidence of comparators lacks a basis in fact.

## ARGUMENT

### I.    Standard Of Review And Applicable Law

#### A.    Standard Of Review

Pursuant to 5 U.S.C. § 7703(c), this Court may reverse an MSPB decision if the decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; obtained without procedures required by law; or unsupported by substantial evidence." *Kahn v. Dep't of Justice*, 618 F.3d 1306, 1312 (Fed. Cir. 2010). This Court reviews legal decisions *de novo*, and is bound by the administrative judge's findings of fact unless the findings are not supported by substantial evidence. *Salmon v. Soc. Sec. Admin.*, 663 F.3d 1378, 1380 (Fed. Cir. 2011); *Bolton v. MSPB*, 154 F.3d 1313, 1316 (Fed. Cir. 1998).

Accordingly, "the standard is not what the court would decide in a *de novo* appraisal, but whether the administrative determination is supported by substantial evidence on the record as a whole." *Parker v. United States Postal Serv.*, 819 F.2d 1113, 1115 (Fed. Cir. 1987). Nor is it this Court's function to reweigh evidence under this standard of review. *Jones v. Dep't of Health & Human Servs.*, 834 F.3d 1361, 1369 (Fed. Cir. 2016); *see also Bieber v. Dep't of the Army*, 287 F.3d 1358, 1364 (Fed. Cir. 2002). Substantial evidence means "such relevant evidence as a

22

reasonable mind might accept as adequate to support a conclusion." *Simpson v.*

*Office of Pers. Mgmt.*, 347 F.3d 1361, 1364 (Fed. Cir. 2003) (quoting *Consol.*

*Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

The petitioner bears the burden of establishing reversible error. *See Sacco v.*

*Dep't of Justice*, 317 F.3d 1384, 1386 (Fed. Cir. 2003). Importantly, "the

[MSPB]'s credibility determinations are 'virtually unreviewable on appeal.'"

*Briley v. Nat'l Archives & Records Admin.*, 236 F.3d 1373, 1377 (Fed. Cir. 2001)

(citing *Rogers v. Dep't of Def. Dep. Sch.*, 814 F.2d 1549, 1554 (Fed. Cir. 1987)).

## B.    <u>The Whistleblower Protection Act</u>

An employee may establish a *prima facie* case of reprisal for whistleblowing

by demonstrating by a preponderance of the evidence that: (1) he or she made a

protected disclosure; and (2) the disclosure was a "contributing factor" in the

agency's decision to take a personnel action. 5 U.S.C. § 1221(e)(1). An employee

may demonstrate that the disclosure was a contributing factor by proving by a

preponderance of the evidence that: (1) "the official taking the personnel action

knew of the disclosure;" and (2) "the personnel action occurred within a period of

time such that a reasonable person could conclude that the disclosure . . . was a

contributing factor in the personnel action." *Id.*

Once an employee establishes a *prima facie* case of reprisal, the burden

shifts to the agency to prove by clear and convincing evidence that it would have

23

taken the same personnel action regardless of the protected disclosure.  5 U.S.C.

§ 1221(e)(2).  To determine whether the agency has met its burden, three factors

are normally considered, as prescribed by the Court in *Carr*:

> (1) the strength of the agency's evidence in support of its personnel action;
>
> (2) the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and
>
> (3) any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated.

*Carr*, 185 F.3d at 1323.

That said, "*Carr* does not impose an affirmative burden on the agency to

produce evidence with respect to each and every one of the *Carr* factors to weigh

them each individually in the agency's favor."  *Whitmore v. Dep't. of Labor*, 680

F.3d 1353, 1374 (Fed. Cir. 2012).  Rather, "[t]he factors are merely appropriate

and pertinent considerations for determining whether the agency carries its burden

of proving by clear and convincing evidence that the same action would have been

taken absent the whistleblowing."  *Id.*  "Evidence only clearly and convincingly

supports a conclusion when it does so in the aggregate considering all the pertinent

evidence in the record, and despite the evidence that fairly detracts from that

conclusion."  *Id.* at 1368 (citation omitted).

24

**II.    Substantial Evidence Supports The Board's Finding That Dr. Deering Would Have Cancelled The Chief Nurse IV Vacancy Regardless of Ms. Potter's July 10, 2014 Protected Disclosure**

After meticulously applying the *Carr* factors, the administrative judge concluded that the "evidence as a whole leans strongly in the agency's direction, and that the agency thus met its burden to prove by clear and convincing evidence that it would have cancelled the November 2015 vacancy even if [Ms. Potter] had never made her July 10, 2014 disclosure." Appx0016. As it is supported by substantial evidence, that conclusion should be affirmed.

**A.    *Carr* Factor One Weighs "Heavily In The Agency's Favor"**

The administrative judge reasonably found that *Carr* factor one weighs "heavily in the agency's favor." Appx#0015. The record establishes that Dr. Deering had strong, legitimate reasons for the November 2015 cancellation. As the administrative judge found, Dr. Deering's contemporaneous email to Human Resources directing the cancellation explained that the recruitment effort needed to be cancelled because: "We need to have more discussion about the best way to structure this service (*i.e.*, what sections should be in this service, where the nurse 4 should report, etc[.], etc[].) before we move toward a selection." Appx#0806.

Consistent with this contemporaneous explanation, during the 2018 hearing, Dr. Deering "testified without dispute that he had tried, earnestly but unsuccessfully, to obtain agreement from multiple stakeholders, including the

25

Office of Nursing Services, on the question of to whom the Chief Nurse would report," and "lack of agreement on the answer to that question led him to indefinitely delay hiring anybody for the vacant position."  Appx0012 (quoting Appx#0559-562 (Tr. 179:3-182:16) (Deering))).  Dr. Deering's reasons for cancelling the recruitment effort, thus, are compelling and unrelated to retaliation against Ms. Potter.  Ms. Potter's arguments to the contrary are unavailing.

Ms. Potter contends that the administrative judge misapplied the first *Carr* factor "by incorrectly stating that 'the first factor is the strength of the agency's *reasons* for its action.'"  Pet. Br. 18 (quoting Appx#0012) (emphasis added by Ms. Potter).[7]  Ms. Potter then draws a false contrast with an "analysis of the agency's *evidence*."  *Id.*  This misreads the administrative judge's decision.  The administrative judge did not say it was unnecessary to analyze the agency's evidence; indeed, the administrative judge analyzed the evidence of the agency's reasons for cancelling the vacancy and found that it "weigh[ed] heavily in the agency's favor."  Appx#0015.  Rather, the administrative judge made the unremarkable observation that, when a personnel action is not based upon misconduct, the agency is not required to produce evidence of misconduct.  Appx#0012 ("This first of the three *Carr* factors does not apply straightforwardly

---

[7]  "Pet. Br." refers to petitioner's corrected opening brief, Dkt. No. 13.

when the personnel action is not disciplinary and, therefore, does not require supporting evidence of misconduct."). This is supported by board precedent. *Id.* (citing *Azbill v. Dep't of Homeland Sec.*, 105 M.S.P.R. 363, ¶ 18 (2007) (where "personnel action is not disciplinary . . . we find it appropriate to consider instead the broader question of whether the agency had legitimate reasons for" its personnel action); *Gonzales v. Dep't of the Navy*, 101 M.S.P.R. 248, ¶ 12 (2006) (same)).

Indeed, in the board's 2018 decision, when considering the first *Carr* factor *vis-à-vis* the March 2015 change in duties, the administrative judge applied the same principle. Appx#0929 ("Where a personnel action is not disciplinary in nature, the Board considers the broader question of whether the agency had legitimate reasons for its action." (citing the same board cases)). Ms. Potter raised no challenge to the use of that standard, and this Court affirmed that portion of the board's decision. *See Potter*, 949 F.3d at 1381 (concluding that the board's decision as to the March 2015 change in duties "is in accordance with the law").

There is no reason why this principle – that, when the action at issue is not disciplinary in nature, the board assesses the agency's reasons for its actions rather than the evidence of misconduct – would not apply here. Ms. Potter does not allege – nor does the record show – that the vacancy cancellation was disciplinary

27

in nature.  Indeed, the cancellation/nonselection is not a suspension, removal, or demotion.  *See* 5 U.S.C. §§ 7501-7543 (delineating adverse personnel actions).

Ms. Potter's attempt to upset the administrative judge's finding that the agency met its burden to show that Dr. Deering's reasons for cancelling the vacancy were legitimate seeks to have this Court re-weigh the evidence, including the board's credibility determinations.  Erroneously suggesting that sworn hearing testimony is not "evidence," Ms. Potter broadly charges that the administrative judge erred by "simply relying on the Agency's word, even though their word is contradicted by, and in clear conflict with, Ms. Potter's evidence."  Pet. Br. 18-19.  However, to the extent that there is conflicting evidence in the record, "[u]nder the substantial evidence standard of review," this Court does "not reweigh evidence."  *Jones*, 834 F.3d at 1369; *see also Bieber*, 287 F.3d at 1364 ("Bieber basically requests us to re-weigh conflicting evidence; this is not our function.").  As detailed above, the administrative judge thoroughly considered and weighed the evidence substantiating the reasons for Dr. Deering's cancellation of the vacancy, including Dr. Deering's contemporaneous email to Human Resources directing the cancellation, Dr. Deering's corroborating testimony, and the testimony of Dr. Venditti and Mr. Grippen.  *See* Appx#0008-16.

In any event, the testimony that Ms. Potter identifies as allegedly contradicting Dr. Deering's reasons for cancelling the vacancy does no such thing.

28

As an initial matter, Ms. Potter concedes that Dr. Deering's testimony "appeared to corroborate" the reasons for the cancellation summarized in his contemporaneous email directing Human Resources to cancel the recruitment effort. Pet. Br. 19 (citing Dr. Deering's testimony at Appx#0602-605). Consistent with those reasons, Ms. Potter even testified that she understood that there was an intent to reorganize the department when the recruitment effort was cancelled. Appx#0325 (Tr. 293:12-24) (Potter)).

Ms. Potter nonetheless claims that Mr. Grippen's testimony belies the reasons Dr. Deering provided for Dr. Deering's decision to cancel the vacancy. Pet. Br. 19. Specifically, Ms. Potter emphasizes that Mr. Grippen testified that, as Phoenix VA Director in 2015, (i) "he considered filling the Chief Nurse IV position to be a priority;" and (ii) "even though there were several reorganizations happening, there were not any impediments on hiring, and, in fact, the department 'increased staffing levels multiple times.'" Pet. Br. 19 (citing Appx#0504-505, Appx#0520). However, these snippets of Mr. Grippen's testimony ignore that Mr. Grippen testified – more particularly regarding the obstacles to filling the Chief Nurse IV position – that (1) Dr. Deering had relayed to Mr. Grippen that there were substantial questions about to whom the position would report, Appx#0520-521 (Tr. 140:21-141:4) (Grippen)); and (2) there was pushback from "other service

29

lines regarding the structure of one Chief Nurse," Appx#0521 (Tr. 141:5-8)
(Grippen)).

Moreover, despite Mr. Grippen confirming that the Phoenix VA "increased
staffing levels multiple times," Mr. Grippen and Dr. Deering testified that those
hires had not been for the Chief Nurse IV position at issue. *See* Appx#0525 (Tr.
145:7-15) (Grippen) (testifying that, even though there was a Chief Nurse position
listed on the March 2015 organizational chart, no one was serving in that
position)); Appx#0604 (Tr. 224:9-24) (Deering) (testifying that no one was
performing the Chief Nurse IV position around the time of the vacancy
cancellation)); *see also* Appx#0180-181 (Tr. 148:22-149:9 (administrative judge
recognizing that Ms. Potter's contention that she had been performing Chief Nurse
IV duties does not mean that the position that was recruited for had been filled).

Ms. Potter similarly argues that the agency provided "zero evidence to show
how reorganizations of the department prevented them from filling . . . [the] Chief
Nurse IV [position], until March 9, 2017, *after* learning of Ms. Potter's
resignation/transfer from the Agency." Pet. Br. 19-20. But, even if the agency's
decision to begin recruiting for a Chief Nurse IV were relevant to the question
whether VA had a legitimate basis for cancelling a vacancy announcement some
15 months *earlier*, the record is replete with testimony from Phoenix VA officials
concerning the substantial pushback that leadership encountered as they tried to

implement the dyad structure that Mr. Grippen advocated – which, again,

contemplated the Chief Nurse IV as a co-equal leader of the Administrative

Medicine Service. *See, e.g.*, Appx#0520-521 (Tr. 140:21-141:4) (Grippen)

(describing the model as "controversial" because "traditionally, nurses report to

physicians, and we were making them full equals")); Appx#0621-622 (Tr. 241:12-

242:10) (Deering) (explaining that the challenge of determining to whom the Chief

Nurse IV would report persisted through and after the vacancy cancellation));

Appx#0097 (Tr. 65:9-21) (Nelson) (testifying that the Administrative Medicine

Service ultimately was not headed by a co-equal doctor and nurse)).

Moreover, the record reveals that the Phoenix VA was in the throes of a

patient access crisis that resulted in leadership turnover that inevitably delayed

decision-making. *See, e.g.*, Appx#0038 (Tr. 6:15-18) (Nelson) ("[W]hen I arrived

in October 2016, I was the seventh director in a two-year period, so there was a lot

of chaos here at the [Phoenix VA] and a lot of that was based on the scandal from

2014.")); Appx#0137 (Tr. 105:10-25) (Potter) (noting that "turnover in leadership"

delayed recruiting for Chief Nurse IV)).  Ms. Potter points out that Mr. Grippen

sought to expedite filling the Chief Nurse IV role, Pet. Br. 6, but Mr. Grippen left

the Phoenix VA shortly after the vacancy was cancelled in November 2015,

Appx#0497 (Tr. 117:10-12) (Grippen)).  Accordingly, Mr. Grippen's actions

31

related to the Chief Nurse IV role have no bearing on the agency's actions between the November 2015 cancellation and the March 2017 re-posting.

Ms. Potter similarly attempts to fault the agency for not providing evidence that the position's functional statement or classification changed before it was re-posted. Pet. Br. 20. But that attempt is misplaced. The record does not establish that Dr. Deering cancelled the vacancy in November 2015 for either the functional statement or the classification needing to be changed. Rather, as demonstrated above, substantial evidence supports the administrative judge's finding that Dr. Deering decided to cancel the vacancy in November 2015 to determine how the position's reporting chain would be structured. *See* Appx#0012-13.

Ms. Potter also attempts to undercut Dr. Deering's reasoning for cancelling the vacancy by contending that "the record is flush with evidence showing that before and during this time period, Ms. Potter was intermittingly performing the duties of a Chief Nurse IV and reporting to several different management officials without complication." Pet. Br. 20. Ms. Potter tellingly cites no evidence for this contention. But even if she had, Dr. Deering explained that Ms. Potter was not actually performing the duties of the Chief Nurse IV position for which he cancelled the recruitment effort. Instead, Dr. Deering testified that Ms. Potter had been performing the duties of a Nurse Manager in the area of Purchased Care,

32

which is only one part of the entire Administrative Medicine Service.  Appx#0585

(Tr. 205:2-206:5) (Deering)).

Without acknowledging the "virtually unreviewable" standard applicable to

credibility determinations like the ones the administrative judge made here, *Briley*,

236 F.3d at 1377, Ms. Potter next attacks the administrative judge's assessment of

the credibility of Dr. Deering's testimony.  Pet. Br. 20-21.  Having observed

Dr. Deering's demeanor at the hearing, the administrative judge "found him to be a

quite credible witness, consistent in his testimony, and sincere, even in the face of

difficult questioning by [Ms. Potter]."  Appx#0014.  Ms. Potter seeks to undermine

these findings by accusing the administrative judge of improperly "explain[ing]

away" Dr. Deering's "admittedly less than certain" recollection of events.  Pet. Br.

21.  But, the administrative judge reasonably found it "hardly surprising" that

Dr. Deering's recollection was not as crisp as it once may have been, given the

substantial time that had passed between Dr. Deering's testimony in 2018 and his

(i) November 2015 cancellation decision and (ii) June 2016 removal from the

agency.  Appx#0013-14.  Attempting to justify her dilatory challenge to

Dr. Deering's November 2015 cancellation decision, Ms. Potter next points out

that she filed her OSC complaint soon after the agency moved forward with re-

posting the vacancy for the Chief Nurse IV position in March 2017.  Pet. Br. 21.

However, the timing of that filing does not undercut the administrative judge's

33

recognition that substantial time passed between Dr. Deering's testimony in 2018 and his (i) cancellation decision and (ii) removal from the agency.

Also concerning Dr. Deering's credibility, Ms. Potter similarly contends that the record contradicts the administrative judge's finding that Dr. Deering's cancellation decision was "never overtly personal to [Ms. Potter] or any individual." Pet. Br. 21. But the evidence that Ms. Potter cites to show "just how personal it was to Ms. Potter" does no such thing. *See id.* at 21-22. For example, that Dr. Deering understood Ms. Potter to be qualified for the position or that Dr. Deering understood that Ms. Potter may have assisted in the drafting of the functional statement for the position does not mean that the cancellation was "overtly personal" to her. *Contra id.*[8] Rather, the cancellation affected the other applicants in the way it affected Ms. Potter—the employment opportunity was no longer available. Moreover, even though Dr. Deering thought Ms. Potter was the most qualified candidate for the position *within the Phoenix VA*, he testified that (1) the position "would have to have been competed," Appx#0537-538 (Tr. 157:14-158:1) (Deering)); (2) it was possible that someone more qualified than Ms. Potter from *outside the Phoenix VA* may have applied for the position,

---

[8] Ms. Potter cites to her own testimony for the proposition that she "helped draft" the functional statement for the position, Pet. Br. 22 (citing Appx#0202-203), but Dr. Deering testified that he was not sure whether she did so, *see* Appx#0582-583 (Tr. 202:16-203:11) (Deering)).

34

Appx#0598 (Tr. 218:5-11 (Deering) (recognizing that "you never know who's going to apply")); and (3) selection would have been made following a rigorous application evaluation process, Appx#0562-563 (Tr. 182:17-183:7) (Deering)).

Ms. Potter also contends that the administrative judge's finding of Dr. Deering's "overall picture of events to be consistent, both internally and when compared with the testimony of Venditti and Grippen," is flawed. Pet. Br. 22. Ms. Potter argues that the portions of the testimony of Dr. Venditti and Mr. Grippen with which the administrative judge found Dr. Deering's testimony to be consistent "had no relation to Dr. Deering's decision to cancel the recruitment on November 1, 2015" because those portions "referenced a period of time prior to the Nurse IV position being approved . . . and advertised." Pet. Br. 22. However, Dr. Deering explained the pushback that he had received concerning the Chief Nurse IV reporting structure persisted after the position was approved and advertised. Appx#0621-622 (Tr. 241:12-242:10) (Deering)). In the end, substantial evidence supports the administrative judge's finding that Dr. Deering's testimony and his contemporaneous email tied "the delay in selection for Nurse 4" to "how that was going to report" and "how we wanted that structured." Appx#0622 (Tr. 242:6-10 (Deering)); *accord* Appx#0015.

Ms. Potter also contends that the administrative judge erred by finding that the agency's actions in March 2017 to re-post the vacancy are no reason to doubt

35

the veracity of Dr. Deering's reasoning for cancelling the vacancy some 15 months

earlier.  Pet. Br. 23.  The administrative judge explained that Dr. Deering "had

been gone from the agency for nine months by that time and has not been shown to

have any role in the agency's March 2017 actions."  Appx#0015.  As the

administrative judge therefore recognized, the decision of another agency official

to re-post the vacancy many months after it was originally cancelled says nothing

about the reasons for Dr. Deering cancelling the vacancy.

Ms. Potter nonetheless asserts:

> Considering the suspect timing and the lack of evidence to support
> their claim that there was a reclassification of the position prior to the
> posting, that there was further discussion of whom the position would
> report to, or that the department needed to be reorganized before the
> position could be filled, the [administrative judge] should have found,
> as the Court did in *Miller* [*v. Department of Justice*, 842 F.3d 1252,
> 1261 (Fed. Cir. 2016)], that the Agency didn't present any robust
> evidence, and thus, as a matter of law, didn't meet their burden of
> providing 'clear and convincing evidence' that they would have not
> selected Ms. Potter for the Chief Nurse IV position in November 2015
> (or thereafter) despite her whistleblower disclosures and activities.

Pet. Br. 23-24.

However, as demonstrated above, there is ample testimony from Phoenix

VA leadership corroborating the reasoning that Dr. Deering summarized in his

contemporaneous email to Human Resources directing the cancellation of the

recruitment effort.  Moreover, also as discussed above, Ms. Potter's argument

concerning reclassification of the position continues to be misplaced.  This case is

nothing like the situation described in *Miller* – a "lack of corroboration, the dearth of documents, emails, or records, and even the lack of detail in the [relevant official]'s recollection." *Miller*, 842 F.3d at 1261.

Also regarding the administrative judge's consideration of the events surrounding the March 2017 re-posting effort, Ms. Potter contends that "the Board included in its analysis factors completely unrelated to those facts for which a *Carr* analysis would rely." Pet. Br. 16. Putting aside that *Carr* does not circumscribe what facts may be relevant to the factors identified therein in any particular case, Ms. Potter cites the following as exemplar events that the administrative judge allegedly should not have considered: Dr. Deering's removal in June 2016, her tentative job offer in California on February 8, 2017, and her confirmed job offer on March 9, 2017. Pet. Br. 16.

But it was Ms. Potter herself who asserted that events from this time period are relevant; she claimed that her job search coming to a close in March 2017 and the agency then moving forward with the Chief Nurse IV recruitment undermined Dr. Deering's reasons for his earlier decision to cancel the recruitment effort. *See* Appx#0011. That Dr. Deering left the Phoenix VA in June 2016 supports the administrative judge's finding that: (1) Dr. Deering's "recollection was admittedly less than certain as to the precise series of events leading up to his November 2015 decision to cancel the vacancy," Appx#0013-14; and (2) the agency's March 2017

37

actions are no reason "to doubt the sincerity of Deering's reasoning" because "Deering had been gone from the agency for nine months by that time and has not been shown to have any role in the agency's March 2017 actions," Appx#0015.

Lastly, Ms. Potter alleges that the board misapplied the clear and convincing evidence standard because it "failed to consider substantial evidence in the record that fairly detracted from the weight of the Agency's reasoning for its decision to cancel the recruitment" effort. Pet. Br. 14. As an initial matter, the board's "failure to discuss particular contentions or evidence does not mean that it did not consider them in reaching its decision." *Lyons v. Dep't of Veterans Affairs*, 273 F. App'x 929, 931 (Fed. Cir. 2008). "All that means is that the author of the [decision], for whatever reason, did not deem it necessary or appropriate specifically to discuss those points." *Id.* In any event, as discussed in section II.B, *infra*, the circumstances that Ms. Potter highlights neither detract from Dr. Deering's reasons for the cancellation nor evidence that Dr. Deering cancelled the vacancy in retaliation for Ms. Potter's July 10, 2014 protected disclosure.

In sum, substantial evidence supports the administrative judge's conclusion that *Carr* factor one strongly favors the agency.

### B.   *Carr* Factor Two Weighs "Modestly" In Ms. Potter's Favor

The administrative judge reasonably found that *Carr* factor two weighs "modestly" in Ms. Potter's favor. Appx#0015. The administrative judge found

38

that Dr. Deering had an "ostensible motive" to retaliate because the July 10, 2014 disclosure "tended to reflect unfavorably upon Deering's management" and caused him to have to choose how to respond. *Id.* However, the administrative judge appropriately weighed that motive against the record evidence that diminishes any retaliatory motive that Dr. Deering may have had, including that Dr. Deering had responded positively to the disclosure. *See id.* Substantial evidence supports the administrative judge's finding that, "taking a straitjacketed approach to the question of motive, . . . Deering had a motive – albeit slight – to retaliate." Appx0015-16. Ms. Potter's contentions to the contrary again seek to have this Court re-weigh the evidence, and, in any event, are unavailing.

Ms. Potter charges that the administrative judge erred by focusing on Dr. Deering's motive to retaliate against her for her July 10, 2014 disclosure. Pet. Br. 24-25. However, far from taking a "dismissive approach" to the question of retaliatory motive, *contra* Pet. Br. 23, the administrative judge appropriately concluded that Dr. Deering's motive was at issue because Dr. Deering made the decision to cancel the vacancy. *See* Appx#0010, Appx#0805-806.

Ms. Potter asserts that the administrative judge should have considered the motives of "other VA management," who "were also copied on the emails containing Ms. Potter's protected whistleblowing disclosures," including her July 10, 2014 disclosure. Pet. Br. 25. However, Ms. Potter does not identify who these

"other VA management" officials are, nor does she explain what their involvement in the decision to cancel the vacancy was or what their motives may have been. In any event, the board must consider only the motives of "the agency officials who were involved in the decision" – here, the decision to cancel the vacancy in November 2015 – not those who simply received the disclosures. *Carr*, 185 F.3d at 1323.

Even though Dr. Venditti and Mr. Grippen are mentioned numerous times in Ms. Potter's opening brief, (1) Ms. Potter "did not allege [before the board] that Venditti had any role in the vacancy cancellation, 'because she was gone at the time,'" Appx#0010 (quoting Appx#0304 (Tr. 272:1-6 (Potter)); (2) Ms. Potter testified that Dr. Venditti told her "that Dr. Deering would be the one making the final decision on that selection," Appx#0167 (Tr. 135:16-21 (Potter)); and (3) Mr. Grippen testified that recruiting for the Chief Nurse IV position was Dr. Deering's decision, Appx#0505 (Tr. 125:9-13) (Grippen)). Moreover, even though Mr. Grippen still worked at the Phoenix VA when Dr. Deering made the cancellation decision, Mr. Grippen (1) did not even recall whether a Chief Nurse IV position had been recruited, *id.* (Tr. 125:4-8) (Grippen)); and (2) was not aware of Ms. Potter's July 10, 2014 disclosure, Appx#0510 (Tr. 130:13-21) (Grippen)).

Similarly, appearing to contend that the administrative judge should have imputed Dr. Deering's slight motive to the officials involved in the 2017 re-posting

decision (which, in any event, is not the subject of this appeal), Ms. Potter asserts

that "the action of Agency officials in the reposting of the Chief Nurse IV position

on the same day Ms. Potter resigned on March 9, 2017 . . . should have been

considered in the analysis of *Carr* factor 2." Pet. Br. 28. Ms. Potter identifies

Dr. Smith as the official who directed the re-posting. Pet. Br. 8. However,

Ms. Potter does not explain why Dr. Smith would have had any motive to retaliate

against Ms. Potter for her July 10, 2014 disclosure to Dr. Deering, which reflected

poorly on Dr. Deering as the Chief of Staff at that time. Moreover, as the

administrative judge found in 2018 when considering whether Ms. Potter's

whistleblowing was a contributing factor in her January 2017 detail, "Ms. Potter

adduced no evidence that . . . Smith had any knowledge of any of [Ms. Potter]'s

established disclosures." Appx#0924.

Ms. Potter, thus, fails to identify any record evidence that detracts from the

administrative judge's conclusion that the question of motive centered on Dr.

Deering, who had only a slight motive to retaliate. Instead, Ms. Potter includes in

her opening brief a laundry list of "events" that occurred "after Dr. Deering signed

off on the December 14, 2014 org. chart, but prior to the nonselection." *See* Pet.

Br. 25 (repeating the list at pages 14 and 15 of her opening brief to allege the

administrative judge inappropriately disregarded evidence that detracts from Dr.

Deering's reasons for the vacancy cancellation). As discussed below, these

41

circumstances do not show that Dr. Deering cancelled the vacancy to retaliate against Ms. Potter for her July 10, 2014 disclosure. Nor do these circumstances detract from Dr. Deering's reasons for the vacancy cancellation. Rather, many of Ms. Potter's concerns allege protected activity (*e.g.*, OIG complaints) that is distinct from the July 10, 2014 protected email disclosure that is at issue in this appeal, or they concern actions of persons who were not involved in the vacancy cancellation decision.

First, Ms. Potter asserts that the vacancy was cancelled as a result of her OIG complaints, rather than as a result of the July 10, 2014 protected email disclosure that is at issue in this appeal. Specifically, Ms. Potter contends that, "[o]n January 23, 2015, Mr. Lowe informed Ms. Potter that staff had animosity against nurses, and particularly against her, due to her participation in OIG complaints." Pet. Br. 25 (citing Appx#0122). Ms. Potter relatedly asserts that six days later, "[o]n January 29, 2015, the OIG released the results of its review of the Phoenix VA's Urology Department, which included a significant amount of information that Ms. Potter provided to the OIG." Pet. Br. 25 (citing Appx#0331). Even if Ms. Potter's alleged OIG complaints were the protected disclosure at issue in this appeal, Dr. Deering testified that he did not know whether Ms. Potter "made any whistleblower type of claims or reports to the OIG." Appx#0573-574 (Tr.

193:25-194:9) (Deering)).  Therefore, Dr. Deering could not have had animosity

against Ms. Potter for her participation in OIG complaints.[9]

Second, Ms. Potter asserts that, "[o]n March 19, 2015, Mr. Grippen

approved an Org Chart reassigning Ms. Potter from Chief Nurse Manager to Nurse

Manager, which removed her from the oversight of the department and prevented

her from being able to report further concerns to the OIG as she was no longer

privy to the handling of patient care referrals."  Pet. Br. 25-26 (citing Appx#0801).

Ms. Potter's focus here on Mr. Grippen is misplaced because Dr. Deering made the

decision to cancel the vacancy.  In any event, Dr. Deering also signed the March

2015 revised organizational chart.  *See* Appx#0009.  However, the administrative

judge, in a portion of the board's 2018 decision that was affirmed by this Court,

concluded that the agency established by clear and convincing evidence that the

---

[9]  Ms. Potter relatedly contends earlier in her opening brief that, also "on January 23, 2015, Dr. Venditti and [Mr. Lowe] accused Ms. Potter of filing an anonymous OIG hotline complaint regarding significant delays by non-VA Care admin staff."  Pet. Br. 5 (citing Appx#0201-202).  However, despite Ms. Potter not alleging that Dr. Venditti had any involvement in the vacancy cancellation decision, Dr. Venditti testified without dispute that she was not interested in who the source was.  Appx#0921 (citing Appx#0433-434 (Tr. 53:16-54:8 (Venditti)).  Mr. Lowe also testified that – despite a meeting during which he asked her whether she was the source of the OIG complaints – he did not actually believe Ms. Potter was the anonymous source of the OIG complaints.  Appx#0920; Appx#0354-357 (Tr. 322:16-325:18 (Lowe)).  In any event, Mr. Lowe was not Ms. Potter's supervisor and "ha[d] no ability to control employment actions related to Ms. Potter."  Appx#0346 (Tr. 314:10-16 (Lowe)).

change in duties would have happened regardless of Ms. Potter's whistleblowing. *See* Appx#0927.

Moreover, Ms. Potter's contention that the change prevented her from being able to report additional concerns to the OIG is belied by her allegation that she made reports to the OIG after the change in duties. *See* Appx#0905 (finding jurisdiction over a December 2016 OIG complaint). Ms. Potter simply fails to explain how changing her title to Nurse Manager over Utilization Review – still under Purchased Care – prohibited her from being privy to the handling of patient care referrals.

Third, Ms. Potter asserts that, "[o]n April 1, 2015, Mr. Grippen expressed to staff that he wanted to 'resolve more issues in-house and try to resolve things before they went out to the media.'" Pet. Br. 26 (quoting Appx#0151). Again, the focus here on Mr. Grippen is misplaced because Dr. Deering cancelled the vacancy. This statement simply says nothing about the reasons for Dr. Deering cancelling the vacancy. Nor does it say anything about Dr. Deering's motive to retaliate, let alone a motive to retaliate specifically against Ms. Potter.

Fourth, Ms. Potter claims that on September 24, 2015 during a mediation, she "informed Ms. Marian Tademy (EEO Program Manager) that she was being retaliated against for her OIG disclosures" and that Ms. Tademy "spoke to Dr. Deering and Mr. Grippen about these concerns." Pet. Br. 26. However, Ms. Potter

does not identify any such testimony by Ms. Tademy in her opening brief. In any event, Ms. Tademy's testimony does not demonstrate that Ms. Tademy spoke about such alleged retaliation to Dr. Deering, the decision maker. Rather, Ms. Tademy's testimony was only that "*Mr. Grippen*" was "one of the individuals that [she] spoke to regarding Ms. Potter's *[EEO] complaint*" – not alleged retaliation. *See* Appx#0388 (Tr. 8:22-25) (Tademy)). Ms. Potter likewise testified that Ms. Tademy met "with Mr. Grippen" and discussed "no selection ha[ving] been made yet" for the Chief Nurse position – not alleged retaliation. Appx#0167-168 (Tr. 135:24-136:2) (Potter)).

Fifth, Ms. Potter states that "[o]n September 28, 2015, Ms. Potter informed Dr. Deering that she could no longer perform the duties of Chief Nurse IV without the official title," and that her request for "a detail to that position" was denied. Pet. Br. 26 (citing Appx#0091). However, this alleged retaliation is outside of those activities over which the administrative judge found jurisdiction. Appx#0906. In any event, given the pushback that Dr. Deering was receiving about implementing the Chief Nurse IV position, as discussed above, Dr. Deering had a non-retaliatory reason for allegedly denying a request to be detailed to the position.

Sixth, Ms. Potter asserts Dr. Deering's decision to cancel the Chief Nurse IV recruitment "was suspicious considering Dr. Deering testified that at the same time

the decision was made not to fill the position, 'there was a lot of discussion about whistleblower reports.'" Pet. Br. 26 (quoting Appx#0622). However, that statement does not show that Dr. Deering had any motive to retaliate against Ms. Potter because Dr. Deering's testimony immediately following that statement was: "I had no idea who the whistleblowers were. Until today, I didn't realize that Tiffany was a whistleblower." Appx#0622 (Tr. 242:19-20 (Deering)). This statement shows that, even though Dr. Deering had received and responded to Ms. Potter's July 10, 2014 protected disclosure, he did not consider that to mean she was a whistleblower against whom he could conceivably have a motive to retaliate. As the administrative judge accordingly found in 2018, "there is nothing suspicious in what Deering said." Appx#0918. Additionally, as the administrative judge also recognized then, the portion of Dr. Deering's testimony cited by Ms. Potter shows that he was responding to a leading question, and "answers to leading questions are entitled to less weight than answers to open-ended questions." *Id.*[10]

---

[10] Ms. Potter also references Dr. Deering cancelling the "Chief of Purchased Care" recruitment after Ms. Potter inquired about applying to that position. Pet. Br. 26. However, that apparently additional alleged reprisal was not before the board. Even if it had been, the record shows that Dr. Deering's explanation to Ms. Potter for the cancellation of that recruitment effort was consistent with his reasoning for cancelling the Chief Nurse IV recruitment effort. *See* Appx#0807 (Dr. Deering's November 23, 2015 email explaining: "We are going to close this position and reconsider our options – we have several meetings coming up to discuss the structure/function of the Admin Med Service.").

46

Seventh, Ms. Potter claims that Dr. Deering had motive to retaliate because he "was required to participate in Congressional Hearings for the OIG investigation, which included information from her protected disclosures." Pet. Br. 26-27. However, as the administrative judge found in 2018, Ms. Potter "adduced no evidence that she was the reason that Congress called Deering to testify" and there was "no reason to assume that [Ms. Potter] was the only individual who made complaints to OIG." Appx#0918. Nor does Ms. Potter point to any evidence that undermines Dr. Deering's testimony that he testified before Congress in *September* 2014, Appx#0564-565 (Tr. 184:24-185:5) (Deering)), months *before* Dr. Deering signed the December 2014 org chart *improving* Ms. Potter's title to "Chief Nurse Manager." Moreover, again, the issue in this appeal is whether Dr. Deering cancelled the vacancy to retaliate against Ms. Potter for her July 10, 2014 protected email disclosure, not for any other activities that Ms. Potter may have conducted and may have caused Dr. Deering to be required to testify before Congress.

In any event, consistent with the administrative judge's 2018 decision and decision on remand, "[e]ven if [Ms. Potter] adduced such evidence of Deering blaming her for having to testify before Congress, . . . it [is] implausible that Deering would then sign an organization chart in December 2014 that the appellant considered to be favorable to her – yet he did." Appx#0918-919. "Those are not

47

the actions one would expect of a man determined to retaliate against [Ms. Potter] for her July 10, 2014 disclosure." Appx#0015.

Eighth, Ms. Potter points to Dr. Deering's "frustrat[ion] that "people were going to the OIG" rather than "com[ing] to [him]" with problems so "we could tackle it together." Pet. Br. 27 (quoting Appx#0595). However, as the administrative judge observed in 2018, because "many, if not most Phoenix VA employees had some level of communication with the OIG during the timeframe at issue in this appeal," "it would be inappropriate to simply presume that everything under the sun that happened to any Phoenix VA employee for several years was reprisal for their OIG involvement." Appx#0922.

Thus, contrary to Ms. Potter's assertions, substantial evidence demonstrates that *Carr* factor two only modestly favors Ms. Potter.

## C.    The Board Did Not Err In Finding *Carr* Factor Three Is Neutral

The administrative judge did not err in finding that the third *Carr* factor is neutral because, although "the record contains evidence that three other individuals also applied for the vacancy and thus were also affected by Deering's November 2015 vacancy cancellation," "neither party adduced any evidence as to [the three] other applicants' qualifications or status as whistleblowers or non-whistleblowers." Appx0016.

48

Nonetheless, the record demonstrates that those applicants – just like Ms. Potter – lost the opportunity to fill the position in November 2015. The agency therefore took the same action against Ms. Potter as it did against any similarly-situated applicants. *Carr*, 185 F.3d at 1323. If the Court disagrees, this does not weigh against the agency, but instead "effectively remove[s] . . . factor [three] from the [*Carr*] analysis." *Whitmore*, 680 F.3d at 1374.

Ms. Potter asserts that the administrative judge committed legal error by concluding that the agency met its burden in defense, even though the VA did not produce "evidence on the three additional applicant's qualifications, and their status as whistleblowers or non-whistleblowers." Pet. Br. 30 (citing *Miller*, 842 F.3d at 1262). Contrary to Ms. Potter's claims, the administrative judge's weighing of *Carr* factor three along with factors one and two was neither contrary to law nor arbitrary.

Although, as Ms. Potter points out, the agency's failure to produce evidence on *Carr* factor three "may be at the agency's peril," Pet. Br. 29 (citing *Whitmore*, 680 F.3d at 1374), this Court recognized in *Carr* that "the absence of any evidence that [an agency] treated similarly situated employees the same way it treated" the petitioner is just one of three factors that the administrative judge weighs as part of the *Carr* test. *Carr*, 185 F.3d at 1326. Indeed, this Court explained in *Whitmore* that "*Carr* does not impose an affirmative burden on the agency to produce

49

evidence with respect to each and every one of the three *Carr* factors to weigh

them each individually in the agency's favor," given that these "factors are merely

appropriate and pertinent considerations for determining whether the agency

carries its burden of proving by clear and convincing evidence that the same action

would have been taken absent the whistleblowing." *Whitmore*, 680 F.3d at 1374.

Accordingly, "the absence of any evidence relating to *Carr* factor three can

effectively remove that factor from the analysis." *Id.*

Moreover, that this Court found in *Miller* that the absence of evidence on

*Carr* factor three "add[ed] little to the overall analysis in [that] case, but if

anything, tend[ed] to cut slightly against the Government," 842 F.3d at 1262, does

not mean that an agency's failure to produce evidence of comparators always cuts

against the agency.  Rather, this Court's conclusion about the weight of *Carr* factor

three in *Miller* depended upon the specific circumstances of that case, in which –

distinct from the case here – there *was* limited testimony about comparators from

the decision maker.  *See id*.

Finally, Ms. Potter contends that the administrative judge "ignor[ed] Ms.

Potter's testimony as to the three similarly situated employees who were not

whistleblowers, whom she believed were treated differently." Pet. Br. 30-31.  But

Ms. Potter's testimony does not say anything about whether the three other

employees were whistleblowers, let alone whether these individuals applied for the

Chief Nurse IV vacancy that Dr. Deering cancelled in November 2015. *See* Pet. Br. 31 (citing Appx#0236-237, Appx#0295).[11] Accordingly, Ms. Potter's testimony does not undercut the administrative judge's finding that *Carr* factor three is neutral because "neither party adduced any evidence as to [the three] other applicants' qualifications or status as whistleblowers or non-whistleblowers." Appx0016.

* * *

In sum, the board reasonably concluded that *Carr* factor one heavily favored the agency, that *Carr* factor two only modestly favored Ms. Potter, and that *Carr* factor three was neutral. Substantial evidence supports the administrative judge's conclusion that the agency met its burden to show that Dr. Deering would have cancelled the vacancy regardless of Ms. Potter's July 10, 2014 disclosure. The administrative judge, therefore, properly denied corrective action.

## CONCLUSION

For these reasons, we respectfully request that the Court affirm the decision of the MSPB.

---

[11] Ms. Potter also fleetingly refers to the administrative judge's 2018 finding that there likely would not be other comparators because of Ms. Potter's "unique stature" on the organizational chart. *See* Pet. Br. 30. But that reference is misplaced because that finding concerning *Carr* factor three related to the March 2015 change in duties claim, *see* Appx#0932, the board's decision on which this Court affirmed, *Potter*, 949 F.3d at 1381.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

MARTIN F. HOCKEY, JR.
Acting Director

/s/ Allison Kidd-Miller
ALLISON KIDD-MILLER
Assistant Director

/s/ Bryan M. Byrd
BRYAN M. BYRD
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 305-7607
Email: Bryan.M.Byrd@usdoj.gov

Dated: May 6, 2021                  Attorneys for Respondent

<u>CERTIFICATION OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure (FRAP) 32(a)(7)(B), I certify that the forgoing brief contains 12,349 words, excluding the parts of the brief exempted by the rule.  The brief complies with the typeface requirements and type style requirements of FRAP 32(a)(5) and has been prepared using Times New Roman 14 point font, proportionally spaced typeface.

<u>/s/ Bryan M. Byrd</u>
BRYAN M. BYRD
Counsel for Respondent