**2021-1460**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

---

TIFFANY POTTER,

Petitioner,

v.

DEPARTMENT OF VETERANS AFFAIRS,

Respondent.

---

**Appeal from the Merit Systems Protection Board**
**Case No. DE-1221-18-0165-M-1**

---

**PETITIONER'S REPLY BRIEF**

A. MARQUES PITRE, ESQ.
PITRE & ASSOCIATES, LLC
Ronald Reagan Building and
International Trade Center
1300 Pennsylvania Avenue, N.W.
Suite 700
Washington, D.C. 20004
 (202) 204-3006
ampitre@ampitreassociates.com

*Attorney for Petitioner*

May 27, 2021

## CERTIFICATE OF INTEREST

Counsel for Petitioner, Tiffany Potter, certifies the following:

1. The full name of every party represented by me

    is: Tiffany Potter.

2. The names of the real parties in interest, if different from the parties named

    above, are:

    None.

3. The names of all parent corporations and any publicly held companies

    that own 10% or more of the stock of the party represented by me are:

    None.

4. The names of all law firms and the partners and associates that appeared for

    Petitioner in the trial court or agency or are expected to appear in this court

    are:

    None.

5. The title and number of any case known to counsel to be pending in this

    or any other court or agency that will directly affect or be directly affected

    by this court's decision in the pending appeal:

    None.

6. The names of all organizational victims in criminal cases and debtors and

    trustees in bankruptcy cases are:

N/A.

Date: <u>May 27, 2021</u>                    Respectfully submitted,

/s/ A. Marques Pitre

_____
A. MARQUES PITRE, ESQ.
Pitre & Associates, LLC
Ronald Reagan Building and
International Trade Center
1300 Pennsylvania Avenue, N.W.,
Suite 700
Washington, DC 20004
Phone: 202-204-3006
Direct: 202-840-6797
Email: ampitre@ampitreassociates.com

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................. ii

TABLE OF CONTENTS........................................................................ iv

TABLE OF AUTHORITIES ....................................................................v

ARGUMENT ........................................................................................1

I.  The Board's decision should be vacated because the DVA failed to provide substantial evidence to support the Board's finding that "the evidence as a whole leans strongly in the agency's direction, and that the agency thus met its burden to prove by clear and convincing evidence that it would have cancelled the November 2015 vacancy even if the appellant had never made her July 10, 2014 disclosure." ........................................................1

   A.  The DVA's dearth of evidence to support its reasoning for the cancellation of the November 2015 Chief Nurse IV vacancy does not meet the heighted burden of proof required of the Government, and simply pointing that out is not requesting re-weighing of evidence, nor a creditability determination. .......................................................1

   B.  Mr. Grippen and Dr. Venditti's testimony do not add sufficient weight to the DVA's reasoning for the cancellation of the Chief Nurse IV position to meet the steep burden of clear and convincing evidence. ...................3

   C.  The fact that there is no documentary evidence in the record that shows the Chief Nurse IV position was reclassified in March 2017, is further proof that Dr. Smith's rushed fulfillment of that position after gaining knowledge of Potter's resignation was retaliatory and should have weighed heavily in Potter's favor for Carr factor 2...............................13

   D.  The DVA attempts to transfer the burden of proof to Potter thereby upsetting the whistleblower protection statute's burden shifting mechanism and relieve the DVA of its responsibility of providing clear and convincing evidence of the reasoning for its personnel action.......15

CERTIFICATE OF SERVICE ...............................................................21

CERTIFICATE OF COMPLIANCE.......................................................22

# TABLE OF AUTHORITIES

**CASES**

*Jones v. Dep't of Health and Human Serv.*, 834 F.3d 1361, 1368 ...........................3

*Lyons v. Dep't of Veterans Affairs*, 273 F. App'x 929, 931 (Fed. Cir. 2008) .........17

*Miller v. Dep't of Justice*, 842 F.3d 1252, 1263 (Fed. Cir. 2016) .................. *passim*

*Whitmore v. Dep't of Labor*, 650 F.3d 1353, 1371 (Fed. Cir. 2012).......................15

**STATUTES**

5 U.S.C. § 7703 (c) (1994).......................................................................................17

## ARGUMENT

I.  **The Board's decision should be vacated because the DVA failed to provide substantial evidence to support the Board's finding that "the evidence as a whole leans strongly in the agency's direction, and that the agency thus met its burden to prove by clear and convincing evidence that it would have cancelled the November 2015 vacancy even if the appellant had never made her July 10, 2014 disclosure."[1]**

A.  The DVA's dearth of evidence to support its reasoning for the cancellation of the November 2015 Chief Nurse IV vacancy does not meet the heighted burden of proof required of the Government, and simply pointing that out is not requesting re-weighing of evidence, nor a creditability determination.

Brief of Respondent ("Resp't Br."), filed May 6, 2021, contends that "the [MSPB's] credibility determinations are 'virtually unreviewable on appeal,'" Resp't Br. 29, and that "Dr. Deering's contemporaneous email to Human Resources directing the cancellation explained that the recruitment effort needed to be cancelled because: "We need to have more discussion about the best way to structure this service (*i.e.*, what sections should be in this service, where the nurse 4 should report, etc[.], etc[].) before we move toward a selection" was sufficient rational for the Administrative Judge's (AJ) finding that *Carr* factor one "weighed heavily in the agency's favor."  Resp't Br. 31; *see also* Appx#0806. The DVA then goes on to cite to additional testimony from Deering for which they argue corroborates the reasoning provided for the cancellation. The DVA argues that Potter "seeks to have

---

[1] Appx0016 (Initial Decision #2 (Sept. 16, 2020)).

this Court re-weigh the evidence, including the board's credibility determinations," Resp't Br. 34, The DVA attempts to persuade this Court of that position by stating, "to the extent that there is conflicting evidence in the record, '[u]nder the substantial evidence standard of review,' this Court does 'not reweigh evidence.'" *Id*. (citations omitted).

However, the facts and case law cited by the DVA fall short of demonstrating its contention. Indeed, this Court in *Miller* struck down an almost identical argument made in responding to a dissenting opinion. Specifically, the *Miller* Court stated, "[c]ontrary to the dissent's suggestion, we do not hold that Warden Upton is not credible or that his testimony requires corroboration as a matter of law. Nor have we reweighed the evidence. The dissent accuses our opinion of having a breadth that it simply does not have. We merely hold that, in this case, there is a failure of proof because the Government did not meet its burden." *Miller v. Dep't of Justice*, 842 F.3d 1252, 1263 (Fed. Cir. 2016). "Congress instituted a particular statutory framework for analyzing whistleblower cases, including a heightened burden of proof once the whistleblower has established by a preponderance of the evidence that whistleblowing was a contributing factor in a personnel action." *Id.* "This heightened burden of proof required of the agency recognizes that when it comes to proving the basis for an agency's decision, the agency controls most of the cards -- the drafting of the documents supporting the decision, the testimony of witnesses

who participated in the decision, and the records that could document whether similar personnel actions have been taken in other cases." *Id.* (quoting 135 Cong. Rec. H747-48 (daily ed. Mar. 21, 1989) (explanatory statement on Senate Amendment to S. 20)). Moreover, contrary to one case the DVA cites, the AJ in this matter did not consider whether Deering's testimony was "contradicted by extrinsic evidence," nor did he give "full credit"[2] to the evidence that fairly detracted from his alleged reasoning, therefore, when, as here, this Court is confronted with a dearth of evidence presented on behalf of the DVA, it is not being asked to reweigh evidence, or make creditability determinations, it's being asked to merely assess whether the DVA failed to provide the evidence to meet the heighten burden that is required in whistleblower cases. The record shows that it has, in fact, failed to do just that.

   B. <u>Mr. Grippen and Dr. Venditti's testimony do not add sufficient weight to the DVA's reasoning for the cancellation of the Chief Nurse IV position to meet the steep burden of clear and convincing evidence.</u>

The DVA argues that testimony from Grippen and Venditti corroborate Deering's reasoning for the November 2015 Chief Nurse IV cancellation[3], and

---

[2] *Jones v. Dep't of Health and Human Serv.*, 834 F.3d 1361, 1368 (Fed. Cir. 2016).

[3] The DVA states, "[a]s detailed above, the administrative judge thoroughly considered and weighed the evidence substantiating the reasons for Dr. Deering's cancellation of the vacancy, including Dr. Deering's contemporaneous email to Human Resources directing the cancellation, Dr. Deering's corroborating testimony, and the testimony of Dr. Venditti and Mr. Grippen." *See* Appx#0008-16; Resp't Br.

3

provides additional support for the AJ's finding that the DVA met the clear and convincing evidence burden, but they simply do not.

In an attempt to establish that Grippen corroborates Deering's reasoning, the DVA points this Court to only two piecemeal portions of Mr. Grippen's testimony; 1) in response to the question, "[d]o you recall Dr. Deering mentioning that -- mentioning to you anything about being unsure of who the Nurse IV position would report to, based on changes going on in the organization?" (Resp't Br. 35 citing Appx#0520-521 (Tr. 140:21-141:4 (Grippen)), in which he states, "[y]es. I mean, the Milwaukee model was controversial. And traditionally, nurses report to physicians, and we were making them full equals. So -- and there was perception of the controversy of that." *Id.*, and 2) Where Grippen testified that "[c]hange is always challenging" is response to the question of whether there was "pushback from any service lines regarding the structure of one Chief Nurse, one Chief Physician as the head of a department." Resp't Br. 35 citing Appx#0521 (Tr. 141:5-8 (Grippen)).

However, these selective excerpts of Grippen's testimony ignore the full breadth of his related testimony concerning the Chief Nurse IV position. For example, Grippen was asked, "what was your role in getting that process [the Chief Nurse IV getting approved and posted for recruitment] complete," he responded, "[w]ell, I was –I would [have] approve the actual position itself, but then I would

---

34.

4

have nothing else directly involved," Appx#0515 (Tr. 135:15-23 (Grippen)); and when confronted with the question, "was the individuals that were currently staffed keeping up with the current workload," his response was, "[e]veryone was trying to expand services as quickly as possible, from both hiring staff and sending veterans out to the private sector through that certain service. And were we keeping up at the -- at the hardest part of the place, currently we were taking care of far more veterans than we ever had taken care of before." Appx#0517 (Tr. 137:16-23 (Grippen)). When posed with the question, "would the filling of a Chief Nurse IV position assisted or helped with that, in completing those tasks?" he responded, "[i]t possibly could, yes" Appx#0517 (Tr. 137:24-138:4 (Grippen)); and "is that why you considered it a priority?" He responded, "[y]es." Appx#0518 (Tr. 138:3-4 (Grippen)). When further posed with the line of questioning regarding hiring in general, Grippen was asked, "during the reorganization, you all were hiring. Is that correct?" His answer was, "Well, yes, yes." (Appx#0520 (Tr. 140:5-7 (Grippen)). In response to the question, [y]ou were doing a lot of hiring," he responded "Yes." *Id.* at Tr. 140:8-9. Finally, in response to the question, "if the position was approved, there isn't any impediment in hiring that position during a reorganization; is that correct?" his response was "Correct." *Id.* at Tr. 140:14-17.

Curiously, when confronted with the above-mentioned portions of Grippen's testimony, and more specifically his statement '[w]e increased staffing levels

multiple times, Pet. Br. 19 (citing Appx#0504-505; Appx#0520), the DVA makes note of the fact that Grippen and Deering both testified "that those hires had not been for the Chief Nurse IV position at issue."[4] That is exactly the point. The DVA doesn't put forward a reasonable argument or clear and convincing evidence to show why the Chief Nurse IV position in question was the one position that could not be filled due to the ongoing reorganizations. It was already established that the Chief Nurse IV position was a priority[5] that could have helped address the expanded workload during that timeframe. *See* Appx#0517 (Tr. 137:24-138:4 (Grippen)). As such, the Board's decision cannot stand.

Finally, in what appears to be a last-ditch effort at pointing this Court to any additional evidence that would corroborate Deering's reasoning for the vacancy cancellation, the DVA cites testimony from Potter, and states, "Ms. Potter even testified that she understood that there was an intent to reorganize the department

---

[4] *See* Resp't Br. 36. (citing Appx#0525 (Tr. 145:7-15 (Grippen) (testifying that, even though there was a Chief Nurse position listed on the March 2015 organizational chart, no one was serving in that position)); Appx#0604 (Tr. 224:9-24 (Deering) (testifying that no one was performing the Chief Nurse IV position around the time of the vacancy cancellation)); *see also* Appx#0180-181 (Tr. 148:22-149:9 (administrative judge recognizing that Ms. Potter's contention that she had been performing Chief Nurse IV duties does not mean that the position that was recruited for had been filled).

[5] Mr. Grippen responding to the question, "Do you recall giving a high priority to filling this position of chief nurse IV or using words to that effect?" "Again, it's -- it's a critical job in a critical department, so yes, I would have had emphasis on that." (Appx#0504-05 (Tr. 124:7-15, 125:1-3 (Grippen)).

when the recruitment effort was cancelled." Resp't Br. 35 (citing Appx#0325 (Tr. 293:12-24 (Potter)). Like with Grippen, the DVA once again cherry picks the record and takes testimony out of context – this time Potter's testimony.  In fact, when read in complete context, her testimony only further corroborates her supported version of the events. When Potter stated, "this was after I was told that their intent was to reorg the department, to [sic] which would result in removing the position," (Appx#0325 (Tr. 293:20-24 (Potter)), she was referring to her previous testimony where she stated, "[w]e had ADR and after that Marian told me that she met with Mr. Grippen and that in relation to this specific position that no selection had been made yet, that he intended on reorganizing our department to put it under nursing service, so that there would be no more chief nurse position which would result in my ability [not] to be hired into the position. So, the intent was to reorg the department in order to remove the chief nurse position suddenly." Appx#0167 (Tr.135:22-136:6 (Potter)).

Similarly, in another failed attempt at corroborating Deering's reasoning, the DVA fails to point to any testimony or documentary evidence provided by Venditti outside that of which the AJ relied. As stated in Petitioner's Brief, Venditti's statements referenced a period of time prior to the Nurse IV position being approved by VISN and advertised for recruitment in August of 2015. By the time a selection on the Chief Nurse IV position was imminent, Venditti had already left the Phoenix,

VA on official detail.[6]

Moreover, the fact that Venditti and Deering signed an Organizational Chart in December 2014, that did nothing more than reflect the duties that Potter had been performing since 2012, is not evidence that supports the DVA's reasoning for the vacancy cancellation. As Venditti admitted, this was an effort at "trying to get Tiffany [Potter] recognition for being the senior nurse manager and for doing the stuff she had done." *See* Appx#0422 (Tr. 42:19-23 (Venditti)). Deering also admitted "the Chief Nurse Manager title really is a Nurse IV," (Appx#0549 169:15-21 (Deering)), and "we were trying to create something to make her role supported and that she was in a role that – and a title that reflected what she was doing" (Appx#0584 204:7-12 (Deering)), which included allowing Potter to hire an additional Nurse Manager to report to her.[7]  None of this testimony explains why *after* the Chief Nurse IV position was classified and approved in August 2015 (even with the dyad structure Mr. Grippen testified was "controversial," but that he approved, and even

---

[6] Potter testified, "Dr. Venditti would have been the one to submit the name, but right around the time where she would have done that, she is sent away. She was -- she went away on a detail assignment to another VA, so before she left she told me that Dr. Deering would be the one making the final decision on that selection." Appx#0167 (Tr. 135:16-21 (Potter)).

[7] Potter testified that Venditti and Deering not only approved of the title but allowed her to hire a Nurse Manager and additional staff to work underneath her, to take over her Nurse Manager duties. Appx#0298 (Tr. 266:11-15 (Potter)).

after having already received some "push back" from unnamed service lines) Deering chose to cancel the recruitment only after Potter applied. Grippen was the Phoenix, VA Medical Center Director, not Deering; so, it feigns reasoning to believe that if Grippen considered filling the position a "high priority,"[8] with the understanding that "change is challenging,"[9] why his decision to have the position posted for recruitment and filled would not have been followed through by his subordinates, barring some extraordinary circumstance. The DVA's stated reasoning for the November 2015 vacancy cancellation is far from being extraordinary. At best, it's "independent causation evidence . . . [is] weak"[10] and does not support the clear and convincing burden of proof.

The DVA also expended an impressive amount of time and effort to argue that even though Potter's title was reflected as a Chief Nurse Manager on the December 2014 Organizational Chart, that "well-meaning gesture" did not affect Potter's job title or pay[11], and thus was not meant to be a promotion. So it strains congruity to think that when Potter was given the opportunity to obtain the Chief Nurse IV

---

[8] *See* Appx#0504 (Tr. 124:25-125:1-3 (Grippen)); Appx#0518 (Tr. 138:3-4 (Grippen); Appx#0533 (Tr. 153:9-16 (Grippen)).

[9] *See* Appx#0521 (Tr. 141:8 (Grippen)).

[10] *Miller v. Dep't of Justice*, 842 F.3d at 1263.

[11] Appx#0950 (Agency's Closing Br. at 2-3, *Potter v. Dep't of Veterans Affairs*, Docket No. DE-1221-18-0165-M-1 (M.S.P.B. Nov. 14, 2018)).

position, after it was finally approved by VISN and posted for recruitment, the AJ's reasoning that "the single most compelling item of evidence is this: "the individuals the appellant accuses of retaliating against her on March 19, 2015 are the very same individuals responsible for the December 8, 2014 organization chart and title she preferred and wished had not been changed on March 19, 2015," (Appx#0928), was not only reasonable, but enough corroboration to find that *Carr* factor 1 "weighs strongly in the agency's favor."[12] That reasoning completely ignores the fact that providing Potter the title of Chief Nurse Manager in December 2014 was nothing more than an empty symbolic gesture that had no financial or career advancing ramifications. The record shows when faced with the decision to officially hire Potter into the Chief Nurse IV position in November 2015, this was not something Deering or the DVA was willing to do because of her whistleblowing; even after the excuse of the position not being VISN approved was no longer on the table. It can be reasonably agreed upon that officially hiring Potter into the position of Chief Nurse IV is of significantly greater importance, both financially and career impacting, than providing her a symbolic title on an Organizational Chart.

Finally, the DVA attempts to close the factual gaps in its flawed reasoning for their cancellation of the November 2015 vacancy by proffering the theory, albeit for

---

[12] *See* Appx#0014-15.

the first time, that the patient access crisis, and resulting leadership turnover, must

have "inevitably delayed decision-making" for the Chief Nurse IV position. Resp't

Br. 37. There is no testimony nor documentary evidence in the record that supports

this assertion, and even testimony cited by the DVA fails to reach that conclusion.[13]

The testimony from Potter cited by the DVA, where she discussed "turnover in

leadership" was prior to the Chief Nurse IV position being classified and approved

by VISN in August 2015. Therefore, this was another failed attempt by the DVA to

use that one statement, out of context, as corroborating evidence for its weak

evidentiary reasoning.[14]

The DVA's practice of convoluting the testimony continued when the DVA

cites to Nelson testifying that "Administrative Medicine Service ultimately was not

headed by a co-equal doctor or nurse." Resp't Br. 37 (citing Appx#0065 (Tr. 65:9-

21 (Nelson)). That testimony does not provide an accurate picture, because in fact,

Administrative Medicine Services ended up removing the physician from the service

---

[13] *See* Resp't Br. 37 (citing Appx#0038 (Tr. 6:15-18 (Nelson) ("[W]hen I arrived in October 2016, I was the seventh director in a two-year period, so there was a lot of chaos here at the [Phoenix VA] and a lot of that was based on the scandal from 2014.")); *see also* Appx#0137 (Tr. 105:10-25 (Potter) (noting that "turnover in leadership" delayed recruiting for Chief Nurse IV)).

[14] Potter testified, "[e]ven prior to that, that was always the goal because she acknowledged that what I was doing was at that level. But because of the turnover in leadership, on the nursing side, and getting that finalized, there were barrier there, so that's why I escalated it then to Dr. Deering to see if he could help make something happen, so that I could perform the functions in that department successfully." Appx#0137 (Tr. 105:17-25 (Potter)).

11

line all together.  Therefore, the Chief Nurse IV ran the service line independently. Appx#0090 (Tr. 58:20-22 (Nelson). More importantly, the Chief Nurse IV position that Nelson is testifying about was created from the January 2017 detail to unclassified duties that Potter was performing prior to her resignation, and which was posted for recruitment and fulfillment the same day the DVA learned of that resignation. *See* Appx#0801; Appx#0189 (Tr. 157:19-25 (Potter)); Appx#0197 (Tr. 165:15-23 (Potter)); Appx#0237 (Tr. 205:7-22 (Potter)). Moreover, Nelson's testimony further cuts against the DVA's reasoning that "reorganizations" and "changes in a service line" somehow prevented the fulfillment of the Chief Nurse IV position. When the position was re-posted in March 2017, Nelson testified: "So the Nurse IV position was created, based on just an assessment of what was going on in the service and what needed to be done….[w]hen the physician was taken out of this service, there was really no discussion to bring that role back, because in assessing where the department was, the changes were made to address the current work and how the work needed to be done and the need to have a physician over this did not really stand out as a good use of that position basically, because of what the MD would be doing." Appx#0091 (Tr. 59:12-23 (Nelson)); Appx#0097 (Tr. 65:25-66:7 (Nelson)). Based on this testimony, the same questions regarding the service line (*i.e.*, whether it would be co-led by a Physician and Chief Nurse IV) that were occurring in November 2015 were also occurring in March 2017. However, in March

2017, after Potter's resignation, the Chief Nurse IV position was re-posted for recruitment and filled with an individual, Ann Wilford, whom the DVA failed to provide any evidence of her whistleblower status, thereby cutting against *Carr* factor 3 as discussed below.

Therefore, when confronted with all of the evidence cited by Potter in her opening brief that fairly detracts from the DVA's reason for the November 2015 vacancy cancellation, (Pet. Br. 14-15), the AJ's finding that *Carr* factor 1 "weigh[ed] strongly in the agency's favor," and thus, met the clear and convincing evidence burden, was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, is unsupported by substantial evidence, and its decision should be vacated.

> C. <u>The fact that there is no documentary evidence in the record that shows the Chief Nurse IV position was reclassified in March 2017, is further proof that Dr. Smith's rushed fulfillment of that position after gaining knowledge of Potter's resignation was retaliatory and should have weighed heavily in Potter's favor for *Carr* factor 2.</u>

The DVA would like this Court to find that Potter's argument that the DVA's lack of documentary evidence of a change in functional statement, or a reclassification of the Chief Nurse IV position, prior to its March 2017 reposting, as proof of their failure to meet the clear and convincing evidence burden "is misplaced," because "the record does not establish that Dr. Deering cancelled the vacancy in November 2015 for either the functional statement or the classification

needing to be changed." Resp't Br. 38. Or because "[t]he administrative judge explained that Dr. Deering 'had been gone from the agency for nine months by that time and has not been shown to have any role in the agency's March 2017 actions.'" Resp't Br. 42 (citing Appx#0015). This rationale completely misses the mark.

The reason a lack of documentary evidence of a new functional statement or proof of a reclassification of the Chief Nurse IV position, prior to it being reposted for recruitment in March 2017, proves that it could have been reposted for recruitment at *any time prior* to Potter's resignation, but curiously, DVA's management, specifically Smith, waited until she was informed of Potter's resignation before rushing the Chief Nurse IV position out for recruitment. *See* Appx#0080; *see also* Appx#0237 (Tr. 205:7-22 (Potter). It is undisputed that prior to a Chief Nurse IV position being classified and posted for recruitment, a Functional Statement must be sent to VISN for approval. Appx#0054 (Tr. 22:1-25-23:1-15 (Nelson)); Appx#0713 (Tr. 333:23-334:2 (Deering)). According to Duarte, during his time as the ACOS, he was not aware of the Chief Nurse IV going through reclassification. Appx#0703 (Tr. 323:8-12 (Duarte)). Additionally, Deering testified that [if the position was not reclassified] since it had already gone through the classification process at VISN, it could have been reposted for fulfillment at any time. Appx#0713 (Tr. 333:20-334:14 (Deering)). The fact that the record is void of any documentary evidence showing the position had gone through this

reclassification process, and the suspect timing of the reposting of the position in March 2017, is evidence that should strike against the DVA in a clear and convincing evidence burden analysis. As the court in *Miller* stated, [position classifications] "are the types of personnel actions for which papers would normally attach."[15] In this case, none were proffered by the DVA. Lastly, since the DVA has yet to put forward any logical reasoning why posting for recruitment of the Chief Nurse IV position was suddenly rushed the same day they became aware of Potter's resignation, as a matter of law, this must cut against their reasoning for the vacancy cancellation in November 2015.[16]

 D. <u>The DVA attempts to transfer the burden of proof to Potter thereby upsetting the whistleblower protection statute's burden shifting mechanism and relieve the DVA of its responsibility of providing clear and convincing evidence of the reasoning for its personnel action.</u>

After ineffectively arguing that only Deering's motive should be considered in a *Carr* factor 2 analysis, which is counter to what this Court later found and expanded upon in *Whitmore*[17], the DVA then spends a considerable amount of ink

---

[15] *See Miller v. Dep't of Justice*, 842 F.3d at 1261.

[16] *Id.* (finding that the government did not present *strong* evidence of independent causation and as such, the first *Carr* factor did not cut in the governments favor.) (emphasis added).

[17] *See Whitmore v. Dep't of Labor*, 650 F.3d 1353, 1371 (Fed. Cir. 2012) ("When a whistleblower makes . . . highly critical accusations of an agency's conduct, an agency official's merely being outside that whistleblower's chain of command, not directly involved in alleged retaliatory actions, and not personally named in the whistleblower disclosure is insufficient to remove the possibility of a retaliatory

discussing all the reasons why Potter "fails to identify any record evidence that detracts from the administrative judge's conclusion that the question of motive centered on Dr. Deering, who had only a slight motive to retaliate." Resp't Br. 46-47. As an initial matter, the DVA's assertion that "Potter adduced no evidence that…Smith had any knowledge of any of [Ms. Potter]'s established disclosures," (Resp't Br. 47), is patently false. One, it was well established that due to Smith's role in the organization (Associate Director for Patient Care Services), the fact that she "was over nursing service," and a member of the Pentad, (Appx#0088 (Tr. 56:3-15 (Nelson)), she would have been privy to what established disclosures were made by her subordinates, which in this case is Potter. Duarte testified that he "discusses these types of issues" at the morning meetings with senior leadership, which included Nelson, Bransky and Smith. Appx#0685 (Tr. 305:24-306:9); Appx#0042 (Tr. 10:12-24). Finally, Smith was copied on the November 1, 2015 vacancy cancelation email from Deering, so she was aware of the DVA's personnel action from the beginning. Appx#0805-06; Appx#0324 (Tr. 292:25-293:9 (Potter)).

Second, the DVA asserts that the board's "failure to discuss particular contentions or evidence does not mean that it did not consider them in reaching its decision," reasoning that "[a]ll that means is that the author of the [decision], for whatever reason, did not deem it necessary or appropriate specifically to discuss

motive or retaliatory influence on the whistleblower's treatment.").

those points" is equally unpersuasive. *See* Resp't Br. 44 (citing *Lyons v. Dep't of Veterans Affairs*, 273 F. App'x 929, 931 (Fed. Cir. 2008))*.* The difference in this case and *Lyons* is "that there is [ample] reason to think [the AJ] did not consider all of the evidence before [him], considering he failed to provide any of it in his analysis in the Initial Decision #1 or #2."[18] Furthermore, [Potter] does explain how this [evidence] would have altered the Board's decision."[19]

The DVA then proceeds to attack what they consider a "laundry list" of "events" that occurred "after Dr. Deering signed off on the December 14, 2014 org. chart, but prior to the nonselection." Resp't Br. 47. The significant amount of time DVA spent attempting to poke holes in how each event should not detract from the DVA's real reason to cancel the Chief Nurse IV vacancy – retaliation against Potter - is unconvincing. As an initial matter, it is the DVA's own arguments, and not the reasoning within the *Boards final decision*, that lead to these conclusions, thus, their relevance is of minimal importance.[20] Even still, in their analysis, the DVA makes

---

[18] *See* Appx#0906 (Initial Decision #1 (Dec. 13, 2018)); Appx#0001 (Initial Decision #2 (Sept. 16, 2020)).

[19] *Lyons v. Dep't of Veterans Affairs*, 273 F. App'x 929, 931 (Fed. Cir. 2008).

[20] Under 5 U.S.C. § 7703, the Court may set aside a final decision of the Board if the decision is "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703 (c) (1994) (*citing Terban v. Dep't of Energy*, 216 F.3d 1021, 1024 (Fed. Cir. 2000)).

the same critical mistake as the dissent in *Miller*, questioning the affirmative evidence Potter has provided to prove the DVA's reasoning for November 2015 vacancy cancelation was due to her whistleblowing. As this Court stated, "the dissent wholly ignores what the Board already found and the Government does not dispute on appeal: Mr. Miller "made protected disclosures under 5 U.S.C. § 2302(b)(8) that were a contributing factor in the decision to reassign him…[t]hus, our review is strictly limited to whether the Government met its steep burden to show independent causation guided by the *Carr* factors, in which the dissent fails to ground its discussion." *Miller v. Dep't of Justice*, 842 F.3d at 1263. The DVA similarly fails to ground its discussion on the strength of its evidence because it is lacking. It continues with this error in its analysis of *Carr* factor 3 when it states, "Ms. Potter's testimony does not say anything about whether the three other employees were whistleblowers, let alone whether these individuals applied for the Chief Nurse IV vacancy that Dr. Deering cancelled in November 2015. *See* Pet. Br. 31 (citing Appx#0236-237, Appx#0295)." Resp't Br. 56-57.  "Accordingly, Ms. Potter's testimony does not undercut the administrative judge's finding that *Carr* factor three is neutral because "neither party adduced any evidence as to [the three] other applicants' qualifications or status as whistleblowers or non-whistleblowers. (citing Appx0016)." Resp't Br. 57. The burden of producing evidence on the three additional applicant's qualifications, and their status as whistleblowers or non-whistleblowers, is solely on

the DVA, considering "the Government has the advantage in accessing this type of evidence."[21] The fact that the DVA failed to produce any evidence for *Carr* factor 3, should have cut against the clear and convincing evidence burden they are required to meet.[22]

It is well-established that once Potter proved a *prima facie* case, which in this matter is undisputed, the burden shifted to the DVA to provide clear and convincing evidence that they would have cancelled the November 2015 Chief Nurse IV vacancy absent Potter's whistleblowing. Simply put, the DVA would like this Court to uphold the AJ's ruling that one email sent by Deering to HR requesting the vacancy cancelation; brief testimony of Deering self-corroborating that reasoning, cherry-picked testimony from Grippen and Venditti, which was mostly used out of context, against the backdrop of Potter's substantial evidence that fairly detracted from the weight of the DVA's reasoning, was enough to meet that clear and convincing evidence burden. This Court has consistently disagreed. When applying the *Carr* factors, the DVA failed to meet that heighted/steep burden of proof. Thus, the Board's finding to the contrary was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, is unsupported by substantial evidence, and thus, its decision should be vacated.

---

[21] *Miller v. Dep't of Justice*, 842 F.3d at 1262 (citing *Whitmore*, 680 F.3d at 1374).

[22] *See* Pet. Br. 29.

## CONCLUSION

For the foregoing reasons, Petitioner respectfully requests that the Court vacate the Board's decision and that this case be remanded for a decision comporting with the precepts delineated herein and for such other and further relief as deemed just and proper.

Respectfully submitted,

/s/ A. Marques Pitre

_____

A. MARQUES PITRE
Pitre & Associates, LLC
Ronald Reagan Building and
International Trade Center
1300 Pennsylvania Avenue, N.W.,
Suite 700
Washington, DC 20004
Phone: 202-204-3006
Direct: 202-840-6797
Email: ampitre@ampitreassociates.com

## CERTIFICATE OF SERVICE

I certify that, on this 27th day of May 2021, I served a copy of *Petitioner's Reply Brief* electronically via the CM/ECF system, which gave notice to all counsel of record.

Respectfully submitted,

/s/ A. Marques Pitre

_____

A. MARQUES PITRE, ESQ.

## <u>CERTIFICATE OF COMPLIANCE</u>
## <u>WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS,</u>
## <u>AND TYPE STYLE REQUIREMENTS</u>

1.      This brief complies with the type-volume limitation of Federal Circuit Rule 32(a). This brief contains 5,010 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

3.      This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

Date: <u>May 27, 2021</u>                      Respectfully submitted,

                                     /s/ A. Marques Pitre
                                     _____
                                     A. MARQUES PITRE
                                     Pitre & Associates, LLC
                                     Ronald Reagan Building and
                                     International Trade Center
                                     1300 Pennsylvania Avenue, N.W.,
                                     Suite 700
                                     Washington, DC 20004
                                     Phone: 202-204-3006
                                     Direct: 202-840-6797
                                     Email: ampitre@ampitreassociates.com