**21-1460**

---

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

---

TIFFANY M. POTTER,

Petitioner

v.

DEPARTMENT OF VETERANS AFFAIRS,

Respondent

---

**Petition For Review From The Merit Systems Protection Board
In Case No. DE-1221-18-0165-M-1
Initial Decision of David S. Brooks, Administrative Judge**

---

**JOINT APPENDIX**

A. MARQUES PITRE
PITRE & ASSOCIATES, LLC
Ronald Reagan Building and
International Trade Center
1300 Pennsylvania Avenue, N.W.
Suite 700
Washington, D.C. 20004
 (202) 204-3006
ampitre@ampitreassociates.com

*Attorney for Petitioner*

June 3, 2021

## STATEMENT OF THE ISSUES

1.     Whether the Board erred in finding that the Agency met their burden to establish by clear and convincing evidence that it would have taken the same actions absent Ms. Potter's protected disclosures?

## JOINT APPENDIX DESIGNATION OF MATERIALS
## TABLE OF CONTENTS

Initial Decision - Case No. DE-1221-18-0165-M-1(Sept. 6, 2020) ……. Appx0001

Certified Docket Sheet - Case No. DE-1221-18-0165-M-1…………...Appx0025

**Transcripts**

Hearing Transcript Excerpts (Oct. 22, 2018) ……………………...……Appx0033

Hearing Transcript Excerpts (Oct. 23, 2018) …….……………....……Appx0381

**Selected Portions of Ms. Potter's Prehearing Submissions**

Appellant's Prehearing Submissions……………..……………..………Appx0734

Email from Ms. Potter to Dr. Venditti
    (May 28, 2014) ……………………….……………….…...Appx0748

Email from Ms. Potter to OIG
    (July 10, 2014) …………………………...…………….…........ Appx0749

Email from Ms. Potter to Drs. Venditti, Deering & Vela
    (July 10, 2014) …………………………...……….…..……... Appx0750

Emails from Ms. Potter to OIG
    (Aug. 7-8, 2014) ……………………...……………….…….......Appx0754

Email from OIG to Ms. Potter (Aug. 20, 2014) ……...………………...Appx0764

Email from Ms. Tademy to Ms. Potter and Meeting Notes
    (Sept. 24, 2015) …………………….......…………………..…Appx0765

Email from Ms. Potter to Dr. Deering
    (Sept. 28, 2015) ……………………......………………….…Appx0767

Email to Ms. Potter re Temporary Detail - Acting Chief of Purchase Care
    (Oct. 28, 2015) ……………………......……………………..Appx0769

Disposition Letter Regarding Chief Nurse IV position
(Nov. 5, 2015) ...............................................….Appx0771

Emails between Ms. Potter and Office of the Medical Inspector
(Dec. 2015) .................................................….Appx0773

Email from Ms. Potter to Dr. Duarte
(Nov. 10, 2016) ……………………..................................Appx0775

Email to Ms. Potter re OIG Complaint
(Dec. 1, 2016) ……………….…..…………….…………………... Appx0777

Detail Memorandum to Unclassified Duties
(Jan. 3, 2017) ……………….……………………………………....Appx0779

Instant Messages between Dr. Duarte and Ms. Potter
(Jan. 17, 2017) ……………….…………………………………......Appx0787

Emails between Ms. Potter & Stephanie White-Lawson
(Jan. 17-27, 2017) ……………….…………....…………..……Appx0788

Email from Ms. Potter to Ms. Nelson
(February 28, 2017) ……....………..………….....……..……....……Appx0795

Instant Messages between Robert McCall, III and Ms. Potter
(March 9, 2017) ……………………....……………..……………....Appx0801

**<u>Selected Portions of the Agency's Prehearing Submissions</u>**

Administrative Medicine Service Organization Chart
(Dec. 8, 2014)……………………………………..……………….Appx0802

Administrative Medicine Service Organization Chart
(Mar. 19, 2015) ……………………………………….........…Appx0803

Email from Dr. Deering to Human Resources
(Nov. 1-4, 2015) …………..………..………....…………….…… Appx0804

Email from Dr. Deering to Ms. Potter

(Nov. 23, 2015)………………………………………….…..…Appx0807

Email from Geehan Chua to Ms. Potter
          (Feb. 8, 2017)..………………………………………..…………Appx0809

Letter from Ms. Potter to RimaAnn Nelson
          (Mar. 6, 2017).………………………………………..………Appx0811

Email from Christina Belin to Ms. Potter
          (Mar. 9, 2017)……………………………………...…………Appx0812

Transcript of Meeting with Ms. Potter, Mr. Grippen, and Dr. Deering
          (Nov. 6, 2018) ……………………………………..………Appx0813

## Pleadings, Charge, Findings or Opinions

Ms. Potter's OSC Complaint
          (Mar. 20, 2017) ………………………………….…....…….......Appx0837

Ms. Potter's Individual Right of Action (IRA) Appeal
          (Feb. 13, 2018) ……………………..……………………........Appx0864

Initial Decision - Case No. DE-1221-18-0165-W-1(Dec. 13, 2018) …… Appx0906

Order, *Potter v. DVA*, 2019-1541 (Fed. Cir. Feb. 13, 2020) ……………...Appx0941

Agency's Closing Br. at 2-3, Potter v. Dep't of Veterans Affairs, Docket No. DE-
          1221-18-0165-M-1 (M.S.P.B. Nov. 14, 2018)……………….…... Appx0950

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 3rd day of June 2021, I served a copy of the *Joint Appendix* electronically via the CM/ECF system, which gave notice to all counsel of record.

Respectfully submitted,

/s/ A. Marques Pitre

_____

A. Marques Pitre, Esq.

# UNITED STATES OF AMERICA
## MERIT SYSTEMS PROTECTION BOARD
### DENVER FIELD OFFICE

TIFFANY POTTER,

               Appellant,

     v.

DEPARTMENT OF VETERANS
   AFFAIRS,

               Agency.

DOCKET NUMBER
DE-1221-18-0165-M-1

DATE: September 16, 2020

<u>Marques Pitre</u>, Esquire, Washington, D.C., for the appellant.

<u>Michelle De Vera</u>, Washington, D.C., for the appellant.

<u>Scott MacMillan</u>, Phoenix, Arizona, for the agency.

**BEFORE**
David S. Brooks
Administrative Judge

## INITIAL DECISION

## INTRODUCTION

In this individual right of action (IRA) appeal, appellant Tiffany Potter alleges, *inter alia*, whistleblower reprisal in the agency's November 2015 cancellation of a vacancy. After my first decision found that prima facie claim unsubstantiated, the Federal Circuit vacated that finding and remanded. *Potter v. Department of Veterans Affairs*, 949 F.3d 1376, 1380 (Fed. Cir. 2020); MSPB Docket No. DE-1221-18-0165-M-1, Remand Appeal File (RAF). Subsequently, the appellant requested a decision based on the written record, which closed on June 24, 2020. RAF, Tab 15.

As analyzed below, I find (1) the appellant established her prima facie claim of whistleblower reprisal for the November 2015 nonselection, but (2) the agency met its burden to show that it would have taken the same actions absent her whistleblowing. Consequently, I must DENY the appellant's request for corrective action.

## ANALYSIS AND FINDINGS

### A. Background

The appellant was a Nurse III for the Phoenix V.A. Healthcare System. MSPB Docket No. DE-1221-18-0165-W-1, Initial Appeal File (IAF), Tab 67 at 2-3 (December 13, 2018 initial decision ("ID")). On February 13, 2018, the appellant filed this IRA appeal, DE-1221-18-0165-W-1 (W-1), alleging several instances of whistleblower reprisal.

For the W-1, I convened a hearing on October 22 and 23, 2018, and I issued an initial decision on December 13, 2018. ID at 1 (W-1). My December 13, 2018 initial decision found the appellant met her burden, under 5 U.S.C. § 1221(e)(1), to establish a statutory presumption that her whistleblowing was a contributing factor to her March 2015 change in duties, but that the agency met its burden, under 5 U.S.C. § 1221(e)(2), to show that it would have taken the same action (changed her duties) absent her whistleblowing. ID at 2. My December 13, 2018 initial decision found the appellant did *not* meet her burden to establish a statutory presumption that her whistleblowing was a contributing factor to the November 2015 vacancy cancellation, January 2017 detail and April 2017 reassignment/resignation. ID at 2. Based on those findings, my December 13, 2018 initial decision denied the appellant's request for corrective action. ID at 2 (W-1).

On appeal at the U.S. Court of Appeals for the Federal Circuit, the Court vacated my December 13, 2018 initial decision's conclusion that the appellant did not establish a prima facie whistleblower reprisal claim related to her November

2015 nonselection, because that conclusion was based upon an incorrect finding. *Potter*, 949 F.3d at 1379-80 (citing ID at 15-16, and stating that "the parties agree that the administrative judge incorrectly found that [Chief of Staff] Dr. [Darren] Deering did not have knowledge of Ms. Potter's second protected disclosure, i.e., her July 10, 2014 email"). Indeed, my factual error was clear and not simply a matter of opinion; as the Federal Circuit noted, my own December 13, 2018 initial decision had first stated the relevant fact correctly, before it later stated it incorrectly. *Id.* (Federal Circuit's reference to my ID at 8, which had stated, "The appellant established that she made a protected disclosure to Venditti and others on July 10, 2014. … Tab 63 at 28 (Venditti), 154 (Deering);" and to my ID at 15-16, which later stated, "The appellant did not establish that Deering had any knowledge of any of the appellant's disclosures before he made his decision to cancel the vacancy in November 2015"). I confess my error, and now retrace the steps prescribed by 5 U.S.C. § 1221(e).

In this remand proceeding, DE-1221-18-0165-M-1, I applied the Federal Circuit's decision and found two issues before me:

> Whether, in view of Dr. Deering's knowledge of Ms. Potter's July 10, 2014 email, Ms. Potter presented evidence sufficient to satisfy the knowledge-timing test, or if Ms. Potter otherwise presented evidence sufficient to demonstrate a prima facie case of whistleblower reprisal. [5 U.S.C. § 1221(e)(1).]

> If so, whether the government can meet its burden of showing that it would have taken the same November 2015 personnel action ("failure to hire") regardless of Ms. Potter's protected disclosure. [5 U.S.C. § 1221(e)(2).]

RAF, Tab 5 at 1-2. After conferring with the parties, I ordered a June 24, 2020 close of record for any further submissions. RAF, Tab 15 at 2. Although neither party made any substantive submission in response to my order,[1] they had already

---

[1] On the close of record date, June 24, 2020, the agency did not submit any new evidence but requested an extension to do so. RAF, Tab 16. I denied that request. RAF, Tab 18.

submitted exhibits from their Federal Circuit litigation in this case, which I have considered in rendering the instant initial decision.

B. Burdens of Proof and Applicable Law

The Whistleblower Protection Act (WPA) prohibits an agency from taking a personnel action because of any whistleblowing "disclosure" or activity. 5 U.S.C. § 2302(b)(8)-(9). The appellant has the burden to establish, by preponderant evidence, two elements: (1) she made a protected disclosure, and (2) her disclosure was a contributing factor to the agency's decision to take a statutorily covered personnel action against her. *Id.*; 5 U.S.C. § 1221(e)(1); 5 C.F.R. § 1209.2(e)(1). One way the appellant may demonstrate her disclosure was a contributing factor is by evidence that (A) the official taking the personnel action knew of the disclosure, and (B) the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action. 5 U.S.C. § 1221(e)(1)(A)-(B).

If the appellant meets her burden as described above, then she has established a prima facie case of whistleblower reprisal, and the burden passes to the agency, such that the Board will order corrective action, unless the agency demonstrates by clear and convincing evidence that it would have taken the same personnel action in the absence of the disclosure. 5 U.S.C. § 1221(e)(2); 5 C.F.R. § 1209.2(e)(2).

C. The appellant MET her burden to establish a prima facie case that her July 10, 2014 disclosure was a contributing factor to her November 2015 nonselection.

As explained below, I find a preponderance of the evidence establishes that the appellant's July 10, 2014 disclosure was protected and was a contributing factor to her November 2015 nonselection; in other words, I find she has established a prima facie case of whistleblower reprisal. The agency essentially concedes the same. RAF, Tab 9 at 53 ("If the AJ had applied the board's

precedent with regard to timing, Ms. Potter would likely have satisfied the knowledge/timing test and states a prima facie case of whistleblower reprisal").

Pertinent to the appellant's prima facie case are five issues: (i) was the disclosure protected; (ii) was the nonselection a covered "personnel action;" (iii) did Deering know of the appellant's disclosure; (iv) did Deering know the appellant had applied for the vacancy; and (v) did Deering make the nonselection decision (by canceling the vacancy) in November 2015 in a period of time such that a reasonable person could conclude that the appellant's July 10, 2014 disclosure was a contributing factor to his decision? 5 U.S.C. § 1221(e)(1)(A)-(B).

Regarding issue (i) – was the disclosure protected – I find, as my previous initial decision found, that the appellant's July 10, 2014 email was a disclosure protected by 5 U.S.C. § 2302(b)(8). ID at 8. It bears repeating that the appellant's July 10, 2014 email was addressed to Fee Manager Ed Lowe, with a carbon copy to the appellant's supervisor, Dr. Robbi Venditti, D.O., and her email stated:

> Attached is part of the OIG spreadsheet for the patients awaiting psychotherapy. Of the 128 patients reviewed, 96 were never sent to Triwest by the authorization staff although the consult instructed to send to Triwest. 9 cases were sent to Triwest but never received by Triwest or loaded by the Triwest staff into their system. So only 23 of the 128 Psychotherapy patients were processed (oldest consult date 5/7/14). Many of these are suicidal and otherwise high risk cases per OIG notes. Please get the 96 cases sent to Triwest and the 9 other cases re-sent as soon as possible.

RAF, Tab 10 at 248-49. The Federal Circuit did not disturb my finding that the appellant's July 10, 2014 email was protected, and I see no reason to revisit the issue. *Potter*, 949 F.3d at 1379-80; ID at 8-9. Thus, I find, once again, that the appellant's July 10, 2014 email was a protected disclosure.

Regarding issue (ii) – was the November 2015 nonselection a covered "personnel action" – my previous initial decision assumed, without finding, that it was a personnel action under the WPA. ID at 15; 5 U.S.C. § 2302(A)(2)(A)(i)

("an appointment")-(ii) ("a promotion"). Complicating the issue of whether the nonselection was a personnel action is the fact that the agency cancelled the vacancy altogether, such that its action, facially, was not personal to the appellant. However, the Federal Circuit has found a cognizable personnel action "when the agency declines to hire an applicant pursuant to a vacancy announcement, but instead of hiring a different person cancels the vacancy announcement and hires no one for the position at that time." *Ruggieri v. Merit Systems Protection Board*, 454 F.3d 1323, 1325 (Fed. Cir. 2006). For such an action to be cognizable, the agency "must take some identifiable step that constitutes a decision not to hire the complainant," such as deciding "to terminate the hiring process that it had put into effect, by canceling the vacancy announcement," and sending the applicant "a letter advising him that he was not selected for the advertised position." *Id.* at 1326. There is no dispute that in the instant case, the appellant applied for the vacancy, and on November 5, 2015, she received an email stating, "The hiring office has decided not to fill the position at this time." RAF, Tab 10 at 263-64. Based on these circumstances, I find that the November 2015 vacancy cancellation was a covered personnel action. 5 U.S.C. § 2302(A)(2)(A)(i)-(ii).

Regarding issue (iii) – did Deering (who cancelled the vacancy) know of the appellant's July 10, 2014 email disclosure – I find he did. As my initial decision noted – before forgetting – Deering was in fact aware of the appellant's email disclosure. ID at 8, 15-16. That is because later the same day of July 10, 2014, the appellant forwarded her email disclosure to Deering, among others. RAF, Tab 10 at 247-49. Notably, at the end of the appellant's July 10, 2014 email forward, the appellant stated to Venditti: "With respect I bring this to your attention first without fear of reprisal or negative consequences, but faith the right decision will be made in a supportive and proactive way." *Id.* at 248. Notably, later the same day of July 10, 2014, Deering responded by email privately to the appellant, stating:

Tiffany,

Thanks for bringing this to my attention.

This sounds like you need more frontline help with workload and we have approved additional FTEE (I sent you that email).

It may take some time to recruit them, so let me speak to nursing to see who we can detail over quickly on a temporary basis.

I'll also explore the possibility of using TNC staff to support us until our permanent positions are hired.

Let's sit down and look at your proposals regarding restructuring of leadership roles again.

I don't think – by HR regulations – we can just grant someone an ACNS role. If we are able to get it approved, I believe it would have to be competed. But, let me double check on that.

I'm not sure why you feel there might be reprisal, so please stop by so we can discuss this so I can determine if there are other issues I need to intervene on.

I appreciate everything you are doing for our veterans.

Darren

*Id.* at 247. The parties agreed that Deering learned of the appellant's July 10, 2014 email disclosure, and the Federal Circuit did not disturb my initial statement that Deering was forwarded the same email on the same date (save my later discrepant finding), and so I see no reason to revisit that particular finding. ID at 8,15. Thus, I find Deering knew of the appellant's July 10, 2014 disclosure.

Regarding issue (iv) – did Deering know the appellant had applied for the vacancy, I consider this question material because if Deering did not know or believe the appellant had applied, then Deering could not be said to have canceled the vacancy with the goal of keeping the appellant from getting the job. Upon my re-review of the W-1 hearing transcript, I see that Deering testified that his "assumption" was that the appellant had applied for the vacancy. IAF, Tab 56 at 224-25. Based on that, I find Deering believed the appellant had applied for the vacancy, and so I find this issue answered in favor of the appellant's prima facie case.

Regarding issue (v) – did Deering make his nonselection in a period of time such that a reasonable person could conclude that the disclosure was a contributing factor – the time gap is approximately sixteen months between the appellant's July 10, 2014 email disclosure and Deering's November 1, 2015 direction for the agency to cancel the vacancy. I find a reasonable person could conclude that these two events were connected. Therefore, I find the appellant satisfied the knowledge/timing test and – reaching the ultimate issue of this part of the appeal – I find the appellant satisfied her burden to establish her prima facie case that Deering's November 2015 nonselection was whistleblower reprisal for her July 10, 2014 disclosure. 5 U.S.C. § 1221(e)(1)(A)-(B).

D. The agency MET its burden to demonstrate that it would have taken the same action absent the appellant's disclosure.

Because the appellant established a prima facie case of whistleblower reprisal, linking her July 10, 2014 disclosure to her November 2015 nonselection, the burden shifts to the agency to establish by clear and convincing evidence that it would have taken the same action in the absence of those disclosures. 5 U.S.C. § 1221(e)(2); 5 C.F.R. § 1209.2(e)(2). Clear and convincing evidence – that measure or degree of proof that produces in the mind of the trier of fact a firm belief as to the allegations sought to be established – is a higher standard than the "preponderance of the evidence" standard. 5 C.F.R. § 1209.4(e); 5 C.F.R. § 1201.4(q). Evidence only clearly and convincingly supports a conclusion when it does so in the aggregate considering all the pertinent evidence in the record, and despite the evidence that fairly detracts from that conclusion. *Whitmore v. Department of Labor*, 680 F.3d 1353, 1368 (2012). In determining whether an agency has shown by clear and convincing evidence that it would have taken the same personnel action in the absence of whistleblowing, the Board will consider the following factors: (1) the strength of the agency's evidence in support of its action; (2) the existence and strength of any motive to retaliate on the part of the

agency officials who were involved in the decision; and (3) any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated. *Carr v. Social Security Administration*, 185 F.3d 1318, 1323 (Fed. Cir. 1999) ("*Carr* factors").

1. Findings of Fact

The below facts overlap somewhat with the above, but they are pertinent to the discrete issues now before the Board in applying the *Carr* factors to Deering's November 2015 cancellation of the vacancy.

On July 10, 2014, the appellant made her email disclosure about a majority of a group of "suicidal and otherwise high risk" patients not being referred, as instructed, for psychotherapy. RAF, Tab 10 at 248-49 (July 10, 2014 disclosure). On the same day, the appellant forwarded that disclosure to Deering. *Id.* at 247. On the same day, Deering sent two private responses to the appellant: (1) thanking her (as quoted above), and (2) stating: "p.s. can you please bring the OIG notes and p[atien]t names you [are] referencing below when we meet so I can review and make sure we have a plan for them?" *Id.* at 247, 250.

Five months later, on December 8, 2014, the Phoenix VA's leadership recognized the appellant on its new organization chart as "Chief Nurse Manager," under Purchased Care, and the appellant considered the "Chief Nurse Manager" title to be beneficial to her. ID at 3; IAF, Tab 44 at 50 (December 2014 chart). Among the leadership officials who signed the new organization chart were: Venditti, on October 7, 2014; Deering, on November 24, 2014; and Grippen, on December 8, 2014. *Id.*

Three months later, on March 19, 2015, the agency took back the "Chief Nurse Manager" title in a revised organization chart, and recognized the appellant as "Nurse Manager" over Utilization Review.  ID at 12; IAF, Tab 44 at 51 (March 2015 chart).  Once again, the reorganization chart was signed by Venditti, Deering, Grippen, as well as other individuals. *Id.* (March 19, 2015).  The

appellant alleged this was whistleblower reprisal, and I found a prima facie case of that, but I also found that the agency met its burden to demonstrate by clear and convincing evidence that it would have taken the same action regardless of the appellant's whistleblowing. ID at 12-14, 28. The Federal Circuit affirmed that finding. *Potter*, 949 F.3d at 1381.

Five months later, on or about August 10, 2015, the agency posted a vacancy for "Registered Nurse, Chief Nurse Administrative Medicine Service." ID at 3; RAF, Tab 10 at 263-64. The appellant and three others applied for the vacancy, and the agency's recruitment for the vacancy closed on August 24, 2015. ID at 3; IAF, Tab 53 at 298; RAF, Tab 10 at 243. According to Deering: "I don't remember a specific conversation [with Potter about her applying] but I'm sure – my assumption was then that she applied." IAF, Tab 56 at 225 (Deering).[2] Also according to Deering: "I can't imagine somebody that would've been more qualified for it off the top of my head, but I don't think I ever promised that position to anyone." *Id.* at 168; *see also Id.* at 195 ("hard to find anyone more qualified"), 221 ("couldn't think of anybody more qualified"), 242 ("don't know of anyone else … more qualified").

Two months later, on November 1, 2015, Deering emailed Juanita Landry, Alyshia Smith, and others, stating of the vacancy:

> Juanita,
>
> I'm not sure who in HR to ask, but I need to close this cert with a non-selection.
>
> We need to have more discussion about the best way to structure this service (i.e. what sections should be in this service, where the nurse 4 should report, etc, etc) before we move toward a selection.

---

[2] Consistent with that recollection by Deering, Deering also testified: "I don't recall getting a cert list for this position. I remember that we got … what I seem to recall is that this got pulled back before we ever got to the point of even looking at who had applied or who had gone that pathway." IAF, Tab 56 at 180 (Deering); RAF, Tab 11 at 13 ("I don't believe I have access to selection manager").

ID at 15; RAF, Tab 11 at 14-15. The appellant did not allege that Venditti had any role in the vacancy cancellation, "because she was gone at the time." IAF, Tab 53 at 276. On November 5, 2015, the appellant received an automated email from OPM stating, "The hiring office has decided not to fill the position at this time." RAF, Tab 10 at 264.

The next year and a half saw changes to the status of three things: Deering's employment, the appellant's employment, and the agency's interest in advertising for the vacancy. First, in June 2016, the agency removed Deering, in an action evidently related to the "crisis" that had emerged at the Phoenix VA. IAF, Tab 53 at 155, 213, 336; ID at 19. Second, on February 8, 2017, the appellant received a tentative job offer in California, and on March 9, 2017, she received a confirmed job offer. ID at 26; IAF, Tab 45 at 80, 83. Third, on March 9, 2017, the agency directed an administrative officer to "enter an ARPA for Chief Nurse IV," which was a step in recruiting for the position. RAF, Tab 10 at 273 ("Master Smith gave the order" … "Belen [Ochoa] just e-mailed it to me five minutes ago and said Dr. Smith wants this today"). The appellant, responding to her learning of the agency's March 9, 2017 action, wrote, "Wouldn't that just be too convenient? I give my 2 week notice, and THEN they recruit for the Chief Nurse IV?" *Id.* Although the appellant alleges whistleblower reprisal in the timing of that last event, as explained below, I am convinced otherwise, and I find the agency met its burden to demonstrate by clear and convincing evidence that Deering would have cancelled the vacancy in November 2015 even if the appellant had never made her July 10, 2014 disclosure.

On March 17, 2017, the appellant filed her Office of Special Counsel complaint alleging whistleblower reprisal. IAF, Tab 1 at 18, 21.  In February 2018, the appellant filed the instant IRA appeal. IAF, Tabs 1 and 2.

2. *Carr* factor 1, agency reasons, weighs strongly in the agency's favor.

Returning to the *Carr* factors, the first factor is the strength of the agency's reasons for its action. *Carr*, 185 F.3d at 1323. This first of the three *Carr* factors does not apply straightforwardly when the personnel action is not disciplinary and, therefore, does not require supporting evidence of misconduct. *Azbill v. Department of Homeland Security*, 105 M.S.P.R. 363, ¶ 18 (2007); *Gonzales v. Department of the Navy*, 101 M.S.P.R. 248, ¶ 12 (2006). Deering's November 2015 vacancy cancellation was neither disciplinary nor personal to the appellant, and thus, is such an action. In such circumstances, when addressing the strength of the agency's evidence in support of its action, the Board considers the broader question of whether the agency had legitimate reasons for its action. *Id*.

In our 2018 hearing, Deering testified without dispute that he had tried, earnestly but unsuccessfully, to obtain agreement from multiple stakeholders, including the Office of Nursing Services, on the question of to whom the Chief Nurse would report, and Deering testified that lack of agreement on the answer to that question led him to indefinitely delay hiring anybody for the vacant position:

> A: I don't recall what precipitated this. I just know that we had had lots of discussion around – as a leadership team about how this should be structured, how it should be ran as a service, whether we get approval for a Nurse 4 or not, was in (indiscernible) whoever approved that. So I don't remember specifically what caused us to pull it back, but I know that there – we decided before we moved forward, that we needed to have some discussion about the reporting. As I recall at the time I think that, and I could be wrong on the date, but I seem to recall that – I don't (indiscernible) stuff here at that time. But I think there was discussion about whether or not there should be a dyad structure or not. I think that was a lot of discussion about how that works, who reports to whom, and we wanted to get that clarified before we went forward with the selection, as I recall.
>
> Q: Do you recall… there being [a] push – that Administrative Medicine said this was one of the first, if you recall, it was one of the first departments at the Phoenix VA to try and use the dyad structure?

A: Well, gosh, as I recall, I mean, I think this was one of the first ones we tried to reorganize to get, you know, the – their structure in place.

Q: Was it your understanding that Mr. Grippen had hoped to use the dyad structure, not only in Administrative Service – Administrative Medicine service, but [in] other areas of the ̶s̶ organization?

A: Yeah, he was – he was a fan of the dyad structure, and I think that's what he wanted to see incorporated. But I – I remember we kept getting feedback from other leaders who were rotating through, there were just so many people coming from the leadership team. And we kept getting feedback that that's not an ideal structure, that there are lots of concerns with that and – and I just remember lots and lots of – what that structure looks like, not who's in it but what does that look like for each service and, you know, if you have that then does the – the Nurse Exec, you know, the Chief Nurse report to the Nurse Exec, or to a physician. I mean there was just tons and tons of discussion around that, which kept being a burr, if you would, and us getting some of this, you know, finalized.

* * *

Q: Do you recall if the dyad structure that Mr. Grippen had proposed – if the nurse and the physician chief were supposed to be co-equals?

A: [A]s I recall, that's what Mr. Grippen had embraced, was this idea where they were – they were co-leaders of the section. There was a lot of consternation from Nursing Service that they didn't want their – their nursing supervisors reporting, you know, to the Chief of Staff. They thought that they should report to the Nursing Service. And the part of this discussion was then we'd end up with an executive leader who didn't have oversight of the service. So we'd end up with a Nurse Exec and the Chief of Staff trying to manage every service, which would be very unwieldy. So there was a lot of discussion on that throughout this whole course of restructuring the services and how do we structure to their lateral function and Nursing Service would maintain their scope of responsibility in the hospital.

IAF, Tab 56 at 182-85 (Deering testimony).

In weighing Deering's testimony about the above matters, I have considered the fact that his recollection was admittedly less than certain as to the precise series of events leading up to his November 2015 decision to cancel the

vacancy. But that was hardly surprising: the appellant did not challenge Deering's November 2015 vacancy cancellation until (i) sixteen months after Deering's decision and (ii) ten months after Deering's removal, and Deering's decision was never overtly personal to the appellant or any individual. That passage of time, along with Deering's departure from the agency, gives me no reason to assume that Deering would have a firm handle of the nuances of his decision to cancel a vacancy in November 2015. I simply find no basis to conclude that Deering's November 2015 decision stood out in his memory in the same manner as it did for the appellant.

In weighing Deering's testimony, I found Deering's overall picture of events to be consistent, both internally and when compared with the testimony of Venditti and Grippen. IAF, Tab 56 at 45 (Venditti, "12/8/14 [organization chart] … was trying to get Tiffany recognition … because we had been blocked at every avenue on getting a chief nurse position"); 75-76 (Venditti, "I was making efforts to get approval to start the process to get a chief nurse position … So we obviously didn't have one [a process] … Darren had went to other nurse executives and was told the same thing, that there was not enough complexity in the department. For a nurse 4"); 124 (Grippen, "the organizational chart in Milwaukee … I was looking at trying to implement something similar"); 144 (Grippen, "the Milwaukee model was controversial … nurses report to physicians, and we were making them full equals").

In considering Deering's credibility overall, I found him to be a quite credible witness, consistent in his testimony, and sincere, even in the face of difficult questioning by the appellant. ID at 31. Credibility determinations properly made in one matter may be weighed in determining a speaker's credibility in another matter. *Hawkins v. Smithsonian Institution*, 73 M.S.P.R. 397, 403-04 (1997). I found Deering credible in his non-retaliatory explanation of why he participated in changing the appellant's duties in March 2015, in part because the appellant's theory that her March 2015 duties change was motivated

by reprisal was inconsistent with Deering's November 2014 approval of the organization chart that had a position title the appellant actually preferred. ID at 14, 29. I also find *no* basis to doubt the sincerity of Deering's reasoning based on the agency's actions in March 2017 to re-post the vacancy, since Deering had been gone from the agency for nine months by that time and has not been shown to have any role in the agency's March 2017 actions. In sum, I found Deering's recollection of why he cancelled the vacancy in November 2015 was quite credible, and I conclude that *Carr* factor 1 – the agency's reasons – weighs heavily in the agency's favor.

3. *Carr* factor 2, retaliatory motive, weighs only modestly in the appellant's favor.

In evaluating whether the agency met its burden of defense, the second of the three *Carr* factors, existence of agency motive to retaliate, comes down to Deering's motive to retaliate against the appellant for her July 10, 2014 disclosure.

Conceptually, I accept that Deering had an ostensible motive to retaliate against the appellant for her disclosure, because the problems she raised tended to reflect unfavorably upon Deering's management and put Deering in the place of having to choose between working to try to address her concerns, or doing nothing and fearing further consequences. But at the same time, I cannot ignore the evidence contrary to an inference that Deering bore animus against the appellant for her July 10 2014 disclosure. Specifically, on July 10, 2014, Deering immediately expressed appreciation to the appellant for her disclosure and pledged to take corrective action. RAF, Tab 10 at 247, 250. Moreover, four months later, on November 24, 2014, Deering signed to approve an organization chart that the appellant preferred. ID at 14; IAF, Tab 44 at 50. Those are not the actions one would expect of a man determined to retaliate against the appellant for her July 10, 2014 disclosure. Nonetheless, taking a straitjacketed approach to

the question of motive, I accept that Deering had a motive – albeit slight – to retaliate.

Based on the foregoing, I conclude that *Carr* factor 2 – motive to retaliate – weighs modestly in the appellant's favor.

### 4. *Carr* Factor 3, Similarly Situated Individuals

Lastly, the third of the three *Carr* factors, whether there is evidence that similarly situated individuals who did not blow the whistle were treated similarly – neither party has submitted evidence for this factor. To be sure, I considered the fact that the record contains evidence that three other individuals also applied for the vacancy and thus were also affected by Deering's November 2015 vacancy cancellation. ID at 3; IAF, Tab 53 at 298; RAF, Tab 10 at 243. However, neither party adduced any evidence as to those other applicants' qualifications or status as whistleblowers or non-whistleblowers.

In *Whitmore*, the Federal Circuit stated that "Carr does not impose an affirmative burden" on the Government to produce evidence regarding each factor, and stated that the factors are "appropriate and pertinent considerations" to be used in determining if the agency carries its burden of establishing by clear and convincing evidence that it would have taken the same action had the protected disclosures not occurred. *Whitmore*, 680 F.3d at 1374. Here, I find that the last *Carr* factor is neutral.

In considering all three factors together, I find that *Carr* factor 1 weighs heavily in the agency's favor, *Carr* factor 2 weighs only modestly in the appellant's favor, and *Carr* factor 3 is neutral. Therefore, I conclude that the evidence as a whole leans strongly in the agency's direction, and that the agency thus met its burden to prove by clear and convincing evidence that it would have cancelled the November 2015 vacancy even if the appellant had never made her July 10, 2014 disclosure. 5 U.S.C. § 1221(e)(2). Thus, I must deny corrective action for the nonselection.

E. <u>Conclusion</u>

Having reviewed the claims of the appellant, but finding no prima facie cases of whistleblower reprisal for which the agency did not meet its burden of defense, I must deny the appellant's request for corrective action. 5 U.S.C. § 1221(e)(1)-(2).

## DECISION

The appellant's request for corrective action is DENIED.

FOR THE BOARD:                    /S/
                        David S. Brooks
                        Administrative Judge

## NOTICE TO APPELLANT

This initial decision will become final on **<u>October 21, 2020</u>**, unless a petition for review is filed by that date. This is an important date because it is usually the last day on which you can file a petition for review with the Board. However, if you prove that you received this initial decision more than 5 days after the date of issuance, you may file a petition for review within 30 days after the date you actually receive the initial decision. If you are represented, the 30-day period begins to run upon either your receipt of the initial decision or its receipt by your representative, whichever comes first. You must establish the date on which you or your representative received it. The date on which the initial decision becomes final also controls when you can file a petition for review with one of the authorities discussed in the "Notice of Appeal Rights" section, below. The paragraphs that follow tell you how and when to file with the Board or one of those authorities. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

## BOARD REVIEW

You may request Board review of this initial decision by filing a petition for review.

If the other party has already filed a timely petition for review, you may file a cross petition for review.  Your petition or cross petition for review must state your objections to the initial decision, supported by references to applicable laws, regulations, and the record.  You must file it with:

The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW.
Washington, DC 20419

A petition or cross petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing.  A petition submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and may only be accomplished at the Board's e-Appeal website (https://e-appeal.mspb.gov).

## NOTICE OF LACK OF QUORUM

The Merit Systems Protection Board ordinarily is composed of three members, 5 U.S.C. § 1201, but currently there are no members in place.  Because a majority vote of the Board is required to decide a case, *see* 5 C.F.R. § 1200.3(a), (e), the Board is unable to issue decisions on petitions for review filed with it at this time.  *See* 5 U.S.C. § 1203.  Thus, while parties may continue to file petitions for review during this period, no decisions will be issued until at least two members are appointed by the President and confirmed by the Senate.  The lack of a quorum does not serve to extend the time limit for filing a petition or cross petition. Any party who files such a petition must comply with the time limits specified herein.

For alternative review options, please consult the section below titled "Notice of Appeal Rights," which sets forth other review options.

**<u>Criteria for Granting a Petition or Cross Petition for Review</u>**

Pursuant to 5 C.F.R. § 1201.115, the Board normally will consider only issues raised in a timely filed petition or cross petition for review. Situations in which the Board may grant a petition or cross petition for review include, but are not limited to, a showing that:

(a) The initial decision contains erroneous findings of material fact. (1) Any alleged factual error must be material, meaning of sufficient weight to warrant an outcome different from that of the initial decision. (2) A petitioner who alleges that the judge made erroneous findings of material fact must explain why the challenged factual determination is incorrect and identify specific evidence in the record that demonstrates the error. In reviewing a claim of an erroneous finding of fact, the Board will give deference to an administrative judge's credibility determinations when they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing.

(b) The initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case. The petitioner must explain how the error affected the outcome of the case.

(c) The judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case.

(d) New and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. To constitute new evidence, the information contained in the documents, not just the documents themselves, must have been unavailable despite due diligence when the record closed.

As stated in 5 C.F.R. § 1201.114(h), a petition for review, a cross petition for review, or a response to a petition for review, whether computer generated, typed, or handwritten, is limited to 30 pages or 7500 words, whichever is less. A

reply to a response to a petition for review is limited to 15 pages or 3750 words, whichever is less. Computer generated and typed pleadings must use no less than 12 point typeface and 1-inch margins and must be double spaced and only use one side of a page. The length limitation is exclusive of any table of contents, table of authorities, attachments, and certificate of service. A request for leave to file a pleading that exceeds the limitations prescribed in this paragraph must be received by the Clerk of the Board at least 3 days before the filing deadline. Such requests must give the reasons for a waiver as well as the desired length of the pleading and are granted only in exceptional circumstances. The page and word limits set forth above are maximum limits. Parties are not expected or required to submit pleadings of the maximum length. Typically, a well-written petition for review is between 5 and 10 pages long.

If you file a petition or cross petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record.  A petition for review must be filed with the Clerk of the Board no later than the date this initial decision becomes final, or if this initial decision is received by you or your representative more than 5 days after the date of issuance, 30 days after the date you or your representative actually received the initial decision, whichever was first.  If you claim that you and your representative both received this decision more than 5 days after its issuance, you have the burden to prove to the Board the earlier date of receipt.  You must also show that any delay in receiving the initial decision was not due to the deliberate evasion of receipt. You may meet your burden by filing evidence and argument, sworn or under penalty of perjury (*see* 5 C.F.R. Part 1201, Appendix 4) to support your claim.  The date of filing by mail is determined by the postmark date.  The date of filing by fax or by electronic filing is the date of submission.  The date of filing by personal delivery is the date on which the Board receives the document.  The date of filing by commercial delivery is the date the document was delivered to the commercial delivery

service.  Your petition may be rejected and returned to you if you fail to provide a statement of how you served your petition on the other party.  *See* 5 C.F.R. § 1201.4(j).  If the petition is filed electronically, the online process itself will serve the petition on other e-filers.  *See* 5 C.F.R. § 1201.14(j)(1).

A cross petition for review must be filed within 25 days after the date of service of the petition for review.

## NOTICE TO AGENCY/INTERVENOR

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.

## NOTICE OF APPEAL RIGHTS

You may obtain review of this initial decision only after it becomes final, as explained in the "Notice to Appellant" section above.  5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file.   5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction.  If you wish to seek review of this decision when it becomes final, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements.    Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case.  If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

**(1)** **_Judicial review in general_**.  As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be received by the court within **60 calendar days** of the date this decision becomes final.    5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

**(2)** **_Judicial or EEOC review of cases involving a claim of discrimination_**.  This option applies to you only if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination.  If so, you may obtain judicial review of this decision—including a disposition of your discrimination claims—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** after this

decision becomes final under the rules set out in the Notice to Appellant section, above.  5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. ____ , 137 S. Ct. 1975 (2017). If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security. *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of your discrimination claims only, excluding all other issues.  5 U.S.C. § 7702(b)(1).  You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** after this decision becomes final as explained above.  5 U.S.C. § 7702(b)(1).

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C.  20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C.  20507

**(3) Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012**.  This option applies to you only if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or

other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D). If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8) or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.  The court of appeals must <u>receive</u> your petition for review within **60 days** of <u>the date this decision becomes final</u> under the rules set out in the Notice to Appellant section, above.  5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

<div align="center">

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

</div>

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

<u>http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx</u>



# U.S. MERIT SYSTEMS PROTECTION BOARD

### Office of the Clerk of the Board

**1615 M Street, N.W.**
**Washington, D.C. 20419-0002**

Phone: 202-653-7200; Fax: 202-653-7130; E-Mail: mspb@mspb.gov

2021-1460


# ATTESTATION


I HEREBY ATTEST that the attached index represents a list of the documents comprising the administrative record of the Merit Systems Protection Board in the appeal of Tiffany Potter *v.* Department of Veterans Affairs, MSPB Docket No. DE-1221-18-0165-M-1, and that the administrative record is under my official custody and control on this date


on file in this Board

| January 29, 2021 | *Lisa L. White for* |
|---|---|
| Date | Jennifer Everling |
| | Acting Clerk of the Board |

CERTIFICATE OF SERVICE

I hereby certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

Counsel For Petitioner

Electronic Mail          A. Marques Pitre, Esq.
(via mspb@mspb.gov)  ampitre@ampitreassociates.com

Respondent

Electronic Mail          Robert E. Kirschman, Director
(via mspb@mspb.gov)  Commercial Litigation Branch
                         Civil Division Classification Unit
                         U.S. Department of Justice
                         c/o Thee Matthews
                         thee.matthews@usdoj.gov

| January 29, 2021 | *Lisa L. White for* |
|---|---|
| (Date) | Jennifer Everling |
| | Acting Clerk of the Board |

INDEX

TIFFANY  POTTER

v.

DEPARTMENT OF VETERANS AFFAIRS

MSPB Docket No.   DE-1221-18-0165-W-1

INDIVIDUAL RIGHT OF ACTION (IRA)

| TAB | VOLUME | DESCRIPTION OF DOCUMENT | DATE OF RECEIPT OR ISSUANCE |
|---|---|---|---|
| 1 | 1 | MSPB - Reject Letter | February 02, 2018 |
| 2 | 1 | Appellant - Initial Appeal | February 13, 2018 |
| 3 | 1 | MSPB - Acknowledgment Order | February 14, 2018 |
| 4 | 1 | MSPB - Jurisdiction Order | February 14, 2018 |
| 5 | 1 | MSPB - Timeliness Order | February 14, 2018 |
| 6 | 1 | Agency - Representative Addition | February 15, 2018 |
| 7 | 1 | Appellant - Designation of Representative | February 23, 2018 |
| 8 | 1 | MSPB - Order Rejecting Improperly Filed Pleading (Appellant) | February 23, 2018 |
| 9 | 1 | Appellant - Response to Order on Jurisdiction | February 23, 2018 |
| 10 | 1 | Appellant - Response to Order on Timeliness | February 23, 2018 |
| 11 | 1 | Agency - Motion to Extend Deadlines 7 Days | March 01, 2018 |
| 12 | 1 | MSPB - Time Extension Request Order | March 02, 2018 |
| 13 | 1 | Agency - Response to Appellant's Response and Declaration Regarding Timeliness | March 13, 2018 |
| 14 | 1 | Agency - File Part 1 of 3 | March 13, 2018 |
| 15 | 1 | Agency - File Part 2 of 3 | March 13, 2018 |
| 16 | 1 | Agency - File Part 3 of 3 | March 13, 2018 |
| 17 | 1 | Appellant - Reply and Declaration to Agency Response to Appellant's Declaration | March 14, 2018 |
| 18 | 1 | MSPB - Order | March 14, 2018 |

Appx0027

| 19 | 1 | MSPB - Hearing Order | April 05, 2018 |
| 20 | 1 | Agency - Motion to Vacate and Reset Hearing Date | April 10, 2018 |
| 21 | 1 | MSPB - Case Reassignment Order | April 16, 2018 |
| 22 | 1 | Agency - Agreement to Mediate | May 03, 2018 |
| 23 | 1 | Appellant - Agreement to Mediate | May 05, 2018 |
| 24 | 1 | MSPB - MAP Suspension Order | May 08, 2018 |
| 25 | 1 | MSPB - Notice of Release from MAP | August 16, 2018 |
| 26 | 1 | MSPB - Notice of Timeliness and Jurisdictional Findings | August 22, 2018 |
| 27 | 1 | MSPB - Hearing Order | August 22, 2018 |
| 28 | 1 | Appellant - Request for Reconsideration of MSPB's Notice of Timeliness and Jurisdictional Fi | August 24, 2018 |
| 29 | 1 | Appellant - Joint Motion to Extend Case Deadlines | September 05, 2018 |
| 30 | 1 | MSPB - Notice on Request for Reconsideration | September 05, 2018 |
| 31 | 1 | Agency - Joint Mot Extend Deadline Pre-Hearing Submissions | September 06, 2018 |
| 32 | 1 | MSPB - Order Rescheduling Case Deadlines | September 06, 2018 |
| 33 | 1 | MSPB - Order Shifting Hearing Date by One Day | September 12, 2018 |
| 34 | 1 | Agency - Request Re Order to Change Hearing Dates | September 17, 2018 |
| 35 | 1 | Appellant - Request to Maintain Original Hearing Dates or Provide New Hearing Date | September 17, 2018 |
| 36 | 1 | MSPB - Order Rescheduling Hearing to Original Dates | September 18, 2018 |
| 37 | 1 | Agency - Notice of Hearing Location | September 18, 2018 |
| 38 | 1 | Agency - Motion for Subpoenas | September 21, 2018 |
| 39 | 1 | MSPB - Order to File Response | September 21, 2018 |
| 40 | 1 | Appellant - Objection to Agency's Motion for Subpoenas | September 24, 2018 |
| 41 | 1 | MSPB - Notice of Subpoenas | September 26, 2018 |

Appx0028

| 42 | 1 | Agency - Prehearing Submission | September 27, 2018 |
| 43 | 1 | Agency - Prehearing Exhibits 13-17 | September 27, 2018 |
| 44 | 1 | Appellant - Prehearing Submissions and Exhibits | September 27, 2018 |
| 45 | 1 | Appellant - Prehearing Submissions Exhibits DD-MM | September 27, 2018 |
| 46 | 1 | Appellant - Prehearing Submissions Exhibits NN-EEE | September 27, 2018 |
| 47 | 1 | MSPB - Notice of Subpoenas | October 02, 2018 |
| 48 | 1 | MSPB - Order and Summary of Telephonic Prehearing Conference | October 03, 2018 |
| 49 | 1 | Agency - Motion Re Hearing Testimony of Agency Witnesses | October 12, 2018 |
| 50 | 1 | MSPB - Order Granting Hearing Adjustments | October 16, 2018 |
| 51 | 1 | MSPB - Hearing Attestation and Speaker Index for October 22, 2018 | October 22, 2018 |
| 52 | 1 | MSPB - Hearing Recording for October 22, 2018 | October 22, 2018 |
| 53 | 1 | MSPB - Hearing Transcript - October 22, 2018 | October 22, 2018 |
| 54 | 1 | MSPB - Hearing Attestation and Speaker Index of October 23, 2018 | October 23, 2018 |
| 55 | 1 | MSPB - Hearing Recording for October 23, 2018 | October 23, 2018 |
| 56 | 1 | MSPB - Hearing Transcript - October 23, 2018 | October 23, 2018 |
| 57 | 1 | MSPB - Close of Record Order | October 29, 2018 |
| 58 | 1 | Agency - Transcription of Audio of May 14, 2015 | November 06, 2018 |
| 59 | 1 | Agency - Motion to Extend Deadline for Closing Briefs | November 08, 2018 |
| 60 | 1 | Appellant - Response to Agency's Motion to Extend Deadline to File Closing Brief | November 08, 2018 |
| 61 | 1 | Agency - Reply in Support of Motion to Extend Deadline for Closing Briefs | November 08, 2018 |
| 62 | 1 | MSPB - Order Granting Extension of Time | November 09, 2018 |
| 63 | 1 | Agency - Closing Brief | November 14, 2018 |
| 64 | 1 | Appellant - Closing Brief | November 14, 2018 |

Appx0029

| | | | |
|---|---|---|---|
| 65 | 1 | Appellant - Motion to Strike Deposition Transcripts | November 14, 2018 |
| 66 | 1 | Appellant - Renewed Request to Strike Deposition Transcripts of Smith and Ochoa | November 27, 2018 |
| 67 | 1 | MSPB - Initial Decision | December 13, 2018 |
| 68 | 1 | MSPB - Certificate of Service | December 13, 2018 |

INDEX

TIFFANY POTTER

v.

DEPARTMENT OF VETERANS AFFAIRS

MSPB Docket No.   DE-1221-18-0165-M-1

COURT REMAND

| TAB | VOLUME | DESCRIPTION OF DOCUMENT | DATE OF RECEIPT OR ISSUANCE |
|---|---|---|---|
| 1 | 1 | COURT - Opinion Filed - Vacated and Remanded | February 13, 2020 |
| 2 | 1 | COURT - Judgment | February 13, 2020 |
| 3 | 1 | COURT - Mandate | April 06, 2020 |
| 4 | 1 | MSPB - Order | May 07, 2020 |
| 5 | 1 | MSPB - Remand Order | May 19, 2020 |
| 6 | 1 | MSPB - Hearing Order | May 19, 2020 |
| 7 | 1 | Appellant - Petitioner's Second Corrected Opening Brief | May 27, 2020 |
| 8 | 1 | Appellant - Petitioner's Second Corrected Reply Brief | May 27, 2020 |
| 9 | 1 | Agency - Brief and Submissions Filed in the Federal Circuit | May 27, 2020 |
| 10 | 1 | Appellant - Corrected Joint Appendix Part 1 | May 27, 2020 |
| 11 | 1 | Appellant - Joint Appendix Part 2 | May 27, 2020 |
| 12 | 1 | MSPB - Rescheduling Order | May 29, 2020 |
| 13 | 1 | Appellant - Joint Appendix 300-301 | June 03, 2020 |
| 14 | 1 | Appellant - Joint Appendix 300-301 | June 09, 2020 |
| 15 | 1 | MSPB - Order and Summary of Close of Record Conference | June 11, 2020 |
| 16 | 1 | Agency - Motion to Extend Deadline for Submission of Attestations | June 24, 2020 |
| 17 | 1 | Appellant - Opposition to Motion to Extend Deadlines and Deposition Transcripts of Smith and | June 24, 2020 |

| 18 | 1 | MSPB - Order Denying Extension of Time | June 25, 2020 |
| 19 | 1 | Appellant - Notice of Change of Address | July 07, 2020 |
| 20 | 1 | MSPB - Order Suspending Case Processing | August 25, 2020 |
| 21 | 1 | MSPB - Initial Decision | September 16, 2020 |
| 22 | 1 | MSPB - Certificate of Service | September 16, 2020 |

UNITED STATES OF AMERICA

MERIT SYSTEMS PROTECTION BOARD

DENVER FIELD OFFICE

| | |
|---|---|
| TIFFANY POTTER, | DOCKET NUMBER: |
| | DE-1221-18-0165-W-1 |
| Appellant, | |
| | |
| v. | |
| | October 22, 2018 |
| DEPARTMENT OF VETERANS AFFAIRS, | 8:15 A.M. |
| | |
| Agency. | |

TRANSCRIPT OF HEARING
BEFORE ADMINISTRATIVE JUDGE DAVID BROOKS

APPEARANCES:

For the Appellant:        By: Marques Pitre, Esq.
                              Michelle DeVeera, Esq.
                              Pitre & Associates, LLC
                              1300 Pennsylvania Ave. NW
                              Suite 700
                              Washington, DC 20004

For the Agency:           By: Scott MacMillan, Esq.
                              Department of Veterans Affairs
                              650 E. Indian School Road
                              Bldg. 24 (200)
                              Phoenix, AZ 85012

Court Reporter            Anna Lee Halsig
                          eScribers LLC
                          7227 N 16th Street, Suite 207
                          Phoenix, Arizona 85020

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.



I N D E X

|                            | Direct | Cross | Redirect | Recross |
|----------------------------|--------|-------|----------|---------|
| WITNESSES FOR AGENCY:      |        |       |          |         |
| RimaAnn O. Nelson          | 5      | 25    | 55       | 65      |
|                            |        |       |          |         |
| WITNESSES FOR APPELLANT:   |        |       |          |         |
| Tiffany Potter             | 76     | 206   | 297      | 302     |
| Edmund Lowe                | 306    | 313   | 316      |         |
| Stephanie White Lawson     | 329    | 337   | 347      |         |

1              October 22, 2018, 8:15 a.m.

2              JUDGE BROOKS:  Good morning.  It's Monday, October

3    22nd, 2018.  The date (sic) is 8:16 a.m. Mountain Daylight

4    Time.  I am Administrative Judge David Brooks with the Merit

5    Systems Protection Board Lakewood Field Office communicating

6    with the Agency and Appellant, who are in Phoenix.  This is the

7    appeal of Tiffany Potter v. Department of Veterans Affairs,

8    MSPB Docket Number DE-1221-18-0165-W-1.

9              Appearing and representing the Appellant is Mr.

10   Pitre.  I didn't get how to pronounce your first name.

11             MR. PITRE:  Marques.

12             JUDGE BROOKS:  Marques Pitre.  And appearing to

13   represent the Agency is Scott MacMillan.  Also present in the

14   room is the Appellant, Tiffany Potter, as well as the first

15   witness.  There's nothing of substance that I plan to address

16   before I take her oath, so her presence is not an issue.

17   What's that?

18             MR. MACMILLAN:  I'm sorry, Your Honor.  Joyce

19   Sullivan (phonetic), a paralegal with the VA here is also here

20   in the room appearing for the VA.

21             JUDGE BROOKS:  Okay.

22             MR. MACMILLAN:  Just for clarification.

23             JUDGE BROOKS:  That's fine.  Thank you.  We had an

24   order and summary of telephonic prehearing conference issued on

25   October 3rd for our October 1st, 2018, prehearing conference,

1   where I approved witnesses and reminded the parties of the

2   accepted issues of this appeal.  Before we went on the record

3   this morning, Appellant's counsel asked about my ruling on

4   exhibits.

5          And to clarify, I consider anything that is currently

6   in the written record as something that I may consult in making

7   my decision and something that either party may use in asking

8   questions of a witness.  However, either party still has the

9   opportunity to object to an exhibit's use for any particular

10  witness and if necessary, to move to strike the exhibit and ask

11  that it not be considered at all in rendering any decision.

12  And if that happens, I'll consider and rule on such motion at

13  such time.

14         Is there anything that either party feels the need to

15  address before I administer the oath for the first witness?

16         MR. PITRE:  No, Your Honor.

17         MR. MACMILLAN:  No, Your Honor.

18         JUDGE BROOKS:  Thank you.  The first witness, who is

19  out of the usual order, but this is being done in order to

20  accommodate some scheduling difficulties, is RimaAnn Nelson.

21  Ms. Nelson, I'm the Administrative Judge assigned to decide

22  this matter.  Do you have any objection to testifying under

23  oath?

24         MS. NELSON:  I do not.

25         JUDGE BROOKS:  During your testimony, if you have

1  questions or are confused, you can direct any questions you

2  have to me.  Would you please raise your right hand for the

3  oath?

4               RIMAANN O. NELSON, AGENCY'S WITNESS, SWORN

5          (Witness testifies via videoconference)

6               JUDGE BROOKS:  For the record, would you please state

7  and spell your name?

8               THE WITNESS:  R-I-M-A-A-N-N middle initial O.  Last

9  name Nelson, N-E-L-S-O-N.

10              JUDGE BROOKS:  Thank you.  The first party that will

11  ask you questions is the Agency through Mr. MacMillan.  You can

12  begin, sir.

13              MR. MACMILLAN:  Thank you.

14                        DIRECT EXAMINATION

15  BY MR. MACMILLAN:

16  Q    Ms. Nelson, I believe it's -- we've talked about it

17  already, but what is your current title with the Agency?

18  A    I'm the Medical Center Director with the Phoenix VA Health

19  Care System.

20  Q    And how long have you worked as the Medical Center

21  Director with the Phoenix VA Health Care System?

22  A    I began my tour October 1, 2016, so going onto three years

23  now, starting my third year.

24  Q    Can you briefly describe some of your duties as medical

25  center director as it relates to job assignments and things of

1  that sort for -- let me scratch that.  Can you just briefly

2  describe what some of your duties are as a medical center

3  director?

4  A    So I oversee the operation, the overall operations of the

5  health care system.  I'm responsible for making sure that we

6  carry out the mission through the different services of

7  departments within the organization and we carry out that

8  mission within the resources, budgeted resources that we are

9  allocated for the fiscal year.

10 Q    Can you briefly describe some of the issues that you

11 encountered when you -- or problems, I should say, that you

12 encountered when your first began working as the medical center

13 director in October of 2016 with respect to the wait list

14 scandal and things of that nature?

15 A    So when I arrived in October of 2016, I was the seventh

16 director in a two-year period, so there was a lot of chaos here

17 at the Phoenix VA Health Care System and a lot of that was

18 based on the scandal from 2014.  So when I arrived, there was a

19 lot of vacant positions, vacant key positions.  So there was a

20 lot of reorganization and there was a lot of, you know, people

21 moving in and out of positions.

22      And as the new director, I also made decisions about the

23 things that I thought needed immediate attention and priority

24 at the time.  There was just a lot going on.

25 Q    Has there been an increasing -- the time that you've

1   worked as the medical center director, has there been

2   increasing growth in the area of providing veterans with third-

3   party purchased care in the community?

4   A    Yes.  That area is always growing.  Even today, we -- in

5   one fiscal year, we issued 20,000 more consults to care in the

6   community than last year.  So it went from about 50,000 last

7   year to about 75,000 at the end of this year.  So that growth

8   has just continued.  On the average, we're enrolling about 358

9   new veterans into our health care system every week.  So access

10  is something at the forefront of you know, what we focus on.

11       And so we're very mindful of that and everything that

12  needs to be done to readjust the way we do business to make

13  sure we stay ahead of that growth and access.  We anticipate we

14  will purchase -- we will break a record next year and purchase

15  more care in the community, probably of over 100,000 consults

16  by the end of this fiscal year will go out into the community.

17  So the growth is tremendous.

18  Q    And given that growth, has there been changes over time in

19  the organizational structure of how the Phoenix VA performs

20  those purchase care functions?

21  A    It's constantly changing.  It's constantly changing

22  because the directives for central office are also changing, so

23  the VA Mission Act was signed in June.  It required us to do

24  additional changes based on the terms of that Act and how we

25  relate to the outside contractor, so we are in the middle of

1    more reorganization, more hiring of additional employees in

2    that section.  And I anticipate it's just going to continue to

3    evolve and change as we try to stay ahead of those access

4    numbers.

5    Q    I want to fast-forward a little bit, but first I'm going

6    to direct you to a document.

7              MR. MACMILLAN:  Your Honor, it's going to be Agency

8    Tab 16, page 35.

9              JUDGE BROOKS:  Thank you.

10             MR. MACMILLAN:  And that's Exhibit 4P of the Agency

11   file.

12             MR. PITRE:  What Exhibit is that?

13             MR. MACMILLAN:  4P of the Agency file, which is Tab

14   16, page 20 -- I'm sorry, 35.

15   BY MR. MACMILLAN:

16   Q    What I'm showing you is an org chart.  Looks like the last

17   date on is 9/25/15.  And it looks like it's from Administrative

18   Medicine Service.  Is that correct?

19   A    Yes, it is.

20   Q    Okay.  Is this -- was this the structure of the

21   Administrative Medicine Service when you came onboard in

22   October of 2016?  Does it appear to be?

23   A    It appears to be, but when I arrived, we were making some

24   changes shortly after that.  So this is -- based on the date,

25   this was probably the one that was in place when I arrived.

1   Q    Now, was there a vacancy -- I know you discussed some

2   vacancies, but were there also vacancies in the Administrative

3   Medicine Service?

4   A    I recall the vacancies had to do with voucher examiners.

5   That's what I recall at the time.

6   Q    Was there turnover -- well, are you aware of Dr. Carlos

7   Duarte serving as an acting?

8   A    Yes.

9   Q    Okay.  And where was he -- on this org chart in front of

10  you, do you recall -- was he the acting Administrative Medicine

11  Service physician at the top of the org chart?

12  A    I know he was in that role.  I don't --

13  Q    Or interim.  I don't know.

14  A    Yeah.  I think he was in that position as the associate

15  chief of staff for the service.

16  Q    Okay.

17  A    If I recall, he was the physician representative over the

18  service.

19  Q    Okay.  Now, as the medical center director, how did you

20  feel issues of transparency should be handled with regard to

21  wait lists and purchased care problems?

22  A    Well, I wanted us to be very transparent and so I used

23  morning report forum to make sure that I was aware of what was

24  going on throughout the health care system in real time.  And

25  so there was a pretty -- there was a morning report that was

1    already in place when I arrived.  Shortly after I arrived, I

2    started modifying that based on information that I was

3    receiving or hearing, whether it be from scheduled meetings or

4    from walking around.

5         If there were things that were going on and I needed us to

6    make sure that we got information and that the staff had a

7    forum to tell me what was going on, I modified the morning

8    report accordingly.

9    Q    Were there discu -- oh, first of all, what is the Pentad,

10   the Phoenix -- people have used the term, Pentad.  What does

11   that mean in the Phoenix VA Health Care System?

12   A    So the Pentad is made up of our executive leadership team.

13   So myself as the medical center director, the deputy medical

14   center director, the chief of staff, the associate director for

15   patient care service and the associate director.  That's the

16   five of us, but we do include the deputy nursing exec and the

17   deputy chief of staff as well in our meetings.  But the forum

18   will be the first five that I mentioned.

19   Q    And is the Pentad -- is a decision-making body, policy-

20   making body?  What does it do exactly?

21   A    We do make decisions to our governing structure, but this

22   is the team that carries out the business based on my direction

23   and also based on the areas that they cover under the

24   organizational structure of the medical center.

25   Q    Okay.  Now, there's no reason you would have seen this,

1   and I haven't shown it to you, but who is Alyshia Smith, Dr.

2   Alyshia Smith?

3   A    Dr. Alyshia Smith is our Associate Director for Patient

4   Care Services.

5   Q    Okay.  And she's a member of the Pentad, correct?

6   A    She is.

7   Q    All right.  And she testified in a deposition for an EEO

8   case, which is Exhibit -- let's see here.  It's Tab 42, but

9   page 21 is the start of it.

10          MR. PITRE:  I would object to the introduction of

11   this exhibit, Judge.

12          JUDGE BROOKS:  Okay.  What's the basis?

13          MR. PITRE:  Well, it seems like Alyshia Smith is not

14   here testifying, so whatever she testified to in a deposition

15   would be hearsay.  The Agency had an opportunity to call Ms.

16   Smith as a witness and they were -- that request was denied.

17          JUDGE BROOKS:  Okay.  The Board does allow hearsay,

18   so that's -- I don't consider that a basis to block it.  It

19   would go to the weight of the evidence.  Does the Agency have

20   evidence that Ms. Smith has reviewed this statement and agreed

21   that it's accurate?

22          MR. MACMILLAN:  Not with me today, but it's -- it was

23   testimony under oath and it was never challenged in any

24   other -- in the EEO proceeding.  I'm just trying -- it's

25   something -- you know, we did ask to call Ms. Smith as a

1    witness and that request was denied by you, Judge, so I'm just

2    ask -- I'm trying to set the framework for a question here to

3    see if the Director agrees with a statement that was raised in

4    this deposition.  But I do believe it is admissible and it was

5    under oath under penalty of perjury.

6         MR. PITRE:  If I may.  There's a lot of hearsay in

7    these records.  The Agency can ask Ms. Nelson her opinion on

8    whatever question that they asked Ms. Smith in the deposition

9    without having to introduce the testimony of the Ms. Smith.  So

10   Ms. Nelson would have her own knowledge and opinion on whatever

11   the question may be, so I don't think Ms. Smith's testimony at

12   this time is relevant.

13        JUDGE BROOKS:  I'm concerned about the possibility of

14   Alyshia Smith, if she were here today, possibly having had some

15   concern with whether this represented what she said.  And if

16   there has been a chance to provide corrections or signed by, we

17   might be in a different place.  So --

18        MR. MACMILLAN:  Well, I --

19        JUDGE BROOKS:  Yes?

20        MR. MACMILLAN:  -- quite frankly, I mean, I would

21   have called her as a witness if I had known that there would be

22   an objection to sworn testimony under oath.  I can't really do

23   much better than that quite frankly, so -- in any event, if I

24   could just ask the question and I guess maybe we can move on,

25   but I would affirm that it is accurate and correct.  It's never

1   been objected to previously.  As you indicated, Judge, there's

2   no hearsay objection to it.

3          And you denied our request to have Ms. Smith testify

4   here directly, so I don't know how else I can use her

5   testimony, which I do believe is relevant, because she was a

6   witness who had knowledge of the creation of the detail that

7   I'm about to go into.  And that's an area where you asked for

8   testimony.  So I'm just trying to get at something -- I was

9   really just doing this by more of background here, but you

10  know, we would have called Mr. Smith if we would have known

11  that Appellant was going to raise these objections.  We did try

12  and call her.

13         JUDGE BROOKS:  Mr. Pitre, would you object if I

14  accepted signatures from these individuals who were deposed

15  after today, if they agree that this is what they said?

16         MR. PITRE:  Well, no objection to that.  I just am

17  still not clear on why the testimony of Ms. Smith would be

18  necessary to obtain the opinion of Ms. Nelson, who is right

19  here before the Judge.  Ms. Nelson was present and working in

20  her position during the time of the detail, so she has relevant

21  knowledge of whatever the Agency is going to ask her.  So I'm

22  not exactly sure why background information is needed from an

23  additional witness when the witness that's before you has that

24  information, due to the position that she held.

25         JUDGE BROOKS:  Okay.  Here's what I'm going to do.  I

1   am going to allow the Agency to submit something from witnesses

2   such as Ms. Smith, if they can attest to what these transcripts

3   say to the accuracy, at least the meaningful accuracy of them.

4   I will allow them to do that within some limited amount of time

5   that I'll provide after today.

6           For today, I don't want the Agency or Appellant to

7   scour through a deposition transcript of an individual if there

8   isn't anything that is signed or indicates that the individual

9   stands by a person's version of what they said.  I will allow

10  this question to proceed, if it's -- if the Agency can

11  represent to the witness that it's based on information and

12  belief that the Agency has that this was said in order to

13  denote that that may yet be challenged by Ms. Smith or anyone

14  who's reviewing this -- a deposition transcript like this.

15          MR. MACMILLAN:  Thank you.  I think I can rephrase

16  the question and --

17          JUDGE BROOKS:  Okay.

18          MR. MACMILLAN:  -- but I do think it's good that we

19  had this conversation.  But -- because there is one other

20  deposition transcript that we probably would like to use in

21  which (indiscernible) will try and do the same (indiscernible)

22  deposition.  Thank you.

23  BY MR. MACMILLAN:

24  Q   Ms. Nelson, were there conversations among members of the

25  Pentad after you came on board about how -- about whether the

1    Administrative Medicine Services, specifically purchased care

2    functions, were operating optimally or effectively?

3    A    There was a lot of conversations, yes.

4    Q    Okay.  Can you just elaborate on that a little bit?  What

5    were some of the issues that seemed to be arising in purchased

6    care especially?

7    A    So the -- so both Mr. Bransky and Dr. Smith would brief me

8    about what was going on based on their role in the

9    organization.  So Dr. Smith was over ultimately all of the --

10   over Nursing Service, so any decisions related to Nursing

11   Services, she's over.  And Mr. Bransky was over all the

12   fiscal -- was over the fiscal section.

13   Q    What is Mr. Bransky's title?

14   A    So he's the Deputy Medical Center Director.

15   Q    Okay.

16   A    So I would be briefed about fiscal issues in the purchased

17   care service and Dr. Smith would brief me about nursing issues

18   or organization issues within the service.  And I recall that

19   those briefings included things like the workload, the growth

20   rate, the vacancy positions and then just overall, you know,

21   day-to-day operations of what was going on as the employees

22   were managing purchased care and all the processes related to

23   that.

24   Q    Okay.  I want to put a different document in front of you.

25   Let's first look at --

1            MR. MACMILLAN:  This, Your Honor, is Tab 46, page 249

2    and that's Tab 11 of Pre-Agency submission --

3         (Counsel confer)

4            JUDGE BROOKS:  Did you say Tab 46 at page 49?

5            MR. MACMILLAN:  249.

6            JUDGE BROOKS:  My tab 26 --

7            MR. MACMILLAN:  Oh, sorry.

8            JUDGE BROOKS:  Okay.

9            MR. MACMILLAN:  I apologize.  It's Tab 42.

10           JUDGE BROOKS:  Okay.

11           MR. MACMILLAN:  Thank you, Marques.

12   BY MR. MACMILLAN:

13   Q    Can you -- so that's going to be this here.

14   A    Uh-huh.

15   Q    So can you take a look at this document and tell me if you

16   recognize it?

17   A    I remember the conversation regarding this detail memo.

18   Q    Okay.  And if you turn the page, the second page of this

19   exhibit, which would be I guess page -- what is that --

20           MR. PITRE:  250.

21   BY MR. MACMILLAN:

22   Q    250.  This memo is coming from you, but someone else

23   signed it.  Is that a fair statement?

24   A    That is fair.

25   Q    Okay.  Who signed it?

1    A    It looks like Mr. -- Shawn Bransky's signature.

2    Q    Okay.  And I think you indicated that you recall a

3    discussion about this memo.  And that discussion occurred when?

4    Before it was drafted?

5    A    There was just ongoing discussions, so yes, we had

6    discussions before it was drafted, and I remember the

7    discussion about drafting this memo as well.

8    Q    Okay.  Please tell us what you recall about the events

9    leading up to this memo and why it was created.

10    A    Okay.  So when -- as I said, there were many things that I

11    asked to have discussed in morning report.  And one of the

12    things I immediately asked for was that I wanted to have

13    information in morning report regarding access, regarding

14    workload, regarding number of consults that were coming into

15    the health care system, so that as the director, I would

16    understand what the demand and volume was, so that in real

17    time, we could make decisions about how to ensure that we had

18    capacity in the health care system.

19        So in morning report, I would get updates.  And the person

20    that would give the updates was Dr. Carlos Duarte.  And shortly

21    after I arrived, and I would say probably, if I recall, within

22    a few months after I was receiving those updates in morning

23    report, it was clear to me that he may not be the content

24    expert, based on his responses to questions that I asked in the

25    meeting.

1   So I would say -- data would be presented and I'd ask for

2   detail and more times than not, he would say, "Let me write

3   that down and take it back to department and come back to you

4   with an answer."  He said that several times, and I decided

5   that if he's not the content expert, then I need to understand

6   who is, and -- because I needed that information in real time

7   so that we could address the growth in the area.  So that was

8   sort of one of the conversations we had.

9   Dr. Smith and Mr. Bransky would also talk to me on an

10  ongoing basis, updating me, whether it was in our formal Pentad

11  meeting or informally when things arose, to tell me that,

12  again, there was a lot of growth in the service, there was a

13  lot of vacancies in the services.  And they wanted to also

14  address my concern that I wasn't sure who the content expert

15  was.

16  So a discussion about Tiffany Potter came up and I was

17  told that Tiffany had a certain skillset and knowledge and was

18  really good at what she did.  And so I wanted to make a change

19  and not have Dr. Duarte be the one to come and present to the

20  morning report.  I wanted to hear from Tiffany Potter.  So

21  Tiffany started presenting and her information was great.  I

22  mean, she knew details.  She not only came with problems and

23  issues, but she came with recommendations for solutions.

24  So it became very clear to me who the content expert was

25  here.  So at some point, we made a decision to not have Dr.

1  Duarte continue in his current role in this service, but he was

2  instead given an assignment to report directly to his staff

3  while we continued to try to reorganize and figure out what was

4  the best structure for the service.  And part of the

5  reorganizing and trying to sort everything out was to detail

6  Ms. Potter into the role outlined in the memo based on her

7  expertise and knowledge.

8  Q    Is it fair to say that a lot or most of -- to do --

9  serving as an -- in the nonclinical aspects of -- that Dr.

10  Duarte was doing prior to him being moved --

11  A    Uh-huh.

12  Q    -- into the -- going on the unclassified detail.  Is that

13  a --

14          MR. PITRE:  Objection to the leading.  I'm not

15  exactly sure of the question, but I know it's leading.

16          MR. MACMILLAN:  Let me rephrase it.

17          JUDGE BROOKS:  Go ahead.

18  BY MR. MACMILLAN:

19  Q    Was the intent of this -- what was the intent of this vis-

20  a-vis doctor -- I'm trying to think how to say this.  Was

21  Tiffany -- was it intended for Tiffany to assume -- Tiffany is

22  not a doctor, is she?

23  A    She's not.

24  Q    A medical doctor?  Is Tiffany Potter a medical doctor?

25          MR. MACMILLAN:  Are you a medical doctor?

1        THE WITNESS:  Tiffany's not a medical doctor.

2    BY MR. MACMILLAN:

3    Q    Okay.  So in any event, can you describe to me which

4    duties she was doing that were performed by her?  Without going

5    into detail on the rest.  What was the intention of this vis-a-

6    vis doc -- or --

7    A    So we needed some leadership in this service and

8    leadership from a content expert.  And I was advised by Mr.

9    Bransky and Dr. Smith that the content expert was Tiffany

10   Potter.

11   Q    Okay.

12   A    And so we were in the middle of reorganizing and really

13   understanding what was needed in the service, again, based on

14   the tremendous growth and workload that we had been taking care

15   of.  And so Tiffany's name came up many times as that content

16   expert in this service.

17   Q    And did you -- was it your understanding that this detail

18   was not -- that it was within Tiffany Potter's experience and

19   capabilities?

20   A    Tiffany would not have been detailed if we didn't feel

21   that she was capable of serving in this capacity.

22   Q    And at some point, was there also conversations among the

23   Pentad about the creation of a -- restructuring the

24   administrative medicine service, so there was no longer a

25   physician chief, but instead having a nurse -- a Chief Nurse

1    IV?

2    A    So, there was a lot of discussion about how best to

3    restructure the service so that again, we could meet the demand

4    and capacity in real time.  And so there was several

5    discussions about what that would look like, what that would

6    be.  And we frequently sought input from the national office,

7    community care office in central office.  They too were trying

8    to figure out what was not only the best organizational

9    structure within the service, but also where the service should

10   report to.

11        So there was discussion that it may report directly to the

12   medical center director or the chief or staff or an

13   administrative person on the Pentad.  And then there was other

14   discussions that it may be not necessarily the chief of staff,

15   but the associate director for patient care services, so that

16   it was still aligned under the clinical umbrella.  So a lot of

17   discussion went on at that time.

18   Q    Okay.  And is it your understanding -- well, let me ask

19   you this.  Were you aware that Dr. Smith was making efforts

20   toward having a functional statement for the Chief Nurse IV

21   position?

22   A    Yes, I was.  And one of the questions I asked is that if

23   that has -- was underway, what was taking so long.  And the

24   frustration was that for this position to get to the point that

25   it could be advertised, it had to go through classification.

1   So all positions had to go through classification and

2   unfortunately, we don't have control over that timeframe.  This

3   is done outside of the facility at the VISN level and so that

4   was in the works and that was -- it was taking place.

5   Q    Can you -- I know you don't typically get involved in

6   classif --

7   A    I do not.

8   Q    But you have a basic understanding of how it works,

9   correct?  How to -- that process worked to create the position

10  approved by classification of the VISN?

11  A    I have a basic understanding, yes.

12  Q    Okay.  So is it true that VISN has to -- well, what role

13  does the VISN play?  So -- and what role does the facility play

14  to -- you know, for instance, what if someone wants to create a

15  position, can you run through the process of getting that

16  position approved and then actually recruiting it?

17  A    So my understanding is when the facility identifies the

18  need for a Nurse IV position, it -- there is involvement of a

19  VISN board.  We don't have -- and I say VISN board, because we

20  don't have a Nurse IV board here at the facility, but there is

21  one at the VISN.  So the position has to go through the board,

22  where they review the scope of the position description, the

23  responsibilities, the duties and the role.  If the board

24  approves it, then it goes -- and I'm not 100 percent sure on

25  this.

 1          Then it goes to classification or -- yes, I think it goes

 2    to classification right after that, where a team of classifiers

 3    looks at the recommendations, the roles, and responsibilities

 4    and scores it according to their criteria to make sure that it

 5    indeed is at level four.  So there is that process.  And it

 6    takes a long time to go through that.  And that -- we don't

 7    have control over that process, but we do follow up frequently

 8    to say where are we at with this, if this is something we want

 9    to advertise right away.  That's basically the process.

10    Q    And typically, is HR involved in that process and I guess

11    specifically Ms. Ochoa -- Vallin Ochoa HR?

12    A    So HR is involved as the representative for the facility

13    as a liaison, so they would be the one communicating with the

14    VISN Nurse IV Board and also the Classification Board.  They

15    would represent the facility.

16    Q    Were you -- as of January 10, 2017, were you aware of an

17    OIG, I guess complaint allegedly being filed by Ms. Potter?

18    A    I don't recall any specifically.  We have a lot of OIG

19    reports in the queue, but nothing that stands out.

20    Q    And safe to say that you believe this was a positive move

21    for Ms. Potter when you gave her the classified detail --

22    unclassified detail?

23    A    It was a positive in that she was the content expert.  She

24    was our go-to person.  She had the knowledge.  She came to

25    morning report with great information, very specific

1   information, great ideas.  And so we looked at this as

2   something that would benefit the service in the sense that she

3   was the person knowledgeable to do this.  And so we had

4   identified her to be put on detail to this role.

5   Q    Did you ever become aware that Tiffany Potter allegedly

6   made a -- or made a whistleblower complaint in December of '16

7   about -- against management of Administrative Medicine Service

8   and purchased care?

9   A    I don't recall that.  Again, I'd only been on the station

10  two months, and there was a lot going on in Phoenix.  But I

11  don't remember specifically that -- anything about that.

12  Q    Okay.

13       JUDGE BROOKS:  Mr. MacMillan?  As a general matter,

14  I'd like it if you and opposing counsel could be more specific

15  and don't just say a whistleblower complaint, because that --

16  it's a little vague whether you mean inspector general or just

17  a disclosure to some noninvestigation entity.  I'd prefer you

18  to be more precise.  I don't remember what December 2016 would

19  be.  Thanks.

20       MR. MACMILLAN:  Okay.

21  BY MR. MACMILLAN:

22  Q    Now, one of the issues in this case -- and accepted issues

23  is that Ms. Potter on December 1st, 2016 -- and this is

24  whistleblower number 5 out of the Tab 49.  On December 1st,

25  2016, there was a complaint made with OIG, "Regarding illegal

1   practices established by Dr. Duarte between April 18th, 2016,

2   and December 1st, 2016, instructing staff to deny veterans

3   their Choice benefits, receiving timely community care for

4   eligible veterans and other concerns regarding misconduct and

5   nonVA care and consult management by senior Phoenix VA

6   officials."

7        That's quoting from Tab 44, 88, and 90.  So that -- and

8   that's -- I believe Ms. Potter's characterization of what --

9   those complaints.  But in any event, were you -- I assume your

10  answer is the same, but were you aware of this OIG complaint on

11  December 1st, 2016, that was made by Ms. Potter?

12  A    I don't recall.

13  Q    And this December 1st, 2016, OIG complaint, in your -- and

14  that had a role in your decision to take Ms. Potter to her

15  classified duties and -- or did it have any role in the

16  decision to classify Ms. Potter to unclassified duties on about

17  January 10th -- or January 17th, 2017?

18  A    It did not.

19            MR. MACMILLAN:  I don't have any other questions.

20            JUDGE BROOKS:  Thank you.  Mr. Pitre.

21            MR. PITRE:  Yes, thank you.

22                         CROSS-EXAMINATION

23  BY MR. PITRE:

24  Q    Ms. Nelson, you stated that Ms. Potter was detailed to the

25  unclassified duties because there was reorganization taking

1    place and that Dr. Duarte is not the content expert for that

2    department.  Is that correct?

3    A    There was a reorganization taking place overall in the

4    service.

5    Q    Uh-huh.

6    A    And I wanted to have somebody besides Dr. Duarte present

7    me the information in morning report.

8    Q    Okay.  And so did Ms. Potter take over those duties for

9    presentation of that information?

10    A    Yes.  So Ms. Potter started presenting information at

11    morning report.

12    Q    Okay.  Because those were the duties of Dr. Duarte prior

13    to that?

14    A    Not necessarily.  What I wanted in morning report was just

15    information about what was going on in the service.  So

16    anything anybody needed to tell me.  Because one of the things

17    I always say is I can't fix what I don't know, and I really

18    wanted folks to feel like they had a forum where they could

19    speak to me directly.

20    Q    Okay.  And was there any other duties that Ms. Potter was

21    assigned to take over for this detail?

22    A    The other duties as outlined in the memo have to do with

23    just the functioning of the service.  So I got input from both

24    Dr. Smith and Mr. Bransky as to what those duties were, to make

25    sure that the service was functional and operational.

1   Q    Okay.  Would it be safe to say that the additional duties

2   that were encompassed in the detail were duties from the

3   associate chief of staff for administrative medicine services?

4   A    I don't know that specifically.

5   Q    Okay.  I'd like to call your attention to a counseling

6   statement, Exhibit EEE.  And that is Exhibit Number -- Tab 46,

7   68 to 74.

8   A    Where is that?

9   Q    It's Tab 46 within --

10  A    This one?

11  Q    Can you take a look at functional statement

12  (indiscernible)?

13  A    Uh-huh.

14  Q    Okay.  What is that functional statement of?

15  A    This is a functional statement of a registered nurse at a

16  IV level.

17  Q    Okay.  And that's for -- is that for Administrative

18  Medicine Services?

19  A    Yes, it is.  She's nurse for aministra -- Administrative

20  Medicine Services.

21  Q    Okay.  And were the duties that were encompassed in the

22  detail duties that are also a part of that functional

23  statement?

24  A    So I relied on Dr. Smith, who is over the nursing service,

25  to make sure that when we did the detail, working with HR, that

1    it was within Ms. Potter's scope of her role.  So do you want

2    me to go --

3    Q    No.

4    A    -- (indiscernible).

5    Q    Well, you can.  If they -- I -- do you -- well, let me ask

6    you this question.  Duties that are encompassed in that detail,

7    are those also duties that are encompassed in this -- I'm

8    sorry -- duties that are encompassed in that functional

9    statement, are those also duties that are encompassed in this

10   unclassified detail?

11            MR. MACMILLAN:  I'm going to object to the

12   foundation, because one, he hasn't established that she's ever

13   seen this document before.  And two, the documents speak for

14   themselves, and there's no need to do an analysis right now

15   comparing the two documents if he hasn't even said -- if she

16   has any knowledge or played any role in preparing the

17   functional statement.

18            JUDGE BROOKS:  Okay.  For starters, are you able to

19   move the microphone anywhere that I can hear better or is there

20   any way to amplify on your end?  Because I've got my volume up

21   fairly high and I could -- I'd like to hear you all a little

22   better.

23            MR. MACMILLAN:  Okay.

24            JUDGE BROOKS:  And I --

25            MR. MACMILLAN:  I don't know --

1          JUDGE BROOKS:  I did hear what you said.

2          MR. MACMILLAN:  We'll try.  So object on -- basically

3   on foundation.  There no indication that Ms. Nelson -- she

4   didn't draft the functional statement.  I know she just

5   testified.  And there's no foundation that she's even reviewed

6   this before.  The documents speak for themselves.  And there's

7   no reason for her to go through and try and compare the two

8   statements, to compare what duties are in one document, but not

9   in the other or if they're all the same.  The documents speak

10  for themselves.

11          JUDGE BROOKS:  Mr. Pitre?

12          MR. PITRE:  Ms. -- as Ms. Nelson testified to, it was

13  her responsibility as a Pentad member as well as a director of

14  the medical center to be abreast on -- to carry out the

15  mission, make sure that all positions that were vacant were

16  filled, so that would include -- as well as to -- she signed or

17  someone signed off on her behalf this detail of unclassified

18  duties.

19          So it would be within her purview to understand what

20  was in this detail, if her name is attached to the signature

21  and what duties and responsibilities as medical center director

22  that those duties correspond to -- what positions those duties

23  correspond to.

24          MR. MACMILLAN:  Well, that might make sense if he was

25  asking just about the detail memo, but he's asking about the

1   functional statement where there's no foundation and he hasn't

2   indicated where this document comes from, who reviewed it,

3   where it was prepared, whether she's ever reviewed it, and then

4   asking her to compare the two, and that makes no sense.

5           JUDGE BROOKS:  Yes.  This is a very detailed

6   statement here.  There could be any number of thousands of

7   documents that are in the system that she may or may not have

8   seen.  Without a foundation, I don't want her testifying about

9   this.

10          MR. PITRE:  Okay.  Not a problem.

11  BY MR. PITRE:

12  Q   Ms. Nelson, have you ever created a functional statement?

13  A   I have not.

14  Q   Okay.  Have you ever reviewed a functional statement?

15  A   I have.

16  Q   Do you know what functional statements are?

17  A   I do.

18  Q   Can you explain what a functional statement is?

19  A   So a functional statement outlines the roles and

20  responsibilities of the role that an employee is in.

21  Q   Okay.  And so when an individual employee is getting ready

22  to take over a new role, a functional statement is created to

23  outline the duties that individual will be performing.

24  A   Not necessarily.  There could be an existing functional

25  statement already in the system.

1   Q    Uh-huh.  And that individual placed in that role would use

2   that functional statement as a basis to understand what duties

3   they will be performing?

4   A    Yes.  And I rely on my associate director of patient care

5   services --

6   Q    Uh-huh.

7   A    -- since she's over nursing --

8   Q    Uh-huh.

9   A    -- HR and HR to be the content experts.  So when the

10  detail memo was put together, both human resources and the

11  associate director of patient care services reviews the

12  document prior to my signature to make sure all of the

13  requirements are in place.

14  Q    Okay.

15  A    I wouldn't do that myself.

16  Q    Understood.  When you -- you stated previously in your

17  testimony that you all had several meetings regarding this

18  detail.  Is that correct?

19  A    We would have ongoing meetings along with everything else.

20  It was part of just operations.

21  Q    Understood.  When -- and when you say your -- can you give

22  me the title again?

23  A    Associate director of patient care services is Dr. Smith.

24  Q    Okay.  So when you and Dr. Smith would meet regarding this

25  detail, would she update you on what's going to go into the

1  detail?

2          MR. MACMILLAN:  Objection.  It misstates her

3  testimony.  She said she -- they would discuss the detail.

4  They didn't meet regarding this detail specifically.  I believe

5  that's what she said.

6  BY MR. PITRE:

7  Q    When you all had discussions regarding the detail, did Ms.

8  Smith inform you on what's going to go into the detail?

9  A    Not specifically.

10  Q    Okay.  Did she inform you of what responsibilities needed

11  to be addressed in the detail?

12  A    She talked to me generally about what the issues were in

13  service and that we needed somebody with the -- a content

14  expert to be the one to serve in this capacity.  And she talked

15  about Tiffany and Tiffany's knowledge and her skill set.

16  Q    In what capacity?

17  A    In a -- just that she would be the best person to be

18  detailed into this role, based on her knowledge and skill set

19  and experience.

20  Q    Okay.  Into what role are you speaking?

21  A    The role to be the community care manager or the lead in

22  community care management center.

23  Q    And when you state the lead in community care management

24  center, where are you getting that role from?  Is that role

25  specified in the detail?

1   A    I'd have to take a look.  I haven't seen this for a while.

2   I don't recall us every discussing a specific title, but I

3   just -- discussing a lead and somebody that would be mainly

4   over the functions of the service --

5   Q    Uh-huh.

6   A    -- but I don't recall any particular title.  I don't

7   remember that.

8   Q    Okay.  So is it possible that when Ms. Potter was issued

9   this detail that she took over the roles for the associate

10  chief of staff of Administrative Medicine Service?

11  A    I don't know exactly what role Dr. Duarte did in the

12  service.  Again, one, because I had just arrived and there was

13  a lot going on.  So I cannot tell you what his specific duties

14  were.

15  Q    Uh-huh.

16  A    All I can tell you is that when he presented information

17  in morning report, it was not information that was useful for

18  me --

19  Q    Right.

20  A    -- as the direct.

21  Q    Right.  I understand that.  So I'm going to restate the

22  question.  Is it possible, based on the detail and other

23  information that you have or do not have, that Ms. Potter took

24  over the role of the associate chief of staff for

25  Administrative Medicine Service within this detail?

1   A    So, my response is no, simply because he's a medical

2   doctor --

3   Q    Uh-huh.

4   A    -- and I would assume based on that background that he had

5   duties that only a medical doctor could do.  Again, I don't

6   know what they were specifically at the time, but I know that

7   we would not assign a nonMD to MD responsibilities.

8   Q    And if you had, what would be your response to that?

9   A    If I had?

10  Q    If you all had assigned a nonMD to the responsibilities of

11  an MD, what would be your response to that?

12  A    So the only position or only duties that I could see us

13  assigning a nonMD to would be maybe overall management,

14  administrative management of the service, because I know that

15  within the service, there's an MD where an MD reviews consults

16  and makes clinical decisions based on the consults and based on

17  their background training as a medical doctor.  But I would

18  not -- we would not assign a nonMD to those kinds of duties.

19  Q    Okay.  Is it possible that Ms. Brazil took over the duties

20  within this detail for the chief of Purchased Care?

21  A    It's possible that Ms. Potter took over the administrative

22  responsibilities or duties of that service, because there was

23  no leader at the time we had detailed her to that role.

24  Q    Okay.  Is it possible that she took over the chief nurse

25  duties for the purchased care department?

1  A    At the time, I think -- well, at the time, Ms. Potter was

2  the nurse manager for the service.  I don't recall there being

3  a chief in the role --

4  Q    Uh-huh.

5  A    -- at the time.

6  Q    Would there have been floor chief at that time?

7  A    Looking back, now that we see how much the service has

8  grown and what it involves -- because again, a couple things

9  were going on at the time of the reorganization.  There was a

10 lot of -- there was not a lot of clarity from central office

11 about the specifics to this program.  We knew what needed to be

12 done, but we were also overwhelmed with the growth and the

13 workload that still needed to be addressed.

14      So the thought of -- or idea of having a chief nurse was

15 one that I knew was not a new idea.  Again, I don't know if

16 they had one prior to my arrival.  Looks like there's -- is

17 there one on the org chart?  There is one on the organization

18 chart, but I don't recall who would have been in that position.

19 So it may have been vacant when I arrived.

20 Q    Could it have been Tiffany Potter?

21 A    I know her role at the time was nurse manager, but I don't

22 know if that was her specific title, chief nurse.

23 Q    Could she have been performing the duties of a chief nurse

24 when you arrived?

25 A    That I'm not sure, because -- I don't know, because I

1  don't know specifically what the difference was of a chief

2  nurse and nurse manager.  I would have to go back to take a

3  look.

4  Q    Okay.  All right.  And I believe the last role that I'm

5  asking you if it's possible that she took would be the chief

6  fee manager.  Is that a possibility as well?  Within this

7  detail?

8  A    Did she take over as the fee manager?

9  Q    Yes.

10 A    I know we had a lot of vacancies in fee at the time.  And

11 again, I don't recall who the chief of the fee section was.

12 That person, he or she may have left right when I arrived, or

13 they still may have been there.  Again, there was a lot of

14 change going on, a lot of movement of positions, a lot of

15 discussion about how best to organize this service.  But what I

16 do know is Tiffany's name kept coming up as the content expert

17 and the person with skills and knowledge.

18 Q    Okay.  So whose ultimate idea was it to detail Ms. Potter

19 to the unclassified duties?

20 A    So that discussion should have been between Mr. Bransky

21 and Dr. Smith, based on their role in the organization.

22 Q    Okay.  And so whose ultimate decision was it to make that

23 move?

24 A    Well, I was -- I'm the ultimate decision maker, because

25 the memo comes from me as the medical center director.

1    Q    Okay.  Do you recall any discussions with Ms. Smith

2    regarding her informing Ms. Potter of this detail?

3    A    I don't specifically, but I would assume in her role as

4    the associate director of patient care services that she would

5    have a discussion with Ms. Potter.

6    Q    Did Ms. Smith ever make you aware of any conversations

7    that she had with Ms. Smith -- I'm sorry, Ms. Potter, regarding

8    this detail?

9    A    I know that when she would update me, she would include

10   that she had spoken to Ms. Potter, but what I recall is just

11   general conversation about the service as a whole and nursing

12   duties.

13   Q    Uh-huh.  So --

14   A    Generally.  Nothing specifically stands out.

15   Q    So Ms. Smith never made you aware that Ms. Potter did not

16   want to accept this detail?

17   A    I don't recall specifically.

18   Q    Okay.  Do you -- you don't recall specifically.  Let me

19   ask this question.  Are details mandatory?

20   A    I don't know.  I know that when -- in the detail -- I'm

21   not -- in my career, trying to recall.  I don't remember anyone

22   not accepting a detail, so I would have to find out.  I'm not

23   sure.

24   Q    Okay.  Had you heard when you arrived at the facility

25   regarding the concerns that Ms. Potter had raised with the OIG

1    regarding urology patients?

2    A    There was a lot of concerns raised about care and wait

3    lists, but specifically to Ms. Potter, I don't recall anything

4    specific.  We had a lot of IG reports and -- in process when I

5    arrived.

6    Q    Were you aware that Ms. Potter was tasked with updating

7    responses to multiple OIG complaints and recommendations in

8    January 2017?

9    A    If she was in a lead role or if she represented the

10   service, she would have been the point of contact, if there

11   were recommendations for the OIG in community care.

12   Q    So you were aware that she was tasked with that role?

13   A    If she was in this position.  I don't remember anything

14   specifically, but if she was in the position, I would say she

15   was most likely the person tasked to respond to a

16   recommendation.

17   Q    Okay.  Did you ever -- were you ever made aware regarding

18   an allegation that a Ms. Linda Swan attempted to have Ms.

19   Potter change her responses in response to OIG requests?

20   A    I don't recall that, no.

21   Q    Did Ms. Potter ever express to you a belief that she was

22   being retaliated against by VA leaderships?

23   A    So Ms. Potter and I met, and she expressed to me concerns

24   she had with just a lot of things within the service.  The

25   workload.  She talked about the vacancies, the concerns she had

1  with vacancies, the amount of workload in that section.  And it

2  sounded like there was a lot of history prior to my arrival

3  with different decisions about roles and responsibilities and

4  leadership and changes in leadership.  There was a lot going

5  on.  And I remember that when we met, she was concerned about

6  those and brought, you know, those things to my attention.

7          MR. MACMILLAN:  So I'm going to object, because when

8  Ms. Nelson was approved as an Agency witness, she wasn't

9  approved for the Appellant's attempts to later complain to Ms.

10 Nelson about the detail, so it sounds like that's what we're

11 getting into here.

12         JUDGE BROOKS:  Okay.

13         MR. PITRE:  I have no further questions regarding

14 that --

15         JUDGE BROOKS:  okay.

16         MR. PITRE:  -- regarding that line of questioning.

17         JUDGE BROOKS:  All right.  Then we'll stop that

18 question there or any further question and answer about that

19 there.

20         MR. PITRE:  Is that answer stricken from record or is

21 it part of the record at this time, since there wasn't a timely

22 objection?

23         JUDGE BROOKS:  It's part of the record at this point.

24         MR. PITRE:  All right.  Thank you.

25 BY MR. PITRE:

1  Q    You stated that there was a lot going on prior to your

2  arrival.  Were you aware that there was a Chief Nurse IV

3  position that had went had through VISN approval and

4  certification and posted in 2015?

5  A    I was not aware of that.  I eventually was made aware of

6  it later on when the position was in process of getting

7  reposted.

8  Q    Uh-huh.  And when was that reposted?

9  A    It was reposted -- I know it was reposted I think shortly

10 after or right around the time that Tiffany was leaving.

11 Q    So isn't it true since that there was already a position,

12 a Chief Nurse IV position that was certified, there wasn't a

13 need to send that position back to VISN get recertification?

14 Correct?

15 A    What I remember about this was because the service was

16 constantly evolving, what I recall is that at other facilities,

17 there was a question about the grade of this position.  In some

18 places it was a Nurse III.  In some places, it was a Nurse IV.

19 In other places it was a physician who was in this role.  So

20 there was a lot of back and forth as this whole service and the

21 whole Choice program and Care in the Community program was

22 evolving.

23 Q    Uh-huh.

24 A    What I wanted to make sure is that we did what was right

25 for Phoenix.  And so there was a lot of back and forth prior to

1   my arrival, again, as, I mentioned earlier, about not only the

2   level of who should lead this program but also where it should

3   report to as far as Pentad members, so when I arrived, I can

4   only speak for decisions that I was involved in.  And I agreed

5   that it should be a Nurse IV and we needed to send it through

6   classification to make sure that it comes out as a IV --

7   Q    Okay.

8   A    -- and get it advertised.

9   Q    And did you also send -- resend the 2015 Nurse IV position

10  through classification again?

11  A    Those details, I don't know.  That would be something

12  human resources would be involved in.

13  Q    Okay.  And because you did state that it was reposted in

14  2017.  Is that correct?

15  A    It was reposted right when Tiffany -- right around the

16  time she was getting ready to leave.

17  Q    Are you aware of when that position was available to be

18  reposted?

19  A    It depended on when it cleared classification.

20  Q    Are you aware of when it cleared classification?

21  A    Probably sometime in March or April --

22  Q    Uh-huh.

23  A    -- of 2017.

24  Q    Okay.

25  A    Somewhere around then.

1   Q     And you're basing this testimony on what knowledge?

2   A     Tiffany came to speak to me right before she left, and I

3   thought -- when she came and told me she was leaving, I was

4   surprised.  And my reaction was that this was a huge loss to

5   our facility, because of her knowledge and skill set.  And I

6   remember that it was shortly after or within that same week

7   around there that the posting came out.  And I remember

8   thinking timing is just really bad, because she would have been

9   a great candidate for the position and if she didn't make the

10  cert, if she had put in for it, I would have been very

11  surprised.

12  Q     So I'm asking specifically about when the certification

13  was approved.  What knowledge do you have of when that

14  certification was approved?

15  A     I don't have any knowledge.  I don't remember a date.  I

16  don't remember any specific --

17  Q     So that -- so the certification for the Chief Nurse IV

18  position could have been approved prior to it being posting.

19  Is that correct?

20  A     It has to be approved prior to posting.

21  Q     What I mean is prior to it being posted in March of 2017.

22  A     Yes.  And a lot of times, we post positions as we soon as

23  we get it cleared, because our goal is to fill it right away.

24  So it could have been approved the day before it was posted.

25  Q     Okay.  And could it have been approved in January 2017?

1          MR. MACMILLAN:  Objection.  Asked and answered.

2          THE WITNESS:  That I don't know.  I don't -- I don't

3    know.  I would -- I would change --

4    BY MR. PITRE:

5    Q    I'm sorry.

6    A    No.  I'd hope that we would post it right away and they

7    knew that my goal was to get the service organized and

8    stabilized as soon as possible.

9    Q    Uh-huh.  So who made -- who had the ultimate decision-

10   making on when that position was posted?

11   A    It should have been through HR.  So what would happen is

12   HR would inform us that the classification was approved and

13   that it would continue on to the next step in the process,

14   which is to make sure that the posting is complete and written

15   up.

16   Q    Inform who?  You said "us".

17   A    So they would inform -- human resources is under the

18   deputy medical center director, so it would make sense that the

19   chief would communicate through that Pentad member.

20   Q    Did you receive any notification that that position was

21   approved for posting?

22   A    I was notified when it was actually posted.

23   Q    Okay.  So you don't know when it was approved?

24   A    I don't.

25   Q    And you stated that when you saw it was posted, you

 1              MR. MACMILLAN:  Objection.  Foundation.

 2              JUDGE BROOKS:  What's the foundation?

 3              MR. PITRE:  Well, the foundation is she stated that

 4    he would have been involved in a lot of the administrative

 5    duties, so I'm asking if that's an administrative duty that he

 6    might have been responsible for.

 7              MR. MACMILLAN:  That's now how you asked it, but go

 8    ahead and ask it, if you want to ask it that way.

 9    BY MR. PITRE:

10    Q    Would that have been one of the administrative duties that

11    he would have been responsible for?

12    A    I would say no, because an admin officer is not

13    responsible for posting.  Those duties belong to human

14    resources.

15    Q    Would it have been his responsibility to inform human

16    resources to have that position posted?

17    A    It could have been.

18    Q    I'm going to call your attention to Exhibit OO, which is

19    Tab 46-5.

20    A    46-5?  Is it Binder 3?

21              MR. MACMILLAN:  Binder 3, which is -- I know we've

22    had this all open -- 46.  Here you go, 46.  I'm sorry.  What

23    Exhibit, Marcus, OO?

24              MR. PITRE:  OO.

25    BY MR. PITRE:

1  Q    Okay.  All right.  If you could read for me where it

2  begins.  Well, actually, can you tell me who this is from?

3  A    So it looks like it's from Robert McCall.

4  Q    And to who?

5  A    To Robert McCall and Tiffany Potter.

6  Q    And what's the date?

7  A    March 9th.

8  Q    The year?

9  A    2017.

10  Q    And what is the subject line?

11  A    Conversation with Robert McCall.

12  Q    All right.  And can you read to us what the actual

13  conversation was?

14  A    From the top down?

15  Q    Yes, please.

16  A    So it looks like Robert McCall says, "So you are committed

17  to leaving, right?"

18        And Tiffany says, "Why do you ask?"

19        And Robert McCall said, "I was informed that I must enter

20  an AARPA for your Chief Nurse IV."

21        And Tiffany says, "When?  Would that just be too

22  convenient?  I gave my two-week notice and then they recruit

23  for the Chief Nurse IV."

24        And then Robert says, "First I've heard of its existence."

25        And then Robert says, "Master Smith gave the order."

1    And Tiffany says, "When?"

2    And Robert says, "Vallin (phonetic) just emailed it to me

3  five minutes ago and said Dr. Smith wants this today.  Wonder

4  how they will act at morning report, because you don't know."

5  That's what Robert's saying.  And then Robert said, "You think

6  they have anyone in mind besides you?"

7    And Tiffany says, "Obviously."

8    And Robert says, "Hm."

9  Q    Okay.  So do you believe that the (indiscernible) for

10  Chief Nurse IV position that he was speaking about in this

11  exchange was the Nurse IV position that was posted?

12  A    That's what it says here.  It was the Nurse IV, according

13  to this email.

14  Q    And according to Mr. McCall, who gave that order?

15  A    It says here Dr. Smith.

16  Q    Okay.  And so is it correct that this was an automatic

17  posting from HR as you stated should have been the process?

18        MR. MACMILLAN:  Objection.  Mischaracterizes her

19  testimony.  She didn't say should have been the process.  She

20  says that's the usual process.

21  BY MR. PITRE:

22  Q    That is the unusual process?

23        JUDGE BROOKS:  Okay, the question I wrote I down is

24  this -- is it correct that this was not an automatic posting?

25  That's the posting that I would take an answer to.  Nothing

1   with a should.

2              MR. PITRE:  Okay.

3              THE WITNESS:  Can you repeat the question?

4              JUDGE BROOKS:  As I understood it, is it correct,

5   based on this, that this was not an automatic posting?

6              THE WITNESS:  So what this sounds like and what I'm

7   familiar with, this is a process of how things are posted.

8   Now, does it need a Pentad member's approval every time?  I've

9   seen it be approved, and I've also seen it where it wasn't

10  approved, that HR just went ahead and posted if all of the

11  paperwork was already in order.

12  BY MR. PITRE:

13  Q    I understand.  But in this situation, this was not an

14  automatic posting, correct?

15  A    So it sounds like there was discussion between Vallin,

16  based on this email, Dr. Smith, and Robert McCall.

17  Q    Uh-huh.  So is that a yes or no?

18             MR. MACMILLAN:  I don't understand your --

19  BY MR. PITRE:

20  Q    Was it not -- was -- did HR -- you stated that there was

21  discussion?

22  A    Uh-huh.

23  Q    So this was not auto -- is it safe to assume that this was

24  not an automatic posting?

25             MR. MACMILLAN:  Asked and answered.  But go ahead.

1          THE WITNESS:  Based on this discussion, when you say

2    an automatic posting, it sounds like it's a conversation back

3    and forth, but that's all I can tell from this discussion.

4    BY MR. PITRE:

5    Q    Okay.

6    A    I can't tell if things were 100 percent in order, if there

7    was a delay for some reason, because you know, the paperwork --

8    there's a lot of paperwork that goes into a posting, so I can't

9    tell based on this if all of that was in order or there was

10   still a need back and forth, but once an AARPA goes in or is

11   asked to be entered, in order to -- for the Pentad member to

12   approve that, everything has to be in place.

13   Q    Uh-huh.

14   A    Yeah.  Including whether or not it has gone through

15   position management committee.  So I'm assuming, based the back

16   and forth, that they were talking about those processes.

17   Q    Okay.  And who is Vallin -- who you believe Vallin to be

18   in this exchange?

19   A    I think Vallin is somebody in human resources.

20   Q    Okay.  Understood.

21          MR. PITRE:  All right.  No further questions.

22          JUDGE BROOKS:  Thank you.  The time is 9:37 p.m.

23   (sic).  Does the Agency have further questions?

24          MR. MACMILLAN:  I do.

25          JUDGE BROOKS:  Okay.  That's fine.

1            MR. MACMILLAN:  Thank you.

2                        REDIRECT EXAMINATION

3    BY MR. MACMILLAN:

4    Q    Is it unusual for a member of human resources to consult a

5    Pentad member before posting a position when that Pentad member

6    had also worked on developing a functional statement and

7    sending it to the VISN for approval?

8    A    It's not unusual for there to be a conversation back and

9    forth, because there may be many different parts of the process

10   that need clarification.

11   Q    So if I told you that doctor -- that Vallin Ochoa

12   (phonetic) reached out to Dr. Smith about posting the position

13   or vice versa, once it was approved, would that be unusual in

14   your mind?

15            MR. PITRE:  Objection to the form of the question.

16   He's asking her to speculate.

17            JUDGE BROOKS:  You've asked her to speculate a lot.

18   I'm allowing the question.

19            THE WITNESS:  Can you repeat the question?

20   BY MR. MACMILLAN:

21   Q    Sure.  If I represent to you -- and I can show you the

22   email exchange if you want, but the bottom line is, if Dr.

23   Smith and Vallin Ochoa communicated about posting this position

24   before it was posted --

25   A    Uh-huh.

1   Q    -- assume that fact, is that -- would you consider that to

2   be unusual?

3   A    No, that's not unusual, because what the Pentad member, in

4   this case Dr. Smith, you know, needs to make sure of is that is

5   every piece of this process in place?  And mainly the piece

6   that she would be most concerned about, because she -- you

7   know, in her role over nursing is that was there already

8   approval from Nurse IV board and have all of those boxes been

9   checked.  So it is not unusual for them to have a back-and-

10  forth dialogue prior to a posting.

11  Q    And I believe it was your -- you talked earlier that Dr.

12  Smith was -- had a role in this particular Chief Nurse IV

13  creation.  Is that correct?

14  A    She had to, based on her role in the organization.  She's

15  over nursing service.

16  Q    Mr. Pitre asked you about details.  Is one reason

17  someone's detailed into a position is to fill a need in the

18  organization?

19  A    It is.  It definitely is.

20  Q    By January of 2017, was there some urgency in the mind --

21  your mind or -- in your mind or the mind of the Pentad that you

22  needed -- new leadership was needed over the admin -- over

23  purchased care and the administrative nursing service?

24  A    Well, the fact that this was Phoenix and there was an

25  access crisis in 2014 and I was the seventh director in two

1  years coming in, this wa -- access was my priority.  Making

2  sure that we fully understood what the demand was for this care

3  and whether or not we had the capacity to meet that demand in

4  order not to create an access problem.  It was to fix it.  And

5  so this was one service that needed immediate attention.  And

6  we made the changes that we did in order to address those in

7  real time.

8  Q    Now, earlier you were asked about functional statements.

9  Would you -- would it surprise you that given the changes in

10  the organizational structure of this particular area or service

11  line we've been talking about, would it surprise you that a new

12  functional statement was submitted to VISN for the Chief Nurse

13  IV position?

14  A    It would not surprise me, if the grade for this position

15  were something different.  So like I mentioned, I don't recall

16  the specifics of it, but I recall a national discussion about

17  why some facilities had this as a Nurse III.  Some had it as a

18  Nurse IV.  Some were considering an MD over this service.  And

19  then again, where -- which Pentad member this service would

20  report to.

21       So I remember a lot of discussion about that nationally.

22  Again, what I was focused on was what would be best for

23  Phoenix, based on the volume, the growth at the time.  And so

24  for something to go back to the classification unit to ensure

25  that we had the right levels, that would not surprise me.  And

1   there as so much change in the organization and the service

2   that I wouldn't be surprised.

3   Q    Ultimately -- is it your understanding that the chief

4   physician position was removed over the service line and the

5   duties were performed by the Chief Nurse IV, of the newly

6   created Chief Nurse IV position?

7   A    I would say no, simply because of what I stated earlier.

8   An MD would be responsible for just what an MD could do, unless

9   the MD role is used in an administrator capacity as well.  And

10  in that case, those administrative duties would probably be

11  assumed by the person that was taking the lead in the service.

12  Q    Are you aware -- so is it your understanding that it's

13  currently a physician chief of the service line as well as a

14  Chief Nurse IV?  Do you know how it's structured right now?

15  How this organization -- like comparing it to Tab -- the one we

16  showed you earlier, which I believe was at 16 -- Exhibit 4P,

17  which is Tab 16, page 35.  Do you have -- if there's any

18  changes between now -- what's happened -- the way this unit is

19  organized now versus --

20  A    So we do not have a -- currently today, we do not have --

21  so, we have a Nurse IV that was over the service, but we do not

22  have a physician working in this service.

23  Q    Okay.

24  A    We have an LIP, a licensed independent practitioner, who

25  is detailed to the chief of staff's office that reviews

1   consults.  A licensed, independent practitioner, but we do not

2   have an MD in this service.

3   Q    Okay.  And did that change occur after -- to your kno --

4   if you know, did that change occur after the Chief Nurse IV

5   position that was posted in -- around March of '17 was

6   advertised and eventually filled?

7   A    What change?  The role of the MD?

8   Q    The organizational restructuring with the elimination of

9   physician chief position.  Did that occur at the same time as

10  the creation of the Nurse IV to assume more of the

11  administrative duties?

12  A    So the Nurse IV position was created, based on just an

13  assessment of what was going on in the service and what needed

14  to be done as more issues with care coordination were arising,

15  due to the fact that the volume was getting bigger and bigger.

16  When the physician was taken out of this service, there was

17  really no discussion to bring that role back, because in

18  assessing where the department was, the changes were made to

19  address the current work and how the work needed to be done and

20  the need to have a physician over this did not really stand out

21  as a good use of that position basically, because of what the

22  MD would be doing versus what needed to be done in the service

23  overall.

24  Q    Okay.  I want to change gears hear a little bit or shift

25  gears.  Mr. Pitre asked you something about the OIG

1    double loss.  And so I really recall that and remember that

2    conversation.  But I did speak to people in VISN 21 and said

3    that they were fortunate to have Tiffany joining them.

4                 MR. MACMILLAN:  I don't have any further questions.

5                 JUDGE BROOKS:  Thank you.  Mr. Pitre?

6                 MR. PITRE:  Yes.  Just a few follow up.

7                              RECROSS-EXAMINATION

8    BY MR. PITRE:

9    Q    You testified to the current structure of the purchased

10   health (indiscernible) services not having a physician,

11   correct?

12   A    Uh-huh.

13   Q    And you said that once the position -- is it true that you

14   stated once the position is removed, you all determined that

15   there was no longer a need for a physician?

16   A    Well, for me personally, I wasn't clear what that -- you

17   know, besides the review of consults, what the value added was

18   for that role, because the duties that were taking place within

19   that service could be performed by a nonphysician.  So

20   utilization management, care coordination, those kinds of

21   things.  You didn't need a physician over those services.

22   Q    And you made -- did you make this decision once you had

23   Mr. Duarte removed from -- well, not necessarily removed, but

24   you had Ms. Potter take over Dr. Duarte's duties?

25   A    So the service actually -- the review of the service and

1   what's needed is actually ongoing.  Right now that's what the

2   structure is today, but we still -- we do have an LIP that

3   reviewing consults that report to the chief of staff.  But like

4   I said, we will look at demand and the capacity.  And now that

5   we have a new VA Mission Act that is going to be put in place

6   in this next year, there will continue to be changes.  So as of

7   today, so as of today, we don't have a physician in --

8   Q    Uh-huh.  And you stated that if the Nurse IV that's in

9   that position is performing any duties that an MD would have

10  had to perform, they shouldn't be, correct?  They cannot

11  (indiscernible).  Right.

12  A    They cannot, because they're not an MD.

13  Q    They're not an MD.  But there are -- did you testify that

14  there are administrative duties that they could have performed?

15  A    There are administrative duties within the service, yes.

16  Q    Right.  Is review and approval or denial of patient

17  consults an administrative duty, or is that a medical duty?

18  A    It depends at what level.

19  Q    Uh-huh.

20  A    So if a consult is put in, denial of a consult, because it

21  didn't have proper authorization or because it didn't follow

22  the proper procedure is an administrative duty.  But denial

23  because it didn't meet clinical needs or care, that's something

24  a clinician needs to do, unless there are preexisting

25  guidelines in place.

1   Q     Uh-huh.

2   A     And those have to be in place for everything in order for

3   that administrative function --

4   Q     Right.

5   A     -- to take place.

6   Q     Okay.  And you also testified to the fact that there --

7   you believed that the Chief Nurse IV was necessary in that

8   service line.  Is that correct?

9   A     Yes.  Eventually we did decide that and make that decision

10  and that's why we sent it forward to classification.

11  Q     Who made that decision?

12  A     So it was a direction within the Pentad, based on the

13  workload, volume, duties, kind of a review of everything going

14  on at the time.

15  Q     Okay.

16          MR. MACMILLAN:  I'd like to object.  I think we're

17  getting outside the scope of -- these are questions that

18  weren't raised in my cross and anywhere in the direct and your

19  original cross not my recross (sic).

20          MR. PITRE:  I believe absolutely they were raised in

21  the cross.  He said --

22          MR. MACMILLAN:  (Indiscernible).  I don't think I --

23  I don't think she testified to what you just talked about, the

24  Chief Nurse IV being necessary.  I don't think that was part of

25  my recross.

1          MR. PITRE:  It was absolutely part of the recross

2   when he asked her about the posting of the Chief Nurse IV

3   position in 2017.

4          MR. MACMILLAN:  I don't know how many times we have

5   to rehash the same issues.  I mean, I --

6          JUDGE BROOKS:  Yeah.  I'm looking at my notes and I

7   can't be certain that it wasn't raised in the Agency's recross,

8   and so I will allow it with the caveat that I'm not sure what

9   I'm hearing that I haven't already heard.  And I do prefer it

10  to be a winding down in the second round.

11         MR. PITRE:  Absolutely.  And I'm just leading to

12  this -- probably this one question right here.

13  BY MR. PITRE:

14  Q   So the position that was posted -- and we're talking about

15  classification.

16  A   Uh-huh.

17  Q   This position was posted in March of 2017.  If it did

18  not -- if the position that was posted in 2015 did not need to

19  be reclassified and that Chief Nurse IV position was then

20  reposted in 2017, could it have been advertised at any time?

21         MR. MACMILLAN:  Same objection.  This is outside of

22  the scope.  I didn't ask about this at all on my cross, so I

23  mean, this is him going back to his original cross-examination

24  with asking the same question that he essentially asked before,

25  which is -- and then he asked -- you know, we were asking

1  questions about reposting.

2       MR. PITRE:  She -- the reason I asked this question

3  is because in recross she spoke about the need for the Chief

4  Nurse IV position and she stated that the need for the Chief

5  Nurse IV position was present; therefore, the certification was

6  made for the 2017 position.  However, she also testified to the

7  fact that she was not involved in the recertification process

8  so she --

9       MR. MACMILLAN:  She -- what I asked was about, would

10  you consider to be unusual that -- and I was asking questions

11  about resubmitting it.  But I wasn't asking questions about

12  (indiscernible) --

13       JUDGE BROOKS:  Okay.  Okay.

14       MR. MACMILLAN:  -- (indiscernible).

15       JUDGE BROOKS:  My main limitation in the second

16  round -- my main limitation is that you have to be addressing

17  something that was substantively addressed in the first round.

18  That is my main limit.  I don't have a strict rule that -- on

19  the Appellant's portion the second round that he can only

20  address what the Agency addressed in the immediately preceding

21  round.  I don't want anything brought up new in the second

22  round.  I'm not sure where this lies.

23       I do still like the parties to be -- to have a

24  narrower scope of review in their second round.  I'm going to

25  allow the question with the caveat that this should be narrower

 1   in scope and not broadening what was previously discussed.  Go

 2   ahead.

 3               MR. PITRE:  Correct.  Yes.

 4   BY MR. PITRE:

 5   Q    Yes.  And I'm specifically talking about the 2017 posting

 6   and the reclassification or actually reposting of it, because I

 7   think that -- and I'm testifying at this point, but isn't it

 8   true that you testified to the fact that you're not sure if it

 9   was reclassified or not?

10   A    Reclassified from the 2015?

11   Q    Correct.

12   A    I can't specifically call -- you're asking for some

13   concrete example of my involvement with the recertification?

14   Q    Yes.  Did you re -- yes.

15   A    So I remember a lot of discussion about it, but I was --

16   I'm not directly involved in the reclassification process --

17   Q    Exactly.

18   A    That's --

19   Q    Exactly, so --

20   A    -- human resources.

21   Q    Yeah, it's human resources.  So if that 2015 position had

22   not been reclassified, isn't it true, based on your knowledge

23   of the classification process, the approval through VISN, that

24   that posting that was posted on March 9th could have been

25   posted at any time prior, because it had already been

1   classified?

2   A    See, I don't know what happened prior to my arrival.

3   Q    Uh-huh.

4   A    But what I do know and what I can speak to is that to post

5   a position, it has to be classified.

6   Q    Uh-huh.

7   A    So if they classified it in 2015, that I can't speak to,

8   because I don't know.  But for any position that we post, it

9   has to go through classification.

10  Q    Correct.  And so once it's --

11            MR. MACMILLAN:  Objection.

12            MR. PITRE:  Objection to what?

13            MR. MACMILLAN:  You're saying correct.  You're

14  agreeing with what she's saying.

15            MR. PITRE:  Okay.

16            MR. MACMILLAN:  So you're testifying.

17            MR. PITRE:  All right.  I'll withdraw from saying

18  correct.  Thank you.

19  BY MR. PITRE:

20  Q    Okay.  Going to your testimony regarding a meeting with

21  Ms. Potter prior to her transferring to California.

22  A    Uh-huh.

23  Q    Can you recall what was stated in that meeting?

24  A    So she came and sat down, and she proceeded to tell me

25  that she had accepted a position with VISN 21.  And I remember

1  feeling that this is a huge loss to us.  That was my feeling.

2  And we proceeded to talk about that.  I asked her questions

3  about the position, what it was and so forth and then also

4  shared with her that I -- you know, I'd just come from Manilla

5  and I'd worked with the folks in VISN 21.

6      And we talked about a recommendation, and I gladly called

7  a couple folks at the VISN office to share that I was informed

8  Tiffany was leaving Phoenix and going to VISN 21 and I had

9  nothing but, you know, praise about her skill set, her

10  knowledge and so forth and expressed that it was a loss for our

11  facility.

12  Q    Okay.  And did Ms. Potter ever issue you a letter of

13  resignation in response after that meeting?

14  A    I remember I did get something --

15  Q    Okay.

16  A    -- stating that she was resigning.

17  Q    Okay.  Call your attention to Exhibit NN, which is Tab 46-

18  4.

19          MR. MACMILLAN:  I guess I would like to object to the

20  admission of this exhibit, because I mean again, I think it's

21  getting into your original ruling where complaints of

22  whistleblower retaliation or whatever to Ms. Potter weren't

23  going to be a subject of this -- in Ms. Nelson's testimony.

24  She can testify that she received a letter, that she received a

25  resignation letter, but once you get into the content of this

1  letter, it touches on, I guess issues of how this an alleged

2  complaint of whistleblowing against --

3            JUDGE BROOKS:  Okay.

4            MR. MACMILLAN:  -- and you know, therefore I believe

5  it's excluded by your prior order.

6            JUDGE BROOKS:  Well, this --

7            MR. PITRE:  Well, actually --

8            JUDGE BROOKS:  -- this exhibit does address more than

9  that, and so I don't see any basis to strike the exhibit or not

10 have her testify about it, but I'd caution you not to ask a

11 question that contradicts what I excluded from the scope of her

12 testifying.

13           MR. PITRE:  Absolutely.  Yes.

14 BY MR. PITRE:

15 Q    All right.  Is this the letter that you received from Ms.

16 Potter?

17 A    It looks like it, because it's addressed to me.

18 Q    Okay.  I'm going to have you read the third paragraph for

19 me, please.

20           MR. PITRE:  And Judge, I may -- just before there's

21 an objection regarding this.  On reexamination, the Agency

22 counsel asked the witness did Ms. Potter apply to the March

23 2017 position after she informed Ms. Nelson that she was

24 resigning.  She also asked the witness could she have applied.

25 But what I'm going to be asking the witness is based on that

1  paragraph, would it have been reasonable in her belief for the

2  Appellant to have applied to that position.

3          MR. MACMILLAN:  I guess what I would counter is why

4  don't you just ask Ms. Potter, Ms. Potter's own feelings.

5  Obviously, this is a letter drafted by Ms. Potter.  You want to

6  know if the director has a belief as to whether it was

7  reasonable for Ms. Potter to apply?  Is that what you're

8  asking?

9          MR. PITRE:  Well, he asked her could she have applied

10  and did she apply, so I'm -- which created an instance of the

11  question of why didn't she, so I'm giving the director the

12  opportunity to answer that question.

13          MR. MACMILLAN:  This is getting to, again, the

14  whistleblowing.  This is exactly what we just talked about,

15  which is getting into the -- why she didn't apply and

16  complaints of whistleblowing and I don't think those are

17  something that this witness is -- I mean, I think there's other

18  ways this can come in, and I don't see the relevance of having

19  the director opine on a resig -- first of all, I think the

20  resignation letter, I'm not -- I opened the door for it, but

21  because we didn't -- because Ms. Nelson didn't even talk about

22  a resignation letter.

23          She just talked about a conversation.  But other than

24  that, now we're getting into the basis of why she didn't apply.

25  I mean, I did ask her if she could have applied, but I mean,

1   I'm happy to re-ask the question was there anything prohibiting

2   her from a policy standpoint or from any other standpoint from

3   applying.  (Indiscernible).

4          JUDGE BROOKS:  That's the way I took the question.  I

5   don't need her to testify as to whether she believes that

6   somebody who's saying they're subject to intolerable working

7   conditions is -- has any true will into whether to apply or not

8   apply for a position.  And Ms. Potter can testify that she sent

9   this letter to Ms. Nelson.  I don't need her to testify to

10  that.

11         MR. PITRE:  Okay.  Thank you.  No further questions.

12         JUDGE BROOKS:  All right.  Ms. Nelson, this is an

13  ongoing proceeding and for the duration of it, you're

14  instructed not to discuss the substance of your testimony with

15  anybody.  Thank you for coming in today and you're free to go.

16         MR. MACMILLAN:  Thank you.

17         THE WITNESS:  Thank you.  Thank you.

18         JUDGE BROOKS:  Thank you.  Okay.  The time is 10:08

19  a.m.  Let's go off the record.

20     (Off the record at 10:08 a.m.)

21         JUDGE BROOKS:  The time is 10:17 a.m.  We're back on

22  the record.  Appearing now as the witness is Tiffany Potter,

23  the Appellant.

24         Good morning, Ms. Potter.

25         MS. POTTER:  Good morning.

1          JUDGE BROOKS:  Do you have any objection to testifying

2    under oath?

3          MS. POTTER:  I do not.

4          JUDGE BROOKS:  During your testimony, if you have

5    questions or are confused, you can direct your questions to me.

6          Would you please raise your right hand for the oath?

7               TIFFANY POTTER, APPELLANT'S, SWORN

8          JUDGE BROOKS:  Thank you.  For the record, would you

9    please state and spell your name?

10          THE WITNESS:  Tiffany Potter, T-I-F-F-A-N-Y; Potter,

11    P-O-T-T-E-R.

12          JUDGE BROOKS:  Thank you.  Your counsel will be the

13    first to ask you questions.

14          Mr. Pitre, you can begin.

15          MR. PITRE:  Thank you.

16                    DIRECT EXAMINATION

17    BY MR. PITRE:

18    Q    Ms. Potter, it's already been agreed upon by the parties

19    that on January 3rd, 2010, you were transferred to the Phoenix

20    VA healthcare system where you initially worked as a Nurse II

21    in the Quality Management Service.  And then on March 13, 2011,

22    you were promoted to a Nurse III in Quality Management Service.

23    Is that correct?

24    A    Yes.

25    Q    Okay.  So I will not be asking you any questions prior to

1   that time.  What were your duties as a Nurse III in the Quality

2   Management Service division?

3   A    I was performing functions that incorporated continued

4   survey readiness for the facility.  So that would include joint

5   commission preparation, accreditation, responding to OI -- or

6   assisting and coordinating in the responses of suspense action

7   items, OIG.  I was assigned a different specific area, so the

8   Quality Managers were split up.  They had the same functions,

9   but split up to different areas.  So I was specifically the

10  Quality Manager for ambulatory care, and I was also assigned

11  emergency management environmental care and life safety.  And

12  so my responsibility would be to go and make sure that all

13  those areas, to include environmental care rounds, infection

14  control and patient safety, that we were functioning in

15  compliance as an organization to make sure that if a survey

16  were to come, we would be prepared for it.

17  Q    Okay.  And at any point, did you have to take on

18  additional duties?

19  A    In that position, no.

20  Q    Okay.  Now, did you receive a functional statement as a

21  Nurse III?

22  A    In that position, yes.

23  Q    Okay.  And the functional statement, was that reflective

24  of the duties that you were performing?

25  A    Yes.

1  Q    Thank you.  At some point, did you receive other

2  promotions?

3  A    I did.  I was -- well, the thing, when I was quality

4  management and I went from a Nurse II to a Nurse III based on

5  my performance in that department, and after -- in about

6  September of 2011, I applied for and was accepted as the Nurse

7  Manager for the utilization review team.  And so then that was

8  a promotion.  Same grade, same stuff; I was still a Nurse III.

9  So nothing changed there.  I was then put on a Nurse Manager

10 pay scale.  And --

11 Q    Okay.  And -- I'm sorry.  Go ahead.

12 A    So then with -- when you convert from a Staff Nurse to a

13 Nurse Manager, then you receive two steps and then you go on a

14 Nurse Manager pay scale.

15 Q    What were your duties as a Nurse Manager?

16 A    In that role, my specific duties was to the utilization

17 review team.  So the job posting that I had applied for was

18 Nurse Manager Utilization Review.  I was the Nurse Manager for

19 five nurses.  Their job functions were to review the patients

20 who were admitted to nonVA hospitals.  So if there was a

21 patient that -- like the Millville patients, they were -- say

22 you went to an outside hospital via emergency, we would get

23 notification of that hospital admission, and the nurses would

24 review that inpatient study.

25 Q    Okay.  And did you have a functional statement that

1   reflected the duties of a Nurse Manager?

2   A    I did not.

3   Q    Okay.  So how did you know what duties to perform?

4   A    Based on the job description that I just outlined, that

5   was the responsibility for that utilization review team.  And I

6   would get my -- there was no predecessor prior to me.  There

7   was a Nurse Manager that was in that role for maybe six months.

8   She had left long before I got there.  So when I came in, it

9   was -- I knew my job was utilization review.  I reported to a

10  Chief Nurse at that time.  It was Gail Smith.  She was the

11  Chief Nurse at that time.  They called it the ACNS.  So she was

12  the Associate Chief Nurse for Specialty and Support Services.

13  And so I received my direction from her.  We were considered

14  the support services of her area and responsibility.  So I

15  would go to her, and she would let me know what needed to be

16  done in that department.

17  Q    Okay.  And at some point, did Ms. Gail Smith leave?

18  A    At -- we were reorganized.  She didn't leave at that time,

19  but in April of 2012 they made an organizational change and

20  moved me and that department out of nursing service and under

21  purchased care under Dr. Robbi Venditti.

22  Q    Okay.  And what duties were you performing when you were

23  moved to Purchase Care?

24  A    Well, because I no longer had Gail Smith as my Chief

25  Nurse, I had to take over her duties and responsibilities.

1    Additionally, they were starting to add on several other

2    services to that department to include the transfer program,

3    the transplant program, the traveling veterans.  They were

4    starting to run the consult review piece.  So prior to me

5    getting there, there were no nurses that reviewed consults that

6    were going on outside of the facility.  So then that was added

7    on.  In addition to -- I mean, there were several -- several

8    other duties, but those were the -- the main functions that I

9    took over.

10        And I also had to assume the Chief Nurse roles, which

11    would include helping with coordinating their posting of

12    positions and previewing the positions or the -- or the scope

13    of the nursing positions for the areas that were being added

14    on, the performance evals for the staff.  We didn't have anyone

15    to do second-level approvals.  I had timekeeping

16    responsibilities as a second-level approval, although I was a

17    first-line manager.  So there were a lot of -- more policy and

18    scope and, you know, like SOP duties that normally would have

19    been -- that I would have went to Gail Smith for, but then I

20    was responsible for.

21    Q    Okay.  So you stated that you took over the duty of the

22    Chief Nurse IV; is that correct?

23    A    Correct.

24    Q    And who was your first-line supervisor?

25    A    I reported to Dr. Robbi Venditti.

1   Q    Okay.  And the duties that you just testified to, were

2   they reflected in the functional statement?

3   A    No, because -- no, they were not.  They were -- well, I

4   did not have a functional statement that reflected those

5   duties.  There were Chief Nurse functional statements in the

6   organization to include Gail Smith that would have encompassed

7   those duties.

8   Q    And where did you get that information?

9   A    From HR.

10  Q    And can you explain to us how you acquired that

11  information?

12  A    Can I --

13          MR. MACMILLAN:  Well, I'd like to object to this line

14  of questioning about -- this hearing seems to be focusing a lot

15  on duties, especially duties -- right now we're talking about

16  duties in 12 and 14.  You know, in Tab 30 -- and you know, the

17  Appellant already asked for reconsideration on issues

18  related -- in this whistleblower appeal, issues related to

19  details leading to compensation.  So I don't know how this

20  historic information about what -- and then going forward.  If

21  she's assuming duties and positions that we can't talk about

22  compensation, I'm not sure how it's relevant because what is

23  the reprisal -- whistleblower reprisal resulting from assuming

24  duties, assuming it is --

25          JUDGE BROOKS:  Response?

1              MR. PITRE:  We're laying the -- we're laying the

2    foundation of her experience to show that how and why she was

3    the most qualified individual to be either promoted or

4    interviewed and hired for the positions that are a part of the

5    whistleblower retaliation claims.  So we're laying the

6    foundation about showing just how experienced she was in what

7    she did at the Agency.

8              JUDGE BROOKS:  I'll note that at least in the

9    testimony I've heard thus far I haven't heard anybody say that

10   she wasn't well-qualified for the Chief Nurse position.  If

11   you're generally trying to lay a foundation because you

12   anticipate that somebody else is going to say that she wasn't

13   necessarily the best qualified candidate, I can give you some

14   leeway, but I was -- I have been waiting to hear how quickly

15   you can get to the events of the case, which starts in May of

16   2014.  Right now you're maybe eight minutes into this.  I can

17   give you a few more minutes to roll forward to the events of

18   the case if you're building a basis for --

19             MR. MACMILLAN:  I'm going to just represent to you

20   we're not going to present any -- no one's ever going to say

21   that Ms. Potter was unqualified for her sole position.  So

22   everyone -- that's not the reason the employment action -- that

23   she's claiming a reprisal did happen, from the Agency's

24   perspective, and that's what -- you know, all of our witnesses

25   are going to say she was qualified, but they're going to talk

1  about reorganizations and things of that nature, and why things

2  that had happened, I guess, on the time frame that Ms. Potter

3  had wanted them to or whatnot.

4       But in any event -- so I -- you know, we could talk --

5  I mean, I guess -- I understand laying the foundation to some

6  extent, but I see this hearing going down this, you know, black

7  hole of talking about what duties were going to what jobs and

8  whatnot, and I just don't see that as being relevant if it's

9  not linked to the actual reprisal action.

10       JUDGE BROOKS:  Anything else, Mr. Pitre?

11       MR. PITRE:  Yes.  Regarding his objection, no.  I

12  think based on your ruling, I'm going to begin asking

13  questions, which I was going to anyway, regarding the events

14  about the whistleblower disclosure.

15       JUDGE BROOKS:  All right.

16       MR. PITRE:  I just wanted to lay the foundation, which

17  I've gotten, to Ms. Venditti, being her current report.  I

18  wanted to lay a foundation regarding the functional statement,

19  because that's going to be an issue that later comes up.  But I

20  think I'm ready to move on.

21       JUDGE BROOKS:  All right.  Go ahead.

22       MR. PITRE:  Thank you.

23  BY MR. PITRE:

24  Q    Okay.  During the time that you were performing the duties

25  as a Chief Nurse IV in Purchase Care while under the

1   supervision of Robbi Venditti, did you ever report any concerns

2   to her?

3          MR. MACMILLAN:  I'm going to -- well, I mean, it's

4   misstating facts, and I assume facts not in evidence.  I mean,

5   I don't when she -- she's claiming that she -- his question is

6   claiming that she's assuming the duties of a Chief Nurse IV.  I

7   don't know where that's coming from.

8          MR. PITRE:  Her --

9          THE WITNESS:  I --

10         MR. PITRE:  Please.

11         She just testified that she assumed the duties of

12  Ms. Smith.  When she went over to Purchase Care, she was

13  performing Chief Nurse IV duties.

14         JUDGE BROOKS:  I think you he ask her something about

15  she took over the duties --

16         MR. MACMILLAN:  Okay.  I --

17         JUDGE BROOKS:  -- of Chief Nurse IV.

18         MR. MACMILLAN:  Okay.  I mean -- all right.  Thank

19  you.  Sorry.

20         JUDGE BROOKS:  Now, I don't believe she was ever

21  graded as a Nurse IV, was she?

22         MR. PITRE:  No, she was not.

23         JUDGE BROOKS:  Okay.  And this is just her position.

24  I don't know what position others would take on this.  So I'll

25  note that her testimony is that she was performing Chief IV --

```
 1    Chief Nurse duties, Nurse IV duties in Purchase Care under

 2    Venditti.

 3            And you're asking her if she reported any concerns to

 4    Dr. Venditti, which that is a relevant question.

 5            MR. PITRE:  You may answer.

 6            THE WITNESS:  Well, yes.  And in around May of 2014, I

 7    reported to Dr. Venditti.  Well, this was part of an ongoing

 8    discussion.  It wasn't the first time.  But I had --

 9    specifically I recall sending an email to Dr. Venditti about

10    urology.  And so we -- there was a whistleblower who had

11    submitted concerns about the cancellation of urology

12    appointments and completing those consults.  And so there were

13    patients who possibly had -- like recently had a biopsy for

14    prostate cancer.  Their appointments were canceled.  And this

15    was a while ago, but it was under Dr. Venditti's prior

16    department and her position before taking over us.

17            And so when there -- when that employee submitted

18    these concerns, there was a list generated of the patients who

19    had their appointments canceled.  Dr. Venditti had instructed

20    one of the light-duty nurses that was detailed to my department

21    at the time to review this list, and I believe it was 6 -- like

22    680 patients that needed to be reviewed and categorized.

23            So this nurse over -- from between like March to May

24    had not completed reviewing this list of patients, and there

25    were concerns about the patients.  So we -- in my role in that
```

1    department, I offered to utilize our nursing resources over the

2    weekend to do overtime to review and complete the list.  But we

3    were -- we were starting to get information, when we were

4    contacting these patients and getting notifications about these

5    patients, of patients who had died.

6         So on that specific date, I remember sending an email

7    to Dr. Venditti, I'm very concerned -- I told her we had

8    reviewed some patients and there were 3 I believe that month

9    that we got notification on who had died related to their

10   urology delays.  I recall being in the office with the nurse on

11   one occasion where she made a phone call.  I actually was

12   helping to make phone calls.  But there was one in particular

13   I'll never forget.  We had called this patient to offer them

14   care in the community or -- and to follow up on them, and the

15   wife actually said, now you're calling?  My husband died three

16   months ago of prostate cancer.  You guys never followed up on

17   his case.  I mean, it was a very emotional -- very emotional

18   and distressful time for us.

19        But because there were 3 new deaths that we had come

20   across, I elevated that concern to her because there was no

21   action being taken it -- it appeared.  It was like, let's

22   review this list.  She said that she was going to give that

23   list to the urology provider that we had left in the facility,

24   because most of them had left the organization by that time,

25   but nothing was happening.  So I was urging her -- you know, we

1  just came across 3 more deaths -- this is in addition to the

2  111 that were already reported -- that died related to this

3  wait time scandal.  Can we do something about it?  Something

4  needs to happen.  These patients were dying, and I didn't want

5  to have any more notifications.  And so that's what I reported

6  to her.

7  BY MR. PITRE:

8  Q    I'm calling your attention to Exhibit A, which is Tab

9  44-26.

10 A    Tab 8?

11 Q    Is that the email in which you reported your concerns to

12 Dr. Venditti?

13 A    This is -- Tab 8?

14 Q    Um-hum.

15 A    Yes.

16 Q    And what is the date of that email?

17 A    May 28th.  And so, yes, in addition in urology, I also --

18 there were also psychotherapy and OIG related to the

19 psychotherapy patients that I was also referring to in this

20 email.

21 Q    Okay.  Could you tell us about the psychotherapy patients?

22 A    Well, I received an email and phone -- and call from a

23 gentleman in the OIG about psychotherapy cases.  He had sent a

24 spreadsheet.  And not for my Nurse Manager duties but

25 because -- and this, again, is another of the chief role that I

1  would have been performing at that time.  He contacted me to

2  help the OIG figure out what's going on with these urology

3  (sic) cases.  So I was tasked by the OIG to review a list of --

4  I'm sorry -- of psychotherapy patients.  I was tasked to review

5  this list and figure out what was going on today.  The subject

6  was that they were lost, to follow up.

7       So I reviewed and categorized.  I accessed our internal

8  share drives and lists to figure out what was going on with

9  those patients.  And through that process discovered that -- I

10 believe there was 128 patients; about maybe 96 of them had

11 never received care.  Their referrals were not transmitted

12 through TriWest.  This was separate from the OIG for the

13 urology, but it was still concerning because these were mental

14 health patients that were suicidal that basically were

15 essentially lost to follow-up on.

16 Q    And you said you reported these concerns to whom?

17 A    I reported them to -- to the OIG.  I do not recall the

18 name.  But he sent me the list and I reviewed it with him, and

19 we had a phone call to go over the findings.  And then that

20 information was sent back to him, and then that -- that

21 specific information, the specific numbers and data that I

22 provided to him, was used in the OIG report that came out

23 later.

24 Q    Okay.  I'm calling your attention to Exhibit B, which is

25 Tab 44-27.  Do you recall that email string?

1   A    Yes.  This is after I coordinated with the OIG.  Once we

2   got the results and discussed that, I sent Ed Lowe -- Ed Lowe

3   is the Fee Manager who is responsible for the stuff that should

4   have made sure that those psychotherapy consults went through.

5   And so I was telling him, attached is the OIG spreadsheet, and

6   that's what I was referring to, the list that the OIG gave me

7   to review.  And I told him that out of those 128 patients, 96

8   were never sent to TriWest by his off. staff even though that

9   they were supposed to.  And so the -- a lot of them were never

10  seen because it wasn't sent, many of the suicidal patients and

11  otherwise high risks notes for the OIG.  So again, the OIG,

12  when they sent it to me, they had their preliminary review;

13  they just needed to figure out what happened with those

14  patients.  So those are the notes that I was referring to.

15          In addition to that, because Dr. Leslie Telfer was

16  the -- I believe she was the Chief 4 for mental health, and she

17  was over psychotherapy, and so I let her know because I was

18  certain she was also involved with the OIG discussions about

19  her patients.  And so that's why I sent that information to her

20  as well.  And then, you know --

21  Q    Okay.  I'm calling your attention to Exhibit C, which is

22  Tab 44-28.  Do you recall this email string?

23  A    Yes.

24  Q    Can you look at the email on the bottom half of the page?

25  It's from Tiffany Potter.  Who is that email to?

1    A      Dr. Venditti and --

2    Q      Who else is on that email string?

3    A      Dr. Darren Deering, who is the Chief of Staff, Dr. Silvia

4    Avila (phonetic), who was an Associate Chief of Staff, and I cc

5    myself for the record.

6    Q      Okay.  And what date was that email sent?

7    A      July 10th of 2014.

8    Q      And can you read that -- can you read the first paragraph

9    of that email for us?

10                   A      "Hello, Dr. Venditti.  I have strong concerns

11                   about the OIG notes and findings in this review.

12                   Many of the cases that didn't" -- "that did make it

13                   to TriWest have no follow-up.  Part of this

14                   responsibility is clinical; however, due to the lack

15                   of clinical staff and support at TriWest, this

16                   responsibility is falling on the nurses in our

17                   department.  We simply are not staffed to address

18                   these issues or case managing these patients.

19                   "Furthermore, processes need to be created and

20                   implemented to address the very many components

21                   associated with case-managing patients that go out

22                   for non-VA care.  This would be my responsibility as

23                   an Associate Chief Nurse or Nurse Manager; however, I

24                   don't have the time or resources to address such

25                   matters adequately or efficiently.

1          "The investigation results below dictate even on the

2          admin side with the Fee Manager, equivalent to an

3          Associate Chief Nurse, supervisor, equivalent to

4          Nurse Manager, another supervisor coming on board,

5          and a lead, they still have fallen short of oversight

6          requirements.  With the clinical side being much more

7          complex, it is beyond common expectations for one

8          person" -- which myself -- "to do the job of what

9          should be at least four separate FTE in a supervisory

10          management capacity in this department."

11   Q    Okay.  That's good.  Thank you.  In that paragraph, you

12   reference to yourself as Associate Chief Nurse.  Why is that?

13   A    At that time, they -- the -- Associate Chief Nurse, ACN

14   Nurse, and Chief Nurse is used interchangeably.  They used to

15   be called ACN Nurse; then they changed it to Chief Nurse.  I

16   referred to myself that way because those were the duties that

17   I was performing in addition to my job as a Nurse Manager.  So

18   I was doing Nurse Manager and Chief Nurse duties.

19   Q    Let's just call -- actually let me call your attention

20   to -- we can go back to Exhibit A.  Let's go back to Exhibit A.

21   A    Yes.

22   Q    Where you signed -- for your signature block, what does it

23   say under your name?

24   A    Nurse Manager/Acting Chief --

25          JUDGE BROOKS:  Where are you?

1          THE WITNESS:  -- of Purchase Care --

2          MR. PITRE:  I'm sorry.  I apologize.  Exhibit A --

3          JUDGE BROOKS:  Page 26 of the --

4          MR. PITRE:  Tab --

5          JUDGE BROOKS:  -- same tab?

6          MR. PITRE:  Yeah.  44 (indiscernible).  Yes, 24 --

7          JUDGE BROOKS:  All right.

8          MR. PITRE:  -- (indiscernible).

9          JUDGE BROOKS:  Thank you.

10         MR. PITRE:  Thank you.  Sorry about that.

11    BY MR. PITRE:

12    Q    What is the title under your name?

13    A    Nurse Manager/Acting Chief of Purchase Care Services.

14    Q    Okay.  Why is the title listed as Acting Chief?

15    A    So in around the June area of 2014, Dr. Venditti was in

16    the -- she was either promoted already or in the process of

17    being promoted to the Associate Chief of Staff for

18    Administrative Medicine Service or Purchase Care.  And so her

19    position as the Chief for Purchase Care, which was her title

20    prior to that, it was then vacant.  She took over additional

21    responsibilities as the Associate Chief of Staff, and then I

22    took over her duties as the Chief for Purchase Care.

23    Q    Did she instruct -- did Dr. Venditti instruct you to add

24    Acting Chief to your title?

25    A    To my title?  In my -- I was -- I was told several times

1  by many people that I should add it to my signature block to

2  reflect what I was doing.  So there were a lot of -- you know,

3  prior to that, if I had like Nurse Manager, then they would

4  say, okay, who's the Chief -- who is your Chief Nurse?  I was

5  the only Nurse Manager in the title facility who did not have a

6  Chief Nurse.  So most of the things that I was being -- that

7  was being brought to me and that I was being requested to do

8  isn't something that any Nurse Manager would do.  A Nurse

9  Manager's job is to supervise the day-to-day operation,

10  supervisory, so-and-so called in sick, make sure they're doing

11  their job day-to-day, not any high-level organizational things

12  and coordinating with these OIG responses and such.  So -- so

13  that is why it was added.  And I was told specifically by

14  Dr. Venditti that I'd be Acting Chief while she focused on

15  compensation pension, which was another area that was added to

16  her area of responsibility when she took over as the Associate

17  Chief of Staff.

18  Q    Okay.  Did anyone tell you to remove the title of Acting

19  Chief from your --

20  A    No.

21  Q    -- title?

22  A    No.

23  Q    Okay.

24  A    As I said --

25  Q    You testified just now that on July 10th you sent an email

1    to Dr. Venditti as well as Dr. Deering, Silvia Avila as well as

2    yourself as reporting strong concerns.  Did at any point in

3    time Dr. Deering respond to your email?

4    A    Yes.

5    Q    Exhibit C?

6    A    Exhibit C, yes.

7    Q    Okay.  I'm calling your attention to Exhibit D, Tab 44-31.

8    A    Yes.

9    Q    Okay.  Do you recall that email string?

10   A    Yes.

11   Q    Who is the top email from?

12   A    Dr. Deering.

13   Q    To whom?

14   A    To me.

15   Q    On what date?

16   A    On July 10th, 2014.

17   Q    And what is that email referencing?

18   A    He wanted me to give him the information that I sent to

19   the OIG.

20   Q    Did he explain to you why?

21   A    Many times.  In addition to that, Dr. Venditti even stated

22   verbally there were a lot of conversations about my

23   coordination -- a lot of phone calls about my coordination and

24   what I provided to the OIG.  So after I had listed these

25   concerns, prior to that discussion was they wanted to see what

1   I sent to the OIG.  So that was requested by Dr. Deering and

2   Dr. Venditti.  And the meeting that he's referencing is he

3   wanted me to bring that information when we met.

4   Q    Okay.  Did you ever have that meeting?

5   A    Yes, we did.

6   Q    And did you bring him that information?

7   A    I did, yes.

8   Q    So he was aware of what you reported to the OIG?

9   A    Yes, he was.

10  Q    Okay.  I'm calling your attention to Exhibit E, Tab 44-32.

11  A    Yes.

12  Q    What is this email referencing?

13  A    Over the next several months, OIG's investigation was

14  ensuing and escalating, and I had to provide testimony to the

15  OIG.  And Katrina Young was one of the individuals that I had

16  provided testimony to.  There was a lot of things covered, not

17  just urology, but a lot of practices by the organizational

18  leadership.  And after that, I provided -- it was well over an

19  hour of testimony that I had to provide to the OIG, and it was

20  specifically regarding Dr. Deering and Dr. Venditti and

21  Dr. Avila's involvement with patient care delays.

22       And so after that, Katrina Young from the OIG asked me

23  to -- during -- during the testimony, she asked me for a list

24  of documents that she wanted me to provide for her -- to her.

25  They also already had knowledge of the emails that I had sent.

1   I don't know how they had it, but they -- during that testimony

2   was asking for -- you know, on this date, you sent an email

3   about this.  Tell me about it.  And so afterwards they asked me

4   to send them specific emails from myself based on what came up

5   during the testimony that I provided to the OIG.

6   Q    When you say, they, who are you referring to?

7   A    The OIG.

8   Q    You said, they asked you to send emails?

9   A    Katrina Young, from the OIG asked me to send her the

10  emails that were relevant to my testimony about Dr. Deering,

11  Dr. Venditti, and Dr. Avila.

12  Q    Okay.  So the OIG is asking you to send emails that you

13  had saved internally to doctors within the organization?

14  A    Yes.

15  Q    Okay.  Calling your attention to Exhibit F, tab 44-33?

16  A    Yes.

17  Q    Want to tell us this email is referring to?

18  A    So during my testimony to the OIG they were talking about

19  why certain patients were lost for follow-up even after they

20  started sending them out to the community and during our review

21  of the list of the urology patients who needed follow-up.

22       Part of the process for the nurses in my department

23  were if there were any patients that we saw that needed

24  immediate or urgent attention we were to alert the provider to

25  take action on -- by submitting a stat consult or something so

1  that they can get seen in the community.  We were doing that,

2  however, the providers were not receiving those notifications,

3  because they turned our alerts off.

4          Dr. Avila was the one responsible, or Dr. Avila and

5  Dr. Deering, who authorized the doctors in the hospital to have

6  their alerts turned off.  So when the OIG was asking me

7  questions about that process and why was there no physician

8  follow-up, one of the things that came up was, well we would

9  alert providers on issues that needed to happen, following our

10  process, but they didn't get any alerts because their alerts

11  were turned off.

12          So they asked who, you know said their alerts can be

13  turned off and I told them, you know, Dr. Avila and that I had

14  actually had a conversation with Dr. Avila about it, because I

15  was concerned, so this is evident of that email.  I was --

16  during this email chain, I was talking about patients who needs

17  attention that they didn't get anything done.

18          (Indiscernible) after that tried to justify it,

19  saying, well, if we alert to the providers, in a certain way,

20  the providers will still get that notification.  And so Dr.

21  Deering was like okay, see then, you know that's a decision

22  that we made, they can turn the alerts off, you know, we rely

23  on those calls to that system and so that should be fine.

24          And then Dr. Avila said that it's been tested, it

25  works, so there no concern with the providers having their

1          MR. PITRE:  That's fine.

2          MR. MACMILLAN:  That's fair.

3          JUDGE BROOKS:  Okay.  It's a mouthful, if you want to

4    just reduce it to something like where they went from calling

5    her chief nurse manager to calling her nurse manager, I'll know

6    what we're referring to.  You can still develop the facts that

7    you need to as far as try to prove or disprove that this is a

8    demotion or change in duties.  So try to avoid the use of the

9    word demotion since it calls for a legal conclusion.

10         MR. PITRE:  Will do.

11         JUDGE BROOKS:  All right.  You may need remember what

12   your question was, Mr. Pitre.

13   BY MR. PITRE:

14   Q    I do.  Do you recall how this change in organizational

15   title came about?

16   A    The change in the title came after OIG reports, after a

17   lot of things were going on.  Dr. Deering, around the same time

18   and previous to this, this specific change, providing testimony

19   in his other trial for his involvement in the OIG based on my

20   testimony.  So the testimony -- the evidence I submitted to the

21   OIG he was -- prior to this change, under trial for those

22   allegations from the OIG.

23         And then --

24         MR. MACMILLAN:  Can I object to the use of the word

25   trial, I mean -- I don't want to keep interrupting her

1   testimony, but there was never a trail, so I don't know what

2   she's -- I mean it sounds like in the record there's a court

3   proceeding going on where Dr. Deering is being litigated, he's

4   responding to OIG.  Not only Ms. Potter, but there are other

5   people who raised concerns regarding waitlists during this time

6   period and he was trying to respond to those --

7          JUDGE BROOKS:  Was he testifying?

8          MR. MACMILLAN:  Sorry?  I believe -- well he's here,

9   technically, tomorrow, you can ask him, but I believe he did

10  testify to the N(indiscernible)AS OIG.  I don't know.  I've

11  seen he provided sworn testimony.

12         JUDGE BROOKS:  Okay.

13         MR. MACMILLAN:  I don't know if he actually -- in a

14  formal hearing -- I actually don't know the answer to that.

15         JUDGE BROOKS:  It's safer to say that he was

16  testifying or providing information in response to the

17  allegations if that's all you have, unless you actually have

18  evidence that they somehow prosecuted an action that I'm not

19  aware of and leave it to other evidence and witnesses to

20  develop to what degree OIG was going after him, because that

21  would be the sort of thing I would think of for a trial, versus

22  an investigation where he's not -- they're not aiming directly

23  at trying to prove that he did something wrong but they're in

24  the process of investigation.

25         Mr. Pitre, can you direct the questions away from the

1  use of the word trial, unless you have something specific to

2  show a trial?

3         MR. PITRE:  No, I'm not going to ask about a trial.

4  I'm just -- I'm asking the witness if she could -- I'll ask you

5  just not to use the word trial, you can say, provide testimony

6  (indiscernible).

7         THE WITNESS:  I apologize I watched -- our whole

8  department watched him on C-SPAN where they were asking

9  questions specific to my testimony and so that's what I'm

10 referring to.

11        JUDGE BROOKS:  If you're going to say that, can you

12 clarify on C-SPAN he was answering questions of the OIG or

13 congress or what?

14        THE WITNESS:  It was the -- all of allegations

15 related to the scandal, the wait times, the urology, the

16 psychotherapy.

17        JUDGE BROOKS:  No, I mean who was asking the

18 questions that you saw it on C-SPAN?  Was this a congressional

19 hearing?

20        THE WITNESS:  Yes, I believe so.

21        JUDGE BROOKS:  Your understanding is that it was --

22        THE WITNESS:  I'm not sure that --

23        JUDGE BROOKS:  -- that it was somebody on Capitol

24 Hill, a senator, or a congressman, a representative?

25        THE WITNESS:  Correct, which then he was ultimately

1    removed from his position and terminated from the Phoenix VA.

2              JUDGE BROOKS:  Okay.

3              THE WITNESS:  Am I good?

4              JUDGE BROOKS:  Continue.  Yeah.

5              UNIDENTIFIED SPEAKER:  Who is this?

6              JUDGE BROOKS:  Okay.

7              THE WITNESS:  So those are the -- those are the

8    things flowing up and leading to this organizational chart

9    change where I went from chief nurse over the whole department

10   having that nurse manager and then most of the staff that I had

11   were removed from me.  I was then only over utilization review.

12   I no longer was over any of the areas that I was prior --

13   previously reporting and involved with the OIG at

14   (indiscernible).  So all my knowledge with counsel review, the

15   case management, the referral processing, all of that that I

16   had direct knowledge of because I was directly overseeing those

17   areas, suddenly were removed from my -- from being under me.

18   And the nurse manager who used to be my subordinate who I hired

19   into the position to be the nurse manager was then my peer.

20             JUDGE BROOKS:  Okay.  Was there a meeting that -- how

21   is this reorganization enough?

22             THE WITNESS:  On I believe it was March 31st, Mr.

23   Grippen, the director, called a meeting with our whole

24   department where he announced these organizational changes,

25   letting everybody know that I was no longer over the

1   department.

2   BY MR. PITRE:

3   Q    Okay.  Calling your attention to Exhibit K which is 44-52.

4   A    Yes, that is referring to the meeting on -- this was on

5   March 30th meeting -- an email from Dr. Venditti referring to

6   the meeting that was going to occur on the next day.  They

7   announced the meeting where Mr. Grippen announced the org chart

8   changes to.

9   Q    Okay.  And may I ask what was the Department's response to

10  this meeting?

11  A    We were all shocked.  I got -- I mean they actually passed

12  out a copy of the org chart and people were looking at me like

13  what -- like what did you do?  You were demoted.  People told

14  me why were you demoted?  Are you in trouble?  That -- that is

15  the -- that's the response from the staff.  I immediately

16  became stressed and had a lot of anxiety over it.  I also

17  noticed in that same org chart change the title of chief was

18  given to the pre -- the fee manager who had never had the title

19  chief before.  So then someone pointed out during the meeting,

20  well, now Greg Crenshaw -- now Greg is the chief?  Why aren't

21  you the chief anymore?

22          And so after the meeting I actually tried to stop Mr.

23  Grippen in the hall and ask hey, is there -- you know, why -- I

24  asked him, this is my words, why was this meet -- why am I not

25  the chief anymore?  But then Greg is now the chief?  He has --

1    like what's going on there and he said we can meet about it,

2    but he did not want to discuss with me the org chart at that

3    time.

4    Q    Did you all have that meeting?

5    A    We did.

6    Q    And when was that?

7    A    We had a meeting on April 14th and April 29th.

8    Q    Okay.  Do you recall what happened at the April 14th

9    meeting?

10   A    Yes.  I reviewed basically every -- all the concerns that

11   I had up to that point about how I was previously performing

12   the chief nurse functions for a long time, ever since we were

13   removed from under nursing service, and how even though I was

14   doing the duties of the chief nurse and nurse manager, that I

15   was never provided the appropriate official title, social

16   statement, or compensation for the role that I was doing.  And

17   that the effect of that org chart change is -- is far beyond

18   anything I ever did that they could have imagined.

19          I explained how all of the roles and the duties I was

20   performing, and how I actually felt that this was a retaliatory

21   action being taken against me which I also reviewed the --

22   basically the needs for the department, all of the changes of

23   the choice program that were rolling out and everything that

24   needed to be done.

25          So his response -- him and Dr. Deering's response

1    during that meeting was they -- they're -- they're thankful,

2    they acknowledged that I had been performing those roles, that

3    they were going to look into expediting that position and then

4    they pointed out that on that same org chart there was a chief

5    nurse position at the top and that they -- they and Dr. Deering

6    actually told me that just because my question was who was

7    going to do that -- the duties, like it's -- I can't -- Dr.

8    (Indiscernible) told me that that's new, but it's not needed

9    yet.  Technically I'm down here, but they were trying to

10   reassure me, oh, it's, you know -- it's fine, we're going to

11   expedite it.  You're doing a phenomenal job.  You know we're

12   going to make this right.  You know, just keep going, we're --

13   we're going to get it approved.  We have to send the -- the --

14   the functional statement that I received from HR prior to that,

15   I believe in 2013 had never actually went to VACO for

16   classifications, so they said that they were going to.  And

17   everything's sent in and expedited at that time.  And that was

18   the meeting on -- in April that I had.

19            And then at the end of April, on the 29th, they told

20   me that they had sent everything to VACO, that it was -- was

21   being expedited as a priority aim because they understand, they

22   don't want the Department to fall apart.  They -- they're going

23   to make sure that everything is in place so that I can

24   officially have that title and pay.

25   Q    Okay.  Did you take notes at this meeting?

1  A    I did.

2  Q    Calling your attention to Exhibit LC 44-53.

3        MR. MACMILLAN:  I'm going to object to this decision

4  because it's -- I guess it's some typed up notes from Tiffany

5  Potter, but as you can tell from looking at the last sentence

6  there she already -- it's a partial copy of something.  We

7  never were furnished a copy of the entire exhibit, so I don't

8  know what else could or -- I mean could be on here, but to the

9  extent she's relying on this to further her testimony, I think

10  it's in conflict because we haven't even been given a full copy

11  of whatever it is.

12        MR. PITRE:  As the Agency counsel is assuming that

13  this is not a full copy, it is a full copy, and if he has

14  questions about what Ms. Potter was going to say --

15        MR. MACMILLAN:  So --

16        MR. PITRE:  -- if she had continued to type, he

17  didn't ask her.  She's right here, she could testify to that.

18        MR. MACMILLAN:  But is it stated -- and then -- so

19  you said you're --

20        MR. PITRE:  Yes.

21        MR. MACMILLAN:  -- Mr. Pitre is going to say that the

22  witness is going to testify that this is complete and she

23  stopped mid-sentence instead of furnishing us a complete copy

24  of something.

25        JUDGE BROOKS:  You're nodding your head.

1          MR. PITRE:  Yes, that is what the witness is going to

2     testify to and the veracity of that testimony is right here

3     before you to test.

4          JUDGE BROOKS:  Okay.  The objection is overruled.

5     BY MR. PITRE:

6     Q     So did you take notes at that meeting?

7     A     I did.

8     Q     Okay.  Calling your attention to Exhibit L 44-53.  The

9     Exhibit L 53, what is the -- what is that top page?

10    A     This -- the first section above the line and then the

11    middle section I had actually typed prior to the meeting

12    because --

13    Q     No, wait, what's the first note?  I'm sorry about -- page

14    53, 101 --

15    A     Oh, sorry.

16    Q     -- Exhibit L, sorry about that.

17    A     So this is the meeting invite for the meeting for April

18    29th that I was going to have with Dr. Deering and Mr. Grippen.

19    Q     And so who are required to meet?

20    A     Dr. Deering, Mr. Grippen, and myself.

21    Q     Okay.  So this is the meeting in which these notes occur?

22    A     Yes.

23    Q     Okay.  Now, go ahead and talk to us about the notes.

24    A     So I had -- did a top part and the middle section is --

25    that was my outline.  I practically read during the meeting

1  that I had with them.  And so I was referring to in the

2  beginning that when he gave the announcement of the ORG chart

3  changes, Mr. Grippen during that meeting when he was addressing

4  the staff said that he was -- he told us all, he was

5  frustrating -- frustrated with staff going directly to outside

6  sources and filing complaints without allowing the facility to

7  address concerns internally and make things right.  And so I

8  actually stated that during my meeting with them, and I said

9  you know I have addressed these concerns multiple times with

10  Dr. Venditti and even recently and brought it up to you last

11  week, it's -- and so that's the reason that I worded it that

12  way is because that's what I was saying to him.

13  Q    Okay.  So in this -- in these notes you stated that Mr.

14  Grippen said he had frustrations with staff going directly to

15  outside sources?

16  A    Correct.

17  Q    What did you interpret the outside -- those outside

18  sources to be?

19  A    The OIG.

20  Q    And when he stated "filing complaints", what is that?

21  A    The OIG.

22  Q    And then when he stated "without allowing facility

23  addressed concerns internally and make things right", what was

24  that in reference to?

25  A    It was the way he -- the way he worded it to us, a lot of

1  staff actually came to me, felt it was a little bit

2  threatening, like he doesn't want us to go to the OIG, he would

3  rather us, if we have an issue, don't just go and file an

4  anonymous complaint, bring it to me.  And so I referenced his

5  own statement in my reason for meeting with him and saying, you

6  know, I know that you said that.  I am bringing this to you,

7  these concerns -- and also another part of what he was

8  referencing there was the media because there were a lot of

9  staff, they were going to the news sources, which I did not do,

10  and instead brought it to him hoping that he would do the right

11  thing.

12  Q    Okay.  Can we read the first three sentences of the --

13  after you stated update typed notes from meeting, where's --

14  what is that?  What is that section?

15  A    After the meeting I went back in, typed up just notes from

16  what I can recall from the meeting before I got interrupted in

17  the (indiscernible) --

18            MR. MACMILLAN:  It's my job.

19            MR. PITRE:  No, she wasn't actually speaking about

20  that interruption.

21            MR. MACMILLAN:  Oh, thanks.

22            MR. PITRE:  But -- yes, sorry (indiscernible).

23  BY MR. PITRE:

24  Q    So where did you type those notes?

25  A    I typed them the same day right after the meeting, as soon

 1  as I got back to my office.

 2  Q    Okay.  And can you read *the* first couple of sentences of

 3  those notes?

 4  A    "Mr. Grippen was very kind.  He recognized my actions and

 5  thanked me for everything that I have done for the facility.

 6  He stated that he is expediting the chief nurse for AMS

 7  position that covers purchase care and writing a cover letter

 8  expressing the priority a -- urgency so that VACO can process

 9  it as priority."

10  Q    Okay.  Can you read the next sentence?

11  A    "Stated the title then should not be an issue as I was --

12  I would be able to assume that role.  Stated he is also

13  submitting the chief nurse floor for specialty clinics.  He

14  thanked me for performing the role."

15  Q    All right.  And then I think as you were testifying to why

16  is it that at the bottom of the page it doesn't say to that?

17  A    So I had a very demanding job.  When I went in I started

18  typing the notes before I would forget anything and when I got

19  to that -- to that point I got interrupted and stopped and

20  closed it out.  But as things were progressing I -- I like to

21  close everything out and print it, so I never went back and I

22  didn't finish my notes from that meeting.

23  Q    So was this a full and complete copy of the notes that you

24  took regarding that meeting?

25  A    That is -- yes, it is.

1          JUDGE BROOKS:  Mr. Pitre, before I lose the thread

2    here, I wanted to be clear.  I understand that she's testifying

3    that the bottom third below the bar is her typed notes of her

4    meeting with Mr. Grippen.  Can you get her to repeat what the

5    top and middle bracket reflects because when it says "you

6    stated in the meeting last week that you were frustrated with

7    staff" et cetera, I was initially thinking that that's what she

8    said to Mr. Grippen in their meeting, but now I'm not sure.

9          MR. PITRE:  You were correct, but I can have her

10   retestify to that.

11         JUDGE BROOKS:  Please do that.

12   BY MR. PITRE:

13   Q    Okay.  So the top section could you let us know what that

14   is?

15   A    Yes.  So there were two meetings that I had with Mr.

16   Grippen and Dr. Deering and I believe one was on April --

17   Q    Was that the --

18   A    -- 14 --

19   Q    -- April 1st -- your April 1st staff meeting that -- where

20   he did introduce the organizational chart?

21   A    It was either March 31st or April 1st, about some meeting

22   that I was referring to --

23   Q    Um-hum.

24   A    -- in those notes and these notes were my notes from

25   there.  It was the 14th or the 29th, I had two meetings with

1  him when they talked about it.

2  Q    Um-hum.

3  A    The first meeting was when I went over the history and

4  when they said that they're going to expedite the position.

5  And then the meeting on the 29th is where they then said, okay,

6  we did everything.  We expedited, you know, and then they were

7  also talking about in the meantime giving me a staff increase

8  to compensate me for the duties that I was and have been

9  performing.  Dr. Deering during that meeting said that he

10  thought -- he assumed that I was already maxed out on the pay

11  skills of nurse duties --

12          JUDGE BROOKS:  Hold on.

13          MR. PITRE:  I'm going to stop you there --

14          JUDGE BROOKS:  I --

15          MR. PITRE:  -- before you object.

16          THE WITNESS:  Okay.

17          JUDGE BROOKS:  Thanks.

18          MR. PITRE:  We're not here for compensation.

19          JUDGE BROOKS:  Yeah, thanks.

20          THE WITNESS:  Okay.

21          JUDGE BROOKS:  But actually my source of confusion is

22  more basic here.  I need to make a note in my notes a plain

23  statement, so the first bracket on page 54 of 101 that starts

24  with "you stated in the meeting last week that you were

25  frustrated" I believe the witness just testified this is a note

1  A     After that -- after that meeting because by the time we

2  met on the 29th it had already been completed.  He said he --

3  it had been sent in.

4  Q     Okay.  So at some point there was a posting for a chief

5  nurse floor position?

6  A     After that, yes.

7  Q     Do you recall when that was?

8  A     I believe it was August 10th of 2015 is when the position

9  was posted.

10  Q     Okay.  All right, so that is Agency Exhibit --

11  (indiscernible).

12         MR. MACMILLAN:  Are you looking for the recruit

13  (indiscernible) information?

14         MR. PITRE:  Yes.

15         MR. MACMILLAN:  So -- yeah, I do.  It's going to be

16  at, I believe 16 -- oh, no, sorry.  Hold on.  Yes, it's 16 --

17  let's see.  The USAJobs posting is 16-41 Tab 16, Page 41.  And

18  that's Exhibit 30.

19         MR. PITRE:  I don't have it, Richard.  Do you have it

20  in M because it's not initialed?

21         MR. MACMILLAN:  This is -- it's in Ledger 1.

22         UNIDENTIFIED SPEAKER:  Ledger 1.

23         MR. PITRE:  Oh, binder 1?  No, it's binder 3?

24         Just so the record can reflect the posting for that

25  position is -- what, Dawn (phonetic)?  16 -- Tab 16, page 41.

1              MR. MACMILLAN:  Okay.

2              MR. PITRE:  And 42 and 43 and 44 and 45.

3   BY MR. PITRE:

4   Q    Okay.  And that was the chief nurse community care

5   position, correct?  Or it's -- it's administrative -- you --

6              UNIDENTIFIED SPEAKER:  Chief nurse of the

7   administrative medicine service.

8   BY MR. PITRE:

9   Q    Okay.  Chief nurse administrative medicine service.  Is

10  that the position that you applied for?

11  A    Yes.

12  Q    Okay.  After the application was presented, were you

13  listed as a highly qualified candidate?

14  A    Yes.

15  Q    And were you doing the priority aid?

16  A    Yes, the position was -- yes.

17  Q    All right.  So were you aiming for that position?

18  A    I was not.

19  Q    Do you know why?

20  A    Yes, Dr. Venditti told me that well, the -- the position

21  was created and expedited with the intention of having me in

22  the position.  There were a lot of discussions.  Dr. Venditti

23  asked can they just convert me?  And after talking to HR they

24  said because it is now finally get -- having -- going to have

25  the pay associated with it, that it had to be posted which

1    should be incorporated in the circumstance.  Dr. Venditti told

2    me that she was told by HR that they did not need to do

3    interviews and that they could just base it on scoring and

4    applications essentially.  And so that's why I was not

5    interviewed.

6    Q    Was the posting for that position to receive additional

7    candidates ever extended?

8    A    I'm sorry?

9    Q    So let's -- let me ask you this question, are you aware of

10   how positions are posted on USAJobs?

11   A    Yes.

12   Q    And how are they?

13   A    So they'll have a posting that goes online that's open for

14   certain period of time.  After the position closes the

15   applicants are screened by the recruitment specialist in HR,

16   and then that candidate list is put on a cert list and provided

17   to the hiring manager to make a selection.

18   Q    Okay.  Did the close date ever get extended for that

19   position?

20   A    Not that I recall.

21   Q    Okay.  And as -- at some point did the recruiting for that

22   position get cancelled?

23   A    Yes.

24   Q    And why did you believe that was the case?  That's okay.

25   There was a --

1  A    Yelling outside.  I personally believe it was cancelled in

2  -- in retaliation.  It was in progress, everything was in

3  motion.  At the same time all of these hearings about urology,

4  my testimony, my involvement with OIG was also discussion and

5  mentioned many times as a concern.  There's even a meeting

6  where I was told that staff had animosity against me because of

7  my involvement and reports to the OIG and so this is --

8        MR. MACMILLAN:  I'd like to object to that because

9  that was something that wasn't accepted into the -- at any rate

10  there was an allegation that wasn't accepted related to staff

11  allegedly indicating to her -- to Ms. Potter that -- that

12  OIG -- that basically there's animosity against her, just

13  general animosity among her coworkers I guess because she

14  responded to the OIG or had done most -- done OIG things.  It

15  was a protected entity, so it's settled now, I don't know, but

16  it should be a case based on your prior ruling.

17        JUDGE BROOKS:  I'm trying to find what that prior

18  ruling would have been.  Would it be in my original --

19        MR. MACMILLAN:  I believe it was related -- I believe

20  it was related to (indiscernible), if I'm correct.

21        JUDGE BROOKS:  Let me see.

22        MR. MACMILLAN:  And it was --

23        JUDGE BROOKS:  Well, I approved low to test -- only

24  to respond to the allegation that he and Dr. Venditti accused

25  the Appellant of being the source of the anonymous OIG hotline

1  complaint.

2           MR. MACMILLAN:  Right.  There was a conference I

3  guess where people you know were -- coworkers are trying to get

4  trust with each other and I guess Mr. Lowe -- my understanding

5  is that Mr. Lowe conveyed to -- allegedly conveyed to Ms.

6  Potter that people don't trust her because of her OIG

7  involvement, but that was not something that you ever indicated

8  was accepted into the case as a non-frivolous allegation.

9           JUDGE BROOKS:  Okay.  I would still take some limited

10  amount of this testimony to the extent it may lend support for

11  her claims.  Even if --

12           MR. MACMILLAN:  Okay.

13           JUDGE BROOKS:  Even if it's not an accepted

14  disclosure or instant action of retaliation, that I would

15  ultimately be able to review.  There was a -- please continue.

16           THE WITNESS:  So after -- Dr. Venditti would have

17  been the one to submit the name, but right around the time

18  where she would have done that, she is sent away.  She was --

19  she went away on a detail assignment to another VA, so before

20  she left she told me that Dr. Deering would be the one making

21  the final decision on that selection.

22           Also at the same time I had a meeting with Marian

23  Tademy who's EEO program manager because my EEO case had just

24  gone formal.  We had ADR and after that Marian told me that she

25  met with Mr. Grippen and that in relation to this specific

1  position that no selection had been made yet, that he intended

2  on reorganizing our department to put it under nursing service,

3  so that there would be no more chief nurse position which would

4  result in my ability to be hired into the position.  So the

5  intent was to reorg the department in order to remove the chief

6  nurse position suddenly.

7          So I explained to Ms. Tademy that was moving it under

8  nurse and service wouldn't take away the chief nurse, that

9  would be great.  Let's go back under nursing service and when I

10  was under nursing service I had a chief nurse.  So there would

11  still be a need for a chief nurse.

12          And then her response was well, I don't think he

13  knows that.  And so many times during that meeting she just

14  kept reiterating you know why I talked to (indiscernible), he

15  said this is the plan.  They're going to remove the chief nurse

16  position and the only way that they could do that for her was

17  to reorganize us so they used the excuse of reorg to attempt to

18  remove the chief nurse position.  And then -- so that I could

19  not have taken it.

20          And -- and again this was -- I -- I didn't know at

21  the time all of the things that were going on as far as the OIG

22  investigation and the pending disciplinary actions, you know I

23  found that out later, but this was during all that time.

24  During this time period was when Dr. Deering was being held to

25  the carpet about his involvement in the OIG which I testified

1    to, so was Dr. Venditti which may have had a part in the reason

2    why she was detailed from the facility.  I am not -- I don't --

3    I don't have the specifics because I'm not privy to the

4    specifics of those cases, but I do know that all that was going

5    on at the same time.  And then also my EEO case went formal

6    which Mrs. Tademy told me was a hit against the org and Mr.

7    Grippen's performance.  And so those are the only things that

8    happened during that time which then suddenly they removed the

9    position.

10             MR. MACMILLAN:  Can I agree?  Okay.  I just want to

11   object.  I think we're not here talking about EEO complaints or

12   reprisal based on EEO, that's another proceeding and presumably

13   -- but -- so I would ask that an instruction be issued that she

14   not reference the EEO proceedings or as -- as a basis of

15   retaliation in this context, in this forum.

16             JUDGE BROOKS:  I -- if she was allegedly EEO

17   retaliation I didn't hear it.  What I heard was that she was

18   receiving information from Ms. Tademy about some indications of

19   what management intentions were.  I'm not interested in hearing

20   in any great detail about the EEO case.

21             MR. PITRE:  Thank you, Judge.

22   BY MR. PITRE:

23   Q    So you stated that the position for chief nurse

24   administrative services was cancelled.  I'll call your

25   attention to Exhibit P 44-50.

1   A    Yes.

2   Q    Is that the notification that you received regarding the

3   cancellation of that posting?

4   A    Yes, it is.

5   Q    And what's the date on that?

6   A    November 5th.

7   Q    Okay.  So you stated that during this time frame you had a

8   meeting with a Ms. Marian Tademy; is that correct?

9   A    Correct.

10  Q    And what is her title?

11  A    EEO program manager.

12  Q    Okay.  And calling your attention to Exhibit N.

13  A    Yes.

14  Q    Is this the meeting which you were referring?

15  A    Yes, it is.

16  Q    Okay.  Who was present at that meeting?

17       MR. PITRE:  Oh, I'm sorry, Judge.  That's 44-56.

18  Sorry about that.

19       THE WITNESS:  It was myself and Marian Tademy.

20  BY MR. PITRE:

21  Q    Okay.  And did you take notes regarding that meeting?

22  A    I did.

23  Q    And are those notes on page 57?

24  A    Yes.

25  Q    And when did you take notes at that meeting?

1    A    During the meeting.

2    Q    And when did you type up those notes?

3    A    I didn't.  Oh, do you mean -- so during the meeting I

4    wrote the handwritten notes on the first page of that exhibit.

5    Q    Um-hum.  And the notes that are on page 57, these are

6    typed, correct?

7    A    Yes.

8    Q    And when did you type these notes?

9    A    On the 22nd.

10   Q    Okay.  I'd like to call your attention to fifth paragraph

11   of those notes.

12   A    Okay.

13   Q    I want to call your attention to where it starts with "And

14   that".

15   A    Okay.

16   Q    Can you read that sentence?

17   A    "And that when I pointed this out to male director Mr. --

18   Mr. Grippen and Dr. Deering, they acknowledged he should not

19   have the title based on what I was saying, but that they were

20   not going to remove it from him because they don't want it to

21   appear that he was demoted like I was."

22   Q    Can you continue?

23   A    "Also mentioned that my downgrade seemed in retaliation

24   for OIG investigations that I was asked to provide

25   documentation for, as well as an anonymous OIG complaint

1  against the facility that I did not file, but was accused of

2  filing."

3  Q    Okay.  You can continue.

4  A    "And that Dr. V. has been either ignoring me or being

5  rude/hostile and threatening me, treating me different from

6  Greg, as she is asking Greg to accompany her to represent the

7  Department and telling him things not -- to not tell me which

8  is despairing treatment which has been since filing my EEO."

9  Q    Okay.  In regards to Greg, who are you speaking of?

10 A    Greg Crenshaw was the fee manager that when on the ORG

11 chart or my -- the chief title was removed and my areas of

12 responsibility were removed, his title was increased and he was

13 provided the title of chief, where he did not have that prior.

14 Q    And when you in these notes say that you point out to Mr.

15 Grippen and Dr. Deering regarding Greg Crenshaw, when did you

16 point that out?

17 A    During my meeting on April 14th.

18 Q    So these notes regard -- these notes from your meeting

19 with Ms. Tademy also reflect information from the April 14th

20 meeting?

21 A    Yes.

22 Q    Okay.  At some point in time did HR direct you or give you

23 guidance regarding the position in purchase care that you were

24 currently fulfilling?

25 A    Yes.

1   Q     And what was that?

2   A     They told me -- and this is right when -- actually right

3   before Dr. Venditti left, Ahmed Barton (phonetic), he was I

4   believe the chief employee regulations and HR instructed Dr.

5   Venditti that they either needed to officially have me as the

6   chief nurse or detail a chief nurse while they're working on

7   things because I could no longer perform those duties because

8   per the old chart that was signed I am not in that position

9   officially.

10              MR. MACMILLAN:  I need to object because Mr. Barton

11  was listed as a witness and we would have called him in to

12  testify.  This isn't one of the accepted areas of -- was around

13  for witness testimony.  I mean if -- if -- fairness dictates

14  that Ms. Potter's allowed to opine on what allegedly was said

15  by Mr. Barton, that we bring Mr. Barton in and opine about it.

16  And I don't think that's where -- we're going to get lost in a

17  lot of tangential issues here if we start getting tits for tats

18  on what she's saying people said to her that have been I guess

19  denied as witnesses in our case.  So I -- I would -- basically

20  I would ask that she -- that portion of the record be stricken

21  or that she refrain from -- or that you refrain from

22  considering it because again compensation is not at issue

23  pursuant to your -- or on a motion for reconsideration.  And so

24  I don't know what relevancy it has here for her -- she talking

25  about being denied steps, quite frankly.  So -- or what steps

1    she should have been given a step and wasn't.

2              JUDGE BROOKS:  Mr. Pitre?

3              MR. PITRE:  Well, the -- yes, this -- her testimony

4    is simply laying the foundation of how the Appellant was then

5    detailed to the chief nurse floor position.

6              MR. MACMILLAN:  I don't understand.  I mean --

7              JUDGE BROOKS:  I don't see the connection.  I would

8    be careful eliciting or testifying about what non-approved

9    proffered witnesses said.  I was scratching my head trying to

10   figure out where this fit in.  I made some brief notes about

11   what Ahmed Barton said, hadn't really connected it in my mind.

12   I don't plan to use it.  I'd suggest you move on.

13             MR. PITRE:  Okay.

14   BY MR. PITRE:

15   Q    So it was your testimony that you informed Dr. Deering

16   that you could no longer perform the chief nurse floor duties

17   without either being promoted or detailed; is that correct?

18   A    Correct.

19   Q    Okay.  So what did occur?

20   A    Well, I believe that was on like September 28th that I had

21   told Dr. Deering that I cannot continue to do that, but

22   something -- something needed to happen and so I -- also around

23   that time after Dr. Venditti left they had a new chief of

24   purchase care who was a physician, Dr. Dorcas-Yale who -- she

25   lasted three months really and during that time I had to train

1  her on her role as the physician chief for purchase care.  She

2  was not all -- she didn't quite get it, so I still had to -- I

3  had to help her.  I literally sat in her office and helped her,

4  explained to her how to do the consul approvals and everything.

5  It was overwhelming for her, so she left the job within three

6  months.  And so around this time because Dr. Venditti was gone

7  there was a question of then who's going to take over.

8          MR. MACMILLAN:  I can see where this is going, I need

9  to object because one of the claims that was not accepted was -

10  - Ms. Potter claims that she should have been given her -- in

11  other contexts and prior to your rulings has claimed that she

12  should have been given -- well, been allowed to apply and then

13  received the chief position position which she didn't apply for

14  or she wanted to apply for, but I guess she didn't meet the

15  minimum qualifications.  But that's not something that is

16  accepted into this case as something you know now at issue or

17  reprisal.  And so I want to try and cut this off early if I

18  can, at least object to it because this is an area of testimony

19  that you've already ruled is not frivolous.

20          JUDGE BROOKS:  Response, Mr. Pitre?

21          MR. PITRE:  Yes, this is going to show that again the

22  agency had Ms. Potter performing a role of a chief nurse in a

23  department in which they had a open or a approved position that

24  was able to be filled, but instead of filling it with Ms.

25  Potter, they had her detailed to the position performing the

1    treated me very differently from everyone else in the

2    department.  They had manager meetings, I wasn't invited to.

3    You know as far as the press tours I wasn't allowed to be on a

4    press tour.  There was a lot of things going on that I wasn't

5    privy to -- to a lot and I did report concerns.  I gave a very

6    strong case for the need for additional staffing, he ignored my

7    request then granted staffing to the other managers.  So

8    there's -- there's a lot of that going on, as well as staff

9    coming to me reporting additional illegal practices going on in

10   the department and asking me to help, but I wasn't in a

11   position of authority to do anything about it.

12   Q    Okay.  I'll call your attention to Exhibit T, 44-67.

13   A    Yes.

14   Q    Now, what is that email referring to?

15   A    This is referring to the Office of Medical Inspector was

16   coming and investigating again more information about Dr.

17   Deering.  And the OIG investigation.  Claims that were also

18   part of the OIG investigation, so patient care deliveries,

19   processing deliveries, that's -- me, I had to provide testimony

20   to (indiscernible) --

21   Q    Was Dr. -- oh, sorry.  Go ahead.

22   A    Go ahead.

23   Q    Was Dr. Deering aware of those -- with that information

24   that you were presenting to OIG?

25   A    Yes, he would have been as the chief of staff.

1  Q    Okay.

2            MR. MACMILLAN:  You said OIG; I think you meant --

3            THE WITNESS:  (Indiscernible).

4            MR. MACMILLAN:  -- Owakoma (phonetic), thank you.

5  BY MR. PITRE:

6  Q    I call your attention to Exhibit V, Tab 44-75.

7  A    Yes.

8  Q    What is that?

9  A    Urgent email I sent to Dr. Duarte regarding the staffing

10 needs in -- in my department.

11 Q    And what was that -- why was there an urgent staff

12 meeting?

13 A    There were a lot, again, changes going on with -- I mean

14 with choice, veteran's choice, the referrals, the volume in the

15 community oversight, the travelling that turns -- I mean there

16 were a lot -- there was a lot of growth.  A lot of coordination

17 happened during the whole -- sending all the patients out to

18 the community one of the things that leadership didn't consider

19 was that there's the loop back.  So when you send them out,

20 they have the follow up and that happens later and so when we

21 sent them out we actually -- I coordinated with chief that the

22 nurse exact sent over their facilities, all across the country

23 and had staff come in and help process those referrals just to

24 get them out the door.  Now the pendulum was like swinging

25 that's like the boomerang came back and now there's additional

1   volume in our department that resulted from all those referrals

2   going out.  And so there were critical staff shortages in all

3   of the areas in our department including the ones that I was

4   overseeing and that's what I was referring to in this email.

5   Q    And who was that email directed to?

6   A    To Dr. Duarte.

7   Q    Okay.  Thank you.  And what was the date?

8   A    November 10th of 2016.

9   Q    Okay.  Quickly going back to your meeting with Ms. Tademy

10  you stated that she told you that Mr. Grippen and Dr. Deering

11  were going to attempt to have the chief nurse floor position

12  moved from the service line; is that correct?

13  A    Yes.

14  Q    I call your attention to Exhibit U which is 44-71.

15  A    Yes.

16  Q    And what does this document represent?

17  A    This is from me -- this is a document reflecting on page

18  74 it is the -- an org chart that is -- it's like by Dr. Duarte

19  and there is no chief nurse on this org chart.  And any

20  addition to org chart changes they are summary of changes,

21  which is on page 72 which that was the document associated with

22  that little chart where it says delete chief RN in addition to

23  other changes.

24  Q    So this is the deletion of that chief (indiscernible)

25  position that was telling after they said they were going to

1    do?

2    A    Correct.

3    Q    All right.  I'm calling your attention to Exhibit W.

4    A    Yes.

5    Q    And what's that referring?

6    A    Concerns that I reported to the visit.

7    Q    Okay.  What concerns were those?

8    A    This was a -- this email was generated as a result of a

9    combination of things that were reported to me from the staff

10   in the department.

11            MR. MACMILLAN:  All right.  I'm going to say, I guess

12   it's now a standard objection.  But this is a non-accepted

13   (indiscernible) disclosure apparently that Ms. Potter's about

14   to get into.  The one that's accepted I believe that they run

15   closest in proximity this would be on December 1st, so that the

16   date of this email it's November 21st.  It occurred before the

17   -- the December 1st (indiscernible) accepted into the case.

18            JUDGE BROOKS:  Mr. Pitre?

19            MR. PITRE:  This is a continuation of -- this hasn't

20   been accepted as an independent action.  However, it does show

21   the continued concerns that Ms. Potter had about the

22   organization.  And I believe that it also showed it will get --

23   it will create more weight to December 1st OIG complaint

24   because this one here also involved Dr. Duarte.

25            MR. MACMILLAN:  And I guess I should add, we had

1  also -- going back to what's background and whatnot, we may

2  have Ms. Hines (phonetic) as a proposed witness.  So, I mean,

3  to the extent that, I guess, Ms. Potter characterizes something

4  that's not -- I mean, not on the face of this email -- first of

5  all, the email's not relevant.  But if it does (indiscernible)

6  then -- and there's any kind of characterization about this

7  conversation or (indiscernible) fairness (indiscernible) that

8  Ms. Hines in and allow her to testify and explain where she's

9  coming from, not just statements Ms. Potter's (indiscernible).

10          JUDGE BROOKS:  Okay.  I don't --

11          MR. MACMILLAN:  I'm not going to ask Ms. Potter

12  anything in regard to Ms. Hines; I'm simply letting the record

13  reflect that this date and time, Ms. Potter sent an email

14  concerning -- having concerns about Dr. Duarte.

15          JUDGE BROOKS:  Here's the thing.  A complaint to the

16  OIG is actually protected with or without reasonable belief.

17  So I don't want testimony about this email to a witness I

18  didn't approve about -- I don't know if this is considered a

19  disclosure, but maybe a disclosure you wanted to allege that I

20  didn't approve.  So the objection is sustained.

21          MR. MACMILLAN:  Okay.  Thank you.

22  BY MR. PITRE:

23  Q    Calling your attention to Exhibit X, 44-87.

24  A    Yes.

25  Q    Okay.  What is that a response to?

1    A    This is a response that I received after I followed an

2    anonymous OIG hotline report about the actions that Dr. Duarte

3    was doing, which were reported to me from the staff of the

4    department that I had been trying to address to multiple --

5    whoever I could in leadership prior to submitting that OIG.

6    Q    Okay.  So at this time, it's your testimony that you

7    submitted an anonymous OIG report regarding concerns of Dr.

8    Duarte and his action?

9    A    Yes.  And when I say anonymous, there's different

10   categories we submit in an anonymous OIG hotline report, and

11   you can say anonymous.  And then, you indicate that your

12   information so that they can contact you, so that's what I did.

13       So they -- I guess it's -- I was hoping that my name

14   wouldn't be used; however, I had to provide my information

15   because I wanted to the OIG to be able to reach out to me to

16   get the specifics.

17   Q    Okay.  And calling your attention to Exhibit Y.

18   A    Yes.

19   Q    And what does that represent?

20   A    This is an email -- so at this time, Carrie Requor was the

21   acting associate director.  And so there was an email that went

22   out for -- it was an OIG report from Charleston VA that

23   included a lot of stuff that actually was concerning and

24   relevant to what was going on at the Phoenix VA that I was

25   trying to escalate to leadership to do something about because

1   I didn't want us to be the next OIG report on those issues.

2        And so I emailed Carrie Requort asking, you know, how long

3   she was going to be the associate director because, you know,

4   there's this OIG report from Charleston; what's going on here

5   is a lot worse.  And I anticipate that OIG is going to be

6   (indiscernible) to this if they're not already.  And I had

7   already reported to the OIG on December 1st some of those

8   issues as well.  So I was trying to bring her attention to it.

9        So she was a new associate director, to see if maybe she

10  could help make things right.

11  Q    Okay.  (Indiscernible) this time, can you remind us

12  what -- what position were you functioning in?

13  A    Nurse manager, (indiscernible).

14  Q    And did that change?

15  A    No, it did not at that time.

16  Q    At that time, did you receive a detail?

17  A    I did, after that.

18  Q    When was that?

19  A    I first got called on January 3rd, 2017, and that was by

20  Mr. Bransky and Alyshia Smith telling me that I'm going to be

21  detailed, but they said that they were removing Dr. Duarte from

22  his position as the associate chief of staff of the department.

23       And I asked him where is -- what's it going to be doing,

24  and she said that's none of your concern.  You are taking over

25  the department.

1    I noticed in the detail memo that she had given me that it

2  actually said I report to Dr. Duarte for the detail, which

3  didn't make sense, so I pointed that out and I asked, okay, if

4  he's being removed, how am I reporting to him?  And then she

5  says, oh, that's an oversight, and then we'll look at that.  So

6  that's why that original January 3rd detail memo wasn't used.

7    She told me that I would be getting a step increase as

8  part of that detail as well and overviewed a lot of the

9  responsibilities that were going to be included in the detail.

10    I pointed out during that conversation is -- why -- I

11  asked why does it say unclassified duties; these are classified

12  duties.  I'm taking over Dr. Duarte's job.  This part is the

13  part that I could be doing if I was a chief nurse, but they

14  canceled that.  This is also a responsibility over here of the

15  fee manager, which is a conflict of interest because I can't be

16  responsible for approving consults clinically and then

17  paying -- and then authorizing the payments for those consults

18  as well.

19    And -- I mean, but she said, you know, this is -- and then

20  I told her I didn't want to do the detail; I was very clear.  I

21  did not want to.  I felt like I was being set up, honestly.  I

22  didn't understand why they had removed all of the

23  responsibilities from me.  Every time that I was in a role or

24  any capacity in a leadership role or a chief role in that

25  department, things went well, but then they took that away.

1   And so I was in my little box and HR told me to stay in that

2   box.

3        And so now that the department was essentially falling

4   apart, suddenly they are detailing me to take over the

5   positions of the (indiscernible) agencies.

6   Q    Okay.  Calling your attention to Exhibit Z.  What is that

7   (indiscernible)?

8   A    Yes.

9   Q    Is that the detail memo that you received?

10  A    Yes.

11  Q    Okay.  After you've seen the detail memo, what did you --

12  outside of having these conversation with Dr. Smith, what did

13  you also do?

14  A    Contacted you, my attorney.  I contacted HR.

15  Q    Okay.  Without -- never mind.

16       I don't know if I would have objected, but I would have

17  said something.  I don't think you want to go there.

18  A    HR did tell me that they did not -- the feedback I got

19  from HR, when I went to them, was that they had no clue about

20  this detail, and that it didn't go through them.

21  Q    Who did you speak to at HR?

22  A    Ahmed Barton and Juanita Landrieu.

23  Q    So (indiscernible) --

24            MR. MACMILLAN:  We're revisiting the same issues

25  again.  So she cited testimony from witnesses that haven't been

1  allowed to testify.  I mean, I can assure you that they would

2  have a different version if I pulled them in, but however -- I

3  can't rebut things -- you know, things that she's saying.  So I

4  would ask that either it be stricken as being irrelevant to --

5  to the Court not consider finding it.  That HR said or didn't

6  say about step increases or them (indiscernible) run by them

7  but rather it was improper -- improper -- I mean, we can't call

8  witnesses that say that it was proper, but I don't know that it

9  gets us to the end (indiscernible) what we're trying to do

10 here.  So --

11             JUDGE BROOKS:  Mr. Pitre?

12             MR. PITRE:  I believe that her testifying to if

13 she -- testifying that she contacted someone from HR

14 (indiscernible) having -- I mean, you know, (indiscernible)

15 asking her who in HR she contacted certainly does -- just

16 saying that she contacted someone from HR.  I'm not sure how

17 that --

18             MR. MACMILLAN:  I can tell you that HR will say that

19 they don't have to be contacted for details.  So that -- I

20 could present an HR witness, Mr. (indiscernible) say that it

21 doesn't have to be run by HR if it's classified as a detail.

22 What is has to do -- and now, I'm not testifying; I'm just

23 giving background.  Temporary promotions have to be -- you

24 know, they have to be (indiscernible) there's a bargaining unit

25 employee and everything, it has to be (indiscernible) and

1    everything like that.  There's a distinction, but those are all

2    things that aren't really in the case, so --

3              MR. PITRE:  All right.

4              MR. MACMILLAN:  So I would say that that's not

5    relevant, whether the detail itself is run by HR or not.  He's

6    making an assumption that it's improper, but it's not.

7    Collaborating Ms. -- actually, I don't believe I know Ms.

8    Nelson testified that in putting -- in setting up the detail,

9    they work with HR and Mr. (Indiscernible) and -- as well as

10   herself, work with HR to create the detail.  That's what she

11   testified to.

12             MR. PITRE:  I don't believe that's what she testified

13   to.  I think that -- I think she was, you know, was talking

14   about HR being involved, but that -- she's talking in

15   generalities, and I don't know -- I mean, I don't know --

16             JUDGE BROOKS:  I'm not -- okay.  She -- the witness

17   said -- the appellant said that she spoke to a Ahmed Barton and

18   Landrieu; that's fine.  I don't know that -- if you had some

19   intended question as to what did you -- what conversation did

20   you have with them -- okay, you're shaking your head.  I don't

21   think that we need to go there.

22             The Agency's objection about HR telling them that

23   they had no clue about the detail, I appreciate the concern.

24             The testimony is already in the record.  I will say I

25   don't recall any rule that says that you have to speak to HR.

1   And the mere fact that any witness testifies that they

2   consulted HR does not open the door to any and every

3   conversation that occurred with HR.  And I'm much more

4   interested in hearing what witnesses said than behind-the-

5   scenes people anyway.

6          So if you don't plan to ask her any questions about

7   her conversation with HR about the detail, then we're fine.

8   The Agency's concern about the testimony that they had no clue

9   about the detail is noted, and you can move on.

10         MR. PITRE:  Thank you.

11  BY MR. PITRE:

12  Q    Going back to the exhibits on Exhibit Z, 44-92.  What is

13  the date on the top of that memo?

14  A    January 3rd.

15  Q    Okay.  Calling your attention to Exhibit BB, the second

16  page, 97-101, 34-96.  What is the date on the top of that memo?

17  A    January 10th.

18  Q    Why are those two memos dated differently?

19  A    Because there was follow-up that was to occur after the

20  January 3rd meeting.  So when we met again, and it was with

21  Alyshia Smith, she -- things changed from the January 3rd

22  meeting.

23         She told me that she was aware that I reached -- that I

24  had contacted my attorney about the detail and that now she is

25  not -- not only is she not going --

1  Q    Don't -- don't testify a conversation.

2  A    Okay.  I also brought up during that meeting why -- you

3  know, we talked about -- it's detail to unclassify duties, but

4  those positions were classified.

5      I know that her (indiscernible) during that meeting that I

6  was told by -- if I can say -- that I was told by HR that it

7  would be -- it would have -- they would have advised that it be

8  a, like, a detail to an actual position that was in existence,

9  not to unclassified duties.  Because I had validated that the

10  duties they were having me --

11          JUDGE BROOKS:  Okay.

12  A    -- do, and other positions.

13          JUDGE BROOKS:  Okay.  I know you're saying what you

14  told Smith, but what you're telling her is a subject that I

15  don't need testimony on.

16          THE WITNESS:  Okay.

17          JUDGE BROOKS:  To the extent -- to the extent that

18  you're telling Smith what you told HR, what HR told you, don't

19  go there.

20          THE WITNESS:  Okay.

21  BY MR. PITRE:

22  A    And then I communicated her again that I did not want to

23  do detail.  But she said that I have no choice, because this is

24  coming from the director.  I cannot refuse the detail.

25      I told her that I didn't feel comfortable with the duties

1    within the detail.  I was concerned about how -- because she

2    told me not to call Dr. Duarte about the detail, that they will

3    communicate that to him.  They actually have on here a cc to

4    Dr. Duarte as though he was also going to be provided or had

5    been provided this memo.

6              MR. PITRE:  I'll ask that we allow the -- I mean --

7              MR. MACMILLAN:  So we're having hearsay from somebody

8    again about the hearsay.  I mean, I don't think Dr. Smith in

9    coming in here and validating what she is saying -- I would

10   just ask -- and I don't know why it's -- I guess the main

11   objection is just relevancy.  Like, what does it matter that --

12   if Dr. Smith said that or didn't say it.  I mean, it doesn't

13   relate to the IRA claims for which we're here today.  So I

14   don't understand --

15             JUDGE BROOKS:  I didn't recognize that I had --

16   when I had made the ruling specifying what she said to HR that

17   she was referring to somebody that I didn't approve as a

18   witness either.

19             Mr. Pitre, what, if anything, do I need to hear about

20   her conversation with Smith in light of the fact that --

21             MR. PITRE:  I think just what you've heard is the

22   fact that she vehemently objected to being assigned to this

23   detail due to the fact that she said that it was -- they were

24   setting her up for failure.

25             JUDGE BROOKS:  All right.  Let's move on.

1    　　　　MR. PITRE:  Okay.

2    BY MR. PITRE:

3    Q    In this same exhibit, Page 99, there is an organizational

4    chart that is listed there.  Do you know the writings of Ms.

5    Potter's?

6    A    Oh, yes.

7    Q    Okay.  So the writings of Ms. Potter's chart, it's dated

8    9/16/15.  What does that organization chart look like?

9    A    This is -- well, it's actually distributed to the

10   department to reflect the changes.  And so I had met with Mr.

11   Bransky about Sever's (phonetic) totally confused about --

12   okay, Dr. Duarte's gone.  They're weren't sure -- there was no

13   real explanation of why.  And then I had taken over, but I

14   didn't have a title.

15   　　　　And so this org chart, then, was sent out, which reflected

16   who was doing what.  So I was -- as a result of the detail --

17   the duties within the detail were the associate chief of staff

18   for (indiscernible) and medicine service, which was Dr. Duarte;

19   the chief nurse, which was vacant; the deputy (indiscernible),

20   which was vacant; the chief of non-VA care, which was a fee

21   manager, which was vacant; and also my -- what should have been

22   my (indiscernible) role, utilization review (indiscernible)

23   manager.

24   Q    Okay.  And when you would detail in this position, what

25   was your interaction with Dr. Duarte?

1    that's necessary for Ms. Potter or Mr. Lowe to testify about

2    any statements of animus that Mr. Lowe made.

3              I could actually deny Mr. Lowe completely and any

4    testimony on this on the basis that he's talking about a

5    disclosure, evidently, other than the one that -- other than

6    the ones that were accepted in this case.  But because it's a

7    statement of animus, I'll permit that.  But that's not a back

8    door to -- to have me give weight to this document which talks

9    about disclosures that I didn't accept and really isn't

10   necessary for Ms. Potter to say that she recalled being told

11   something on January 23rd, or Mr. Lowe.

12             MR. MACMILLAN:  Absolutely.  Agreed.  Thank you.

13             JUDGE BROOKS:  Okay.

14             MR. PITRE:  All right.

15   BY MR. PITRE:

16   Q    Calling your attention back to the time frame in which you

17   were performing the details to unclassify duties.  You stated

18   that there were issues between you and Dr. Duarte; is that

19   correct?

20   A    Yes.

21   Q    And can you clarify for the record what those -- what some

22   of those issues were?

23   A    He was -- apparently, it was not communicated to him that

24   he was no longer the associate chief of staff for AMS and that

25   I had taken over.  And so he continued, initially, to function

1  as normal, which then created a lot of awkwardness in the

2  department and problems because he thought I was just going in

3  there and taking over.  And so I tried to communicate and

4  escalate that to leadership because it was creating a hostile

5  work environment.

6  Q    Okay.  Let's not go there.  At some point, were you tasked

7  with updating responses to the OIG complaints and

8  recommendations?

9  A    Yes, I was.

10  Q    When was that?

11  A    Multiple times.  I think it was shortly after the detail

12  started was the first one.

13  Q    Now, was this time frame January 17th to -- and -- or was

14  this the time frame January 2017?

15  A    I believe, yes.

16  Q    Okay.  So what was occurring in that time?

17  A    I had received report that previously the -- Dr. Duarte

18  and I'm not sure who else had responded to OIG recommendations.

19  So OIG came in; they investigated an issue.  Dr. Duarte and

20  others provided responses back.  So now that I was in that

21  position, I had to update the responses because they were

22  trying to get some things closed out.

23        When I looked at what I had to update, a lot of what

24  was previously submitted to the OIG was not accurate.  And so I

25  corrected and provided the accurate information in response to

1  the OIG recommendations.

2  Q    Calling your attention to Tab 45 I, Exhibit EE.  Do you

3  recall -- do you recognize that document?

4  A    Yes.

5  Q    And what is that?

6  A    This is one of the -- there are several pages -- one of

7  the -- the OIG recommendations that I was asked to update the

8  responses for.  And so I was sent the previous responses from

9  previous leadership.  Specifically, I remember one of them was

10 about staffing.  And so they were, like, trying to say -- I was

11 talking with Ms. Fine (phonetic), working on it.  It didn't

12 even answer the OIG's questions -- or it didn't directly

13 address the recommendations, and it wasn't truthful

14 information.

15       And so I provided clarification, directly aligning it

16 with what specifically the OIG claim was and what the

17 recommendation was, to show, whether good or bad, where the

18 Phoenix VA actually stood on that issue.

19 Q    Okay.  And what -- what action, if any, did management

20 provide in regard to those -- those corrections that you made?

21 A    So I knew that I was -- inclination that Stephanie White

22 Lawson -- she's the one that sent it to me to update.  When

23 I -- so I submitted my clar -- my clarifying responses back to

24 be submitted to the OIG.

25       On the 27th, I received a phone call from a Rex

1   Patterson (phonetic) where he, like, went over my responses and

2   was telling me to change it and take stuff out, and I said, no,

3   that's not accurate, and what was there wasn't accurate, and

4   the way that it's worded -- and that he wanted me to word it,

5   it was completely misleading.  They wanted to close out this

6   recommendation, I understand, but the problems were there; it

7   wasn't closed out.  It shouldn't be closed out until the Agency

8   has taken action for the OIG's recommendation.

9          And so he just kept arguing with me, and that phone

10  call ended.  And then I got another call from his boss, who was

11  the chief of quality.  And so it was Linda Swan, Rex Patterson,

12  Joe Friend (phonetic), who's an manager in the department, as

13  well as Stephanie White Lawson, and it was -- that's who I know

14  for sure was on the call.  There might have been others; I'm

15  not sure.  But where they proceeded to go through all of my

16  responses and tell me to change them.  And I would not do so

17  because what they wanted me to change it to was not true.  It

18  wasn't accurate.  And I was -- I told them very clearly, I am

19  not going to provide false information to the OIG.  This is

20  what they're asking; this is the truth.  I am now in this

21  position.  This is now my job to provide accurate responses,

22  and these are my responses.

23         And they, like, berated me for over an hour on that

24  call.  It was almost -- it was two hours, a full day, of them

25  trying to have me change my responses, and I wouldn't do so.

1           So after that -- and I told them on the phone if

2    you -- you have what I sent.  What I sent to you is the

3    accurate information.  If you want to change it, that's up to

4    you.  I don't want anything to do with it.  I have nothing to

5    do with it.  I have on record what I submitted is truth.

6           And then Stephanie White Lawson told me that they

7    proceeded anyway to change my responses to the OIG, which I was

8    upset about because it was -- the way that it got submitted is

9    almost like a reflection of the data that I provided, but it

10   wasn't the data I provided; it's what they changed to falsify

11   the response to the OIG so that it is very misleading and

12   making it look like they were compliant in ways they were not.

13   Q    Thank you.  Drawing your attention to 45-18, Exhibit FF,

14   you stated that -- in your testimony that at some point, Dr.

15   Duarte began forwarding all of this emails to you.  Is this a

16   reflection of that?

17   A    Yes.

18   Q    And what is it?

19   A    It's an email that I reported my concerns to Mr. Bransky,

20   who I was reporting to for this unclassified detail.  I told

21   him the impact that it was having on just my life in general.

22   I said, you know, there's nothing -- that department was an

23   absolute disaster, and there was so many things going on.  I

24   was quite shocked, and things were functioning so smoothly when

25   I was in a leadership position in that department, and after

1    being removed from that position, it was -- it fell apart, bad.

2    And then after my reporting to OIG, now I'm now responsible to

3    fix this mess, and I was also being sent OIG -- I remember

4    getting a report from the OIG, which was actually the report

5    that I submitted on December 1st.  And now I'm responsible for

6    it.  It was, like -- I felt like I was being set up.

7         So I told them in this email, I spent 15 weeks

8    (indiscernible) my kids now.  I would be there -- actually had

9    to -- during this -- all this time frame, I remember having to

10   have a staff to take me to St. Joe's (sic) Hospital because I

11   had sudden migraines at work.  I was there till, like, 9:00

12   almost every night, didn't see my kids, and I was in my

13   doctorate program, and that was even falling to the wayside

14   because of all the pressure and everything in this -- on detail

15   to unclassified duties; it was impossible.

16        And so I told him I've made some progress, but there

17   was a lot more that needed to be done.  And then now, Mr. -- or

18   Dr. Duarte was sending me all this information, and this is

19   also where I referenced the new-provider orientation and why I

20   was going to do that, and I'm not a provider.  So I asked him

21   to address these concerns, but then Mr. Bransky roughed the

22   organization the next day, I believe.

23   Q    Okay.  At some point in time, did you discover evidence of

24   mismanagement of VA funds?

25   A    Yes.

1    Q    And when was that?

2          MR. MACMILLAN:  I think I may (indiscernible) my

3    objections.  I don't believe that's one of the accepted

4    (indiscernible) and so I don't know why we need to go down this

5    route at all of talking about whether she was detailed to

6    something that she didn't feel capable of doing, or asked just

7    -- it's just not -- it's not something that is in the case

8    (indiscernible).

9          MR. PITRE:  It's exactly in the case.  It's directly

10   related to her constructive discharge claim.  Because I'm

11   showing exactly what Ms. Potter was doing with during this time

12   frame in regards to all the actions that she's being asked to

13   partake in, treatment that she was receiving.

14          As she just stated, the fact that the detail was

15   almost impossible to perform for one individual.  This all

16   creates the -- this all shows the type of environment in which

17   she was experiencing prior to her transferring from this

18   position to the VA -- I mean to the VA in California.

19          JUDGE BROOKS:  Okay.  You said something about

20   mismanaging of VA funds.  Her being asked to mismanage VA

21   funds; is that what you said?

22          MR. PITRE:  No, she discovered evidence of

23   mismanaging the VA funds.

24          JUDGE BROOKS:  I'm not sure how you wrap that into a

25   constructive discharge theory, or a constructive involuntary

1  transfer theory.

2          MR. PITRE:  Because once she reported that

3  discovery -- the discovery of that evidence, the truth and the

4  backlash that she was received for that can also go into the

5  atmosphere that was created prior to her having to leave the

6  organization -- to transfer from the organization.

7          JUDGE BROOKS:  Yeah, but there was a chance for

8  briefing on jurisdiction, and I identified the disclosures that

9  I was going to hear about for the period that led to this.  If

10  this is something that you touched on in a brief, it was

11  inadequately articulated, and so the Agency hasn't had

12  appropriate notice of it.

13          It's one thing if you're saying that she's just

14  stressed about being told to mismanage VA funds and that's the

15  end of it.  But if it's her making disclosures and then getting

16  mad at her about it, that's -- that might help prove a

17  constructive discharge case, but it's relying on disclosures

18  that were not accepted in the case.

19          So there's no basis for me to hear about it if -- if

20  it relies on who she blew the whistle to about it.

21          MR. PITRE:  I don't believe it relies on who she's

22  blew the whistle -- I just -- we're just laying a foundation

23  that it occurred and then what then what transpired thereafter.

24          JUDGE BROOKS:  But if it relies on her disclosing it

25  to anybody, that's -- I was reading the -- the theory that --

1   when I accepted the issue of -- issue of retaliation for

2   involuntary resignation or transfer based on intolerable

3   working conditions that she was driven to involuntarily resign

4   based on the Agency's reprisal for five different items of

5   whistleblowing.

6          You're adding additional items of whistleblowing to

7   that list.  I understand you need to get evidence on the

8   constructive involuntary transfer/resignation.  I understand

9   that.  But I wouldn't rely on nonaccepted claims disclosures.

10         MR. PITRE:  Okay.  Thank you.

11  BY MR. PITRE:

12  Q    Ms. Potter, you previously stated that during -- that this

13  detail encompassed the duties of a chief fee manager; is that

14  correct?

15  A    Right.

16  Q    And what is -- are you responsible for regarding that

17  position?

18  A    The movement and approval of funds from the -- for non-VA

19  care, as well as the oversight of the authorizations in that

20  department, and adhering to the budget under the strict budget

21  restrictions, the fiscal responsibility for that side of --

22  that section of the department.

23  Q    Were you trained to perform these duties?

24  A    No, never.

25  Q    And so --

1          MR. MACMILLAN:  Again, may I just ask.  I don't

2     understand how this is -- this is a (indiscernible) that we

3     just talked about because I --

4          MR. PITRE:  I did not discuss the disclosure.  I'm

5     just asking her what duties she was performing and was she

6     trained for that -- was she trained for those duties, and then

7     I'm going to ask her what that -- what having -- what not

8     having training for her duties -- how that affected her ability

9     to do her job.  This has nothing to do with -- I did not ask

10    about her disclosure.

11         JUDGE BROOKS:  Understood.  Continue.

12    BY MR. PITRE:

13    Q    So were you trained to perform those duties?

14    A    No.

15    Q    And so not having trained to perform the management of

16    funds, how did that affect your ability to do your job?

17    A    Extremely negatively.  I will say, just to be quite

18    honest, I was deathly afraid to go to work every day.  I felt

19    like every day I walked in there and it's like looking under

20    the hood of a car and there's another mess.  I would have the

21    fiscal staff with budget types coming to me with issues and

22    concerns, and honestly, a little bit over my head.  I could

23    only consult with central business office and policy and

24    regulations on how things should be done, but I was -- I was

25    afraid.

1        I had to consult with the CFO during the time to figure

2   out what I should, shouldn't be doing, and that's how I noted

3   there was a -- a conflict of interest as far as separation of

4   duties, because I couldn't be doing -- moving funds.  I mean, I

5   was moving the funds from accounts that were in the negative.

6   Like, how -- how can I take from an account that's negative and

7   then, like, move $4,000 into another account.  Like, it just

8   didn't make sense to me.  No clue what I was doing.

9        And so I didn't want to do it, but then I was being told,

10  you have to do it.  If you're not, you're delaying patient

11  care.  So I went to the acting CFO at the time and sat down at

12  his desk, and he was shocked that I was even being asked to do

13  this.

14       He also couldn't do it because it would have been a

15  conflict of interest for him.  So I sat at his computer, and he

16  was like, okay, nope, don't -- and I was -- just to be clear, I

17  was told to approve everything.

18       He stood over my shoulder and was like, nope, don't do

19  that one.  Oh, my God, no, that one's an error.  Nope, don't do

20  that one.  Okay, that one's okay to approve.

21       That was -- and that's how I survived when it came to

22  those functions.  I had no clue what I was doing, and I was

23  crossing my fingers that I would not be fired or put in jail

24  because of the actions I was taking that I had no clue about.

25       So I know that there were other agencies that that did

1   happen with fee managers who had charges against them for

2   wrongdoing, and I didn't want to be one of them.

3   Q    Okay.  At some point in time, did he reach out to the

4   director, Ms. Nelson, regarding what you were being asked to do

5   at the time?

6   A    Yes, I did.

7   Q    What was that?

8   A    I sent -- I attempted to meet with her, and I remember a

9   meeting that was cancelled.  I also sent her an email outlining

10  my fear and concerns about what I was being made to do during

11  this detail.

12  Q    Okay.  Did you ever have a meeting with Ms. Nelson?

13  A    The meeting that I had with her was -- that I scheduled

14  with her was cancelled, and that was related to -- I mean, one

15  of the issues that I guess we want to bring up.  But there is a

16  specific reason that I had called a meeting with her to discuss

17  because I was uncomfortable with what I was -- what was going

18  on, and that meeting that -- suddenly cancelled and not

19  rescheduled.

20  Q    Okay.

21          MR. PITRE:  Just Court's indulgence real quickly.

22  BY MR. PITRE:

23  Q    Can you testify -- can you talk about the meeting that you

24  had with Dr. McCarthy and what occurred at that meeting?

25  A    I had several meetings with Dr. McCarthy.

1    Q    Okay.  A meeting that occurred -- that possibly occurred

2    around February 2018?

3              MR. MACMILLAN:  Before she answers, this is another

4    one of these issues.  We've disclosed Dr. McCarthy as a

5    witness, and she wasn't -- you know, allowed to testify.  So

6    now we're going to get a -- I just don't -- I don't really know

7    enough about where they're going, but I -- based on how this

8    morning has gone, it's sensitive.  I believe that this

9    is relevant.  But if it is, it's been (indiscernible) in a

10   general way, I suppose.  And --

11             JUDGE BROOKS:  Mr. Pitre, can you proffer the general

12   topic that you're going into here?

13             MR. PITRE:  Yes.  Just the -- there's a continuation

14   of the environment which Ms. Potter was experiencing during the

15   time immediately prior to her transfer to the California VA.

16             JUDGE BROOKS:  Okay.  But is it -- is it her seeking

17   relief from the hostile work environment?  Is it -- I mean, is

18   it discussing unaccepted disclosures?

19             MR. PITRE:  No, it's discussing the treatment that

20   she received.

21             JUDGE BROOKS:  If she's just telling -- if it's just

22   telling Dr. McCarthy the treatment that she received, I don't

23   know what that add to (indiscernible) testify now.

24             MR. PITRE:  No.  No, this is treatment at the hands

25   of Dr. McCarthy.  Can I -- can I get (indiscernible)?

1          JUDGE BROOKS:  You were saying?

2          MR. PITRE:  This is the -- this is in regards to the

3    environment she was working in prior to her transfer --

4          JUDGE BROOKS:  Well, I do see that there was --

5          MR. PITRE:  -- previous --

6          JUDGE BROOKS:  -- the Agency was going to try to

7    address an allegation that Dr. McCarthy was attempting to force

8    her to engage in illegal activity, and her knowledge of

9    appellant's allegations related to the actions of Dr. Duarte,

10   appellant's allegations that Dr. McCarthy yelled a little and

11   threated the appellant when she attempted to explain how the

12   process -- something to help implement was in violation of

13   current business practices.

14         MR. PITRE:  Right.  I'm guessing that gets into

15   issues that have not been accepted as -- into the case, which

16   -- rather than spell them out.  I mean, I can, but there are

17   issues that were not accepted as whistleblowing, one of which

18   is -- relates to this fee issue that I just talked about,

19   presumably.  So -- and Dr. McCarthy would come here and deny

20   that she would yelled, belittled, and abused.

21         MR. MACMILLAN:  I will ask that the --

22         MR. PITRE:  That she did (indiscernible).

23         MR. MACMILLAN:  Counsel (indiscernible) proffer what

24   testimony would --

25         MR. PITRE:  And (indiscernible) in a more specific

1  way, please.

2            JUDGE BROOKS:  If you want -- if you want Ms. Potter

3  to testify that Dr. McCarthy yelled at her and to spring up

4  this -- are you proffering that she would testify that Dr.

5  McCarthy yelled at her in spring of 2017?

6            MR. PITRE:  That is correct.

7            JUDGE BROOKS:  I can take that --

8            MR. PITRE:  So she was --

9            JUDGE BROOKS:  I can take that testimony --

10            MR. PITRE:  It was understood.

11            JUDGE BROOKS:  I can take that testimony --

12            MR. PITRE:  All right.

13            JUDGE BROOKS:  -- but I'm going to need to hear from

14  Dr. McCarthy as well, either today, tomorrow, or telephonically

15  with appellant's consent.

16            MR. PITRE:  (Indiscernible) --

17            JUDGE BROOKS:  Yes.

18            MR. PITRE:  (Indiscernible).  Everyone is out of town

19  at this VISN meeting, which is why -- in San Diego, so Dr.

20  McCarthy's not -- I mean -- I didn't know that she would have

21  to -- I mean --

22            JUDGE BROOKS:  Yeah.

23            MR. PITRE:  -- (indiscernible) testify.  She's

24  unavailable now.

25            JUDGE BROOKS:  Okay.  Okay.

1          MR. PITRE:  So we may have to --

2          JUDGE BROOKS:  Mr. Pitre, if we need to, would you be

3    amenable to telephonic testimony on a later day of Dr. McCarthy

4    about the limited manner on which I would accept some testimony

5    from Ms. Potter about Dr. McCarthy?

6          MR. PITRE:  Yes.

7          JUDGE BROOKS:  Okay.  I assume the Agency will remind

8    me if I forget my offer about subsequent telephonic testimony

9    of Mr. McCarthy.

10          To be clear, I'm not opening the door for a great

11    amount of evidence.  I'm only aware of relevant testimony that

12    Dr. McCarthy could provide and that the appellant could provide

13    about some interaction in which Dr. McCarthy yelled at the

14    appellant.  No new disclosures or anything beyond what we're

15    talking about now.

16          MR. PITRE:  So would you -- I'm sorry.  So we'd be

17    holding (indiscernible) to the disclosures; is Ms. Potter able

18    to testify to that now?  I'm sorry.  I missed that part.

19          JUDGE BROOKS:  She's able to testify about some

20    interaction in which -- if the appellant is alleging that Dr.

21    McCarthy yelled at her in some way or mistreated her in some

22    meeting, she could testify about that.  I don't want the door

23    opened for disclosures that were not approved.

24          MR. PITRE:  Understood.

25    BY MR. PITRE:

1    Q    At some point in time, did you have a interaction with Dr.

2    McCarthy?

3    A    Yes.

4    Q    Okay.  And can you -- in which you were treated in a way

5    that you did not approve of?

6    A    Yes.

7    Q    Can you talk to us about that interaction?

8    A    It was a phone call where we were talking about a process

9    that Dr. McCarthy wanted me to lead implementing, and it was

10   not in accordance with the policy or choice regulations.  So

11   there was a phone call where I brought that up.  With me in the

12   room was another employee who also is not called as a witness,

13   Jim Para (phonetic), but -- and so, when we -- the both of us,

14   actually, tried to explain the regs, and Dr. McCarthy got upset

15   because we were not wanting to roll out this plan.

16        I tried to explain that choice funds couldn't be utilized

17   for certain things and -- and that's -- that's what the

18   discussion was about.  Without going into detail, that's what

19   it was about.

20        And she did later apologize to me for that.

21   Q    What did she apologize to you for?

22   A    She apologized for the way that she spoke in the meeting,

23   that she had -- didn't -- didn't intend to upset or have me

24   react in a certain way to what she said, and that she was under

25   a lot of pressure from, I guess, secretary of the VA or -- I'm

1  not sure.  She referenced a meeting that all chief of staffs

2  had on the direction the VA was going, and that she was trying

3  to make some changes and that she was under a lot of pressure

4  herself.  So she apologized.

5  Q    Okay.  Thank you.  So after all of these interactions, at

6  some point, did you request a meeting with Director Nelson?

7  A    Yes, I did.

8  Q    Calling your attention to Exhibit II, page 45-30.

9  A    Yes.

10  Q    Is this the meeting that you requested?

11  A    Yes.

12  Q    And did you receive that meeting?

13  A    No.  It was cancelled.

14  Q    Okay.  Calling your attention to Exhibit LL 45-70.

15  A    Yes.

16  Q    Did you send this email?

17  A    Yes, I did.

18  Q    And who did you send it to and on what date?

19  A    I sent it to Ms. Nelson on February 28th, and with it was

20  a letter that I had also written to her on January 13th of

21  2017.

22  Q    Okay.  So the letter that was sent on February 28th --

23        MR. MACMILLAN:  So our concerns -- really, I get

24  along with people fairly well, but this -- we talked about this

25  letter with Ms. Nelson this morning, and we (indiscernible) I

1   don't believe that it was not -- the letter itself was not

2   admitted.  I don't know if -- I can't recall if -- but there's

3   a lot in this letter and I believe your ruling -- because she's

4   talking about -- Ms. Potter's saying that (indiscernible) the

5   letter.

6          And one of the areas that Ms. Nelson's testimony was

7   limited was reports of whistleblowing.  And so,

8   (indiscernible).

9          JUDGE BROOKS:  Well, the -- all -- everything in the

10  record is something that I may consider in the case, so you

11  don't have to get it admitted.  I don't have a note that I

12  looked at this page before, tab 5 at 70, but if it's in email,

13  her concerns about the detail, I guess, my only -- well, beyond

14  the possibility --

15         MR. PITRE:  Your Honor, I may have been mistaken.

16         JUDGE BROOKS:  Okay.  But I will note that I did not

17  approve RimaAnn Nelson to testify about the Appellant's

18  attempts to later complain to Nelson about the detail, and this

19  appears to be Ms. Potter's attempts to later complain to Nelson

20  about the detail.  I can read this and hear her arguments about

21  this, but I'm not sure how much testimony I need.

22         Do you have many questions about this document, Mr.

23  Pitre?

24         MR. PITRE:  No.

25         JUDGE BROOKS:  Okay.

1            MR. PITRE:  Just maybe one or two.

2            JUDGE BROOKS:  Okay.

3            MR. PITRE:  So which -- additional, I mean.

4    BY MR. PITRE:

5    Q    So is this an email that you sent to Ms. Nelson on

6    February 28th?

7    A    Yes.

8    Q    And what was the purpose of this email?

9    A    To explain to her the intolerable work environment that I

10   was in as a result of the detail that she put me on.

11   Q    Okay.  And calling your attention to page 73 of 74, was

12   that exhibit -- was that exhibit was that letter?

13   A    This is the letter that I wrote to try -- after I was told

14   that I had to do the mandatory detail, it was an attempt to,

15   hopefully, not have to do it, but I -- at that point, I was

16   already told that I had no choice.  But I wanted to make sure

17   it was on the record that I expressed those concerns so that

18   she understood what this detail did to me.

19   Q    What did this detail do to you?

20   A    I mean -- I was, like, nearly destroyed me as a person.  I

21   will never be the same.  The day that I was told about this

22   detail, that weekend, I ended up in -- I had to go to a doctor.

23   I actually thought I was having, like, some cardiac-related

24   issue.  Went in there and all kinds of tests and labwork and --

25   I mean, even leading up to that, the stress, weight gain and

1    everything -- it was really bad.  But that -- I remember right

2    after this detail memo, before I had to report for the detail,

3    I literally ran cardiac tests on me and then told me that I was

4    actually having a panic attack, that it's not cardiac-related;

5    I couldn't believe it.  I am a nurse.  I know that it was

6    literally that extreme.  And so -- and I was also seeing the

7    therapist for several months around this time, too, just to

8    help deal with this issue, but it was really -- it was really

9    bad.  I didn't want to go to work.  We talked to the

10   (indiscernible) getting me documentation so that I could be on

11   a medical leave of absence to avoid being on the detail, that

12   when I talked to HR about that, they -- I mean, it was -- I was

13   told -- it was very clear to me that I could be called out for

14   insubordination if I didn't proceed.  And so that's the only

15   reason why I reported, but I did draft this email, just so that

16   she knew what was -- what was going on.  But I had -- I was

17   diagnosed with anxiety and everything and it was very hard to

18   go to work.  It was hard to deal with it.  It impacted my

19   family.  I didn't see my children, my husband, impacted my

20   schoolwork and everything.  It was the -- it was the worst --

21   honestly, the absolute worst three months of my life.

22   Q    And I think you testified to attempts to get out of the

23   detail; what were those?

24   A    I asked HR could they even do this.  I was told no.  I --

25            MR. MACMILLAN:  Can you -- I mean, I -- do I -- can I



1   bring an HR person in -- and I mean, we keep going back over

2   the same things over and over again so I --

3               JUDGE BROOKS:   Okay.

4               MR. MACMILLAN:   I don't know what to say other than

5   some of the conversations that Ms. Potter is -- the hearsay

6   that she's reporting from HR, they're going to say they didn't

7   say.  So --

8               JUDGE BROOKS:   Okay.

9               MR. MACMILLAN:   -- I don't know how else -- I mean, I

10  guess I -- you could take that under advisement.  I don't

11  know -- it's frustrating because she keeps talking about what

12  HR told her.  I can't -- how am I supposed to rebut that, I

13  guess, and -- um --

14              JUDGE BROOKS:   I haven't heard anything about --

15              MR. MACMILLAN:   -- so --

16              JUDGE BROOKS:   -- the conversations with HR yet that

17  would affect my determinations on this case either way, but I

18  would move past HR now.

19  A    So I was -- during this -- the course of this detail, even

20  leading up to it, because of the OIG involvement, I was meeting

21  with a therapist who basically told me -- I did everything I

22  could to try to not be physically and emotionally impacted by

23  it, everything that was going on.  And then -- to the point

24  where I was told by both my physician and therapist, that I

25  need to get out of this situation.  I'm not the problem, that

1  my license is being put at risk, and that's not something that

2  I should take lightly.  And I have actually had two nurses in

3  my -- the course of my career that reported to me that one --

4  either lost their license or had a censure put on their nursing

5  license and what I was doing was putting my career, my license,

6  my life at risk, I felt.

7  And so it was suggested to me to -- that I had -- I had to

8  leave -- I had to get out of that place.  And so I started

9  applying to literally everything I could.  Everything.  I

10 didn't want to be in that VISN because I didn't know who had

11 connections in that VISN, so I just looked at -- actually, my

12 therapist is the one that said, hey, well, what about -- I have

13 a daughter that lives in San Francisco.  Maybe you should live

14 there.  So I had -- I -- I mean, I had just applied to every --

15 everything I could that was outside of that VISN, so I felt

16 like a transfer could help.

17 I also had to -- because of this detail -- turn down my

18 scholarship for my doctorate program.  I had actually been

19 accepted.  And they were going to pay for it but then I would

20 have a three-year commitment at the Phoenix VA.  And so I had

21 to decline that and pay penalties on not accepting it because I

22 couldn't -- there was no way that I could stay there.  It

23 was -- it was -- it was an intolerable work environment I had

24 to get out of, and I was desperate to do anything I could to

25 get out of that situation.

1   BY MR. PITRE:

2   Q    Okay.  And so if, at some point, you applied to the VA

3   Northern California healthcare system; is that correct?

4   A    Yes.

5   Q    Calling your attention to Exhibit MM, which is 45-76.

6   A    Yes.

7   Q    And what are these?

8   A    This is emails between the HR person in California, and

9   our HR about my accepting a position and a release date.

10  Q    And what is the date on the -- calling your attention to

11  page 77 of 84.

12  A    Yes.

13  Q    What is the date on the top, ma'am?

14  A    March 8th.

15  Q    And what does that email state?

16  A    It's from the HR in California, asking if there is any

17  update or if I had given notification on a release of -- that

18  they could get a release date.  And so I said that I was -- or

19  that they said that I had -- yeah.  I had told Ms. Chua

20  (phonetic) in California that I spoke to my supervisor and then

21  I had a release date.

22  Q    Okay.  So what date was that?

23  A    My effective (indiscernible) release date was April 1st,

24  but I was going to be clearing station on March 17th.

25  Q    Okay.  But what date was on it on the email that you just

1  stated?

2  A    March 8th.

3  Q    March 8th, 2017.  And would that be the date that the

4  Agency officially recognized that you were leaving the Agency?

5  A    Yes.

6        UNIDENTIFIED SPEAKER:  Check with them.

7  Q    Okay.  Okay.  So after you -- after HR was informed that

8  you were leaving the Agency -- I'm sorry, that you were

9  transferring from Phoenix to California, what did you do next?

10  Did you even write a letter of resignation to --

11  A    Before -- so I -- I got contacted, I believe, on March 2nd

12  or 3rd, that I was offered the position; I just hadn't --

13  formally accepted it yet.  So I met with Ms. Nelson on March

14  3rd and told her -- I recapped what I had also previously

15  stated in my letter about the intolerable work environment, and

16  that I had to leave.  And that it was not an easy decision,

17  that there was a position -- and the only opportunity -- it was

18  absolutely the first opportunity for me to get out was a

19  temporary, basically demoted, a demotion to a temporary

20  position in northern California.

21  And so I was letting her know that I had to go.  She was very,

22  very supportive during that meeting.  She agreed and said, you

23  know, yes, you need to get out of here.  This place is not

24  good.  You know, it's really a big loss, that it's a big loss

25  to us and I'm really sorry, but what can I do to help?  You

1    know, you're doing the right -- you know, you're doing the

2    right thing.  She said I was brave and how -- what can she do

3    to help me.  What can she do to support me.  And so that

4    conversation I had with her on the 3rd.  And then I, after

5    that, wrote the formal letter of resignation, which was on

6    March 6th of 2017, with giving my official two-week notice.

7    Q    Why did you consider your transfer to the Phoenix VA

8    California as a demotion?

9    A    Because it was.  I was going from -- one, I was going from

10   a nurse manager to a staff nurse position.  It was levels below

11   what I had functionally -- what I had functioned in in my own

12   department.  It was the same department, community care, only

13   here, I had been functioning as a chief nurse of community

14   care.  There, I was a staff nurse; not just a staff nurse, but

15   I was temporary help, going to a position that was not to

16   exceed August 7th.

17   And so but it was the quickest way I could get out.  It was --

18   and I couldn't miss that opportunity.  I had to leave my family

19   behind, but because of the distress and everything that I

20   walked into every single day at the Phoenix VA, I was -- it was

21   that bad.  And I don't take that lightly.  I had a long career

22   at the VA, and that's not a decision that I would make lightly.

23   I mean, it was that bad that I had to go.  And yes, it

24   absolutely was a demotion.  I lost my two steps being nurse

25   manager and had -- I was no longer a supervisor, and a lot of

1    jobs in the VA actually had stipulated in the requirements when

2    you're applying for leadership positions -- must have a history

3    of progressive leadership experience.  So the fact that I had

4    to go backwards actually disqualifies me from positions in

5    leadership roles in the VA.

6    Q    Okay.  You said it was a temporary --

7    A    Yes.

8    Q    For how long?

9    A    It was -- the position was a temporary position, not to

10   exceed August 7th, 2017.

11   Q    So how many months was that?

12   A    From the time that I got there -- April, May, June,

13   July -- and it was a few days in August.  So a little over four

14   months.

15   Q    And after that position ended, were you promised another

16   position?

17   A    I was not promised another position.  Am I able to explain

18   the circumstances around (indiscernible) --

19        MR. MACMILLAN:  We're getting pretty close, I think,

20   to the -- there was supposed to be a damages hearing, separate

21   and apart.  And I know Ms. Potter is allowed to testify as to

22   her mental state and, I guess, to prove a constructive

23   discharge claim or attempt to prove it.  However, I mean, in

24   regards to -- ever since she's demoted, so now it's almost --

25   it's going to require me to pull out SF-50s and then I'm going

1    to have -- and then if she goes too far afield as to what's

2    going -- my understanding was, from (indiscernible) -- Ms.

3    Potter's counsel is (indiscernible) is -- when we were talking

4    about some of our exhibits in the pre-hearing stage, there had

5    been questions (indiscernible) recruit SF-50s and things like

6    that from Martinez, California, where Ms. Potter was

7    transferred or transferred to.  So I mean, I'm not sure what

8    relevance of continuing down this path, talking about damages

9    and damages she suffered after she --

10          JUDGE BROOKS:  Okay.

11          MR. MACMILLAN:  -- allegedly suffered after she took

12   the transfer.  She's noted in the record that she thought she

13   took a demotion that I think the rest of it, quite frankly, is

14   beyond the scope of your prior order on damages.

15          JUDGE BROOKS:  Okay.

16          MR. PITRE:  I don't believe the witness has testified

17   to any damages, whatsoever.

18          JUDGE BROOKS:  Okay.  Well, that said, I am

19   bifurcating damages for any future necessary proceeding, but

20   now that you're past the transfer and that you've established

21   that it was a demotion, I don't need to know more, because the

22   rest of it would only go to damages.  You've defined the

23   circumstances of the transfer and explained that there was a

24   reduction in steps and a change in title from nurse manager to

25   staff nurse position, but to go into what happened at the end

1   A    It's in binder 2.  I mean binder 1, I'm sorry.

2   Q    All right, let's go to -- let me get you something else to

3   look at instead.  Tab 44, page 26.  So it's still in binder 3.

4   And that's, tab 44, page 26.  This is an email -- well, we

5   talked about this email.  I don't want to belabor it, but so

6   this is the email that you sent to Dr. Venditti talking about

7   your initial concerns with urology.  Is that fair?

8   A    Yes.

9   Q    And there was some testimony about, you know, your job

10  title and the signature line of your email that, you know, you

11  indicated that you're nurse manager/acting chief.  And you

12  testified about that with Mr. -- when Mr. Pitre was asking you

13  questions, right?

14  A    Yes.

15  Q    Okay.  During this time period, let me give you a time

16  frame.  Between May of 2014 -- May 20th, 2014 and the time you

17  left the V.A. in April -- or you left the Phoenix V.A. in April

18  of '17, did your SM50's change, as to how they reflect your job

19  title?

20  A    No.

21  Q    I'm sorry?

22  A    No.

23  Q    Okay, and I believe you indicated that others, including

24  Dr. Venditti encouraged you to add  -- well, to use the Acting

25  Chief in your job titles; is that correct?

1    A    Yes.

2    Q    And you don't have to hold it up, unless you want to, but

3    tab 16, page 77, it's the 12/4/18 organizational chart.

4    A    Tab 16.  Page 77, so it's going to be letter Y.

5    Q    Letter Y.  So the flow char does not have a chief nurse 4

6    position; is that correct?

7    A    Chief nurse, not chief nurse 4, no.

8    Q    It doesn't have any chief nurse -- well, I'm sorry, it

9    says chief nurse manager which is what it indicates for your

10    position, correct?  On this flow chart?

11    A    Correct.

12    Q    Okay.  But under the -- in the first box, at the very top,

13    again, it's hard to read, but there's -- I think -- I guess it

14    says medicine service position.  But there's no chief nurse 4

15    position in that first box; is that correct?

16    A    Correct.

17    Q    Okay, and then under purchase code, you have the job title

18    chief nurse manager, correct?

19    A    Correct.

20    Q    Okay, and then when you get -- go to tab 16, which I

21    believe you're in, page 66, tab 4B.  This is the chief -- this

22    is the 3/19/2015 flow chart that I believe Mr. Pitre called

23    after reorganization.  Is that correct?

24    A    Yes.

25    Q    Okay, and again here now there is a chief nurse 4, or

1  chief nurse position in the first box, right?

2  A    Yes.

3  Q    Okay, and I believe you indicated there's two nurse

4  managers.  One for NVCC consults/veterans choice coordination,

5  right?  And then one for --

6        JUDGE BROOKS:  Take a step back, please.  On page 66,

7  you said that there's a reference to chief nurse.  Can you tell

8  me what box that falls under?  I'm not -- I haven't caught up

9  with you.

10        MR. MACMILLAN:  So it's actually the very top of the

11  work chart.

12        JUDGE BROOKS:  Uh-huh.

13        MR. MACMILLAN:  This one has -- it says ACOS

14  administration service position.  And then next to it, it says

15  1.0 Chief RN, VN, and then it gives a number.

16        JUDGE BROOKS:  Okay, I see that.  Can you go through

17  the next one that you were asking her about as well.

18  BY MR. MACMILLAN:

19  Q    Sure.  And whereas in the -- the work chart we just looked

20  at, it was 12/8/14, there was a nurse manager position

21  according to you, right?

22  A    Yes.

23  Q    Okay, and then now there's two nurse manager positions,

24  yours and you are no longer called the chief nurse manager,

25  right?

1  A    Yes.

2  Q    And there's another one, and that's in the box of

3  utilization review, correct?

4  A    Yes.

5  Q    Okay, and then there's NVCC Consults/veteran's choice

6  coordination.  See that?

7  A    Yes.

8            JUDGE BROOKS:  I don't.

9            MR. MACMILLAN:  There's a nurse manager.

10            JUDGE BROOKS:  I don't.

11            MR. MACMILLAN:  Okay, it's under utilization --

12            JUDGE BROOKS:  Under utilization review I see nurse

13  manager.  And then what --

14            MR. MACMILLAN:  Right  And then if you go down the

15  next -- a box  below that.

16            JUDGE BROOKS:  Yes.

17            MR. MACMILLAN:  It says NVCC Consults.  Are you on 10

18  -- I'm sorry, I changed it back -- I don't think I was clear.

19  I'm back on tab 16, page 66.

20            JUDGE BROOKS:  Okay, I'm on tab 16, page 66,

21  utilization review.  1.0 nurse manager --

22            MR. MACMILLAN:  So there's --

23            JUDGE BROOKS:  Yeah.

24            MR. MACMILLAN:  Under purchase care, there's two

25  additional boxes.  There's utilization review.  And then

1    there's non-VA purchase care.  And then there's a third box,

2    which I think is just there to make it look nice, but NVCC

3    consults/veteran's choice coordination.  It's still reported --

4    they are reporting to the same non-VA purchase care.

5              JUDGE BROOKS:  Okay.

6              MR. MACMILLAN:  In the work chart.

7              JUDGE BROOKS:  Okay.

8              MR. MACMILLAN:  Okay.

9              JUDGE BROOKS:  I'm there now at the bottom box.

10   BY MR. MACMILLAN:

11   Q    Okay. right.  So I guess what I'm trying to get at is,

12   so this -- the 3/15/19-15 work chart that we just talked about,

13   the chief nurse position was created, but it was not over

14   purchase care, correct?

15   A    This work chart -- correct.  There were --

16   Q    Well, so I think that's a yes or no question, but --

17   A    It included three additional nursing staff from other

18   areas, yes.

19   Q    Okay, but that's not what I'm asking.  So the Chief Nurse

20   4 position is not -- there's no chief nurse manager position

21   over purchase care, correct?  Just over purchase care?  Okay,

22   but maybe we can do this, I guess.  So if you look in the --

23             JUDGE BROOKS:  I didn't hear an answer.  If there was

24   nod or a shake, I didn't hear it.

25             THE WITNESS:  It's -- so it's going to be hard to

1   delay on this.  There is a colored version of this work chart,

2   where it actually shows who in the work chart reports to who.

3   And so there was like -- and it was either green or blue or the

4   chief nurse, and then it actually pointed out the staff.

5   Because the chief nurse at the top isn't over every single one

6   of these 136 FTE.  So it's -- to say -- so the question you're

7   asking is -- I mean it's --

8   Q    Well, was it consecrated by Glen Grippen that -- and I

9   guess Darren Deering that chief nurse position that they

10  created and ACOS, Administrative medicine service, that it

11  would encompass more than just the purchase care sections?

12              MR. PITRE:  Objection to you asking what Dr. Deering

13  and Mr. Grippen's -- what they -- what their purpose in

14  creating the chart was.

15              MR. MACMILLAN:  Well, Ms. Potter had a conversation

16  with them, which I'll be talking about in a second.

17              MR. PITRE:  Okay, so then you can lay that foundation

18  then.

19              MR. MACMILLAN:  Okay, well --

20              MR. PITRE:  So that question --

21  BY MR. MACMILLAN:

22  Q    So, Ms. Potter, did you record a conversation -- did you

23  record a conversation on your cell phone with Glen Grippen and

24  Dr. Deering on or about May 14, 2018 or sorry, May 14th, this

25  is -- okay, if you could turn to -- I'll just show it to you,

1   and then we'll talk about it because if you turn to tab 44, and

2   then page 25.  These are the exhibits that were disclosed in

3   your prehearing disclosure.

4   A    On which page?

5   Q    Page 25.  Are you there?

6   A    Yeah.

7   Q    So there's -- under Exhibit EEE, there's another box that

8   has no exhibit and it says 5/14/15.  How are you recording that

9   conversation between his Ms. Potter, Glen Grippen, and Dr.

10  Deering, regarding demotion and change of title, and it goes

11  on.  Do you see that?

12  A    Yes.

13  Q    Okay.  So there is a recording that exists, right?

14  A    Yes.

15  Q    Okay, and so I think I just need to make a record because

16  what we're going to ask is that this get -- a transcript of

17  this audio recording get admitted.  The Agency didn't get a

18  copy of it until after the prehearing submissions came in.  Got

19  an email from Ms. DaVira (phonetic), indicating that basically

20  here's a copy of the audio recording that was referenced in

21  this exhibit list.  So then we had it transcribed, but not

22  officially.  And I assumed it was going to be admitted into

23  evidence by the Appellant.  They didn't do anything with it,

24  but there's parts of it I would like to use.  And so I guess

25  I'm going to ask that I can supplement the record with it.

1   What I have is my paralegal transcribe it, but there's, I think

2   information in there that I would like to -- the People would

3   like to -- the Agency would like to use in its case.  And I'm

4   going to ask some questions just about the conversation

5   generally, if she recalls it.

6           JUDGE BROOKS:  Okay.  I see where there's this blank

7   for an unlabeled exhibit.  I don't believe the board has

8   received this recording.  And I think maybe you're saying that,

9   but I want to be clear.  Has the Board received this audio

10  recording yet, Mr. Pitre?

11          MR. PITRE:  No, we didn't have a -- we didn't

12  honestly know how the Board would receive that copy of that

13  recording.

14          JUDGE BROOKS:  Well, it is complicated.  That said,

15  have we yet received testimony about this conversation from Ms.

16  Potter?

17          MR. PITRE:  No, we have not.

18  BY MR. MACMILLAN:

19  Q   So, well, I guess I was just going to clarify.  Was this

20  one of the conversation she -- I believed she identified, and

21  testified there were two conversations with Dr. Deering and

22  Glen Grippen in April, but this is a third conversation in May.

23  So is it possible that the date on here is wrong and this is

24  one of the conversations that you have?

25  A   No, I did have a conversation on that date, as well.

1  that position.  Just keep doing what you're doing.  And so that

2  is why then I had to still maintain those functions, even

3  though I was removed from that position, or the title had

4  changed.

5  Q    Do you recall Dr. Deering saying, an organization

6  restructure shall be based on who was in the role prior to my

7  chief of staff position folding and collapse?

8              JUDGE BROOKS:  Mr. MacMillan -- Mr. MacMillan.

9              MR. PITRE:  Objection to -- yes. Thank you.

10             JUDGE BROOKS:  What I'm actually -- what I'm actually

11  going to say is because this testimony appears to be relevant,

12  and it's -- and you're asking her what she recalls, but in the

13  correct circumstances, the information that you have could

14  potentially be used to impeach her, or refresh her

15  recollection, whether it was an exhibit or not, would the

16  parties like to both get a copy of the transcript, listen to

17  the recording, and stipulate to the same content, to see if --

18  to try to eliminate the need for me to listen to it, to decide

19  what I think I heard?  Because chances are, the parties can

20  agree to the words that are said on there.  And if there's some

21  narrow area of dispute, I could -- I could at that point listen

22  to it.  Maybe instead of this back and forth, that would be a

23  solution to this.

24             MR. MACMILLAN:  I mean we would like to -- we'll get

25  I transcribed and then -- if you want to get it transcribed,

1    we'll listen to the transcription and make sure it's not

2    (indiscernible) that's fair.

3              MR. PITRE:  That's fine.

4              MR. MACMILLAN:  Okay.

5              JUDGE BROOKS:  Okay.  I -- after our -- after our

6    hearing now --

7              MR. MACMILLAN:  I'll cease this line of questioning.

8              JUDGE BROOKS:  Okay.  After our hearing I'll include

9    some kind of directions to the parties that -- my hope is to

10   get a stipulation for a transcript for it.  But that if there's

11   disagreement, in the end I'll end up listening to it.  So

12   hopefully the parties can figure it out.  Go ahead, sir.

13             MR. MACMILLAN:  Okay, thank you.

14   BY MR. MACMILLAN:

15   Q    Ms. Potter, I believe you indicated this morning that Dr.

16   Venditti made -- did you say that Dr. Venditti was encouraging

17   toward creating a chief nurse 4 position for purchase care,

18   initially?

19   A    Yes.

20   Q    Okay, and throughout the time she was your supervisor she

21   indicated to you that she was supportive of keep trying to get

22   you a chief nurse 4 position, is that -- in purchase care.  Is

23   that fair?  Or was there a time where that changed?

24   A    Yes, as it reflected the duties that I was performing and

25   she wanted to support making that right and official.

1    Q    Okay, and -- and I believe you indicated this morning that

2    the chief nurse 4 was something that Dr. Venditti -- well, did

3    Dr. Venditti agree to give you that title?  Is that a fair

4    statement, or thought that was a good idea?

5    A    To give me the chief title, yes.

6    Q    Yeah.  Because I believe she -- she had -- is it your

7    understanding that she had asked to create a chief nurse 4

8    position before, but had been basically shot down by prior

9    management, as to creating that position?

10   A    Is that a yes or no question?

11   Q    Is it your understanding -- I mean it could not be your

12   understanding -- well, what's your understanding as to what

13   happened -- well, strike that.  Did Dr. Venditti ever tell

14   you, I'd like to create a chief nurse 4 position over purchase

15   care, but for whatever reason -- but management won't let me,

16   essentially?

17   A    I mean not in those exact --

18   Q    I'm not trying to -- I'm not trying to get exact words.

19   Is that your understanding sort of the situation?

20   A    At certain points over time, yes, can I --

21   Q    Yeah, sure.

22   A    -- information.  Okay, so when she knew that when I took

23   -- when she -- when she became the chief of that section, she

24   knew and acknowledged that I had taken over the chief nurse

25   functions from my previous chief nurse.  And so with my

1    performance evaluations every year, it was a culmination of

2    nurse manager plus chief duties that was reflected in those

3    performance evals.  So she was in full support of getting that

4    officialized.  She acknowledged I didn't have a functional

5    statement.  She was -- she went with me to the EHT's, to the

6    nurse exec at that time, to try to get her -- it already gone

7    to VISN for approval, the chief nurse functional statement.

8    And she was actually supportive of trying to get that official.

9    But the nurse exec at that time wouldn't send it to BACO to

10   officially classify it, which was also disappointing to her.

11   But she was also reassuring, I'll get you (indiscernible)and

12   we'll keep going.  Just keep doing a good job.  I'll keep

13   pushing for it.  The next nurses that came.  She ended getting

14   promoted and then she wanted me to be by her side on that work

15   chart.  Which is why then that was created.  And she continued

16   to pursue getting that position for me.  At least all the way

17   up until she was detailed to some facility in 2015, after my

18   multiple OIG complaints and involvement, which a lot of them

19   pointed to her actions, and that's when she stopped.

20   Q    Okay, so I won't even try and unpack all of that, but let

21   me -- let me just -- so you complained to Urology -- I'm sorry,

22   you complained to Dr. Venditti about urology -- or urology wait

23   list.  And I believe you showed us all the email on 5/28/14; is

24   that correct?

25   A    Yes.

1    Q    Okay, and then there was an email regarding psychotherapy

2    consults, or email chain, I should say on all of these.  In

3    July -- July 10th, 2014, right?

4    A    Yes.

5    Q    Okay, and then there was another email chain on August

6    8th, 2014 about alerts being turned off of providers, right?

7    A    Yes.

8    Q    Okay, and I believe you indicated that you provided

9    additional information to OIG regarding Dr. Deering and

10   Venditti on 8/20/14, right?  On or about that?

11   A    Yes.

12   Q    Okay, and then on -- in December of '14, a work chart goes

13   through that gives you the title of chief nurse manager, which

14   I guess should you consider reflected what you were doing at

15   the time, right?  The job duties you were performing?

16   A    Yes, and that was the result of the July 14th meeting I

17   had with Dr. Deering.

18   Q    Right, and that's -- getting -- getting that -- the job

19   title -- I believe you liked that job title, right?  Or at

20   least you thought it was a good thing.  Better than what it was

21   before, just being a nurse manager  (Indiscernible), right?

22   A    It was a more accurate reflection of the job that I was --

23   Q    Right, so you considered it a good thing, right?  Not a

24   bad thing.  Was it -- in your mind was there reprisal for them

25   to put chief nurse manager in the work chart?

1    I'm sorry -- so your recollection is that Dr. Venditti did use

2    the word demoted in talking to you about what happened?

3              MR. PITRE:  Objection.  Asked and answered.

4    Objection. Asked and answered.  Asked and answered.

5              JUDGE BROOKS:  Well, thank you.  I heard her say that

6    she used it, yes, because I used it in my conversations with

7    her.  So it's not clear to me if she's saying that she was

8    responding to something that she said, or if she was

9    introducing the word.  Frankly, I don't know if it makes a

10   difference, but --

11   BY MR. MACMILLAN:

12   Q    You know, let me just ask the same question.  Did you --

13   well, did anyone else other than -- do you'd recall Dr. Darren

14   Deering say -- mention -- using the terminology demotion in

15   describing what occurred?

16   A    Yes.

17   Q    Did she use the terminology -- was she using the

18   terminology demotion in describing what her --

19   A    Yes.

20   Q    And when?

21   A    During my meetings with her.  I believe it was my first

22   meeting with him, after the (indiscernible) changed, April

23   14th, because --

24   Q    So he -- so he -- you're saying that he initiated the

25   conversation talking to you about this was a demotion?

1    A    We talked about the perceived demotion, yes.

2    Q    Your perception of a demotion?

3    A    I think everyone's perception of a demotion.  During that

4    conversation I pointed out that I was demoted on the work

5    chart.  And that --

6    Q    Did you --

7    A    -- Crenshaw was given the chief title.  And the response,

8    because I said then -- then he said that was an oversight and

9    that he shouldn't have the chief title.  And in response to

10   that, I said well, then are you going to remove his.  And he

11   said no, because I don't want it to look like he was demoted,

12   too.

13   Q    Okay.  Other than that, I guess -- let me ask you about --

14   let me -- is there any other examples, I guess, that come to

15   mind right now, that Dr. Deering used the word demotion

16   discussing I guess, your employment?

17   A    Just during those conversations when we were talking about

18   the work chart.  Outside of those conversations, no, not that I

19   recall.

20   Q    So are you saying that he said it in every conversation

21   that you had with him about the work chart?  The three of them

22   that we talked about?

23   A    I don't remember the specific and how --

24   Q    So --

25   A    -- many number.  I didn't keep a log --

1  Q    Well, I'm trying to narrow it and you're broadening it out

2  again.  So I'm going to ask you, other than the one that you

3  just talked about with Mr. Crenshaw, were there any others

4  where he talked about demotion?  Now we're back where we were.

5  So do you recall any others as you sit here today?  It's not a

6  complicated question.  If you don't, you don't.

7           MR. PITRE:  Objection.  Objection to counsel's use of

8  the -- or the -- objection to counsel speaking to the witness

9  by statements not a complicated question.  I find that to be

10  condescending in nature and I would just ask that he refrain

11  from doing so.

12          MR. MACMILLAN:  I wasn't trying to be condescending.

13  I'm trying to get an answer.  Trying to get a responsive

14  answer.

15          MR. PITRE:  You're --

16          JUDGE BROOKS:  Let's -- let's take a break.

17          MR. PITRE:  I know --

18          MR. MACMILLAN:  You don't --

19          JUDGE BROOKS:  Take a break for a moment.  My last

20  useful notes said that Deering was notified that Crenshaw got

21  the chief title and that he said that it was an oversight.  And

22  she asked him are you going to fix his, and he said, no, I

23  don't want it to look like he was demoted, too.  And after that

24  there was some back and forth.  It's difficult for me to know

25  what question to address.

1        MR. MACMILLAN:  The question that was I guess posed,

2   and then I guess Mr. Pitre objected to the part I added -- my

3   subsequent comments, but I asked, other than that conversation,

4   which I believe she said Mr. Crenshaw discussed with her, any

5   other conversations where you recall if Mr. Deering used the

6   term demotion in discussing your employment.  That's the

7   question.

8        JUDGE BROOKS:  Okay, they're -- I don't remember if

9   that was the question that you said was simple or not, but that

10  question is fine, and I expect we can get an answer to it.  Was

11  there any other time that Deering talked about demotions?

12       THE WITNESS:  During the April 14th and April 29th

13  meetings.  Outside of that, I do not recall.

14  Q    BY MR. MACMILLAN.  Okay, what did he say in the April 14th

15  meeting about demotions?

16       MR. PITRE:  Asked and answered.

17       MR. MACMILLAN:  It's not. Well, is that -- is that --

18  BY MR. MACMILLAN:

19  Q    I'm sorry, it's the one with Mr. Crenshaw, is that the

20  April 14th meeting?

21  A    That and my -- and that I was demoted, because we talked

22  about that.  And so I'm sure he used the same verbiage back.

23  Q    Okay.

24  A    And same -- is the question with Dr. Venditti, we talked

25  about it.

1    or the second time that he went over to the department.  That

2    first morning when he went over there, he wasn't told about it

3    and kind of continued.  And I -- I'm not a person of conflict,

4    so I was trying to reach out to him and reassure him that I

5    didn't have anything to do with it.

6    Q    But here he's indicating that he actually did know, right?

7    A    He didn't have a memo, which is why he showed up.  And he

8    continued to show up, which is why Bransky later had to come to

9    tell us that he's not to be there anymore.  Because he

10   continued to show up.

11   Q    So when you saw the letter, you believe there was no

12   delegation of authority in the memo; is that correct?

13   A    There was no job title in the memo.  It was unclassified

14   duties.

15   Q    Okay.  Is that because there had -- what if -- well, I

16   won't go there.

17        My understanding is that you asked for a meeting with

18   Bransky to clarify the delegation of authorities.  Isn't that

19   what the Exhibit BB says?

20        Not BB.  What was it?  DD.

21   A    No.

22   Q    But the detail in that memo, "I have no positional

23   authority to direct anyone in the department in order to

24   accomplish the task that I've been made responsible for."

25        So what do you mean there?

1   A    So Dr. Duarte was the ACOS for AMS.  I was taking over his

2   job, but I did not have his title.  I had no title.  I can't

3   put "unclassified duties" under my name on the signature block.

4   What does that mean?

5        So that's what I was referring to.  And that's also where

6   I documented -- which Dr. Duarte is included -- that he told me

7   that morning he hadn't received anything in writing, which is

8   why he continued to show up.

9        So the --

10  Q    Did he actually continue to do some duties related to the

11  clinician duties as an MD before the department was -- and also

12  there were compensation and pension immediately after the

13  detail?

14  A    I wouldn't say immediately, but they --

15  Q    Well, let's say the week after the detail on January 17th.

16  Is it your understanding that the list of job duties that

17  Director Duarte was performing in the administrative medicine

18  service?

19  A    No.  He was explicitly told he is to do nothing with that,

20  and he was given -- noncompetitively provided a new title and a

21  new job as the -- I don't know, it was, like, some special

22  assistant to the chief of staff or something like that.  But he

23  was to have nothing to do with that department.  No functions

24  related to that department.

25  Q    When do you think that description came out, or do you

1  know?

2  A    That actually was communicated to me on January 3rd, when

3  they told me about the -- the -- the detail.

4  Q    Isn't it presumed that there would be a delegation of

5  authority in the detail itself?  If you were being assigned

6  duties, wouldn't you assume you have positional authority to

7  perform those duties?  Isn't that assumed?

8  A    No, it's not as -- assumed.  I had no title.  I was the --

9  it was duties that were encompassed in four people's positions.

10  I didn't have any of those four people's titles.

11  Q    The memo delineated what duties you were to perform,

12  correct?

13  A    In a summary statement, yes.

14  Q    Do you contend that -- well, so Dr. Duarte -- it seemed

15  like he was upset -- or he -- so your contention is he was

16  angry that you were getting assigned unclassified duty or

17  detail, and he was being moved.  Is that a fair summary of your

18  beliefs?

19  A    Yes.

20  Q    Okay.  And I believe you indicated one of the things that

21  he excluded you from was -- well, is there conduct that you --

22          MR. MACMILLAN:  Let me strike that.  So -- let me --

23  I'll start again.

24  BY MR. MACMILLAN:

25  Q    Do you believe that any of Dr. Duarte's conduct toward you

1    literally every email that he received, it seemed as though he

2    was just pushing off to include things that would not, I felt,

3    be in the scope -- that that was unclassified duties.

4        So it -- it was -- it was intentional to just send

5    everything, even simple things.

6    Q    So you got -- when you say one another, it's how many of

7    these invites did you claim that he sent you, and how many do

8    you claim were inappropriate based on your duties?

9        Let's break it down.  How many invites do you claim that

10   Dr. Duarte sent you that you perceived as being harassing?

11   A    I don't --

12   Q    Meeting invites, we're talking about.

13   A    I don't remember the exact number.  It was enough for me

14   to report it to Doc -- to Mr. Bransky.

15   Q    But you reported that you were frustrated about a new

16   provider orientation, right?

17       That's the one we looked at today?

18   A    I -- what I stated to Mr. Bransky is, like, every email

19   and meeting invite he receives related to CMC (phonetic) --

20   Q    So you don't know how -- as you sit here today though, you

21   don't -- you just think there were a lot; you just don't recall

22   how many?

23   A    I don't recall the specific number, no.

24   Q    Okay.  Just bear with me.

25       And when did you start your active job search away from

1    the VA?  No, I'm sorry, I should -- let me rephrase that.

2        When did you start -- I know you testified this

3    morning/this afternoon that at some point you did start looking

4    for jobs outside of the Phoenix VA, correct?

5    A    Correct.

6    Q    Okay, when approximately did you start that job search?

7    A    It was after I met with my therapist, and she recommended

8    that, in order to --

9    Q    Okay.  I just wanted when.

10   A    When --

11   Q    When did you start your job search?

12   A    After I -- after my therapist --

13   Q    Date?

14   A    -- recommended.  It was -- I don't remember the exact

15   date.  It was at the -- I believe was the end of 2016.  Yes, at

16   the end of 2016.

17   Q    Okay, and besides the facility, I believe you testified

18   you applied everywhere, or something to that effect.  Where was

19   it you applied besides the VA facility in Martinez, California?

20   A    At what point in time?

21   Q    Throughout your job search, between the time you -- end of

22   2016 when you started your job search, which you just

23   indicated, to the time you actually accepted the position and

24   left.  Or, I guess, accepted the position.  I don't know how

25   long you kept applying for but accepted the position in

1    Martinez, which I believe you indicated was in March of '17.

2    Where else did you apply besides the VA facility in Martinez,

3    California?

4    A    It wasn't specific to the VA in California.  The job that

5    I actually got wasn't in Martinez, California.

6    Q    Okay, well --

7    A    But I applied to several positions in VA Northern

8    California, not VISN, to include specifically the chief of

9    quality, the chief nurse position at the VISN, that temporary

10   detail.  I believed every vacant position they had that I

11   qualified for, I applied to.

12   Q    Okay.  And did you apply anywhere else besides Northern

13   California that you recall?

14   A    At -- during that time, I don't recall.  I know later I

15   did, because I knew I applied for -- I only had four months on

16   that job, so I had better apply.  So I applied to places even

17   outside just to make sure that I could still have a job after

18   that temporary detail ended.

19   Q    Okay, where did you apply then?

20   A    Center -- the areas around that location, because that's

21   where I was moving.

22   Q    I think we can all agree that California's a fairly

23   expensive state.  Did you apply to any VA jobs in Southern

24   Arizona?

25   A    I have in the past, not -- I don't believe during that

1   going back to your discussions with Dr. Venditti regarding you

2   receiving a chief nurse IV position in purchase care, you

3   testified that she was supportive -- at some point she was

4   supportive of that move.  Is that correct?

5   A    Yes.

6   Q    Isn't it true that those conversations with Dr. Venditti

7   took place between 2012 and 2014?

8   A    Yes.

9   Q    Okay.  Then you testified that after you made multiple OIG

10  complaints, you said, quote/unquote, that stopped.  What did

11  you mean by "that stopped"?

12  A    Her support in getting the position -- or I guess fighting

13  for it and also she was a -- the associate chief of staff at

14  that point.  But after the OIG involvement, the congressional

15  hearings related to urology, where I actually named specific

16  actions from Venditti and Deering -- that is when, in my

17  opinion, things changed.

18  Q    Um-hum.  So instead of advocating for you to get the chief

19  nurse IV position, what actions did Dr. Venditti then take

20  after your OIG complaints?

21  A    She distanced herself.  There were meetings where she was

22  very -- not -- not -- not kind.  In fact, there was one where

23  she was pretty aggressive in a meeting, where somebody actually

24  commented at the meeting, wow, she was brutal towards you.

25       So that's -- those -- those types of interactions

1   afterwards.  My performance still -- I mean, I still -- I still

2   excelled in my performance, but the treatment towards me was

3   different from leadership.

4   Q    Okay.  You also testified that -- based on counsel's

5   questioning -- that Dr. Deering initially was supportive of you

6   getting the chief nurse IV position.  Is that correct?

7   A    Yes.  Initially, yes.

8   Q    Isn't that true that those conversations also took place

9   in July 2014?

10  A    Yes.

11  Q    Okay.  Can you remind me what date the OIG issued its

12  report, which included your protective disclosures?

13  A    The official one that included everything I believe was in

14  Jan -- January 29th of 2015.

15  Q    Okay, 2015.  And so this is after Dr. Deering's effort to

16  get you the chief nurse IV position that that report came out.

17  Is that correct?

18  A    Yes.

19  Q    Okay.  What actions did Mr. Grippen, if any, take after

20  the issuance of the OIG report in January 2015?

21  A    That's when I was -- that's when my -- my title was

22  removed, and I was -- effectively lost the departments that

23  were previously under me on the org chart.

24  Q    Okay.  And so at any point in time, did Dr. -- I'm sorry,

25  did Mr. Grippen ever support you being placed in the chief

1  nurse IV position?

2  A    After the org chart change, when I had those meetings with

3  him April 14th and 29th, yes.  I outlined my concerns,

4  specifically tying back the fact that he did not fear staff

5  going to the media or to EEO or OIG.  And so I referenced that

6  in my pleading with him to do the right thing.

7      And so for that reason, I believe, he was supportive.

8  Like I said, the first -- those first two meetings, he was very

9  kind and -- and actually did take the action to expedite the

10  position.

11  Q    Okay.  Well, whose responsibility was it for that position

12  to be filled?

13  A    At that point, it was Dr. Deering.

14  Q    Okay.  Just so I'm clear, about the time the OIG report

15  came out in January 2015, Dr. Deering had changed his attitude

16  about you receiving the chief nurse IV position.  Is that

17  correct?

18  A    Yes.

19  Q    And what did Dr. Deering ultimately do as it pertained to

20  the chief nurse IV position?

21  A    He removed it.

22  Q    And when did that occur?

23  A    Later that year.  It was -- I believe I got the official

24  notification on November 5th of 2015.

25  Q    All right.  Calling your attention back to Tab 16, 4-Q --

```
 1   A      Yeah.

 2              MR. MACMILLAN:  I don't have it.

 3              MR. PITRE:  Okay.  Come over here.

 4              MR. MACMILLAN:  Oh, okay.

 5              JUDGE BROOKS:  4-Q starts at 37.

 6              MR. PITRE:  I'm happy to share.

 7   BY MR. PITRE:

 8   Q      Do you recognize these individuals that are listed on this

 9   report?

10   A      I only recognize one and myself.

11   Q      Okay, and who was that individual that you recognize?

12   A      Besides myself, I recognize Leilani Lobrez (phonetic).

13   Q      And who was Leilani Lobrez?

14   A      She was -- she was my subordinate in the purchase care

15   department.  She was one of the nurses -- the (indiscernible)

16   nurses.

17   Q      She was a subordinate of yours?

18   A      Yes.

19   Q      Okay.  Had she ever, to your knowledge, been detailed to a

20   chief nurse IV position?

21   A      No.

22   Q      Had she ever performed responsibilities of a chief nurse

23   IV?

24   A      No.

25   Q      Okay.  And the other two individuals outside of
```

1   BY MR. MACMILLAN:

2   Q    So do you personally -- let me ask this.  Do you have any

3   personal knowledge of the qualifications of these people?  Of

4   the two people that you didn't recognize --

5   A    Personal knowledge, no.

6   Q    Okay.  Thank you.  It's better to answer the questions

7   that are asked.

8           MR. MACMILLAN:  I don't have any more questions.

9           JUDGE BROOKS:  Thank you.  The time is 4:58 p.m.

10  We'll go off the record.  Okay.

11      (Off the record at 4:59 p.m.)

12          JUDGE BROOKS:  Can we go back on the record?  The

13  time is 5:01 p.m.  We're back on the record.

14          Appearing now as a witness is Edmund Lowe.

15          Mr. Lowe, I'm David Brooks.  I'm the administrative

16  judge assigned to decide this matter.  Do you have any

17  objection to testifying under oath?

18          MR. LOWE:  No, I do not.

19          JUDGE BROOKS:  During your testimony, if you have

20  questions or are confused, you can direct any questions to me.

21          Please raise your right hand for the oath.

22          EDMUND LOWE, APPELLANT'S WITNESS, SWORN

23          JUDGE BROOKS:  Thank you.  For the record, would you

24  please state and spell your name?

25          THE WITNESS:  Edmund Lowe, E-D-M-U-N-D L-O-W-E.

1          JUDGE BROOKS:  Thank you.  Mr. Pitre will ask you

2     questions first and then Mr. MacMillan will have the chance to

3     do the same.

4          MR. MACMILLAN:  All right.  Thank you.

5                         DIRECT EXAMINATION

6     BY MR. PITRE:

7     Q    Good afternoon, Mr. Lowe.   What is -- are you currently

8     working at Phoenix VA?

9     A    I'm retired from the Phoenix VA.

10    Q    Okay.  And when did you retire?

11    A    December 31st of 2015.

12    Q    December 31st, 2015.  Prior to your retirement, what was

13    your title at the Phoenix VA?

14    A    I was the Chief of non-VA purchase care.

15    Q    Okay.  And how long were you in that position?

16    A    Five years.  On and off over probably a 15-year period.  I

17    did lot of temp -- I worked there temporarily, but from my last

18    position, it's been about five years or so.

19    Q    Okay.  Briefly explain what type of -- where were you

20    performing that position.

21    A    There were two sides to what I did as a purchase gig.

22    There's an administrative side and there's a product side.  I

23    was in charge of the administrative side.  The administrative

24    side was the side that was responsible for the creation of

25    authorizations and the rules as to the running of that for the

1   pay of the vendors that provided the care to the veterans in

2   the community.  We had the overall view that -- that's it, and

3   everything else is involved inside of there.  We work with the

4   clinical side because, again, of the rules that are involved

5   with created authorizations and being able to deal with the

6   vendors, things like that.

7   Q    Okay.  And during your time at the Phoenix VA, did you

8   work with Ms. Potter?

9   A    Yes, I did.

10  Q    In what capacity?

11  A    She was the charge nurse for the nursing side of non-VA

12  purchase care.

13  Q    Okay.  And I want to call your attention to January 2015.

14  During that timeframe, you were recall an anonymous -- a OIG

15  hotline complaint that was released regarding the backlog of

16  non-VA care administrative staffing processing?

17  A    Yes, I do.

18  Q    Okay.  And do you recall how you became aware of that OIG

19  hotline complaint?

20  A    I found out from one of my staff members who came along

21  and told me as to what was going on.

22  Q    Okay.  And when you heard about the complaint, did you

23  have any ideas of where that complaint might have come from?

24  A    Okay.  So before I explain this, you have to understand

25  something.  This was years ago.  So I'm trying to bring all of

1   this back to mind.  The one thing that definitely brings that

2   back to mind is that I was totally surprised by that complaint.

3   And the reason I was compli -- surprised by it is that the

4   working relationship the administrative side of non-VA purchase

5   care and the clinical side being the nurses we had there, if

6   there was a problem relating to either side, the head of either

7   side and we will address it.  But the fact that it came through

8   an OIG report tells me that no one brought it to me.  And the

9   way that it read, it did not read administrative; it read

10  clinical.  The words that were used, the time, the duration,

11  this is how a clinician would speak, not how one of my

12  administrative staff would speak.  I know the difference.

13  Q    And by clinician, what titles or what roles would follow

14  that category?

15  A    Nurses.

16  Q    So it was your belief that a nurse made this OIG

17  complaint?

18  A    Yes.

19  Q    Okay.  At some point in time during that timeframe, did

20  you have a meeting with Ms. Potter --

21  A    Yes.

22  Q    -- regarding the actual complaint?

23  A    Yes.

24  Q    And was Dr. Venditti present?

25  A    That part, I'm not really sure if she was actually sitting

1 | in the room and I was talking with Tiffany or if it was over
2 | the phone, we had the speakerphone on.  We had the working
3 | relationship at the time, at least I felt that the relationship
4 | was that if something happened, the leaders would sit down and
5 | we could talk about it and we can try and figure out what's
6 | going on.  So I had no qualms whatsoever about bring up
7 | something with Dr. Venditti.  Definitely had no qualm about
8 | bringing up something to Ms. Potter because I considered her my
9 | equal.  We were just on different sides of the table; that's
10 | all.  And I respected her for what her staff did clinically,
11 | and I respect my staff for what they have to -- had to do
12 | administratively.  There was a lot of work involved.
13 | Q    Okay.  So during that meeting, did you or Dr. Venditti ask
14 | Ms. Potter if she had filed that OIG report?
15 | A    I asked her.  She said no.  But as explained to her, I
16 | felt that it came from a nurse, based on how it was written.
17 | Q    Okay.  And all this time period, were you aware that Ms.
18 | Potter was also involved in other OIG disclosures?
19 | A    Probably, yes.  There were a lot of OIGs going at that
20 | time that dealt with non-VA care.  So my answer to that would
21 | be yes.
22 | Q    And you were --
23 | A    Because a lot of these OIGs would probably come to us for
24 | solutions, so we would have to understand what we were doing.
25 | Q    And would Dr. Venditti have also been aware of Ms.

1  Potter's other OIGs disclosures?

2  A    I would say yes simply because she was the leader of the

3  department.

4  Q    Ms. Potter has testified that there was animosity towards

5  nurses or to -- nurses in general, but specifically to her

6  regarding her participation in OIG complaints.  Would you agree

7  with that testimony?

8  A    Yes.  I would definitely agree with it based on the report

9  of OIG that upset me at that time period.

10  Q    Okay.

11            JUDGE BROOKS:  Do you have --

12            MR. MACMILLAN:  Not to distract from some of his

13  testimony, but we're getting into other OIG complaints and

14  whatnot and apparently were not accepted, you know, into the

15  case, and so I would ask that both that testimony be eliminated

16  because whatever events he was talking about, I think we've

17  already established that it's not one of the ones that were

18  accepted into the case and so, therefore, it's not relevant.

19            JUDGE BROOKS:  Mr. Pitre, I do have a very narrow

20  basis for approving the witness.  I don't know if you have that

21  in front of you.

22            MR. PITRE:  Yes, I believe that it was -- we were

23  asked about the animosity about the various OIG complaints.

24            JUDGE BROOKS:  Well, I have approved only to testify

25  to the allegation that he and Dr. Venditti on January 23rd,

1  2015 -- and I will paraphrase here -- suggested that Ms. Potter

2  was the source of an anonymous OIG hotline complaint regarding

3  significant delays by non-VA admin staff.

4          Now, I guess if you're referring to the same

5  conversation on January 23rd, 2015, that may be somewhat in

6  bounds because it says anonymous OIG hotline complaint

7  regarding significant delays by non-VA care admin staff.

8          Are you asking him about any later conversations

9  beyond January 23rd?

10         MR. PITRE:  I'm asking, you know, not about

11 conversations but more so about the environment and how --

12 if -- indeed if there was animosity towards nursing and Ms.

13 Potter specifically regarding OIG complaints in general, not

14 specific -- not any specific OIG complaint.

15         MR. MACMILLAN:  I don't think that's -- it's relating

16 to other OIG complaint, and I don't think it's relevant.  So

17 again, we've seemed to hash out these issues frequently here

18 today.  You know, I think he's already been asked and answered

19 about what allegedly happened during this conversation.  I

20 don't think there's anything else to add.

21         JUDGE BROOKS:  I --

22         MR. MACMILLAN:  That's relevant.

23         JUDGE BROOKS:  I wouldn't go beyond this one. I

24 didn't approve him for anything beyond what they said in this

25 conversation.  If it's beyond that, I don't want it.

1          MR. PITRE:  Okay.  So the last question was, was

2     there animosity toward Ms. Potter, and the answer was yes.  So

3     do you -- you want that to be the last question?

4          JUDGE BROOKS:  Well, you want to clarify when you ask

5     him was there animosity if he meant on January 23rd or prior

6     to -- leading up to the January 23rd meeting without going into

7     events prior to then.

8          MR. PITRE:  Okay.

9     BY MR. PITRE:

10    Q    Prior to the January 23rd meeting in which you all spoke

11    to Ms. Potter regarding the OIG hotline complaint, did you

12    believe that there was animosity towards nursing?

13    A    No.

14    Q    After the January 23rd, 2015 meeting, did you believe that

15    there was animosity towards nurses?

16    A    Yes.

17    Q    And was it specific to Ms. Potter?

18    A    Yes, and the reason -- I -- I need to clarify why I would

19    say yes.  The reason why, as I stated before, there was a

20    working arrangement between the clinical staff and the

21    administrative staff.  The routines that were actually sitting

22    out there between these two different departments, if they saw

23    a problem in that particular team, if they saw a backlog was

24    going on in that particular team, and the teams could not work

25    it out, they would come to us.  They would come to leadership,

1   and leadership would sit down as a group and try and figure out

2   what was going on and what the problem was.

3       And when the administrative staff saw this OIG that said

4   that there was a backlog, they felt that they were thrown

5   underneath the bus.  And that's why they brought it to me, and

6   that's why I, in turn, took it to her, and I'm pretty sure I

7   took it to Dr. Venditti also.

8   Q    All right.  Thank you.

9       MR. PITRE:  No further questions.

10                          CROSS-EXAMINATION

11  BY MR. MACMILLAN:

12  Q    Did Dr. Venditti every tell you that she had animosity

13  toward Tiffany Potter?

14  A    Dr. Venditti had animosity towards Tiffany?

15  Q    Yeah.

16  A    No.

17  Q    Did you initiate this meeting with -- this January 23rd,

18  2015 meeting -- let me backtrack.  So Dr. Venditti, you don't

19  recall if she was physically present or was on the phone?

20  A    Correct.

21  Q    Okay.

22  A    But it was one or the other.

23  Q    Did she ask for the meeting or did you?

24  A    I did.

25  Q    Okay.  And, I believe, you indicated you were the one --

1  you asked if she made the OIG report, correct?

2  A    Say it again.

3  Q    I believe you were the one who asked, hey -- you know, you

4  asked Ms. Potter if she was the one who had made an OIG report;

5  is that correct?

6  A    Correct.

7  Q    And it wasn't Dr. Venditti?

8  A    No, no.  I went first to Tiffany.  I'm sure I would go

9  first to Tiffany over it.

10  Q    Okay.  And then you -- I think you indicated you were on

11  different side of the house, so to speak, so you personally

12  have no ability to control employment actions related to Ms.

13  Potter, correct?

14  A    No.

15  Q    You aren't her supervisor?

16  A    No.

17  Q    I believe you thought that Dr. Venditti must have known

18  that Ms. Potter was involved in whistleblowing.  That's your

19  assumption based on your own experience; is that correct?

20  In other words, you assumed it, so you assumed that Dr.

21  Venditti must have also assumed that as well.

22  A    I would not have made that assumption.  I would -- I would

23  only have made a statement about something that I know I told

24  Dr. Venditti about.

25  Q    Well, I thought you just said that Dr. Venditti never told

1  you -- well, you said Dr. Venditti never said she had

2  animosity, right?

3  A    You asked me if I felt that Dr. Venditti had animosity

4  toward Tiffany, my answer was no.

5  Q    Okay.  Did Dr. Venditti ever say, well, you know, I feel

6  like we should find out if Tiffany Potter is the whistleblower?

7  A    No, she never made that statement to me.

8  Q    Okay.  Did she ever indicate that she wanted to take -- in

9  any way, I'm not saying -- I'm trying to put words in her

10  mouth, but did she ever indicate to you that she, you know,

11  desired to take some kind of negative employment action against

12  Tiffany because of OIG activity?

13  A    And I would not expect Dr. Venditti to talk to me about

14  any activity she planned on taking toward her staff.

15  Q    Right, but she never indicated that to you?

16  A    I would never have expected her to do that.

17  Q    Okay.  But she didn't?

18  A    No.

19  Q    And did Dr. Venditti say, hey, I know Tiffany, prior to

20  January 23rd, 2015 -- did Dr. Venditti say I believe Tiffany

21  Potter filed OIG complaints against me or something to that

22  effect?  Did she ever indicate to you that she --

23  A    Sorry?

24  Q    Did she ever indicate to you that she -- that she -- in

25  her mind, she knew that Tiffany was a whistleblower, prior to

```
 1   talk to me and you'll end up talking less.

 2             MR. PITRE:  Yes.  Yes, sir.  See, Judge, you --

 3   Judge, are you absolutely correct.

 4             MR. MACMILLAN:  Well, first of all, I think from --

 5   can I -- can I speak?

 6             MR. PITRE:  Judge, you are absolutely correct, that

 7   the -- that the focus on the question was very narrow and I

 8   stuck to that focusing of questions.

 9             However, counsel decided to bring the supervision of

10   the com -- of the appellant by Dr. Venditti into the discussion

11   by asking if the witness -- was he aware of Dr. Venditti's --

12             MR. MACMILLAN:  No.

13             MR. PITRE:  -- making any statements regarding --

14   making any statements regarding the animosity.

15             MR. MACMILLAN:  Which goes to --

16             MR. PITRE:  -- or if she took any action --

17             MR. MACMILLAN:  -- which goes to the conversation on

18   the 23rd.

19             MR. PITRE:  -- or if she took any action regarding --

20             MR. MACMILLAN:  I didn't ask about action.

21             JUDGE BROOKS:  You're -- you're looking at him.

22             MR. MACMILLAN:  I didn't ask about action.

23             JUDGE BROOKS:  You're looking at him.

24             MR. MACMILLAN:  Let's read it back.  I did not ask

25   about action.
```

1          JUDGE BROOKS:  I don't need it to be read back

2    because the question isn't relevant.  Sure, it's possible

3    something happened.  I don't need him to testify to that.  It's

4    possible that -- that Venditti did something that he didn't

5    hear about.  It doesn't matter.

6          He didn't testify that it would have been possible

7    anyway.  It doesn't matter what he knows about it anyway.

8          MR. PITRE:  Yes, sir.

9          JUDGE BROOKS:  I actually have a question for the

10   witness, if you're done.

11         MR. PITRE:  I'm done.  All right.

12         MR. MACMILLAN:  I just was objecting.

13         JUDGE BROOKS:  Sure.

14                      DIRECT EXAMINATION

15   BY THE COURT:

16   Q    Okay.  And this may or may not lead to any further

17   questions from the parties, but I need -- I need to straighten

18   out my understanding of on January 23rd, when you had this

19   meeting with the appellant, Ms. Potter.  Ms. Potter was in the

20   room with you, correct?

21   A    We were in her office.

22   Q    Okay.  And you were either on the phone with Dr. Venditti

23   or Venditti was in the room, right?

24   A    Correct.

25   Q    And you asked Ms. Potter if she was the source of the OIG

1  complaint, right?

2  A    Correct.

3  Q    Okay.  And I think you said something about you don't

4  think anything of or at the time you didn't think anything of

5  having a meeting to ask managers and, I guess, different

6  individuals with authority matters such as this.  Am I

7  summarizing that roughly correctly?

8  A    I don't think so, because I'm not following you.

9  Q    Okay.  You said something that gave me an impression that

10  on the January 23rd meeting -- I got the impression that it --

11  okay, let's talk, you know, we can talk to each other, it's not

12  a big deal, let's straighten this out.

13      I got the impression that you went into it feeling like it

14  wasn't a big deal or something, but does that ring a bell with

15  what you were testifying about?

16  A    It rings a bell, but it's totally opposite.  It was a big

17  deal.  It was a big deal.  I was very upset, professionally.  I

18  was upset.

19  Q    Okay.

20  A    I was upset because it was total contrary to what we had

21  been dong.  Our goal was to take care of the veteran, to see

22  that the veteran got the care that the veteran needed.  If

23  there's a problem in the process, our process states that the

24  teams work on it first.  If the teams can't work on it, bring

25  it to management, bring it to leadership and let us try.  That

1   did not happen.  What happened was, clinically, a complaint was

2   put in through the IG.  That complaint could not come

3   administratively.  I can recognize that.  I recognize how

4   individuals complain about processes within a system based on

5   terminology and direction that they go in which they're

6   speaking.  I can tell very simply, and Ms. Potter agreed with

7   me at the time, that this came from someone that was not

8   administrative.  And it should not have happened.

9       Dr. Venditti needed to be made aware of it also.  I made

10  her aware of it.  Now, whether this was in person or over the

11  phone, I can't be definite about that, but I can definitely be

12  sure that I made her aware.

13  Q    Okay.  And you asked Ms. Potter during this meeting, were

14  you the source of the complaint?

15  A    Yes, I did.

16  Q    Okay.  Because you suspected that she was?

17  A    I did not.  I did not suspect that she was, but what I did

18  have to do is before I go blaming her nurses, to take it

19  directly to her.  I never felt that she would not have followed

20  the procedure that we had been -- had in place for so long that

21  was successful.

22  Q    If you didn't suspect it was her, why did you ask if it

23  was her?

24  A    Because we're on a team.  She is my working partner.  The

25  same team that our staff would be on, the administrative side

1   and the nurse, they should be able to talk to each other

2   freely.  That is one of many problems that I've taken to

3   Tiffany.  Something's going on with the teams, we need to

4   address it, we need to fix it.  Whether it's problems with

5   follow-up with care in the community or giving an authorization

6   to get a patient out, something's going on, we need to look at

7   it.

8   Q    Okay.  So you're saying --

9   A    Tiffany --

10  Q    -- that when you -- you're saying that when you asked her

11  if she was the source of the complaint, you didn't suspect her

12  as the source of the complaint.  She said she wasn't the source

13  of the complaint, correct?

14  A    That's correct.

15  Q    Did you doubt her denying --

16  A    That's correct.

17  Q    Did you doubt her denying it?

18  A    I did not.  I did not.

19  Q    Okay.

20          JUDGE BROOKS:  Does either party have any question

21  within the narrow scope of what I've asked?

22          MR. PITRE:  Just two.

23                   REDIRECT EXAMINATION CONTINUED

24  BY MR. PITRE:

25  Q    You stated that you were very upset.  According to your

1  recollection, do you recall if Dr. Venditti was very upset as

2  well?

3          MR. MACMILLAN:  First of all, he doesn't even know if

4  she was there, and he doesn't even know if she was there, so I

5  don't know how he would know -- unless she said, I'm upset, I

6  don't know how she (sic) would know.

7          JUDGE BROOKS:  There can be follow-up.

8          MR. MACMILLAN:  Okay.

9  BY MR. PITRE:

10 A    It's kind of -- I could not honestly say if she was or was

11 not.  Maybe surprised as I was, but I don't know if I can say

12 she was upset.

13 Q    Okay.  And --

14         MR. PITRE:  Okay.  No further questions.

15         JUDGE BROOKS:  Anything from the agency?

16         MR. MACMILLAN:  I don't have any follow-up with that

17 answer.  Thank you.

18         JUDGE BROOKS:  Thank you.  Mr. Lowe --

19         MR. PITRE:  Thank you, Mr. Lowe.

20         JUDGE BROOKS:  -- thank you for coming in during

21 retirement.  Enjoy it.

22         MR. LOWE:  Do I get a --

23         JUDGE BROOKS:  Sure.

24         MR. LOWE:  Can I get back to --

25         JUDGE BROOKS:  Sure.  Let me do note here, though,

UNITED STATES OF AMERICA

MERIT SYSTEMS PROTECTION BOARD

DENVER FIELD OFFICE

| | |
|---|---|
| TIFFANY POTTER, | DOCKET NUMBER: |
| | DE-1221-18-0165-W-1 |
| Appellant, | |
| | |
| v. | October 23, 2018 |
| | 9:15 A.M. |
| DEPARTMENT OF VETERANS AFFAIRS, | |
| | |
| Agency. | |

TRANSCRIPT OF HEARING
BEFORE ADMINISTRATIVE JUDGE DAVID S. BROOKS

APPEARANCES:

For the Appellant:          By: Marques Pitre, Esq.
                                Michelle DeVeera, Esq.
                                Pitre & Associates, LLC
                                1300 Pennsylvania Ave. NW
                                Suite 700
                                Washington, DC 20004

For the Agency:             By: Scott MacMillan, Esq.
                                Department of Veterans Affairs
                                650 E. Indian School Road
                                Bldg. 24 (200)
                                Phoenix, AZ 85012

Court Reporter              Anna Lee Halsig
                                eScribers LLC
                                7227 N 16th Street, Suite 207
                                Phoenix, Arizona 85020

Proceedings recorded by electronic sound recording, transcript
produced by transcription service

I N D E X

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| WITNESSES FOR AGENCY: | | | | |
| Robbi Venditti | 24 | 64 | | |
| Glen W. Grippen | 116 | 129 | 140 | 145 |
| Dr. Darren Deering | 151 | 197/325 | 337 | |
| Rex Patterson | 246 | 263 | | |
| Carlos Duarte | 269 | 300 | 323 | |

| WITNESSES FOR APPELLANT: | | | | |
| Marian Tademy | 4 | | | |
| Melissa Pacheco | 105 | | | |

.

1                        October 23, 2018, 9:18 a.m.

2              JUDGE BROOKS:  Let's go on the record, Anna Lee.

3              MR. MACMILLAN:  I don't know how to do it, but I'm

4    going to try.

5              JUDGE BROOKS:  I have us on the record now.  This is

6    day 2 of hearing.  The time is 9:18 a.m.  The date is October

7    23rd, 2018.

8              Appearing now as a witness is Marian Tademy.

9              Ms. Tademy, I'm David Brooks.  I'm the administrative

10   Judge --

11             COURT REPORTER:  Sir, I'm sorry.

12             MR. MACMILLAN:  Can you hold on one second?  Okay.

13   Thank you.

14             JUDGE BROOKS:  Can you all hear me?

15             COURT REPORTER:  We couldn't hear you.

16             MR. MACMILLAN:  Now we can hear you.

17             JUDGE BROOKS:  Okay.  I just recited the time and

18   date and that the witness is Marian Tademy.

19             Ms. Tademy, I'm the administrative judge assigned to

20   decide this matter.  My name is David Brooks.

21             Do you have any objection to testifying under oath?

22             MS. TADEMY:  No.

23             JUDGE BROOKS:  During your testimony, if you have

24   questions or are confused, you can direct any questions you may

25   have to me.

1            Would you please raise your right hand for the oath?

2              MARIAN TADEMY, APPELLANT'S WITNESS, SWORN

3            MS. TADEMY:  Yes.

4            JUDGE BROOKS:  Thank you.  For the record, please

5   state and spell your name?

6            MS. TADEMY:  Marian Tademy, M-A-R-I-A-N T-A-D-E-M-Y.

7            JUDGE BROOKS:  Thank you.  The first party that'll

8   ask you question is the attorney for Ms. Potter, who's Mr.

9   Pitre.

10           Mr. Pitre, you can begin.

11           MR. PITRE:  Thank you.  Thank you, Your Honor.

12                         DIRECT EXAMINATION

13  BY MR. PITRE:

14  Q    Good morning, Ms. Tademy.

15  A    Good morning.

16  Q    For whom do you currently work?

17  A    The Phoenix VA Health Care System.

18  Q    And what is your job title?

19  A    EEO program manager.

20  Q    Okay.  And how long have you been in that position?

21  A    With the Phoenix VA?

22  Q    Yes, ma'am.

23  A    Officially on the record since October of 2014.  I came on

24  station January of 2015.

25  Q    And what are your duties in that position?

1    A    I'm the EEO manager.  I'm the ADR coordinator.  I'm the

2    diversity manager.  So I'm an advisor to the director,

3    employees, managers, and supervisors on EEO matters.

4    Q    Um-hum.  Are you -- in that job position, do you also --

5              MR. PITRE:  Well, strike that.

6              JUDGE BROOKS:  Strike that.

7    BY MR. PITRE:

8    Q    While in that position, have you ever taken a complaint

9    from a VA employee by the name of Ms. Tiffany Potter?

10   A    Oren (phonetic) processes EEO complaints.  So I don't take

11   complaints.

12   Q    Okay.  And have you -- did you ever process EEO -- thank

13   you.  Thank you for that.  Did you ever process a complaint for

14   a VA employee by the name of Tiffany Potter?

15   A    The answer's the same.  So Oren is responsible for

16   processing EEO complaints.

17   Q    I'm sorry.  Oren is --

18   A    Oh, Oren.

19   A    -- responsible for processing EEO complaints.

20   Q    Were you --

21   A    I advise.

22   Q    Okay.  Did you advise on a EEO complaint with a Ms.

23   Tiffany Potter?

24   A    Yes.

25   Q    Do you recall when that was?

```
 1   A    When that was?  I don't remember the date Tiffany came
 2   over.
 3   Q    Okay.  Was it approximately April of 2015?
 4             JUDGE BROOKS:  Ms. Tademy,  you're a little quiet
 5   on -- on some of the -- some of the ends of your words.  Okay.
 6             MS. TADEMY:  Can you hear me better now?
 7             JUDGE BROOKS:  Yes, and let me make sure I can also
 8   hear Mr. Pitre.  Can you say something?
 9             MR. PITRE:  Testing, testing.
10             JUDGE BROOKS:  Okay.
11             MR. PITRE:  Testing.
12             JUDGE BROOKS:  Okay.  Good.  Go ahead.
13   BY MR. PITRE:
14   Q    Could it -- approximately -- could it have been
15   approximately 2000 -- April of 2015?
16   A    Um-hum.
17   Q    Okay.  During that time period that you worked with Ms.
18   Potter or advised Ms. Potter on her EEO complaint, at some
19   point, did you also become aware that she had filed an OIG
20   complaint?
21   A    Yes, she did let me know there was a previous OIG
22   complaint.
23   Q    Okay.  And did you recall when she gave you that
24   information?
25   A    It could have been around the same time.  I know there was
```

1  a pre-ADR meeting in August --

2  Q    Okay.

3  A    -- with Ms. Potter.

4  Q    All right.  So there was a pre-ADR meeting in August of --

5  A    2015.

6  Q    Um-hum.  And at that meeting, Ms. Potter informed you that

7  she had filed an EEO complaint?  I'm sorry, an OIG complaint.

8  A    It was probably discussed at that meeting along with other

9  things, yes.

10 Q    Okay.  Do you recall Ms. Potter stating to you in that

11 meeting or in any other meetings that she felt like she's being

12 retaliated for the OIG complaint that she had filed?

13 A    I recall Ms. Potter telling me that the previous EEO

14 manager, prior to me --

15 Q    Um-hum.

16 A    -- and that she had spoken to her about it and about the

17 complaint and how she was feeling then.

18 Q    Um-hum.  And so did she express to you that she felt like

19 there was retaliation ongoing regarding that OIG complaint?

20 A    She thought that they may -- that may have something to do

21 with what she felt was her current situation.

22 Q    Okay.  Perfect.  As your role of ADR manager, did you

23 reach out to the responsible management officials or anyone in

24 Ms. Potter's management to discuss the issues that she brought

25 to you in her complaint?

1    A    What we do when we're preparing for the ADR, she had

2    requested mediation for her email complaint.

3    Q    Um-hum.

4    A    Originally, she had not, but she changed her mind and

5    wanted to do mediation.  So when that happens, I do reach out

6    to our director who's the EEO for the facilities and the

7    medical center director and they assign a settlement authority

8    for each case.

9         So the claimants in the case are reviewed with that

10   management official because they are the ones who are the

11   deciding official, should a settlement happen.

12   Q    Um-hum.

13   A    Okay.  So we reviewed the claims and basis for the

14   complaint.

15   Q    At some point in time, did you have a discussion with any

16   of her management -- any of her management regarding the claims

17   that she had in the complaint?

18   A    Yes, they're reviewed with the director, and they're

19   reviewed with the settlement authority, and the claims are also

20   reviewed with the RMO, the responsible management official,

21   because they have a right to know of the claim.

22   Q    Understood.  So was Mr. Grippen one of the individuals

23   that you spoke to regarding Ms. Potter's complaint?

24   A    Yes, those notifications of the complaint go to the

25   director with a copy to the EEO manager.

1   Q     Was Mr. Grippen one of the --

2   A     Yes, he was the director at the time.

3   Q     Okay.  Thank you.

4   A     There were several directors.

5   Q     Mr. Grippen was a director.  So you spoke to Mr. Grippen

6   regarding Ms. Potter's complaint?

7   A     The claims, yes.

8   Q     The claims in her complaint.

9   A     Yes.

10  Q     Okay.  Was one of the discussions -- one of the matters

11  that you discussed with Mr. Grippen Ms. Potter's removal from

12  being chief nurse manager in March of 2015 -- from her -- on

13  the organizational chart in which she deemed was in motion?

14  A     That was one of the claims in the complaint.

15  Q     Um-hum.  And so that was one of the issues that you spoke

16  to Mr. Grippen about?

17  A     Right, that was one of the complaints.  So we just

18  reviewed the claims.  This is claim one, claim two, claim three

19  from AES, that was one of the claims.

20  Q     Yes, I understand.  I just -- just for the record, and the

21  judge is --

22  A     Okay.

23  Q     -- you know, we need to -- I need to be able to flesh this

24  out --

25  A     Okay.

1  Q    -- just a little bit.  Is that -- is that okay?

2  A    Yes.  Yes.

3  Q    Okay.  Perfect.  So in your discussions with Mr. Grippen,

4  first of all, do you recall when -- when or about these

5  discussions occurred?

6  A    Prior to the mediation, late July.  And I also spoke to

7  him via phone on August 14th, 2015.

8  Q    And was that the last time you spoke to him was August 14,

9  2015?

10  A    Via phone, yes.

11  Q    And in person?

12  A    No, via phone.

13  Q    And what about via person?

14  A    No, I don't have a date for in person.

15  Q    Okay.  During your discussions with Mr. Grippen, did he

16  ever inform you that he was going to remove the chief nurse IV

17  position from the organizational chart so that Ms. Potter would

18  not be able to obtain it?

19  A    No.

20  Q    No?  Did he ever explain to you that he was going to

21  reorder the department?

22  A    No.  He didn't explain that they were going to reorder.

23  They were thinking about a lot of things on what to do with the

24  department.  They don't consult me on their reorganizations or

25  anything.

1  Q    Um-hum.

2  A    But they were trying to figure out what they were doing to

3  do with administrative medicine services.  I believe that's

4  what it was called at the time.

5  Q    Okay.  So it was Ms. Potter's testimony that she spoke to

6  you, and you stated on several occasions that Mr. Grippen told

7  you that they were going to remove the chief nurse IV position

8  and then, thus, she stated she would not be able to obtain it.

9  Do you recall any of those conversations?

10  A    Absolutely not.  He did not tell me that they were going

11  to remove the -- the nurse -- the chief nurse IV.

12  Q    Do you recall that conversation with Ms. Potter?  Do you

13  recall having that --

14  A    No, I didn't tell her that.

15  Q    Okay.

16  A    There was no conversation that I told her that he told me

17  that they were removing that chief nurse IV position so that

18  she couldn't apply for it.

19  Q    Okay.  Do you know why Ms. Potter would have testified to

20  that fact?

21  A    I think that may be her perception.

22  Q    And why would that be her perception?

23  A    There are several reasons with Ms. Potter, both scheduling

24  and nonscheduled appointments, where she came in discussing her

25  -- you know, what her frustration level was with not just this

1   particular case, but other cases, you know, in which she was

2   involved and things that she had to do.  It was her perception

3   that she wasn't being compensated for the duties she was

4   performing.  And that was her main concern.

5   Q    What -- when the -- were you aware that the chief nurse IV

6   position was ultimately removed from the purchase care service

7   line?

8   A    No, I'm not -- partly I don't know what it is in that

9   service line.

10  Q    Okay.

11  A    I don't.

12  Q    Okay.  So --

13          MR. MACMILLAN:  And it assumes facts not in evidence

14  as well, move to -- the chief nurse IV position, I don't know

15  which one you're talking about, but there is -- there was a

16  draft org chart that you, I guess, put into evidence yesterday,

17  but Ms. Potter said she didn't recall whether any of them were

18  finalized.

19          MR. PITRE:  Is that an objection?

20          MR. MACMILLAN:  Yes.  My objection is that you're

21  stating facts not in evidence and misleading the witness.

22          MR. PITRE:  I would ask that any objections be made

23  prior to my questioning, prior to my --

24          MR. MACMILLAN:  I don't know what you're asking until

25  you phrase the question.

1    Q    Okay.

2    A    I think in between there.

3    Q    When did you -- I know the name of the area the

4    organization has sort of change during your time.  But when did

5    you become involved first with purchase care or, you know,

6    third party care in the community?

7    A    So back when I was the associate deputy chief of staff of

8    purchase -- primary care, I used to cover for Dr. Pat

9    (phonetic).  Dr. Pat was the associate chief of staff in

10   primary care.  And one of his jobs was to review the -- the fee

11   for service consults.  And he would approve them or disapprove

12   them.  And so when I was acting for him, I would do that job.

13   Q    And what year -- what year was that --

14   A    It was --

15   Q    -- approximately?

16   A    -- before '10, probably.

17   Q    Okay.  And at some point, did you become the chief --

18   physician chief of purchase care?

19   A    Right.  So I was in informatics and the OLFIE (phonetic)

20   department had had an issue back in -- I'm looking to Tiffany

21   for this, in 2011, I think, it was 2011.  And they had de-

22   obligated a bunch of consults to try and balance budget.  And

23   the current chief of staff, which was Ray -- Ray Raymond

24   (phonetic) -- I don't remember his last name -- asked me to

25   step in to look at all these consults and try to find them.

1   So I had to dig through consults with other departments and try

2   to find the patients that didn't get the care and try to get

3   them the care.  Does that answer your question?

4   Q    Yes.  And that was in 2011?

5   A    Yeah, it was about 2011.

6   Q    And then -- I'm sorry, so at that point, you did become

7   the --

8   A    No, then I went back to informatics, and then they stood

9   up the new department, which was nonVA care coordination, about

10  end of '11, I'm thinking.  And that's when I became the chief

11  of nonVA care coordination.

12  Q    And that is sort of a precursor to, I guess, purchasing?

13  A    Right.  Then we went into purchase care, then we went into

14  nonVA care coordination.

15  Q    Okay.  So how would characterize the changes that occurred

16  in purchase care in that, you know, third-party care community

17  between, I guess, prior to the weightless -- the weightless

18  scandal, do you recall that?

19  A    Yes.

20  Q    Okay.  So what was the relationship between that care of

21  the community and that -- that -- those issues that arose in

22  2014?

23  A    I'm sorry, I --

24  Q    I guess what I'm asking is, would you -- would you agree

25  or -- that -- well, this is going to sound leading.  But was

1   it -- was there a change in the number of consults and volume

2   of cases that purchase care handled in the wake of the -- wake

3   of the scandal in 2014?

4   A    There was an increase in the number of consults, and I

5   would also say that our patient load in the medical center

6   increased.  So it would --

7   Q    And were --

8   A    -- go with that.

9   Q    Were there attempts at frequent -- how would you charac --

10  were there reorganizations occurring during this time of the

11  union?

12  A    There were lots of reorganizations occurring.

13         JUDGE BROOKS:  Could you move the microphone between

14  the binders so I can hear her a little better?  You might --

15  you might need to consult with the --

16         DR. VENDITTI:  Is that better?

17         JUDGE BROOKS:  Thank you.  There might be a better

18  place that Mr. MacMillan knows.  That's what I had in mind.

19  Thank you.  Go ahead.

20         MR. MACMILLAN:  Okay.

21         THE WITNESS:  So there was a lot of change.  I mean,

22  we started with seven people and by the time I left, we were up

23  to 130 some people.  So just from like '11 to -- when did I

24  leave, '16.  I think I left in '16.  We went from 7 to 130-some

25  people.  So that in itself tells you there was a change.

```
 1   BY MR. MACMILLAN:

 2   Q    Okay.  And when -- when did you -- when did Ms. Potter

 3   join that area of the organization, if you recall?

 4   A    She joined in either the end of '11 or beginning of '12.

 5   Q    Okay.  And what -- did she -- did she come in -- what job

 6   did she have?

 7   A    She was the nurse -- the nurse manager.

 8   Q    Okay.  I want to show you some more charts, and I'll ask

 9   you about them.  So if you could turn in the binders in front

10   of you to and I'll view it.  It's going to be under Tab 16 in

11   that first part of the book.  So Tab 16, page 89, 4CC.  So it's

12   going to be 4CC; it's going to be back here.  Sorry, it's a

13   little further.

14           MR. PITRE:  Page 89?

15           MR. MACMILLAN:  Yes.

16   BY MR. MACMILLAN:

17   Q    This is a 7/14/14 work chart.

18   A    Okay.  So these pages are not -- they don't have 89 on

19   them.  They have 92 and 173.

20   Q    Yeah, sorry, it's page 92, not 89.  I guess I designated

21   it wrong.  Okay.  So starting in 2014, is this -- it looks like

22   this is an org chart that -- is this an org chart that you

23   signed or did you --

24   A    Yes, I signed it.

25   Q    Okay.  And does this represent the structure of
```

1  administrative medicine service and purchase care at this time?

2  A    Yes.

3  Q    Okay.  And where would you be on this org chart?

4  A    I would have been the A cost administrative medicine.

5  Q    Okay.  And you're pointing at the top box?

6  A    Yes, sir.

7  Q    Okay.  At one point did you become a cost or what date

8  approximately did you become the A cost of administrative

9  medicine?

10 A    I really don't remember.  I was detailed to it or active,

11 I think, for like a year or maybe a little over a year before I

12 was finally assigned it.

13 Q    Okay.

14 A    So --

15 Q    Do you think --

16 A    -- well, I was acting -- well, my signature box is acting

17 A cost.

18 Q    Okay.

19 A    So I had to have been acting at that time.

20 Q    Sure.  Were you also -- there's a -- a box in the -- the

21 purchase care box, it says on the far right side -- it says,

22 "Chief Physician".  Were you also acting in that capacity?

23 A    No, that was my official tile, and then I was acting in

24 the A cost.

25 Q    Okay.

1  A     So I functioned in both roles.

2  Q     And where was Ms. Potter in this org chart?

3  A     She was the nurse manager.

4  Q     Okay.  And that's, like, the third box beneath the chief

5  physician?

6  A     Yes, sir.

7  Q     Okay.  And then at some -- I want to show you another

8  return, and then we'll start with some other things that are

9  the issues.  If you could turn to -- hopefully this -- this

10  one's right -- Tab -- it's going to be in that same binder and

11  it's going to be page 77, I believe, which is 4Y.

12  A     What?

13  Q     4Y.  So I think it's going to be -- I had to do that one

14  for opposing counsel.

15  A     Okay.

16  Q     This on the chart is, I believe it's dated -- the last

17  date it looks like it was signed by the director on 12/8/14.

18  You see that?

19  A     Yes, sir.

20  Q     Okay.  And did you sign this one as well?

21  A     Yes, sir.

22  Q     Okay.  I think it still says you're the acting --

23  A     Yes, sir.

24  Q     -- A cost -- okay.  Now, this is -- this work chart

25  reflects does it reflect an org reorganization from what we

1    just looked at?  Well, is a --

2    A    Yes, and there's -- there's about eight more positions on

3    it.

4    Q    Okay.  And is one of the positions -- there's another

5    nurse manager position.  Is that the term -- well, first of

6    all, Ms. Potter -- is Ms. Potter now identified as a chief

7    nurse manager?

8    A    Yes.

9    Q    Okay.  And is there a position that reports to Ms. Potter

10   that has to report her on the part of the work chart?

11   A    Well, Tiffany was always over all the nurses.  So now,

12   let's look at this one.  It looks like there was two

13   administrative assistants and another nurse manager.

14   Q    Okay.  So I think this is what I'm getting at; the

15   organizational structure is different.

16   A    Yes.  Yes, sir.

17   Q    Okay.  Can you talk to me about leading up to -- so

18   Tiffany Potter, on this org chart, she has a different title

19   than she had on the last one?

20   A    Uh-huh.

21   Q    Is that correct?

22   A    Yes, sir.

23   Q    Okay.

24         MR. PITRE:  I apologize.  Objection to the -- not

25   objection, just -- just remind the counsel -- I'm just trying

1  to remind counsel please not -- to not lead the witness so that

2  we can say one objections.

3          MR. MACMILLAN:  Okay.  I'm trying.  I just trying to

4  move it along.

5          MR. PITRE:  Oh, I understand.

6  BY MR. MACMILLAN:

7  Q    So this -- is -- does Tiffany Potter -- at some point, did

8  you become aware that Tiffany Potter was given a title chief

9  nurse manager?

10 A    Yes.

11 Q    Okay.  Can you discuss what led to that crea -- providing

12 Ms. Potter that title or, you know, I guess what -- what

13 started -- what precipitated it and then what -- let's start

14 with that, I guess.

15 A    So we started the department, I guess, it was seven

16 people, and Tiffany was the nurse manager.  And in 2012, right

17 -- right after --

18          JUDGE BROOKS:  I'm here.

19          DR. VENDITTI:  Okay.

20          MR. MACMILLAN:  We're just getting some feedback.

21          JUDGE BROOKS:  Okay.

22 BY MR. MACMILLAN:

23 A    So 2012, probably mid-2012, we did a -- we submitted a

24 special advancement for performance, which is called a S -- SAP

25 in the nursing acronym.  And that's because Tiffany had done a

1   lot of things in the department and that -- and I think it got

2   her a step or two steps.

3       And then we started in 2013 trying to get a nurse IV

4   position asking -- I mean, I was asking the nurse executive.  I

5   was asking the medical center directors, and everybody came

6   back and said the department wasn't complex enough to have a

7   nurse IV, that we were dotted line to nursing and there was a

8   nurse IV or Marva Green (phonetic), who was the second highest

9   nurse in the Phoenix VA, to be our go-to person for nursing.

10  So every time I tried to get the nurse IV position, I was told

11  no, the department wasn't complex enough.  So when we had grown

12  and Tiffany was doing a really good job being a nurse manager,

13  and we were trying to acknowledge her for her achievement and

14  to show that she had seniority in the department with the other

15  nurses.  So I went to Tiffany and asked her about being a chief

16  nurse, and she said she was okay with the title.  So I -- I ran

17  it up through Darren, and then it got to Mr. Grippen, who was

18  the director at that time.  And we did the org chart with

19  Tiffany as the chief nurse.  And I signed it, HR signed, Dr.

20  Darren signed it, and Mr. Grippen signed it.

21  Q    Okay.  Did Dr. Deering or -- well, I can divide it up.

22  Did Dr. Deering -- was he responsive to the reasons for giving

23  -- well, obviously, he signed on the org chart, but do you

24  recall any feedback from him about giving Tiffany Potter the

25  title and, I guess, adding some more FTEs?

```
 1  A     No, the -- the department had been complex, and Tiffany
 2  had expressed that she had -- was working and was -- her family
 3  was suffering and her health was suffering, and so we were
 4  trying to give -- spread the workload, which is why we had --
 5  Nadine (phonetic) somewhere became an acting nurse manager
 6  somewhere in this process.
 7  Q     Okay.  All right.  And then I want to talk about -- well,
 8  just let me -- let's try to hammer down some dates so I don't
 9  have to ask you questions about areas if you weren't around or
10  you weren't involved in things.
11        And I know -- my understanding is that you did go on a
12  detail at some point in 20 -- I believe it was 2015.
13  A     Yes.  September, towards the end of September to the end
14  of November, I was the acting chief of staff at the Michigan
15  Saginaw VA.
16  Q     Okay.  And then did you -- then you came back to the
17  facility -- when did you come back, I guess?
18  A     I did a little vacation, and then I -- I came back.  So
19  somewhere after Thanksgiving, I came back.
20  Q     Okay.  And at some point, you took a position in El Paso;
21  is that correct?
22  A     Right.  I started interviewing and I transferred, I
23  believe, in March of '16.  I was the -- the -- became the chief
24  of staff at the El Paso VA.
25  Q     Okay.  And were you the chief of staff of the El Paso VA
```

1   when you retired?

2   A    Yes, sir.

3   Q    Okay.  And when approximately -- or when did you retire?

4   A    September '17, right at the beginning of September '17.

5   Q    Okay.  I want to talk to you about -- is it your

6   understanding -- well, let me -- was there a reorganization

7   that happened subsequent to this org chart that you just looked

8   at the organizational structure it reflects?

9   A    Yes.  There -- there was another reorg after this one.

10  Q    Okay.  So I want to show you another org chart here.  So

11  this is going to Tab 16, page 66 and that's 4V, as in Victor,

12  so that's 4V.

13  A    Yup.

14  Q    How did this -- whose idea was this reorganization or how

15  did it come about?

16  A    So if you -- the big difference on this org chart to the

17  other org chart, besides the fact we went from 66 people to

18  136, you now see the administrative portion of the nonVA care

19  on this org chart.

20      So prior, we had all the clinical stuff under the chief of

21  staff, and the administrative staff was under the health

22  administration service.  And this org chart was to bring,

23  essentially, the clinical and the administrative together as

24  one functioning team, and it all moved under the chief of

25  staff.

1  Q    Okay.  And it looks like there's Ms. Potter -- there's two

2  nurse managers reflected here just like the last org chart,

3  correct?

4  A    Um-hum.

5  Q    Was there a change in Ms. Potter's duties as -- as

6  reflected in this org chart?

7  A    So with the last org chart, she was -- well, I have to

8  back -- go back to the last org chart.

9  Q    Here I'll just --

10         MR. MACMILLAN:  Can I show her mine or do you want

11 to --

12         JUDGE BROOKS:  Hmm?

13         MR. MACMILLAN:  Can I show her mine just for ease?

14         DR. VENDITTI:  Or do you want me to go back in here?

15         MR. MACMILLAN:  All I want is the date --

16         DR. VENDITTI:  I just them mixed up.  Page 77Y.

17         THE WITNESS:  So we go -- we're going back to the one

18 in 2014?

19 BY MR. MACMILLAN:

20 Q    Right.

21 A    So the chief nurse, the one marked 12/8/14 was -- had two

22 administrative assistants directly reporting to her and another

23 nurse manager directly reporting to her and then everybody else

24 under -- under that.

25      On this one, we have the non-daycare divided into the

1   admin side, and then clinical side has a utilization review

2   component and a nonVA care consult, veteran's choice section.

3   Tiffany was over one of those.  I don't remember which one.

4   Q    So does that refresh your recollection -- so do you recall

5   if she was involved in a utilization review or a nonVA purchase

6   care?

7            MR. PITRE:  That would be objection to leading,

8   counsel.

9            MR. MACMILLAN:  Okay.

10           JUDGE BROOKS:  That's not leading.  It's just -- it's

11  one of the two, I assume.

12           MR. MACMILLAN:  Right.

13           THE WITNESS:  So way back, I had asked her and

14  Melissa to determine which one they wanted to be, and I was

15  thinking Tiffany would pick utilization review because that was

16  her roots, but I think she picked nonVA care.

17  BY MR. MACMILLAN:

18  Q    Okay.  And I -- well, I can show you an email, I guess.

19  Here, can I show you -- here, let me show you something.  If

20  you can turn to -- this is Tab 44, it's going to be in binder 3

21  here, a different binder.  This is page 51.

22           MR. PITRE:  Tab?

23           DR. VENDITTI:  Tab 44.

24  BY MR. MACMILLAN:

25  Q    This is a -- this is a -- Ms. Potter hand-annotated

1  regarding the version of the one you're looking at.

2  A    Okay.

3  Q    And she's -- there's labels of who's working where.  So --

4  so does that refresh your recollection as to where Ms. Potter

5  worked?

6  A    Yes, on this work chart, I'm showing Tiffany's name next

7  to utilization review and Melissa next to nonVA care

8  coordination.

9  Q    Okay.  In any event, do you recall why -- why did -- what

10 was the purpose of this reorganization?

11 A    So there's a couple -- a couple things to point out.  One,

12 if you notice on the bottom, there's more signatures than on

13 the other org charts.  So we have myself.  We have HR.  We have

14 the chief of staff.  We have the acting associate director of

15 patient care services, which would be nursing.  We have the

16 acting associate director and we still have Mr. Grippen as the

17 interim medical director.

18     So on this chart, we have nursing, which we didn't have on

19 the other two charts you showed me.  So when we brought all

20 these people together, and this is in March -- March 19 of

21 2015, we were still trying to get a chief nurse position, and

22 there is a position on this org chart that names a chief nurse.

23 Q    Okay.  I'm sorry.  What?  And where is that located?

24 A    That's up in what we call the leadership block.  So it was

25 right next to the position I held.  Prior to this org chart

```
 1  being sent out, Mr. Grippen, being signed -- Mr. Grippen had
 2  sent it out to all of these -- of the Phoenix VA, and he asked
 3  for comments.  And I believe he said he got 40 comments back.
 4  And the union said this org chart is okay.
 5       So then there was still concerns with --
 6  Q    I'm sorry.  Did Mr. Grippen send it out or --
 7  A    No, Mr. Grippen -- Mr. Grippen would send it out --
 8  Q    Okay.
 9  A    -- to the whole --
10  Q    Okay.  Mr. -- yeah.
11  A    Yeah.  So he was trying to vet it and get feedback.  I
12  think he said there were 40 comments.  I'm not privy to those
13  comments.  And then there was still questions with -- with
14  Tiffany and the nurses, maybe -- probably more with Tiffany,
15  that they really still didn't like -- didn't like the org
16  chart.  So I called for one more meeting.  And we went -- we
17  had --
18  Q    Okay.  Can I just stop you for a second?
19  A    Yeah.
20  Q    So Ms. Potter didn't like the org chart that was prepared?
21  A    Right.
22  Q    Okay.  And she -- she just took one or did you tell
23  that?  Do you recall?
24  A    No, I think we probably had lots of conversations about
25  that.
```

1  Q    Sure.

2  A    And since there was still concerns about it, I asked for

3  another meeting.  So we raised a meeting with the director, and

4  Marva Green was there, and I don't remember if it was Vella

5  (phonetic) or Deering.  I think it was Deering, Dr. Hadad

6  (phonetic), who, at that time, was the chief physician of

7  compensation and pension was there.  Tiffany was sitting to my

8  right.  Melissa was somewhere at the table, and we brought up

9  this org chart and the fact that there was two nurse managers.

10 And they didn't want two nurse managers.  And I finally --

11 Q    I'm sorry.  Who is they?

12 A    Tiffany and Melissa didn't want two nurse managers.  So I

13 remember Tiffany was to my right.  I remember looking at

14 Tiffany, and I said -- finally, they agreed to the org chart.

15 And I looked at Tiffany, and I said, Tiffany, if you have this

16 org chart, you know you're not in leadership block.  And she

17 said, I know, but I want two nurse managers.

18 Q    You said two nurse managers.  She want -- did she want

19 another nurse manager reporting to her or -- because there is

20 two nurse managers --

21 A    Right.

22 Q    -- agree in the service, right?  So what -- what was

23 she --

24 A    Just -- she didn't -- she wanted two nurse managers.  We

25 were a huge department, and so essentially, that took her out

 1  of the chief nurse position and put her into one of these nurse

 2  positions.  So after the meeting, her and Melissa came to my

 3  office, and they wanted to submit another new chart -- another

 4  org chart.  And I said no, we need to give this one a try.

 5  There's been so much; we have to give it a try.  And -- and I

 6  reiterated what happened at the meeting, and Tiffany's comment

 7  to me was, well, I didn't know how this was going to turn out,

 8  and somebody has to protect the nurses.

 9      So we ended up with this org chart.  Now, the other issue

10  with this org chart is, as you know, there's no chief nurse

11  anymore.  Prior to this org chart, which is the one dated

12  3/19/15, going back to the org chart, which has the chief

13  nurse --

14  Q   Chief nurse manager.

15  A   -- chief nurse manager, which is 12/8/14, it is signed by

16  nursing.  It was either early one morning or late one night,

17  because I worked from dark to dark, Marva Green and Dara

18  Deering popped into my office.  And they wanted to be refreshed

19  how this chief nurse position got in.  And I restated that it

20  was trying to get Tiffany recognition for being the senior

21  nurse manager and for doing the stuff she had done, because we

22  had been blocked at every avenue on getting a chief nurse

23  position.  And then Marva said, well, let me see the org chart.

24  So I showed her the org chart, and she said nursing didn't sign

25  off on that; we don't agree with it.  And that was the same

1   time that they had taken the nurse IVs and had changed their

2   title to chief.  And so Marva said it would be confusing to

3   have a nurse III as a chief and have nurse IV as a chief, that

4   I had to do away with the title.

5   Q    Okay.

6   A    And then --

7   Q    So was that conversation -- I'm sorry -- was that

8   conversation, the last thing you just referenced with, I guess,

9   Dr. Deering and Marva Green, did that happen after the org

10  chart was already -- it was after it was already signed,

11  correct?

12          MR. PITRE:  Objection to leading.

13  BY MR. MACMILLAN:

14  A    So that would have been --

15          JUDGE BROOKS:  Wait --

16          MR. MACMILLAN:  I can ask it again.  That's fine.

17          MR. PITRE:  I would just -- I'm still objecting to

18  him leading the witness.  This is his witness.  If -- if he

19  wants her to testify to specific facts, yes, the open -- he has

20  to ask her what she knows about these facts and not --

21          MR. MACMILLAN:  We know what a leading question is.

22  Thank you.

23          MR. PITRE:  So I --

24          MR. MACMILLAN:  I'll -- I'll ask it again.  I'll ask

25  it again.

 1          MR. PITRE:  I'll also ask that the counsel exhibit

 2   some restraint when we're speaking to the judge regarding

 3   objections and back and forth, to not speak over each other.

 4          JUDGE BROOKS:  Yes, and please speak through me.  It

 5   eliminates a lot of the back and forth and argument.

 6          Just try to rephrase.

 7          MR. MACMILLAN:  Okay.  I -- I said I was going to

 8   rephrase it.

 9   BY MR. MACMILLAN:

10   Q    So when did the conversation occur between you and Mr.

11   Deering?  Was it before the org chart was signed or after the

12   org chart was signed or -- or none of the above?

13          JUDGE BROOKS:  Hold on.  Let's -- let's get in the

14   habit of referring to the as the December 14 work chart and the

15   March 15 work chart, because we're toggling back and forth and

16   I'm not sure which one you're asking about when you say this.

17   Okay.

18   BY MR. MACMILLAN:

19   Q    I'm not -- okay, I apologize.  When did the conversation

20   with Mr. Deering and with Marva Green occur?

21   A    So, I don't know the exact date, but it would have

22   happened in between the 12/8/14 work chart and the 3/19/15 work

23   chart.

24   Q    Okay, so it was -- so was it done before the work -- was

25   it done before the work chart was finalized?  The 3/19 work

1  chart was finalized?

2  A    Again, I don't remember the dates.  But I would think it

3  would have had to have been, because nursing had already told

4  me that they hadn't approved the other work chart.

5  Q    Okay.

6  A    And they were approving this work chart.

7  Q    Thank you.  Was -- so who was the -- who was the -- was

8  there an initial person, or a person who decided to start the

9  process of the reorganize -- the reorganization?  Or how did

10  that issue come up?  Actually doing the reorganization that

11  occurred in March?

12  A    You know, I wasn't part of the leadership of the Phoenix

13  VA and those -- I would assume that decision was from up down.

14  Q    Were you consulted during this process?

15  A    Yes.

16  Q    Okay, and with respect to the two -- one nurse manager

17  having utilization review and one nurse manager having nonVA

18  purchase care, was that decision -- was that -- why was -- do

19  you recall why that particular split occurred?

20  A    Workload.  And it was a nurse manager over purchasing and

21  a nurse manager over nonVA care consults, veteran's choice.

22  Strictly the complexity in the workload.

23  Q    Okay.  Do you recall if Glen Grippen had ever mentioned

24  creating an organizational model like he had done at the

25  previous facility he worked, where I think it was one physician

1  -- chief physician and one chief nurse over the entire service

2  line?  Administrative medicine service.

3  A    I don't recall that.

4  Q    Do you recall if there was any issue as to who that chief

5  nurse position in the leadership box -- I believe you called it

6  -- do you recall if there were any conversations about who that

7  chief nurse position would report to in management?

8  A    So this department was under the chief of staff.

9  Q    Okay.

10  A    On the 3/19/15 work chart, the administrative medicine

11  service line was under the chief of staff.  And they were

12  always dotted line to nursing.

13  Q    In the time period after this work chart was approved, did

14  Ms. Potter ever indicate that her and Ms. Pacheco would

15  continue working in the same fashion that they had previously

16  in order to keep things functioning properly?

17  A    So in one of the -- in that one meeting we had afterwards,

18  where they said they didn't want to divide up the work, that

19  they wanted to keep doing things the same, they did bring it

20  up.  And I believe my response was that was fine, because we

21  have to cover each other.  We all need to know what everybody

22  else is doing, and still have to cover each other.

23  Q    And do you recall when that conversation would have

24  happened?

25  A    It would have happened right around this assign.  Because

```
 1   Q    Okay.  It didn't -- I believe there were two -- Tiffany

 2   Potter, her job titled changed as a result of -- did her job

 3   title change as a result of the March 19th reorganization?

 4            MR. PITRE:  Objection.  Asked and answered.

 5            MR. MACMILLAN:  I'm trying to lay the foundation for

 6   this --

 7            MR. PITRE:  I know, you've laid a foundation.

 8            JUDGE BROOKS:  I don't remember what the answer would

 9   be to it, so I'm allowing it.

10   BY MR. MACMILLAN:

11   Q    I'm sorry, so in March of '19, did Tiffany Potter's job

12   title change from chief nurse manager to nurse manager on the

13   org chart?

14   A    That's the date that the org chart changed.

15   Q    Right.  And her job title, did it change from chief nurse

16   manager on that -- on the -- from the previous org chart to

17   nurse manager on the March 19th org chart?

18   A    Yes, sir.

19   Q    Okay, and did that -- did that change -- was it caused by

20   this issue of --

21            MR. PITRE:  Objection, asked and answered.

22            MR. MACMILLAN:  How is it asked and answered?

23            JUDGE BROOKS:  I don't have a --

24            MR. PITRE:  It was --

25            JUDGE BROOKS:  I don't have a complete question yet
```

1  to know.

2          MR. PITRE:  Okay.  Okay, go ahead.

3  BY MR. MACMILLAN:

4  Q    Did the decision -- was the -- there was a change we just

5  talked about, right?

6  A    Correct.

7  Q    Was that change -- was it precipitated in any way by this

8  disclosure regarding provider information?

9          MR. PITRE:  Objection, asked and answered.

10          JUDGE BROOKS:  Overruled.

11          THE WITNESS:  So the short answer is no.  The long

12  answer is the only reason Tiffany's title was changed is

13  because nursing said they didn't authorize the first change to

14  chief, and they couldn't have a nurse 3 as a chief, and nurse 4

15  as being a chief.  It was going to be confusing for the

16  organization.

17  BY MR. MACMILLAN:

18  Q    Okay.

19  A    That's the only reason I know that the title was changed.

20  Q    And job -- now going back to job duties, did Ms. Potter's

21  job duties change between March -- December 2014 and March of

22  2015 because of any disclosures to you and others about

23  providers?

24  A    No.

25  Q    And same -- I'm going to ask the same question how about

1  psychotherapy patients?

2  A    No.

3  Q    So let me just ask the question.  So did Ms. Potter's

4  disclosures regarding psychotherapy patients play any role in

5  the employment decisions that occurred in March of 2015?

6  A    No.

7  Q    And did her disclosures -- or providing information

8  regarding urology patients -- well, let me ask you this.  When

9  did -- were you aware that Ms. Potter was responding to OIG

10  requests to provide information regarding urology patients?

11  A    I don't remember if I knew it or not, but I'll add saying

12  that a lot of people, even myself was responding to the OIG and

13  supplying information when they asked for it.  It was -- it was

14  very common occurrence at the Phoenix VA to talk to the OIG.

15  Q    Did any - so -- okay.  Did -- did Ms. Potter provide any

16  information to the OIG on any issue -- did that have any

17  influence on the reorganization that occurred and the

18  employment decisions that occurred in March of 2015?

19  A    Not that I'm aware of.

20          MR. MACMILLAN:  I don't have any further questions.

21          Thank you. Mr. Pitre?

22          MR. PITRE:  Yes.

23                    CROSS-EXAMINATION

24  BY MR. PITRE:

25  Q    Okay.  Good afternoon, Dr. Venditti.  How long did you

1  the complexity of the service line expanded at that point in

2  time; is that correct?

3  A    Yes.

4  Q    And then you testified that you don't recall working on a

5  function statement; is that correct?

6  A    Right.  I don't recall.

7  Q    But a function statement was created for the chief nurse 4

8  position?

9  A    I don't know if I ever saw a functional statement.  So

10 again we are going back to the cart or the horse.  Did you get

11 the position and then you got -- you got the position on the

12 org chart and then you got the position -- then you got the

13 functional statement?  Or did you get the functional statement

14 and then you got the position on the org chart?

15 Q    That's my question to you.

16 A    Yeah, I don't know.

17 Q    Okay.

18 A    I really don't know.  When I think about that time, I was

19 leaving for Saginaw.

20 Q    Okay.  Now prior to the position being posted, did you

21 have conversations with Ms. Potter regarding that position

22 being created for her to fill?

23 A    I don't recall that.

24 Q    Do you recall discussing with Ms. Potter that once the

25 position was posted, that she -- there would be interviews

1  prior to the selection?

2  A    No, I don't recall that.

3  Q    Is it possible that these conversations occurred?

4  A    No, because I think it would have had to have been

5  competitive.

6  Q    Okay, explain to me that process.

7  A    So you have to apply for it, and you have to go through

8  the selection process.

9  Q    Does that selection process including interviews?

10  A    It can. It doesn't have to.

11  Q    Okay.

12  A    They can make a selection based on paper.

13  Q    Uh-huh.

14  A    Paper submitted.

15  Q    So is it possible that you told Ms. Potter that the

16  position would have been competitively posted, and then there

17  would have been applications, but there would not have been

18  interviews for the selection process?

19  A    So you're asking me if something is possible.  Everything

20  in this world is possible.

21  Q    I'm asking do you recall that conversation?

22  A    I do not recall that conversation.

23  Q    Well, Ms. -- okay, so just so you know, Ms. Potter

24  testified yesterday that she had a conversation with you, in

25  which y'all spoke about the creation of a chief nurse 4

1  position, and you told her that the position was going to be

2  created for her and that it needed to be competitively applied

3  for, but there would not be any interviews?

4  A    I couldn't have said that.  That would be a prohibited

5  practice. You don't preselect.  At least in that -- I mean

6  doctors can be appointed, but that's all I know.  I can appoint

7  a doctor in the position.  But as far as I know, with nursing,

8  they had to be posted, and they had to go through resumes.  And

9  you can pick a position based on paper.

10  Q    Okay.  So I'm going to go back prior to the -- prior to

11  the posting of the position.  You testified that on the 3/19

12  org chart, which is 66, that the nurse managers are split up

13  due to workloads.

14  A    Which floor am I looking at?  Which page are we?

15        JUDGE BROOKS:  You're on 77, so you're going to go

16  back.  I think that's V.  Is that what we said it was

17        THE WITNESS:  77.

18        JUDGE BROOKS:  V as in Victor.

19  BY MR. PITRE:

20  Q    Are we there?

21  A    Uh-huh.

22  Q    So you testified that the nurse managers were split up due

23  to workloads; is that correct?

24  A    I believe so.

25  Q    So when Ms. Potter's title was changed from the previous

1   org chart, was her oversight reduced as a result?

2   A    So I don't think her oversight was reduced.  But what you

3   see is we added veteran's choice.  That was that national law

4   that got created, to allow veterans to go out into the

5   community.  And it was a whole slew of rules and regulations

6   that we had to follow.  And it required mandatory Excel

7   spreadsheet, or mandatory like waitlists that were downloaded

8   to central office every day.  And so the complexities of the

9   department had changed, because we had added this veteran's

10  choice program.

11  Q    Okay.

12  A    Nurse Potter was a nurse 3.  She was always a nurse 3,

13  even when there was a chief nurse position, she was still a

14  nurse 3.  And --

15  Q    When she was the -- when she was on the org chart as the

16  chief nurse manager, was she managing 45 FTEs in all of the

17  programs in the entire clinical side for the nonVA department?

18  A    So you're looking at the org charge from 12/8/14?

19  Q    Correct.

20  A    So I can't read the numbers in there.  It's a very bad --

21  it's a very bad copy.  But if there's 66 and there's 13 in

22  Informatics, that takes you down to what, 53?  And then there

23  is 9 in comp and pas, so now you're at like what, 44?  And then

24  you take 5 med-surg.  So now you're down to what 30 -- 30

25  something.  And then there's a couple in occupational health.

1    is Glen Grippen.  He's telephonic with the parties who are

2    videoing with me.

3            Mr. Grippen, can you hear me?

4            MR. GRIPPEN:  Yes, I can.

5            JUDGE BROOKS:  All right.  I'm David Brooks, the

6    administrative judge assigned to decide this matter.  Do you

7    have any objection to testifying under oath?

8            MR. GRIPPEN:  No, sir.

9            JUDGE BROOKS:  During your testimony, if you have

10   questions or are confused, you should direct any questions you

11   have to me.  Also, be aware that there's a time delay for me

12   because I'm by video.  The parties won't have as much of that

13   by telephone with you, but I'm a second or two behind them.  If

14   it sounds like we're talking over each other, it could just be

15   the time delay of the video.  Can you please raise your right

16   hand for the oath?

17           MR. GRIPPEN:  Yes, sir.

18             GLEN W. GRIPPEN, AGENCY'S WITNESS, SWORN

19          JUDGE BROOKS:  Thank you.  For the record, can you

20   please state and spell your name?

21          THE WITNESS:  It's Glen W. Grippen.  G-L-E-N W.

22   G-R-I-P-P-E-N.

23          JUDGE BROOKS:  Are there two n's at the end of your

24   first name?

25          MR. GRIPPEN:  One -- one n.

1            JUDGE BROOKS:  Okay.

2            I'll note for the court reporter that I appear to

3    have misspelled Mr. Grippen's first name.  It's Glen, with only

4    one n.

5            The first party to ask you questions is Mr.

6    MacMillan.  I'll let him begin now.

7                         DIRECT EXAMINATION

8    BY MR. MACMILLAN:

9    Q    Mr. Grippen, hi.  Can you hear me?

10   A    Yes, I can.

11   Q    Okay.  Can you tell us -- you're currently retired, yet

12   can you tell us -- my understanding is you're currently

13   retired, what date did you retire?

14   A    My first -- the first time I retired was in December 2011.

15   Then, three years later, I was asked to come out of retirement

16   and become the interim director of Phoenix.

17   Q    Okay.

18   A    I worked there for about another year and retired the

19   second time in November of 2015.

20   Q    Okay.  Can you tell us just a little bit about your

21   background before you came to Phoenix?

22   A    Yes.  I've been in the VA for 39 years from a chief

23   accountant to a network director, and met in 12 or 13 different

24   geographic locations.

25   Q    Okay.  And --

1    A    I am the medical center director in Milwaukee for ten

2    years and Iron Mountain for three years, I guess.

3    Q    So you were living -- just, you cut off a little bit, so

4    I'm just -- you were the medical center in Milwaukee for ten

5    years and then Iron Mountain for three years?

6    A    Three -- then the network director (indiscernible).

7    Q    Okay.  And what date did you come to Phoenix as the

8    interim director approximately?

9    A    I believe it was about November 17th, 2014.

10   Q    Okay.  And then I believe -- and you indicated -- and you

11   retired again from Phoenix on what date?

12   A    I believe it was November 30th, 2015.

13   Q    Okay.  And what -- can you discuss what was going on in

14   Phoenix and why you came in in Phoenix in November of '14?

15   A    There had been IG (phonetic) reports and -- and a lot of

16   that national news that Phoenix was not keeping up with the --

17   all the workload that was in the Phoenix area, caring for

18   veterans, and that there are -- the -- allegedly was the -- was

19   the waitlist.  And veterans weren't getting care appropriately.

20   And it made lots of national news, including the secretary's

21   resignation.  And so they were -- he was looking for an

22   experienced person to come into Phoenix.

23   Q    Okay.

24   A    Also, at that time, the medical center director was still

25   out on administrative leave.  Also, the associate director was

1   out on administrative leave.  So there was a lot of turmoil in

2   the front office.

3   Q    Okay.  Now, I want to talk about the administrative

4   medicine service.  But first of all, logistically, do you have

5   access to a computer right now?

6   A    Yes, I do.  Yes, I do.

7   Q    All right.  All right.

8        So in any event, do you recall in -- so you came to

9   Phoenix in November of '14.  There was a -- what significance

10  did the administrative medicine service and purchase care have

11  in the waitlist scandal and in addressing the issues that you

12  were brought to Phoenix to address?

13  A    Certainly was a huge part of the issue.  As the veterans

14  needed care and we didn't have the staff inside the medical

15  center to care for them, the appropriate thing to do was to put

16  them out to private care -- the private sector.  And so that

17  service -- that department was the -- the one that made those

18  arrangements, and follow-ups, and so forth.  So we were right

19  in the middle of all the issues with the access to care.

20  Q    Okay.  In 2014, in December -- so I guess it would have

21  been shortly after you came on board, there was a

22  reorganization of -- well, do you recall if there was a

23  reorganization of administrative medicine service and purchase

24  care?

25  A    Well, I don't -- I don't believe I could have implemented

1   a reorganization in two weeks.  I think the -- well, probably

2   the first org chart that was sent to me was probably just that

3   we were increasing the staffing in that service.  And that

4   shows that the department was withdrawing the (indiscernible)

5   workload.  But shortly afterwards, I did start working on

6   looking at a reorganization that would implement change quicker

7   and as fast as possible.

8   Q    Okay.  And I want to -- so we're all on the same page --

9   it's a little bit different because I didn't -- the first org

10  chart that I sent you is, I think, the one you're referencing.

11  Is that dated -- did you sign that on 12/8/14?

12  A    Yeah, I believe so.  I can pull it up right now --

13  whatever you say.  The first one is -- well, that's number 3 on

14  your list.  I'm trying to go back here.  Dated 12/18/2014.

15  Q    Is it 18 or 8?  Can you tell?

16  A    I -- I think it's 8.

17  Q    Okay.  Do you recall -- and I know you just came on board,

18  but do you recall some discussion of -- you indicated there was

19  some FTEs added; is that correct?

20  A    Well, absolutely.  Yeah.

21  Q    Okay.  And do you recall Tiffany Potter -- the nurse

22  manager position -- chief nurse manager -- this is hard to

23  read, but do you recall there being a chief nurse manager title

24  being added?

25  A    I guess I -- I -- I don't recall the -- the pages that we

1  make the org chart.  Other than that, we were hiring and

2  recruiting lots of new staff.  As we authorized more FTE, we

3  changed the org chart so that it goes to show that the staffing

4  is being increased.

5  Q    Okay.  I sent you another org chart that was dated

6  3/19/15.  It looks like the date you signed it.  Can you pull

7  that one up, please?

8  A    Yeah.

9  Q    Okay.

10  A    Yes, I -- I have to pull it up.

11  Q    Okay.  Is this the org chart that you were referencing

12  that you -- after you had spent some thinking about

13  reorganizing the department?

14  A    Again, we did multiple draft org charts.  And so

15  certainly, this is the one that I signed, as you can see, on

16  March 19th.  Again, we were trying to implement as much change

17  as possible and looking at restructuring the leadership team

18  and so forth.

19  Q    Do you recall creating -- in the top box -- the leadership

20  box, I guess that's called, there's a position for chief RN, is

21  what I believe a chief nurse manager essentially.  Do you see

22  that?

23  A    Yes.

24  Q    Okay.  Is that -- what was the thinking behind adding --

25  is that position being added?

1  A    Yes.  Actually, when I was the director of Milwaukee, the

2  organizational chart in Milwaukee had basically established a

3  doctor and a nurse in charge of the different departments in

4  the medical center.  And working together as a team, versus

5  reporting direct to each other, with the nurse reporting to the

6  doctor.  And actually, that had worked well in Milwaukee.  So I

7  was looking at trying to implement something similar that would

8  improve coordination and communication between the team members

9  and particularly the leadership team.

10 Q    Okay.  And so was it your desire to create -- to sort of

11 emulate the model that you had successfully used previously in

12 the administrative medicine service in this org chart?

13 A    Yeah.

14 Q    Okay.  Was it decided -- when this org chart was decided,

15 do you know if there were discussions about what duties

16 specifically would be performed by that chief nurse or -- what

17 do you recall, I guess?

18 A    Well -- I mean, how -- how it worked in Milwaukee was that

19 they were equal.  The doctor and the nurse were -- were called

20 equals.  I guess that's what I was thinking at the same time

21 because I was trying to emulate what mostly had developed in

22 Milwaukee.

23 Q    Okay.  After this org chart came out, do you recall a

24 meeting where you discussed the org chart and the changes that

25 were being made to the staff of the administrative medicine

1  service?

2  A    I mean, I don't particularly remember that meeting.  But

3  my normal approach would have been to communicate to overly,

4  especially when you're trying to make change.

5  Q    Do you recall making -- well, let me just ask you this.

6  Do you recall making a statement at this meeting, specifically,

7  or it could be, I guess, another meeting that -- words to the

8  effect of -- and again, I'm not pretending to quote you, but

9  the sentiment being, complaints -- there's too many complaints

10  that are going to outside entities and you need to give us the

11  opportunity to handle them in-house first -- something to that

12  effect?

13  A    I -- I don't recall saying that.

14  Q    Okay.

15  A    Yet, I -- I -- I don't recall saying that.  I don't

16  remember that meeting.  But certainly, that is -- I was trying

17  to resolve more issues in-house and trying to resolve things

18  before they went out to the media.  So from that perspective, I

19  could have said that.  But I don't recall the individual

20  meeting still.

21  Q    Were you trying to discourage people from filing OIG --

22          MR. PITRE:  Objection, leading.

23          JUDGE BROOKS:  I --

24          MR. MACMILLAN:  I can rephrase.  I'll rephrase it.

25          JUDGE BROOKS:  All right.

1  BY MR. MACMILLAN:

2  Q    Do you recall if -- did you have any malicious intent

3  in --

4  MR. PITRE:  Objection.

5            MR. MACMILLAN:  That's not leading.

6            JUDGE BROOKS:  He's go to ask it somehow.

7            MR. MACMILLAN:  I didn't even finish my question.

8            THE WITNESS:  As -- as I have repeated to you

9  earlier, I had thirty-nine years in a leadership role.  So I'm

10 very familiar that they have their rights to go to whoever they

11 like, whether it be IG, or the television, whoever.  That's

12 certainly in their right and I would never discourage that.

13       But also, I sometimes ask people to give your manager an

14 opportunity to fix things first.  But certainly, they have

15 their rights to go wherever they want to go.

16 BY MR. MACMILLAN:

17 Q    Okay.  Ms. Potter testified that sometime after this

18 meeting in April of '15, she had a couple of meetings with you

19 and, I believe, Darren Deering.  I believe both of you were

20 present in both meetings.  And then there was a third meeting,

21 I believe, in May of '15.

22       But I want to first talk about, I guess, the first two

23 meetings.  Do you recall meeting with Ms. Potter, specifically,

24 during this time period after the org chart came out?

25 A    I -- I remember, I guess, vaguely meeting with her, yes.

1  Q    Okay.  What do you recall, if anything, about those

2  conversations with her?

3  A    Very little.  Again, normally what will happen if a -- if

4  a manager wanted to speak with me, then certainly, we would

5  have arranged for that to happen and -- or if someone had

6  questions -- further questions, we would arrange for that to

7  happen.  I do recall that she and others had questions.  And it

8  would have been normal that we would have scheduled those

9  meetings, particularly for a team manager, like she was.

10  Q    Did you have a favorable impression of Ms. Potter?

11  A    Yes, I did.  She was a team member of the management team

12  in a very, very key department.

13  Q    And going forward, at some point, you and, I guess, Dr.

14  Deering had -- you can feel free to make it more specific to

15  one of you.  But my understanding is that a recruitment

16  occurred for the chief nurse IV position that's indicated on

17  the org chart that -- the 3/19/15 org chart.  Is that true?

18  A    I -- I -- I don't recall what happened at that point?

19  Q    Okay.  Do you recall --

20  A    (Indiscernible) --

21  Q    Go ahead.  I'm sorry.

22  A    There was lots of issues going on at the medical center.

23  And certainly -- that's three years ago, I  -- I -- I don't

24  want to speak, under oath, to things that I don't remember.

25  Q    Okay.  Do you recall giving a high priority to filling

1  this position of chief nurse IV or using words to that effect?

2  A    Again, it's -- it's a critical job in a critical

3  department, so yes, I would have had emphasis on that.

4  Q    Okay.  Did you -- I believe -- I'm not sure you recall it,

5  but do you recall, as you sit here today, whether that chief

6  nurse IV position was approved by the VISN and then was

7  recruited for?

8  A    I do not recall that.

9  Q    Okay.  Do you recall if Dr. Deering was sort of the lead

10 on that issue?

11 A    That would be his -- his -- you know, he was in charge of

12 the clinical division.  So yes, he would have probably had the

13 lead in -- in that key position, yes.

14 Q    Okay.  Did you -- so based on your other answers -- but do

15 you recall looking -- being informed by Dr. Deering about who

16 had applied or anything of that nature?

17 A    I -- I do not recall.

18 Q    Okay.  Do you recall if Tiffany Potter -- if during one of

19 the meetings with Ms. Potter or, I guess, anyone else -- but do

20 you recall if Ms. Potter was essentially told that she would be

21 given the nurse IV position that was being recruited for?

22 A    Well, what I recall is that the position needed to be

23 competitively announced.  And we would have to go through the

24 normal competitive process.  So I certainly would not have said

25 anything to her about that, other than that it would need to be

1  competitively announced.  And whoever got the job would get the

2  job.

3  Q    Okay.  In your opinion, as a medical center director, does

4  it make sense to create new functional statements when new

5  positions are being created?

6  A    Yes.

7  Q    And what about if positions change over time?  Would it

8  make sense to have a new functional statement directive --

9            MR. PITRE:  Objection, (indiscernible).

10           JUDGE BROOKS:  Did I hear an objection?

11           MR. MACMILLAN:  (Indiscernible).

12           MR. PITRE:  (Indiscernible).

13           THE WITNESS:  I mean, if he --

14           MR. PITRE:  Yes, I objected to leading.

15           JUDGE BROOKS:  Could you rephrase?

16           MR. MACMILLAN:  Sure.

17 BY MR. MACMILLAN:

18 Q    Does it make sense -- well, in your experience as a

19 medical center director, if duties in a particular job change

20 over time, does it make sense to update the functional

21 statements for those positions?

22 A    Yes.  It particularly should be updated for those -- for

23 RNs with functional statements or for position descriptions for

24 non-RNs.  They should both be accurate of what a person is

25 doing.

1  exhibits.  Did they provide you a list of exhibits that -- no?

2          MR. MACMILLAN: I don't have (indiscernible) the

3      return email (indiscernible).

4          MR. PITRE:    No, that's fine.

5  BY MR. PITRE:

6  Q   Okay.  Mr. Grippen, prior to your arrival at the agency --

7  or at the Phoenix VA, did you -- I'm sorry.

8          MR. PITRE:  Let me retract that.  Let me retract

9  that.

10 BY MR. PITRE:

11 Q   I'm trying to get through this without being able to show

12 the exhibits.  I apologize.

13     Are you aware that in July of 2014, Ms. Potter had made

14 OIG disclosures regarding TriWest patients -- I mean, TriWest

15 care not seeing urology patients?

16 A   I was not aware of that.

17 Q   Okay.  Were you aware that Ms. Potter disclosed to Dr.

18 Deering and Dr. Venditti that urology patients -- there were a

19 certain number of urology patients that had died because they

20 had not received treatment?

21 A   I was not aware of that.

22 Q   Okay.  At any point in time, did Dr. Deering or Dr.

23 Venditti have a discussion with you regarding Ms. Potter, upon

24 your arrival into the organization?

25 A   No.

1  Q    What was your first interaction with Ms. Potter when you

2  came on?

3  A    Yeah, because administrative medicine and -- and certainly

4  having better care in the private sector was one of the most

5  common issues.  I'm sure I would have met with those folks

6  earlier at best to get a handle of -- getting briefed on what

7  was happening and making sure there was --

8  trying to keep up as much as possible.

9      I did not have a lot of interaction with -- with managers

10 three levels below me.  But I certainly saw Ms. Potter far more

11 often than other managers that were three levels below me.

12 Q    And why is that?

13 A    Because of (indiscernible) -- because of the heated

14 importance of getting the veterans care out to the private

15 sector.

16 Q    Could you expand on that?  What do you mean by the -- I'm

17 sorry, did you say heated?

18 A    Well, yes.  Well, I mean, the urgency for veterans to get

19 their care out in the private sector.  So certainly, she was

20 involved with that department.  So I had more meetings with her

21 and that department than I was with other departments.

22 Q    Okay.  How was she involved with that department?

23 A    She was -- she was a key manager in that department.

24 Q    By key manager, what title did she hold?

25 A    I don't recall exactly the title, but I believe she was a

1  section chief.  So that's what I recall.

2  Q    Okay.  Does a chief nurse manager -- does that spark your

3  recollection?

4  A    Again, I -- it's been a long time since I've been involved

5  with Phoenix.

6  Q    Okay, understood.

7       So did the agency counsel discuss with you the change in

8  the organizational chart from 7/9 -- I'm sorry -- from 12/18/14

9  to 3/9/15?  Do you recall that discussion?

10 A    Yes.

11 Q    Okay.  When Ms. Potter's title was changed from chief

12 nurse manager to nurse manager, what was your involvement in

13 that change?

14 A    I do not recall.

15 Q    Do you recall why Ms. Potter's title was changed?

16 A    I -- I do not recall.

17 Q    Do you recall if Ms. Potter's oversight reduced as a

18 result of the title change?

19 A    I don't think it was.  But I don't -- again, I just really

20 do not recall.

21 Q    Okay.  Prior to Ms. Potter -- and I'm only going to ask

22 two questions regarding this.  We're not going to go down the

23 same road.  But prior to -- back to -- you know what, strike

24 it.  Do you recall Ms. Potter ever approaching you regarding

25 her belief that the effect of the organizational chart change

1  was, in effect, a demotion for her?

2  A    Yes.  I believe I -- that was part of one of the

3  discussions we had, yes.

4  Q    And do you -- okay.  Could you expound on what that

5  discussion entailed?

6  A    I mean, I can just vaguely remember that she -- she had

7  that concern.  And as I said to her -- said to you, I had met

8  with her several times.  And -- because she was a key team

9  manager as I would with any of our -- our managers.  And so I

10  wanted to listen to her concerns.

11  Q    Okay.  During that meeting -- during one of those

12  meetings, do you recall Ms. Potter discussing an individual by

13  the name of Greg Crenshaw?

14  A    No, I do not recall.

15  Q    Do you know an individual by the name of Greg Crenshaw?

16  A    No.  I don't recall Greg Crenshaw.

17  Q    Okay.  I want to call your attention to an exhibit --

18  okay.  So Mr. Grippen, can you take a look at the 4-V

19  (phonetic), the 3/19/15 organizational chart?

20  A    (Indiscernible) what's that date of that one?

21  (Indiscernible)?

22  Q    Yes, 3/19/15.

23  A    Yes.  I have it -- I have it in front of me.

24  Q    Okay.  Can you take a look at the non-VA purchase care

25  box?

1    A    Yes.

2    Q    Can you look at the title of chief non-VA care management

3    and program analyst?

4    A    Yes.

5    Q    Do you recall which individual assumed that role?

6    A    No.  No, I do not recall.

7    Q    Okay.  Is that role -- do you -- let me ask you this

8    question.  Are you aware of what that role entails?

9    A    No, I do not recall.

10    Q    Okay.  Are you aware if that role is -- requires for the

11    individual in that role to be an MD?

12    A    I -- I do not recall.

13    Q    Okay.  I'm going to ask you -- and I understand if you

14    don't recall.  I'm just going to tell you what was testified to

15    and to see if this sparks your memory.  If you still do not

16    recall, that's perfectly fine.

17         During a meeting, do you recall Ms. Potter telling you

18    that Mr. Crenshaw had the title of chief non-VA care and

19    program analyst, the position that we just discussed, and that

20    he should not have had that title because he was not an MD?

21    A    I do not recall that.

22    Q    Okay.  She then further testified that you agreed that he

23    should not have been in that position, but that he was not

24    going to be removed from that position because then it would

25    appear as if he was demoted as she was.  Do you recall that?

1    A    No, I do not recall.

2    Q    What -- okay.  I think we're -- what position did

3    Tiffany -- Ms. Potter have on the same chart that you're

4    reviewing?

5    A    To be honest with you, I -- I don't recall.

6    Q    Okay, not a problem.  So let me ask you this.  What was

7    your role in having the -- so let me ask you this question.

8         First of all, what is your knowledge of how a position is

9    created within the organization?

10   A    Normally, a -- a -- the (indiscernible) in chief would

11   request a staffing increase or -- or change.  Sometimes,

12   there's a position management committee or it goes through HR

13   to be properly classified and that would come to the management

14   team to either approve or disapprove that request.

15   Q    Okay, perfect.  And so, is your testimony that eventually

16   a Chief Nurse IV for Purchase Care was -- well, I'm sorry.  Do

17   you recall that if a Chief Nurse Purchase Care position was

18   eventually approved and posted for improvement?

19   A    Yes.

20   Q    Okay.  And what was your role in getting that process

21   complete?

22   A    Well, I was -- I would approve the actual position itself,

23   but then I would have nothing else directly involved.

24   Q    Okay.  So you were not aware if Tiffany Potter applied to

25   that position or not?

1  A    I don't recall what happened after the offer was signed.

2  Q    Okay.  Are you aware if that position was filled or not?

3  A    I am not aware of that.

4  Q    Are you aware if -- so if prior to your departure, which

5  was in November of 2015; is that correct?

6  A    It's either November 30th or December 1st, something like

7  that.  Yes.

8  Q    Prior to your departure, did that service line have a

9  Chief Nurse IV?

10  A    I do not recall.

11  Q    Did you believe that a Chief Nurse IV was necessary for

12  that department?

13  A    I don't recall what happened in the last parts of my time

14  there, no.

15  Q    No -- meaning, during your time as the Medical Director,

16  do you believe that a Chief Nurse IV was necessary for that

17  department?

18  A    I -- I guess as of 3/19, I did.  But I don't know what

19  else happened after that.

20  Q    And why, as of 3/19, did you believe that a Chief Nurse IV

21  was necessary for that department?

22  A    Because we were emulating the organizational structure

23  that we had at the Milwaukee VA where I was the Director at.

24  Q    Specifically for the Phoenix VA -- I understand that you

25  created a org chart that emulated the Milwaukee VA.  But

1  specifically for the Phoenix VA, what was the -- was there an

2  actual need for a Chief Nurse IV during that time period?

3          MR. MACMILLAN:  This has been asked and answered, so

4  I object.

5          THE WITNESS:  Yeah, again, what I recall is, other

6  than that we were trying to emulate the organizational

7  character we had implemented in Milwaukee in which we had

8  success in implementing change -- positive change.

9  BY MR. PITRE:

10  Q    Okay.  You stated earlier that there was a lot of vacant

11  roles and positions when you came on to the VA; is that

12  correct?

13  A    No, I think I referenced that the manage-- the senior

14  management team had a director and the associate director out

15  on administrative leave.

16  Q    Right.  And was the individuals that were currently

17  staffed keeping up with the current workload when you arrived?

18  A    Everyone was trying to expand services as quickly as

19  possible, from both hiring staff and sending veterans out to

20  the private sector through that certain service.  And were we

21  keeping up at the -- at the hardest part of the place,

22  currently we were taking care of far more veterans than we ever

23  had taken care of before.

24  Q    Um-hum.  And would the filling of a Chief Nurse IV

25  position assisted or helped with that, in completing those

1  tasks?

2  A    It possibly could, yes.

3  Q    Okay.  So is that why you considered it a priority?

4  A    Yes.

5  Q    Okay, so you do agree that there was a need for a Chief

6  Nurse IV position?

7         MR. MACMILLAN:  This has been asked and answered, I

8  object.  He keeps asking the same thing.

9         MR. PITRE:  Well, I haven't --

10         JUDGE BROOKS:  That final penultimate question, I'm

11  not sure about.  I'm not sure how you really got here.  The

12  "so" is the part I would take out of the question.  Because I'm

13  not sure about the logical inferences you're taking to get to

14  this point.  If you want to ask him again if he believes that a

15  Chief Nurse IV position was needed, you can.  I think it has

16  been asked several times.  But if you want to ask him that one

17  more time, it's fine -- in light of your questions, you may.

18  But without the word "so" in front of it.

19         MR. PITRE:  Yes, Judge, absolutely.

20  BY MR. PITRE:

21  Q    Based on the testimony in which you stated that it was a

22  priority to have a --

23         JUDGE BROOKS:  Without the word "based" either.

24         MR. PITRE:  Okay.

25  BY MR. PITRE:

1   Q    Taking into account the previous --

2              JUDGE BROOKS:  Okay.

3              MR. PITRE:  -- testimony --

4              JUDGE BROOKS:  Okay.  Okay.  Maybe you don't

5   understand.  You're leading --

6              MR. PITRE:  All right.  I'll just ask -- you want me

7   just to ask it directly?

8              JUDGE BROOKS:  Yes.

9              MR. PITRE:  Yes.

10  BY MR. PITRE:

11  Q    Was there a need for a Chief Nurse IV in that department?

12  A    On March 19, it turns out that there was, yes.

13  Q    Thank you.  And just one last question.  During your time

14  as the director, how many reorganizations did you go through?

15  A    Not as many as I would have liked.  But probably --

16  again, I'm guessing, so I don't really want to guess under

17  oath, so --

18  Q    Okay.  Can you give us an estimate?

19             JUDGE BROOKS:  Are you talking about the -- at this

20  medical service?

21             MR. PITRE:  Yes, this service, correct.

22             THE WITNESS:  Well that service there's only been

23  one.

24  BY MR. PITRE:

25  Q    Okay.  Were there --

1  A    That's a reorganization.

2  Q    Um-hum.

3  A    We increased the staffing levels multiple times, and that

4  would have generated a new org chart.

5  Q    Understood.  And so during the reorganization, you all

6  were hiring.  Is that correct?

7  A    Well, yes, yes.

8  Q    You were doing a lot of hiring?

9  A    Yes.

10  Q    So there isn't any impediment in hiring a position during

11  a reorganization; is that correct?

12  A    Certain positions need to be approved by a level higher

13  than the Medical Center Director.

14  Q    Right.  But if the position was approved, there isn't any

15  impediment in hiring that position during a reorganization; is

16  that correct?

17  A    Correct.

18  Q    All right.  No further questions.

19                      REDIRECT EXAMINATION

20  BY MR. MACMILLAN:

21  Q    Mr. Grippin, this is Scott MacMillan again.  I have a few

22  follow-up questions.  Do you recall Dr. Deering mentioning

23  that -- mentioning to you anything about being unsure of who

24  the Nurse IV position would report to, based on changes going

25  on in the organization?

 1  A     Yes.  I mean, the Milwaukee model was controversial.  And

 2  traditionally, nurses report to physicians, and we were making

 3  them full equals.  So -- and there was perception of the

 4  controversy of that.

 5  Q     Was there also pushback from any service -- other service

 6  lines regarding the structure of one Chief Nurse, one Chief

 7  Physician as the head of a department?

 8  A     Yes.  Change is always challenging.

 9  Q     Do you recall any conversations occurring during this time

10  about the use of Chief Nurse creating confusion --

11          MR. PITRE:  Objection.  Leading.

12  BY MR. MACMILLAN:

13  Q     Do you -- well --

14          JUDGE BROOKS:  You're saying, do you recall any

15  conversations occurring during this time about the use of the

16  title of Chief Nurse causing confusion?  Is that what your

17  question is asking --

18          THE WITNESS:  Yes.

19          JUDGE BROOKS:  -- Mr. MacMillan?

20          THE WITNESS:  Again.  Yes, there was.

21          JUDGE BROOKS:  Okay.

22          THE WITNESS:  And we were same age to hire another --

23          MR. MACMILLAN:  All right, hold on a second there.

24  Hold on a second there.

25          JUDGE BROOKS:  I was going to say he can ask the

1   question.  It sounds like he's saying yes he recalls such

2   conversations, but confirm that.

3   BY MR. MACMILLAN:

4   Q    Can you confirm that, Mr. Grippin?  What you just said?

5   A    Yes.  There was some concerns of the Chief Nurse title.

6   And what it was intended to be, and the protocol -- the VA, or

7   the directors of the VA, and making sure that we were following

8   through with what Washington had wanted us to do -- the

9   policies that Washington laid out.

10  Q    Okay.  Do you recall -- and I guess I should ask the

11  question a little more specifically -- is it your

12  understanding -- I believe we've represented to you, today at

13  least, that Ms. Potter had the title of Chief Nurse Manager in

14  the 12/8/14 org chart.  Do you recall any conversations about

15  that title in particular causing confusion?

16  A    No.  I don't -- I don't believe we made major changes on

17  that 12/8 org chart, other than adding the -- adding the FTE.

18  But I -- I could be wrong, but certainly was -- what I recall

19  is that the sections about the Chief Nurse were approved

20  earlier into the year -- or, or the next calendar year.

21  Q    Did Ms. Potter in the org chart on 3/19 -- 3/19/15 org

22  chart, I believe you don't recall where she was, but if there's

23  no Chief Nurse Manager position in there in that org chart --

24  you want to wait a minute? -- if -- let me rephrase that and

25  ask --

1            JUDGE BROOKS:  I didn't hear what that was.

2            MR. MACMILLAN:  I'm going to have to break it down a

3  little bit.  I have to break it down so I'm not leading him.

4  BY MR. MACMILLAN:

5  Q    If you take a look at the 12/8/14 org chart.  I believe

6  you saw that there was a position for Chief Nurse Manager.  Do

7  you see that?  It's under purchase care --

8  A    I'm going to go back --

9  Q    Yeah, sorry.

10 A    I'm just going to go back to that org chart.  As you know,

11 it's not very legible.

12 Q    Yeah.  It would be -- well, it'd be under purchase care,

13 under the box "purchase care".

14 A    I -- yeah.  I see the -- the block, the third block above

15 the bottom, there's a Chief Nurse Manager.

16 Q    And do you know if that title carried through for anyone

17 in the subsequent org chart -- and go ahead and take a look at

18 that, 3/19/2015.  Do you recall if there was a Chief Nurse

19 Manager in that org chart?  Or can you see if there is one?

20 A    I don't see one there.

21 Q    Do you recall any pushback about the title Chief Nurse

22 Manager being included in the first org chart, and that's the

23 reason it's not in the second org chart?

24            MR. PITRE:  I'll just object to the last part.  You

25 did great, just object to the last part of that question

1          JUDGE BROOKS:  He asked -- okay.  Mr. Grippin, don't

2    answer right now, I'm just talking to the attorneys, but

3    okay --

4    what I have down is, does the witness recall pushback about the

5    title of Chief Nurse Manager in the first chart.  Do you object

6    to that?

7          MR. PITRE:  No, he answered that question.  He said

8    he didn't recall.

9          JUDGE BROOKS:  Okay.  What was the next question?

10         MR. MACMILLAN:  What I was asking was -- what I was

11   walking him through was, there's a distinction between the two

12   org charts, and I was asking him if there was pushback on the

13   first use of that Chief Nurse Manager title in the first org

14   chart.  And then you're at leave, according to Mr. Pitre, your

15   answer is that you don't recall; is that correct?

16         THE WITNESS:  Yes.

17   BY MR. MACMILLAN:

18   Q    So therefore I guess I don't need to ask the second part

19   of it.  But do you recall a -- what I was going to ask, then,

20   is, I know you just indicated there was some discussion about

21   the title Chief Nurse being controversial.  Was that related to

22   Chief Nurse IVs -- or, Nurse IVs being called Chief Nurses?

23   A    Yes.  Yes.

24   Q    Okay.  Then I have no further questions.

25         JUDGE BROOKS:  Okay.

1          MR. PITRE:  Judge, I believe just one question.

2          JUDGE BROOKS:  All right.

3                    RECROSS-EXAMINATION

4    BY MR. PITRE:

5    Q    Mr. Grippin, on 3/19/15 org chart, are you there?

6    A    Yes, I am.

7    Q    At the top box, where it says "Chief RN VN 06104", you see

8    that?

9    A    Yes.  Yes.

10   Q    Who was contemplated to be in that position?

11   A    That position would have needed to been competitively

12   announced.

13   Q    Um-hum.  Understood.  And who was serving in that position

14   prior to this org chart?

15   A    Don't -- no one was.

16   Q    Okay.  Was anyone performing the duties of that position

17   prior to the org chart?

18          MR. MACMILLAN:  I believe this has been asked and

19   answered, so I'll object on that basis.  Feel like we're

20   rehashing.

21          JUDGE BROOKS:  Mr. Pitre, you can ask the question.

22   But depending on the answer, we're not necessarily able to

23   break down --

24          MR. PITRE:  Yeah, I'm just -- if I, for me -- I think

25   it's been -- okay.  I'll ask the question.

1          JUDGE BROOKS:  Okay.

2          MR. PITRE:  I won't -- I will not testify in front of

3   the witness.  That's inappropriate.

4          JUDGE BROOKS:  Thank you.  Repeat the question.

5   BY MR. PITRE:

6   Q    Yes.  Prior to this org chart, who was performing the

7   duties of that role, Chief Nurse, in the department?

8   A    No one.  Because that position has been a co-equal to the

9   physician in charge of that department.

10  Q    Okay.

11  A    So certainly there was no one who was co-equal to the

12  physician in charge of the department at that time.  Correct.

13  Q    Who was the nurse managers reporting to, prior to this org

14  chart?

15  A    The physician in charge of that department.

16  Q    And who was that?

17  A    Dr. Venditti.

18  Q    And when you came aboard, where was Dr. Venditti?

19  A    She was -- she was the department head of -- I guess --

20  administrative medicine and comprehensive and pension medicine.

21  Q    Isn't it true that at some point --

22  A    And occupational --

23  Q    Right.  Isn't it true that at some point, Dr. Venditti

24  went on detail to another facility?

25  A    But the position was still there, and there just wasn't

1  acting.  When she went to Las Vegas or wherever where she went.

2  Q    I'm sorry?

3            MR. MACMILLAN:  I --

4            MR. PITRE:  I just -- I didn't understand -- I didn't

5  hear what he said.

6            MR. MACMILLAN:  I'd like to object on relevancy

7  again.  I don't know what -- I guess he's trying to identify

8  people in the work, see Dr. Grippin's other -- I don't know.

9  So I just don't understand where we're going.  Now in 15

10 minutes, on the same -- had a line of questioning about -- he's

11 trying to get -- apparently talk about what details were being

12 performed by Ms. Potter, but I think he's already answered

13 those questions.

14           MR. PITRE:  I like the fact that counsel loves to

15 bring up the time at which I've been asking questions.  But I

16 don't ever recall him stating that he's been, you know, asking

17 questions a certain amount of time.  With that said, I really

18 am trying to finish up my line of questioning.  I think all the

19 evidence has been clear that the testimony that we're getting

20 is not necessarily accurate.  So I'm just trying to get to the

21 point where it's accurate.

22           MR. MACMILLAN:  Now you're testifying.

23           MR. PITRE:  Now I just did, you're right.  I

24 apologize.  But, you know, I guess -- you know what, I just

25 answered my own question.  But I just wanted to get the witness

1   there, because he was there, so I believe that he has the

2   information, and I just wanted him to confirm what we already

3   know.

4           JUDGE BROOKS:  I'm not sure how far down the rabbit

5   hole of the organizational chart you plan to go at this point.

6           MR. PITRE:  Not far at all.  I just want to know --

7   not far at all.  I just want to ask him, at some point, did Dr.

8   Venditti go upon a detail?

9           JUDGE BROOKS:  All right.  Go ahead.

10  BY MR. PITRE:

11  Q    At some point in time, did Dr. Venditti go on the detail?

12  A    Yes, I recall that she did.

13  Q    And who was performing her role when she was out on

14  detail?

15  A    I don't recall.  Yet normally, if a physician who was in

16  charge would place another physician in that position as an

17  "acting".

18  Q    Is it possible that Ms. Potter was performing the duties

19  of Dr. Venditti while Dr. Venditti was on detail?

20          MR. MACMILLAN:  I'm going to object on foundation.  I

21  don't think there is any foundation for this.  He hasn't

22  said --

23  he doesn't recall.

24          MR. PITRE:  But he said --

25          MR. MACMILLAN:  You aren't asking about

1  possibilities.

2          JUDGE BROOKS:  He --

3          MR. PITRE:  Well he said "normally".  So since he

4  said "normally", I'm asking him, could something be abnormal?

5  Which is, and I'm asking him based on his understanding of what

6  he thinks should occur, I'm asking him is it possible that it

7  did occur that way?

8          JUDGE BROOKS:  He -- okay.

9          MR. PITRE:  And that something actually was abnormal.

10          MR. MACMILLAN:  That's not a question, Your Honor.

11          JUDGE BROOKS:  You asked him if it's possible that

12  Ms. Potter was doing Venditti's duties while she was on detail.

13  I will allow the witness to answer that question, but when you

14  get into possibilities going down an org chart, you're starting

15  to go down the rabbit hole.  So I would --

16          MR. PITRE:  That's my last question.  My last

17  question, Judge.

18          JUDGE BROOKS:  Okay.

19          MR. PITRE:  That was my last question.

20          JUDGE BROOKS:  Okay, ask him.

21  BY MR. PITRE:

22  Q   Is it possible that Tiffany Potter was performing the role

23  of Dr. Venditti when she went out on detail?

24  A   No.  The physician had responsibilities that would be

25  different than an RN.

1  Q    Okay.  Thank you.

2         JUDGE BROOKS:  Okay.  All right.  Mr. Grippin, I

3  don't have any questions for you.  And so in a moment I'm going

4  to excuse you.  I just need you to know that this is an ongoing

5  proceeding, and for the duration of it, you're instructed not

6  to discuss the substance of your testimony with anybody.  Thank

7  you for coming in today, telephonically, and you're free to go.

8         MR. PITRE:  Thank you Mr. Grippin.

9         THE WITNESS:  Thank you very much.

10        JUDGE BROOKS:  Thank you.  It's 1:20 p.m. let's go

11  off the record.

12     (Off the record at 1:20 p.m.)

13        JUDGE BROOKS:  I have us back on the record, it's

14  1:25 p.m.  I'll need somebody to turn the audio on.  Thank you,

15  Ms. Potter.  Okay.  Appearing now as a witness, at 1:26 p.m. is

16  Dr. Darren Deering.  Dr. Deering, I'm David Brooks, the

17  Administrative Judge assigned to decide this matter.  Do you

18  have any objection to testifying under oath?

19        THE WITNESS:  I do not.

20        JUDGE BROOKS:  During your testimony, if you have

21  questions or are confused, you should direct any questions you

22  have to me.  Would you please raise your right hand for the

23  oath?

24        DARREN DEERING, AGENCY'S WITNESS, SWORN

25        JUDGE BROOKS:  Thank you.  For the record, please

1 | state and spell your name.

2 | THE WITNESS:  My name is Darren Deering.

3 | D-A-R-R-E-N, last name is D-E-E-R-I-N-G.

4 | JUDGE BROOKS:  Thank you.  Now people refer to you as

5 | Dr.; is it MD or some other designation?

6 | THE WITNESS:  I'm a D.O.

7 | JUDGE BROOKS:  All right.

8 | THE WITNESS:  Yeah, I'm a D.O.

9 | JUDGE BROOKS:  Thank you.

10 | MR. MACMILLAN:  To ask a question?

11 | JUDGE BROOKS:  Okay.  The first party that will ask

12 | you questions is the Agency, through Mr. MacMillan.  You can

13 | begin.

14 | DIRECT EXAMINATION

15 | BY MR. MACMILLAN:

16 | Q    Thank you.  Dr. Deering, can you tell us when you began

17 | working with the Phoenix VA and in what capacity?

18 | A    I joined the Phoenix VA in July of 2005 as a inpatient

19 | hospitalist.

20 | Q    And I know, at some point, you became the Chief of Staff.

21 | A    Right.

22 | Q    Can you briefly describe the other positions that you held

23 | before you became the Chief of Staff at the Phoenix VA?

24 | A    Sure.  So I -- after coming on board as an inpatient

25 | hospitalist, I became Associate Program Director for the

1   internal medicine residency.  Had that role for a couple of

2   years, then I became the chief of the Hospitalist division,

3   which I had for, I think, a couple of years, two or three

4   years -- I don't know exact dates.  And then became the Chief

5   of Staff in February of 2012.

6   Q    And when did you stop being the Chief of Staff?

7   A    In June of 2016.

8   Q    And you no longer work for the VA, correct?

9   A    Correct.

10  Q    I want to just start by -- you were the Chief of Staff

11  during the, for lack of a better -- well, were you the Chief of

12  Staff during the Phoenix waitlist scandal?

13  A    Yes.

14  Q    Okay.  And was there -- how would you characterize the --

15  was there a turnover going on in higher-level management during

16  this time at the Phoenix VA?

17  A    When the crisis, I won't call it a scandal --

18  Q    Sorry.

19  A    That's okay, just I don't like that characterization

20  because I think the IG reports resolved much of that.  But when

21  this crisis erupted, it resulted in an enormous amount of

22  turnover in executive leadership.  So our director, our

23  associate director, were both put out on administrative leave

24  pending an investigation.  Our assistant director resigned and

25  left to go to another organization.  Our nurse executive was,

1  in my opinion, forced out into retirement.  And I was cut from

2  my position while they brought, I think, four or five interim

3  and acting directors through the organization, as well as a

4  whole host of acting nurse execs and associate directors over

5  almost a two-year period.

6  Q    And how would you characterize -- was purchase care given

7  heightened importance in light of the issues that were going on

8  with waitlists and patient care?

9  A    Yeah.  I think purchase care and administrative medicine,

10  that whole service was given a high priority from the time I

11  came into this position, because we had access issues from --

12  for years.  I mean, that wasn't a new challenge that we were

13  trying to address.  But once this crisis erupted and we were

14  getting a lot more resources to get people -- veterans out into

15  the community, then certainly it became an even higher

16  priority.

17  Q    Okay.  Now, I want to start by kind of showing you some

18  documents I'm talking about.

19  Q    Okay.  Was Glen Grippen one of the interim directors that

20  worked at Phoenix during the time period you just referenced, I

21  believe is 2015?

22  A    Yes.  Glen -- Mr. Grippen was the only interim director,

23  actually, the others were all acting.  He was here for an

24  extended period, I think, about thirteen or fourteen months.  I

25  don't know the exact time frame, but it was a little over a

1  year.

2  Q    Now, let's go to -- I'm going to have you compare a couple

3  of org charts for me.

4  A    Okay.

5  Q    So I'm going to have a couple -- find them.  So this one

6  is Tab 16, page 89 and it's 4-CC.  It's an org chart dated

7  7/14/14.  Page 92, I'm sorry.  I got it wrong earlier this

8  morning.  16, page 92, so let's find that for you.  Well, if

9  you can just, kind of keep the page, because I'm going to have

10  you compare it to another org chart.

11  A    Okay.

12  Q    Is this -- what does this document look like to you?

13  A    Well, this is an organizational chart for administrative

14  medicine service.

15  Q    And at this time, there is -- is there a chief nurse

16  manager position identified in there, anywhere on the org

17  chart?

18  A    A chief nurse manager?

19  Q    Or a chief Nurse IV position I should say.

20  A    No.

21  Q    Okay.  Now, if you could turn to --

22        JUDGE BROOKS:  Where's the microphone?

23  BY MR. MACMILLAN:

24  Q    Now, what I want to show is -- it's the same Tab 16 but

25  it's 4Y.  So let's find 4Y.  And it's page 77.  I'm doing it

1   A     But it would have to have been competed.

2   Q     Okay.

3   A     I just can't read the print in this org chart.  I

4   apologize.

5   Q     All right.  That's fair.  Do you recall there being

6   conversations -- well, I'm going to go to another chart in a

7   moment.  But do you recall there being conversations about Ms.

8   Potter being given a job title that -- not a nurse manager but

9   something else?

10  A     I know there was a lot of discussions that we had with

11  Tiffany throughout this time period and, not only was the

12  crisis brewing and Purchase Care was very busy, but we were

13  also trying to reorganize the whole healthcare system, not just

14  Purchase Care.  So other services, we were -- Mr. Grippen, as I

15  recall it, wanted to, kind of, have a physician and a nurse

16  lead over each of the big services.  And we kept trying to work

17  that out and administrative medicine service is always a little

18  bit different than most of the clinical services because it had

19  different pieces under it, if you will, that weren't always

20  direct patient care related type services.

21        So there were a lot of discussions around that to try

22  to get, you know, a position created to support that.  I

23  remember -- what I recall is being told by nursing service that

24  we couldn't do a Nurse IV and then I think -- I don't remember

25  how the chief nurse manager title came to fruition, but I think

1  we were given the -- you know, an okay on it and, as I recall

2  it got created and put into the org chart, but then we were

3  told that it wasn't okay as I recall from the VIZN or from

4  nursing service, one of the two.

5  Q    Okay.

6  A    It's been a few years out.

7  Q    I'm going to walk you through some of that.

8  A    Okay.

9  Q    Maybe it will refresh your recollection.

10 A    Sure.

11 Q    So let me show you another org chart.  It's going to be in

12 the same binder.  It's under Tab V as in Victor.  It's Tab 16,

13 page 66.

14 A    Okay.

15 Q    And if you -- the leadership box, there is now a -- is

16 there now a nurse manager position present -- a chief nurse

17 floor?

18 A    Yes.  There's a chief nurse floor, it appears to be.

19 Q    Okay.  And do you recall if that was present on the

20 12/8/14 org chart that --

21 A    No, I don't remember that.  I think this -- as I recall,

22 this was the org chart that we were able to create once --

23 like I said, we were given an okay to do a Nurse IV.  But

24 again, as I recall, something came up within nursing or VIZN

25 level that we weren't approved for this and I don't think we

1    ever went forward with formally selecting anybody for this

2    position.  As I recall, we were recruiting but we had to pull

3    it back.

4    Q    Okay.  Okay.  Do you -- is there a difference -- if you

5    looked under the Purchase Care boxes in the two that I --

6    12/8/14 and 3/19/15, is there a different -- is there a

7    different reporting relationships between the nurse cares?

8    A    Yes, as I recall -- well, I mean, I can -- the 12th -- or

9    December 2014 one is difficult to read, but as I remember that

10   structure was an all nurses reported up to specific team within

11   Purchase Care.  And as it grew, as I recall, this -- yeah, we

12   went from the service having sixty-something to 130 employees,

13   that we divided these out into specific group, where they would

14   have nurse managers over -- utilization review and over consult

15   and choice coordination.

16   Q    Do you recall what -- is it your understanding that Ms.

17   Potter held one of those two nursing manager positions on the

18   3/19/15 org chart?

19   A    As I recall, I remember that the discussion was if we

20   could not get a nurse manager position and one of the

21   discussions that I remember having with Tiffany was that she

22   felt that we should divide this work and that she would take

23   one of the roles and I can't remember who took the other one

24   off the top of my head.  But that's -- that's what I recall

25   around this time and I may be -- I may have that confused, but

1  that's what I remember at the time of splitting this work up

2  between two groups of nurses.

3  Q    Okay.  And was it -- so -- and maybe you answered it, but

4  the reason for -- was there a reason, that you recall, as you

5  sit -- I mean, is there a reason that you recall that it was

6  split up between two nurse managers versus the prior version?

7  A    I remember part of what probed this was, at the time, it

8  was a growing -- it was constantly growing the volume of

9  workload and it was becoming too much for one person to manage

10 both of these departments.  And a lot of this change actually

11 came about after discussions with Tiffany about the structure

12 and how best to organize this.  And it was felt that this would

13 offload some of the work volume for the nurse manager positions

14 and help them share that workload, so that they weren't getting

15 too much power on their plate as I recall.

16 Q    Okay.  Do you recall -- did you attend a meeting with Glen

17 Grippen in which the new org chart, I guess, organizational

18 structure was presented to the service line right after this

19 org chart came out on 3/19/15 sometime back?

20 A    With the whole service line?

21 Q    I believe it was a meeting with employees to discuss the

22 changes.  Glen had that meeting in the structure.

23 A    I don't remember a meeting with a larger group --

24 Q    Okay.

25 A    -- talk -- all 130-something employees talking about this.

1    Q    Okay.

2    A    If I recall, I think Glen had sent out something to all

3    the staff when we were looking at reorganizing this service at

4    one point, asking for feedback from -- I think it went out to

5    every employee, saying we're going to be reorganizing this

6    service and we want your input.

7    Q    Okay.

8    A    But I don't remember, specifically, meeting with the whole

9    team, but I may have, I can't recall.

10   Q    Would it be typical like -- so if you could just touch on

11   the point you just made over the issue.  When -- before

12   organizational changes are made, so just the one in front of

13   you, is there a requirement that the union be consulted for

14   approval or for their comments?

15   A    I think it depends on -- so I -- what I would say most of

16   my employees are not bargaining in that member.  So I doubt

17   very little of the union compared to the other leadership team

18   members.  But my understanding was that as long as there wasn't

19   a change in the -- the direct reporting or the specifics of the

20   job functions being performed, I don't -- I don't think there's

21   a requirement to have those discussions with the union before

22   changes are made, but they certainly would voice their concern

23   if they had issues with the --

24   Q    Okay.

25   A    -- change.

```
 1  Q    But you recall that -- I believe you just testified, you
 2  recall Mr. Grippen sending out an email?
 3  A    Yeah, I --
 4              JUDGE BROOKS:  Wait --
 5              THE WITNESS:  -- so sometimes I --
 6              JUDGE BROOKS:  -- I didn't hear the question.
 7              MR. MACMILLAN:  I asked him if -- the way I said it
 8  was, do you recall Mr. Grippen sending out an email; is that
 9  correct?
10  BY MR. MACMILLAN:
11  Q    Is it correct that you recall Mr. Grippen sending out an
12  email?
13  A    I know he sent out an email for one of the services, and I
14  think it was this one, because this was so complicated trying
15  to get it organized that he was looking for input from the
16  frontline staff on the best way to structure this because
17  this -- this was a service that actually, although didn't
18  directly affect patient care, affected a lot of our services
19  across the organization.  Now, if you show me the email that it
20  was a different service, then I'll apologize, but as I recall,
21  he reached out to the whole organization for feedback on this
22  one.
23  Q    Okay.  Do you recall meeting with Ms. Potter -- I believe
24  Ms. Potter testified at least two or three meetings in the time
25  frame after this organizational chart came out, because in
```

1   April of -- the meetings occurred in April of 2015, regarding

2   the changes that had been made in the org chart and to her

3   position?

4   A    So what was the question?

5   Q    Do you -- sorry, let me -- that was a bad a question.  Do

6   you recall meeting with -- do you recall having meetings with

7   Mr. Grippen, Ms. Potter, and yourself in April of 2015

8   regarding the org chart and Ms. Potter's role in the service?

9   A    I remember -- I don't remember the time but I remember

10  that Tiffany and Mr. Grippen, I know, I met in his office.  And

11  then I've met with Tiffany lots of times and with the

12  service -- different members of the services multiple times,

13  so.  But I do recall one meeting with him and her,

14  specifically.

15  Q    Do you recall --

16  A    There may have been more, but.

17  Q    Do you recall -- did you ever tell Ms. Potter that,

18  basically, she would be given the chief nurse IV position on

19  the 3/19 org chart, that she would -- essentially, that was her

20  position to have?

21  A    I don't remember telling her that was her position to

22  have.  I remember having discussions about trying to create a

23  position.  And as I recall, I just -- I think we had several

24  discussions where it would have to be competed.  I mean, any

25  time we created a nurse IV position, we can't just appoint

1  somebody to a role like that, you have to compete it.

2  Q    But in any event, did you -- do you recall Mr. Grippen

3  making a comment like that either -- a similar comment to --

4  Q    I don't recall, I mean, that comment.

5  Q    Do you --

6  A    I mean, I can't imagine somebody that would've been more

7  qualified for it off the top of my head, but I don't think I

8  ever promised that position to anyone.

9  Q    Okay.  Do you -- I'm going to show you a different

10  document.  This is the Tab 44, page 51.  So it's going to be a

11  different binder, I believe.  I'm just going to get the binder

12  for you over here.

13        (Counsel confer)

14  BY MR. MACMILLAN:

15  Q    Now, I'm looking at -- actually page 51.  This is another

16  version of -- I'll just represent to you, it's another version

17  of the same org chart, but it has some handwritten notations on

18  it and I'm just (indiscernible).  Do you see where it says Greg

19  Crenshaw Nottingham D?

20  A    Right.

21  Q    And it looks like the title is -- position where his name

22  is next to it, it says chief non-VA care management program

23  analyst; do you see that?

24  A    Right.

25  Q    Okay.  Do you know who Mr. Crenshaw is?

1   A      Yeah, I remember who Greg is.

2   Q      Is a he a nurse?

3   A      No.

4   Q      And was he a doctor?

5   A      No.

6   Q      Okay.  Do you recall having a conversation with Potter

7   where Ms. Potter indicated that she didn't think it was proper

8   to -- she didn't think it was proper to have -- for Mr.

9   Crenshaw to have the title of chief?

10  A      Yeah, I remember Tiffany was very concerned about having a

11  title, some reflection of authority in her role and being

12  compensated for the complexity work that she felt she was

13  doing.  She felt that the role that she was -- should be -- you

14  know, a Nurse IV-type of position.  And when we tried to create

15  these positions to make, you know, parity and even the

16  workload, I remember that there was some, you know, concern on

17  her part that there was a title of chief on a non-Purchase Care

18  site and not on the other site.

19  Q      I'm going to show you Exhibit L.  It's in that binder that

20  you're looking at.  So that's Appellant's Exhibit L and that's

21  on page 54 of one of -- page 54, Tab 44.

22  A      Okay.

23  Q      These are some notes from Ms. Potter.  I'm going to, kind

24  of, have -- well, you can, kind of, start skimming, but I'm

25  going to ask you some questions about the bottom box --

1  A    Okay.

2  Q    -- for lack of a better word.

3  A    Okay.  It cuts off.

4  Q    Right.  But at the -- so, basically, Ms. Potter indicated

5  and I'm actually looking -- you see where they're talking about

6  Greg Crenshaw on the -- or do you see in the last box where it

7  says -- I guess, it's the second or the third-to-the-last

8  statement.  Mr. Grippen first stated he can remove the chief

9  title from Greg Crenshaw as that was an oversight but then Dr.

10 Deering said no, because then it would appear that he was

11 demoted as well and that you would not want to reflect

12 negatively on Crenshaw's integrity; do you see that?

13 A    Yeah, I see that.

14 Q    Okay.  So do you recall -- did that help refresh your

15 recollection about some conversation that occurred about Mr.

16 Crenshaw?

17 A    I mean these are her notes.  I don't remember that,

18 specifically.

19 Q    Okay.  Do you --

20 A    Unless there's a transcript, but I mean.

21 Q    Okay.  Do you recall thinking that Ms. Potter was demoted,

22 following the --

23 A    No.

24 Q    -- re-organization -- let me just finish the question --

25 on 3/19/15?

```
 1   A    No.

 2   Q    Okay.

 3   A    That was never the intent was to note -- to demote Tiffany

 4   and make her (indiscernible).

 5   Q    Do you know -- what are the rules about using a chief

 6   title, do you know those?

 7   A    I don't.  I just know that there are certain -- when they

 8   score the title or that role?

 9   Q    I guess, yeah, I mean, I think the criticism is that he's

10   using chief --

11   A    Right.

12   Q    -- when (indiscernible).

13            MR. PITRE:  Objection to -- I mean, there's

14   questions --

15            MR. MACMILLAN:  I'll rephrase it.

16            MR. PITRE:   -- and then there's answers, and no

17   discussions, please.  Judge, sorry.

18            JUDGE BROOKS:  He's rephrasing.

19            MR. MACMILLAN:  I'll rephrase.

20   BY MR. MACMILLAN:

21   Q    Do you recall -- well, let me ask you this.  I believe I

22   was -- I lost my train of thought.  I believe you were

23   asking -- I had asked you before that if you were aware of the

24   rules regarding the chief and you said you weren't; is that

25   correct?
```

1  A    No.  I asked for clarification if you meant the actual

2  verbiage of the title or the --

3  Q    Okay.

4  A    -- classification of Nurse IV versus Nurse III.  So what I

5  know is the way a nursing position gets ranked or classified is

6  that they look at the complexity of that role, the breadth of

7  the scope of what they're doing, the supervision.  I think

8  there's a lot of factors that play in to whether it's Nurse I,

9  II, III or IV.

10      And then you can supervise -- my understanding -- just an

11 example, you can supervise a lot of people but if it's not a

12 complex scope, then it wouldn't qualify for a Nurse IV.  Nurse

13 IV's are hard to get.  They have to go to Nursing Board to get

14 approved.  They can't be approved by us.

15      So I -- what I recall in this process was that we were

16 trying to get Tiffany some recognition for her work.  We

17 couldn't get a Nurse IV, we kept getting told no.  We created

18 this title of chief, as I recall it, chief nurse manager, so at

19 least we could, you know, have that reflected that she's

20 helping manage this area and then ultimately we're told that a

21 chief nurse manager title really is a Nurse IV, basically.  It

22 does -- that title, I think, doesn't technically exist in the

23 nursing world, if I recall right, in the VA.  And that's why we

24 had to get rid of that title and then go for the Nurse IV

25 again.

1  Q    Okay.

2  A    Which that's what I tend to recall from these -- these

3  discussions.

4  Q    Okay.  Do you recall who objected to the use of chief

5  nurse manger as a title?

6  A    If I recall, it was nursing service, who would have been

7  probably at the time -- probably Dr. Calform (phonetic) was

8  still here as a -- the nurse exec.  Because that all had to go

9  through nursing service.  I had -- I could only tell them what

10 I wanted and beg and plead for it, but I had no say over

11 whether a Nurse III or IV got approved at a certain -- whether

12 a position got approved at a Nurse III or IV level.

13 Q    So generally speaking, you were -- were -- so I'm sorry.

14 So did you get pushed back when -- at some point, as reflected

15 on this report, that there wasn't -- and I believe you talked

16 about it, but there wasn't a chief nurse position created; is

17 that correct?

18 A    Yeah.  At some point.  I'm guessing it's on this one I can

19 hardly read, because I don't see it --

20 Q    Well, no, let me -- well, I can't direct you.  If you --

21 A    It looks like to me it says chief nurse, but I'm -- again,

22 I'm struggling to see what (indiscernible) were.

23 Q    If you look at -- if I can direct you --

24 A    Yeah.

25 Q    -- or if I could have you look at the org chart, the 3/19

 1  posted, then -- people don't, I guess they just show up, so --
 2  but I mean I had so many discussions with Tiffany over time
 3  about this position of -- I would have assumed that she had
 4  applied.
 5  Q    Okay.
 6  A    I don't remember her specifically saying I've put my
 7  application in, but --
 8  Q    Okay.
 9  A    -- she may have.  We -- we talked frequently about trying
10  to get a Nurse 4 position created to support them.
11  Q    Let me show you -- it's going to be Tab 16, page 55 in
12  Exhibit 4T, as in Tom, it's another one.  And if you go back a
13  couple of pages, it's one of these email chains where you start
14  at the back.
15  A    Okay.
16  Q    So if you go -- well, if you go to page 56 and there's a
17  last email from you to Juanita Landrieu (phonetic) on November
18  1st, 2015, and then it continues onto the subsequent page,
19  behind it.
20  A    Oh, okay.
21  Q    Can I just --
22  A    Ah, okay.  Okay.  Okay.
23  Q    Do you recall -- well, now that you've reviewed this
24  email, do you recall being the individual who, I guess,
25  notified HR that the -- that it was going to be --

1  (indiscernible) should be cancelled with a non-selection?

2  A    Well, clearly this --

3  Q    Do you recall what led you to cancel the recruitment with

4  a (indiscernible) non-selection?

5  A    I don't recall what precipitated this.  I just know that

6  we had had lots of discussion around -- as a leadership team

7  about how this should be structured, how it should be ran as a

8  service, whether we get approval for a Nurse 4 or not, was in

9  (indiscernible) whoever approved that.  So I don't remember

10  specifically what caused us to pull it back, but I know that

11  there -- we decided before we moved forward, that we needed to

12  have some discussion about the reporting.  As I recall at the

13  time I think that, and I could be wrong on the date, but I seem

14  to recall that -- I don't (indiscernible) stuff here at that

15  time.  But I think there was discussion about whether or not

16  there should be a dyad structure or not.  I think that was a

17  lot of discussion about how that works, who reports to whom,

18  and we wanted to get that clarified before we went forward with

19  the selection, as I recall.

20  Q    Do you recall, and I think you -- you may have just

21  touched on this, but do you recall there being push -- that

22  Administrative Medicine said this was one of the first, if you

23  recall, it was one of the first departments at the Phoenix VA

24  to try and use the dyad structure?

25  A    Well, gosh, as I recall, I mean, I think this was one of

1  the first ones we tried to reorganize to get, you know, the --

2  their structure in place.  I can't remember if we did any

3  others before this.  But I can't remember off the top of my

4  head.

5  Q    Was it your understanding that Mr. Grippen had hoped to

6  use the dyad structure, not only in Administrative Service --

7  Administrative Medicine service, but other areas of the

8  organization?

9  A    Yeah, he was -- he was a fan of the dyad structure, and I

10 think that's what he wanted to see incorporated.  But I -- I

11 remember we kept getting feedback from other leaders who were

12 rotating through, there were just so many people coming from

13 the leadership team.  And we kept getting feedback that that's

14 not an ideal structure, that there are lots of concerns with

15 that and -- and I just remember lots and lots of -- what that

16 structure looks like, not who's in it but what does that look

17 like for each service and, you know, if you have that then does

18 the -- the Nurse Exec, you know, the Chief Nurse report to the

19 Nurse Exec, or to a physician.  I mean there was just tons and

20 tons of discussion around that, which kept being a burr, if you

21 would, and us getting some of this, you know, finalized.

22 Q    So, okay, and as you -- now that you've, I guess, are

23 recalling it, I mean, does -- is that the reason you recall, as

24 you sit here today, that the reason she just --

25           MR. PITRE:  Objection to --

1             MR. MACMILLAN:  What --

2             MR. PITRE:  Well, I believe he's saying he did not

3   recall, then he discussed what he did recall.  And now I

4   believe counsel is going to try to lead him down a path of what

5   he said -- he clearly says that he had not recalled.

6             JUDGE BROOKS:  It's a little leading.  Can you --

7             MR. PITRE:  Yes.

8             MR. MACMILLAN:  Sure.

9             JUDGE BROOKS:  Okay.

10            MR. MACMILLAN:  Let me just ask it, without asking

11  about recollection.

12  BY MR. MACMILLAN:

13  Q   So were the issues you just identified regarding the dyad

14  structure and the reporting structure, were those issues --

15  some of those that led to the cancellation of the

16  recruitment -- were those issues that led to the cancellation

17  of the recruitment?

18  A   I believe so.  I mean, those were ongoing discussions the

19  whole time.

20  Q   Do you recall anything else factoring into those

21  considerations, regarding the cancellation of the recruitment?

22  A   No, it was almost solely around what that structure

23  would -- what that service looks like and who would report to

24  whom.

25  Q   Do you recall if the dyad structure that Mr. Grippen had

1  proposed -- if the nurse and the physician chief were supposed
2  to be co-equals?
3  A    I -- as I recall, that's what Mr. Grippen had embraced,
4  was this idea where they were -- they were co-leaders of the
5  section.  There was a lot of consternation from Nursing Service
6  that they didn't want their -- their nursing supervisors
7  reporting, you know, to the Chief of Staff.  They thought that
8  they should report to the Nursing Service.  And the part of
9  this discussion was then we'd end up with an executive leader
10  who didn't have oversight of the service.  So we'd end up with
11  a Nurse Exec and the Chief of Staff trying to manage every
12  service, which would be very unwieldy.  So there was a lot of
13  discussion on that throughout this whole course of
14  restructuring the services and how do we structure to their
15  lateral function and Nursing Service would maintain their scope
16  of responsibility in the hospital.
17  Q    Do you recall there being a conversation about when the
18  Chief Nurse for the position was still being recruited, before
19  its cancellation, do you recall there -- whether it was going
20  to be decided without interviews, that it was just going to be
21  a review of resumes and whatnot?
22  A    I -- I don't recall that and that would have been
23  incredibly atypical, because for any leadership position, we
24  had a consistent, or at least for my services a process of
25  having a team review CVs, score them based on pre-set criteria

1  that we needed for the job.  Then we'd bring in the top

2  applicants, we'd face-to-face, they would get scored and we

3  would take the whole package of scores as an objective approach

4  to make a selection.  So if I'm understanding your question

5  right, we never would have selected from a paper selection for

6  a role like this, at this level anyway, and we wouldn't have

7  thought about competing it.

8  Q    Okay.  And you don't -- you don't recall how far -- in

9  this particular job, how far it went in the process, whether

10 you actually -- you or other members of the PENTAD looked at,

11 resumes and qualifications, or set interviews?

12 A    I don't recall that and looking at this email, it -- from

13 the way this is reading, which I wrote it when I was in section

14 manager, I mean, only one I would have accepted would have

15 been, at this level, which didn't occur that often, so this

16 email, as I read it, I couldn't even get into section manager

17 to see who was on the cert list.  I actually had to --

18 I think I delegated to my health system specialist to go in and

19 do the non-selection.  Right for this at your -- let me just

20 re-read this.  I needed to close it for non-select and then

21 they said you should see the cert list in section and I just --

22 and in action, they give me instructions on how to close it and

23 I come back and say I don't have access to it.  And then --

24         MR. PITRE:  I'll object to -- I mean, is there an

25 open question on the floor?  Or is -- well, the man is just

1  thinking out loud.

2           THE WITNESS:  No, I think I was asked if I had seen

3  the cert list --

4           MR. PITRE:  Okay.

5           THE WITNESS:  And I'm trying to make a point in this

6  email --

7           MR. MACMILLAN:  No, I'm just (indiscernible) using

8  email to determine whether -- I believe he's clarifying the

9  point whether he could even get into selection manage.  And he

10 was looking through the email to see if he could and if -- and

11 he was figuring out that he couldn't, so --

12          THE WITNESS:  And then my last point was my last

13 email says I'm in, but I can't see the cert list.  I only see

14 the one for the Chief of Surgery.

15          JUDGE BROOKS:  What page is that on?

16          MR. MACMILLAN:  Page 54 of -- I guess it's 16 or --

17 16 -- 14.

18          JUDGE BROOKS:  Okay.

19 BY MR. MACMILLAN:

20 Q   We're wanting to go through some of the whistle-blowing

21 allegations in this case and disclosures that have been

22 identified as being relevant.  And ask you a few questions

23 about them.

24 Before I do that, there was some testimony about a time, not

25 today, but yesterday, about you testifying before Congress.

1  When did that happen?

2  A    Gosh.  I think that was in September of 2014, I believe.

3  I'd have to go back and look.  I remember it was the day after

4  I got back from Europe.  I had to fly to DC, I think that trip

5  was in September of '14.

6  Q    Okay.

7  Were you trying to be proactive and solving the patient-care

8  issues?

9          MR. PITRE:  Objection, leading.

10         JUDGE BROOKS:  It sounds a bit leading.  Is there

11  another way to phrase this?

12         MR. MACMILLAN:  Sure.

13  BY MR. MACMILLAN:

14  Q    I want to ask you some questions about, just a couple more

15  questions about the scandal, generally.  What was your

16  perception about -- well, first of all, I think I shouldn't say

17  scandal, crisis.  Did the crisis involve, what -- at least part

18  of it, involved Urology wait-list?

19  A    When the -- eventually, it did.  So when the initial

20  accusations came forward in April, 2014, it was focused mostly

21  on primary care.  And then the IG, the OIG, launched an

22  investigation and, as that unfolded, Urology surfaced as part

23  of their investigation, as I recall.

24  Q    Were there efforts made by you and your staff to address

25  the problems that were identified at -- well, initially, in the

1  crisis, as well as -- as well as with the Urology wait-list

2  A    Sure.  I mean from the time I became Chief of Staff, we

3  were working to address the access issues before this ever

4  became a media circus.  So I mean, we had been working to try

5  to get resources to support the organization.  We'd been going

6  through all the primary care clinics, trying to improve their

7  efficiencies and increase capacity for appointments.  When I

8  started in February of 2012, I remember getting complaints from

9  veterans it was taking 13 and 14 months to get into primary

10  care.  By the time that this became a media event, we had

11  already improved our wait times.  So we were already working on

12  this before this became a media situation.

13  The Urology situation was a little different, in that, we had

14  several providers.  We were having challenges in Urology where

15  we have -- they weren't doing simple urologic procedures, like

16  vasectomies, which are just routine, standard of care of any

17  out-patient urology clinic in the United States.  And for some

18  reason, we were not doing them, we were sending them out, we

19  were having major issues with management in Urology.  So when

20  we had discussions with the leadership team that -- the Chief

21  of Urology resigned very abruptly, with little notice, maybe

22  two or three days.  And then another urology provider left just

23  a few days later, which actually was abandonment of patient

24  care, and in hindsight, should have been reported to the

25  Medical Board.  But that left us in the lurch, with a huge

1  this: did you ever have an understanding that Tiffany Potter
2  was furnishing information to OIG in response to inquiries by
3  OIG?
4  A    Can you say that again? Slow down. Just so that I --
5  Q    Sure. OIG, during this time period, how would you
6  characterize -- did OIG seek information from people?
7  A    Sure, by July, they had already launched an investigation.
8  Q    Right.
9  A    And they were all over the facility, interviewing I forget
10  how many staff.  They, I think, went through a million emails,
11  they were everywhere.
12  Q    What does it appear like here that Ms. Potter was doing?
13  A    Well, it's hard to tell without seeing the attachment, but
14  I -- when she talks about the OIG notes, and I don't recall
15  exactly which ones these were, but -- well, IG had released a,
16  around this time, if I recall, they had released a preliminary
17  report on their findings and outlined some of their concerns.
18  So I don't know if that's what she's saying, is that in their
19  preliminary report, there were notes that she had concerns
20  about that -- OIG didn't usually provide us with notes, if you
21  will.  Like, they would give a report and say, here's what we
22  found.  You need to respond to this if -- what your action plan
23  is.  Or they might come to us with a patient note saying, hey,
24  what do you make of this?  We think this guy needs care
25  quickly.  Will you look at this one specific situation?  So

1   when she says notes, I'm guessing that this has to do with that

2   preliminary report that came out.

3   Q    Okay.

4   A    But I think she'd have to clarify that.

5   Q    Okay.  And how would you characterize your own response to

6   this.  You asked to -- you asked to meet with her?

7   A    Well, up in this -- this email, I said a couple things.  I

8   said that it was clear that they needed help, so we were going

9   to see what we could do to get them help quickly to support

10  this workload.  And then I said let's look at your proposals

11  for leadership roles again.  I did say here, we can't just

12  grant someone an ACNS (phonetic) role like she was asking in

13  her email.  And then, she had mentioned in the end of her email

14  about reprisal, which really, kind of, grabbed me by attention,

15  and I said, you know, please stop by so we can discuss this, so

16  I can figure out if there are other issues, meaning between her

17  and her supervisor or some other leader, where she felt she

18  would be reprised against for bring these concerns forward.

19  Q    And then, in a subsequent email what are you saying here

20  and why?

21  A    Well, I'm asking her, well, we need to bring the notes and

22  the names so I can see what this is about and to make sure that

23  you have a plan to cover it.

24  So again, my guess is, this is a preliminary report where they

25  say, here's names of patients that we have concerns about which

1  did happen in Urology where they I said, here are, you know,

2  certain I forget how many names that need to be reviewed and

3  looked at.

4  Q    Do you recall that happening with regard to psychotherapy

5  patients which is placed in the subject line?

6  A    Yeah.  It could be psychotherapy patients as well because

7  there was a -- there was a group of a urology patients and a

8  group of psychotherapy patients.  So this could have easily

9  been the psychotherapy patients.

10  Q    Did you recall if you actually met with them because I

11  believe this email chain occurred pretty late at night on

12  Thursday, July 10th.  Did you meet with her, subsequent to

13  this, to discuss these issues raised in these emails?

14  A    Like you said, we met numerous times over the course of

15  this.  To specifically address this email, I would hope that we

16  would have but I can't remember exactly off the top of my head.

17  Q    Okay.  Did this email chain or the underlying concerns

18  reflected in it -- did it play any role in the decision to

19  reorganize administrative roles in medicine service in March of

20  2015?

21  A    A year later, no.  Absolutely not.

22  Q    Did it play any role in dividing duties between two nurse

23  managers as part of that reorganization?

24  A    That I'm not sure, just because here she references the

25  amount of work that she's doing and then, in our discussion

1    about creating those two roles, which she had proposed in one

2    of our discussions, was to help offload some of the work from

3    one of the nurse managers and to share that.  So I can't say

4    that this exact email --

5    Q    Did you originally intend it would've been to address the

6    problem, it wouldn't have been --

7              MR. PITRE:  Objection, leading.

8              JUDGE BROOKS:  Can you rephrase it.

9              MR. MACMILLAN:  I'll rephrase it.

10   BY MR. MACMILLAN:

11   Q    Go back to the -- if you can go back to that 3/19 org

12   chart.  Could there have been -- did you have any intent, based

13   on the concerns raised in emails C and D that you just looked

14   at, did you retaliate against Ms. Potter in any way or engage

15   in a reprisal?

16   A    No.

17   Q    Does the org chart in your mind reflect any reprisal based

18   on emails C and D?

19   A    No.  Just the opposite.  I -- these changes were made

20   based on her recommendations in the interim and certainly

21   trying to get a nurse IV position, I was one of the biggest

22   advocates for that.  And Tiffany knows this through our many

23   meetings, that I felt it would be hard to find anyone more

24   qualified than her to fill that role.  That we couldn't just

25   give it to her, we'd have to compete it but I was always a

```
 1  champion for getting a nurse IV in there and for Tiffany being
 2  in that role.  So to suggest that this has anything to do with
 3  a reprisal for her bringing these concerns forward is, I think,
 4  preposterous.
 5  Q    Could you look at -- could you go back to Exhibit A in
 6  the -- in that binder?
 7  A    This one?
 8  Q    Yeah.  Tab A.  And sorry, this is 44, tab 44 --
 9            JUDGE BROOKS:  28.  26.
10  BY MR. MACMILLAN:
11  Q    26.  Thank you. 66.  66, I believe.  Here we are.  Oh, no.
12  Here, sorry.  Tab A.
13  A    Oh, tab A?
14  Q    Yeah, (indiscernible).
15            JUDGE BROOKS:  I thought you said, Exhibit A.
16            MR. MACMILLAN:  Sorry, I --
17            JUDGE BROOKS:  So tell me again, where are you?
18            MR. MACMILLAN:  I'm at tab 44, page 26, which is also
19  Exhibit A.
20            JUDGE BROOKS:  Okay.  All right.  We're on the same
21  page.
22  BY MR. MACMILLAN:
23  Q    Are you copied on this email?
24  A    No.
25  Q    Do you recall Ms. Potter providing this information to OIG
```

1  regarding the urology issues?

2  A    I know that -- I want to make sure I understand the

3  question.  So I wasn't aware if Tiffany made any whistleblower

4  type of claims or reports to the OIG, I was never aware of

5  that.  But I do know that, after the IG was the onsite and

6  doing these investigations, they frequently worked with our

7  various staff, saying, please, send me this copy of whatever or

8  that list of patients or I need an update on this.  So the IG

9  worked with a lot of our staff across the board very closely.

10  Q    Okay.

11  A    But I wouldn't have been privy to who -- like I still

12  don't know who submitted the initial -- the urology complaint

13  or the psychotherapy complaint to the IG.

14  Q    Okay.

15  A    If that was Tiffany that's -- that, I would not have known

16  that.  They would never have given that information to us.

17  Q    Okay.

18  A    Still but subsequently, I do know that the IG worked very

19  closely with her department on all of these issues, primary

20  care, urology, psychotherapy, you name it.

21  Q    If you could turn to E.  So again this is -- well, you

22  would've -- would you have had knowledge of the disclosure that

23  was referenced in this email?

24  A    E, right?

25  Q    E.  So it's -- sorry, it's at page 32 of tab 44, so that

 1 | you --

 2 | A    Can I --

 3 | Q    Yeah, go ahead.

 4 | A    Is it this whole stream?

 5 | Q    Yeah.  It's -- the bottom line is that (indiscernible) --

 6 | A    My question is, do you need me to read the whole --

 7 | Q    No, you --

 8 | A     -- email stream?

 9 | Q     -- I don't.  But you can read the first email which is on

10 | page 32.  It's two other emails.

11 | A    All right.  If I may say, this is the email I was talking

12 | about earlier from the clerk and it was December 13, about the

13 | urology.  So Judge, this confirms my dates from earlier.

14 |        Okay.

15 | Q    Okay.  So you -- were you privy to this email at the time

16 | it was submitted?

17 | A    To the OIG?

18 | Q    Correct.

19 | A    No.

20 | Q    Okay.  And were you -- particularly, based on your

21 | testimony, were you ever aware of communications between Ms.

22 | Potter and OIG, reporting on allegations of wrongdoing?

23 | A    So I was not aware of Tiffany reporting any allegations of

24 | wrongdoing to the IG.  I know that she, like I said, she worked

25 | with them, providing them updates and reports that they were

1   requesting and list of patient names.  But this was a report to

2   the IG about allegations of wrongdoing, I had no idea that that

3   was from Tiffany and that it had occurred.

4   Q    And I guess the same question if you turn the page.  Can

5   you go to page 34 of the same exhibit, there's another email to

6   OIG from Ms. Potter, I take it, your answer is the same?  In

7   other words, did you have knowledge of this?

8   A    No.  No.  No.

9   Q    Who was Dr. Telfer?

10  A    Leslie Telfer is -- was the chief of our psychology

11  service.

12  Q    Did you ever speak with Dr. Telfer about psychotherapy

13  waitlist issues?

14  A    Yes.

15  Q    Okay.  Were you aware that Tiffany also had made a report

16  to Dr. Telfer of those same issues?

17  A    Was I aware of --

18  Q    Let me --

19  A     -- Tiffany reporting to Dr. Telfer?

20  Q    Did Dr. Telfer indicate to you any -- that Tiffany was

21  acted as a whistleblower in any capacity?

22  A    No.  Never.

23          MR. MACMILLAN:  I don't have any further questions.

24  Thank you.

25          JUDGE BROOKS:  Thank you.

1            Mr. Pitre?

2            MR. PITRE:  Yes.  Thank you.

3                         CROSS-EXAMINATION

4   BY MR. PITRE:

5   Q    You previously testified and I'll call your attention back

6   to Exhibit C, so that's 44-28.

7   A    That you -- which one is this?

8   Q    Oh, I apologize.  I've got different binders.  44, it says

9   binder 3 and that would be C.

10           MR. PITRE:  Sorry, Judge, I don't mean to keep

11  hitting the microphone.

12  BY MR. PITRE:

13  Q    Okay.  You previously testified that you do recall getting

14  this email.  Is that correct?

15  A    Yes.

16  Q    Okay.  And at this point in time, who was Tiffany's first-

17  line supervisor?

18  A    Tiffany's first-line supervisor?  I'd have to look through

19  a chart of that time.

20  Q    I guess, well, would you like me -- well, if I stated it

21  was Dr. Venditti, would that ring a bell?

22  A    I'd have to look at the org chart.  I know they worked

23  close together.  I don't know if she directly reported to Dr.

24  Venditti at the time.

25  Q    Not a problem.  We look at --

1        MR. MACMILLAN:  I'm sorry.  I'm sorry, Marques.

2        MR. PITRE:  Oh (indiscernible).

3        MR. MACMILLAN:  (Indiscernible).

4        MR. PITRE:  No problem.

5  BY MR. PITRE:

6  Q    Org. chart 12 -- I'm sorry, org. chart 92.  So that would

7  be 16-92, tab 16-92.

8        JUDGE BROOKS:  We're staying on the record.  I'm

9  stepping out for less than 30 seconds.  Just find the page

10 while I'm doing that.

11       MR. PITRE:  Okay.

12 BY MR. PITRE:

13 A    10-16.  It's going to be -- (indiscernible) why and

14 then --

15 I'm sorry what exhibit is it again?

16 Q    16-92.  It's just the org. Chart from 2014.

17 A    Okay.  It's --

18 Q    7-14.

19 A    Yeah.

20       JUDGE BROOKS:  You can proceed.

21 BY MR. PITRE:

22 Q    Yes.  So who was Ms. Potter's first-line supervisor at

23 this time?

24 A    So this was dated, July 14th, of 2014.  This email is July

25 10th, of 2014.  So that wouldn't have been in effect at the

1  time of this email.

2  Q    Okay.

3  A    So if I go back to the org. chart from December'14 -- I

4  mean, I'd have to see the one before that because there was one

5  from December to March.

6  Q    Okay.  But you're not aware of who --

7  A    It very well could've been Dr. Venditti.  I just had to

8  see the org chart before this but it looks like it was.

9  Q    All right.  Perfect.  So if -- calling you to Exhibit C,

10 do you see the email at the bottom of the page, that you were

11 cc'd on?

12 A    Yeah.  12:28 p.m.?

13 Q    Um-hum.  Um-hum.  That's correct.  Who was that email sent

14 to?

15 A    Dr. Venditti.

16 Q    Did you discuss this email with Dr. Venditti?

17 A    I'm sure I did.  We talked about her service all the time.

18 Frequently.

19 Q    When you say, her, who do you -- who do you mean?

20 A    Dr. Venditti's service.  She was a direct report under me.

21 Q    Okay.  Understood.  Do you recall the conversation that

22 you did with Dr. Venditti regarding this email from Tiffany

23 Potter?

24 A    No.  I mean, we talked about so many different emails and

25 issues.  I mean, we were constantly talking about the concerns

1    that she brings up here about the staffing and how to support

2    all the services and how to get them resources.  That was just

3    a common standing agenda item for us when we met.

4    Q    Okay.

5    A    I don't recall specifically talking about this.  I wanted

6    to talk Tiffany about the reprisal part, I know I wouldn't have

7    talked to Robbie about that -- Dr. Venditti about that piece.

8    Q    Okay.  So is that the reason that you responded to the

9    email and not Dr. Venditti?

10   A    Of course.  I mean, when I read this email that she's

11   talking to Dr. Venditti and asking, you know, not to have a

12   reprisal, I was concerned that there was something happening I

13   wasn't aware of.  So that's why I reached straight out to

14   Tiffany and not to Dr. Venditti.

15   Q    Okay.  And is that when you all had the discussion

16   regarding Tiffany's concerns with the urology patients?

17   A    Which discussion?

18   Q    You stated you all had a discussion, a meeting?

19         MR. MACMILLAN:  I think I asked him if he did, and he

20   didn't recall specifically.

21         THE WITNESS:  I think my answer was that we'd had

22   multiple meetings about urology patients.

23   BY MR. PITRE:

24   Q    Okay.  Your attention to Exhibit -- I'm sorry.  Right.  So

25   you stated that you all had a meeting and you all discussed her

1    concerns.  Do you recall that the action that she took in

2    response to that meeting?

3    A    Not off the top of my head.  I would have to look at my

4    notes, which have all been since destroyed.

5    Q    Okay.  Is it possible that you -- is that the point in

6    which you allow Ms. Potter to have the chief nurse manager

7    title?

8    A    I don't remember the timing of when it happened.

9    Q    Do your recall if that's when you allowed her to hire

10   additional staff to work under her?

11   A    Well, that wasn't just my decision.  That was an executive

12   leadership team.  We had approved -- when this crisis started

13   and before, we were getting resources in to support her.

14   Q    Okay.

15   A    To support them.

16   Q    Right.  And in one of these meetings, would you have

17   informed Tiffany that she could have made those hiring

18   decisions and to bring people on to support her in her role?

19   A    I mean, typically, when we would get the position manager

20   committee approval, to move forward, I would usually send out

21   the emails to whoever had staff that was approved and say, this

22   was approved.  You know, you can start working with HR on

23   these.  I don't remember a specific meeting saying, hire them

24   but that may have been part of our discussion depending on the

25   timing of when the PMC (phonetic) happened.

1  Q    Okay.  And did -- at that point in time, did Ms. Potter

2  hire another nurse manager?

3  A    I don't remember the timing of when that happened.

4  Q    Do you recall meeting with Ms. Potter to discuss the

5  additional duties of the chief nurse IV position that she was

6  performing?

7  A    I don't recall a specific meeting for that but I know that

8  in several of our meetings when we'd get together, I would ask

9  her to help her with writing a functional statement for that

10  position.

11  Q    Okay.  And the functional statement that was eventually

12  submitted to VISN and along with the org. chart, was that

13  functional statement the -- possibly the one that Ms. Potter

14  assisted in drafting?

15  A    My assumption would've been, yes.

16  Q    And did you have Ms. Potter assisting in drafting that

17  functional statement because she was performing those duties?

18        MR. MACMILLAN:  I'm just going -- I think he said he

19  didn't -- he assumed she would've helped with it but not that

20  it was definitive.

21        MR. PITRE:  Okay.

22        MR. MACMILLAN:  That was Mr. Deering's testimony.

23        MR. PITRE:  Understood.

24  BY MR. PITRE:

25  Q    Is it your assumption that she would've been the one to

1  help drafting that functional statement because she was

2  performing the duties of that position?

3  A    I don't know that she was performing the duties of the

4  nurse IV position because as I said earlier, I don't know what

5  goes into those classifications.  But she was interested in

6  getting a nurse IV position.  I was advocating for that request

7  to try to get her that position, which I thought she would've

8  been the best fit for so she would've been the person that I

9  would've asked for help to write that functional statement.

10 Q    Um-hum.

11 A    So that makes sense to me.

12 Q    Okay.

13 A    To say she was performing that, I'm not sure because I

14 don't know what that functional statement looked like until it

15 was done.

16 Q    Um-hum.  Okay.  You just was -- you just knew that there

17 was a need for a chief nurse IV in that?

18 A    Yeah.  I personally felt like that was one of our biggest,

19 more complex services and I supported it and Tiffany should

20 tell you that, that from day one, I supported having a nurse IV

21 in that.

22 Q    Um-hum.

23 A    Which resulted in many contentious arguments with nursing

24 service and myself about trying to get a nurse IV position

25 approved for that service.

1  Q    Right.  Isn't it correct that while you were trying to get

2  this position filled, that's the reason you created the chief

3  nurse manager title so that Tiffany could perform those duties

4  without the issue of contention.

5  A    No.  Because I don't know what all those were.

6  Q    Um-hum.

7  A    A large part of why we created this chief nurse manager

8  title was to support her.  She repeatedly came to us saying,

9  she didn't feel like she's being recognized with the work that

10  she's doing, with the appropriate title, and we were trying to

11  create something to make her role supported and that she was in

12  a role that -- and a title that reflected what she was doing.

13  Q    And what was that?

14  A    I didn't have the position description or functional

15  statement for the nurse IV to know what complexities go into

16  that.

17  Q    Um-hum.  Understood.  And what was that appropriate title

18  that she felt like she was performing but didn't have the title

19  for?

20  A    She felt she was in the nurse IV position.

21  Q    And did you disagree?  No.  Not in a IV position,

22  performing the duties of that position.

23  A    She felt that she was performing the duties of a nurse IV

24  position.

25  Q    And did the issuance of that title, isn't it true that you

1  agreed partly with that statement?

2  A    I agreed that we needed a nurse IV in that department.

3  But the role that she was performing was just in purchased

4  care, it wasn't over all of the administrative medicine.

5  Q    Um-hum.

6  A    Administrative medicine had other areas in it, like

7  clinical informatics that she wasn't supervising at the time.

8  Q    Um-hum.

9  A    And that's why I kept going to get nursing and trying to

10  get a nurse IV position, it wasn't working for just purchased

11  care.  And that's why we had to keep going back and saying,

12  it's a bigger scope than just purchased care.  So sitting here

13  today and looking at org charts and the position that she was

14  in and what we were trying to get, I would say she wasn't

15  functioning at a nurse IV level as we saw it on the org chart

16  with these other services under it.  She was over her area of

17  that org chart and what nursing kept telling us was that the

18  scope of that was not enough to support a nurse IV.

19  Q    Okay.  But eventually, it became -- the scope became

20  enough to support a nurse IV.  Is that correct?

21        MR. MACMILLAN: Well, I guess I object.  Sorry.

22        THE WITNESS:  Yeah, we thought it did and that's

23  because if you look in this box now, that nurse IV, on this org

24  chart from March of 2015, it's not just over purchased care.

25  BY MR. PITRE:

1  Q     Um-hum.

2  A     It's over purchased care, occupational health, and comp

3  and pen services.  So the previous ones as the chief manager or

4  whatever that was, it was just under the purchased care line,

5  not the other services.

6  Q     Are you aware if the chief nurse position -- is there a

7  chief nurse position over just purchased care today?

8  A     I have no idea.  I haven't been there in two years.

9  Q     Understood.  Okay.

10 I want to call your attention to Exhibit I.

11             JUDGE BROOKS:  Tab 44 at 45.

12             MR. PITRE:  Tab 44 of 44.

13             THE WITNESS:  I'm guessing it's in this one.  Yes.

14 That's it.

15 BY MR. PITRE:

16 Q     Have you ever seen this document?

17 A     Yes.

18 Q     When did you see this document?

19 A     This has an issue date -- I don't know the date but this

20 was issued on January 28.  So my guess is that -- is this the

21 report hearing?

22 Q     Yes.

23 A     This is the administrative -- no, no.  That's not the

24 report.  (Indiscernible).  So we would've received this before

25 it was published to look for any factual errors.  So we usually

1   get an email three or four weeks beforehand, sometimes longer,

2   to go through and review it and be able to give feedback if any

3   facts or information was incorrect or inaccurate.

4   Q    Understood.  So you had advanced knowledge that the OIG

5   was prepping this report?

6   A    Well, clearly -- I just -- yeah, they'd been here since

7   April of 2014.  There were lots of reports at the time.

8   Q    Okay.  You testified that you had to testify in front of

9   Congress in 2014.  Is that correct?

10  A    If I -- if I recall the date correctly, it was around

11  September 2014.

12  Q    Okay.  And what was the reasoning you were testifying to

13  Congress?

14  A    Mostly political but I think Congress's stated purpose for

15  that hearing was to try to get to the bottom of the access

16  crisis in Phoenix.

17  Q    Um-hum.

18  A    But if you take the time to watch that hour and a half

19  testimony, they asked very little about what led to the point,

20  what caused it.  They were more focused on which books I happen

21  to know about and why I hadn't been fired.  It was coming all

22  over the place.  They didn't want to stick to their theme.

23  Q    Did they ask, why you hadn't been fired?

24  A    Yeah.

25  Q    So they wanted you fired?

1   A    They didn't say that.  They asked me, why I still had my

2   job.

3   Q    They inferred that they wanted you fired?

4   A    I don't -- I'm not making any inference from what they

5   said.

6   Q    Okay.  I believe that when you began your testimony today

7   and agency counsel called this crisis a scandal, you began to

8   talk about how this crisis affected many people in the

9   management?

10  A    Right.

11  Q    Could you elaborate on that as well?

12  A    In what way?

13  Q    Just -- I just would like to hear exactly how, you know,

14  all the individuals, you stated that were either fired or who

15  moved into this crisis?

16       JUDGE BROOKS:  Wait.  Wait.  You're not asking him to

17  talk about all of the individuals.  We could be here all day to

18  talk about all.

19  BY MR. PITRE:

20  Q    No.  No.  Just talk about -- just to rename what occurred.

21  Yeah, not talk about, no.

22  A    Okay.  So if you want more detail, you'll have to tell me.

23  This could be a four-day discussion but Sharon Helman, the

24  director, Lance Robinson, Associate Director and Brad Curry,

25  who was the chief of our health administration service, about a

1   month after this all surfaced, they were put on administrative

2   leave, pending an investigation which they stayed on

3   administrative leave for about a year, I think, before anything

4   came of that.  So we had an acting associate director and an

5   acting director rotating through almost every 60 to 120 days

6   until Mr. Grippen got here and then he stayed for the better

7   part of a year, or maybe a month or two past that.

8           During that course of time, our -- one of the acting

9   directors, actually it was pretty early in this course, our

10  nurse exec was retired under some unusual circumstances.  And

11  then our assistant director left voluntarily and went and

12  joined another organization.

13  Q    Um-hum.  Did anything eventually happen to you in your

14  position --

15  A    Sure.

16  Q    -- concerning this --

17  A    Yes.  So I was left in my position as kinda of the bully

18  to keep the place stabilized.  So I was the one giving reports

19  to central office and updates and the CPOs, the directors were

20  coming through on the four-month stints, largely were just

21  kinda figureheads to keep someone in place until Mr. Grippen

22  got here and then Mr. Grippen was going to be long enough to

23  actually kind of take charge.

24          So I was left in my position for that whole time.

25  And then, in the fall of 2015, I was approached by leadership

1  in central office about taking a new position with the

2  Department of Systems Redesign as the deputy director as a

3  virtual position, just to get me out of this position and try

4  to move on.  Lots of discussion on that.  I don't know how much

5  I want to get into here because it relates to my EO (phonetic)

6  case.  But after being told that they were working on a

7  position for me, I returned from vacation.  I'd gave them the

8  nuance of why -- what I needed in that role.  I explained that

9  I had a partner that was a middle school science teacher and he

10  was under contract until the end of his year and that we

11  couldn't just pack up and move and I'd need to be virtual.

12  Everything seemed fine.  We went on vacation.  Came back and

13  that following Tuesday, I was given a letter of termination

14  from federal employment.

15  Q    Okay.  So it seems that --

16  A    And that would've been -- the upper portion of what was

17  March of 2016.

18  Q    Okay.  So it seems this crisis affected pretty

19  substantially.  Is that fair to say?

20  A    That's probably the understatement of the year, but yeah.

21  Q    Okay.  I apologize.  I did not mean to understate the

22  effect that this has had on you.  So if that was what came off,

23  I definitely apologize.

24        So during the time period of which you were

25  participating in these investigations to Congress and, as you

1   testified to, was literally made a figurehead, what was your

2   state of mind at that point in time?

3   A    Not to brag, but I think, given the complete chaos that

4   was unfolding, I think I kept a pretty level head through the

5   whole process.  I was actually, given recognition behind the

6   scenes from central office for maintaining that composure and

7   trying to keep staff morale lifted and staying calm through

8   this whole process.

9   Q    Did you feel like this was a fair process?

10  A    No.  I couldn't leave my home without a police escort.  I

11  couldn't walk into the building because of the death threats.

12  I felt like I had no support.

13  Q    You were receiving death threats?

14  A    I had multiple death threats through this process.  So I

15  mean, for what I put in and what I gave the agency, I think the

16  way it was handled, was pretty terrible.

17  Q    Understood.

18  A    But I think I -- overall, I think I did a pretty

19  remarkable job and I think that we saw that most people would

20  jump ship or not stick it out to try to do what was right by

21  the agency and by the veterans.

22  Q    You testified that the original OIG investigation was

23  strictly about processing delays but, at some point, urology

24  were pulled into it?

25  A    No.  What I said was that -- the initial allegation was

1  that there were delays in patient care--

2  Q    Patient care.

3  A     -- and that up to 40 veterans had died.

4  Q    Um-hum.

5  A    And that's what launched the investigation.  And when they

6  first got here, the very first parts of this investigation was

7  focused primarily on primary care and then, as they started

8  peeling back and got into specialty care, other areas starting

9  popping up, like urology.  There were some concerns I think

10 around vascular surgery, psychotherapy, these areas where we

11 had considerable wait times.

12 Q    And so it's true that Tiffany, Ms. Potter, reported to you

13 urology concerns and psychotherapy patients wait time in 2014,

14 correct?  She reported those concerns to you.

15 A    She sent an email with these, and I'd have to go back and

16 look and -- but that wasn't the first we'd heard of it.

17 Q    Understood.

18 A    I mean this wasn't (indiscernible) information --

19 Q    No, I understand.  So she gave a report of those concerns

20 to you in 2014?

21 A    Lots of people I guess.

22 Q    Okay.  And you stated that the OIG report that came out in

23 January of 2015 encompassed urology concerns and psychotherapy

24 concerns, as well.

25 A    I don't -- you know it's a summary here -- I don't

1  remember if it was focused on psychotherapy but it was clearly

2  utterly focused on urology.

3  Q    Okay.

4  A    I don't remember this -- I don't remember psychotherapy

5  being part of this but -- but it may have been.  I think that

6  was part of a different report.

7  Q    Okay.  Do you know an individual by the name of Ed Lowe?

8  A    Yeah.

9  Q    And who is Mr. Lowe?

10  A    Mr. Lowe is a gentleman that worked in Health

11  Administration Services, and I don't remember his title.  I

12  know he worked for Brad.  He worked very closely on the -- so

13  the part of purchased care -- there's the clinical side, and

14  then there's the administrative side of like processing

15  payments and claims and that nonclinical role, and Ed played a

16  key piece in that.

17  Q    Okay.  Do you recall a time period in 2014 where there was

18  an anonymous OIG complaint that was filed for nonVA care (sic)?

19  A    We had so many IG complaints and they were all anonymous.

20  So I -- to give you a date or a time, I have no idea.  I mean

21  there were just innumerable IG complaints.

22  Q    Understood.  Obviously you don't know this, so I'm just

23  going to tell you.  There was testimony by Mr. Lowe that, at

24  one point, when anonymous OIG complaints was reported, he

25  approached Ms. Potter and asked her if she was the source of

1  that anonymous complaint, and he stated that he was very angry

2  that that report had come out.  Were you also angry when

3  anonymous OIG reports were issued?

4  A    No, I -- when the first one hit and --

5            UNIDENTIFIED SPEAKER:  It's -- can you repeat that?

6            THE WITNESS:  Oh, sorry.  Okay, sorry, I didn't want

7  to interrupt you, but -- in April, when this surfaced, when

8  Senator -- or Chairman Norris started (indiscernible) brought

9  these allegations forward, we were all shocked.  I remember

10  watching this live on a feed on my computer as we were working

11  and we were completely stunned by the allegations of the secret

12  wait list, per se, or supposed wait list, and I wasn't angry.

13  I was just -- I was surprised, and I couldn't figure out where

14  it was coming from, like, what they meant by this because we

15  had not instructed anybody to keep wait lists.  And the

16  subsequent IG report actually clarified that and said that

17  there was no wrongdoing on the part of leadership, you know,

18  keeping secret lists and there was no wrongdoing there.  But we

19  were just -- we couldn't figure out where it was coming from.

20  I wouldn't say angry.

21            I think at one point -- I wasn't angry.  I always

22  told people if you felt that there was an issue, take it where

23  you need to take it.  And I tried to create an environment

24  where people felt safe coming to me and a lot of staff came to

25  me with concerns that we could act on and address and resolve.

1           But I think I was -- I was getting frustrated because

2    in my role -- I had worked for many years.  I created a whole

3    patient safety curriculum with our chief residency program.

4    We're one of the few VAs in the country to even have this focus

5    on patient safety.  So it's antithetical to my entire

6    philosophy to get angry if somebody brings up a safety issue.

7           I was feeling frustrated because people were going to

8    the IG and I just wished they would come to me and say here's

9    what it is so we could tackle it together.  But, you know, when

10   the IG gets involved, it just adds multiple layers of

11   complexity trying to solve the problem.

12   BY MR. PITRE:

13   Q    Okay.

14   A    And so I wouldn't say angry.  I just -- I felt -- I wished

15   that the staff would've felt more comfortable coming to

16   somebody, not even me, a nurse exec.  I mean so --

17   Q    There was also testimony today by Dr. -- sorry.  There was

18   testimony that at a meeting in which Mr. Grippen presented the

19   org chart, the 3/19/15 org chart, that he had actually told

20   staff not to report these complaints, that they was

21   (indiscernible) with the reporting of the complaint, that they

22   should keep it in-house.  Based on your testimony today you

23   agree with that --

24   A    No, that's not what I said.  I said staff can feel free to

25   take complaints wherever they want.  If they don't feel safe

1    coming to us, they need to go -- that's why the IG is there.

2    That's why the OMI is there.  That's why these agencies are

3    there.

4            I wish that they would've felt comfortable coming to

5    me to talk about some of these issues.  And some staff did.  I

6    mean I had the whole ICU nursing team come to me because they

7    didn't want to go to nursing leadership.  I had no

8    responsibility for them.  But they had concerns that they

9    wanted to discuss, so I went and spent a half day talking to

10   the entire team down there around concerns they had in ICU.  I

11   mean that's the way I would want things to work out so that we

12   could be proactive in tackling them.

13   Q    Uh-huh.

14   A    So, no, I'm not saying people shouldn't report stuff.

15   That's not a culture we want either.

16   Q    All right.  I'm calling your attention to Exhibit J.

17   A    Same book?

18   Q    Yes.  44 -- I'm sorry -- yeah, 44, 50.  Okay.  Same

19   organizational chart that you've been reviewing today.  I'm

20   going to call your attention to 51 back to 3/19/15

21   organizational chart.  You've already testified regarding this

22   organizational chart.  Are we on the same page?

23   A    Yes.

24   Q    Okay.  You testified that you had a role in the creation

25   of this organizational chart, correct?

```
 1   A    Yes.

 2   Q    Okay.  You testified that there was meetings that Ms.

 3   Potter came to you to discuss this organizational chart after

 4   it was created; is that correct?

 5   A    I don't know about after.  I'm sure we had discussions

 6   before and after.

 7   Q    Okay.  Do you recall discussions before the organizational

 8   chart was created where Ms. Potter expressed to you that she

 9   felt that this organizational chart would be a demotion?

10   A    I don't recall that discussion.  I think that came up when

11   we were talking to Mr. Grippen.

12   Q    Uh-huh.

13   A    But I don't recall that specifically before this was

14   signed.

15   Q    Okay.  Do you recall that discussion happening?

16   A    I don't -- I don't remember the sequence of this.

17   Q    But do you recall that it wasn't -- so I'm asking.  You

18   say I don't recall that it occurred, but I recall that it did

19   not occur before it was signed.  So I just want to be clear.

20   A    I think what I recall is that if she would've had concerns

21   about that before this was signed that we would've addressed

22   that or tried to address it from what I -- from what I recall.

23   Q    Okay.  And how would you have addressed it?

24   A    I don't know.  I would've probably had discussions with

25   Tiffany about why she feels it's a demotion, what can we do to
```

1  remedy this, you know, to -- because I didn't -- I had no

2  intention of ever having Tiffany feel like she was being

3  demoted.  That's actually a complete opposite of what I tried

4  to do for Tiffany.

5  Q    You -- yeah.  You testified several times that you

6  actually wanted her to be -- you wanted her to get into the

7  Chief Nurse IV position --

8  A    No, I said that I wanted a Chief Nurse IV position.  I

9  couldn't think of anybody more qualified although you never

10  know who's going to apply.  At our facility, I didn't think

11  there was anybody more qualified than Tiffany to do that job.

12  Q    Uh-huh.  So it would've been -- it would've been your --

13  you would've been very satisfied if Ms. Potter had received the

14  Chief Nurse IV position.

15  A    I think Tiffany could've done that job great.

16  Q    Okay.  So let's talk about the posting of the position --

17  A    Okay.  I'm sorry, did you have a question about page 50

18  because you referenced that one, too?  I didn't know.

19  Q    Oh, no, I was calling because (indiscernible).

20  A    Okay, sorry.

21  Q    I'm sorry.  Actually, let's, before we do that.  Just real

22  quickly because -- refresh my memory.  On your conversation.

23  You stated -- did you state -- let me just ask.  Do you recall

24  a conversation with Ms. Potter concerning Mr. Crenshaw?  I

25  can't recall if you said you did or not.

1  A    I knew who Greg was and I think -- I'd have -- what I

2  recall is that I think when we met with Mr. Grippen it

3  concerned -- about him having a title of chief and her not

4  having it.  I seem to recall that being an issue.

5  Q    Uh-huh.

6  A    But I don't remember any one-on-ones with Tiffany or

7  otherwise with other people where we talked specifically about

8  a Greg Crenshaw.

9  Q    Okay.  Let me ask you to look at page 50 of this exhibit.

10  A    Okay.

11  Q    Under Non-VA Purchased Care, the first line, Chief Non-VA

12  Care Management and Program Analyst.  Do you see that?

13  A    I can't read this.

14  Q    Oh.

15  A    Which one are you on?  I think you said 50 but I think you

16  want 51 maybe?

17  Q    No, 50.  Oh, I'm sorry; yes, you're right.  I apologize.

18  51.

19  A    Yes.

20  Q    Okay.  Yeah.  Under Non-VA Purchased Care.  Okay?  Number

21  1 where it says Chief, Non-VA Care Management and Program

22  Analyst.  Right?  Was Mr. Crenshaw in that position?

23  A    It says his name here, so I'm assuming that's who was in

24  the role.

25  Q    Was Mr. Crenshaw a doctor?

1  A    Yeah.

2  Q    Could that -- is that position -- should that position be

3  filled by someone that is not a doctor?

4  A    So as I mentioned earlier there's a clinical side and a

5  nonclinical side, so this side was really the nonclinical side.

6  They do the processing of the requests, the claims, the -- I'm

7  oversimplifying this, but they did all the nonclinical

8  administrative work.  So to answer your question -- now I

9  forgot your question -- but basically a supervisor in this

10 area, in my opinion, would have been fine to be a nonclinical

11 person.

12 Q    Okay, great.  Okay.  Prior to -- I'm sorry

13 (indiscernible).

14 A    It's doing the same thing to me to.

15       UNIDENTIFIED SPEAKER:  (Indiscernible) feedback

16 (indiscernible).

17 BY MR. PITRE:

18 Q    Prior to posting of the Chief Nurse IV position, do you

19 recall Mr. Grippen stating that position needed to be expedited

20 due to urgency as far as you feel?

21 A    I don't remember that specifically, but that's his nature,

22 so it wouldn't surprise me.

23 Q    Okay.

24 A    If he wanted things done fast and --

25 Q    Uh-huh.  Okay.  And so in Mr. Grippen's opinion, do you

1  believe that he thought that a Nurse IV position was necessary

2  in the department?

3  A    I remember him being supportive of this.  In the whole

4  Administrative Medicine Service not Purchased Care --

5  Q    Right.

6  A    -- (Indiscernible) and so I remember him being supportive

7  of it, and I was trying to get it approved and going down that

8  path multiple times.

9  Q    So it is your belief that the Chief Nurse IV position was

10  needed in the Service?

11  A    Yeah.  I think I made that pretty clear, yes.

12  Q    Okay.  So I believe it's already been testified to that

13  the position was posted in August.  And your role in that was?

14  A    In posting it?

15  Q    Uh-huh.

16  A    We would've met with -- so the position had to be approved

17  and then we had had to have the PNC (phonetic) approval to

18  recruit it which is what we saw in that document earlier.  Then

19  I -- I would have no role.  HR takes that and they start their

20  process of whatever happens in HR of putting it online, getting

21  it posted and advertised, and they go on that process.  And

22  then it's opened.  Depending on the position, usually a certain

23  number of days.  You know, once that is done then you get your

24  list of applicants.

25  Q    Okay.  Do you recall having a conversation with Ms.

 1  Potter, after the position was posted, informing you that she
 2  had applied?
 3  A    I don't remember a specific conversation but I'm sure --
 4  my assumption was then that she applied.
 5  Q    Okay.
 6  A    I think that's what I testified to earlier was that I knew
 7  this was something that she was interested in.  She was pushing
 8  very hard for it, so to not apply would've been very unusual.
 9  Q    Okay.  Do you recall Ms. Potter requesting from you a
10  status of that regarding the selection of that position?
11  A    I'm sure she probably did.  I don't remember the exact
12  specifics of it.
13  Q    Okay.  Let's turn your attention to Exhibit YY, pages
14  (indiscernible) at 51.
15  A    Same binder?
16  Q    Yes.
17          JUDGE BROOKS:  What did you say again?  Tab what?
18          MR. PITRE:  46, 51.
19          JUDGE BROOKS:  Okay.
20  BY MR. PITRE:
21  Q    Do you recall this email?
22  A    Yeah.
23  Q    Okay.  Earlier you stated that at some point you had to
24  cancel the position; is that correct?
25  A    Yeah, we did a nonselection and pulled it back.

1    Q    And you stated that in that email string you informed HR

2    that you could not access the cert list; is that correct?

3    A    Right.

4    Q    Were you selecting official on this position?

5    A    From that previous email, it looks like I was the

6    selecting official.  But now, in this email to Tiffany, I said

7    we're trying to clarify who that would be.  So, clearly, it

8    goes back to my point that there was lots of discussion among

9    the nurse exec at the time -- and I can't remember who it was

10   at the time -- myself, the director -- how this would report,

11   who they would report to.  Because if you have the

12   (indiscernible) like you wanted, the nurse and the physician,

13   and they both report to me, for example, then Nursing Services

14   lost a big piece of their staff as far as scope over the

15   organization and Nursing Services kept having a lot of

16   heartburn and consternation with that.  So there's lots of

17   discussion going around and around and around about that.

18   Q    So let me ask you this question.

19   A    And then I think -- I'm just making that point because I

20   think that says right here; we're still trying to clarify who

21   the selecting official.

22   Q    Understood.  So if you couldn't access the cert list,

23   would someone else have been maybe the selecting official at

24   that time?

25   A    Probably.  I don't know.  Probably not.  But me not

1    accessing the cert list doesn't mean a whole lot because I --

2    that's just something I rarely did in my role as Chief of

3    Staff.  I don't mean to make it sound like it's a menial task

4    but, typically, if I had a position, which I didn't have many,

5    but -- I had to fill myself, direct reports.  But when I did I

6    would usually work with, you know, my Health Specialist to get

7    those pulled up and looked at, and that's when I was -- that's

8    what I was referencing that the email was meaning.

9    Q    Now, let me ask you a question.  Prior to your November

10   5th email or November 5th action of not selecting the position

11   or pulling the position back --

12   A    Okay.

13   Q    -- who was performing the duties of that position within

14   the department?

15   A    Of the Nurse IV?

16   Q    Uh-huh.

17   A    There wasn't a Nurse IV.

18   Q    Right.

19   A    Nobody.

20   Q    So --

21   A    There was no nurse over all those different areas of

22   Administrative -- in Administrative Medicine.  So there was no

23   one nurse that was seeing all of informatics, (indiscernible),

24   you know, these different areas.

25   Q    (Indiscernible) of a Nurse IV in Purchased Care?

1  A    There wasn't.  That's my point.  There wasn't a Nurse IV,

2  so I can't say that.

3  Q    Okay.  But you're aware --

4  A    And that was the argument that we kept giving back to

5  nursing was that that complexity didn't -- for that role in

6  Purchased Care did not support a Nurse IV.

7  Q    Okay.  I'm going to ask you this question.  Isn't it true

8  that Nurse Managers cannot report to other Nurse Manager?

9  A    That I don't know.  I don't understand nursing's report

10  structure well enough to speak to that.  That would make sense

11  to me but --

12  Q    Okay.  So if there were Nurse Managers that needed to be

13  supervised but they could not report to other Nurse Managers,

14  who would then be the next person in line?

15  A    I don't know.

16  Q    Okay.

17  A    I mean, again, I'm not familiar with the nursing reporting

18  structure.  And this was one of the -- probably the only

19  service that I had that actually had nursing staff in it.

20  Q    Okay.  So I'd like to turn your attention to go to Exhibit

21  (indiscernible) 46, 53.  I'd like to show you (indiscernible)

22  there's three of them.

23  A    How far back do you want me to go?  Looks like there's --

24  Q    I think there's three.

25  A    (Indiscernible) the one from Virginia Hines, the one from

1  Tiffany --

2  Q    The one from Tiffany to you.

3  A    Okay.

4  Q    Okay.  Do you recall seeing that email?

5  A    Obviously.

6  Q    Do you recall Tiffany stating several times in this email

7  that she was performing the Chief Nurse of Purchased Care?

8  A    Yes, that's what she claims.

9  Q    At any point in time do you inform her she's not

10 performing the Chief Nurse of Purchased Care?

11 A    No.

12 Q    And what was your actual response to her?

13 A    Well, it's right there.  It says that we haven't clarified

14 who this Nurse IV (indiscernible) yet.  So we don't have a

15 selecting official clarified.  It will be timely resolved when

16 Mr. Grippen gets back.  So clearly there's still a discussion

17 and challenges happening --

18 Q    Isn't it true that you had no objection to Ms. Potter's

19 characterization that she was performing the duties of Chief

20 Nurse of Purchased Care --

21 A    I think that's a mischaracterization.  This was in the

22 time that I was getting four or five of her emails a day, so I

23 didn't have time to write tons of information about every line

24 that came to me.  So I don't think at the time -- and I knew

25 Tiffany was working very hard -- that I would take the time to

 1   approval fulfilled?  And when applicants applied, it was
 2   approved to be filled?
 3   A    Right.
 4   Q    And when the cert list was created, it was approved to be
 5   filled?
 6   A    Of course.
 7   Q    Okay.  So we're not talking about a position that's not
 8   approved to be filled.  We're talking about --
 9   A    I didn't know where you were going on this time frame.
10   Q    Understood.
11   A    Okay.
12   Q    Yes.  So we're talking about a position that was approved
13   to be filled.
14   A    Yes.
15   Q    Why was that position not filled if you had an individual
16   that was -- there was no other individual more qualified in the
17   Phoenix VA to fill that position, but there was a need for that
18   position, as you stated?
19   A    Right.
20   Q    And it was a position that was approved to be filled.
21   A    Right.
22   Q    Why wasn't it filled?
23   A    So you didn't hear my testimony earlier when I said, and
24   it's in the email string, there was clearly a discussion
25   amongst leadership team and nurse exec, the director, and

 1 | myself, about who that position was going to report to.  We're

 2 | speaking of a very major issue of what that reporting structure

 3 | was looking like.  And I even said that in the email.  I recall

 4 | that we sent it to -- that I sent it, of me saying we have to

 5 | get clarity around how this reporting structure is going to

 6 | work.  So we're going to pull this back.  It had nothing to do

 7 | with who had applied.  It was about how that was going to

 8 | report, who the (indiscernible) official should really be, and

 9 | how we wanted that structured, more than who it was that

10 | applied for it.

11 | Q    Isn't this the same time that the OIG investigation was

12 | going on?

13 | A    Yes.

14 | Q    So there was a lot of discussion about whistleblowers and

15 | who was reporting what to the OIG; is that correct?

16 | A    There was a lot of discussion about whistleblower

17 | reports.

18 | Q    Um-hum.

19 | A    And we had -- I had no idea who the whistleblowers were.

20 | Until today, I didn't realize that Tiffany was a whistleblower.

21 | Q    Okay.  And so --

22 | A    So that's news to me today.

23 | Q    Um-hum.

24 | A    I never had that information before.

25 | Q    Okay.

```
 1  A    And while we're on the topic, I am --

 2  Q    Well --

 3  A    -- very surprised by it.

 4  Q    Okay.  So let me ask you this question, are you aware --

 5  you testified that you're aware of how positions are filled; is

 6  that correct?

 7  A    Yes.

 8  Q    Okay.  Are you aware of how positions are appointed?

 9  A    What do you mean, appointed?

10  Q    Like how -- who can be appointed into what position or

11  not?

12  A    I know that there are different rules around different

13  classes of employees, as far as appointing people.  And I think

14  on the physician side, we have a lot more flexibility with

15  appointing --

16  Q    Um-hum.

17  A    -- versus the administrator -- the title five side, where

18  you can't -- my understanding is you can't appoint people that

19  I could have -- I'm not an expert in HR policies.

20          JUDGE BROOKS:  Okay.

21          MR. PITRE:  Oh, I'm sorry.

22          DR. DEERING:  Sorry.

23          MR. PITRE:  Sorry, Judge.

24          JUDGE BROOKS:  We're at the point where I promised

25  the witness could be released.  So either he's --
```

1              MR. PITRE:  Could I ask one more question before

2      we -- could I ask one more question before --

3              JUDGE BROOKS:  If you're completely done.

4              MR. PITRE:  Well, I'm not, but I'll just ask this

5      last question and he'll answer it however, if it means he can

6      or cannot.

7              JUDGE BROOKS:  Yeah.  But if he's coming back, then

8      we should wait, because we've already pushed --

9              MR. PITRE:  Oh, is he going to come back?

10             DR. DEERING:  So I have a physician's appointment

11     that it took me nine months to get in.  So I'm surprised IEG's

12     not investigating the community.  But anyway, I don't want to

13     reschedule, if at all possible.

14             MR. PITRE:  Oh, I'm sorry.  I just didn't --

15             DR. DEERING:  It's a 3:00 appointment.  And I offered

16     to come back afterwards.

17             MR. PITRE:  Yes.

18             JUDGE BROOKS:  Unless your one question means you're

19     done completely?

20             MR. PITRE:  No, sir.  I thought you were --

21             JUDGE BROOKS:  Okay.

22             MR. PITRE:  -- releasing the witness --

23             JUDGE BROOKS:  Okay.

24             MR. PITRE:  -- for good.

25             JUDGE BROOKS:  All right.  It's 3:41 p.m.  We're

 1  going to go off the record.  You're released.  I guess we'll

 2  see you after your appointment.

 3       (Off the record at 3:42 p.m.)

 4            JUDGE BROOKS:  Okay.  The time is 4:16 p.m.  We are

 5  back on the record.  Who is our witness?

 6            MR. MACMILLAN:  Rex Patterson.

 7            JUDGE BROOKS:  Okay.

 8            Mr. Patterson, I am David Brooks, the administrative

 9  judge assigned to decide this matter.  Do you have any

10  objection to testifying under oath?

11            MR. PATTERSON:  I do not.

12            JUDGE BROOKS:  During your testimony, if you have

13  questions or are confused, you can direct any questions you

14  have to me.  Would you please raise your right hand for the

15  oath?

16            REX PATTERSON, AGENCY'S WITNESS, SWORN

17            JUDGE BROOKS:  For the record, please state and spell

18  your name.

19            MR. PATTERSON:  Rex Douglas Patterson Junior.  R-E-X

20  P-A-T-T-E-R-S-O-N.

21            JUDGE BROOKS:  Thank you.  The first party that will

22  ask you questions is the Agency, through Mr. Macmillan.

23            Mr. Macmillan, you can begin.

24            MR. MACMILLAN:  Thank you.

25                      DIRECT EXAMINATION

1  BY MR. MACMILLAN:

2  Q    Mr. Patterson, what is your current job title for the VA?

3  A    I am the program manager for the quality, safety, and

4  approving service.

5  Q    And how long have you been in that role?

6  A    Since June 30th, 2014.

7  Q    And immediately prior to being the program manager, what

8  job did you have at the Phoenix VA?

9  A    I was the administrative assistant to the associate

10  director.  But I had been detailed to be the acting patient

11  advocate supervisor starting in, I believe, it was May 5th of

12  2014.

13  Q    Okay.  How long have you worked at the Phoenix VA

14  altogether?

15  A    Since April of 2005.

16  Q    Okay.  How long -- excuse me -- I want to talk to you

17  about some of the -- first, I'm going to ask you some questions

18  today about some of Ms. Potter's claims in the case.  So do you

19  recall early -- let's start by doing this -- do you recall --

20  there's a binder in front of you and it's -- what I'm showing

21  the witness is tab for the 4 -- sorry -- forty-five, Exhibit

22  EE, and that's page -- it starts at 5 of 84, and it goes on

23  from there.

24             JUDGE BROOKS:  Wait.  You don't mean tab 45 then?

25             MR. MACMILLAN:  I thought it was 44.

1           UNIDENTIFIED SPEAKER:  Here it is.

2           MR. MACMILLAN:  Tab 45, Exhibit EE.  And that's page

3    5 of 84.

4           JUDGE BROOKS:  Oh, I see.  I was looking at the top

5    of something else.  So tab 45 on what page again?

6           MR. MACMILLAN:  5.

7           JUDGE BROOKS:  Okay.  Now, I'm there.

8           MR. MACMILLAN:  That's the start of the exhibit.

9           JUDGE BROOKS:  Thank you.

10   BY MR. MACMILLAN:

11   Q    Let me know when you're ready to move on.

12   A    I have the page in front of me.

13   Q    Okay.  Have you -- on or about January -- sorry -- in

14   January of 2017, were you involved in discussions or

15   communications with Ms. Potter regarding responses to certain

16   recommendations that had been made by the OIG?

17   A    I was.

18   Q    Okay.  Now, Ms. Potter has testified that on January 27th,

19   she had a conversation  -- I'm sorry -- I'll just read this to

20   you.  "On January 27th, 2017, Rex Patterson of quality

21   management contacted the appellant and asked her to change the

22   responses that she provided for the OIG, because the director

23   did not want to include some of the information she had

24   provided".  And then it says:

25           "The appellant informed Mr. Patterson that she was

1        not going to delete or change her answers, because in

2        doing so, she would falsify information in response

3        to an OIG investigation".

4   Now, do you recall having a conversation with just you and Ms.

5   Potter on January 27th, 2017?

6   A    I recall it was a discussion with myself -- in the room

7   was Linda Swan (phonetic), Joe Friend (phonetic), Stephanie

8   White Lawson (phonetic), and me, and on the phone was Ms.

9   Potter.

10  Q    Okay.

11  A    If this is the conversation that we're referring to.

12  Q    So I believe Ms. Potter referenced two conversations.  So

13  do you recall an initial conversation with just yourself and

14  Ms. Potter, no one else on the line, I guess, or anyone with

15  you?

16  A    I don't recall a conversation.

17  Q    Is it possible that one happened?

18  A    It's possible.

19  Q    Okay.

20  A    Probable, because I would have probably set the --

21  called her to set the meeting for the five of us having a

22  discussion on the phone.

23  Q    Okay.  Do you recall discussing -- well, do you recall

24  what were the particulars of that first conversation?

25        MR. PITRE:  Asked and answered.  Objection.

1          MR. MACMILLAN:  Okay.

2  Q    Do you recall any -- you said that you didn't recall the

3  conversation, but do you recall any of the particular -- so

4  particularly, you don't recall any of the particulars; is that

5  fair?

6          JUDGE BROOKS:  How about this?  He said it was

7  possible there was a first call.  Ask him if he recalls if

8  there was -- if he now recalls --

9          MR. MACMILLAN:  Okay.

10          JUDGE BROOKS:  -- anything from a first call --

11          MR. PITRE:  Your Honor, I still --

12          JUDGE BROOKS:  -- and not what would have been

13  covered in a first call.

14          MR. MACMILLAN:  Okay.

15          JUDGE BROOKS:  So he said he didn't recall it.

16          MR. MACMILLAN:  Okay.

17  BY MR. MACMILLAN:

18  Q    What would have been covered in that first call if you

19  recalled it?

20  A    I would have --

21  Q    What did you typically talk about in a first call?

22  A    I would have been setting up the meeting with Ms. Swan to

23  discuss with Ms. Potter the -- her responses to the OIG.

24  Q    Okay.

25  A    But I would like to say, based on the allegation that you

Appx0629

1   read, that I would not ask her to change the (indiscernible).

2          MR. PITRE:  I would just ask that the witness --

3   BY MR. MACMILLAN:

4   Q    Let me ask the questions.  And if I need help, I will

5   attend to that issue that you just raised.

6   So in any event, did you -- do you believe that you would have

7   asked Ms. Potter to change the responses that she provided to

8   the OIG in a first call of this nature?

9   A    I would have said we needed to discuss the responses to

10  make sure that it answers the recommendations by the OIG.

11  Q    Okay.  Let's move on to the second conversation.  Do you

12  recall how long -- do you recall when that conversation took

13  place?

14  A    I don't recall what time it started.  I know that it

15  lasted a couple of hours.  I want to say close to three hours

16  is what it felt like.  It was a long conversation.

17  Q    Now, there's Exhibit EE in front of you.  Does it look

18  like do you recognize this document or emails reflected in this

19  document?

20  A    I recognize these statements, yes.

21  Q    Okay.  Was that the subject of the conversation with Ms.

22  Swan, Joe Friend, Stephanie White Lawson, and yourself, and Ms.

23  Potter on January 27th?

24  A    When you read the verbiage that's in this response, yes.

25  Q    Okay.  And before I read it into the specifics, I wanted

1  to ask you generally speaking, what happens -- can you -- what

2  happens when OIG sends a recommendation to a facility?  What

3  are the steps that follow from that?

4           MR. PITRE:  I would object.  Relevance.

5           MR. MACMILLAN:  I don't understand.  The foundation,

6  and I'm going to explain where we are in this process.  So it's

7  I guess relevant.

8           MR. PITRE:  I don't think this is.

9           JUDGE BROOKS:  It doesn't sound inherently irrelevant

10  to me.  You may answer.

11          THE WITNESS:  So the OIG would typically come in to

12  do a review of an allegation or allegations.  They would do a

13  draft -- they'll write a draft response.  They would send that

14  to us.  And the facility, we would, at that time, I would get

15  the response and assign who was responsible for which

16  recommendations.  In this case, there were thirteen

17  recommendations -- well, there was thirteen listed here.

18  Number one was eliminated in the first draft report.

19          The -- I would have sent these out to different

20  areas.  Ms. Potter would have been assigned number 13 that I'm

21  looking at on this page, because it belongs to the VHO's care

22  and she was the acting chief at the time.  Then she would have

23  drafted a response.  At the time, we were transitioning over.

24  And that's why Stephanie White Lawson was involved.  Ms. Lawson

25  was assisting Ms. Potter to track and make sure that the

1  services were providing the responses.  Once we got the

2  responses in, we would set up a meeting with the stakeholders,

3  and, in this case, it would have been Ms. Potter, and discuss

4  the response to make sure that it addresses the recommendation.

5          Once that recommendation is -- we go to go through

6  the verbiage to make sure that it is being met.  Once that

7  verbiage has been addressed appropriately, we put that draft

8  together, send it up to the front office for their review, the

9  PENTAB (Indiscernible) reviews it.  And if the medical center

10  agrees with the responses that we're going to do, we will

11  forward that.  That includes any actions that we need to take

12  for corrective actions.

13  BY MR. MACMILLAN:

14  Q    The person who submits the final comments would be the

15  medical center director?

16  A    The medical center director would be the one that would

17  sign the document that would go forward to the OIG.  And it's

18  sent to the visiting director for the signature concurrence.

19  Q    Do you recall what issues -- well, in your experience,

20  does Linda Swan have a particular style she used in reviewing

21  verbiage produced by an acting chief of an area that was asked

22  to respond to via comments?

23  A    Well, not just acting chiefs, but pretty much any

24  stakeholder that would respond.  Ms. Swan would go through and

25  review, word-by-word, every response that we are getting.  And

1  that was one of the reasons that it took so long to get through

2  this, because Ms. Potter was responding to recommendations 13

3  and 14.  And both of those responses -- the initial responses

4  from Ms. Potter were fairly long.  So it would have taken a

5  while.

6  Q   Was there raised voices or accusations made on this phone

7  call?

8  A    No.  I do recall at the end of it, Ms. Potter did say,

9  Fine, change it to whatever you want to change it to, because

10  I'm tired of doing this.  I've got to go.  But the answer

11  wasn't -- the answer is, we don't change it to whatever we want

12  to change it to, because we're not the subject matter experts.

13  We depend on the service she -- the stakeholders that are

14  involved with that, to provide us with that information.  What

15  we do is make sure that it is in the correct format and that

16  it's addressing the issues at hand.

17  Oftentimes, you'll see where there's additional verbiages put

18  in that doesn't need to be there, or you'll see issues that

19  aren't really germane to the issue that are put in, and it

20  actually caused the response to skew off to the left or right

21  of what the recommendation is.  It did not meet the intent of

22  what the recommendation is.

23  Q   Okay.  Now, let's start with -- well, have you had the

24  opportunity to review the final report that was submitted to

25  OIG on these issues with these recommendations and comments on

1  it?

2  A    I have.  The -- so the sender of this -- for example, when

3  we send this report in, the OIG will send us back their

4  comments saying they accept the response and they're going

5  to -- they will write and close the recommendation.  Then I'll

6  close every recommendation in the mail, we close two or three.

7        The recommendation 13 closed in September of 2017.

8  Recommendation 14 closed in July of 2017, for example.  I

9  didn't get a chance to review those final documents.  And there

10  was a difference in the responses that were initially provided

11  to the response that -- being the one that closed it.  And it

12  gets down to the actions being carried out that were being

13  implemented in the initial part of it.

14  Q    Okay.  Now, as far as -- as you hear of the

15  recommendations that were referenced in Exhibit E, it appears

16  that there were three recommendations before or two?

17  A    Recommendations 13 and 14.

18  Q    Do you recall -- does it appear that there are two

19  recommendations that were at issue?

20  A    In recommendation EE, from what I can tell here, down to

21  the end of the -- this is recommendation -- there's three

22  recommendations here.

23  Q    Oh, I'm sorry.  Where is recommendation 4 located?

24  A    Recommendation 4 is on page 10 of 13, on page 14 of 84.

25  Q    Okay.  Okay.

1          JUDGE BROOKS:  While we're on that topic, I see

2   recommendation 4 on page 4 of 14.  I see where there's

3   recommendation 14 and recommendation 13.  Is there a fourth one

4   or is it just three?

5          THE WITNESS:  There are just three that I am seeing

6   on this particular exhibit.

7          JUDGE BROOKS:  Okay.

8   BY MR. MACMILLAN:

9   Q    Can you describe what changes were made on the final

10  version of recommendation -- the comments that Ms. Potter made

11  to recommendation 13 versus what was submitted by the Agency?

12         MR. PITRE:  Objection to relevance.

13         MR. MACMILLAN:  You did yesterday.  Relevance is

14  going to show that there was no misleading of the OIG, as Ms.

15  Potter has contended, but people trying -- or staff of quality)

16  made two comments to her about the draft.  She's indicated that

17  they've abused her --

18         JUDGE BROOKS:  Okay.

19         MR. MACMILLAN:  -- and (indiscernible)

20         JUDGE BROOKS:  Okay.  I am going to allow that, but

21  with the caveat that -- and in spite of the fact that there was

22  testimony yesterday looking into what was in the S drive and

23  things.  Trying to prove or disprove whether wrongdoing

24  actually happened doesn't make either party's case.  So I

25  wouldn't go too far into what changes were made on the final.

1          MR. MACMILLAN:  Okay.

2    BY MR. MACMILLAN:

3    Q    So can we just talk -- so in your opinion, was the final

4    version, the changes that were made, were they misleading?

5    A    If you're referring to the final version that was

6    submitted regarding the January submission, January of 2017

7    submission?

8    Q    Correct.  It was recommendation 13.

9    A    So I didn't have a chance to review the final

10   recommendation -- the final report that was sent in.

11         MR. PITRE:  Objection to I'm not sure exactly what

12   the witness is reviewing.

13         THE WITNESS:  Well, I'm pulling out the

14   recommendation that was sent forward to the medical center

15   director that was sent forward to the VISN and following the

16   OIG.

17         MR. PITRE:  I don't understand.  I don't know what -

18   I am not exactly sure what the witness is reviewing.

19         THE WITNESS:  The comments that were sent to the

20   OIG --

21         JUDGE BROOKS:  Okay.  If you're bring in --

22         THE WITNESS:  -- from the medical center.

23         JUDGE BROOKS:  If you're bringing in a document that

24   isn't in the record, both parties do need a chance to see it.

25   I don't know if Mr. Macmillan already has a copy of what's in

1   front of you.

2               MR. MACMILLAN:  I don't.

3               JUDGE BROOKS:  Okay.

4               THE WITNESS:  I can speak to it without referencing

5   the (indiscernible).

6               MR. MACMILLAN:   Why don't we try to speak to him

7   without admitting it and then go from there?

8               JUDGE BROOKS:  I would close that if you're not

9   consulting it.

10              THE WITNESS:  It's closed.

11              JUDGE BROOKS:  Okay.

12              THE WITNESS:  It's closed.

13              JUDGE BROOKS:  Okay.

14  A     So I didn't have a chance to review it.  And basically,

15  it -- the recommendation 13, it includes the numbers that,

16  looking on page 1 of 13 for Exhibit EE, it provides the numbers

17  that Ms. Potter provided for the administrative and the

18  clinical staff and the -- I believe it -- well, if it shows the

19  percentages or not, it does not include the paragraph at the

20  bottom that starts with the current allocated FTE (phonetic).

21  The reasons that that paragraph was removed because it

22  doesn't -- it wasn't germane to the discussion at the time.  It

23  didn't provide any recommendations for actions that those

24  facilities were going to take or any justification for the

25  actions.

1  It also -- the verbiage is basically blaming the director for

2  the amount of staff that's there, without actually giving the

3  director the opportunity to see any recommendations for

4  augmenting or the staff, if needed.  The numbers that are

5  provided here show the volume workload, but it doesn't show how

6  much each staff can process in a day or a month or whatever

7  time period it is.  So the volume doesn't state that this is

8  annually, monthly, quarterly, weekly.  The -- so that's

9  unknown.

10        It also states that there is a staffing methodology

11  based on 2016 for staffing needs was sent to VISN leadership.

12  But that was not provided for part of this response.  And

13  because it wasn't provided, to say that we had this

14  (indiscernible) to the OIG, that's the first thing the OIG is

15  going to ask us is where is that staffing methodology at.  It

16  should be at this number of people, but how many do you

17  actually need.  That information was not provided.  And Ms.

18  Potter could not provide that information, as I recall, at the

19  time.

20  Q    And --

21  A    And what was actually used to close this recommendation

22  was a staffing methodology tool that was provided in a

23  conference that took place in May of 2017.  And it did show

24  that there was a need for, I think it was five additional

25  clinical and five additional nursing staff.  Those staff were

1  added to the non-VA care -- the community managed care org

2  chart.  And they were submitted for approving.  And we have

3  the -- we did submit those requests, because they were sent for

4  to recruit those staff members.  And that is what ended up

5  closing it was that we were able to demonstrate that.

6          In looking at recommendation 14, the -- there's a

7  very long paragraph that was -- and we basically chopped that

8  into several different paragraphs.  But the verbiage remained

9  the same.  The attachments remained the same.  And what ended

10  up -- and there was a statement that says that we were going

11  to, at the end of this:

12          "The CNC (phonetic) leadership as well as the PENTAB

13          and will continue to monitor the progress of

14          obtaining records to complete the consults that are

15          open greater than 180 days."

16          This is the action plan that was submitted.  And the

17  response was that we were leaving it open until we were able to

18  provide greater evidence.  That evidence was provided in

19  response in May.  And where we went from 5,000 open consults to

20  1,400 and we showed -- and we are having a continuing decrease

21  and had a plan to make -- sustain that continuing decrease.

22  And that is what we argued that so we would go ahead and close

23  this.  And so the --

24          JUDGE BROOKS:  Mr. Macmillan.

25          THE WITNESS:  If you prepare the --

1          MR. MACMILLAN:  Yeah, I'm sorry.

2  Q    So I think we have a flavor of some of the comments.  Were

3  those provided during the conversations -- do you recall what

4  comments -- well, is that the nature of the comments that were

5  made to Ms. Potter by Ms. Swan and this is what they resolved

6  on January 27th, 2017?

7  A    Well, recommendation 14 is the easiest one to respond to,

8  because we did keep the majority of the response in here a

9  little.  There was some verbiage that was changed to go from --

10  I distinctly remember verbiage that was changed to go from

11  passive tense to active tense.

12  Q    And so Mr. Patterson, do you think -- we just need to --

13  A    On number 13, there was with regards to we need to keep it

14  down to -- because they were very -- we were going to keep it

15  open and we weren't going to be able to close it.  We just want

16  to keep that.  So this is what our current staffing is and

17  we're reviewing that to make sure that we have the appropriate

18  staffing at all, because we didn't have anything to demonstrate

19  that we had appropriate or inappropriate staffing for the

20  client.

21          JUDGE BROOKS:  Let me provide some guidance for

22  everybody here, including for any further questions.  It may be

23  that -- it may be the easiest way for the witness to address

24  the conversation by talking about what happened in the report

25  subsequently, because that's maybe -- because he's read it at

1  some point and he remembers that.  But really the focus is what

2  were you discussing with Ms. Potter.  That's the lens through

3  which any of these recollections should come, including for

4  recommendation 4, if you reach it.  I don't know if you need

5  to.

6         But the question as to was this the nature of the

7  comments made, that's the key.  I need to know about the

8  conversation that was had with Ms. Potter on that day.

9         THE WITNESS:  So the conversation with Ms. Potter did

10  go over each word, but it also was to make sure that the

11  English stylings that Ms. Swan wanted to use, certainly they're

12  stylings, but they had nothing to do with changing the content.

13  There was a discussion with regards to recommendation 13 that

14  the -- because the final paragraph, what Ms. Potter submitted,

15  didn't really have any substance to it that we could discuss of

16  (indiscernible) we were going to leave that recommendation

17  opened until we had something substantial to put in there.  And

18  that would be the follow-up evidence.

19  BY MR. MACMILLAN:

20  Q    Okay.  I think I can move it along here, if I may.  So did

21  you have any subsequent conversations with Ms. Potter after

22  January -- sorry January 27th, 2017?  Either you or Ms. Swan or

23  did any of you have any other conversations about these

24  responses?

25  A    It was likely, but I don't recall.

1  Q    Do you know, Mr. Patterson, who -- I'm looking at page 15

2  of 84, who Louise Bachlier (phonetic) was?

3  A    Louise Bachlier, yes.  He was the acting fee manager at

4  the time.

5  Q    Okay.  Is he the one -- was he preparing the responses --

6             MR. PITRE:  Objection to relevance.

7             MR. MACMILLAN:  Well, yesterday, (indiscernible) --

8             JUDGE BROOKS:  Talk to me.

9             MR. MACMILLAN:  -- with Carlos Duarte.  Yesterday,

10 Carlos Duarte, we were indicating that Carlos Duarte prepared

11 the responses in question to Stephanie White Lawson.  So I'm

12 confirming who actually sent the emails to -- but Ms. Potter

13 had identified as being inadequate, but whether they were

14 coming from Carlos Duarte or from Louise Bachlier.  That's

15 all -- I only have one more question, but that's where I'm

16 going with it.

17            JUDGE BROOKS:  It's a bit of background.  That's

18 okay.

19 BY MR. MACMILLAN:

20 Q    So does Louise Bachlier prepare the initial responses to

21 the recommendation 4 -- I guess -- if you turn to the last

22 couple of pages in this email chain, are the emails coming from

23 Louise Bachlier?

24 A    The email that was sent on January the 9th, does come from

25 Mr. Bachlier.  And he is providing a response to what appears

1  to be recommendation 14.

2          MR. MACMILLAN:  Okay.  I don't have any further

3  questions.  Thank you.

4          MR. PITRE:  Yes.

5                    CROSS-EXAMINATION

6  BY MR. PITRE:

7  Q    So it was your testimony today that you recall multiple

8  conversations with Ms. Potter regarding the responses to these

9  alleged recommendations?

10 A    I recall two conversations specifically.  There likely was

11 others.

12 Q    Okay.  And it's your testimony today that on the -- it is

13 your testimony today that on the call on January 27th, 2017,

14 Ms. Potter was requesting to change her responses; is that

15 correct?

16 A    It's not in the verbiage that you're facing it.

17 Q    It's a yes or no question.

18 A    It was to --

19 Q    It's a yes or no question.

20          JUDGE BROOKS:  Wait.  What was the question --

21          THE WITNESS:  Yes.

22          JUDGE BROOKS:  -- again?  Because you all were

23 talking over each other.

24          MR. PITRE:  Well, I asked him that is his testimony

25 to date that on the January 27th, 2017 call, Ms. Potter was

```
 1   requesting to change her answers?

 2             THE WITNESS:  Change the answers, no.  Change the

 3   verbiage, yes.

 4   BY MR. PITRE:

 5   Q    Was the verbiage a part of her responses?

 6   A    Verbiage would be a part of the response.  Yes, sir.

 7   Q    Okay.  So then she was requesting to change her responses?

 8             JUDGE BROOKS:  You're asking him to make --

 9   A    Yes.

10   Q    Okay.

11             JUDGE BROOKS:  Okay.  He said yes.  But you're asking

12   him to make a logical conclusion when you're establishing the

13   facts one way or another.  I wouldn't get caught up on the

14   semantics of it.

15             MR. PITRE:  Right.  I understand.  It's just -- okay.

16   BY MR. PITRE:

17   Q    And it is your testimony today that that call could have

18   taken approximately three hours?

19   A    Very likely.  It was a long call.

20   Q    Okay.  Is that the normal time frame for these calls?

21   That's a yes or no answer.

22   A    Ms. Potter had --

23   Q    That's a --

24   A    -- a few responses.  So --

25   Q    That's a yes or no answer.
```

1    A    -- because there were three responses, yes.

2    Q    Okay.

3    A    They were very -- for all the responses were very long.

4    Q    Okay.  There was testimony from Ms. Stephanie White Lawson

5    that Ms. Swan was strongly recommending that Ms. Potter change

6    her answers for the recommendations.  Is that what you recall?

7    A    Yes, as far as removing that --

8    Q    Okay.  Thank you.

9    A    -- one paragraph.

10    Q    Thank you.  Ms. Lawson also testified that she was

11    uncomfortable by the tone Ms. Swan used on that call.  Did you

12    sense that Ms. Potter was also uncomfortable on that call?

13    A    No.

14    Q    You did testify that Ms. Potter ended the call abruptly,

15    though; isn't that correct?

16    A    She ended it abruptly.  She said I'm tired of this -- of

17    going -- because it had been three hours.

18    Q    Um-hum.

19    A    And she says -- it sounds as though she had been -- she

20    was tired of the discussion and that she wanted to move on to

21    something else.

22    Q    So --

23    A    But it was late.

24    Q    Um-hum.  So could that have been her being uncomfortable

25    with the length of the call?

```
 1   A      I can't speak to Ms. Potter's state of mind at the time.

 2   Q      Okay.  So now, you stated that you reviewed the final

 3   documentations for the recommendations that were to the OIG; is

 4   that correct?

 5   A      I did.

 6   Q      And when was that?

 7   A      I had reviewed that when I was told that I would be

 8   testifying today regarding these recommendations.

 9   Q      So when was that?

10   A      Last week.

11   Q      Okay.  So you reviewed those documents last week?

12   A      I also reviewed them today --

13   Q      Um-hum.

14   A      -- before I came in.

15   Q      Did anyone ask you to bring documentation to your --

16   A      No.

17   Q      No.  In your testimony, you stated that Ms. Potter was

18   acting chief, and that's why you were dealing with her,

19   correct?

20   A      That was why I would be working with her, yes, sir.

21   Q      What was she the acting chief of?

22   A      I don't know whether recalling it at the time, but it was

23   community care service.  It was the -- they have all the non-VA

24   community care, the choice consults.

25   Q      Okay.  Thank you.
```

1        MR. PITRE:  No further questions.

2        JUDGE BROOKS:  Thank you.

3        MR. MACMILLAN:  I don't have any questions.

4        JUDGE BROOKS:  Okay.  I don't have any questions

5  either.  And so I'll be releasing you, Mr. Patterson.  This is

6  an ongoing proceeding and for the duration of it, you're

7  instructed not to discuss the substance of your testimony with

8  anybody.  Thank you for coming in today, including waiting

9  around today and probably yesterday.  You're free to go.

10       THE WITNESS:  Thank you.

11       JUDGE BROOKS:  The time is 4:50 p.m.  We're off the

12 record.

13     (Off the record at 4:50 p.m.)

14       JUDGE BROOKS:  The time is 4:51 p.m.  We're back on

15 the record.  I wanted to note Mr. Macmillan stated off the

16 record yesterday that they anticipated I believe withdrawing

17 Linda Swan.  Did I get that correct?

18       MR. MACMILLAN:  No, you're correct, Your Honor.

19       JUDGE BROOKS:  Okay.  Then I will consider Ms. Swan

20 withdrawn.  And Mr. Pitre had just said that he wanted to ask

21 something.  And so we're on the record.

22       What is it, Mr. Pitre?

23       MR. PITRE:  Yes.  I just wanted to address a

24 statement that was made yesterday.  And I'm not exactly sure

25 we're on the same page with that.  And I just wanted to get

1   your understanding of why you believed that there was an

2   opportunity for discovery in this matter.  You stated there was

3   opportunity for discovery.

4          JUDGE BROOKS:  Okay.  If you have a motion, that's

5   one thing.  If you're asking for me to, on the spot, provide a

6   rationale to you, that's not why I took us on the record.

7          MR. PITRE:  Okay.

8          JUDGE BROOKS:  Okay.  The time is 4:52 p.m.  We're

9   off the record.

10       (Off the record at 4:52 p.m.)

11         JUDGE BROOKS:  The time is 4:54 pm.  We're back on

12  the record.  Appearing now as a witness is Dr. Carlos Duarte.

13         Dr. Duarte, I am David Brooks, the administrative

14  judge assigned to decide this matter.  Do you have any

15  objection to testifying under oath?

16         DR. DUARTE:  No, I do not.

17         JUDGE BROOKS:  During your testimony, if you have

18  questions or are confused, you can direct any questions you may

19  have to me.  Would you please raise your right hand for the

20  oath?

21          DR. CARLOS DUARTE, AGENCY'S WITNESS, SWORN

22         JUDGE BROOKS:  Thank you.  For the record, please

23  state and spell your name.

24         DR. DUARTE:  Good afternoon.  Carlos Duarte, D, as in

25  David, U-A-R-T-E.  First name, Carlos, C-A-R-L-O-S.

1              JUDGE BROOKS:  Thank you.  And you have a title in

2    doctor.  Is it M.D. or D.O. or something else?

3              DR. DUARTE:  M.D.

4              JUDGE BROOKS:  Thank you.

5              DR. DUARTE:  Medical doctor.

6              JUDGE BROOKS:  All right.  The first party to ask you

7    questions will be the Agency through Mr. Macmillan, who can

8    proceed now.

9              MR. MACMILLAN:  Thank you.

10                        DIRECT EXAMINATION

11   BY MR. MACMILLAN:

12   Q    Dr. Duarte, can you please tell us your current job or

13   position within the VA?

14   A    Sure.  I'm currently the chief medical officer at the

15   Midtown Community Based Outpatient Clinic here in Phoenix.

16   I've been in that role since April the 2nd of this year to the

17   present.

18   Q    And what job did you do immediately prior to this chief

19   of --

20   A    Sure.  Prior to that, I was in the role as the special

21   advisor to the chief of staff for care coordination in the

22   community.  And in that role, I was in that role from

23   approximately January of 2017 through April the 1st of this

24   year.  Just to go back in chronological order, prior to that, I

25   was the associate chief of staff of administrative medicine

1   from approximately February the 29th through January the 23rd.

2   And then prior to that, I was clinic director here at the VA,

3   one of our primary care clinics, from September of 2014 until

4   February the 28th, which is right before I took on the new role

5   of administrative medicine associate chief of staff.

6   Q    Okay.  Thank you.  Now, I want to show you an org chart.

7   If you could turn to -- and I'll help you find out in this

8   binder --

9   A    Sure.

10  Q    -- in front of you.  I'm looking for Agency tab -- it's

11  tab 16, page 35, which is 4OP.  So --

12  A    Excuse me.

13  Q    Sure.  It's in the one which is I believe -- I just was

14  trying to put it out of the way.  I apologize.  It's in binder

15  one.  I thought you said it was in binder two.  This is

16  unfortunately our system here.  And you could actually close

17  that binder.

18  A    Sure.

19  Q    Do you recognize this document?

20  A    I do.  It looks like the document that I had encountered

21  when I first came in into the role as associate chief of staff

22  of administrative medicine.  I believe the only difference is

23  there were some handwritten items in the one that I encountered

24  first.  This is just a copy.  I don't know if it has anything

25  handwritten in pencil.  But I do recognize this.

1  Q    Okay.  And so you -- where would be on -- what box would

2  you be on this org chart?

3  A    I would be at the top box, here, associate chief of staff

4  administrative medicine 1.0.

5  Q    Okay.  And were you -- did you serve any other -- while

6  you were the administrative chief of staff --

7  A    Um-hum.

8  Q    -- did you serve in any other acting capacities within the

9  administrative medicine service?

10  A    Yes, I did.  And that was concurrent during the entirety

11  of the month that I was in this capacity.  There was a position

12  under the non-VA Care/Purchase Care department that was never

13  filled.  It's called the deputy ACOS.  It's another physician.

14  So I basically was kind of doing both of those duties.

15  Q    Okay.  And during this time period, was there -- where

16  would Ms. Potter be on this org chart?

17  A    She was under the utilization review, the 1.0 nurse

18  manager.

19  Q    And was there another -- who was the other nurse manager

20  under non-VA Purchase Care?

21  A    So and I'm trying to recollect how it looks in here.  So

22  there was another person who worked on the utilization review.

23  And I believe her name was Michelle Harrison (phonetic).  And

24  she was also an RN full time.  And I am trying to remember

25  specifically how they fit in this role in here.  Give me one

1    then it's tough -- either him or Michael Welsh (phonetic),

2    because they kind of came in at around the same -- they came in

3    right after the other.

4    Q    Do you recall if you -- were you first to sign in, or did

5    you -- I mean did you -- do you recall the situation of this

6    org chart coming out?  Can you talk about it?

7    A    Sure.  My understanding is that the main change for this

8    organizational change was to remove a position, occupational

9    health, because they were going to be going to ambulatory care.

10   I wasn't the one who initiated or who had the final say so on

11   that per se; that was just a change that had been probably

12   initiated before I even came in the role.  And so occupational

13   health is not in the org chart there anymore.

14   Q    Okay.  Okay.  Do you have a copy of -- well, scratch that.

15        Have you seen the signed copy of this before; Exhibit U,

16   page 74?

17   A    I'm trying to remember.  I mean this is from more than two

18   years ago.  And I might have, but I don't want to say

19   absolutely.

20   Q    It's okay if you don't recall --

21   A    Yeah.  I don't recall.

22   Q    Okay.  All right.  Let's move on.

23   A    Sure.

24   Q    Now I'm going to show -- as the head -- as the ACOS, did

25   Tiffany Potter report to you?

1    A    Directly?

2    Q    Sure, directly?

3    A    I mean they all had a different organizational structure,

4    and so what I'm trying to say is technically in the way it

5    should be, they should be directly reporting to the ACOS deputy

6    of Purchased Care (phonetic).

7    Q    Okay.

8    A    That role was never filled.  I kind of was in that

9    position.  So in a way, she kind of did, but I was also in

10   another role as well.

11   Q    Okay.  Now when you came on into the ACOS position, did --

12   did you have morning meetings or huddles?

13   A    We did.  We established that at around -- in the fall of

14   2016.

15   Q    Okay.  Can you -- who was -- who was included in the

16   morning huddles initially?

17   A    It was primarily Purchased Care (phonetic) staff involved

18   in processing consults that were being referred out from the VA

19   facility out into the community.  Primarily people in the fee

20   department who were not clinicians.  And I believe one or two

21   of the other nurse managers.  And we started those huddles

22   sometime in October of 2016.  And they continued pretty much

23   every day until January until I was no longer in that role.

24   And during that time, they kind of changed their focus and

25   became much more refined.

1  Q    Okay.  And was Ms. Potter -- was her -- her position, was

2  she included in the morning huddles initially?

3  A    Actually looking back at my emails, she was included.

4  There was a -- there was an email Outlook invitation.  And I

5  think what might have happened at one point, there was a glitch

6  where the (indiscernible) from October 12th through November

7  the 4th or something.  And then I was looking back at

8  communications.

9       And then we communicated via email, and we said oh, I'm

10  not in that invitation, and we'll resend it to you.  Answer the

11  question, we did -- I did invite her into those morning huddles

12  because I wanted to make sure that we had everybody who should

13  be in those communications there.

14  Q    Okay.  And one of the allegations in this case is that you

15  denied a compressed work schedule to Ms. Potter.  How did you

16  -- first of all, well why don't you describe how you handled

17  compressed work schedules while you were running -- while you

18  were the ACOS?

19  A    Sure.  So I was made aware during one of these huddle

20  meetings in December I believe, that there were some nurse

21  managers -- some staff working compressed schedules.  And when

22  that came to my attention, one of the things I wanted to do was

23  to find out okay, is this -- is this being done in an equitable

24  format; to make sure that if we have those that meet the

25  criteria are offered that.  And once I found that there were, I

1  Ms. Potter prior to January 17th, 2017?

2  A    Very good.

3  Q    And how would you -- did your relationship ever change

4  after January 17th, 2017?

5  A    Not in my view.  Even to this day, I think of her very

6  highly.

7  Q    Okay.  Immediately after -- so when -- and when did you

8  actually understand were being detailed elsewhere?

9  A    Subsequent to January the 17th.

10  Q    Okay.  Do you recall a meeting occurring on January 23rd,

11  2017 with Mr. Bransky and others to clarify roles?

12  A    I don't recall.

13  Q    Okay.  Did you have an understanding some period of time

14  after January 17th, 2017 that you were continuing -- were going

15  to continue to have some role in the administrative medical

16  service?

17  A    My understanding was that I was going to be reviewing and

18  approving consults.  However, all of the other duties,

19  primarily operational, were not going to be under my purview.

20  Q    And when did you -- how soon after January 17th, 2017 --

21  how long after that --

22  A    Sure.

23  Q    -- did you have that understanding?

24  A    I believe it was a few days after that.  And I'm trying to

25  remember when, but it was after the 17th.

1  Q    Okay.  And at some point, did you -- did you learn that --

2  or did you understand that you weren't going to be having any

3  role in the administrative medicine service?

4  A    Correct.

5  Q    Okay.  When did you learn that?

6  A    It was after the 17th, but I don't remember the specific

7  date; that it was soon thereafter.

8  Q    Okay.  Were you upset with Ms. Potter following her

9  details and the classified duties on January 17th?

10  A    No, I was not.

11  Q    Did you -- when Ms. Potter indicated during her

12  disclosures (indiscernible) and elevated his voice, saying he

13  was not provided a copy of the memo, detail memo.  Is that

14  correct?  Do you agree with Ms. Potter -- Ms. Potter's

15  recollection?

16  A    I agree I wasn't provided with the memo.  I probably said

17  why.  You know, not loud; but not upset at her, not angry at

18  her.

19  Q    So you didn't agree outside of the situation?

20  A    The circumstances, the way that this transition occurred.

21  Q    It -- in your perception, what was your perception about

22  how it was handled by, not by Ms. Potter, but by the senior

23  managing for Pentad?

24  A    I wish I would have been involved with the discussions to

25  make the transition much more seamless and easier so everybody

1  understands and avoid.

2  Q    Would you -- did you, were you attributing to what was

3  it -- what was occurring?

4  A    No, I did not.

5  Q    Did you blame her --

6  A    No.

7  Q    -- at the time?

8  A    I did not and I wouldn't.

9  Q    I want to show you tab 45-DD.  Which is page 4 of tab 45.

10 You look at the first --

11 A    40 -- you said DD?

12 Q    Yes.  DD.

13 A    45, 4?

14 Q    45, it's page 4 of DD, yeah.  It's an email --

15 A    Um-hum.

16 Q    -- from Ms. Potter to Shawn Bransky.

17 A    Um-hum.  I see this.

18 Q    And yet you about it briefly in her -- did -- you

19 indicated that you believed -- you were believing that since

20 you hadn't received a copy of the memo, that business that

21 should continue as usual; is that -- do you -- did -- was that

22 you understanding at the time?

23 A    Reviewing this email here, my understanding is there is a

24 communication to leadership to provide specifics on how this

25 transition is to occur.

1 | Q    And again, this is --

2 | A    Yeah.

3 | Q    -- this is the email that was, I guess, the subject --

4 | A    Yes.

5 | Q    -- for her?

6 | A    Yes.

7 | Q    Okay.  And you didn't disagree with what Ms. Potter was

8 | saying, objecting to you, did you disagree with what Ms. Potter

9 | was saying right there?

10 | A    This is a variable mode of communication to leadership, I

11 | don't disagree.

12 | Q    Okay.  Another allegation that Ms. Potter has made, was

13 | made on January 20th, so I guess we're talking three days post

14 | detail, Dr. Venditti became angry and yelled at the Appellant,

15 | Ms. Potter averting the selection of a candidate for the

16 | administrative officer position, making the Appellant feel

17 | threatened.  Do you recall -- what do you recall about the AO

18 | candidate selection?

19 | A    That that was a position that was vacant, that was very

20 | important and, I think and others played a role in interviewing

21 | and coming up with a selection.  The final selectee, the person

22 | who was selected was someone who is that role now, who I had a

23 | chance to work with, and had worked with before.  I was

24 | perfectly fine with that selection, so I had no concerns with

25 | that selection.

1  Q    Did you become angry and yell at Ms. Potter?  Well, I -- I

2  guess because -- well, did you become angry again with Ms.

3  Potter, at all?  She was making herself infectious to the team?

4  Well -- go ahead.

5  A    No, and I -- and I don't even recall that happening.  But,

6  no.

7  Q    Okay.  Well, so what do you recall about what happened?

8  Did -- do you believe you raised your voice?

9  A    What was that?

10 Q    Do you believe you raised your voice?

11 A    Because I don't believe so, no.  No.  No, I don't recall

12 really raising my voice in any sit -- circumstance, during this

13 AO selection process.  So no, I don't recall.

14 Q    Do you recall any meeting?  Do you remember having a

15 meeting or a conversation with Ms. Potter about the -- about

16 this issue?

17 A    On the AO selection?

18 Q    Yeah.

19 A    When?  I think I might have spoken with her and some of

20 the others who were involved.

21 Q    (Indiscernible) was it unclear to you on January 20th who

22 had the authority to lift the sanction for the AO position?

23 A    It would have been -- it would have been Tiffany, it

24 wouldn't have been me.

25 Q    At the time, was that unclear to you?  Do you know?

1   A    No, I was basing everything on the memo, and I wanted to

2   insure that, for consistency, that whoever was considered the

3   chief of that department or even in an acting role, made the

4   final decision.

5   Q    Do you remember if you -- how using your voice in anger

6   against Ms. Potter for any reason?

7   A    No.  I do not.

8   Q    Were you told at some point that you were at, did you

9   continue attending community managed care staff meetings after

10  this period of time, after January 17th, 2017?

11  A    I don't recall, and if I did, it would have been only for

12  a few days until the final transition closed.

13  Q    How often did community managed care have staff meetings?

14  A    Every day during the week.  We only -- we only work Monday

15  through Friday, so once a day.

16  Q    Did you ever call Ms. Potter, being upset, and directing

17  you to Dr. McCarthy for further reason in the middle of these

18  staff meetings, the continued following January 20th, 2017?

19  Directing you to go to Dr. McCarthy?  Do you remember this --

20  well, let me ask you this.  And here's the allegation, okay?

21  You know, you can ask him a very pointed --

22              MR. PITRE:  I object to him --

23              MR. MACMILLAN:  Well, I'm going to give a count --

24              MR. PITRE:  Okay -- well, I --

25              MR. MACMILLAN:  -- and am asking then.

1          JUDGE BROOKS:  If there's an accusation and he

2     doesn't recall anything on an obvious question, then you can

3     say what the allegation is, and give him an initial chance to

4     recall it without saying even more of accusation, you're just

5     going to have to take the allegations.

6          MR. PITRE:  You're right, but that's the -- that's

7     not what my objection was.  I don't believe that he had given

8     him the initial chance to --

9          MR. MACMILLAN:  That's what I was trying to do.

10          MR. PITRE:  Well, you -- what you were doing is to

11     read the allegation, so that's last.  I agree the initial

12     chance is --

13          MR. MACMILLAN:  Well, sorry, but okay.  But let me

14     start again.

15     BY MR. MACMILLAN:

16     Q    Do you recall a staff meeting on or about January 24th,

17     2017?

18     A    January 24th?

19     Q    Yes.

20     A    I don't even think I was at staff meetings anymore.  I

21     mean, if I recall, after a certain -- I think the 23rd or 24th,

22     I actually ceased attending any meetings because I was informed

23     not to attend any more of those meetings in community care, I

24     was no longer a part of community care.

25     Q    Do you recall at a staff meeting, I guess where you told

1              MR. MACMILLAN:  (Indiscernible).

2              JUDGE BROOKS:  Yeah, just to be clear -- doesn't

3    it -- doesn't it say the proposal is August 30 date, it doesn't

4    say that it happened that day, does it?

5              MR. PITRE:  Yes.  No, right.  The proposal was the

6    30th, correct.

7              JUDGE BROOKS:  All right.

8    BY MR. PITRE:

9    Q    So the proposed change to the organizational chart.  Do

10   you recall having a conversation with Ms. Potter, as it

11   pertains to Dr. Smith, and the proposed changes to the this --

12   to the organizational chart?

13   A    I don't recall.

14   Q    You can't?  If I informed you that Ms. Potter testifies

15   that she has a conversation with you, it was Ms. Smith's

16   statement that it was her intention to have the chief nurse

17   floor position removed from the previous organizational chart

18   to this organizational chart; does that ring a bell?

19   A    Probably, yes.  It does.

20   Q    Okay.  And do you recall that conversation, Ms. Potter

21   stating that she believes that that move was in retaliation to

22   her -- in retaliation?

23   A    Her convince me that removing her --

24   Q    Yeah -- well -- what Ms. Smith had confirmed was that she

25   had planned on removing the chief nurse four position from the

1 | organizational chart, as retaliation -- in retaliation.

2 | A    No, I don't recall that.

3 | Q    You don't recall the retaliation part of it, but you do

4 | recall Ms. Smith, her having a conversation with you, about Ms.

5 | Smith removing that position?

6 | A    That probably so, yes.

7 | Q    Okay.

8 | A    But not about the retaliation.

9 | Q    Okay.  But you don't recall that?

10 | A    No.

11 | Q    All right.  Thank you.  Okay.  Let's turn to, Exhibit X,

12 | which tab 44, 87.

13 | A    So it should be in this one, yeah?  Okay.

14 |          MR. MACMILLAN:  Is that the LAG Exhibit?

15 |          MR. PITRE:  Yes.

16 |          THE WITNESS:  Go ahead.

17 | BY MR. PITRE:

18 | Q    When is this document dated?

19 | A    December 1st, 2016.

20 | Q    Okay.  Now, you made test -- you've testified today that

21 | you were not aware that this OIG complaint was filed, during

22 | the time -- at the time that it was filed; is that correct?

23 | A    Correct.

24 | Q    Who in Pentad would have been made aware of this OIG

25 | complaint?

 1  A    I believe the medical center director.

 2  Q    Um-hum.

 3  A    But I don't know who else would be on -- I don't -- I'm

 4  not at that level.

 5  Q    Okay.

 6  A    I don't know the specifics, but someone at Pentad,

 7  probably the medical center director.

 8  Q    So the medical center director would have been made aware

 9  of this OIG complaint?

10  A    I'm making that assumption, but I can't be -- I'm not 100

11  percent sure.

12  Q    But based on your experience and knowledge, that's what

13  you would believe?

14  A    I mean, I don't a lot of experience with this.

15  Q    Um-hum.

16  A    I think it's been asked and answered but I just --

17  Q    Okay.  Turning your attention to Exhibits BB, T-44, 97

18  Myriad.

19  A    So what it is again?

20  Q    For the T, T -- BB, 44, 97.

21  A    44, 97.

22  Q    No.  I apologize, sorry.

23  A    40 -- no, 42 -- 42, 249 to 250.

24  Q    42?

25  A    Yes.  Yeah.

1  Q     Okay.  Can I close this?

2  A     Yes, please.  Well --

3  Q     All right.  Dr. Duarte, you testified that you were not

4  made aware of this detail prior to it going into effect, is

5  that correct?

6  A     Correct.  I received a phone call like the Friday before.

7  This was a call that there was going to be a change, but not --

8  not getting any information.

9  Q     And who had the authority to create this detail?

10 A     The person in charge of the department, the Pentad member,

11 and who was --

12 Q     And who was in transition carried (indiscernible), and so

13 that or Shawn Bransky.  I didn't see -- I was staying here from

14 medical center directives.  It says medical center directives.

15 I don't know if that's just generic, okay.

16        And who is cc'd on that -- second page, 250.  Who was cc'd

17 on this document?

18 A     Dr. Smith, myself, and Mr. Shawn Bransky.

19 Q     Okay.  And why are those individuals cc'd?

20 A     It's a nursing position.  Me at the time I was the main

21 person in charge of that department.  And Mr. Shawn Bransky was

22 the acting deputy center director.

23 Q     Okay.  Let me ask you this question.  How long have you --

24 please just remind us.  How long have you been in the position

25 of -- what was the position that you had?

1    A    ACOS.

2    Q    Yes, ACOS, yes?

3    A    Eleven months total.

4    Q    Eleven months total.  And previous to that how many months

5    have you been in that type of position?

6    A    Had never been in this kind of a position before.  Prior

7    to that I was a clinic director of an ambulatory clinic.

8    Q    Okay.  At any point in time had you detailed an agency

9    employee to a position?

10    A    Prior to coming into this role?  No.

11    Q    No.  So you had never had the opportunity to detail any

12    individual?

13    A    Correct.

14    Q    Have you ever been detailed yourself?

15    A    I was detailed myself.

16    Q    And where were you detailed?

17    A    When I started this position in February of 2016.

18    Q    And so when you got the detail tell us what it said?

19    A    It came from -- it should be the service chief that you

20    report to, the department.  And I'm trying to remember if the

21    detail had Mr. Don Taylor as the Pentad member and it had my

22    name.

23    Q    Um-hum.

24    A    I mean, I don't have the form in front of me.

25    Q    Understood, understood.  But you were detailed into a

1 | position, is that correct?

2 | A    I was, yes.

3 | Q    Had you ever -- prior to seeing this detail, had you ever

4 | seen a detail where an individual who was not detailed to a

5 | position, but they were detailed to unclassified duties?

6 |          MR. MACMILLAN:  It might -- no.  Okay, go ahead.

7 |          THE WITNESS:  No.

8 | BY MR. PITRE:

9 | Q    Okay.  Did you -- after reviewing this detail did you find

10 | it odd that Ms. Potter was detailed to unclassified duties?

11 | A    A) I never received this, probably didn't get a copy --

12 | you know -- it is strange, but then again I've never really

13 | done this -- I've never seen too many of these done before to

14 | know whether this was out of the ordinary or not.

15 | Q    Understood.  Now, was it your understanding that this

16 | detail actually had Ms. Potter take over your duties?

17 | A    That is the impression that I'm getting, yes.

18 | Q    And how did that make you feel?

19 | A    Well, on the one level you're asking yourself why, but on

20 | the other hand it's a decision coming from higher above.  And

21 | at the end of the day I'm going to try to serve the

22 | organization as best as I can.  But obviously not as

23 | flattering.

24 | Q    Not as flattering.  So it didn't look well upon you?

25 | A    I wish I would have been in a discussion with this, as I

1  mentioned before.

2  Q    Understood, understood.  Which is respected.  And you

3  stated that you didn't understand why this detail occurred?

4  A    No.

5  Q    Could it have been the fact that Ms. Potter had made the

6  -- to lodge a complaint regarding the instructions to staff had

7  not been choice benefits?

8          MR. MACMILLAN:  I'm going to object, because it calls

9  for speculation.  And he said he didn't know about it.

10         MR. PITRE:  Well --

11         MR. MACMILLAN:  So no you're asking to speculate as

12 to his knowledge -- you know, recent knowledge, and I don't

13 think that's proper subject of testimony.

14         MR. PITRE:  Well, he stated he doesn't understand why

15 he was taken out of his position.  We have in effect a -- a

16 lodging complaint against him prior to him being taken out of

17 his position.  So I believe it's a fair question to ask if that

18 could have been one of the reasons.

19         THE COURT:  The objection is sustained.

20 Q    Calling your attention to Exhibit U.  No, I'm sorry --

21 Sorry about that.  One second.  I want this exhibit.

22     Calling your attention to Exhibit 1635?

23         UNIDENTIFIED SPEAKER:  (Indiscernible)

24         UNIDENTIFIED SPEAKER:  No, it's going to be before

25 Peter --

```
 1              MR. PITRE:  Tab -- yes, tab 16, Exhibit 4-P, page 36.

 2              THE COURT:  Thank you.

 3              MR. PITRE:  You're welcome.

 4   BY MR. PITRE:

 5   Q    Okay.  You recognize that --

 6   A    Yes.

 7   Q    -- we talked about it many times.

 8   A    Yes, I acknowledge it.

 9   Q    I said we talked about it many times.

10        I'm going to also ask you to toggle from that exhibit to

11   Exhibits 11, which is tab 42249, which is the detailing.

12   A    I'm seeing them both.

13   Q    Okay, perfect, thank you.  Now, again, you state that when

14   you came into the organization you were the ACOS of

15   administrative medicine for (indiscernible)?

16   A    Yes.

17   Q    And this detail on January 10th, 2017 effectively

18   transferred (indiscernible) to Ms. Potter, is that correct?

19   A    Well, there's one -- that's incorrect.  The approving

20   authority to review and approve consults is not in here.

21   Q    Okay.

22   A    And that's an integral part of it.

23   Q    Right.  So all the other entities --

24   A    All the other entities.

25   Q    All the other (indiscernible) --
```

1  A    Management, yes.

2  Q    Correct.  Went to the ACO.  So that -- so outside of the

3  clinical Ms. Potter was acting as the ACO as administrative

4  medicine service position outside -- I mean, take off the

5  position part because I believe (indiscernible)?

6  A    I guess I would say the deputy ACOS in charge of that

7  department.  The ACOS was fully charged of comp and pen as

8  well.  So remember I had -- at that point I had two

9  departments.

10  Q    Did she take all the operational functions of both?

11  A    No.

12  Q    Just one?

13  A    Just the purchase care.

14  Q    Okay.  Deputy ACOS?

15  A    Yes.

16  Q    Did she also take over the functions of the chief nonVA

17  care management and program analyst?

18  A    That position was vacant and was still in the process of

19  getting filled, they were actively recruiting.

20  Q    You stated they were actively recruiting at this time?

21  A    I believe so.

22  Q    And how do you believe that that recruit was occurring?

23  A    I believe they were -- well, this just really me going

24  based on my memory, this is based on what I remember being in

25  that role.  That position was vacant from September 2016, until

1  when I left.  And I don't know what ended up happening with

2  that.

3  Q    So was that -- was the duties of that position not being

4  performed?

5  A    It was being performed by other staff members.

6  Q    Okay.  And who were the other staff members?

7  A    It was someone who was put in detailed role for that

8  position.

9  Q    Who was that?

10  A    Louise (indiscernible).

11  Q    And when was that?

12  A    I believe that was September.

13  Q    Of what year?

14  A    2016, until November or December, for about three to four

15  months.

16  Q    It's 2016?

17  A    Yes.

18  Q    And then who take over the role after that?

19  A    And then he was relieved from that detail.  And then there

20  was a combination of someone from the division Regina Hynes,

21  whose the business integrity management specialist.

22  A    Um-hum.

23  Q    Who had been detailed around that same time.  These two

24  also oversee the department because there was a lot of stuff

25  going on.  And then, of course, that fee manager position, is

1   colloquy termed, was still vacant, but I don't know who they're

2   filling that role (indiscernible), it was no longer available

3   (indiscernible).

4   Q    Okay.  Do you -- it's a fairly short detail.  Do you know

5   the matters for those individual positions that you -- what are

6   the duties for those individual positions that you said were

7   vacant?

8   A    Generally speaking, the fee manager role that she is now

9   the (indiscernible) management program.

10  Q    Okay.  Can you take at the detail and let me know exactly

11  what roles you believe those functions fall under?

12  A    B, D -- B and D for sure, they wouldn't be involved with

13  clinical operations, that person is not a clinician.

14  Q    So what position are you speaking of when you say B and D?

15  A    The fee -- she would now be a care management and program

16  analyst position.

17  Q    Okay.  So the chief nurse -- chief nurse position?

18  A    No, no, no.  I'm saying the position in here under

19  (indiscernible).

20  Q    Oh, yes, okay.  Perfect.

21  A    So under that role it says it's to be granted or -- it

22  says PD#2327.  I'm talking about -- that's an administrative

23  role.

24  Q    Got you.

25  A    B and D, that's what that person would be doing.  A lot of

1  the management of spreadsheets, data, putting data, that person

2  is medical (indiscernible).

3  Q    And then, of course, what I was seeing in here, there's

4  clinical operations, so that would be someone with a nursing

5  background or a clinical background.

6  A    Okay.  So that wouldn't be that person, though.

7  Q    What person?

8  A    The fee manager.

9  Q    Understood.  Which person would that be?  Well, looking at

10 -- let me direct you.

11 A    Sure.

12 Q    Let's look at 1-C and -- and 1-C and it's 1-CI.  Could you

13 take a look at that and let me know what role do you believe

14 that applies to -- what position that applies to?

15 A    Sure.  1-C, leadership responsibilities for a clinical

16 operations with a community CMC, community managed care.  Serve

17 as primary supervisor for nursing/clinical programs within the

18 community managed care service to include provision and

19 monitoring of and then performance standards for fiscal year

20 '17.  I don't know what abbreviation they're using for NM.

21 Once again, I didn't create this.  So I --

22 Q    I know, I completely understand.

23 A    That would be someone with a clinical background.

24 Q    Again, that would be a doctor?

25 A    No.  Someone with a clinical -- well, I mean, we're

1  talking about 1 --

2  Q    Yeah, 1-C.

3  A    Yeah.

4  Q    I'm sorry, when you say clinical -- could you --

5  A    Oh, yes.  Yes.  1-C leadership responsibilities for

6  clinical operations for CMC service.  Primary supervisor for

7  nursing/clinical programs, a nurse.

8  Q    Got it.  Okay.  And within -- NMB, nurse managers?

9  A    Maybe that's what that means.

10 Q    Okay.  So is it your understanding that that role could

11 have been a chief nurse role?

12 A    I don't know -- I mean, if we're going based on a -- on

13 this flow chart from 2015, and then -- I mean, I don't know.  I

14 never worked -- that role was never filled when I was there, so

15 I don't know what duties they would have performed.

16            UNIDENTIFIED SPEAKER:  Do you have a lot more?

17            MR. PITRE:  No.

18            UNIDENTIFIED SPEAKER??:  Dr. Dearing is here.

19            MR. PITRE:  Okay.  I don't have a lot more at all.

20 BY MR. PITRE:

21 Q    Here's my question to you.

22 A    Sure.

23 Q    You stated that there were several positions that were

24 unfilled at that time?

25 A    When did I say that?  Hold on, you mean, a few minutes

1  ago?

2  Q    Yes.

3  A    Yes.  Yes.

4  Q    So is -- if it's Ms. Potter's contention that this detail

5  required her to encompass the duties of the associate chief of

6  staff for Administrative Management Services, that she would

7  purchase care, that she's nurse 4 position, and the chief fee

8  manager position, accept, you know, every duty for each one of

9  those positions, but several duties for each one of those

10  positions, would that be feasible for one individual to

11  perform?

12         MR. MACMILLAN:  I'm going to object, because it calls

13  for speculation.

14         THE COURT:  Mr. Pitre?

15         MR. PITRE:  Well, he stated that he was the

16  administrative medicine services position and that he created

17  the flow chart.  He stated that he also has performed the

18  deputy ACOS, so he's very well aware of what it takes to

19  perform multiple position.  So he's also aware that other

20  positions that were in the flow chart, that are on the

21  (indiscernible) chart, that was not filled.  So I'm basically

22  stating if the contingent -- because he says he does not know

23  if the contingent is correct that he is performing duties that

24  didn't call for those positions, in his opinion as the ACOS

25  prior to this detail, would he find that feasible for one

```
 1  individual to do?

 2              THE COURT:  I'm not sure how far you can go with

 3  this, but I'm allowing the question.

 4              THE WITNESS:  This is what I was doing practically.

 5  The only difference is this person, whoever is in this role,

 6  would not have those capabilities to improve consults.  With a

 7  lot of the other leadership operational management roles in

 8  essence is what I was doing as the deputy ACOS.  And if the

 9  intent of leadership at this time was to fill that position

10  with one person outside of approving consults, which they don't

11  have -- which is not part of what they do, one person doing

12  that that's probably what they expected.  If you're saying that

13  needed to be a nurse 4, I can't answer that question.

14  BY MR. PITRE:

15  Q    That's not the question I was asking.

16  A    Yeah.

17  Q    So you said essentially these are the duties you were

18  performing, understood.  Did you start as a primary supervisor

19  for nursing clinical programs within the CMC?

20  A    They had their own primary sup -- they had their own

21  nurses.

22  Q    Right.  (Indiscernible).  So did you serve as the

23  supervisor?

24  A    I -- supervisor their operations, yes.

25  Q    Okay.  And do you see that on E it says additional
```

1   responsibilities that may be added based on organizational

2   needs?

3   A    I see that, sir.

4   Q    Okay.  And so if those additional duties of which I have

5   spoken of for those positions that I spoke of were as Tiffany

6   has -- just so you're aware, Tiffany has testified that she had

7   several responsibilities for those four positions.  If that is

8   true, and that is the case, do you think that's feasible for

9   one individual to cover?

10          MR. MACMILLAN:  I think it's been asked and answered,

11  isn't it?  I don't answer -- he is -- sorry, note my objection.

12  Go ahead and answer.

13          THE WITNESS:  That is what I was doing.  And I don't

14  know that -- I don't know if leadership understood the

15  complexity of the work, but that is what I was doing.  So one

16  person, yes.

17  BY MR. PITRE:

18  Q    I asked you a different question.  I did -- I understand

19  the role, but we're just on a disconnect.  I answered me, I

20  asked you a different question.

21  A    Okay.

22  Q    I asked you about the additional responsibilities section

23  B, E, and I'm asking you -- and I'm telling you what the

24  testimony was.  And if you're not sure -- I think you're being

25  very up front in trying to answer the question, but I think you

1  -- I need to be a little clearer.

2      Tiffany's -- Ms. Potter's testimony was that in this

3  detail she was asked -- along with what you were doing to take

4  over your role, she was asked to perform additional

5  responsibilities that encompassed responsibilities from that

6  she purchased care, that's nurse 4, and that's fee manager.

7  Positions of which you stated were unfilled.  Do you find that

8  feasible for one --

9          THE COURT:  All right.  I'll allow this one question,

10  but you're getting beyond the document, and you're adding

11  information that's not there.

12          MR. PITRE:  Okay.

13  BY MR. PITRE:

14  Q    Do you --

15  A    Can you repeat it?

16  A    Do you find it feasible for all of those roles for one

17  person to --

18          MR. MACMILLAN:  I still think it's speculative -- I

19  really -- I withdraw my objection.

20          THE WITNESS:  I am waiting for additional

21  responsibilities may be added based on organizational needs.  I

22  don't know what those needs are.  Depending on what they are

23  possibly, but because I don't know what they are, and they're

24  not read in the memo, I can't -- I can't say that it would be

25  beyond the scope of one person.

1  BY MR. PITRE:

2  Q    You can't say or can't say -- you can't --

3  A    I can't answer, because I don't know what the specifics

4  are.

5  Q    Understood.  Okay.  A couple of more questions.

6  A    Sure.

7  Q    During your time at the -- as the ACOS, you stated that

8  they were recruiting for the chief of nursing position, is that

9  correct?  You said that's what you believe.

10  A    You're talking about the nurse 4 position?

11  Q    Correct.  It's the nurse 4 position that was vacant.

12  A    I don't really know if they were recruiting for that

13  position when I came in.

14  Q    Okay.  Do you believe that at any time while you were

15  there were they recruiting for that position?

16  A    I was never made aware if they were.

17  Q    Do you believe that there was a need for that position?

18  A    The ACOS position?

19  Q    No, chief N-4?

20         MR. MACMILLAN:  I just want to object on the grounds

21  of spec -- it's calling for speculation.  And  -- I believe

22  it's -- I thought it's been asked.

23         MR. PITRE:  He's the head of the department, so he

24  would know.

25         THE COURT:  Well, you said you had a couple of more

1  questions.

2          MR. PITRE:  Yeah, I do.  And then -- I'm literally

3  trying to finish up.

4          I'm trying -- while we're arguing I'm trying to

5  finish up.

6          THE COURT:  You're asking him if he believes that

7  there was a need for chief nurse 4, it's not relevant.

8          MR. PITRE:  Okay.

9  BY MR. PITRE:

10  Q    Let me ask this last question then.

11  A    Sure.

12  Q    Are you aware of the chief nurse 4 position ever going for

13  recertification during the time that you were the ACOS,

14  administrative (indiscernible).

15          MR. MACMILLAN:  Object to form of the question.  I

16  don't think it's clear that recertification.  So I don't even

17  know -- I don't even know --

18  BY MR. PITRE:

19  Q    Do you understand what the 4 --

20  A    Explain it to me.

21  Q    I'm going to ask, I can't explain to you.  I'm going to

22  ask you do you understand what it takes for a position to be

23  filled?

24  A    Well, I'm -- go ahead.

25  Q    I mean, if you understood the question, and answer it,

1  we'll be done.

2  A    So there has to be a classification -- a position that's

3  what the definition of a role that's recent -- that's recently

4  been classified.

5  Q    Um-hum.

6  A    And it requires a -- there's a high-level approval beyond

7  my scope.

8  Q    So at any point in time were you aware of a chief nurse 4

9  position being reclassified while you were the ACOS

10  administrative medical services, or classified?

11          MR. MACMILLAN:  Object to the form.

12          THE WITNESS:  No, I don't recall that.

13  BY MR. PITRE:

14  Q    Okay, perfect.  Thank you.

15          MR. PITRE:  No further questions.

16          THE COURT:  Thank you.

17          MR. MACMILLAN:  I have a question.  I have literally

18  one question.

19          THE COURT:  Okay.

20                    REDIRECT EXAMINATION

21  BY MR. MACMILLAN:

22  Q    You're not a HR subject matter expert, are you?

23  A    No, I'm not.

24  Q    Okay.  And my other question is would you defer to HR On

25  issues related to classification on details?

1          MR. PITRE:  Objection.  Objection, would you defer to

2  HR regarding what?

3          MR. MACMILLAN:  Classifications -- details.

4          MR. PITRE:  I didn't ask him about classification

5  details, I asked him about a specific position.  So that

6  question is not relevant because I didn't ask about

7  classifications in general.  I asked him about specific --

8          THE COURT:  But his question -- all right.  It's

9  close enough in mind, he can answer it.

10          THE WITNESS:  Whenever I came across things I would

11  have to defer to the  specialist whether HR, who's the Pentad

12  representative who ultimately approved these positions.

13  BY MR. MACMILLAN:

14  Q    Thank you.

15          MR. MACMILLAN:  I have no further questions.

16          THE COURT:  Any last --

17          MR. PITRE:  No, thanks.

18          THE COURT:  Time is 6:28 p.m.  We're off the record.

19          Actually, stay on the record long enough -- and Mr.

20  MacMillan, you're okay.  I just need to instruct the witness

21  that this is an ongoing proceeding, and for the duration of it

22  you're instructed not to discuss the substance of your

23  testimony with anybody.  I appreciate you coming in.  You're

24  free to go.

25          THE WITNESS:  Thank you, Your Honor.

Appx0704

1          MR. PITRE:  Yes.  Exhibit --

2          THE COURT:  Wait.

3          MR. PITRE:  -- SST4613.

4          THE COURT:  Yeah.  Here it is.  What was your

5   question about this document?

6   BY MR. PITRE:

7   Q    Can you turn to page 15 of 75?  Yeah.  (Indiscernible)

8   Exhibit S, page 3 of 12?  Have you ever seen this policy?

9   A    I don't recall seeing this policy, no.

10  Q    Okay.  So are you not aware of the details in this policy?

11  A    I -- if I've seen it, I -- I've --

12          MR. MACMILLAN:  (Indiscernible), he said he doesn't

13  have any foundation for it.  There's no foundation for that

14  question.  He said he hasn't seen it.  So why is --

15          MR. PITRE:  I mean --

16          MR. MACMILLAN:  -- (indiscernible) asking him if he

17  doesn't recall (indiscernible) policy because he hasn't seen

18  it.

19          MR. PITRE:  The witness can -- I believe that the

20  witness is testifying, and he can testify to the

21  (indiscernible) if he says he's not -- if he's not abreast of

22  it, he's not abreast of it.  So -- but I feel like I just

23  wanted to ask him, and we'll see what he says he's seen it if

24  he hasn't.  If he has, yes.

25          MR. MACMILLAN:  He said he hasn't seen it.

1              MR. PITRE:  Well, do you like to (indiscernible) --

2              THE COURT:  Okay.  You've asked him his --

3              MR. PITRE:  (Indiscernible) --

4              THE COURT:  You've asked him, is he --

5              MR. PITRE:  (Indiscernible) --

6              THE COURT:  You've asked him if he's aware of the

7   details of this policy, and I'm going to allow him to answer

8   that.  And dependent on his answer, that will affect whether I

9   will allow any further questioning on this document.

10             MR. PITRE:  Thank you.

11             THE WITNESS:  So as I mentioned, I don't ever recall

12  seeing this policy, so I wouldn't have (indiscernible)

13  knowledge of this policy.

14  BY MR. PITRE:

15  Q   Okay.  One question, when did you leave the services?

16  When did you leave your position in this service line?

17  A   I went out on sick leave in March of 2016.

18  Q   Mm-hmm.

19  A   And then I was terminated in June of 2016.

20  Q   Okay.  Prior to your departure, the chief nurse floor

21  position that you cancelled, do you ever recall being -- going

22  up for reclassification for this?

23  A   Well, I remember it was sent to the Vizen (phonetic) for

24  classification or to -- actually, I -- let me clarify -- either

25  the (indiscernible) or central office because I'm not sure who

1  does that.  But I -- I think it has to go through Vizen first

2  before it goes to central office.

3  Q    Right.  And so (indiscernible) through that and it was

4  posted, and then you eventually cancelled it.  Do you recall

5  ever seeing him going back to Vizen?

6  A    Not off the top of my head; I don't recall that.

7  Q    Okay.  So if it had never gone back to Vizen, you stated

8  that the reason it wasn't filled at the time was due to a bunch

9  of things going on.  If it had no need to go back to Vizen,

10  couldn't it have been posted and filled at any time?

11  A    I -- I guess hypothetically, but to be clear, I said the

12  reason that we pulled back was to try to decide where the best

13  place was to have this position in (indiscernible) and what the

14  structure and service looked like.

15  Q    Understood.  Were there any other positions that were

16  hired during that time?

17  A    Sure.  We were hiring lots of positions across the whole

18  organization.

19  Q    Okay.  And during that time, was there also

20  reorganizations going on?

21  A    Yes.

22  Q    Okay.  And so there were other positions that probably had

23  questions about who was there to report to (indiscernible) that

24  nature, is that correct?

25  A    Pro -- yes.  But not to the extent of this.  I mean, this

1  was --

2  Q    Well --

3  A    -- (indiscernible).

4  Q    Okay.  But there was (indiscernible) positions in the

5  field?

6  A    No.  Not necessarily.

7  Q    No.  Okay.  So what other example of position that you

8  know of that was not field?

9  A    There were lots.  I mean, we've had so many positions

10 approved and then pulled back for various reasons, whether

11 that's budgeting, because we needed to move those positions to

12 a different part of the organization to support whatever was

13 happening in that area.

14     This -- this PMC meeting happened every other week.  I

15 mean, there are very few committees in this hospital that met

16 as frequently as that committee did trying to get resources

17 aligned -- and when I say resources, I'm talking FTE --

18 Q    Mm-hmm.

19 A    -- aligned to the appropriate services.

20 Q    Mm-hmm.

21 A    So that was a constant.  So there was always positions

22 being approved and pulled back.  When I joined service in July

23 of 2005 --

24 Q    Mm-hmm.

25 A    -- I was offered a position, and it -- the year before.

1   And it was pulled back after I had already off -- accepted the

2   offer to come here.  And then I -- every year later.  I mean,

3   this happens all the time in the VA.

4   Q   Understood.  But just so I'm clear, it's true that once

5   the position goes to classification as posted, it can be posted

6   again at any time, but if it still has -- remains to be the

7   same (indiscernible).

8           MR. MACMILLAN:  (Indiscernible) objection.

9           MR. PITRE:  Foundation.

10          MR. MACMILLAN:  I mean, I don't know if you've

11  established that he has knowledge of that particular issue.

12          MR. PITRE:  I believe that -- well, he just stated he

13  had.

14          THE COURT:  The answer to that --

15          MR. MACMILLAN:  (Indiscernible) it's just like you're

16  ask --

17          THE COURT:  Well, you asked that question before, and

18  he said something to the effect of, I suppose theoretically

19  that's possible that they can still select for the position in

20  the future.

21          Was that your answer?

22          THE WITNESS:  Sure.  And that's my understanding of

23  it.  And I know --

24  BY MR. PITRE:

25  Q   Thank you.

**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**
**DENVER FIELD OFFICE**

| | | |
|---|---|---|
| Tiffany Potter, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | Docket Number |
| v. | ) | DE-1221-18-0165-W-1 |
| | ) | |
| David Shulkin, Secretary | ) | Admin Judge: David S. Brooks |
| U.S. Department of Veteran Affairs | ) | |
| | ) | |
| Agency. | ) | Date: September 27, 2018 |
| | ) | |

## <u>APPELLANT'S PREHEARING SUBMISSIONS</u>

Pursuant to Administrative Judge David S. Brooks' August 22, 2018 Order and Notice of Hearing and Prehearing Conference in the above-referenced Merit Systems Protection Board (MSPB) appeal, and in accordance with 5 C.F.R. §§ 1201.73 et seq., Tiffany Potter, the Appellant, by and through her undersigned and designated attorney, hereby timely provides her Prehearing Submission in the above referenced appeal.

Please find attached:

1) The Appellant's statement of facts and issues;

2) A list of all agreed upon material facts;

3) A list of Appellant's proposed witnesses;

4) In addition to the Exhibits listed in the Agency's Agency File the Appellant list of additional exhibits are attached.

Respectfully Submitted,

*A. Marques Pitre, Esq.*

A. Marques Pitre, Esq.
PITRE & ASSOCIATES, LLC.

Ronald Reagan Building &
International Trade Center
1300 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004
Email: Ampitre@ampitreassociates.com

Attorney for Appellant

**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**
**DENVER FIELD OFFICE**

| | | |
|---|---|---|
| Tiffany Potter, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | Docket Number |
| v. | ) | DE-1221-18-0165-W-1 |
| | ) | |
| David Shulkin, Secretary | ) | Admin Judge: David S. Brooks |
| U.S. Department of Veteran Affairs | ) | |
| | ) | |
| Agency. | ) | Date: September 27, 2018 |
| | ) | |

## I.     Appellant's List of Material Facts

**Employment with Department of Veterans Affairs:**

1. On September 25, 2011, the Appellant was promoted to a Nurse III/Nurse Manager until her involuntary resignation on March 3, 2017.

**Whistleblower Disclosures between May 28, 2014 and January 29, 2015:**

2. On May 28, 2014, the Appellant reported concerns to her supervisor, Dr. Robbi Venditti, that three Urology patients, who had been diagnosed with cancer over two years prior, treatments had been unaddressed due to the cancelling of consults/appointments, directed by Dr. Venditti and Dr. Darren Deering, Chief of Staff for Administrative Medicine Service. The patients had died earlier that month as a result of the untreated cancer. **Exhibit A**

3. On July 10, 2014, the Appellant reported to the OIG a list of one hundred and twenty-eight (128) patients who were awaiting psychotherapy treatment. Ninety-six (96) of the patients were never sent to TriWest to receive care in the community, despite clear instructions on the consult to do so. Many of the patients listed were suicidal and otherwise high-risk cases needing urgent attention. **Exhibit B**

4. On July 10, 2014, the Appellant emailed Dr. Venditti, Dr. Deering, and Dr. Blanca Vela (Deputy Chief of Staff) reporting the Appellant's strong concerns about the patient care delays that were discovered through the OIG investigation. **Exhibit C**

5. On July 10, 2014, Dr. Deering emailed the Appellant requesting exact correspondence that was provided to OIG investigators by the Appellant regarding facility failures leading to patient care delays for Veterans needing psychotherapy care. **Exhibit D**

6. On August 7, 2014, the Appellant reported the mishandling of Urology patients which resulted in patient deaths to the OIG.  **Exhibit E**

7. On August 8, 2014, the Appellant reported to the OIG concerns regarding providers having their alerts turned off, resulting in doctors not responding to patient care and follow-up requests. The Appellant originally reported this concern to facility leadership on June 27, 2014. **Exhibit F**

8. On August 20, 2014, the Appellant was contacted by the OIG to provide further testimony regarding the mishandling of Urology patients by Dr. Deering and Dr. Venditti. **Exhibit G**

9. On January 23, 2015, Dr. Venditti and Edmund Lowe accused the Appellant of filing an anonymous OIG hotline complaint regarding significant delays by Non VA Care admin staff.  **Exhibit H**

10. On January 29, 2015, the VA Office of Inspector General released the results of its review of the Phoenix VA's Urology Department which included information that the Appellant provided during her testimony to the OIG. **Exhibit I**

**Retaliatory Actions and March 19, 2015 Demotion:**

11. Between December 8, 2014 and March 18, 2015, the Appellant performed duties and responsibilities above her assigned position, Nurse Manager, without additional compensation.  The Appellant performed duties and responsibilities of Chief of Purchased Care or Chief Nurse IV.  The Appellant assumed these additional duties due to a reorganization, the Agency's failure to fill the Chief of Purchased Care position, and failure to assign a Chief Nurse IV.

12. The additional duties performed by Appellant between December 8, 2014 and March 18, 2015, included but were not limited to, approval and denial of all referrals to Non VA Care, creating training plans, policies, and SOPs for staff, overseeing and managing the full implementation of non-VA care coordination, to include process implementation, providing  leadership and support of all programs within Community Cae including Consult/Case Management, ACI, Triwest PC3 contractual obgligations, Utilization Review, Transfer Program, Transplant Program, Traveling Veterans Program. Coordnating with TriWest senior leadership to enusre authorizations are followed through by Triwest and other outside vendors, and assuminng all duties and responsibilities of the ACOS for Administrative Medicine, and the Chief of Purchased Care when Dr. Venditti was in those positions but out of the office.

13. On July 15, 2014, the Appellant met with Dr. Darren Deering regarding her performance of additional duties above her position.  Dr. Deering informed Appellant, that although she was performing the duties of Chief of Purchased Care he would not authorize her to officially obtain the position of Chief Nurse IV, and also denying her Chief Nurse IV

compensation.

14. On March 19, 2015, an organizational chart was signed off by former Phoenix VA Medical Center Director, Glenn Grippen, demoting the Appellant from Chief Nurse IV to Nurse Manager. As a result of the demotion, Appellant's oversight was reduced and she went from managing 45 full-time employees to supervising 14 full-time employees. **Exhibit J**

15. On April 1, 2015, Mr. Grippen, held a staff meeting with the entire Non VA Purchased Care department wherein he presented the new organizational chart reflecting Appellant's demotion to Appellant's staff. **Exhibit K**

16. On April 14, 2015, the Appellant met with Dr. Deering and Mr. Grippen and expressed that she felt her demotion was an act of retaliation for OIG and whistleblower protected disclosures.

17. On December 8, 2015, the Appellant met with the Office of the Medical Inspector and provided testimony regarding administrative and clinical processes and process delays. **Exhibit T**

**November 5, 2015 Failure to fill Chief Nurse IV position:**

18. On April 29, 2015, Mr. Grippen and Dr. Deering informed the Appellant that the Chief Nurse IV position was being expedited with urgency to be filled, and that Mr. Grippen would write a letter requesting it to be rushed as the position is essential to the functioning of the department. This urgency in action was done in hopes that it will resolve the Appellant's complaints of retaliation. **Exhibit L**

19. Appellant was already performing Chief Nurse IV (Purchased Care) duties without compensation and without the title.

20. On May 29, 2015, during a Speed of Trust conference, Mr. Lowe, stated to the Appellant that staff had animosity against her due to her involvement with the OIG. **Exhibit M**

21. On August 10, 2015, the Appellant applied for the Chief Nurse IV (Community Care) position.

22. The Appellant was listed as a "highly qualified candidate" and deemed a "Priority A" for the Chief Nurse IV (Community Care) position. **Exhibit P**

23. On September 24, 2015, Ms. Marian Tademy, EEO Program Manager, told the Appellant that Mr. Grippen and Dr. Deering were trying to re-organize the Appellant's department back under Nursing service with the intention of eliminating the Chief Nurse IV position, so that the Appellant could not obtain the position. **Exhibit N**

24. On September 28, 2015, the Appellant informs Dr. Deering that per HR, she is no longer

able to perform the functions of Chief Nurse (Nurse IV) without an official title and requests a detail to the position.

25. On September 29, 2015, Dr. Deering informs the Appellant that he cannot detail her into the Chief Nurse IV role.

26. On November 5, 2015, the Appellant received official notification that the hiring office had decided not to fill the Chief Nurse IV position. **Exhibit P**

27. On September 30, 2016, a new organizational chart was submitted for signature by Dr. Duarte, reflecting the removal of the Chief Nurse IV position permanently from the service line. **Exhibit U**

**Facts regarding Chief Nurse IV (Purchased Care) position:**

28. Between March 19, 2015 and October 27, 2015, the Appellant performed duties and responsibilities above her assigned position of Nurse Manager without additional compensation. The Appellant performed duties and responsibilities of Associate Deputy Chief of Staff or Chief Nurse IV. The Appellant was required to assume these additional duties because of the Agency's failure to assign someone to take over the Appellant's duties after her demotion, the Agency's failure to fill the Chief of Purchased Care position, and Agency's failure to fill the vacant Chief Nurse IV position.

29. On October 28, 2015, the Appellant was officially detailed as Acting Chief of Purchased Care without additional compensation, even though she had been performing the duties of that position since March 19, 2015. **Exhibit O**

30. On November 9, 2015, the position for Deputy Associate Chief of Staff/Chief of Purchased Care, was posted to USA Jobs with disqualifying criteria preventing the Appellant from applying. **Exhibit Q**

31. On November 23, 2015, the Appellant emailed Dr. Deering and requested that the disqualifying criteria be removed so that she could apply for the position since she was already performing the duties for the detail successfully. Dr. Deering responded by stating he was cancelling the Deputy Associate Chief of Staff/Chief Nurse IV of Purchased Care for recruitment. **Exhibit R**

32. On November 30, 2015, the Appellant reported the successes and accomplishments during her detail as Deputy Associate Staff/Chief of Purchased Care. **Exhibit S**

33. After the detail ended, the Appellant returned to her Nurse Manger position but still maintained various Chief Nurse IV (Purchased Care) duties in the absence of a Chief Nurse to report to.

**Further Whistleblower Disclosures between November 10, 2016 and December 20, 2016:**

34. On November 10, 2016, the Appellant attempted to formally express to Dr. Duarte her repeated concerns over urgent staffing needs for vacant positions she had been attempting to get filled for over three months, and noted that the other managers' requests for staffing were being honored but hers were being ignored, leading to critical staffing shortages compromising patient care; the positions remained unaddressed by Dr. Duarte. **Exhibit V**

35. On November 21, 2016, the Appellant emailed Regina Haynes (VISN Business Implementation Manager) regarding her concerns that facility leadership was directing staff to engage in unethical conduct in attempts to improve the appearance of non-VA Care consult performance numbers. **Exhibit W**

36. On December 1, 2016, the Appellant filed an OIG complaint regarding the illegal practices established by Dr. Carlos Duarte of instructing staff to deny veterans their Choice benefits of receiving timely community care for eligible veterans and other misconduct by senior VA officials. **Exhibit X**

37. On December 20, 2016, the Appellant emailed Carrie DeKorte, Associate Director of Charleston VA regarding the concerning practices taking place at the Phoenix VA and patients being left at risks as a result. **Exhibit Y**

**January 17, 2017 Detail to "Unclassified Duties":**

38. Between December 1, 2015 and January 15, 2017, the Appellant performed duties and responsibilities above her assigned position without compensation. The Appellant performed the duties and responsibilities of Associate Deputy Chief of Staff or Chief Nurse IV. After the October 28, 2015, detail to Acting Chief of Purchased Care ended, the Appellant re-assumed these additional duties because of the Agency's failure to assign someone to take over the Appellant's duties after her demotion, the Agency's failure to fill the Chief of Purchased Care position, and Agency's failure to fill the vacant Chief Nurse IV position.

39. On January 3, 2017, Dr. Alyshia Smith gave the Appellant a detail memo detailing the Appellant for 120 days to "Unclassified Duties." **Exhibit AA**

40. Dr. Smith informed the Appellant that the detail was not a detail to a position, just the duties of several positions, that the Appellant would receive a 1 step increase, and that a position would not result from the detail.

41. The Appellant expressed to Dr. Smith that she did not want to accept the detail. However, Dr. Smith advised the Appellant that she did not have a choice but to accept the detail.

42. On January 3, 2017, the Appellant contacted Human Resources Employee Labor and Relations Supervisors Ahmed Barton and Juanita Landry regarding the detail to "Unclassified Duties." The Appellant was informed that the decision to detail her was not run by Human Resources, and that if the duties of the detail belonged to those of higher-graded positions, she should have not been detailed, but instead they should have

promoted her to a Nurse IV after 120 days.

43. On January 4, 2017, the Appellant's attorney communicated with Agency Counsel regarding the detail to "Unclassified Duties." **Exhibit BB**

44. On January 10, 2017, the Appellant received an updated Detail Memo detailing her to "Unclassified Duties" effective January 17, 2017. **Exhibit BB**

45. On January 10, 2017, in a meeting with Dr. Alyshia Smith and Acting Deputy Medical Center Director, Shawn Bransky, Dr. Smith reiterated to the Appellant that the detail was not optional and that now she would not be receiving the 1-step increase that was previously mentioned. Dr. Smith further stated, that as a result of Appellant involving her attorney, she would not be receiving any compensation during the detail. Dr. Smith also stated that the Appellant was to report directly to the Deputy Medical Center Director, Mr. Bransky and directed the Appellant to not tell her supervisor, Dr. Duarte. **Exhibit BB**

46. The "Unclassified Duties" reflected a combination of duties belonging to the already classified positions of the Associate Chief of Staff for Administrative Medicine Service, the Chief of Purchased Care, the Chief Nurse IV, and the Chief Fee Manager. The Appellant performed these duties from January 17, 2017 until March 17, 2017 without additional compensation.

47. On January 17, 2017, the Appellant reported as instructed for the detail assignment. The Appellant was immediately put in charge of fixing multiple process and patient care deficiencies, as well as updating responses to multiple past-due OIG complaints regarding patient care delays. Upon learning of the detail, Dr. Duarte met with the Appellant, became upset, and elevated his voice saying he was not provided with a copy of the detail memo. **Exhibit CC**

48. On January 17, 2017, the Appellant emailed Mr. Bransky, Dr. Smith, and Dr. McCarthy (Chief of Staff) regarding the detail, advising them that Dr. Duarte was not allowing her to execute the duties she was being mandated to perform, that no staff in the department were notified of the change, and requested a meeting to discuss how the detail to "unclassified duties" was mandating a delegation of duties with no title or delegation of authority to perform the duties. The Appellant did not receive a response to her concerns. **Exhibit DD**

49. On January 20, 2017, Dr. Duarte became angry and yelled at the Appellant regarding the selection of a candidate for the Administrative Officer position making the Appellant feel threatened.

50. On January 23, 2017, during a Community Managed Care's management staff meeting, Mr. Bransky announced that the staff was to report to the Appellant and that Dr. Duarte was no longer overseeing the department. However, the detail memo did not indicate any such supervision authority.

51. On January 24, 2017, after being informed that he could not attend CMC staff meetings anymore, Dr. Duarte called the Appellant, yelled, and demanded to know what was going on. The Appellant felt threatened by Dr. Duarte and ended the conversation by directing him to Chief of Staff Dr. McCarthy for further information.

52. Beginning January 25, 2017 through March 2017, Dr. Duarte harassed the Appellant by forwarding the Appellant nearly every calendar meeting invite and email for her to respond to, to include stating that she had to provide New Provider Orientation, although she was not a physician provider. **Exhibit FF**

**Further Whistleblower Disclosures and Retaliatory Acts leading up to Involuntary Resignation (Constructive Discharge)**

53. Between September 21, 2016 and January 17, 2017, Dr. Duarte authorized compressed tours for all managers and supervisors in the Purchased Care department with the exception of the Appellant, leaving her as the only manager/supervisor in the department not allowed to be on a compressed tour, making the Appellant feel harassed and ostracized.

54. Between September 21, 2016 and November 21, 2016, Dr. Duarte had daily scheduled meetings with every manager and supervisor in the Purchased Care department except the Appellant, leaving her as the only manager/supervisor not allowed to attend the management meeting and making her feel harassed and ostracized.

55. Between January 17, 2017 and January 27, 2017, the Appellant was tasked with updating responses to multiple OIG complaints and recommendations, to include Alleged Consult Mismanagement, Consult Closure processes, Staffing, and Delay of a Lung Cancer Patient reports. The Appellant corrected inaccurate responses provided by previous leadership and submitted her responses to Quality Management. **Exhibit EE**

56. On January 27, 2017, Rex Patterson of Quality Management, contacted the Appellant and asked her to change the responses that she provided for the OIG because the Director did not want her to include some of the information she provided. The Appellant informed Mr. Patterson that she was not going to delete or change her answers because in doing so, she would be falsifying information in response to an OIG investigation.

57. On January 27, 2017, Linda Swan, Acting Chief of Quality, Safety and Improvement, Mr. Patterson, Jill Friend, Chief of Quality, and Stephanie White-Lawson, Quality Manager, called the Appellant. Ms. Swan repeatedly requested that the Appellant take out pertinent information from her OIG response and re-word her responses which would result in misleading the OIG. The Appellant informed them that she would not change her responses and falsify information.

58. On January 30, 2017, the Appellant discovered evidence of significant mismanagement of VA funds by previous leadership, to include knowingly utilizing care costs from FY2014 instead of updated cost estimates, making it appear that the facility has not

authorized as much care as it actually has.  The Appellant notified Mr. Bransky.

59. On February 6, 2017, the Appellant was mandated to approve the movement of CITC funds from different accounts, ranging from $32 to $1,000,000.  The Appellant was provided with the action keys to effectuate the process.  However, the Appellant expressed that she was not comfortable performing these functions as she was not trained. After threats from the VISN BIM and VISN Fiscal staff, the Appellant attempted to perform the request, but noticed that funds were being drawn from accounts reflecting a negative balance. The Appellant brought the matter to the Acting CFO who assisted her in performing these functions and advised her to report to the Director that she is being mandated to perform these functions outside of her scope and without training. **Exhibit GG**

60. On February 6, 2017, the Appellant discovered 831 open Non VA Care Dental Consults, going back to 2014.  Upon conversation with Fee Supervisor Shondel Thieverge regarding the matter, the Appellant learned that the Chief of Dental, Dr. Rutkus, was creating Non VA Care Dental consults, approving care to be provided directly by outside vendors with no authorization, and then after the bills came in, would document the care provided on the consults, and send the bill to the NVCC department to backdate authorizations to cover the unauthorized care (delinquent obligations), and process for payment of services.  The Appellant informed Ms. Thieverge, Dr. Rutkus, and the Administrative Officer, Dental Anna Ivey, that these were illegal practices and needed to stop immediately.   The Appellant notified the VISN BIM Ms. Hines, the Central Office Field Manager, the Director, and CFO.  **Exhibit HH**

61. On February 7, 2017, the Appellant reported the concerns regarding Dental to the Nurse Executive Dr. Smith, who was Acting Director, and Deputy Chief of Staff, Dr. Vela, in the absence of the Director Ms. Nelson. Dr. Smith instructed the Appellant to have staff pay the delinquent obligations. The Appellant advised Dr. Smith that she did not have the legal authority to authorize staff to backdate authorizations to cover care that was not approved or authorized.

62. On February 8, 2017, VISN BIM, Ms. Hines called the Appellant and repeatedly asked her to identify who submitted the anonymous OIG complaint, and subtly accused the Appellant by stating that it appeared to be written by a Nurse in a leadership position.

63. On February 8, 2017, after speaking with Ms. Hines, the Appellant spoke to EEO Manager Ms. Tademy and reported her fears of retaliation by leadership, functioning outside the scope, and filling the roles of 4 vacancies, and requested options for removing herself from the situation.

64. On February 9, 2017, the Appellant attempted to schedule a meeting with the Director Nelson to discuss illegal activity, mismanagement of VA funds, processes leading to patient care delays, as well as the impact to her ethics, integrity standards, and personal health. A meeting was scheduled for February 10, 2017 at 8:30am. **Exhibit II**

65. On February 10, 2017, the meeting scheduled at 8:30am with Director Nelson was cancelled with no explanation and not rescheduled.

66. On February 10, 2017, during a meeting with the Chief of Dental Dr. Rutkus, it was uncovered that there were 771 NVCC Dental consults that had care provided without an authorization. In response to an inquiry from the CFO, the estimation of unauthorized care that was rendered was $1,156,500. Dr. Rutkus also admitted that he was having his Program Support Assistant (PSA) submit the consults under his name and Dr. Rutkus was then approving his own consults against VA policy. It was also uncovered that Ms. Thieverge had been instructed multiple times in the past to backdate authorizations to cover care that was not emergent, against VA policy, and was unaware that it was against VA policy as her supervisors were instructing her to do it.

67. On February 13, 2017, the Appellant was informed by Ms. Thieverge that during her review of unauthorized dental care, she discovered at least 4 cases in which a dental vendor previously called CASS, sent bills and were paid for services. CASS changed their company name to Bright Way Dental, and subsequently attempted to get payment again for services that were already paid for under the previous vendor name. She indicated that many of these bills may have already been dual-paid as the employee processing them would not have thought to identify such discrepancies, which are not audited.

68. Between February 22, 2017 and March 10, 2017, the Appellant was repeatedly requested by the Chief of Staff, Dr. Maureen McCarthy, to implement a process that violated current VA regulations. The Appellant was asked to review, approve, and implement a process that would result in bypassing the VA Hierarchy of Care Memorandum, available appointments at the Phoenix VA, and violate existing Choice regulations, the TriWest Choice TPA contract, the RN scope of practice for licensure scope, separation of duties regulations, CBO policy, and SOPs.

69. The Appellant contacted Pat Shipley, Regional Director of TriWest; Bart Blaylock, Director of Medical Operations for TriWest; Danielle Traylor; HUB Supervisor for TriWest; and Johnny Thomas, Program Analyst for the VHA Office of Community Care (10D) requesting guidance on the requests made by Dr. McCarthy. The individuals advised the Appellant that they were all told by their own leadership to "stay out of it" as it was a violation of multiple practices.

70. During a meeting with several Phoenix VA leadership, Dr. McCarthy yelled, belittled, and threatened, the Appellant when she attempted to explain how the process she was being made to help implement were in violation of current business practices. The Appellant requested to be removed from any further involvement with the process implementation requested by Dr. McCarthy.

71. On February 28, 2018, the Appellant emailed Director Nelson regarding retaliatory actions against her due to her participation in the OIG investigation, the unsuitable detail she was required to perform as a result of multiple failures within the department, and the effect it was having on her health, family life, and education.

**March 2, 2017 Involuntary Resignation (Constructive Discharge)**

72. On March 2, 2017, the Appellant applied for and accepted a temporary position at the VA Northern California Health Care System, VISN 21, in which she would be required to relocate without her family, and take a salary that was less than what she was currently making, due to the retaliation and subjection to prohibited personnel practices at the Phoenix VA.

73. On March 3, 2017, the Appellant spoke to Director Nelson to inform her that she had no choice but to resign, and accept another position, due to the retaliation and illegal actions that she was being required to perform.

74. On March 9, 2017, the Chief Nurse IV position was reposted for recruitment after 5 months of being inexplicably held up by management.

**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**
**DENVER FIELD OFFICE**

| | | |
|---|---|---|
| Tiffany Potter, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | Docket Number |
| v. | ) | DE-1221-18-0165-W-1 |
| | ) | |
| David Shulkin, Secretary | ) | Admin Judge: David S. Brooks |
| U.S. Department of Veteran Affairs | ) | |
| | ) | |
| Agency. | ) | Date: September 27, 2018 |
| | ) | |

## II.    List of Agreed Upon Material Facts

1. On December 17, 2004, Appellant began working with the Department of Veterans Affairs as a Student Nurse Technician Valor Student.

2. On July 9, 2006, the Appellant was hired as a Registered Nurse by the Puget Sound VA Healthcare System.

3. On January 3, 2010, the Appellant transferred to the Phoenix VA Healthcare System, where she initially worked as a Nurse II in the Quality Management Service. On March 13, 2011, Appellant was promoted to a Nurse III in the Quality Management Service.

4. In an Organizational Chart dated December 8, 2014, Appellant's position in the Administrative Medicine Service of the Phoenix VA Healthcare system **was** listed as "Chief Nurse Manager."

5. In an Organizational Chart dated March 19, 2015 for the Administrative Medicine Service, among other changes, there is no longer a "Chief Nurse Manager" position listed. This Organizational Chart identifies two "Nurse Manager" positions, one of which was held by Appellant.

6. On or about August 10, 2015, the Agency posted the position "Registered Nurse, Chief Nurse Administrative Medicine Service" for recruitment on USAJOBS.  The recruitment for this position closed on August 24, 2015.

7. Appellant and others applied for the "Registered Nurse, Chief Nurse Administrative Medicine Service" position.

8.  On or about November 1, 2015, Chief of Staff Darren Deering sent an email to HR/ER Specialist Belen Ochoa to cancel the recruitment of the "Registered Nurse, Chief Nurse Administrative Medicine Service" position.

9.  On or about January 10, 2017, the Medical Center Director issued Appellant a Memorandum, with the subject line "Detail to Unclassified Duties."

**Potter, Tiffany M**

| | |
|---|---|
| **From:** | Potter, Tiffany M |
| **Sent:** | Wednesday, May 28, 2014 8:16 PM |
| **To:** | Venditti, Robbi D |
| **Subject:** | Urology Conerns |

Dr. Venditti,

The nurses finished all the psychotherapy consults and we are more than halfway done with the Urology consult list.

We went through and identified which ones need consults placed. I didn't have them call yet because I need to know how many calls do we make before placing the consult, and do you want to be alerted to approve all these consults or do you want the nurses to review and approve them when they submit them?

I reassigned Ricki to NVCC Urology to help Terry with this load of consults we are going to be getting.

Also, I am concerned about these Urology patients. We came across 3 so far (not part of the 111 reported to QSI earlier) that died as a result of delays. One of them was diagnosed 2 years ago (9/2011) and not sent out or addressed until 2 years later (9/2013) and just died earlier this month from the cancer. Please make sure that the patients not on the "Send to Community" list are followed up in-house. If they can't see them then we should send them out. These deaths were in the last 2 months and this worries me. Please let me know if you want us to work OT to work down that list as well.

See you tomorrow.

*Tiffany Potter, RN, MSN, CPHQ*
*Nurse Manager/Acting Chief*
*Purchased Care Service*
*Phoenix VA Health Care System*
*650 E. Indian School Rd*
*Phoenix, AZ 85012*
*Office: (602) 277-5551 x2180*
*Pager: (602) 779-8173*
*Blackberry: (602) 568-8855*
*Fax: (602) 222-2771*

## Potter, Tiffany M

| | |
|---|---|
| **From:** | Telfer, Leslie |
| **Sent:** | Thursday, July 10, 2014 12:46 PM |
| **To:** | Potter, Tiffany M |
| **Subject:** | RE: Psychotherapy patients never sent to triwest 7-9-14.xlsx |

Thanks for letting me know, Tiffany. I appreciate it.

**From:** Potter, Tiffany M
**Sent:** Thursday, July 10, 2014 12:44 PM
**To:** Telfer, Leslie
**Subject:** FW: Psychotherapy patients never sent to triwest 7-9-14.xlsx

Dr. Telfer,

I just wanted to send this to you so that you are aware of what happened with your patients and that it is being immediately addressed. Leadership discussed this early this morning but not sure if you got the information.

Let me know if you have any questions.

*Tiffany*

**From:** Potter, Tiffany M
**Sent:** Thursday, July 10, 2014 9:24 AM
**To:** Lowe, Edmund
**Cc:** Venditti, Robbi D; Ritter, Charles A.
**Subject:** Psychotherapy patients never sent to triwest 7-9-14.xlsx

Ed,

Attached is part of the OIG spreadsheet for the patients awaiting psychotherapy. Of the 128 patients reviewed, 96 were never sent to Triwest by the authorization staff although the consult instructed to send to Triwest. 9 cases were sent to Triwest but never received by Triwest or loaded by the Triwest staff into their system. So only 23 of the 128 Psychotherapy patients were processed (oldest consult date 5/7/14). Many of these are suicidal and otherwise high risk cases per OIG notes. Please get the 96 cases sent to Triwest and the 9 other cases re-sent as soon as possible.

Please let me know if you have any questions.

*Tiffany Potter, RN, MSN, CPHQ*
*Nurse Manager/Acting Chief*
*Purchased Care Service*
*Phoenix VA Health Care System*
*650 E. Indian School Rd*
*Phoenix, AZ 85012*
*Office: (602) 277-5551 x2180*
*Pager: (602) 779-8173*
*Blackberry: (602) 568-8855*
*Fax: (602) 222-2771*

**Potter, Tiffany M**

| | |
|---|---|
| **From:** | Deering, Darren |
| **Sent:** | Thursday, July 10, 2014 10:29 PM |
| **To:** | Potter, Tiffany M |
| **Subject:** | RE: Psychotherapy patients never sent to triwest 7-9-14.xlsx |

Tiffany,

Thanks for bringing this to my attention.
This sounds like you need more frontline help with workload and we have approved additional FTEE (I sent you that email).
It may take some time to recruit them, so let me speak to nursing to see who we can detail over quickly on a temporary basis.
I'll also explore the possibility of using TNC staff to support us until our permanent positions are hired.
Let's sit down and look at your proposals regarding restructuring of leadership roles again.
I don't think – by HR regulations – we can just grant someone an ACNS role. If we are able to get it approved, I believe it would have to be competed. But, let me double check on that.
I'm not sure why you feel there might be reprisal, so please stop by so we can discuss this so I can determine if there are other issues I need to intervene on.
I appreciate everything you are doing for our veterans.

Darren

---

**From:** Potter, Tiffany M
**Sent:** Thursday, July 10, 2014 12:28 PM
**To:** Venditti, Robbi D
**Cc:** Deering, Darren; Vela, Blanca Sylvia; Potter, Tiffany M
**Subject:** RE: Psychotherapy patients never sent to triwest 7-9-14.xlsx
**Importance:** High

Hello Dr. Venditti,

I have strong concerns about the OIG notes and findings in this review. Many of the cases that did make it to Triwest have no follow-up. Part of this responsibility is clinical, however due to the lack of clinical staff and support at Triwest, this responsibility is falling on the nurses in our department. We simply are not staffed to address these issues or case manage these patients. Furthermore, processes need to be created and implemented to address the very many components associated with case managing patients that go out for Non VA Care. This would be my responsibility as an Associate Chief Nurse or Nurse Manager, however I don't have the time or resources to address such matters adequately or efficiently . The investigation results below dictate even on the admin side with a Fee Manager (equivalent to Associate Chief Nurse), Supervisor (equivalent to Nurse Manager), another supervisor coming on board, and a Lead, they still have still fallen short of oversight requirements. With the clinical side being much more complex, it is beyond common expectations for 1 person to do the job of what should be at least 4 separate FTE in a supervisory/management capacity in this department. I have been working more than 80 hours per week, just to stay afloat. Unfortunately, this takes away from my Nurse Manager responsibilities as I am consumed with Associate Chief Nurse duties. Simply put, our department, is at risk. Requests to convert my position and hire another Nurse Manager continue to be denied or passed over without action. We are heading towards a crisis situation in Purchased Care which for me was emphasized by Joint Commission this week when they voiced concerns asking from Leadership "How did you

get there without knowing you were going down that road?  Why didn't you do anything to prevent this from happening?"

I am requesting your support again and ask you not wait until the crisis happens like below is indicating.  Please let me know what I can do to obtain your support to ensure our efforts are proactive by supporting the conversion of my position to Associate Chief Nurse, hire another Nurse Manger, and permanently convert the acting Assistant Nurse Manager.  This will enable me to:

- Create comprehensive training plans for staff that are currently non-existent
- Ensure adequate support for staff questions and concerns throughout the day
- Ensure an available point of contact for the frequent daily phone calls received from both Veterans, vendors, and staff regarding patient care delays needing to be addressed by management and actually have the time and process to ensure these issues are immediately addressed
- Ensure that authorizations created for patients are followed through with either Triwest or the vendor
- Create a process for the 100% implementation of NVCC through Triwest
- Ensure appropriate review,  cost-containment, and processes are in place for Non VA Care as the clinical staff primarily control the cost of the 100 million dollar Purchased Care budget.
- Create and implement processes for communicating with Triwest on patients who need follow-up
- Identify the gaps between the clinical and administrative sides, as well as the gap between the VA and Triwest to create systems to bridge these gaps so to avoid further patient care delays and fall-outs
- To clearly identify our workload needs and capacity to better justify the approval of the remainder of our original staffing request before a crisis ensues
- To be proactive with setting up processes before staff come on board so that we are prepared for changes and progression with Non VA Care before the workload hits.
- Ensure adequate oversight and management of the Transplant Program
- Ensure that the Utilization Review staff are returned efficiently to their positions to help control the cost of care
- Provide adequate leadership and support of all programs within  Purchased Care that need frequent and thorough attention: Consult/Case Management, ACI, TriWest PC3 contractual obligations, Utilization Review, Transfer Program, Transplant Program, Traveling Veteran Program
- To allow for the proactive system redesign and process improvement implementation that was once achieved by this department so that the Phoenix VA Health Care System can be the leading example as the spotlight is turned on Purchased Care.
- Etc.

With respect I bring this to your attention first without fear of reprisal or negative consequences, but faith the right decision will be made in a supportive and proactive way.

Thank you in advance for your support.

*Tiffany Potter, RN, MSN, CPHQ*
*Nurse Manager/Acting Chief*
*Purchased Care Service*
*Phoenix VA Health Care System*
*650 E. Indian School Rd*
*Phoenix, AZ 85012*
*Office: (602) 277-5551 x2180*
*Pager: (602) 779-8173*
*Blackberry: (602) 568-8855*
*Fax: (602) 222-2771*

**From:** Potter, Tiffany M
**Sent:** Thursday, July 10, 2014 9:24 AM

**To:** Lowe, Edmund
**Cc:** Venditti, Robbi D; Ritter, Charles A.
**Subject:** Psychotherapy patients never sent to triwest 7-9-14.xlsx

Ed,

Attached is part of the OIG spreadsheet for the patients awaiting psychotherapy. Of the 128 patients reviewed, 96 were never sent to Triwest by the authorization staff although the consult instructed to send to Triwest. 9 cases were sent to Triwest but never received by Triwest or loaded by the Triwest staff into their system. So only 23 of the 128 Psychotherapy patients were processed (oldest consult date 5/7/14). Many of these are suicidal and otherwise high risk cases per OIG notes. Please get the 96 cases sent to Triwest and the 9 other cases re-sent as soon as possible.

Please let me know if you have any questions.

*Tiffany Potter, RN, MSN, CPHQ*
*Nurse Manager/Acting Chief*
*Purchased Care Service*
*Phoenix VA Health Care System*
*650 E. Indian School Rd*
*Phoenix, AZ 85012*
*Office: (602) 277-5551 X2180*
*Pager: (602) 779-8173*
*Blackberry: (602) 568-8855*
*Fax: (602) 222-2771*

**Potter, Tiffany M**

| | |
|---|---|
| **From:** | Deering, Darren |
| **Sent:** | Thursday, July 10, 2014 10:31 PM |
| **To:** | Potter, Tiffany M |
| **Subject:** | RE: Psychotherapy patients never sent to triwest 7-9-14.xlsx |

p.s. can you please bring the OIG notes and pt names you referencing below when we meet so I can review and make sure we have a plan for them?

---

**From:** Potter, Tiffany M
**Sent:** Thursday, July 10, 2014 12:28 PM
**To:** Venditti, Robbi D
**Cc:** Deering, Darren; Vela, Blanca Sylvia; Potter, Tiffany M
**Subject:** RE: Psychotherapy patients never sent to triwest 7-9-14.xlsx
**Importance:** High

Hello Dr. Venditti,

I have strong concerns about the OIG notes and findings in this review. Many of the cases that did make it to Triwest have no follow-up. Part of this responsibility is clinical, however due to the lack of clinical staff and support at Triwest, this responsibility is falling on the nurses in our department. We simply are not staffed to address these issues or case manage these patients. Furthermore, processes need to be created and implemented to address the very many components associated with case managing patients that go out for Non VA Care. This would be my responsibility as an Associate Chief Nurse or Nurse Manager, however I don't have the time or resources to address such matters adequately or efficiently . The investigation results below dictate even on the admin side with a Fee Manager (equivalent to Associate Chief Nurse), Supervisor (equivalent to Nurse Manager), another supervisor coming on board, and a Lead, they still have still fallen short of oversight requirements. With the clinical side being much more complex, it is beyond common expectations for 1 person to do the job of what should be at least 4 separate FTE in a supervisory/management capacity in this department. I have been working more than 80 hours per week, just to stay afloat. Unfortunately, this takes away from my Nurse Manager responsibilities as I am consumed with Associate Chief Nurse duties. Simply put, our department, is at risk. Requests to convert my position and hire another Nurse Manager continue to be denied or passed over without action. We are heading towards a crisis situation in Purchased Care which for me was emphasized by Joint Commission this week when they voiced concerns asking from Leadership "How did you get there without knowing you were going down that road? Why didn't you do anything to prevent this from happening?"

I am requesting your support again and ask you not wait until the crisis happens like below is indicating. Please let me know what I can do to obtain your support to ensure our efforts are proactive by supporting the conversion of my position to Associate Chief Nurse, hire another Nurse Manger, and permanently convert the acting Assistant Nurse Manager. This will enable me to:

- Create comprehensive training plans for staff that are currently non-existent
- Ensure adequate support for staff questions and concerns throughout the day
- Ensure an available point of contact for the frequent daily phone calls received from both Veterans, vendors, and staff regarding patient care delays needing to be addressed by management and actually have the time and process to ensure these issues are immediately addressed
- Ensure that authorizations created for patients are followed through with either Triwest or the vendor
- Create a process for the 100% implementation of NVCC through Triwest

## Potter, Tiffany M

| | |
|---|---|
| **From:** | Potter, Tiffany M |
| **Sent:** | Thursday, August 07, 2014 3:03 PM |
| **To:** | Young, Katrina (OIG) |
| **Subject:** | FW: Veterans to review for disposition |
| **Attachments:** | OT Project Urology Veterans to review for disposition.xlsx |

Ms. Young,

As requested, I am sending a series of documents related to the OIG Urology review. Attached is the original list of 2583 Urology patients. This is the list that Dr. Venditti had run as Dr. Deering put her in charge of looking into the status of these patients. I am unaware of the full instructions of how the nurse Annie Simpson was to review these cases as the training conversation happened offline. However, the attachment shows the first tab Master sheet, then each tab after that was how it was broken down. The spreadsheet tabs reflect the work of the nurses who helped review these patients after Ms. Simpson was unable to do so timely. Dr. Venditti did not want any action taken on any of these consults. So from January when the list was ran through March when I volunteered nurses to do it on overtime, no action was allowed to be taken on these consults. It was simply chart review. I sent out an email to nurses in nursing service recruiting help to work overtime to get the patients reviewed, so that was my role, following the instructions for sorting that Dr. V provided below and further updated on the spreadsheet. The last tab shows the deceased patients from this list (111).

*Tiffany Potter, RN, MSN, CPHQ*
*Nurse Manager*
*Purchased Care Service*
*Phoenix VA Health Care System*
*650 E. Indian School Rd*
*Phoenix, AZ 85012*
*Office: (602) 277-5551 x2180*
*Pager: (602) 779-8173*
*Blackberry: (602) 568-8855*
*Fax: (602) 222-2771*

---

**From:** Venditti, Robbi D
**Sent:** Monday, February 24, 2014 2:06 PM
**To:** Potter, Tiffany M; Simpson, Annie
**Subject:** RE: Veterans to review for disposition

Annie please page me to discuss.

*Thank you for serving our Veterans,*

*Dr. V.*
*602.277.5551 extension 6235*
*602.779.3900 pager*

---

**From:** Potter, Tiffany M
**Sent:** Monday, February 24, 2014 11:03 AM
**To:** Venditti, Robbi D; Simpson, Annie
**Subject:** RE: Veterans to review for disposition

1

Dr. Venditti,

Annie is calling me asking questions that I don't have the answer to. One is for a patient who has no Urology consult in the system at all, just a note mentioning that the patient needs a TURP. Is this one she should mark as Unsure or Send to Community? Can you clarify does everything that is not prostate cancer follow up get sent to the community?

For those that need to be sent to the community, should be putting a note in the chart indicating so? Who is to be placing the NVCC consult?

*Tiffany Potter, RN, MSN, CPHQ*
*Nurse Manager*
*Purchased Care Service*
*Phoenix VA Health Care System*
*650 E. Indian School Rd*
*Phoenix, AZ 85012*
*Office: (602) 277-5551 x2180*
*Pager: (602) 779-8173*
*Blackberry: (602) 568-8855*
*Fax: (602) 222-2771*

---

**From:** Venditti, Robbi D
**Sent:** Monday, February 24, 2014 8:16 AM
**To:** Simpson, Annie; Lowe, Edmund
**Cc:** Greene, Marva J; Hoogerwerf, Micheal A.; Potter, Tiffany M; Venditti, Robbi D
**Subject:** Veterans to review for disposition

**Annie please see the directions below and location of the spread sheet for you to review. If you do not have access to the drive/folder Ed will need to provide this. Please page me with questions. We need your tour of duty. Alert Micheal to time off.**

Directions
Review each Veteran's records
Determine if they are

| Prostate Cancer Follow UP | Send to Community | Unsure |
|---|---|---|

Place "Y" in the appropriate column

**The link would not insert.**
        **U drive**
        **Fee UC -folder**
        **GU Project Veteran Review -folder**
        **Veterans to review for disposition -spread sheet**

*Thank you for serving our Veterans,*

*Robbi Venditti, DO, MHA*
*Acting, ACOS Administrative Medicine Service*
*Chief, Purchased Care Services*
*Phoenix VA Health Care System*
*602.277.5551 extension 6235*

**Potter, Tiffany M**

| | |
|---|---|
| **From:** | Potter, Tiffany M |
| **Sent:** | Thursday, August 07, 2014 3:33 PM |
| **To:** | Young, Katrina (OIG) |
| **Subject:** | FY13 Accerated Access |
| **Attachments:** | Urology 070213 (2).xlsx; Christine's Copy of Urology 070213 (2).xlsx; Urology 0617.xlsx; GU 090313 -PCRN.xlsx |

Ms. Young,

Here are the spreadsheets that have urology on them that we did last year for accelerated access. Nurses worked overtime to call the patients and offer them Non VA Care. There are a few more that may be imbedded within larger documents, but these are the ones that I could find in our folder. This may have been around the same time that patient appointments and consults were discontinued as well. But I believe the original list of deceased patients that Ed Lowe sent to QSI last year included the ones in these sheets. I didn't see the list that went to QSI last year, but I will forward an email I have that referenced that QSI only spot-checked them.

*Tiffany Potter, RN, MSN, CPHQ*
*Nurse Manager*
*Purchased Care Service*
*Phoenix VA Health Care System*
*650 E. Indian School Rd*
*Phoenix, AZ 85012*
*Office: (602) 277-5551 X2180*
*Pager: (602) 779-8173*
*Blackberry: (602) 568-8855*
*Fax: (602) 222-2771*

**Potter, Tiffany M**

| | |
|---|---|
| **From:** | Potter, Tiffany M |
| **Sent:** | Thursday, August 07, 2014 3:56 PM |
| **To:** | Young, Katrina (OIG) |
| **Subject:** | FW: Urology |

The original email

*Tiffany*

---

**From:** Deering, Darren
**Sent:** Tuesday, December 31, 2013 4:28 PM
**To:** Robinson, Lance E; Kurtz, Julie L; Curry, Bradley S; Venditti, Robbi D; Lowe, Edmund; Potter, Tiffany M; Freeman, Andrew W. (Phoenix); Vela, Blanca Sylvia; Johnson, Jewel M.
**Cc:** Cox, Wanda P; Gonzalez, David 3
**Subject:** RE: Urology

I will (and apologize for the delay – I'm just catching up from being on leave).
I have been having some email dialogues with Dr. Joehl, Dr. Claflin and Dr. Venditti.
Dr. Joehl and I are meeting on Thursday (Jan 2nd). I'll invite others to join us at the beginning of the meeting to discuss the Urology status and come up with a game plan.

---

**From:** Robinson, Lance E
**Sent:** Tuesday, December 24, 2013 9:13 AM
**To:** Deering, Darren; Kurtz, Julie L; Curry, Bradley S; Venditti, Robbi D; Lowe, Edmund; Potter, Tiffany M; Freeman, Andrew W. (Phoenix); Vela, Blanca Sylvia; Johnson, Jewel M.
**Cc:** Cox, Wanda P; Gonzalez, David 3
**Subject:** RE: Urology

Please see message below from a specialty clinic MSA. I don't know if everything he's reporting is accurate but it does sound like there needs to be a meeting with Purchased Care, Urology Staff, HAS and perhaps Nursing to discuss the current situation and what type of actions or communication still needs to occur. Perhaps this has all been worked out but the MSAs haven't been briefed, I don't know sure, but it's pretty obvious that patients are frustrated.

Who wants to take the lead on this?

---

**From:** Levesque, Steve M.
**Sent:** Tuesday, December 24, 2013 8:50 AM
**To:** Robinson, Lance E
**Cc:** Cox, Wanda P; Gonzalez, David 3
**Subject:** RE: Urology

Good morning Mr. Robinson,

Thank you for your immediate attention. The patients that are being fee based out are the new consults, and if possible they should be getting a letter letting them know what's going on so they're not calling the clinic every two days trying to find out what's going to happen. We have at least 600 patients (Mobley's estimate) that have been seen in the past by providers that are no longer here. Dr. Mobley has asked that we not overbook his panel anymore because he can't keep up with the paper work. Dr. Corrie asked us to stop making appointments for patients that have been seen by other providers because he has no room for emergent patients if he needs. We as clerks don't know the severity of

the patients illness, so when we tell them we can't make an appointment for them, some of the patients get very upset with us.  This is happening daily, creating worker burn out.

The patient advocate has asked that we stop sending people there because they don't know what to do either.

Staffing is a major problem, but like Dr. Mobley has said they don't have back up staff to do what a nurse would normally do so he has to do it.  That takes away from the time he could spend with another patient.

I guess I'm just looking for the reply that we should be telling the veterans.  Instead of telling them we don't know what to do, or don't know where to send them for the answers.

Sorry for the depressing letter at Christmas time!

---

**From:** Robinson, Lance E
**Sent:** Monday, December 23, 2013 4:34 PM
**To:** Levesque, Steve M.
**Cc:** Cox, Wanda P; Johnson, Jewel M.
**Subject:** FW: Urology

Steve,

Ms. Helman forwarded your message to me and asked me to follow up. Can you give me some additional information on exactly what your referring to.  Are the veterans frustrated because we're having to fee basis virtually all of them out right now? Is there problems with their fee providers?  As always I do want you to go through your chain of command but if you're not receiving answers then we certainly want to know about it. Now sometimes the answers are not what employees or veterans want to hear but at least it's the answer we have.  There is no doubt that until we can staff up Urology things are going to be extremely challenging.  Thanks for your work and your patience.

Thanks for your note, but as I mentioned we need more details.

Lance E. Robinson, MS, FACHE
Associate Director
Phoenix VA Healthcare System
650 E. Indian School Road
Phoenix, AZ
85012-1892
602-222-6445
Lance.Robinson@va.gov

---

**From:** Levesque, Steve M.
**Sent:** Monday, December 23, 2013 01:30 PM Mountain Standard Time
**To:** Helman, Sharon M. (SES)
**Subject:** Urology

Good afternoon Ms. Helman:

I wish there was another way to approach this but I haven't found it. Letters have been written to all the appropriate people but our problem seems to be getting worse instead of better. We as clerks' are dealing with the frustrations of the veterans daily and we don't have any answers for them. We can't make appointments for them, can't send them to Patient Advocate, and can't send them back to their PCP. This has been going on now for months and still no guidance or answers. We are getting our heads handed to us daily by the patients! How much are we supposed to endure before we end up on the 5th floor, or worse.

I will probably get written up for not going through the chain of command, but I have written them with no response. I think that this is important enough to take that chance. PLEASE HELP we are leaving our vets in limbo!

**Potter, Tiffany M**

| | |
|---|---|
| **From:** | Potter, Tiffany M |
| **Sent:** | Friday, August 08, 2014 9:45 AM |
| **To:** | Young, Katrina (OIG) |
| **Subject:** | FW: Urology review |

Here's the other email string about the concerns with providers turning off alerts that even intentional alerts are not received by the providers to act on.

*Tiffany*


-----Original Message-----
From: Vela, Blanca Sylvia
Sent: Wednesday, July 16, 2014 7:16 PM
To: Venditti, Robbi D; Deering, Darren; Potter, Tiffany M
Subject: RE: Urology review

Crap! It didn't work...

B. Sylvia Vela MD
Deputy Chief of Staff
Phoenix VA Health Care System
Associate Professor of Medicine
University of Arizona College of Medicine


-----Original Message-----
From: Venditti, Robbi D
Sent: Wednesday, July 16, 2014 5:54 PM
To: Deering, Darren; Vela, Blanca Sylvia; Potter, Tiffany M
Subject: Re: Urology review

Did it work?

---

**From:** Potter, Tiffany M
**Sent:** Wednesday, July 16, 2014 3:22 PM
**To:** Deering, Darren; Vela, Blanca Sylvia; Venditti, Robbi D
**Subject:** RE: Urology review

Dr. Vela,

I just tested it and alerted you on a patient ▬▬▬ does it come up in your alerts? If so that's great, then there would have to be another reason if providers are not responding to intentional alerts.

Thanks!

*Tiffany*

**From:** Deering, Darren
**Sent:** Wednesday, July 16, 2014 3:18 PM
**To:** Vela, Blanca Sylvia; Potter, Tiffany M; Venditti, Robbi D
**Subject:** RE: Urology review

Ah! A possible solution that doesn't add extra work for the NVCC team? Awesome!

---

**From:** Vela, Blanca Sylvia
**Sent:** Wednesday, July 16, 2014 2:50 PM
**To:** Deering, Darren; Potter, Tiffany M; Venditti, Robbi D
**Subject:** RE: Urology review

Tiffany:
Regarding your sentence below (highlighted) that is indeed the case.  Informatics had tested this at the time we presented to CEB.  You can specifically select the name for the comment to go to, and they will still receive it even if the mandatory is turned off for consult comments.  If you want, you can test it with me, since mine is turned off.

**B. Sylvia Vela MD**
Deputy Chief of Staff
Phoenix VA Health Care System
Associate Professor of Medicine
University of Arizona College of Medicine

 

---

**From:** Deering, Darren
**Sent:** Wednesday, July 16, 2014 1:47 PM
**To:** Potter, Tiffany M; Venditti, Robbi D; Vela, Blanca Sylvia
**Subject:** RE: Urology review

I'm not saying this, this was an issue taken up by CEB and a decision was made for the facilty.  But, I do understand your concern.
Unfortunately, they are all or nothing.  I think we rely to heavily on the consult system to communicate details to providers.  All of these alerts cause alert fatigue for providers, so it actually increases the risk of important ones being missed or glossed over when the volume is high.  It is extra work for someone in the end to send notifcations...if I have to choose, I would not want the providers getting 300 a day and being here until 8pm going through them and risking missing one that is critical.  I believe that was the CEBs stance on it too, but I'm adding Sylvia as she had the lead on this project.

---

**From:** Potter, Tiffany M
**Sent:** Wednesday, July 16, 2014 1:41 PM
**To:** Deering, Darren; Venditti, Robbi D
**Subject:** RE: Urology review

Just to clarify, I understand  you are requesting that everyone, in addition to notating the patients' needs on the consult, needs to take extra steps by entering a note and adding the provider as an additional signer, or cancelling the consult (which in my opinion would not be appropriate to cancel a consult to communicate a patient need to a provider).  To do

these extra steps may save time for the providers, but consumes large amounts of time for everyone else and may lead to patients consults getting dropped completely as they are cancelled then have to be resubmitted and go through the process again. I get tons of alerts as well but feel I am responsible for making sure the patients get taken care of so would never opt to turn mine off. Is there a way for the providers to be taken off of automatic alerts and instead only be alerted when someone actually specifically adds them as an alert to a comment? Just trying to brainstorm a better way to avoid patients like the example below who have needs that are missed.

*Tiffany*

---

**From:** Deering, Darren
**Sent:** Wednesday, July 16, 2014 1:28 PM
**To:** Potter, Tiffany M; Venditti, Robbi D
**Subject:** RE: Urology review

Good point. Alerts are turned off because there are many alerts being generated that are unnecessary and consume large amounts of the providers time.
If something is needed, the consult could be cancelled back to the provider with a comment and I believe that would then alert them. Or a note could be entered in the chart and add an additional signer.

When the alerts were on, the PCP would receive every single alert/comment that got added.
Some services use those to communicate with other...so every comment went to the PCP, including "please schedule into my next clinic.", "you don't have an appt for 8 weeks", "Okay, double book him", "okay, thanks for clarifying", "no, thank you for clarifying what I needed to clarify", etc.etc. It was filling their alert inboxes.

---

**From:** Potter, Tiffany M
**Sent:** Wednesday, July 16, 2014 10:56 AM
**To:** Deering, Darren; Venditti, Robbi D
**Subject:** RE: Urology review

For this patient, comments were placed on the consult reflecting the needs of the patient but I don't know if they docs have their alerts off, but nothing was scheduled, so please inform how you would like these handled. Thanks.

*Tiffany*

---

**From:** Potter, Tiffany M
**Sent:** Wednesday, July 16, 2014 10:50 AM
**To:** Deering, Darren; Venditti, Robbi D
**Subject:** RE: Urology review

We don't do scheduling. I was under the impression that the disposition marked on the spreadsheet would go to the GU service for follow up. Please correct me if I am wrong or if I need to have the nurses alert the providers on each individual patient on the list or trained to schedule for GU as well? Thanks.

*Tiffany*

---

**From:** Deering, Darren
**Sent:** Tuesday, July 15, 2014 6:18 PM
**To:** Potter, Tiffany M; Venditti, Robbi D
**Subject:** RE: Urology review

And did the case of ████████ get referred to Urology for scheduling?  The comments say "wants f/u with Dr. Mobley".

---

**From:** Deering, Darren
**Sent:** Tuesday, July 15, 2014 6:13 PM
**To:** Potter, Tiffany M; Venditti, Robbi D
**Subject:** RE: Urology review

Also, for the 72 that "Needs NVCC and referred to TriWest"...did your team put those consults in or do we need to have Primary Care do that?

---

**From:** Deering, Darren
**Sent:** Tuesday, July 15, 2014 6:08 PM
**To:** Potter, Tiffany M; Venditti, Robbi D
**Subject:** RE: Urology review

Excellent!  On the first list, what does it mean by "NEEDS ATTN (Secondary Auth Request)?

Any deceased veterans or concerns re: harm will be reviewed by Quality.

Thanks!

---

**From:** Potter, Tiffany M
**Sent:** Tuesday, July 15, 2014 4:10 PM
**To:** Venditti, Robbi D; Deering, Darren
**Subject:** RE: Urology review

Good Afternoon Dr. V and Dr. Deering,

I'm just catching up on emails.  The GU lists are all completed and attached.

The first list is the first 694 patients sent.

The second attachment is the last one sent and I have separated the tabs out, just haven't had time to merge them back together.  Also on that last tab in that spreadsheet, there are 43 at the bottom that the DEMPS nurse has on her sheet completed but she left before I could have it sent, so I will resend in the morning with those 43 added.

The ones that need letters sent are being combined with our other lists and sent to HAS for mailings.

Thanks!

*Tiffany Potter, RN, MSN, CPHQ*
*Nurse Manager/Acting Chief*
*Purchased Care Service*
*Phoenix VA Health Care System*
*650 E. Indian School Rd*
*Phoenix, AZ 85012*
*Office: (602) 277-5551 X2180*
*Pager: (602) 779-8173*
*Blackberry: (602) 568-8855*

**Potter, Tiffany M**

| | |
|---|---|
| **From:** | Young, Katrina (OIG) |
| **Sent:** | Wednesday, August 20, 2014 10:39 AM |
| **To:** | Potter, Tiffany M |
| **Subject:** | Can you call |

Me when you get a moment.
Thanks,

**Katrina L. Young, RN, BSN, MSHL**
Health Systems Specialist
VA-Office of Inspector General (54SD)
5120 Shoreham Place Ste 200
San Diego, CA 92122
Office-858-404-8331
BB-858-401-9794
Fax-858-202-0699

**Potter, Tiffany M**

| | |
|---|---|
| **Subject:** | Update |
| **Location:** | EEO Office |
| **Start:** | Thu 9/24/2015 2:30 PM |
| **End:** | Thu 9/24/2015 3:00 PM |
| **Recurrence:** | (none) |
| **Meeting Status:** | Accepted |
| **Organizer:** | Tademy, Marian |
| **Required Attendees:** | Potter, Tiffany M |

------------

| | |
|---|---|
| **From:** | Potter, Tiffany M |
| **Sent:** | Wednesday, September 23, 2015 10:12 AM |
| **To:** | Tademy, Marian |
| **Subject:** | Update |

Any updates?

Tiffany

$5000 offer is still on the table, will not approve anything else.
No steps.
No bonus.
No back pay

Re: Nurse IV? More under nursing since,
"then there will be no Nurse IV."

WHAT?!!!

1

Notes/Meeting with EEO Manager Marian Tademy 9/22/15

-discussed poor outcome of ADR and thoughts regarding my multiple attempts for resolution were all unresponded to or denied, yet there was no attempt or suggestion from resolution by the RMO Dr. Venditti as she was concerned that she had a flight to catch that day and was no longer in a position to decide anything.

-discussed claim, Ms Tademy asked me "Are there any other similarly situated individuals" that have been treated differently to back my claim based on race and sex. I outlined past events going back to 4/2012 when I had to assume the Chief Nurse duties when re-organized under Dr. Venditti, Caucasian female with no prior EEO activity.

Outlined events in discussions with Nancy Claflin Nurse Exec in 2013 when we I was told that I don't qualify to be a Nurse IV because I don't report to a pentad member, even though none of the other ACNS Nurse IVs did as they all reported to Marva who is not a Pentad member, and they are all Caucasian females. Also mentioned that when that was brought up, was told "well we are talking about YOU Tiffany" and then proceeded to inform Dr. V a different excuse which was that "Tiffany has never supervised a 24-7 unit before so she doesn't qualify to be a nurse IV". Mentioned that I felt that was not true, that other Nurse IVs haven't supervised a 24-7 unit, I have indeed, but that it's not a requirement, and should not be about me, and since it was, felt it was because of my race.

Outlined that the same thing happened with GECS, that Leslie Lockridge was the Nurse Manager in GECS and that she was also approved to have a Nurse Manager report to her even though they were both Nurse III and her title was changed to Program Director. Mentioned that when I brought this up after they demoted me on the org chart saying that a Nurse III can't supervise a Nurse III, that suddenly leadership denied knowledge of what happened with GECS, and that Marva called me stating that Leslie cannot be like that either and thanked me for pointing it out, but then they promoted Leslie to a Nurse IV. Leslie is a Caucasian female.

Outlined that even though I was told yet another excuse that I cannot have a Chief title in Non VA Care because I am not a physician, that when they took away my Chief title on the org chart, they upgraded Greg Crenshaw's title (recently hired Caucasian male) from Program Manager/Analyst to Chief, Non VA Care, and he is admin, not a physician or any clinical background. And that when I pointed this out to male Director Mr. Grippen and Dr. Deering, they acknowledged he should not have the title based on what I was saying, but that they are not going to remove it from him because they don't want it to appear that he was demoted like I was. Also mentioned that my downgrade seemed in retaliation for OIG investigations that I was asked to provide documentation for, as well as an anonymous OIG complaint against the facility that I did not file but was accused of filing. And that Dr. V has been either ignoring me or being rude/hostile and treating me different from Greg, as she is asking Greg to accompany her to represent the department and telling him things to not tell me, which is disparity in treatment, which has been since filing my EEO.

Mentioned that I know of two males who were provided step increases/bonuses to keep them at the facility but I was never offered such despite my performance.

Reviewed previous performance evals and org charts and explained course of events.

Ms. Tademy reviewed my request for resolution. Mentioned that she will follow-up with the director and let me know the final decision.

**Potter, Tiffany M**

| | |
|---|---|
| **From:** | Deering, Darren |
| **Sent:** | Tuesday, September 29, 2015 6:07 PM |
| **To:** | Potter, Tiffany M |
| **Cc:** | Yao, Dorcas |
| **Subject:** | RE: Planning for FY16 and Care in the community. |

Thank you Tiffany.
We have not clarified who the nurse 4 will report to yet, so we don't have a selecting official clarified.
We plan to resolve this when Mr. Grippen returns next week.
We cannot details someone into a role when we don't know who they are reporting to.
I appreciate your patience.

Thanks,
Darren

**From:** Potter, Tiffany M
**Sent:** Monday, September 28, 2015 10:59 AM
**To:** Deering, Darren
**Cc:** Yao, Dorcas
**Subject:** FW: Planning for FY16 and Care in the community.

Dr. Deering,

As you are aware, Choice Phase II is rolling out this week. This roll-out is going to require a large amount of time and coordination on the clinical side. The new processes will need to be aligned with nursing scope of practice, the nursing competencies will need to be revised, and our business rules and SOPs will need to be adjusted. These are just some of the immediate needs outside of training. These are functions that I normally perform as a Chief Nurse for Purchased Care as they are within the scope of a chief nurse. However, I was informed by Mr. Barton in HR on September 18, 2015 and again on September 25, 2015 that I am no longer able to perform the functions of a Chief Nurse without an official title. In the absence of an acting Chief Nurse, I have no problem continuing to function in this capacity; however, will require a detail to this position. An alternative would be to detail a current Chief Nurse in the facility to be acting over our department to perform these duties, as well as the other Chief Nurse functions I have been performing. There would be a tremendous learning curve with that, and these things need to be accomplished over the next week due to the imminent rollout of Choice Phase II on 10/1/15.

Please advise how you would like to move forward. The nursing side of Purchased Care has excelled under my leadership and I do not want our success to be compromised, or the veterans and staff negatively impacted in any way.

Thank you,

*Tiffany*

**From:** Hines, Regina
**Sent:** Thursday, September 24, 2015 8:54 AM
**To:** VHA V18 HAS Chiefs; VHA V18 FEE Technical Advisory Group

**Cc:** V18 Business Office Suspense Grp
**Subject:** Planning for FY16 and Care in the community.

Many changes are coming in FY16 and Care in the Community

Choice Phase II will be implemented 10/01/15 (training of new processes will be provided by CBO on September 28th-30[th]).

Changes coming with Phase IIA include the 30 day wait group, the new 10-0386 in CPRS and the VC Viewer Contact Log. With this new process, additional workload will be put on your NVCC staff, Choice Champions, clinic clerks and scheduling staff. Local processes will have to be developed to address these new requirements.

New requirements include: daily worklist of VCL for all Veterans with appointments greater than 30 days old, maintenance of opt-in/opt-out list, staff contacting Veterans that haven't opted out to provide high level Choice explanation, document communication with Veteran in VC Viewer Contact log and CPRS progress note, completion of 10-0386 and upload of documentation for Veterans that Opt in.

Another important focus is there will be a **hard cap** on regular non-VA care expenses in FY16. In September, many services were sent out utilizing regular NVC because of EOY funding that will not be available as of 10/01/15. As of 10/01/15, your facilities will have to use Choice funds to the fullest extent possible.

Have any of your facilities been successful with hiring more staff to assist with the Choice responsibilities? Are your schedulers/clinic staff assisting with the Choice education of Veterans at point of service? Do you have multiple vacancies in your areas that support Choice/Choice First? If so, how many vacancies to you have at this time in you critical Choice areas (NVCC, clinic clerks that work with Choice, schedulers that assist with Choice)?

Regina Hines
Business Implementation Manager (BIM)
VA Southwest Health Care Network (VISN 18)
(206) 939-2374
www.southwest.va.gov

**Department of**                                    **Memorandum**
**Veterans Affairs**

**Date:**   October 28, 2015

**From:**  Chief of Staff, Phoenix VA Health Care System (11)

**Subj:**  Temporary Detail, Acting Chief of Purchased Care

  **To:**  Tiffany Potter, RN, Nurse Manager, Utilization Review
**Thru:**  Reem Haddad, M.D., Acting ACOS, Administrative Medicine

The Administrative Medicine Service is in need of an Acting Chief of Purchased
Care. This temporary detail is until November 29, 2015.  In this position, you will be
working with the ACOS for Administrative Medicine to help lead a variety of projects
and coordinate consults that affect our daily operations.  Your direct supervisor
during this time will be Dr. Reem Haddad, Acting ACOS/Administrative Medicine.
This detail will begin on October 28, 2015. Please contact either Dr. Haddad at ext
6184 or Dr. Deering at ext 6446, if you have any questions.

Thank you for your willingness to assist us in this temporary detail. I am sure your
contributions to the Admin Medicine Service and the facility will be meaningful and
valuable.

DARREN G. DEERING, D.O.

**Potter, Tiffany M**

| | |
|---|---|
| **From:** | Hamilton-Bell, Donna S. |
| **Sent:** | Wednesday, October 28, 2015 11:04 AM |
| **To:** | Potter, Tiffany M; Deering, Darren |
| **Cc:** | Auriemma, Nanette T.; Haddad, Reem M; Vela, Blanca Sylvia; Pacheco, Melissa G.; Landry, Juanita; Barton, Ahmed; Hoogerwerf, Micheal A. |
| **Subject:** | RE: Temporary Solution for Purchased Care |
| **Attachments:** | Temporary Detail Acting Chief of Purchased Care - Potter.pdf |

Attached is the Temporary Detail Memo.  This will not be a promotion since it is only for 30 days.  We may be able to do a special contribution award but that will be determine at a later date.

*correction: 33 days!*

Thanks,

*Donna*
Donna Hamilton-Bell
Administrative Assistant to the Chief of Staff
Phoenix VA Health Care System
(602) 222-6446
fax: (602) 222-6489

**From:** Potter, Tiffany M
**Sent:** Wednesday, October 28, 2015 10:02 AM
**To:** Deering, Darren
**Cc:** Auriemma, Nanette T.; Haddad, Reem M; Vela, Blanca Sylvia; Pacheco, Melissa G.; Landry, Juanita; Barton, Ahmed; Hamilton-Bell, Donna S.
**Subject:** RE: Temporary Solution for Purchased Care

FYI I did attempt to contact Dr. Deering by phone and was told he is unavailable.

**From:** Potter, Tiffany M
**Sent:** Wednesday, October 28, 2015 10:00 AM
**To:** Deering, Darren
**Cc:** Auriemma, Nanette T.; Haddad, Reem M; Vela, Blanca Sylvia; Pacheco, Melissa G.
**Subject:** RE: Temporary Solution for Purchased Care
**Importance:** High

I still have not received a response back from Dr. Deering, or received a Temporary Detail/Promotion memo.

Dr. Yao just came to my office and said she is leaving now, and will not be back on computer, and will not be processing any of the consults that were sent to her this morning. (yikes!)

I am contacting the Purchased Care staff immediately to have them send all consult approvals to Dr. Deering in the absence of an official detail.

Please respond and get this in place asap.  I am concerned that the approvals will not be done correctly if assigned to someone who is not trained or familiar with our processes.  In the meantime, I will be awaiting the memo giving me the

1

**Potter, Tiffany M**

| | |
|---|---|
| From: | Vacancy ID: 1478023  <usastaffingoffice@opm.gov> |
| Sent: | Thursday, November 05, 2015 8:09 AM |
| To: | Potter, Tiffany M |
| Subject: | [EXTERNAL] Disposition Letter Vacancy ID: 1478023 |

DEPARTMENT OF VETERANS AFFAIRS

VHA PHOENIX HCS

HUMAN RESOURCES MANAGEMENT S

650 EAST INDIAN SCHOOL ROAD

PHOENIX AZ  85012

Dear    TIFFANY  POTTER,

This refers to the application you recently submitted to this office for the position below:

Position Title:    Registered Nurse, Chief Nurse of Administrative Medicine Service

Pay Plan:    VN

Series/Grade:

0610-04

Vacancy ID:    1478023

Announcement Number:    XP-15-BOc-1478023-T38

Hiring Office:    ADMIN MEDICINE SVC

Results regarding your recent referral to the Hiring Official are as follows:

Referral Type:    Non-Traditional

Appointment Type:    Permanent

Specialty / Grade:    0610 - 04

Promotion Potential:

Locations:

Phoenix, AZ

1

The hiring office has decided not to fill the position at this time.

Audit Code:

UN

Code Definition:

Certificate Unused

Code Explanation:

The hiring office that advertised this job has decided not to use the certificate, or list, of highly qualified candidates.

Thank you for your interest in Federal employment.  You are encouraged to visit www.usajobs.gov to view additional Federal

employment opportunities and information.

PLEASE DO NOT RESPOND TO THIS EMAIL MESSAGE.  IT IS AUTOMATICALLY GENERATED.

For additional information, please refer to the vacancy announcement for this position.

**Potter, Tiffany M**

| | |
|---|---|
| **From:** | Crenshaw, Gregory S. |
| **Sent:** | Friday, December 04, 2015 8:45 AM |
| **To:** | Jennings, Tiffany C. (PHO); Potter, Tiffany M |
| **Cc:** | West, James (PHO) |
| **Subject:** | RE: OMI visit/interview |

I am available Tuesday 11-2 or 8-11 on Wednesday.

Greg Crenshaw, MBA
Non-VA Purchased Care
Assistant Manager
650 E. Indian School Rd.
Phoenix, AZ 85012
602-277-5551 Ext. 3585

---

**From:** Jennings, Tiffany C. (PHO)
**Sent:** Thursday, December 03, 2015 3:38 PM
**To:** Potter, Tiffany M; Crenshaw, Gregory S.
**Cc:** West, James (PHO)
**Subject:** OMI visit/interview

Hi Tiffany and Greg,

I hope this message finds you well.  The Office of the Medical Inspector (OMI) is visiting PVAHCS 07 – 10 December and has requested a 30 minute interview with both of you (simultaneously).  Are you available on either Tuesday, 08 December or Wednesday, 09 December?

Please coordinate amongst yourselves and let me know a mutually convenient time.

Thank you for your prompt attention to this matter.

--
Tiffany C. Jennings, MPH
Administrative Officer for Patient Care Services
Phoenix VA Health Care System
W: (602)277.5551 ext. 6158 BB: (480)450.1645

**Potter, Tiffany M**

| | |
|---|---|
| **From:** | West, James (PHO) |
| **Sent:** | Monday, December 07, 2015 10:00 AM |
| **To:** | West, James (PHO) |
| **Subject:** | OMI Interviews |
| **Attachments:** | OMI Notice of Witness Obligations and Protections.docx |

In preparation for the upcoming OMI Interviews, please review the Notice of Witness Obligations and Protections. For Collective Bargaining Unit employees, if you wish to have Union representation, please coordinate prior to your scheduled interview.

Thank You,

**James M. West, MHA**
**Health System Specialist**
**Phoenix VA Health Care System (644)**
**650 E. Indian School Road**
**Phoenix, AZ 85012**

**Potter, Tiffany M**

| | |
|---|---|
| **From:** | Potter, Tiffany M |
| **Sent:** | Thursday, November 10, 2016 11:12 AM |
| **To:** | Duarte, Carlos A. |
| **Cc:** | Arensman, Michelle S.; Hoogerwerf, Micheal A. |
| **Subject:** | RE: Urgent Staffing Needs |

**Importance:**    High

Dr. Duarte,

I still have not had the opportunity to discuss with you and haven't had any updates either. I do not want veteran care to suffer due to critical RN staffing needs not being addressed. Please assist with this request. I believe the 2 pending vacancies are awaiting Mr. Welsh's approval in the Resource Portal. These requests were submitted almost 3 months ago. Should I reach out to him to expedite? Is he aware of what's going on?

*Tiffany*

**From:** Duarte, Carlos A.
**Sent:** Thursday, October 27, 2016 2:00 PM
**To:** Potter, Tiffany M
**Cc:** Arensman, Michelle S.; Hoogerwerf, Micheal A.
**Subject:** RE: Urgent Staffing Needs

Tiffany let's discuss this Friday, possibly in the am after morning report.

Thank you.

Dr. Duarte

**From:** Potter, Tiffany M
**Sent:** Thursday, October 27, 2016 9:48 AM
**To:** Duarte, Carlos A.
**Cc:** Arensman, Michelle S.; Hoogerwerf, Micheal A.
**Subject:** Urgent Staffing Needs
**Importance:** High

Dr. Duarte,

I need your assistance please. We are facing critical staffing shortages. The org chart does not accurately reflect the number of RN FTE split between the roles (should be 18.0 RN under NVCC, not 19.0, and should be 9.0 RN under Utilization Review, not 8.0). I brought this up several times in the past and it still has not been updated, which makes it impossible for HR Staffing to accurately account for our staff.

Based on our previous staffing methodology, 10 RNs are needed for UR. If the org chart were accurate, we have 9 RNs approved. However, I am short 2 RN vacancies, bringing that to 7 as far as boots on the ground.

But of those 7 RNs:

1 is doing full time Traveling Veterans (Traveling vets requires 2 FTE since taking over PCMM role and we are only allotted 1 so I had to take a Utilization Review FTE to cover).
 1 is covering full time Transplants (Transplants requires 2 FTE to share responsibility for the program, and Tom is out on extended leave so even the 1 I have covering is not sufficient until Tom gets back).

So in actuality, I have 5 RNs doing Utilization Review functions that require 10 RNs to do.  And for the entire section, I have 8 RNs doing the roles that require 14 FTE (10 UR, 2 Transplants, 2 Traveling Vets).


Needs:
Org chart should accurately reflect 9.0 UR nurses for Utilization Review.
Need approval to hire 1.0 additional RN for Utilization Review
Need approval to hire 1.0 additional Traveling Veteran Coordinator FTE to appropriately reflect the 2.0 RNs I have working the program to keep it afloat.  Alternative: move Traveling Veterans Program to Ambulatory Care as previously discussed.
Need approval to hire 1.0 additional RN Transplant Coordinator to ensure adequate coverage on the program with blended UR functions. Alternative: move Transplant Program to the Specialty areas to coordinate their own referrals.
Need an update on the 2 RN FTE that went to PMC to backfill so that I can get those already approved FTE on board.


I have worked very hard with my team to ensure we are successful in all areas, but with our workload going up due to winter visitors, and already being only 50-60% staffed,  I cannot continue the high level of performance without the support and resources to adequately staff my section, and staff are burning out trying.


Thank you for your assistance and attention to this urgent matter.  Please let me know if any additional information is needed for you to support our request for help.

*Tiffany Potter, RN, MSN, CPHQ*
*Nurse Manager*
*Administrative Medicine Service*
*Phoenix VA Health Care System*
*(602) 277-5551 X2180*

**Potter, Tiffany M**

| | |
|---|---|
| **From:** | Do Not Reply <vaoighotline@va.gov> |
| **Sent:** | Thursday, December 01, 2016 1:33 PM |
| **To:** | Potter, Tiffany M |
| **Subject:** | Tiffany Potter |

SUBJECT: PLEASE READ - IMPORTANT INFORMATION ABOUT YOUR SUBMISSION

We encourage you to read this message in its entirety because it contains answers to questions you may have about your submission. The U.S. Department of Veterans Affairs Office of Inspector General (OIG) Hotline has received your submission. Please note that our Hotline is not staffed to support emergency responses. If your submission concerns a life-threatening emergency, please call 911 or your local VA police.

WHAT HAPPENS NEXT? WILL I BE CONTACTED AGAIN BY THE OIG?
Within the next 6 weeks your information will be carefully reviewed by our Hotline Staff and other OIG subject matter experts to determine the appropriate course of action. We will contact you again only if we open a case or need additional information; therefore this may be the only correspondence you receive from our office.

Acceptance Criteria -The Hotline accepts tips or complaints that, on a select basis, result in reviews of:
* VA-related criminal activity
* Systematic patient safety issues
* Gross mismanagement of waste of VA resources
* Misconduct by senior VA officials

We recommend that if you are having ongoing health care, disability claim, or business disputes with VA, continue working with the responsible Department office while waiting to see if the OIG will open a case on your complaint.

CAN I CHECK THE STATUS OF MY SUBMISSION?
We cannot provide status reports or information regarding the disposition of submissions that do not result in cases. However, complaints that do not result in formal cases may be used in planning future OIG inspections and audits, or, if not confidential, referred to VA officials for their information.

IT HAS BEEN 6 WEEKS SINCE I SUBMITTED MY COMPLAINT AND I HAVE NOT HEARD BACK FROM THE OIG. WHY WASN?T MY COMPLAINT ACCEPTED? WHAT CAN I DO NOW?
If we have not contacted you in 6 weeks, your complaint was not accepted for review because it does not meet one of the four criteria for acceptance or because another Government agency is better positioned to resolve the issue. Contact information for VA and other Government agencies that can help you is located on our website at http://www.va.gov/oig/hotline/faq.asp.

The OIG does not investigate complaints that are unrelated to VA programs and operations or issues, such as those listed below, or those that are addressed in other legal or administrative forums:

* Allegations of whistleblower retaliation (This is because the OIG cannot provide direct relief to complainants in contrast to the U.S. Office of Special Counsel which can. Further information is available at https://osc.gov/Pages/WhatWeDo.aspx or 1-800-872-2249.)
* Claims for VA disability and pension benefits, and ratings, appeals, or home loan issues
* Claims for VA education benefits
* Tort claims or other legal issue/case/claims

* Litigation matters
* Employee grievances, unfair labor practices, union matters
* Whistleblower disclosures not related to the VA
* Discrimination and EEO complaints for VA employees, former VA employees, and applicants for VA positions
* Discrimination and complaints related to the Uniformed Services Employment and Reemployment Rights Act (USERRA)
* Personnel actions/adverse action appeals/MSPB matters
* Disagreement with law or other political disputes

Thank you for contacting the VA OIG Hotline.

**Department of
Veterans Affairs**

# Memorandum

Date:   January 3, 2017

From:   Medical Center Director (00)

Subj:   Detail to Unclassified Duties – Administrative Medicine Service

To:     Tiffany M. Potter, Nurse Manager (136G)

1. This memorandum serves as notification that you will be temporarily detailed to an unclassified duties reporting directly under the Chief of Administrative Medicine Service, effective January 9, 2017. Your assigned duties and responsibilities will be as follows:

   a. Serve as a primary point of contact and supervisor for care in the community (CITC)
   b. Develop and implement strategies to maximize use of Choice funds:
      i. Establish process to utilize Choice funds for community care
      ii. Ensure development and utilization of provider agreements based on identified priorities
      iii. Establish metrics to track and report use of facility funds and Choice funds for care in the community to include daily/weekly/monthly reports to Medical Center Director/designee and Chief, Administrative Medicine
      iv. Establish processes to support FY17 budget compliance
   c. Leadership responsibilities for clinical operations within CITC
      i. Serve as primary supervisor for nursing/clinical programs within CITC to include provision and monitoring of NM performance standards for FY 17
   d. Lead/ensure appropriate audits and program monitoring to ensure compliance with directives, policies and procedures
   e. Additional responsibilities may be added based on organizational needs

2. This detail assignment is based on a qualified business reason for an individual with particular knowledge, skills and abilities pertaining to purchased care management and operations. Based on your unique qualifications, you are being administratively detailed to fill this need. There is no guaranteed promotion or advancement based on this detail.

3. Effective January 9, 2017, you will report to Dr. Carlos Duarte, Chief of Administrative Medicine Service. The complete term of your detail will not exceed 120 days from the effective date of your detail without written notice. This detail may be terminated prior to the expiration date pending the finalization of the reorganization/realignment of Purchase Care Services.

4. If you have any questions or concerns related to this detail please contact Alyshia Smith, Associate Director, Patient Care Services at (602) 277-5551, ext. 7037.

RIMAANN O. NELSON

cc:    Alyshia Smith, Associate Director, Patient Care Services (AD/PCS)
       Carlos Duarte, Chief, Administrative Medicine Service (136G)

I have received the original copy of this Detail Notification.

_____
Tiffany M. Potter, RN                              Date

Page 2

Subj: Detail to Unclassified Duties – Tiffany Potter

 Gmail

**Tiffany Potter** <████████████████████████>

## 120 Detail to Unclassified Position

**A. Marques Pitre** <████████████████████>
To: Tiffany Potter <████████████████████>
Cc: Michelle de Vera <██████████████████████████████>

Wed, Jan 4, 2017 at 3:19 PM

Good Afternoon Tiffany,

I received a call from Agency Counsel informing me that the Agency has decided to place you on a 120-Day detail to an unclassified position under the Administrative Medicine Services, reporting directly to the Chief of Medicine Services. This will be a Supervisory position and you will receive a one or two-step (she said she believes it will be a two-step) increase. Additionally, she stated they will be going through the classification process in order to get this position classified as a Chief Nurse IV position. If they are able to do so, she stated even though it would need to be advertised as a competitive position, we would be able to work it out where you get the position in Settlement. Please let me know your thoughts on this move and potential position. Thanks.

If you have any questions regarding this matter, please do not hesitate to contact me. Your attention to this matter is greatly appreciated.

Sincerely,

*A. Marques Pitre, Esq.*

A. Marques Pitre, Esq.

Partner

Pitre & Associates, LLC.

Ronald Reagan Building and

International Trade Center

1300 Pennsylvania Avenue, NW

Suite 700

Washington, DC 20004

Phone: 202-204-3006

Direct: 309-287-1914

Email: ampitre@ampitreassociates.com

Case: 21-1460     Document: 19     Page: 491     Filed: 06/03/2021

Confidentiality and Privilege Notice/DO NOT PRODUCE THIS EMAIL IN DISCOVERY:

This email is sent by an Attorney.  Its contents may be confidential or otherwise privileged under the Attorney-Client or Attorney Work Product Privileges. Your unauthorized review, copying, and/or use of this email or its attachment(s) may thus be prohibited by law.  If you are not the proper recipient, please notify the sender immediately and delete this message.

Unless expressly stated to the contrary herein, nothing in this message was intended or written to be used, nor may be relied upon or used: (a) to avoid any penalties that could be imposed under the Internal Revenue Code of 1986, as amended, or (b) to recommend or support the promotion or marketing of any federal tax transaction or issue discussed herein.

 Gmail                                      Tiffany Potter 

## Need Guidance on Mandatory Detail Memo

**Tiffany Potter**                               Thu, Jan 12, 2017 at 10:33 PM
To:

I attached the detail memo I was given.  I was told to report to the Directors office  for a meeting.  The meeting was with Dr. Smith the nurse executive, and Mr. Bransky, the Deputy Medical Center Director. I was told that I am being detailed effective Tuesday, that I have no choice, and that I will receive no compensation and no title. I will be responsible for the duties of the position above me (Chief of Purchased Care) as well as the Associate Chief of Staff of Admin Medicine.  When I asked about being detailed without pay I was told by Dr. Smith I will not be getting ANY compensation because I'm already being paid as a nurse manager. When I pointed out my nurse manager duties in comparison to the physician Associate Chief of Staff duties, a position I don't even qualify to apply for, which makes more than double my salary, it was repeated that I will not be compensated. They said also that I am to report directly to the Deputy Medical Center Director, and that my boss Dr. Duarte will have other duties assigned and that I don't need to "worry about what he's doing" I need to know what I'm being held responsible for, which I have no say-so on.  I signed under duress what they said was simply a notification. I didn't know how else I could argue my point being that they were now displaying a show of force by having me in there with not even an HR representative forcing me to take on the duties of a grade and position way higher than mine. I was also notified today the OIG is investigating the department. I think they are trying to set me up. I felt like they were saying "sink or swim". If I refuse to do it, don't perform or show up to their meetings Tuesday I think they will write me up for insubordination or fire me. If I do perform successfully it will be without pay and I will be screwed in the end. It has also already caused a hostile work environment as now I'm doing my boss' job and was told not to tell him or anyone else once I leave that office because he doesn't know yet. And the other nurse managers also don't know I'm now their new boss, albeit without any official title. They are giving me delegation of duties with no delegation of authority. So I have no positional authority to tell anyone in the department what to do in order to accomplish the tasks they are making me responsible for. So delegation of duties without authority is a set up. The staff and managers will just keep doing whatever they want and there's nothing saying they don't report to Dr. Duarte anymore. That's another reason why I don't want to do it. It's a set up for failure.. and will certainly cause tension for me to go in and have the staff reporting to me instead of him when he is still responsible for mine and their performance evaluations.  They did not run this by our HR department, and when I asked my POC in HR I was told I have no choice but to do whatever they say.  This is so wrong, there's no way that can be.  I should have the right to respectfully decline.  This is continued harassment and retaliation and I just want them to leave me alone to do my job.  Please help!

Tiffany

📄 **Detail Memo.pdf**
310K

**Department of Veterans Affairs**                    # Memorandum

Date:   January 10, 2017

From:   Medical Center Director (00)

Subj:   Detail to Unclassified Duties – Community Managed Care

To:     Tiffany M. Potter, Nurse Manager (136G)

1. This memorandum serves as notification that you will be temporarily detailed to an unclassified duties reporting directly to the Deputy Medical Center Director, effective January 17, 2017. Your assigned duties and responsibilities will be as follows:

   a. Serve as a primary point of contact and supervisor for care in the Community Managed Care (CMC).
   b. Develop and implement strategies to maximize use of Choice funds:
      i. Establish process to utilize Choice funds for community care.
      ii. Ensure development and utilization of provider agreements based on identified priorities.
      iii. Establish metrics to track and report use of facility funds and Choice funds for care in the community to include daily/weekly/monthly reports to Medical Center Director/designee and Deputy Medical Center Director.
      iv. Establish processes to support FY17 budget compliance.
   c. Leadership responsibilities for clinical operations within CMC.
      i. Serve as primary supervisor for nursing/clinical programs within CMC to include provision and monitoring of NM performance standards for FY 17.
   d. Lead/ensure appropriate audits and program monitoring to ensure compliance with directives, policies and procedures.
   e. Additional responsibilities may be added based on organizational needs.

2. This detail assignment is based on a qualified business reason for an individual with particular knowledge, skills and abilities pertaining to purchased care management and operations. Based on your unique qualifications, you are being administratively detailed to fill this need. There is no guaranteed promotion or advancement based on this detail.

3. Effective January 17, 2017, you will report to the Deputy Medical Center Director. The complete term of your detail will not exceed 120 days from the effective date of your detail without written notice. This detail may be terminated prior to the expiration date pending the finalization of the reorganization/realignment of Community Managed Care.

4. If you have any questions or concerns related to this detail please contact Alyshia Smith, Associate Director, Patient Care Services at (602) 277-5551, ext. 7037.

*(FoL)*

RIMAANN Q. NELSON

cc:    Alyshia Smith, Associate Director, Patient Care Services (AD/PCS)
       Carlos Duarte, Chief, Administrative Medicine Service (136G)
       Shawn Bransky, Acting Deputy Medical Center Director (001)

I have received the original copy of this Detail Notification.

_Tiffany Potter, RN, MSN_                        1/10/2017
Tiffany M. Potter, RN                            Date


Page 2

Subj: Detail to Unclassified Duties – Tiffany Potter

*Tiffany Potter/Detailed* (handwritten, left)

**PHOENIX VA HEALTH CARE SYSTEM**
**ADMINISTRATIVE MEDICINE SERVICE**
**147.5 FTE**

*Tiffany Potter/Detailed* (handwritten, right)

**Top box:**
1.0 ACOS Administrative Medicine Service Physician, VM-0602-15    1.0 Chief, RN VN-0610-4
1.0 Administrative Officer, GS-0341-11, PD#4972 → *Robert McCall*
1.0 Administrative Assistant, GS- & PD TBD → *VACANT*
1.0 Program Analyst, GS & PD TBD → *Nur Ataullah*

---

**Compensation & Pension** — 38.5 FTE

1.0 Chief Physician: VM-0602-15
1.0 Supervisory Management and Program Analyst (GS-0343-12)
1.0 RN: VN-0610 (Nurse Supervisor)
1.0 RN: VN-0610
1.0 LPN: GS-0620-06
1.0 Supervisor Program Specialist: GS-0301-7/9 , PD#4861A
15.0 Advanced Medical Support Assistant:
    GS-0679-5/6 FS, PD
4.0 Advanced Medical Support Assistant:
    GS-0679-05 FS, PD
5.0 Physician: VM-0602-15, General Medicine
1.0 Physician: VM-0602-15, PM&R
1.0 Physician: VM-0602-15, Physical Medicine & Rehab
2.0 Psychologist: GS-180-13
3.0 Physician Assistant: GS-603-13, General Medicine
1.0 Nurse Practitioner: VN-0610, General Medicine
0.5 Physician: VM-0602-15, Optometry

*Michelle Arensman* ← (handwritten)

**Occupational Health & Environmental Medicine** — 7.0 FTE

1.0 Chief Physician: VM-0602-15
2.0 Nurse Practitioner/Physician Assistant
2.0 LPN: GS-0620-06
2.0 Medical Support Assistant: GS-0679-05 FS

**Utilization Review**

1.0 Nurse Manager: RN VN-0610 → *Tiffany Potter*
1.0 Assistant Nurse Manager: RN VN-0610, VCL
4.0 LPN/LVN: GS-0620-06 Transfer Coordinator/Discharge Planning
8.0 Registered Nurse: RN VN-0610, Utilization Review
1.0 Registered Nurse: RN VN-0610 Transplant Coordinator
1.0 Registered Nurse: RN VN-0610 Traveling Veteran

**Non-VA Care/Purchased Care** — 97.0 FTE

1.0 Deputy ACOS, Chief Physician: VM-0602-15 → *Tiffany Potter Detailed*
2.0 Administrative Assistant, GS-07, PD#201180

(→ *Toby Scove*)
→ *VACANT*

**Non-VA Purchased Care**

1.0 Chief, Non VA Care: Management & Program Analyst, GS -0343-12 PD#4327 → *Tiffany Potter Detailed*
2.0 Supervisor Program Specialist: GS-0301-09 PD#4269 → *Christie Freeman, Shondel Thiel*
2.0 Lead Voucher Examiner: GS-0540-07 PD#4814 → *Andrea Collins, Lucy Lederfeind*
1.0 Budget Analyst: GS-0560-07 PD#4589 → *Lynn Curr*
35.0 Voucher Examiner: GS-0540-06 PD#4337 A
1.0 Voucher Examiner: GS-0540-06 PD#4088 A
1.0 Voucher Examiner: GS-0540-05 PD#4326 A
5.0 Voucher Examiner: GS-0540-06 PD#20142A

**NVCC Consults/Veterans Choice Coordination**

1.0 Nurse Manager: RN, VN-0610
1.0 Assistant Nurse Manager: RN VN-0610
19.0 Registered Nurse: RN VN-0610, NVCC
8.0 Voucher Examiner: GS-0540-06 PD#20142A, VCL
1.0 Lead Voucher Examiner: GS & PD TBD

*Melissa Pacheco* ←
*Jennifer Lachtara* ←
*Wilfredo Gonzales* ←

---

**SUBMITTED**
*[signature]*    8/17/15
Robbi Venditti, D.O., MHA    Date
ACOS, Administrative Medicine Service

**TECHNICAL REVIEW**
*[signature]*    9/3/15
UR Representative    Date

**RECOMMENDED APPROVAL**
*[signature]*    9/16/15
Darren G. Deering, DO.    Date
Chief of Staff

**RECOMMENDED APPROVAL**
*Marva Greene*    9/16/15
Marva Greene    Date
Acting Associate Director/Patient Care Services

**RECOMMENDED APPROVAL**
*[signature]*    9/03/15
Donald E. Taylor    Date
Acting Associate Director

**APPROVAL**
*[signature]*    9/21/15
Glen W. Grippen    Date
Interim Medical Center Director

---

Appx0786

**Potter, Tiffany M**

| | |
|---|---|
| **From:** | Potter, Tiffany M <tiffany.potter@va.gov> |
| **Sent:** | Tuesday, January 17, 2017 12:42 PM |
| **To:** | Duarte, Carlos A.; Potter, Tiffany M |
| **Subject:** | Conversation with Duarte, Carlos A. |

Potter, Tiffany M [12:20 PM]:
  See my email?
Duarte, Carlos A. [12:20 PM]:
  yes
Potter, Tiffany M [12:20 PM]:
  Do you think that will help?
Duarte, Carlos A. [12:22 PM]:
  it should - it clearly articulates that you need delegation of authority, not just duty, to accomplish your goals.
  i think it is appropriate.  we don't want to create any further distractions, innuendo, or uncertainity in our dept.
  are you holding up okay?
Potter, Tiffany M [12:25 PM]:
  Yea, and you don't even have a memo!  I am obviously stressed and anxious about all this as I am sure you are.  I will
  always do what I can to help the department, but you would think they would at least TRY to do the right things.  I
  don't know their plan and that's frustrating.
Duarte, Carlos A. [12:27 PM]:
  i've been frustrated all weekend long for me too.  ruined my weekend
Potter, Tiffany M [12:29 PM]:
  :( I'm sorry.  I hope this does not negatively impact our relationship.  I don't know what they are doing or why they
  are doing it.  I have just wanted to be left alone to do my job, and now they are ripping me out of my chair and
  throwing this on me. It's not right, it's not fair, I don't know why they are picking me, but please know I had nothing
  to do with this, and was told I have no option to decline.

**From:** Bachelier, Luis D.
**Sent:** Monday, January 09, 2017 7:53 AM
**To:** White Lawson, Stephanie R.
**Cc:** Donlon, Kathleen J.; Duarte, Carlos A.; Patterson, Rex
**Subject:** RE: Response to Open OIG Recommendation - Report: Review of Alleged Consult Mismanagement at the Phoenix Health Care System

I apologize for not getting back with you sooner.  My responses are in blue.

Purchased Care is implementing the following strategies to ensure that all consults, including those over 120 days, have received the requested care:

- Purchase Care supervisors review this report on a weekly basis. **(Is this being done?)** Yes, with the addition of the top ten report that is reported to leadership at morning report, this is being done on a daily basis.  The report from 1/4/17 is attached, I have not received a more recent report since coming back to Compliance.  The status and breakdown of all Non VA Care and Choice-First open consults are reviewed daily by all managers and supervisors in CMC, as well as reported to the Director daily.  A current sample is attached, titled 1.24.17 NVCC-Choice.Top.Ten.  Consult RNs review all open consults beginning with greater than 90 days, then 60, then 30, to identify if care has been provided and request the medical records to complete the consult.  This is part of the daily consult closure function of the Consult RNs, 18FTE perform this function daily.  The process they follow is attached, titled FY16 Consult Closure Business Rules.

- Re-train staff on the Choice-First process to ensure consults are forwarded to Choice-First upon upload of consult to Tri West, the Choice vendor.**( Are we able to provide documentation…e.g. TMS modules, competencies?)** NonVA care staff is pretty well-versed in what must be sent out choice first.  Dr. Duarte has a project currently underway that will keep providers informed of what care will have to go out Choice First.  Yes, staff were trained when this action item was responded to originally.  In addition to that response, they were retrained again on 1/22/17.  The documentation of that training is attached, titled Consult Conversion.

  The specialty clinic with the highest volume of Choice First consults is Ophthalmology and there is also has a project underway that will allow the primary care provider to Opt-in the Veteran for Choice in the clinic as part of a required field in the consult template.  The overall goal is to spread this to all Choice First eligible clinics.  Opting in at the clinic level is expected to reduce the need for NonVA care staff to call the Veteran and Opt them in via telephone, which has taken anywhere between 7-20 days since they are not always available to speak on the phone.  Since they are physically present in the clinic at the time the consult is written, it makes sense to Opt them in there.  Because the template has already been built by the CAC, the only step left is training primary care staff on the procedure and going live with the new consult format.

- Develop an automated monitor to identify consults that have been processed Choice-First but stay in a Non VA Care Status. **(SOP, policy or explanation of the automated tool being used to monitor)** I am not certain what this means.  All Choice First consults by definition are NonVA Care Consults as Choice First is a subcategory of NonVA Care.

- Continue to work on quality improvement measures to improve efficiency and closer monitoring of consult processes.**( Have any been identified?  What is the status?)** Their data analyst, Bashiruddin Attaullah, has been instrumental in developing tools and reports to identify potential deficiencies.  For example, we have added a daily Level-1/STAT monitor, Consult missing linked FBCS

Case: 21-1460    Document: 19    Page: 498    Filed: 06/03/2021

Authorizations as well as a weekly IP/OP report. He also has been working with clinic leaders on an ad-hoc basis to provide meaningful data for their own analysis.

*Luis Bachelier*
Health Systems Specialist
Compliance & Business Integrity Specialist
Phoenix VA Health Care System
602-277-5551 x3585

"We will always remember. We will always be proud. We will always be prepared, so we will always be free." – Ronald Reagan



**From:** White Lawson, Stephanie R.
**Sent:** Friday, January 06, 2017 2:55 PM
**To:** Bachelier, Luis D.
**Cc:** Donlon, Kathleen J.; Duarte, Carlos A.
**Subject:** Response to Open OIG Recommendation - Report: Review of Alleged Consult Mismanagement at the Phoenix Health Care System

Luis,

Thank you for chatting with me and explaining the intricacies of the spreadsheet. Per our conversation, I am forwarding to you the open OIG recommendation. Please accept my apologies for the short notice, but if at all possible, please submit response to me via email by **COB today, January 6, 2017.**

Copying Ms. Donlon and Dr. Duarte for their awareness.

Thank you!

**Recommendation 14. We recommended the Veterans Integrated Service Network 22 Director ensure the Director of Phoenix VA Health Care System makes sure Non-VA Care develops a process to routinely follow up with those patients with open community care consults older than 120 days to determine if they received the requested care.**

VHA Comments: Concur

PVAHCS has an established process to routinely follow up with those patients with open community care consults older than 120 days to determine if they received the requested care. PVAHCS Purchased Care Service currently implements the PVAHCS Consult Closure Business Rules and routinely monitors its implementation strategy. Community Care staff are involved in weekly routine calls with regional leadership to incorporate any new changes or revisions to the PVAHCS Consult Closure Business Rules.

Purchased Care is implementing the following strategies to ensure that all consults, including those over 120 days, have received the requested care:

- Purchase Care supervisors review this report on a weekly basis. **(Is this being done?)**

- Re-train staff on the Choice-First process to ensure consults are forwarded to Choice-First upon upload of consult to Tri West, the Choice vendor.**( Are we able to provide documentation…e.g. TMS modules, competencies?)**

- Develop an automated monitor to identify consults that have been processed Choice-First but stay in a Non VA Care Status. **(SOP, policy or explanation of the automated tool being used to monitor)**

- Continue to work on quality improvement measures to improve efficiency and closer monitoring of consult processes.**( Have any been identified?  What is the status?)**



Stephanie R. White Lawson, MSN RN
QUALITY, SAFETY & IMPROVEMENT (QSI)
Ambulatory Quality Manager
Phoenix VA Health Care System
Phone: 602-277-5551 Ext 3703  Email: Stephanie.WhiteLawson@va.gov

*QUALITY IS NOT AN ACT, IT IS A HABIT ~ ARISTOTLE*

**Integrity - Commitment - Advocacy - Respect – Excellence**



**ARE YOU CREW?**
**Civility, Respect, &**
**Engagement in the Workplace**
Ask me for more information

**Potter, Tiffany M**

| | |
|---|---|
| **From:** | Potter, Tiffany M |
| **Sent:** | Friday, January 20, 2017 5:29 PM |
| **To:** | White Lawson, Stephanie R. |
| **Subject:** | RE: For Today's Meeting |

No, it's a workload report reflecting what medical records still need to be indexed.. They are medical records that have been scanned.. indexing is the process of getting them into the CPRS..

*Tiffany*

**From:** White Lawson, Stephanie R.
**Sent:** Friday, January 20, 2017 2:35 PM
**To:** Potter, Tiffany M
**Subject:** RE: For Today's Meeting

THANKS!  One question: Is there an "official" title for the Index document?

**From:** Potter, Tiffany M
**Sent:** Friday, January 20, 2017 2:29 PM
**To:** White Lawson, Stephanie R.
**Subject:** RE: For Today's Meeting

**Recommendation 4.**  We recommended that the System Director ensure that documentation from non-VA clinical care, including radiology reports, are obtained and available in the electronic health record for review in a timely and consistent manner.

1. Consult Closure: The attached Consult Closure document discusses the PVAHCS business rules for non-VA consult closure, which includes obtaining records from the vendor and uploading to the Veteran's electronic medical record.  The Consult RNs assigned to Non VA Care request medical records for open consults on a daily basis.  Once the medical records are received, they are made available in the electronic health record for review.
2. Triwest Portal Medical Records: There is a PSA in CMC assigned to retrieve the medical records from the Triwest portal on a daily basis.  These records are loaded into Doc Manager to be indexed into the medical record, a function that is performed daily and monitored daily by the supervisors in CMC.
3. Medical records that have been received via fax, mail, or Triwest portal, are loaded into the Doc Manager for indexing.  The progress of pending medical records needing to be made available in the electronic health record is monitored daily.  See attached workload sheet for an example.
*Note: The functions of scanning/indexing medical records into CPRS is now a HIMS responsibility.  These functions are currently being transitioned over to HIMS staff to take over this process.

*Tiffany*

**From:** White Lawson, Stephanie R.
**Sent:** Friday, January 20, 2017 12:32 PM
**To:** Potter, Tiffany M
**Subject:** FW: For Today's Meeting

**Recommendation 4.** We recommended that the System Director ensure that documentation from non-VA clinical care, including radiology reports, are obtained and available in the electronic health record for review in a timely and consistent manner.

Concur

**Target date for completion:** September 30, 2016

**System response:** The following embedded document discusses the PVAHCS business rules for non-VA consult closure, which includes obtaining records from the vendor and uploading to the Veteran's electronic medical record.

FY 16 Consult Closure Business Rules 11-7-

PVAHCS is in the process of hiring a Program Support Assistant whose primary responsibility will be to input Radiology reports from non-VA providers. Radiology reports that will be uploaded to the electronic medical record upon receipt.

PVAHCS is developing a report to pull information monthly from open consults for which a non-VA appointment has been scheduled. This report will generate a list of Veterans for whom records must be requested when non-VA care is provided. Tri-West uploads records to the communication portal, which PVAHCS then downloads and inserts into the VA medical record. The consult is closed once the records are received from Tri-West.

---

**From:** White Lawson, Stephanie R.
**Sent:** Thursday, January 19, 2017 2:31 PM
**To:** Duarte, Carlos A.; Potter, Tiffany M
**Subject:** For Today's Meeting

---

**From:** Bachelier, Luis D.
**Sent:** Monday, January 09, 2017 7:53 AM
**To:** White Lawson, Stephanie R.
**Cc:** Donlon, Kathleen J.; Duarte, Carlos A.; Patterson, Rex
**Subject:** RE: Response to Open OIG Recommendation - Report: Review of Alleged Consult Mismanagement at the Phoenix Health Care System

I apologize for not getting back with you sooner. My responses are in blue.

Purchased Care is implementing the following strategies to ensure that all consults, including those over 120 days, have received the requested care:

- Purchase Care supervisors review this report on a weekly basis. **(Is this being done?)** Yes, with the addition of the top ten report that is reported to leadership at morning report, this is being done on a daily basis. The report from 1/4/17 is attached, I have not received a more recent report since coming back to Compliance.

- Re-train staff on the Choice-First process to ensure consults are forwarded to Choice-First upon upload of consult to Tri West, the Choice vendor.**( Are we able to provide**

documentation...e.g. TMS modules, competencies?) NonVA care staff is pretty well-versed in what must be sent out choice first. Dr. Duarte has a project currently underway that will keep providers informed of what care will have to go out Choice First.

The specialty clinic with the highest volume of Choice First consults is Ophthalmology and there is also has a project underway that will allow the primary care provider to Opt-in the Veteran for Choice in the clinic as part of a required field in the consult template. The overall goal is to spread this to all Choice First eligible clinics. Opting in at the clinic level is expected to reduce the need for NonVA care staff to call the Veteran and Opt them in via telephone, which has taken anywhere between 7-20 days since they are not always available to speak on the phone. Since they are physically present in the clinic at the time the consult is written, it makes sense to Opt them in there. Because the template has already been built by the CAC, the only step left is training primary care staff on the procedure and going live with the new consult format.

- Develop an automated monitor to identify consults that have been processed Choice-First but stay in a Non VA Care Status. **(SOP, policy or explanation of the automated tool being used to monitor)** I am not certain what this means. All Choice First consults by definition are NonVA Care Consults as Choice First is a subcategory of NonVA Care.

- Continue to work on quality improvement measures to improve efficiency and closer monitoring of consult processes.**( Have any been identified?  What is the status?)** Their data analyst, Bashiruddin Attaullah, has been instrumental in developing tools and reports to identify potential deficiencies. For example, we have added a daily Level-1/STAT monitor, Consult missing linked FBCS Authorizations as well as a weekly IP/OP report. He also has been working with clinic leaders on an ad-hoc basis to provide meaningful data for their own analysis.



Health Systems Specialist
Compliance & Business Integrity Specialist
Phoenix VA Health Care System
602-277-5551 x3585

"We will always remember. We will always be proud. We will always be prepared, so we will always be free." – Ronald Reagan

**VA HEALTH CARE** | Defining **EXCELLENCE** in the 21st Century

---

**From:** White Lawson, Stephanie R.
**Sent:** Friday, January 06, 2017 2:55 PM
**To:** Bachelier, Luis D.
**Cc:** Donlon, Kathleen J.; Duarte, Carlos A.
**Subject:** Response to Open OIG Recommendation - Report: Review of Alleged Consult Mismanagement at the Phoenix Health Care System

Luis,

Thank you for chatting with me and explaining the intricacies of the spreadsheet. Per our conversation, I am forwarding to you the open OIG recommendation. Please accept my apologies for the short notice, but if at all possible, please submit response to me via email by **COB today, January 6, 2017.**

Copying Ms. Donlon and Dr. Duarte for their awareness.

Thank you!

**Recommendation 14. We recommended the Veterans Integrated Service Network 22 Director ensure the Director of Phoenix VA Health Care System makes sure Non-VA Care develops a process to routinely follow up with those patients with open community care consults older than 120 days to determine if they received the requested care.**

<u>VHA Comments</u>: Concur

PVAHCS has an established process to routinely follow up with those patients with open community care consults older than 120 days to determine if they received the requested care. PVAHCS Purchased Care Service currently implements the PVAHCS Consult Closure Business Rules and routinely monitors its implementation strategy. Community Care staff are involved in weekly routine calls with regional leadership to incorporate any new changes or revisions to the PVAHCS Consult Closure Business Rules.

Purchased Care is implementing the following strategies to ensure that all consults, including those over 120 days, have received the requested care:

- Purchase Care supervisors review this report on a weekly basis. **(Is this being done?)**

- Re-train staff on the Choice-First process to ensure consults are forwarded to Choice-First upon upload of consult to Tri West, the Choice vendor.**( Are we able to provide documentation…e.g. TMS modules, competencies?)**

- Develop an automated monitor to identify consults that have been processed Choice-First but stay in a Non VA Care Status. **(SOP, policy or explanation of the automated tool being used to monitor)**

- Continue to work on quality improvement measures to improve efficiency and closer monitoring of consult processes.**( Have any been identified?  What is the status?)**

Stephanie R. White Lawson, MSN RN
QUALITY, SAFETY & IMPROVEMENT (QSI)
Ambulatory Quality Manager
Phoenix VA Health Care System
Phone: 602-277-5551 Ext 3703  Email: Stephanie.WhiteLawson@va.gov

*QUALITY IS NOT AN ACT, IT IS A HABIT ~ ARISTOTLE*

**Potter, Tiffany M**

| | |
|---|---|
| **From:** | Potter, Tiffany M |
| **Sent:** | Tuesday, February 28, 2017 8:06 PM |
| **To:** | Nelson, RimaAnn O. |
| **Subject:** | Concerns with Mandatory Detail |
| **Attachments:** | Letter to the Director.docx.pdf |

Ms. Nelson,

I just wanted to follow up on the concerns I have regarding my mandatory detail and some things that have transpired as a result. I intended to send you the attached letter before the detail went in effect in attempt to prevent the detail from occurring, especially considering the inappropriate circumstances. But it was made clear to me by Dr. Smith, Mr. Bransky, and VA's Regional Counsel Ms. Varma that you were fully aware of the specifics regarding this detail and that it was coming from you. However, after speaking with you on 2/13/17 about several of my concerns, I am not certain whether you were indeed aware of everything or not, so I am attaching it now. As you know, I am on a mandatory detail to "Unclassified Duties" which are actually the responsibilities of 4 vacant FTEs classified in other PDs within this department, two of which were being performed by physicians (Dr. Duarte and Dr. Yao). In addition, I am not being compensated at all for performing these duties, even though according to HR others are fairly compensated when detailed to perform duties above their pay grade. As I expressed to you during our meeting, I am being mandated to perform these functions, making me responsible for an entire service line with minimal support. Although I am fully committed to honoring your instructions, I do feel that being mandated to perform the functions of multiple crucial leadership positions by myself may be putting my license, the department, and the veterans at risk. I fear I am being set up to fail (which you mentioned some pentad members anticipated) or take the fall for the several failures I am identifying within the areas that I am now in charge of, some of which I could have prevented from happening had I not been wrongfully demoted from the Chief Nurse leadership position in the department back in 2015 which resulted in me no longer having any oversight of consult or appointment management. Nearly every day since this detail began I come into work and uncover inappropriate and unlawful processes that I am now responsible to fix. I brought up my concerns regarding the impact this detail was having on me to Mr. Bransky (see below), but then he left a few days later and things continued to worsen. I was asked to update several OIG recommendation responses that were previously submitted by Dr. Duarte, and upon review discovered that the information provided by previous leadership was inaccurate. When I updated and provided accurate and truthful responses, I received a phone call from Rex Patterson and Linda Swan, who berated me for nearly two hours attempting to make me change my submission and responses to the OIG and omit information that was pertinent to the recommendations. I attempted to explain several times that I cannot ethically falsify information to the OIG and that their recommended changes are misleading and alter the nature of the response. Regardless of this, they made changes without my consent. I have been made to approve the movement and transfer of funds from different accounts for CITC, some which were negative account balances already, despite the fact I reiterated I have no training to perform these functions. These are just two of the many examples of situations I face, in addition to being in a role that requires me to perform functions that were previously held by two physicians, compromising my license and ethical values. I was told by Mr. Bransky previously that I would not be responsible for the budget/fiscal responsibilities, to include supervision, as Regina Hines would be filling in for those duties, however, she has made it clear from the beginning that she is not working in that capacity and that I am responsible for that role in addition to the other vacant leadership positions. Yesterday was Regina's last day on site and she made it clear before she left that I will now be on my own.

I have tried to schedule meetings with you, two of which were cancelled and the other Regina invited herself to so I was not able to address my concerns openly. Even when I spoke to you in confidence on 2/13/17 requesting that Dr. Smith not be involved as she has made threats to me in the past, I still received a call from her the next day wanting to discuss the concerns I brought to you in confidence. She mentioned that an org chart was being signed yesterday for Community Managed Care, although neither I nor anyone in the purchased care/CMC department who knows how this

department functions was consulted to ensure the new organizational structure reflects an appropriate structure and leadership positions. I can only hope that the multiple vacancies I have to perform are not, as I heard, being rolled into one position as a Chief Nurse when there was already a Chief Nurse IV on the org chart in addition to the other 3 key leadership positions. This is not a 1-person job. And although it may be perceived that I am high-functioning, I have been putting in 14+ hour days, neglecting my family responsibilities, schooling, and health, trying to successfully execute the near impossible responsibilities that were mandated to me, all without even being fairly treated with some type of compensation.

You have mentioned in the past that you can't fix what you don't know about, so I am bringing these concerns to your attention again to ensure you are fully aware of what has been going on and how I am being treated.

*Tiffany*

**From:** Potter, Tiffany M
**Sent:** Thursday, January 26, 2017 4:16 PM
**To:** Bransky, Shawn M.
**Subject:** RE: new provider orientation powerpoint

Mr. Bransky,

Dr. Duarte has left me with nothing short of a disaster. I spend now about 15 minutes a day with my kids by the time I get home. I am getting my Doctorate in Nursing Practice and have had to ask for 2 assignment extensions due to the demand of cleaning up this mess requiring me to change my tour and stay late every day. I have made a lot of progress and improvements already, but there is so much more that demands my attention over the next 2 weeks. NPO is tomorrow at 11am. Like every email and meeting invite he receives related to CMC, this again was just forwarded to me, more dumped on my plate with no notice. If you want me to take over NPO, respectfully I will do so. But if he can at least attend tomorrows to give me time to take care of the rest of his previous functions that have not been addressed, it would be greatly appreciated.

Please let me know. I am functioning in the roles of 4 vacant positions over here, but I am committed to successfully completing this detail for my leadership. Any consideration to this request regarding tomorrow would be helpful towards that goal.

Thanks.

*Tiffany*

**From:** Bransky, Shawn M.
**Sent:** Thursday, January 26, 2017 4:09 PM
**To:** Potter, Tiffany M
**Subject:** RE: new provider orientation powerpoint

Tiffany-

The information on the slides seems to be very basic in nature. It might be better to have you in the driver seat on this—as long as Dr. Duarte continues to brief Choice and NVCC information, it confuses people. I would rather you be the face and voice of the program. Let me know what concerns you have. I'm confident you have the right knowledge base to be able to get through the slides.

Shawn

**From:** Potter, Tiffany M
**Sent:** Thursday, January 26, 2017 4:05 PM
**To:** McCarthy, Maureen; Bransky, Shawn M.
**Cc:** Duarte, Carlos A.; McCall, Robert J. III; Hines, Regina
**Subject:** FW: new provider orientation powerpoint
**Importance:** High

Mr. Bransky/Dr. McCarthy,

My detail did not include New Provider Orientation.  Since Dr. Duarte is now the Special Advisor to the COS for Care Coordination, wouldn't he continue to provide NPO Education to new Providers regarding Care Coordination, which would include this presentation?

Please advise, as I am not prepared to present tomorrow and was not provided this information until now.  But it seems more appropriate for Dr. Duarte's important new role in my opinion, addressing proper care coordination with providers..

Thanks.

*Tiffany Potter, RN, MSN, CPHQ*
*Acting Chief*
*Community Managed Care*
*Phoenix VA Health Care System*
*Office: (602) 277-5551 X2180*

---

**From:** Duarte, Carlos A.
**Sent:** Thursday, January 26, 2017 4:01 PM
**To:** McCall, Robert J. III
**Cc:** Potter, Tiffany M
**Subject:** new provider orientation powerpoint
**Importance:** High

Tiffany

This is the ppt I used last time I gave a talk to new providers.

Feel free to use it and make any changes you like.

Thanks.

*Carlos A Duarte, MD MPH*
*Associate Chief of Staff, Administrative Medicine Services*
*Phoenix VAHCS*
*650 E. Indian School Road*
*Phoenix, AZ 85012-1892*
*602 277-5551 Ext. 6235*
*Carlos.Duarte2@va.gov*

1/13/2017

Ms. Nelson,

I would like you to be aware of the serious concerns I have with the actions of Phoenix VA leadership. I was requested to meet with Dr. Smith and Mr. Bransky, where I was informed that I am being mandated by you to perform the collective duties of the positions above me (Associate Chief of Staff, previously Dr. Duarte), Deputy ACOS for Purchased Care (vacant, previously Dr. Yao), Chief Nurse IV for AMS (vacant, previously the role I was performing before Mr. Grippen had HR cease processing to convert me to a Nurse IV suddenly out of retaliation for me filing an EEO), and the Chief Program and Management Analyst Fee Manager position (vacant), collective duties as outlined in the detail memo I received. I was told that I am being detailed effective Tuesday, that I have no choice, and that I will receive no compensation and no title. I was originally told by Dr. Smith that I would receive additional compensation while performing these additional duties, but after she became aware that my attorney contacted Agency Counsel on the matter, this was rescinded and I was told that not only will I not be getting the step increase she mentioned before, that I also will not be getting ANY compensation because I'm already being paid as a nurse manager. When I pointed out my Nurse Manager duties are not comparable to the physician Chief duties, which are out of scope for an RN, in addition to the other positions including those above my pay grade, it was repeated that I will not be compensated. They said also that I am to report directly to the Deputy Medical Center Director, and that my boss Dr. Duarte will have other duties assigned and that I don't need to "worry about what he's doing", that I only need to know what I'm being held responsible for, which I have no say-so on. I signed under duress what they said was simply a notification. I was even told not to tell anyone about this detail as my boss was not yet aware. It was mentioned that Dr. Duarte will be working on the Provider Agreements, but noted the memo states that I am responsible for development and utilization of Provider Agreements. Does this mean my former boss will now be reporting to me? I fear the retaliation I will receive once he does become aware that I will be taking over his job duties and staff.

You may not be aware, but I was once the Chief Nurse over this department, but I was demoted as a result of discrimination and retaliation. I was already threatened by Dr. Smith to drop my EEO case or she will permanently remove the Chief Nurse IV position, and now after not dropping my case, and reporting some of the recent wrongdoing in the department to the OIG, I am suddenly being mandated to these unclassified duties that will make me responsible for the existing failures of the department that I had nothing to do with. I have not been provided a reason why I am being detailed considering the fact that it I am no longer over any of the areas outlined in the detail memo, and haven't had any involvement for over a year now. I also questioned why I am being detailed to "Unclassified Duties" as opposed to the existing positions and PDs that these duties fall under, which are already classified positions above my pay grade. I was not given any reasonable response. Furthermore, per the detail memo I have no positional authority to tell anyone in the department what to do in order to accomplish the tasks that I have been made responsible for. In doing so, you are mandating me delegation of duties with no delegation of authority to perform the duties. It was already commented by two of the managers in the department that Dr. Duarte is still their boss as he is the one rating their performance in

October. Due to this, it is not reasonable to put staff in a negative position to report to me as opposed to him.

To put it simply, I feel this is a set up for failure. After longstanding continued discrimination, retaliation, bullying and abuse by leadership at the Phoenix VA, I am now being forced to take on additional responsibilities that are above my pay grade and current duties, without compensation or title to reflect the "Unclassified Duties" I have been assigned. This action is and will continue to result in a hostile work environment, as well as undue stress and anxiety. I was already threatened and it was made very clear by Dr. Smith that I have no option to decline this mandatory detail. There was no consideration or even a two-week notice given so I can plan for the changes to my tour of duty that are having to be made to accommodate this requirement. I cannot proceed without at least informing you the concerns I have in the matter. I will report on Tuesday to morning report as instructed, and as always I will do my best to serve the agency and the veterans under the given circumstances.

Respectfully,

Tiffany Potter, MSN, RN, CPHQ
Nurse Manager, Utilization Review

**Potter, Tiffany M**

| | |
|---|---|
| **From:** | Microsoft Outlook |
| **To:** | Nelson, RimaAnn O. |
| **Sent:** | Tuesday, February 28, 2017 8:06 PM |
| **Subject:** | Delivered: Concerns with Mandatory Detail |

## Your message has been delivered to the following recipients:

Nelson, RimaAnn O. (Rima.Nelson@va.gov)

Subject: Concerns with Mandatory Detail

**Potter, Tiffany M**

**Subject:**                              FW: Conversation with McCall, Robert J. III

**From:** McCall, Robert J. III [mailto:robert.mccall2@va.gov]
**Sent:** Thursday, March 09, 2017 3:49 PM
**To:** McCall, Robert J. III; Potter, Tiffany M
**Subject:** Conversation with McCall, Robert J. III

McCall, Robert J. III [7:33 AM]:
   So you're committed to leaving, right?
Potter, Tiffany M [7:33 AM]:
   Why do you ask?
   ...
   ^o)
McCall, Robert J. III [7:34 AM]:
   I was informed that I must enter an ARPA for Chief Nurse IV
[7:35 AM] McCall, Robert J. III has requested to send file "**CMC Proposed Org Chart 022717.pdf**" to you.
Potter, Tiffany M [7:35 AM]:
   When?  Wouldn't that just be too convenient?  I give my 2 week notice, and THEN they recruit for the Chief Nurse IV?
McCall, Robert J. III [7:35 AM]:
   first I've heard of it's existance!
[7:35 AM] You have successfully received **CMC Proposed Org Chart 022717.pdf** from McCall, Robert J. III. The file is located in
\\R01phohsm02.r01.med.va.gov\homedir$\VHAPHOPotteT2\My Documents\My Received Files. Before you open this file, we strongly
recommend that you scan it with an antivirus program.
McCall, Robert J. III [7:38 AM]:
   Master Smith gave the order
Potter, Tiffany M [7:38 AM]:
   When?
McCall, Robert J. III [7:39 AM]:
   Belen just e-mailed it to me five minutes ago and said Dr. Smith wants this today.
   Wonder how they will act at morning report.  Because you don't know....
McCall, Robert J. III [10:36 AM]:
   You think they have anyone in mind besides you?
Potter, Tiffany M [10:47 AM]:
   obviously
McCall, Robert J. III [10:48 AM]:
   Hmmmm

Pleading Number : 2018041295    Submission date : 2018-09-27 22:07:09    Confirmation Number: 417325737



PHOENIX VA HEALTH CARE SYSTEM
ADMINISTRATIVE MEDICINE SERVICE

66.0 FTE

→ Tiffany Potter
Chief Nurse

— Melissa Pacheco
Nurse Manager

Appx0802

Pleading Number: 2018041295 Submission date: 2018-09-27 22:07:09 Confirmation Number: 417325737 page 51 of 101



**PHOENIX VA HEALTH CARE SYSTEM**
ADMINISTRATIVE MEDICINE SERVICE
136.5 FTE

1.0 ACOS Administrative Medicine Service Physician, VM-0602-15     1.0 Chief, RN VN-0610-4
1.0 Administrative Officer, GS-0341-11, PD#4972
1.0 Administrative Assistant, GS- & PD TBD
1.0 Program Analyst, GS- & PD TBD

**Compensation & Pension** — 33.5 FTE

1.0 Chief Physician: VM-0602-15   1.0 Nurse Manager: RN, VN-0610
2.0 RN: VN-0610
1.0 Supervisor Program Specialist:
   GS-0301-7/9, PD#4861A
12.0 Advanced Medical Support Assistant:
   GS-0679-5/6 FS, PD
4.0 Advanced Medical Support Assistant:
   GS-0679-05 FS, PD
5.0 Physician: VM-0602-15, General Medicine
1.0 Physician: VM-0602-15, Physical Medicine & Rehab
2.0 Psychologist: GS-180-13
3.0 Physician Assistant: GS-603-13, General Medicine
1.0 Nurse Practitioner: VN-0610, General Medicine
0.5 Physician: VM-0602-15, Optometry

**Occupational Health & Environmental Medicine** — 6.0 FTE

1.0 Chief Physician: VM-0602-15
2.0 Nurse Practitioner/Physician Assistant
1.0 LPN: GS-0620-06
2.0 Medical Support Assistant: GS-0679-05 FS

**Utilization Review**

1.0 Nurse Manager: RN VN-0610   —Tiffany Potter
4.0 LPN/LVN: GS-0620-06 Transfer Coordinator/Discharge
   Planning
8.0 Registered Nurse: RN VN-0610, Utilization Review
1.0 Registered Nurse: RN VN-0610 Transplant
   Coordinator
1.0 Registered Nurse: RN VN-0610 Traveling Veteran

**Non-VA Care/Purchased Care** — 92.0 FTE

1.0 Deputy ACOS, Chief Physician: VM-0602-15
2.0 Administrative Assistant, GS-07, PD#201180

**Non-VA Purchased Care**

1.0 Chief, Non VA Care: Management &    —Greg Crenshaw not a MD.
   Program Analyst, GS -0343-12 PD#4327
2.0 Supervisor Program Specialist: GS-0301-09
   PD#4269
2.0 Lead Voucher Examiner: GS-0540-07
   PD#4814
1.0 Budget Analyst: GS-0560-07 PD#4589
35.0 Voucher Examiner: GS-0540-06 PD#4337 A
1.0 Voucher Examiner: GS-0540-06 PD#4088 A
1.0 Voucher Examiner: GS-0540-05 PD#4326 A

**NVCC Consults/Veterans Choice Coordination**

1.0 Nurse Manager: RN, VN-0610   Melissa Pacheco
1.0 Assistant Nurse Manager: RN VN-0610, VCL
1.0 Assistant Nurse Manager: RN VN-0610, NVCC
19.0 Registered Nurse: RN VN-0610, NVCC
8.0 Voucher Examiner: GS-0540-06 PD#20142A, VCL
1.0 LPN/LVN: GS-0620-06I, VCL

SUBMITTED
Robbi Venditti, D.O., MHA / Date
ACOS, Administrative Medicine Service

TECHNICAL REVIEW
HR Representative   Date

RECOMMENDED APPROVAL   3/18/15
Daniel G. Deering, D.O.   Date
Chief of Staff

RECOMMENDED APPROVAL   3/19/15
Rebecca Kordahl   Date
Acting Associate Director/Patient Care Services

RECOMMENDED APPROVAL   3/19/15
Dale P. DeXrey   Date
Acting Associate Director

APPROVAL   3-19-15
Glen W. Grippen   Date
Interim Medical Center Director

**EXHIBIT J**

From: Deering, Darren
Sent: Wednesday, November 04, 2015 7:56 PM
To:   Ochoa, Belen; Freeman, Megan A.
Subject:   RE: Nurse 4 Cert for Admin Medicine Service

Done.
Please make sure I did this correctly and let me know.

Thanks,
Darren

From: Ochoa, Belen
Sent: Wednesday, November 04, 2015 9:06 AM
To: Deering, Darren; Freeman, Megan A.
Subject: RE: Nurse 4 Cert for Admin Medicine Service

I added Megan and refreshed it so you should both have access now.   Thank
you.

Belen

From: Deering, Darren
Sent: Wednesday, November 04, 2015 8:18 AM
To: Ochoa, Belen; Kinslow, Darcy B.
Cc: Smith, Alyshia W.; Greene, Marva J; Vela, Blanca Sylvia; Landry,
Juanita; Freeman, Megan A.
Subject: RE: Nurse 4 Cert for Admin Medicine Service

I'm in! but the only cert listed is for the Chief of Surgery which should
have been closed a long time ago.

Thanks,
Darren

From: Ochoa, Belen
Sent: Wednesday, November 04, 2015 7:57 AM
To: Deering, Darren
Cc: Smith, Alyshia W.; Greene, Marva J; Vela, Blanca Sylvia; Landry,
Juanita
Subject: RE: Nurse 4 Cert for Admin Medicine Service

I will add Megan Freeman to the cert list.

From: Deering, Darren
Sent: Wednesday, November 04, 2015 7:34 AM
To: Ochoa, Belen
Cc: Smith, Alyshia W.; Greene, Marva J; Vela, Blanca Sylvia; Landry,
Juanita
Subject: RE: Nurse 4 Cert for Admin Medicine Service

I don't believe I have access to selection manager.  Is that within
WebHR?  Can Megan be added for her
to assist with this.

(Exhibit 7-24 )

813

Page 1 of 3 pages

Thanks,
Darren

From: Ochoa, Belen
Sent: Tuesday, November 03, 2015 7:14 AM
To: Deering, Darren
Cc: Smith, Alyshia W.; Greene, Marva J; Vela, Blanca Sylvia; Landry,
Juanita
Subject: RE: Nurse 4 Cert for Admin Medicine Service

Good morning Dr. Deering,

You should see this cert list in selection manager as a pending action.
Open the cert and click the
'submit to HR' blue button. Once I receive it, I will send out
notification letters to the non-selectees.

Thank you,

Belén Ochoa
Human Resources Specialist (Recruitment/Placement)
602-277-5551 ext 4473
Fax 602-222-6554

From: Landry, Juanita
Sent: Monday, November 02, 2015 5:34 PM
To: Deering, Darren
Cc: Smith, Alyshia W.; Greene, Marva J; Vela, Blanca Sylvia; Ochoa, Belen
Subject: RE: Nurse 4 Cert for Admin Medicine Service

Adding Belen Ochoa.

Juanita Landry, MBA
M.A., Human Resources
M.A., Management and Leadership
Assistant Human Resources Officer
Phoenix VA Health Care System
650 E. Indian School Road
Phoenix, AZ 85012
602-277-5551 ext. 2381
Fax 602-200-2385

From: Deering, Darren
Sent: Sunday, November 01, 2015 9:54 PM
To: Landry, Juanita
Cc: Smith, Alyshia W.; Greene, Marva J; Vela, Blanca Sylvia
Subject: Nurse 4 Cert for Admin Medicine Service

Juanita,

I'm not sure who in HR to ask, but I need to close this cert with a non-
selection.

814

Page 2 of 3 pages

We need to have more discussion about the best way to structure this
service (i.e., what sections should
be in this service, where the nurse 4 should report, etc, etc)  before we
move toward a selection.

Thanks,
Darren

Darren G. Deering, D.O.

Chief of Staff
Phoenix VA Health Care System

(o) 602-222-6446
(f) 602-222-6489

darren.deering@va.gov

815

Page 3 of 3 pages

**Potter, Tiffany M**

| | |
|---|---|
| **From:** | Deering, Darren |
| **Sent:** | Monday, November 23, 2015 7:17 PM |
| **To:** | Potter, Tiffany M |
| **Cc:** | Haddad, Reem M; Barton, Ahmed; Vela, Blanca Sylvia; Landry, Juanita |
| **Subject:** | RE: Change Application Requirement for Chief of Purchased Care |

Tiffany, my apologies.  I'm way behind on emails.
We are going to close this position and reconsider our options – we have several meetings coming up to discuss the structure/function of the Admin Med Service.

Thanks,
Darren

**From:** Potter, Tiffany M
**Sent:** Monday, November 23, 2015 2:43 PM
**To:** Deering, Darren
**Cc:** Haddad, Reem M; Barton, Ahmed; Vela, Blanca Sylvia; Landry, Juanita
**Subject:** RE: Change Application Requirement for Chief of Purchased Care
**Importance:** High

Dr. Deering,

Can you please respond to this request or let me know what my options are?  The position closes Friday and I would like to have the opportunity to apply, unless you would like to re-address filling the position as it does not require a physician or a full FTE as the roles are blended with what I already do.

Thanks.

*Tiffany Potter, RN, MSN, CPHQ*
*Acting Deputy ACOS/Chief*
*Purchased Care Service*
*Office: (602) 277-5551 x2180*

**From:** Potter, Tiffany M
**Sent:** Monday, November 16, 2015 10:03 AM
**To:** Deering, Darren
**Cc:** Haddad, Reem M; Barton, Ahmed
**Subject:** Change Application Requirement for Chief of Purchased Care

Dr. Deering,

Is it possible for the application/position requirements for the Chief of Purchased Care position be adjusted to reflect the eligibility requirement does not need to be a physician to apply?  I have been performing all the functions of the position, without assistance, in addition to the duties of the Chief Nurse and Nurse Manager for Purchased Care, and have excelled in each role.  The duties of the Chief of Purchased Care are equivalent to my ECF, and I am currently acting in the role.  Additionally, I spent up to 3 hours a day assisting Dr. Yao in performing the functions, and identified that it does not require a full FTE or a Doctor of Medicine or equivalent.  It would be more cost-effective for the facility and avoid delegation of the duties to me if I were able to assume the role officially.

1

Please let me know of your decision so that I may apply prior to the application deadline of November 27, 2015.  I am available to meet to discuss this further as I am very compassionate about the success of this department.  Thank you for your consideration and I look forward to continuing to serve our Veterans with excellence and integrity.

*Tiffany Potter, RN, MSN, CPHQ*
*Acting Deputy ACOS/Chief*
*Purchased Care Service*
*Office: (602) 277-5551 x2180*

2

**Potter, Tiffany M**

| | |
|---|---|
| **From:** | Potter, Tiffany M |
| **Sent:** | Wednesday, February 08, 2017 6:23 PM |
| **To:** | tiffany.potter83@gmail.com; demarques.potter@hotmail.com |
| **Subject:** | FW: Tentaitve Offer: Tiffany Potter _ RN (Purchase Care/VCC) _ Full Time, Temporary NTE 8/7/2017, Mather, CA |

*Tiffany*

**From:** Chua, Geehan
**Sent:** Wednesday, February 08, 2017 4:03 PM
**To:** Potter, Tiffany M
**Subject:** Tentaitve Offer: Tiffany Potter _ RN (Purchase Care/VCC) _ Full Time, Temporary NTE 8/7/2017, Mather, CA

REVISED

## PLEASE CONFIRM RECEIPT OF THIS EMAIL

Dear Ms. Potter,

Congratulations on being tentatively selected for **a RN (Purchased Care/ACC), Full Time, Temporary NTE 8/7/2017** with **VA Northern California Health Care System (VANCHCS), Nursing Service.** This is to confirm your acceptance of our tentative offer for this position. The duty station for this position will be at **5342 Dudley Blvd, McClellan, CA 95652.** Your official starting date will be determined once all of the pre-employment requirements are met. **Please do not give notice to your current employer at this time.**

Confirmation of your appointment is pending the successful completion of the following (if applicable):

1. Physical: You will be contacted by our VA Occupational Health Office to schedule your physical. If you wear eyeglasses, bring them with you on the day of your physical examination. If you have a record of inoculations (MMR) and/or the results of a TB screen performed within the last year, please bring those with you also. And, if you have had, and can provide the results of, any other medical examination performed within the last 6 months, they may also be acceptable by our Employee Health, if needed.

2. Background Investigation: All VANCHCS employees must complete various pre-employment security requirements prior to their first day of work. These requirements consist of initiating your background investigation through e-QIP and pre-employment fingerprinting, if needed.

1

3. <u>VetPro</u>: All VANCHCS employees who occupy positions requiring education, licensure, registration or certification must be credentialed to ensure they have appropriate professional credentials and personal background to provide care to our veterans. This credentialing process is known as VetPro, update only.

4. <u>OF-306</u>: Declaration of Federal Employment (attached).

You will be contacted by a representative from our Pre-employment Office to provide you with further instructions for e-QIP, fingerprinting and VetPro, if required. If you have not been contacted within 5 days regarding the applicable requirements listed above, or have any further questions, please feel free to contact the Pre-employment Office at (916) 843-9190.

If checked, below are other documents that may be needed to complete the processing of your appointment. If you should have any questions while completing any of the below, please contact your HR Specialist, GeeHan Chua at (925) 372-2334 or Christina Belin (925) 372-2476 HR Assistant.

The VA Northern California Health Care System is an excellent medical facility staffed by able and devoted employees. We look forward to you joining our staff.

Sincerely,

*//s// for* GeeHan Chua
Christopher L. Howell
Chief, Human Resources Management Service

*GeeHan Chua*
*Human Resources Specialist*
*VA Northern California Health Care System*
*150 Muir Road, (05/MTZ)*
*Martinez, CA 94553*
*Tel: 925 372 2334*
*Fax: 925 372 2139*

How was your HR service today? Please take a few moments to complete the HR Customer Service Quick Card at this link: **HR Quick Card** .

RimaAnn Nelson                                                                   3/6/2017
Medical Center Director
Phoenix VA Health Care System
650 E. Indian School Rd.
Phoenix, AZ 85012

Dear Ms. Nelson,

I am writing this letter as follow up to our conversation on Friday, 3/3/2017.  It is with great sadness that I respectfully submit notice of my transfer from the position of Nurse Manager at the Phoenix VA to a position I have accepted at the VA Northern California Healthcare System with a release date of 4/1/2017.  I requested 2 weeks off from 3/20/2017 to 3/31/2017, as this is an out of state relocation. Therefore, my last day at the Phoenix VA will be 3/17/2017.  I will put forth as much effort as possible over the next 2 weeks to assist with training, handoff of information on the progress I have made during my detail, and providing input into a successful organizational structure in the absence of the 4 vacancies I have been attempting to fill over the last month.

I have been a faithful and dedicated employee at the Phoenix VA for over 7 years, starting off as a Quality Manager prior to being promoted to Nurse Manager for Purchased Care.  I have held positions as high as Acting Deputy Associate Chief of Staff and Chief Nurse for Purchased Care.  I have received an Outstanding rating on every performance evaluation since I have been employed at the Phoenix VA, led and/or facilitated over 20 process improvement projects, and was proud to have won Best Practice at the last VISN 18 Quality Expo in 2013, making the Phoenix VA the Best Practice Winner for the first time it its' history of competing at the VISN level, which earned the facility a $50,000 award.  I have had an outstanding reputation of work performance and am highly regarded by my peers and subordinates.

Unfortunately, as you are aware, since 2012 I have also been subjected to discrimination, threats, and retaliation by leadership that has increasingly become so intolerable and detrimental to my health and well-being, that I have no choice but to resign or transfer to another facility outside of VISN 22 leadership.  I have recently been asked to function outside of my scope and requested by various facility leadership to take actions that compromise my integrity, are against VA regulations, and places my nursing license at risk, which I am unwilling to do for any condition of employment. Additionally, my health, family, and school performance for my doctorate program have all began to decline to the point that if an immediate change is not made, I fear that everything that I have worked so hard for will be detrimentally effected beyond repair.

I thank you for the tremendous amount of concern and support you showed me on Friday.  I truly appreciate any assistance you can provide in a transfer that will prayerfully allow my family to stay together.  I wish you the best of luck and success in restoring the Phoenix VA to the place of true quality and leadership in healthcare that it has the potential to be.

Respectfully,

Tiffany Potter, MSN, RN, CPHQ
15719 W. Sierra St
Surprise, AZ 85379

**Potter, Tiffany M**

| | |
|---|---|
| **From:** | Belin, Christina S |
| **Sent:** | Thursday, March 09, 2017 12:49 PM |
| **To:** | Potter, Tiffany M |
| **Cc:** | Chua, Geehan |
| **Subject:** | Confirmation Letter: Potter, Tiffany_Purchased Care_RN_Full-Time/Reassignment_@McClellan |
| **Attachments:** | Confirmation Letter-Potter, Tiffany (McClellan-F-T RN) _ Revised.pdf; I-9 Info.pdf |

Dear Ms. Tiffany Potter,

Attached is your confirmed job offer letter with reporting instructions. Please carefully review the details of your confirmation letter and let us know if you have any questions prior to your in-processing date.

Also, click the link below to access information on federal health care benefits & options:
http://www.opm.gov/healthcare-insurance/Guide-Me/New-Prospective-Employees/


Welcome to the VA Northern California Health Care System!


Respectfully,


*Christina Belin*

Human Resources Assistant (Staffing)
Department of Veterans Affairs
Northern California Health Care System
150 Muir Rd *(05/MTZ)*
Martinez, CA 94553
Phone (925) 372-2476
Fax (925) 372-2139

How was your HR service today?  Please take a few moments to complete the HR Customer Service Quick Card at this link:  **HR Quick Card** .

UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD
DENVER FIELD OFFICE

| | | |
|---|---|---|
| TIFFANY POTTER, | ) | |
| Appellant | ) | |
| | ) | DOCKET NUMBER |
| v. | ) | DE-1221-18-0165-W-1 |
| | ) | |
| DEPARTMENT OF VETERANS | ) | Administrative Judge David Brooks |
| AFFAIRS, | ) | |
| Agency | ) | Date:  November 6, 2018 |
| _____ | ) | |

**AGENCY'S TRANSCRIPTION OF AUDIO OF MAY 14, 2015 OF CONVERSATION
BETWEEN MS. POTTER, GLEN GRIPPEN, AND DR. DARREN DEERING**

The Agency transcribed the audio recording of this conversation, and counsel for the Appellant made revisions in two separate drafts. The Agency has agreed to all of the revisions indicated by Appellant's counsel, and the following is an agreed upon transcript.

/S/

_____
Scott M. MacMillan, Esq.
Agency Representative
Office of Chief Counsel, Pacific District-South
650 East Indian School Road, Building 24
Phoenix, AZ 85012
Phone:      (602) 212-2091
Fax:          (602) 212-2144

**Nothing really starts until 7:06 on the audio:**

Grippen:     Ok, so let me tell you what I know is new.  Last Monday I signed the letter for the request of the Nurse IV for Intermediate Medicine, Administrative Medicine.  On Wednesday, I signed the letter for the Nurse IV for Specialty Care.  So they just went in last Monday and Wednesday.

TP:          Okay.

Grippen:     I wrote a special cover letter for one for Administrative Medicine talking about the Choice Program and how it's not traditional nursing, but also it's the future of the VA and what we hear about every day in the news.  So, you know, obviously it's gone, and if it comes back approved you know we have to compete it, but at least we're trying anyway to make something happen.  We think it's the right thing to do.  And the other job was not done either so that was sent in two days later.

TP:          Okay.

Grippen      So that is where they are.  So what I also said I would do is I would take a look at the policy on nursing and awards, which I am just starting right now.  I got some information from nursing about different awards, and what I told you I would do is make sure that your peers didn't get treated differently - you didn't get treated differently because you weren't in nursing service.  So I will look at the awards and I will look and see what happened through the board and try to make sure that if someone got treated X-way because they were in nursing service and you got treated Y-way because you weren't in nursing service that we will have to do something if we find that you weren't treated fairly. So that's underway.

Deering       So I may have missed that piece, so if I did I apologize.  Was that a perception?

TP:          No.

Deering      that the nurses have been treated differently that the nurses (inaudible)

Grippen:     You asked for promotions, you know.

TP:          Yes to make up…

Grippen:    And if no one else got any, I can't treat you differently than those people.

TP    Well everyone else had a Chief Nurse, so I have been Acting Chief Nurse.

Grippen:    Well let me see what recognition people got because I think that is part of the process is the recognition piece and whether you were treated differently or not. You don't seem to be …

TP    I just don't know that there is an equivalent situation in Nursing Service to compare it to because there hasn't been – I am the only Nurse Manager that's been functioning at the level of a Chief Nurse without a Chief Nurse.

Grippen:    Well, you know, I mean, I think until we put the service together, obviously the new Nurse IV position, it has far broader responsibilities than what you had before.

TP    Well the only difference really is that it's assuming Comp and Pen – I mean the broad level of responsibilities…

Grippen:    And overall administrative parts.

TP    Right, but that's what I am doing now.  I mean the bulk of that position the focus is Purchased Care – I mean that is the biggest service there.  Comp and Pen is limited in what involvement it will have when it compares to the Purchased Care section.  So I have been doing all of that for Purchased Care because there hasn't been anyone in that position and it wasn't there.  And so when I used to have a Chief Nurse, but when they moved us I didn't so then I took on all that responsibility and Acted Chief of Purchased Care for Dr. Venditti so...

Grippen    I will have to look obviously I cannot promote you retroactively, so I mean …

TP    But you can fix it now.

Grippen    Well I have to look to see, you know, what are the authorities, you know, what recognition you got for, and I assume you got a performance rating and a performance award?

TP          Right, based on my normal performance but there was nothing, I guess, beyond that.

Grippen      Okay, well that is what I will have to take a look at.

TP:          Okay.

Grippen      So, um, but it's important that we keep communicating, and ….

Deering      So, I think I want to make sure I understand what you're saying – Tiffany, is that you've, I'm not putting words in your mouth, so correct me if I am wrong, but what I am hearing you say that you feel that in your role as a Nurse Manager for Purchased Care that you were performing at a Nurse IV level. The word Chief Nurse is what is causing a lot of confusion right, so am I hearing you saying you feel like you were performing at a Nurse IV level but with a Nurse III level pay? Because I think that is very different than saying we are getting a Nurse IV for all of the Administrative Medicine, you know …

TP          Right.

Deering      And I do think there is a different, I think what your role was in Purchased Care, I agree it's a big role, but Comp and Pen is not a small service to manage.

TP          Well I just mean like the spot light right now … the focus for that role.

Deering      Oh sure, the focus, I mean, is on urology. I got an IG report on urology but it doesn't make the management of that unit, it doesn't change the … necessarily, the complexity of what they do or the volume and I don't understand nursing but I like…I think of AO's right? So I have AO's at different grades and some of them, like my AO in medicine, has a huge amount of work, huge!, and his grade is actually lower than my AO for research by quite a bit but it's because of the complexity of what they're doing, it's not the volume of what they do, so when you look at medicine it's got 150 some odd FTE; research has technically on the org charts, I think 6, but the scope and complexity of what they are doing is different and the grade for an AO doesn't factor in the volume of what they do.

TP              Right.

Deering         Now I don't know if that is the same for nursing.

TP              So in my area, I mean again I had - when you look at Nurse Manager scope of
                responsibility, it was nothing like what I was responsible for and so that's when I
                went to HR and they said well based on the complexity and, you know, the scope
                of your position, you should be a Nurse IV. I mean that's where I got it from. That
                and the fact that I wasn't under a Nurse IV, so I was doing the roles of what a Chief
                Nurse would do - Nurse IV - plus the roles of what a Nurse Manager would do for
                the whole entire time that I have been under Dr. Venditti. And so that is where I
                feel like and being told by HR and being handed a functional statement saying this
                is what you should be at. And Dr. Venditti, I mean, in her defense, I do believe she
                tried. Even when she got the MS position, I think that was the first thing that she
                went for but it has just been blocked for a number of various reasons that have not
                been documented. I've never been provided any document that said why just
                random reasons of why it never happened. And nothing was done to at least even
                compensate or even do a performance award or a step increase for the additional
                responsibilities I had. I could have at any point said you know I am not doing any
                of this that's not my job but I didn't, I performed and Dr. Venditti kept saying I will
                get you step increases, I'll do this, we'll get you your Nurse IV, you know just keep
                functioning at that level and we'll take care of it. It was never taken care of. Three
                years, and so that's where now I'm like I just to keep waiting and waiting and I feel
                like I have been treated unfairly in that respect. And I know that there are other
                people in the facility who are taken care of in that respect. I don't think it's very
                difficult to provide step increases. If she was saying she was going to do that
                before I don't know why it didn't happen, but that's, at this point, all I am asking
                for. That and the fact that my title was stripped, and I also would like that
                addressed. I think if we, if me and Melissa, can't report to each as Nurse Manager,
                Nurse II, Nurse III that's fine – but I don't think that my title needed to be changed,
                if it can't be called Chief Nurse, then at least Deputy Chief Nurse, Associate Chief
                Nurse, she changed the title of the Chief of Purchased Care to Associate or Deputy

|          | Associate Chief of Staff so I mean I don't understand why there can't be some equivalent so that it doesn't look to my peers and my employees like I was demoted. I think that's fair that's all I'm asking for.  I wasn't asking for retro. |
|----------|------|
| Grippen  | I know, and again I'm just trying to see what the policies say, you know, I'm not … I wasn't familiar with what the policies say and so that's what I'm trying to do some research on this to see what the options are – special advancement for achievements, special advancement for performance, I mean … just trying to get a sense of what those were.  And we recognized, you know, I can't stop the past but we've got the Nurse IV submitted now so... |
| TP       | Right, but even aside from that just moving forward, I mean even just for what I've been doing or even what I am doing today, I am still functioning at that level, with no incentive.  We have a site inspection coming up in the end July, still no Chief Nurse to handle it all, so it's still falling on my shoulders with nothing, like nothing.  So just asking for fairness in that respect. |
| Grippen  | Ok, will you try me again in three weeks?  Do you want to try that again so you know what we are going to do. |
| TP       | Three weeks? |
| Grippen  | Two weeks? |
| TP       | I mean it's fine, I mean it has been a month now and nothing, I still have no resolution so. |
| Deering  | Well I don't know if that is completely fair Tiffany, I think we are getting some clarity on some of the stuff, so like when you talk about the Nurse III, Nurse III Reporting, I mean  that's what I've been told, it can't happen, but I can find out from others outside the facility to see if that's the case.  If we're going to give a title … I think where we got into trouble is with the whole title thing, and I understand your perception that it was a demotion although we know it wasn't but it's perceived that way because of the title change.  What I worry is that if we are going to change this somehow to where it's a different title or different |

responsibility, I mean, I don't have an issue with that, I just…do we have to compete that?

TP       No, it's a title so they did the same thing in GECS, Leslie Lockridge and the other manager, so she was, her title was changed to Program Director and then they hired a Program Manager under her.  They were both Nurse III's, and they reported to each other.  They did that around the same time that they did our section.

Deering       Who was the person who reported to her?

TP       I don't know, I don't remember her name.

Deering       Okay.

TP       But then when I was told oh you can't do that, although it had already been signed off and Marva knew about it, then suddenly in March it was oh you can't have it like that then I brought up, well, it was done in this area and so then they undid it.  They changed them to where they were no longer reporting to each other but they kept their titles, so they still have Program Director, still Program Manager.  They just don't report to each other.  So, my title is changed, so I mean we're talking to fairness in comparison to Nursing Service, and that would be a comparison.  It doesn't mean we have to report to each other if that's the rule, and I understand that and I don't have a problem with that.

Grippen       Ok, well we'll look into that.

Deering       I am going to check with some other programs to see how they have it structured, what titles there are.  Yeah, because I don't want anyone to feel or having a perception that a demotion occurred, that's not what happened, and what I don't want to do is go over and strip Greg's new whatever title they changed in their process either to make it look like the same thing has happened to him, so let me , I'll explore what we can do with that option.  And then you've got the policies on the SAPs and SAAs?

Grippen       Yeah.

Deering      Ok.

TP           Have I upset you?

Grippen      No, no not at all.

Deering      No not at all, this just is not an easy fix.  I know, Tiffany, you're saying that oh this
             should be easy to fix but there is...

Grippen:     There is a policy you have to follow.

Deering      There are a lot of implications to it.

Grippen      There's regulations you have to follow, so I mean we're just trying to make sure
             that, that we're ...

Deering      And I'm just, I'm, to be in full candidness, I'm really upset about Danny dying.

TP           Oh I understand.

Deering      That's it's just a rough day so it is not you at all Tiffany so please don't perceive
             that.

TP           Okay.

Grippen      And again, we appreciate all that you are doing…

Deering      Oh yeah.

Grippen      But again, I've got to treat you like everyone else too, I have to see what happened
             to them as well.  So, and what authorities I have, what things are happening, we're
             trying to … well we are trying to make things better, so.

Deering      So I do have a question.  Is there a particular title, if we could wave a wand and say
             that this is an appropriate approved title, I mean, what do you think an appropriate
             title is?

TP           I would say maybe, I think Associate Chief Nurse, Deputy Chief Nurse, Head
             Nurse, Lead Nurse Manager.

Deering          Just something that shows you are responsible for the unit.

TP               Something that's not, I mean more of the programmatic responsibilities.  I even like the whole Program Manager/Program Director thing, but she - there wasn't a Chief Nurse so that's why Dr. Venditti said, just make, so that's why it was Chief  Nurse, because there wasn't one, but some separation.

Deering          Yeah.

Grippen          Yeah, you know and also, because we are looking at doing this with other services, like Primary Care, for example, how then we set up that arrangement because no longer will that, potentially that nurse, over let's say the South East Clinic won't report to the Nurse Executive.  So I mean there are some things here we need to look at as well.

TP               But there are still Nurse Managers and they still have Chief Nurses.

Grippen          But there will be something similar to what you're talking about, what happened to you because there won't be a supervisory nurse above that person.  That nurse potentially could work for Darren.  If we set up the functional units that have line authority.

TP               Right so like Ambulatory Care has a Chief Nurse, and Specialty Clinics will have a Chief Nurse.

Grippen          Maybe not, they may not be in the chain of command.

TP               Well…

Deering          So I think that's right when you say Chief Nurse, tell me, give me a name of who you are talking about so I know what role?

TP               Lynn Schneider.

Deering          So I think of ACNS, right, same thing?

TP          Correct, but they changed. I guess they recently changed them all from Associate Chief Nurse for Nursing Service to Chief Nurse, it looks like. They were ACNSs but now on the correspondence they all changed to Chief Nurse.

Deering    So like Yancy Gazer might be an example, right? So he is over primary care nursing at the South East CBOC.

TP          He is a Nurse Manager, right?

Deering    Right, his, when we redo that Org scope, he is going to have probably a much larger scope out there, but probably still won't be at the level of a Nurse IV, so I think, this is just why I need to get my head wrapped around this, you know again, I know it is probably apples and oranges, but when I look at AOs, a GS-11 doesn't mean a GS-11 across the board right? So my GS-11 in surgery and my GS-11 in medicine are similar but they're very different in the volume - Surgery service is much smaller and Medicine is much larger but they both are still both GS-11 Step 5s. But they have different scopes, and I think that's kind of, and maybe I am wrong, but that's kind of how I see Nurse Managers, so you can be the Nurse Manager of OR which is very different than the Nurse Manager of Primary Care, right? Out at the Specialty Clinics, or out at the South East CBOC, they're both Nurse IIIs but I think their scopes are going to be different although they are within that same stratification of a Nurse III.

TP          For Nurse Managers the scopes are the same, they might have more staff or different types of areas but they all have just the functions of the Nurse Manager, they all have Chief Nurses who have a different scope.

Grippen    But we're talking about changing that all upside down.

TP          Right but even if it, it was South East and the Nurse Manager reported to the Director of the South East Clinic, which I thought they were going to have DIADs, but even if they don't there's still a Chief Nurse over ambulatory.

Grippen    Not necessarily.

TP          So that …

Grippen      We would have potentially - let's say we have the co-directors of the South East Clinic being a physician and a nurse.  They would report to Dr. Darren.  There would not be a supervisor over them.

Deering      So they probably would not report to Lynn.  I am just going to use names so it is easier for me. So let's just say that we would do all South East, and we've got Dr. Smith and Yancy, for example, that's over that whole clinic?

TP          Right.

Deering      They may report to me not Lynn.

TP          So then who would report to Lynn?

Deering      Probably everything that's here, all, everything at this facility, at the main campus.

TP          So then they would have to create Chief Nurse Positions, because a Nurse Manager, again unless you put in double shift hours and everything, the job duties there is going to be a lot undone.  You would have to reclassify the nurse managers positions, redo all their PDs which then probably would come back and say well this should be you need a Chief Nurse for every clinic and a Nurse Manager, because there is a separation of duties there so...

Deering      I don't understand that part, help me understand that.

TP          So if Lynn's position was not needed then she would not be …

Deering      I didn't say her position was not needed.

TP          So if the Nurse Manager is then going to take on what Lynn does now for all the CBOCs, for their own CBOCs …

Deering      Nope, I didn't say that.

TP          So then who would?

Deering    Yancy may be the Nurse Manager of the South East CBOC.

TP    So who would do the Chief Nurse functions for the South East CBOC?

Deering    There may not be a Chief Nurse function out there.  There may not be a Nurse IV out there.  So would I put a Nurse IV at Globe?

TP    No.

Deering    Would I put a Nurse IV at T-bird?  I think it depends on the scope, you know, the complexity and scope of what's under them. So I don't know that job out there, and I think that maybe that's where I am struggling with this and I'm just being fully transparent.  Is that for Purchased Care, I am not seeing that the scope of that, and I'm just, all I have to compare it to are others, like when I look at Mental Health, right?  So when I look at Cheryl Roberts, she's got inpatient, she's got outpatient, she's got, you know, everything that touches mental health in the CBOCs under that scope of a Nurse IV, I'm not seeing that in the Purchased Care unit.  I don't see that scope of – like Lynn has all primary care and specialty care, which is too much, I think for, that's my opinion, for one Nurse IV to manage that whole area. I see the ACNS for – I don't understand the one for education but that's me, but for surgical service.

TP    Right.  But they all have Nurse Managers.

Deering    Education doesn't.

TP    Education does, Leora Jacover.

Deering    She's a Nurse IV.

TP    Right.

Deering    She doesn't have a nurse manager under her, does she?

TP    Well, I actually don't know if she has Leads or Assistant Managers, I don't know.

Deering    Yeah, I don't know I'm just, I don't know that area as well but I think that's why I'm just trying to get my head wrapped around what I think – the same with like for the physician side, there's really no difference in the Chief and ACOS except usually when you say ACOS there is not just the supervisory piece with the physicians but there's like programs, like ACOS GECS only has like six programs, or six staff, but they just have this vast scope of, you know, programs they are responsible for running, including the CLC.

TP    Right, but so like if it were equivalent to education, I think that is where HR was coming from, in the absence, which is when we met in July I think which came up, if I am having the functions of a Nurse Manager and a Nurse IV, then I should be a Nurse IV, even if they chose not to hire a Nurse Manager same with like...

Deering    Right but what I am saying is I'm not, I don't get the sense that Purchased Care by itself - that would require a Nurse IV over Purchased Care.

TP    Are you familiar with everything that is involved in that section?

Deering    Yeah.

TP    All the sub-compartments, and the staffing, and the complexity of each - there are five, like five sub departments over there.

Deering    I know, I know I hear that it's complex, I am just saying, when I think of that compared to mental health, when I compare that to – that's what I'm just, I'm using as a comparison so when I think of inpatient, you know, the ICU, right?  That is maybe not as many staff, but that is a very, I think, complex unit that has to have very flexible staffing, 24/7 coverage, I mean there's just, if I broke that into sub compartments, you know, night shift, day shift, all those different things that they're managing, I guess that's king of how I see that.  I think you are more complex than the ICU, I am not saying you are on the same par, but I, maybe I am not explaining myself very well but.

TP    Well, I mean I am not asking to be turned into a Nurse IV.  If the Nurse IV is being presented to be over all AMS, which has different sections.

Deering      Right, right.

TP      I think that is fair that's fine.  What I am saying is during the growth period, this is what I was told and they actually told me and they compared, I mean I saw the functional statements for the Nurse IVs in other areas and mine was two pages longer at least, I mean I didn't create it, but from an HR perspective at that time, it met the complexity; and I did not have a Chief Nurse to go to to hand off those duties so it was very difficult to struggle, like to balance – I'm a supervisor, I am supposed to do student performance evaluations, time and attendance, the day to day functions, and then I have all this programmatic responsibility, and then transfers came under me, transplants.  I mean all of these other areas, and then non-daycare broadened, and I mean it's just everything and I am dealing with a lot of programmatic responsibilities like a Chief Nurse would do for other areas, but without the Nurse Managers to handle the day to day and supervisory level things, so that's why I went to you in July for like a lot of those supervisory things were going to be neglected if it continued that way because I did not have any help.  So that is why they created that separation, and even without the Nurse IV, I mean I was fine with that, I had a Nurse Manager, we had a separation at least in title to differentiate between our functions.  And that's what was now changed, and we were still literally operating like that based on need.  I can't just stop and say, "I am only going to do what the scope is for a Nurse Manager," because that department will fall apart if I just stop doing everything.  And this is a very risky time for that to happen, so what I'm saying is because I've been functioning outside of, I don't even still have a real functional statement, but if I use the one for the regular Nurse Manager…

Deering      So, so am I hearing you correct, correct me if I am wrong, but am I hearing you say that having a Nurse Manager over like just Purchased Care by itself would make sense but because of transplant, transfer coordinators, traveling veteran, the other stuff that's under there, you've been managing all that at the same time, which is outside the scope of being the Program Manager or the Nurse Manager for?

TP — No I'm saying it's not so much that is the programmatic responsibility - if I was just being the Nurse Manager for Purchased Care, I would be doing day to day – okay, are you doing your job, I need to write you up.  Oh let's look at your performance evaluation.  I mean it is very, the nurses on the unit that's running the day to day operations of the unit.  They don't have the programmatic responsibility, that's what the Chief Nurse's do so there's a separation there; whereas my time is consumed with developing, I mean the program side of it - literally writing SOPs, sharing, developing different programs with …

Deering —  Right but, so let's just use 4C as an example, and maybe I am wrong, but I think that there's a Nurse Manager for 4C, right?

TP — Correct.

Deering — Does that Nurse Manager, I don't know who it is now but is it India? No.  I don't know who it is but wouldn't that Nurse Manager do the proficiencies for nursing on that unit?

TP — Correct.

Deering — But wouldn't that Nurse Manager also be responsible for looking at processes or policies or protocols for telemetry, or infusions or drips?

TP — Not changes, just making sure that the staff follows them.  They may be involved in some of that…

Deering — Because I'll tell you that when Mike in Hospice when he did fix drips on inpatient, that Nurse Manager was absolute key in writing almost all of those.

Grippen — And, you know, we're making lots of changes of the ED; whose making the changes is Kathy.  So the Nurse Manager is in the middle of all of the policy changes, writing the policies, following up on the policies making sure they match up.

Deering     Well, maybe that's the part, I'm just I'm talking through this with you so I understand, I think maybe that's the part I'm not understanding that I need help understanding.

TP          So then what are the Chief Nurses for inpatient and ER, whoever is the Chief Nurse for that, what do they do then?

Deering     You mean ACNS?

TP          Umm hmm.

Deering     That's a good question and maybe I don't understand that piece then, but you know, Gail, right. They're all under Gail, so if we keep going down this example, so Gail is responsible to me for the bigger aspect of inpatient. So if I've got something in the ER that needs to be fixed, I don't call Gail, I call Kathy to work with Tim and those two work that out in the ED. Now if I'm having a bigger issue of maybe it's the flow of patients from ED to the inpatient and then the ICU, then Gail, or if we want telemetry throughout all of inpatient, you know, that's something that Gail like, that's the scope I would see Gail being responsible for but you know like our service agreement between the handoff between Jade/Opal and the ED and that whole policy process, if Gail was involved I would be surprised. It was most Kathy, Tim and Mental Health.

TP          Right so what I am saying is that I do what both of them do. Even at the National Level, because there's so many – I mean maybe if things were more – I mean not growing with the Purchased Care, say everything there was no new changes, no new Choice program, nothing really going on, it's just regular day to day, then it wouldn't probably maybe it wouldn't be as big of an issue. Maybe I wouldn't have so much do on a broader scope but because, and so maybe that's part of it. Maybe there wouldn't be a need for somebody to do any higher level things. Maybe there is not much going on, I am not sure. I mean without, I've never. I don't know what Gail does every day, I just know what she was responsible for when we were under her and then I hadn't, didn't have her anymore. But if they're not, if the Nurse

|  | Managers are doing everything then I don't see the need for Chief Nurses in those areas, honestly, if they're not doing anything. |
|---|---|
| Deering | Well no, I see a need for it. I mean my coordinator chief on the physician side is, you know, I've got Endocrinology right? So somebody has to manage all the endocrinologists and supervise them so I need a Chief of the Endocrinologists, I need a Chief of Oncology, I need, you know, I can't have, as the Chief of Staff, 50 direct reports to me. So the Medicine Service is managed by Dr. Carbone, she manages those 13 sections. So if you ask what she does day to day most of her job is helping manage at that level of all the sections that's going on. |
| TP | I have 49 direct reports. |
| Deering | Direct to you? |
| TP | Yes. |
| Deering | 49? |
| TP | Yup. |
| Deering | But you haven't always had 49 direct reports? |
| TP | No, I mean they just approve a few more nurses, we got the voucher examiner, so that's 8. |
| Deering | So maybe that's where I'm not getting the big picture then, that I needed help, I need help understanding. |
| TP | I was told though it didn't matter how many staff you have reporting, it's the complexity and then that's what was … |
| Deering | That could be true. |
| TP | So that's when HR looked at the complexity and said that this meets the complexity for Nurse IV. |

Deering      Right, but nobody, in my opinion, Mr. Grippen may disagree, nobody can effectively manage 49 direct reports.

TP      Which is why I went to you in July, I mean at that time, it wasn't…

Deering      But we talked about doing two Nurse Managers.

TP      Right.

Deering      We talked about how to divide up that work force.

TP      Right, so if it's divided the way that is on the org chart, I don't have NVCC or Choice. So do I stop doing everything for that and leave it to Melissa?

Deering      If she is the Nurse Manager of that area that may be what we have to talk about and figure out how to make that work, I don't have it memorized, but I'd have to look at it but I mean it doesn't, I mean just philosophically it doesn't make sense that we would have two Nurse Managers but still have one of them doing everything.

TP      It is not that, it is the separation of duties this way not this way; it's split on the org chart this way, but functionally everything going on like the majority of the work and staffing is under the NVCC /Choice side so it's an, just, I mean it's not an even split, and she's not been involved with any of the programmatic responsibilities for Purchased Care, I have, so I'm not sure that I mean just to wash my hands of that and leave it to her would be like, not a good thing. So we have maintained the separation, she does more of the day to day with the whole area like she has and I am handling more of the responsibility, and we kind of split some of the staff because it's too many when it comes to performance evaluations and everything, so we're still operating essentially like it was when it was Chief Nurse / Nurse Manager, in the absence of the Chief Nurse.

Deering      Hmmm, I think I need you to talk me through the org chart again, so I really get that. [Pages flipping]. I don't know how you do 49 evaluations and ….is this the new one [org chart]?

TP          Um hmm.  So we have these boxes, they have like 30 something total of 92; and between these two boxes there's 49.

Deering     Right but your role in this org chart is where, show me your position currently.

TP          Well that's hard to say because again if we're split I'm technically here and she would be here only because my, when I applied for the job originally it was just the UR, my job description had nothing to do with that, whereas hers, she applied and it had everything, so I, we figured if it has to be so on paper, it would be...

Deering     So our options is to keep you here, keep you as a Nurse Manager, and only have you do this and have, if Melissa is in this role then that becomes her responsibility. Or are you saying right now these two boxes are functioning as a unit?

TP          Together, correct, just to keep it going successfully.  And I honestly think, I mean Dr. Venditti originally when this was together on that last - first org chart here, it was just this and this, but I mean it couldn't be – now if I were here I don't think anything would suffer by just having one Nurse Manager over this area because that Nurse Manager wouldn't have the responsibility of the program changes and everything that I'm doing right now, but because we didn't have this, there's no way that one person could do that which is why it was split out.

Deering     I guess my hang up here then you're saying if this is filled you wouldn't need this.

TP          No, you wouldn't need another one, in my opinion, depending on who is in that role.  But that's where and I know that's why it was done this way the first time, but that was without that position being filled there is no way that one person can manage this entire section, these two boxes, there is no way.

Deering     Right.

TP          Which is why then it went back to that, putting them there.  I actually think it should just be combined in one box and just put 2.0 Nurse Manager and not really have it split in separate boxes like that but.  This could have been a 2.0 there, I don't know why it was moved.  I mean regardless of what happens with the Chief, my thing is

I've been functioning at a level higher than my job description for three years and I was given a title to reflect that and it was taken away.  Those are my only two.

Deering     Okay, do you have extra copies of these?  I can find it if you don't

TP     I do.

Grippen     I have copies, there in a folder that Karen has.

Deering     Okay, I need copies.

Grippen     Yeah.

Deering     Okay.

TP     So if we meet again in two weeks it'll be for?

Grippen     We're just trying to keep you up to date on what we're looking at.

TP     Okay.

Deering     I mean, I need to look at this closer Tiffany for all we can and can't do as far as realignments and, you know, I don't want you to do more than what's in your scope, I don't think, you know, that was not the intention and ...

TP     Well I have been for three years.

Deering     I'm, I'm not saying that's not what you are stating, what I'm saying is that moving forward how does this need to be organized to make it the most effective.  And I think that's going to be, I need to chew on that for a little bit, is that one box with two Nurse Managers, or is it just saying yeah you're right Tiffany that's your role and we're not going to ask you to do anything else with non-VA care, and we take it all and give it to Melissa and she's got to step up and run it.  That might be, I mean I've got to look at all the options. Right? I know you're very attached to that program, I get that you are.

TP     Well I just think, I don't want the department to suffer. I think this is not the time.

Deering    Well I don't think anybody does, I don't think that's what I am suggesting either.

TP    Right.  So I think that if I mean the way that it is right now, without this, I think it, I mean it could work, if I were here, I think Melissa would be fine there and another manager would be fine there, but because that is not how things are right now, who is going to keep it going.  And that's my biggest fear, is letting, I cannot have that.

Deering    I get it, but an organizational structure shouldn't be based about who's in the role.  Right?  If I leave tomorrow as Chief of Staff, this place shouldn't fold in and collapse.

TP    Right.

Deering    Right, so if you take the next promotion up, and you leave us or go to a different part of the hospital, we want to make sure that we have succession planning in place and that the structure supports what that looks like.  I think that's my concern is that we have an org chart now that shows Melissa is responsible for all of this but you are still doing a lot of this.  I mean it's like as if this is cardiology and endocrine, and Dr. O is running endocrine when it should be Dr. Shaw doing it.  And how do we fix that?  I think that's what I got to try to get my head wrapped around.

TP    Moving forward, if there was a Chief Nurse to offset the responsibility for Melissa in this box, then it would not, I don't think it would be a problem.  But because there isn't, that impossible still for one person which is why we're basically both sharing the responsibility.

Deering    So I'm just, I'm thinking out loud with you, my thing is either we have it split and have people doing the roles they're supposed to or this is not, should not be a split box and if not, then what does that look like?

TP    Right

Deering    I mean that's, this is where we're getting hung up on, and that's why I just need to look at this and digest it a little bit and figure out what is best for our organization.  So and I will try to do that before we meet again, and I'll probably have to have

some calls with you to figure out who is in each of these areas, so I tend to know more about the person, than I do. Because if you ask me to point out where, you know, Nadine is on this thing I probably couldn't tell you.

TP          Nadine stepped down so ...

Deering     But I'm just saying, but did she leave the department altogether?

TP          No. She's no longer an Assistant Manager.

Deering     Right, but I'm saying, like if you made me show you her FTE on the org chart I'd have a hard time doing it. That's what I'm saying.

TP          Gotcha.

Deering     Ok and then we'll look at titles too.

TP          Okay.

Deering     Anything else? And sorry if I'm in a down mood.

TP          Oh I understand completely, I know I saw that email last night and I was like oohh you know.

Deering     Thank you.

Grippen     Thank you for all you're doing.

TP          Thank you.

Deering     And you've got the policy?

Grippen     Yeah.

TP          Thank you for your time.

**Tiffany walking out of Grippen's office w/Deering:**

Deering     Do you know who else has a program that's comparable in size of ours in Purchased Care, like what other facilities?

TP          I don't know because I was, I know the other PC that was always brought into comparison was Central Texas VA, but now we are like [inaudible], I know.

Deering       … Because I want to do what is right for you in the organization and if I can find a facility that has set this up already, then we might be able to use that as an example. So do we have a breakdown – do you have a breakdown of facilities and by the amount?

TP          I do and I have org charts.

Deering       Can you send me what you have so I can (inaudible)…

TP          Yes

**Walking down a hall…..End of Audio.**

# <u>Certificate Of Service</u>

e-Appeal has handled service of the assembled pleading to MSPB and all of the Parties.
Following is the list of the Parties in the case:

| Name & Address | Documents | Method of Service |
|---|---|---|
| MSPB: Denver Field Office | Agency's Transcription of Audio of May 14, 2015 | e-Appeal / e-Mail |
| Tiffany Potter<br>Appellant | Agency's Transcription of Audio of May 14, 2015 | e-Appeal / e-Mail |
| Marques Pitre, Esq.<br>Appellant Representative | Agency's Transcription of Audio of May 14, 2015 | e-Appeal / e-Mail |
| Michelle De Vera<br>Appellant Representative | Agency's Transcription of Audio of May 14, 2015 | e-Appeal / e-Mail |

U.S. OFFICE OF SPECIAL COUNSEL                                    (202) 254-3600 / (202) 254-3670 / (800) 872-9855

**COMPLAINT OF POSSIBLE PROHIBITED PERSONNEL PRACTICE**
**OR**
**OTHER PROHIBITED ACTIVITY**

*(Please print legibly or type and complete all pertinent items. Enter "N/A" (Not Applicable) or "Unknown" where appropriate. (If more space is needed, use Continuation Sheet at page 12.)*

| PART 1: PROHIBITED PERSONNEL PRACTICES PROHIBITED ACTIVITY (GENERAL) |
|---|

1. Name of person seeking OSC action ("Complainant"):    Mr. ( ○ )   Ms. ( ● )   Mrs. ( ○ )   Miss ( ○ )

   Tiffany Potter

   For USERRA complaints only - please provide the last digit only of your Social Security Number (SSN): (needed to determine jurisdiction under § 204(c)(2) of Public Law No. 108-454.)

2. Position, title, series, and grade:  MSN, RN, CPHQ, Nurse Manager, GS-0610-Nurse III,

3. Agency name:  Department of Veteran Affairs

4. Agency Address:  650 E. Indian School Road

   Phoenix, AZ 85012

5. Home or mailing address:  15719 West Sierra Street

   Surprise, AZ  85379

6. Contact information: Telephone number(s): ( 254 )  238-1152                    (Home)

   (          )                                        (Office)  Ext.

   Fax number:    (          )

   E-mail address:  tiffany.potter83@gmail.com

7. If you are filing this complaint as a legal or other representative of the Complainant, please supply the following information:

   Name and title of filer:          Mr.( ● )    Ms.( ○ )    Mrs.( ○ )    Miss( ○ )

   A. Marques Pitre

   Address:  1300 Pennsylvania Avenue, NW, Suite 700

   Telephone number(s): ( 202 ) 240-3006              (Home)

   (          )                        (Office)  Ext.

   Fax number:   (          )

   E-mail address:  ampitre@ampitreassociates.com

8. Are you (or is the Complainant, if you are filing as a representative) covered by a collective bargaining agreement? (Check one.)

   ( ○ ) Yes          ( ● ) No          ( ○ ) I don't know

9. How did you first become aware that you could file a complaint with OSC?

   ( ○ ) OSC Web site     ( ○ ) OSC Speaker          ( ○ ) OSC Brochure     ( ○ ) OSC Poster
   ( ○ ) News Story       ( ○ ) Agency Personnel Office   ( ○ ) Union        ( ○ ) Co-worker
   ( ● ) Other (*please describe*):  Attorney

   Date (approximate):  01/01/2017

COMPLAINT OF POSSIBLE PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY
Page 2 of 12

10. What is the employment status of the person affected by the suspected prohibited personnel practice or other prohibited activity? (*Check all applicable items - more than one item may apply.*)

   a.   ( ) Applicant for Federal employment

   b.   ( ✓ ) Competitive Service

         ( ) temporary appointment              ( ✓ ) career or career-conditional appointment
         ( ) term appointment                    ( ) probationary employee

   c.   ( ) Excepted Service

         ( ) Schedule A                    ( ) Postal Service
         ( ) Schedule B                    ( ) Tennessee Valley Authority
         ( ) Schedule C                    ( ) VA Dept. of Medicine and Surgery
         ( ) National Guard Technician       ( ) Veterans Readjustment Act (VRA)
         ( ) Non-appropriated Fund           ( ) Other (Specify)

   d.   ( ) Senior Executive Service (SES), Supergrade, or Executive Level

         ( ) career SES                   ( ) Executive Level V or above (career) fund
         ( ) noncareer SES                ( ) Executive Level V or above (noncareer)
         ( ) career GS-16, 17, or 18        ( ) Presidential appointee (Senate-confirmed)
         ( ) noncareer GS-16, 17, or 18

   e.   ( ) Other

         ( ) civil service annuitant           ( ) military officer or enlisted person
         ( ) former civil service employee     ( ) contract employee
         ( ) competitive service          ( ) other (*specify*):
         ( ) excepted service            ( ) unknown

11. What other action(s), if any, have you taken to appeal, grieve, or report this matter under any other procedure? (*Check all that apply.*)

    ( ✓ )    None, or not applicable                        Date: _____
    ( )    Appeal filed with Merit Systems Protection Board (MSPB)   Date: _____
    ( )    Petition for reconsideration of initial decision filed with MSPB   Date: _____
               Initial Decision No.
    ( )    USERRA claim filed with VETS (Department of Labor)   Date: _____
               (Form VETS/USERRA/VP-1010)
    ( )    Grievance filed under agency grievance procedure   Date: _____
    ( )    Grievance filed under negotiated grievance procedure   Date: _____
    ( )    Matter heard by arbitrator under grievance procedure   Date: _____
    ( )    Matter is pending in arbitration   Date: _____
    ( )    Discrimination complaint filed with agency   Date: _____
    ( )    Agency or Administrative Judge (AJ) decision on discrimination complaint appealed
               to Equal Employment Opportunity Commission   Date: _____
    ( )    Appeal filed with Office of Personnel Management   Date: _____
    ( )    Unfair labor practice (ULP) complaint filed with Federal Labor Relations Authority
               General Counsel   Date: _____
    ( )    Lawsuit filed in Federal Court   Date: _____
               Court name:
    ( )    Reported matter to agency Inspector General   Date: _____
    ( )    Reported matter to member of Congress   Date: _____
               Name of Senator or Representative:
    ( )    Other (*specify*):

COMPLAINT OF POSSIBLE PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY
Page 3 of 12

12. What official is responsible for the violation(s) that you are reporting, and what is his/her employment status? (*See question 10 for appropriate description of employment status. If space is needed to identify more than one official, use Continuation Sheet at page 12.*)

Name: 1)Robbi Venditti; 2)Darren Deering; 3)Glenn Grippen; 4) et al.

Position/Title: 1)Former Associate Chief of Staff; 2)Former Chief of Staff; 3)Former Medical Director

Employment Status:

13. What are the actions or events that you are reporting to OSC? (*To the extent known, specifically list: (a) any suspected prohibited personnel practices or other prohibited activity, <u>other than reprisal for whistleblowing</u>; and (b) any personnel actions involved.* **(<u>IF YOU ARE ALLEGING REPRISAL FOR WHISTLEBLOWING, SKIP TO PART 2 ON THE NEXT PAGE.</u>)**

§2302(b)(4) Obstruction of the Right to Compete
§2302(b)(5) Influence the Withdrawal of Applicants From Competition
§2302(b)(6) Unauthorized Preferences
§2302(b)(9) Reprisal
§2302(b)(12) Personnel Action in violation of law

14. Provide details of the actions or events shown in your response to question 13. (*Be as specific as possible about dates, locations, and the identities and positions of all persons mentioned. In particular, identify actual and potential witnesses, giving work locations and telephone numbers when possible. Also, attach any pertinent documents that you may have. <u>Please provide, if possible, a copy of the notification of the agency's proposal and/or decision about the personnel action(s) covered by your request for OSC action.</u> If more space is needed, use Continuation Sheet at page 12.*)

1) On March 19, 2015, an organizational chart was signed off by former Phoenix VA Medical Center Director, Glenn Grippen, demoting me from Chief Nurse to Nurse Manager, reducing my oversight from managing 45 FTEs and all programs in the entire clinical side of the Non VA Care department with a Nurse Manager and two Assistant Nurse Managers reporting to me, to the title of Nurse Manager, supervising only 14 FTEs that do not involve Non VA Care consult processing. As a result, I was no longer able to identify the administrative-caused patient care delays, or clinical risks related to Non VA Care and Choice referrals and appointments.

(See Continuation Sheets)

15. What action would you like OSC to take in this matter (that is, what remedy are you asking for?)

1) Stop the prohibited personnel actions taken against me as set forth in this OSC complaint with applicable retroactivity, backpay, benefits, interest, and record correction.

(See Section 2, Question 5 of OSC Form 11 below)

---

## PART 2: REPRISAL FOR WHISTLEBLOWING

---

*This part of the form is solely for use by persons alleging reprisal for whistleblowing (that is, persons who believe that personnel actions were taken, not taken, or threatened because of a whistleblower disclosure). Please read the introductory material before answering the questions that follow. If more space is needed, use the continuation sheet at page 12.*

*Complainants not alleging reprisal for whistleblowing should proceed to Part 3 ("Consent to Certain Disclosures of Information"), at page 9.*

---

### Reprisal for Whistleblowing Allegations

As a general rule, it is a prohibited personnel practice to take or fail to take, or threaten to take or fail to take, a personnel action because of a protected disclosure of certain types of information by a Federal employee, former employee, or applicant for Federal employment. 5 U.S.C. § 2302(b)(8).

### Legal Elements of a Violation

By law, certain elements must be present before OSC can establish that a legal violation of law has occurred. Two of the required elements that must be established are: (1) that a whistleblower disclosure was made; and (2) that an agency took, failed to take, or threatened to take or fail to take a personnel action because of the whistleblower disclosure. Your description of these elements will help OSC's investigation of your allegation(s).

### Protected Disclosures

A disclosure of information is a protected whistleblower disclosure if a Federal employee, former employee, or applicant for Federal employment discloses information which he or she reasonably believes evidences: (a) a violation of any law, rule, or regulation; (b) gross mismanagement; (c) a gross waste of funds; (d) abuse of authority; or (e) a substantial and specific danger to public health or safety.

### Covered Personnel Actions

The law prohibiting reprisal for whistleblowing requires proof that one or more of the following personnel actions occurred, or failed to occur, because of a protected disclosure:

(1)   an appointment;
(2)   a promotion;
(3)   an action under 5 U.S.C. chapter 75 or other disciplinary or corrective action;

    (4)   a detail, transfer, or reassignment;

    (5)   a reinstatement;

    (6)   a restoration;

    (7)   a reemployment;

    (8)   a decision about pay, benefits, or awards, concerning education or training if the education or training may reasonably be expected to lead to an appointment, promotion, performance evaluation, or other action described in 5 U.S.C. § 2302(a)(2);

    (9)   a performance evaluation under 5 U.S.C. chapter 43;

    (10) a decision to order psychiatric testing or examination; or

    (11) any other significant change in duties, responsibilities, or working conditions.

### *Reporting Your Allegation(s)*

In the section that starts below (pages 6-8), provide the information requested about all disclosures that you believe led to reprisal by the agency involved. If more space is needed, use extra copies of page 6-8, or the Continuation Sheet at page 12. **If any of the disclosures were in writing, please provide a copy of the disclosure with your complaint.**

**IT IS IMPORTANT THAT YOU LIST ALL DISCLOSURES AND PERSONNEL ACTIONS INVOLVED IN YOUR COMPLAINT**. This is because: (1) failure to list any disclosure or personnel action may delay the processing of your complaint by OSC; and (2) a comprehensive listing will avoid disputes in any later Individual Right of Action (IRA) appeal that you may file with the Merit Systems Protection Board (MSPB) about its jurisdiction to hear case.

Additional allegations of reprisal for whistleblowing may be added to this complaint while it is pending at OSC. Submission of any such additional allegations to OSC **in writing** will help you if you decide to file any later IRA appeal with the MSPB. Form OSC-11a is available for that purpose at OSC's web site, under "Forms."

### *Appeal to the Merit Systems Protection Board (MSPB)*

If OSC fails to complete its review of your whistleblower reprisal allegation within 120 days after it receives your complaint, or if it closes your complaint at any time without seeking corrective action on your behalf, you have the right to file  IRA appeal with the MSPB. 5 U.S.C. § 1214(a)(3).

### *Recordkeeping*

To establish its jurisdiction over any later IRA appeal that you may file, the MSPB will require you to show that the appeal relates to the same whistleblower disclosure(s) and personnel action(s) involved in your complaint to OSC. A copy of the whistleblower reprisal allegations in your complaint, any supporting documentation about those allegations that you sent with the complaint, and any additional allegation of reprisal that you submitted in writing to OSC while the complaint was pending, will serve as proof in any IRA of the disclosure(s) and personnel action(s) involved in your OSC complaint. **IT IS IMPORTANT, THEREFORE, THAT YOU MAKE AND KEEP COPIES OF ALL THESE DOCUMENT FOR YOUR RECORDS.**

COMPLAINT OF POSSIBLE PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY
Page 6 of 12

**MUST BE COMPLETED FOR ALL DISCLOSURES REPORTED IN THIS COMPLAINT**

| A. WHAT INFORMATION WAS DISCLOSED? (DESCRIBE WHISTLEBLOWER DISCLOSURE). | |
|---|---|
| I reported concerns to my previous supervisor, Dr. Robbi Venditti regarding three Urology patients who had cancer diagnosed over two years prior that remained unaddressed due to the cancelling of consults/appointments directed by Dr. Venditti and Dr. Darren Deering, Chief of Staff for Administrative Medicine Service. The patients had died earlier that month as a result of the untreated cancer. I requested to have staff work on sending the remaining 2,583 unresolved urology patients out to the community through Non VA Care as it did not appear any action was being taken by the providers who were assigned to review cancelled veterans on another list.  However, my requests to intervene and assist these at-risk patients were repeatedly denied. | **1. WHEN WAS THE DISCLOSURE MADE? (MO/DA/YR)**<br>05/28/2014<br><br>**2. TO WHOM (NAME AND TITLE) WAS THE DISCLOSURE MADE?**<br>Dr. Robbi Venditti, Former Ass. Chief of Staff<br><br>**3. DISCLOSURE OF INFORMATION EVIDENCED** (check all that apply):<br>( ✓ )  VIOLATION OF LAW, RULE, OR REGULATION<br>(    )  GROSS MISMANAGEMENT<br>(    )  GROSS WASTE OF FUNDS<br>( ✓ )  ABUSE OF AUTHORITY<br>( ✓ )  SUBSTANTIAL AND SPECIFIC DANGER TO PUBLICHEALTH OR SAFETY<br>(    )  NONE OF THE ABOVE<br><br>**4. WHAT PERSONNEL ACTION(S) OCCURRED, FAILED TO OCCUR, OR WAS THREATENED BECAUSE OF THE DISCLOSURE?** (List all applicable personnel action numbers from pages 4-5).<br>(11)Demotion;(2)Fail to Promote;(8)Detail no pa<br><br>**5. WHEN DID PERSONNEL ACTION(S) OR THREAT(S) OCCUR?  (MO/DA/YR)**<br>03/19/2015;11/05/2015;11/09/2015 |
| B. WHAT INFORMATION WAS DISCLOSED? (DESCRIBE NEXT WHISTLEBLOWER DISCLOSURE). | |
| I reported to the OIG a list of 128 patients who were awaiting psychotherapy treatment. Ninety-six (96) of the patients were never sent to TriWest for the patients to receive care in the community, despite the clear instructions on the consults to do so. Many of these cases were suicidal and otherwise high risk cases needing urgent attention. | **1. WHEN WAS THE DISCLOSURE MADE? (MO/DA/YR)**<br>07/10/2014<br><br>**2. TO WHOM (NAME AND TITLE) WAS THE DISCLOSURE MADE?**<br>OIG<br><br>**3. DISCLOSURE OF INFORMATION EVIDENCED** (check all that apply):<br>( ✓ )  VIOLATION OF LAW, RULE, OR REGULATION<br>(    )  GROSS MISMANAGEMENT<br>(    )  GROSS WASTE OF FUNDS<br>( ✓ )  ABUSE OF AUTHORITY<br>( ✓ )  SUBSTANTIAL AND SPECIFIC DANGER TO PUBLICHEALTH OR SAFETY<br>(    )  NONE OF THE ABOVE<br><br>**4. WHAT PERSONNEL ACTION(S) OCCURRED, FAILED TO OCCUR, OR WAS THREATENED BECAUSE OF THE DISCLOSURE?** (List all applicable personnel action numbers from pages 4-5).<br>(11)Demotion;(2)Fail to Promote;(8)Detail no pa<br><br>**5. WHEN DID PERSONNEL ACTION(S) OR THREAT(S) OCCUR? (MO/DA/YR)**<br>03/19/2015;11/05/2015;11/09/2015 |

**KEEP A COPY OF THIS PAGE FOR YOUR RECORDS**

## MUST BE COMPLETED FOR ALL DISCLOSURES REPORTED IN THIS COMPLAINT

**C. WHAT INFORMATION WAS DISCLOSED?**
*(DESCRIBE NEXT WHISTLEBLOWER DISCLOSURE).*

On August 8, 2014, I reported to the OIG the concerns regarding providers having their alerts turned off, which I originally reported to facility leadership on June 27, 2014, resulting in doctors not responding to patient care and follow-up requests. I sent the list of providers to the OIG.

**1. WHEN WAS THE DISCLOSURE MADE? (MO/DA/YR)**

08/08/2014

**2. TO WHOM (NAME AND TITLE) WAS THE DISCLOSURE MADE?**

OIG

**3. DISCLOSURE OF INFORMATION EVIDENCED** *(check all that apply)*:
( ✓ ) VIOLATION OF LAW, RULE, OR REGULATION
( ) GROSS MISMANAGEMENT
( ) GROSS WASTE OF FUNDS
( ✓ ) ABUSE OF AUTHORITY
( ✓ ) SUBSTANTIAL AND SPECIFIC DANGER TO
        PUBLIC HEALTH OR SAFETY
( ) NONE OF THE ABOVE

**4. WHAT PERSONNEL ACTION(S) OCCURRED, FAILED TO OCCUR, OR WAS THREATENED BECAUSE OF THE DISCLOSURE?**

(11)Demotion;(2)Fail to Promote;(8)Detail no pay

**5. WHEN DID PERSONNEL ACTION(S) OR THREAT(S) OCCUR? (MO/DA/YR)**

03/19/2015;11/05/2015;11/09/2015

**D. WHAT INFORMATION WAS DISCLOSED?**
*(DESCRIBE NEXT WHISTLEBLOWER DISCLOSURE).*

On August 20, 2014, I was contacted by the OIG to provide further testimony to the details of mishandling of Urology patients by Dr. Deering and Dr. Venditti, and was contacted on several other occasions to provide additional documents, information and testimony during the subsequent facility investigations by the OIG and Office of the Medical Inspector (OMI).

(See Continuation Sheets)

**1. WHEN WAS THE DISCLOSURE MADE? (MO/DA/YR)**

08/20/2014

**2. TO WHOM (NAME AND TITLE) WAS THE DISCLOSURE MADE?**

OIG

**3. DISCLOSURE OF INFORMATION EVIDENCED** *(check all that apply)*:
( ✓ ) VIOLATION OF LAW, RULE, OR REGULATION
( ) GROSS MISMANAGEMENT
( ) GROSS WASTE OF FUNDS
( ✓ ) ABUSE OF AUTHORITY
( ✓ ) SUBSTANTIAL AND SPECIFIC DANGER TO
        PUBLIC HEALTH OR SAFETY
( ) NONE OF THE ABOVE

**4. WHAT PERSONNEL ACTION(S) OCCURRED, FAILED TO OCCUR, OR WAS THREATENED BECAUSE OF THE DISCLOSURE?** *(List all applicable personnel action numbers from pages 4-5).*

(11)Demotion;(2)Fail to Promote;(8)Detail no pay

**5. WHEN DID PERSONNEL ACTION(S) OR THREAT(S) OCCUR?**

03/19/2015;11/05/2015;11/09/2015

COMPLAINT OF POSSIBLE PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY
Page 8 of 12

**MUST BE COMPLETED FOR ALL DISCLOSURES INCLUDED IN THIS COMPLAINT**

3.  If you are **not** the person who actually made a disclosure described in boxes A, B, C, D above, please check below to specify the disclosure involved, and provide the name, address, and telephone number of the person who made the disclosure, if known. (*If space is needed to identify more than one person, use Continuation Sheet at page 12.*)

Disclosure:        A (  )              B (  )              C (  )              D (  )

Name:

Address:

Telephone number:    (      )                                    Ext.

4.  Explain why you believe that the personnel action(s) listed above occurred because of the disclosure(s) that you described. (*Be as specific as possible about any dates, locations, names, and positions of all persons mentioned in your explanation. In particular, identify actual and potential witnesses, giving work locations and telephone numbers, if known. Attach a copy of any documents that support your statements. Please provide, if possible, a copy of the notification of the agency's proposal and/or decision about the personnel action(s) covered by your complaint. If more space is needed, continue on page 12.*)

> 1) Witness Jennifer Russoniello, Patient Advocate Supervisor and friend, can attest to the ongoing retaliation and Agency's Prohibited Personnel Practices I have experienced since my whistleblower protected activities.
>
> 2) Witness Michelle Arensman, acting Nurse Manager, Utilization Review, can attest to the retaliatory and prohibited personnel actions and threats made by management as a result of whistleblower protected activities, the negative changes to my position and reputation in the organization these actions have had, and the stress and burden that has been placed on me due to management's actions since my OIG involvement and testimony, and OMI testimony.
>
> (See Continuation Sheets)

5.  What action would you like OSC to take in this matter (that is, what remedy are you asking for)?

> 1) Stop the prohibited personnel actions taken against me as set forth in this OSC complaint with applicable retroactivity, backpay, benefits, interest, and record correction;
> 2) Although I am pending transfer to a lower position out of the Phoenix VA Health Care System, and VISN 22, due to the inability to continue employment at the Phoenix VA, due to the egregious conditions, I request to be reassigned to a virtual position under VISN 21, or another Veterans Health Administration (VHA) Program office at the rate of Nurse IV Step 12, retroactive to April 5, 2012, with applicable backpay, benefits, interest, and a corrected record;
> 3) I request compensatory damages, to include medical expenses, in the amount of $300,000;
> 4) I request full reimbursement of my attorney's fees through the time necessary to complete any settlement negotiations and ensure parties' compliance with the terms of any settlement agreement

**KEEP A COPY OF THIS PAGE FOR YOUR RECORDS**

COMPLAINT OF POSSIBLE PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY
Page 9 of 12

## PART 3: CONSENT TO CERTAIN DISCLOSURES OF INFORMATION

OSC asks everyone who files a complaint alleging a possible prohibited personnel practice or other prohibited activity to select one of three Consent Statements shown below. *IF YOU DO NOT SELECT ONE OF THE THREE CONSENT STATEMENTS BELOW, OSC WILL ASSUME THAT YOU HAVE SELECTED CONSENT STATEMENT 1.* Please: (a) select and sign (or check, if filing electronically) one of the Consent Statements below; and (b) keep a copy of the Consent Statement you select (as well as a copy of all documents that you send to OSC) for your own records.

If you initially select a Consent Statement that restricts OSC's use of information, you may later select a less restrictive Consent Statement. If your selection of Consent Statement 2 or 3 prevents OSC from being able to conduct an investigation, an OSC representative will contact you, explain the circumstances, and provide you with an opportunity to select a less restrictive Consent Statement.

You should be aware that the Privacy Act allows information in OSC case files to be used or disclosed for certain purposes, regardless of which Consent Statement you sign. See 5 U.S.C. § 552a(b). Information about certain circumstances under which OSC can use or disclose information under the Privacy Act appears on the next page.

*(Please sign one)*

### Consent Statement 1

I *consent* to OSC's communication with the agency involved in my complaint. I agree to allow OSC to disclose my identity as the complainant, and information from or about me, to the agency if OSC decides that such disclosure is needed to investigate the allegation(s) in my complaint (for example, to request information from the agency, or seek a possible resolution through mediation or corrective action). I understand that regardless of the Consent Statement I choose, OSC may disclose information from my complaint file when permitted by the Privacy Act (including circumstances summarized in Part 5, below).

Complainant's Signature for Consent Statement 1 _____ 3/17/2017 Date Signed

### Consent Statement 2

I *consent* to OSC's communication with the agency involved in my complaint, but I do not agree to allow OSC to disclose my identity as the complainant to that agency. I agree to allow OSC to disclose only information from or about me, without disclosing my name or other identifying information, if OSC decides that such disclosure is needed to investigate the allegation(s) in my complaint (for example, to request information from the agency, or seek a possible resolution through mediation or corrective action). I understand that in some circumstances (for example, if I am complaining about my failure to receive a promotion), OSC could not maintain my anonymity while communicating with the agency involved about a specific personnel action. In such cases, I understand that this request for confidentiality might prevent OSC from taking further action on my complaint. I also understand that regardless of the Consent Statement I choose, OSC may disclose information from my complaint file when permitted by the Privacy Act (including circumstances summarized in Part 5, below).

Complainant's Signature for Consent Statement 2 _____ Date Signed

### Consent Statement 3

I do *not* consent to OSC's communication with the agency involved in my complaint. I understand that if OSC decides that it cannot investigate the allegation(s) in my complaint without communicating with that agency, my lack of consent will probably prevent OSC from taking further action on the complaint. I understand that regardless of the Consent Statement I choose, OSC may disclose information from my complaint file when permitted by the Privacy Act (including circumstances summarized in Part 5, below).

Complainant's Signature for Consent Statement 3 _____ Date Signed

## PART 4: CERTIFICATION AND SIGNATURE

I certify that all of the statements made in this complaint (including any continuation pages) are true, complete, and correct to the best of my knowledge and belief.  I understand that a false statement or concealment of a material fact is a criminal offense punishable by a fine of up to $250,000, imprisonment for up to five years, or both. 18 U.S.C. § 1001.

| | |
|---|---|
| Signature | Date Signed  3/17/2017 |

## PART 5: PRIVACY ACT / PAPERWORK REDUCTION ACT STATEMENTS

*Routine Uses*. Limited disclosure of information from OSC files is needed to fulfill OSC's investigative, prosecutorial, and related responsibilities. OSC has described 18 routine uses for information in its files in the *Federal Register* (F.R.), at 66 F.R. 36611 (July 12, 2001), and 66 F.R. 51095 (October 5, 2001). A copy of the routine uses is available from OSC upon request. A summary of the routine uses appears below.

OSC may disclose informatiofrom its files in the following circumstances:

1. to disclose that an allegation of prohibited personnel practices or other prohibited activity has been filed;
2. to disclose information to the Office of Personnel Management (OPM) as needed for inquiries involving civil service laws, rules or regulations, or to obtain an advisory opinion;
3. to disclose information about allegations or complaints of discrimination to entities concerned with enforcement of antidiscrimination laws;
4. to the MSPB or the President, when seeking disciplinary action;
5. to the involved agency, MSPB, OPM, or the President when OSC has reason to believe that a prohibited personnel practice has occurred, exists, or is to be taken;
6. to disclose information to Congress in OSC's annual report;
7. to disclose information to third parties as needed to conduct an investigation; obtain an agency investigation and report on information disclosed to OSC's whistleblower disclosure channel; or to give notice of the status or outcome of an investigation;
8. to disclose information as needed to obtain information about hiring or retention of an employee; issuance of a security clearance; conduct of a security or suitability investigation; award of a contract; or issuance of a license, grant, or other benefit;
9. to the Office of Management and Budget (OMB) for certain legislative coordination and clearance purposes;

10. to provide information from an individual's record to a congressional office acting pursuant to the individual's request;

11. to furnish information to the National Archives and Records Administration for records management purposes;

12. to produce summary statistics and work force or other studies;

13. to provide information to the Department of Justice as needed for certain litigation purposes;

14. to provide information to courts or adjudicative bodies as needed for certain litigation purposes;

15. to disclose information to the MSPB as needed in special studies authorized by law;

16. for coordination with an agency's Office of Inspector General or comparable entity, to facilitate the coordination and conduct of investigations and review of allegations;

17. to news media or the public in certain circumstances (except when the Special Counsel determines that disclosure in a particular case would be an unwarranted invasion of personal privacy); and

18. to the Department of Labor and others as needed to implement the Uniformed Services Employment and Reemployment Rights Act of 1994, and the Veterans' Employment Opportunities Act of 1998.

If OSC officials believe that disclosure may be appropriate in a situation not covered by one of OSC's routine uses, or one of the 11 other exceptions to the Privacy Act's general prohibition on disclosure, OSC will seek written authorization from the complainant permitting the disclosure.

*Purposes, Burdens, and Other Information.* An agency may not conduct or sponsor a collection of information, and persons may not be required to respond to a collection of information, unless it: (a) has been approved by OMB, and (b) displays a currently valid OMB control number. The information in this form is collected pursuant to OSC's legal responsibility to investigate: (a) allegations of prohibited personnel practices, to the extent necessary to determine whether there are reasonable grounds to believe that a prohibited personnel practice has occurred, exists, or is to be taken (5 U.S.C. § 1214); and (b) other allegations of prohibited activity (5 U.S.C. § 1216). The information will be reviewed by OSC to determine whether the facts establish its jurisdiction over the subject of the complaint, and whether further investigation and corrective or disciplinary action is warranted. The reporting burden for this collection of information is estimated to be an average of one hour and 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering the data needed, and completing and reviewing the form. Please send any comments about this burden estimate, and suggestions for reducing the burden, to the Office of Special Counsel, Legal Counsel and Policy Division, 1730 M Street, N.W. (Suite 218), Washington, DC 20036-4505. Use of this form to file a complaint alleging a prohibited personnel practice or other prohibited activity is required; use of this to file a complaint alleging only a Hatch Act violation is not required. 5 C.F.R. § 1800.1(d), as amended. As stated in Part 3 of this form, complainants may request that OSC maintain their name, and information provided by them, in confidence.

**COMPLAINT OF PROHIBITED PERSONNEL PRACTICE / OTHER PROHIBITED ACTIVITY**
Page 12 of 12

## CONTINUATION SHEET

*Part No.*     *Item/Question No.*     *Response Continuation*

(See Continuation Sheets)

**KEEP A COPY OF THIS PAGE FOR YOUR RECORDS IF YOU ARE ALLEGING**
**REPRISAL FOR WHISTLEBLOWING**

## PART 1 - Appellant and Agency Information
### Everyone must complete Part 1.

*Please type or print legibly.*

**1. Name** *(last, first, middle)*

Last: Tiffany   First: Potter   M. Initial:

> Please list your first name as it appears in your official personnel records. For example, if your first name is "William" on your official personnel records, please list it that way on the appeal form, not "Bill" or "Willy."

**2. Present address** *(number and street, city, State, and Zip code)*
**You must promptly notify the Board in writing of any change in your mailing address while your appeal is pending.**

Address: 333 Karelian St

City: Danville   State: CA   Zip Code: 95406

**3. Telephone Numbers** *(include area code) and E-Mail Address*
**You must promptly notify the Board in writing of any change in your telephone number(s) or e-mail address while your appeal is pending.**

Home: +1 (254) 238-1152   Work:   Fax:   Cell:

e-Mail Address: tiffany.potter83@gmail.com

**4. Name and address of the agency that took the action or made the decision you are appealing** *(include bureau or division, street address, city, State and Zip code)*

Agency Name: Department of Veterans Affairs

Bureau: Phoenix VA

Address: 650 E. Indian School

City: Phoenix   State: AZ   Zip Code: 85012   Phone Number:

**5. Your Federal employment status at the time of the action or decision you are appealing:**

☒ Permanent   ☐ Temporary   ☐ Term
☐ Seasonal   ☐ Applicant   ☐ Retired
☐ None

**6. Type of appointment (if applicable):**

☒ Competitive   ☐ Excepted
☐ Postal Service   ☐ SES
☐ Other *(describe)*:

**7. Your position, title, grade, and duty station at the time of the action or decision you are appealing (if applicable):**

Occupational Series or Cluster: 0610   Position Title: Nurse Manager
Grade or Pay Band: Nurse III   Duty Station: Phoenix, AZ

**8. Are you entitled to veteran's preference?**
See 5 U.S.C. § 2108.

☐ Yes   ☒ No

**9. Length of Federal service (if applicable):**

13 Years   1 Months

**10. Were you serving a probationary, trial, or initial service period at the time of the action or decision you are appealing?**

☐ Yes   ☒ No

**11. HEARING:** You may have a right to a hearing before an administrative judge. If you elect not to have a hearing, the administrative judge will make a decision on the basis of the submissions of the parties. Do you want a hearing?

☒ Yes   ☐ No

## PART 2 - Agency Personnel Action or Decision (non-retirement)

**Complete this part if you are appealing a Federal agency personnel action or decision other than a decision directly addressing your retirement rights or benefits.** This includes certain actions that might not otherwise be appealable to the Board: individual right of action (IRA) appeals under the Whistleblower Protection Act (WPA); appeals under the Uniformed Services Employment and Reemployment Rights Act (USERRA); or appeals under the Veterans Employment Opportunities Act (VEOA). An explanation of these three types of appeals is provided in **Appendix A**.

12. Check the box that best describes the agency **personnel action or decision** you are appealing. (If you are appealing more than one action or decision, check each box that applies.)

- [ ] VA SES Removal from civil service
- [ ] Removal (termination after completion of probationary or initial service period)
- [ ] Termination during probationary or initial service period
- [ ] Reduction in grade, pay, or band
- [ ] Suspension for more than 14 days
- [ ] Failure to restore/reemploy/reinstate or improper restoration/reemployment/reinstatement
- [ ] Negative suitability determination

- [ ] VA SES Transfer to general schedule
- [x] Involuntary resignation
- [ ] Involuntary retirement
- [ ] Denial of within-grade increase
- [ ] Furlough of 30 days or less
- [ ] Separation, demotion or furlough for more than 30 days by reduction in force (RIF)
- [ ] Other action (describe):

13. Date you received the agency's final decision letter (if any) *(MM/DD/YYYY)*:

14. Effective date (if any) of the agency action or decision *(MM/DD/YYYY)*:

04/01/2017

15. Prior to filing this appeal, did you and the agency mutually agree in writing to try to resolve the matter through an alternative dispute resolution (ADR) process?

- [ ] Yes *(attach a copy of the agreement)*     [x] No

16. Explain briefly why you think the agency was wrong in taking this action, including whether you believe the agency engaged in harmful procedural error, committed a prohibited personnel practice, or engaged in one of the other claims listed in **Appendix A**. **Attach the agency's proposal letter, decision letter, and SF-50, if available.** Attach additional sheets if necessary (bearing in mind that there will be later opportunities to supplement your filings).

See attached continuation sheets.

---

## PART 2 - Agency Personnel Action or Decision (non-retirement) (continued)

17. With respect to the agency personnel action or decision you are appealing, have you, or has anyone on your behalf, filed a grievance under a negotiated grievance procedure provided by a collective bargaining agreement?

☐ Yes          ☒ No

If "Yes," **attach a copy of the grievance**, enter the date it was filed, and enter the place where it was filed if different from your answer to question 4 in Part 1.

Agency Name: [                                    ]          Date Filed (MM/DD/YYYY): [              ]

Bureau: [                                    ]

Address: [                                    ]

City: [                    ]     State: [              ]     Zip Code: [              ]

If a decision on the grievance has been issued, **attach a copy of the decision** and enter the date it was issued (MM/DD/YYYY):

Date Issued (MM/DD/YYYY): [              ]

---

**Answer Question 18 ONLY if you are filing an IRA appeal.**

18. If you filed a whistleblowing complaint with the Office of Special Counsel (OSC), provide the date on which you did so and the date on which OSC made a decision or terminated its investigation, if applicable. **Attach copies of your complaint and OSC's termination of investigation letter**, notifying you of your right to seek corrective action from the Board.

Date Filed (MM/DD/YYYY): [03/21/2017]

Date of OSC decision or termination of investigation (MM/DD/YYYY): [11/20/2017]

---

**Answer Question 19 ONLY if you are filing a USERRA or VEOA appeal.**

19. If you filed a complaint with the Department of Labor (DOL), list the date on which you did so, and **attach a copy of your complaint**. If DOL has made a decision on your complaint, list the date of this decision, and **attach a copy of it**. If DOL has not made a decision on your complaint within 60 days from the date you filed it, state whether you have notified DOL of your intent to file an appeal with the Board, and **attach a copy of such notification.**

Date Filed (MM/DD/YYYY): [              ]

Has DOL made a decision on your complaint?

☐ Yes          ☐ No

If "Yes," enter the date it was made. If "No", state whether you have notified DOL of your intent to file an appeal with the Board, and **attach a copy of such notification.**

Date of DOL decision (MM/DD/YYYY): [              ]          ☐ Notified DOL of your intent to file an appeal with the Board?

## PART 3 - OPM or Agency Retirement Decision

**Complete this part if you are appealing a decision of the Office of Personnel Management (OPM) or other Federal agency directly addressing your retirement rights or benefits.**

20. In which retirement system are you enrolled?

☐ CSRS    ☐ CSRS Offset    ☐ FERS

☐ Other, *describe:*

21. Are you a:

☐ Current Employee    ☐ Annuitant

☐ Surviving Spouse

☐ Other, *describe:*

22. If retired, date of retirement, or if unknown, approximate date:

Date Retired (*MM/DD/YYYY*):

23. Describe the retirement decision you are appealing.

24. Have you received a final or reconsideration decision from OPM or another Federal agency?

☐ Yes *(attach a copy)*    ☐ No

If "Yes," on what date did you receive the decision?

Date Received (*MM/DD/YYYY*):

Provide the OPM processing (CSA or CSF) number in your appeal:

OPM Claim Number:

25. Explain briefly why you think OPM or another Federal agency was wrong in making this decision.

## PART 4 — Designation of Representative

26. Has an individual or organization agreed to represent you in this proceeding before the Board? (You may designate a representative at any time. However, it is unlikely that the appeals process will be delayed for reasons related to obtaining or maintaining representation. Moreover, you must promptly notify the Board in writing of any change in representation.)

☒ Yes *(Complete the information below and sign)*          ☐ No

**DESIGNATION:**

"I hereby designate  A. Marques Pitre, Esq. & Michelle de Vera, Esq.  to serve as my representative during the course of this appeal. I understand that my representative is authorized to act on my behalf. In addition, I specifically delegate to my representative the authority to settle this appeal on my behalf. **I understand that any limitation on this settlement authority must be filed in writing with the Board.**"

Representative's address *(number and street, city, State and Zip code)*

Address: 1300 Pennsylvania Ave, NW
Suite 700

City: Washington

State: DC      Zip Code: 20004

Representative's telephone numbers *(include area code) and e-mail address*

Office: +1 (202) 204-3006

Fax: +1 (202) 789-7349      Other:

e-Mail Address: ampitre@ampitreassociates.com

### SIGN BELOW TO MAKE YOUR DESIGNATION OF REPRESENTATIVE EFFECTIVE

_____
Appellant's Signature

01/24/2018
Date *(MM/DD/YYYY)*

| PART 5 - Certification |
|---|

27. **I certify that all of the statements made in this form and any attachments are true, complete, and correct to the best of my knowledge and belief.**

_____    01/24/2018
Signature of Appellant or Representative        Date *(MM/DD/YYYY)*

## Privacy Act Statement

*This form requests personal information that is relevant and necessary to reach a decision in your appeal. The Merit Systems Protection Board collects this information in order to process appeals under its statutory and regulatory authority. Because your appeal is a voluntary action, you are not required to provide any personal information to the Merit Systems Protection Board in connection with your appeal. Conceivably, failure to provide all information essential to reaching a decision in your case could result in the dismissal or denial of your appeal.*

*Decisions of the Merit Systems Protection Board are available to the public under the provisions of the Freedom of Information Act and are posted to the Merit Systems Protection Board's public website. Some information about the appeal also is used in depersonalized form for statistical purposes. Finally, information from your appeal file may be disclosed as required by law under the provisions of the Freedom of Information Act and the Privacy Act. See 5 U.S.C. §§ 552, 552a.*

## Public Reporting Burden

*The public reporting burden for this collection of information is estimated to vary from 20 minutes to 4 hours, with an average of 60 minutes per response, including time for reviewing the form, searching existing data sources, gathering the data necessary, and completing and reviewing the collection of information. Send comments regarding the burden estimate or any other aspect of the collection of information, including suggestions for reducing this burden, to Office of the Clerk of the Board, Merit Systems Protection Board, 1615 M Street, N.W., Washington, DC 20419 or by e-mail to mspb@mspb.gov.*

<u>Continuation Sheet</u>

**16.**     Explain briefly why you think the agency was wrong in taking this action, including whether you believe the agency engaged in harmful procedural error, committed a prohibited personnel practice, or engaged in one of the other claims listed in Appendix A.  Attach the agency's proposal letter, decision letter, and SF-50, if available.

**Involuntary Resignation/Constructive Discharge:**

1) The Agency created an intolerable and coercive working environment forcing the Appellant to resign from her position.  The Agency actions that created such intolerable and coercive working conditions were as follows:

   a. The Agency engaged in retaliation based on Appellant's Whistleblower Activity in violation of 5 U.S.C. §§2302(b)(8)(A)(B) & (b)(9)(A)(i)(B)(C).

      i. The Agency took the following actions against Appellant based on Appellant's disclosures of illegal activity, mismanagement of VA funds, and processes leading to patient care delays:

         1. The Agency demoted Appellant;
         2. The Agency denied Appellant compensation commensurate with Appellant's duties;
         3. The Agency forced Appellant into an "unclassified detail;"
         4. The Agency interfered with Appellant's ability to apply for a position by removing the position.

   b. The Agency engaged in prohibited personnel practices in violation of 5 U.S.C. §§2302(b)(4)(5)(6)(9) & (12) based on the following:

      i. The Agency demoted Appellant;
      ii. The Agency denied Appellant compensation commensurate with Appellant's duties;
      iii. The Agency forced Appellant into an "unclassified detail;"
      iv. The Agency interfered with Appellant's ability to apply for a position by removing the position;

   c. The Agency engaged in discriminatory behavior against Appellant based on her Race (African American), Sex (Female), and in Retaliation for prior EEO Activity in violation of 5 U.S.C. §2302(b)(1)&(9).

U.S. OFFICE OF SPECIAL COUNSEL                    (202) 254-3600 / (202) 254-3670 / (800) 872-9855

**COMPLAINT OF POSSIBLE PROHIBITED PERSONNEL PRACTICE**
**OR**
**OTHER PROHIBITED ACTIVITY**

*(Please print legibly or type and complete all pertinent items. Enter "N/A" (Not Applicable) or "Unknown" where appropriate. (If more space is needed, use Continuation Sheet at page 12.)*

| PART 1: PROHIBITED PERSONNEL PRACTICES PROHIBITED ACTIVITY (GENERAL) |
|---|

1. Name of person seeking OSC action ("Complainant"):    Mr. ( )  Ms. (•)  Mrs. ( )  Miss ( )

   Tiffany Potter

   For USERRA complaints only - please provide the last digit only of your Social Security Number (SSN):
   (needed to determine jurisdiction under § 204(c)(2) of Public Law No. 108-454.)

2. Position, title, series, and grade:  MSN, RN, CPHQ, Nurse Manager, GS-0610-Nurse III,

3. Agency name:  Department of Veteran Affairs

4. Agency Address:  650 E. Indian School Road

   Phoenix, AZ 85012

5. Home or mailing address:  15719 West Sierra Street

   Surprise, AZ  85379

6. Contact information: Telephone number(s): ( 254 )  238-1152                    (Home)
                                            (    )                               (Office)  Ext.

   Fax number:      (    )
   E-mail address:  tiffany.potter83@gmail.com

7. If you are filing this complaint as a legal or other representative of the Complainant, please supply the following information:

   Name and title of filer:        Mr. (•)    Ms. ( )    Mrs. ( )    Miss ( )

   A. Marques Pitre

   Address:  1300 Pennsylvania Avenue, NW, Suite 700

   Telephone number(s): ( 202 ) 240-3006                (Home)
                        (    )                          (Office)  Ext.

   Fax number:  (    )

   E-mail address:  ampitre@ampitreassociates.com

8. Are you (or is the Complainant, if you are filing as a representative) covered by a collective bargaining agreement? (Check one.)

   ( ) Yes          (•) No          ( ) I don't know

9. How did you first become aware that you could file a complaint with OSC?

   ( ) OSC Web site      ( ) OSC Speaker              ( ) OSC Brochure      ( ) OSC Poster
   ( ) News Story        ( ) Agency Personnel Office  ( ) Union            ( ) Co-worker
   (•) Other (*please describe*):  Attorney

   Date (approximate):  01/01/2017

COMPLAINT OF POSSIBLE PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY
Page 2 of 12

10. What is the employment status of the person affected by the suspected prohibited personnel practice or other prohibited activity? (*Check all applicable items - more than one item may apply*.)

   a.   (   ) Applicant for Federal employment

   b.   ( ✓ ) Competitive Service

        (   ) temporary appointment          ( ✓ ) career or career-conditional appointment
        (   ) term appointment                  (   ) probationary employee

   c.   (   ) Excepted Service

        (   ) Schedule A               (   ) Postal Service
        (   ) Schedule B               (   ) Tennessee Valley Authority
        (   ) Schedule C               (   ) VA Dept. of Medicine and Surgery
        (   ) National Guard Technician     (   ) Veterans Readjustment Act (VRA)
        (   ) Non-appropriated Fund        (   ) Other (Specify)

   d.   (   ) Senior Executive Service (SES), Supergrade, or Executive Level

        (   ) career SES              (   ) Executive Level V or above (career) fund
        (   ) noncareer SES           (   ) Executive Level V or above (noncareer)
        (   ) career GS-16, 17, or 18    (   ) Presidential appointee (Senate-confirmed)
        (   ) noncareer GS-16, 17, or 18

   e.   (   ) Other

        (   ) civil service annuitant       (   ) military officer or enlisted person
        (   ) former civil service employee   (   ) contract employee
        (   ) competitive service        (   ) other (*specify*):
        (   ) excepted service         (   ) unknown

11. What other action(s), if any, have you taken to appeal, grieve, or report this matter under any other procedure? (*Check all that apply*.)

| | | Date: |
|---|---|---|
| ( ✓ ) | None, or not applicable | |
| (  ) | Appeal filed with Merit Systems Protection Board (MSPB) | Date: |
| (  ) | Petition for reconsideration of initial decision filed with MSPB | Date: |
| |     Initial Decision No. | |
| (  ) | USERRA claim filed with VETS (Department of Labor) | Date: |
| |     (Form VETS/USERRA/VP-1010) | |
| (  ) | Grievance filed under agency grievance procedure | Date: |
| (  ) | Grievance filed under negotiated grievance procedure | Date: |
| (  ) | Matter heard by arbitrator under grievance procedure | Date: |
| (  ) | Matter is pending in arbitration | Date: |
| (  ) | Discrimination complaint filed with agency | Date: |
| (  ) | Agency or Administrative Judge (AJ) decision on discrimination complaint appealed | |
| |     to Equal Employment Opportunity Commission | Date: |
| (  ) | Appeal filed with Office of Personnel Management | Date: |
| (  ) | Unfair labor practice (ULP) complaint filed with Federal Labor Relations Authority | |
| |     General Counsel | Date: |
| (  ) | Lawsuit filed in Federal Court | Date: |
| |     Court name: | |
| (  ) | Reported matter to agency Inspector General | Date: |
| (  ) | Reported matter to member of Congress | Date: |
| |     Name of Senator or Representative: | |
| (  ) | Other (*specify*): | |

12. What official is responsible for the violation(s) that you are reporting, and what is his/her employment status? (*See question 10 for appropriate description of employment status. If space is needed to identify more than one official, use Continuation Sheet at page 12.*)

Name:    1)Robbi Venditti; 2)Darren Deering; 3)Glenn Grippen; 4) et al.

Position/Title:   1)Former Associate Chief of Staff; 2)Former Chief of Staff; 3)Former Medical Director

Employment Status:

13. What are the actions or events that you are reporting to OSC? (*To the extent known, specifically list: (a) any suspected prohibited personnel practices or other prohibited activity, <u>other than reprisal for whistleblowing</u>; and (b) any personnel actions involved.* **(*IF YOU ARE ALLEGING REPRISAL FOR WHISTLEBLOWING, SKIP TO PART 2 ON THE NEXT PAGE.*)**

§2302(b)(4) Obstruction of the Right to Compete
§2302(b)(5) Influence the Withdrawal of Applicants From Competition
§2302(b)(6) Unauthorized Preferences
§2302(b)(9) Reprisal
§2302(b)(12) Personnel Action in violation of law

14. Provide details of the actions or events shown in your response to question 13. (*Be as specific as possible about dates, locations, and the identities and positions of all persons mentioned. In particular, identify actual and potential witnesses, giving work locations and telephone numbers when possible. Also, attach any pertinent documents that you may have. <u>Please provide, if possible, a copy of the notification of the agency's proposal and/or decision about the personnel action(s) covered by your request for OSC action.</u> If more space is needed, use Continuation Sheet at page 12.*)

1) On March 19, 2015, an organizational chart was signed off by former Phoenix VA Medical Center Director, Glenn Grippen, demoting me from Chief Nurse to Nurse Manager, reducing my oversight from managing 45 FTEs and all programs in the entire clinical side of the Non VA Care department with a Nurse Manager and two Assistant Nurse Managers reporting to me, to the title of Nurse Manager, supervising only 14 FTEs that do not involve Non VA Care consult processing. As a result, I was no longer able to identify the administrative-caused patient care delays, or clinical risks related to Non VA Care and Choice referrals and appointments.

(See Continuation Sheets)

15. What action would you like OSC to take in this matter (that is, what remedy are you asking for?)

1) Stop the prohibited personnel actions taken against me as set forth in this OSC complaint with applicable retroactivity, backpay, benefits, interest, and record correction.

(See Section 2, Question 5 of OSC Form 11 below)

## PART 2: REPRISAL FOR WHISTLEBLOWING

> _**This part of the form is solely for use by persons alleging reprisal for whistleblowing (that is, persons who believe that personnel actions were taken, not taken, or threatened because of a whistleblower disclosure). Please read the introductory material before answering the questions that follow. If more space is needed, use the continuation sheet at page 12.**_
>
> _**Complainants not alleging reprisal for whistleblowing should proceed to Part 3 ("Consent to Certain Disclosures of Information"), at page 9.**_

### Reprisal for Whistleblowing Allegations

As a general rule, it is a prohibited personnel practice to take or fail to take, or threaten to take or fail to take, a personnel action because of a protected disclosure of certain types of information by a Federal employee, former employee, or applicant for Federal employment. 5 U.S.C. § 2302(b)(8).

### Legal Elements of a Violation

By law, certain elements must be present before OSC can establish that a legal violation of law has occurred. Two of the required elements that must be established are: (1) that a whistleblower disclosure was made; and (2) that an agency took, failed to take, or threatened to take or fail to take a personnel action because of the whistleblower disclosure. Your description of these elements will help OSC's investigation of your allegation(s).

### Protected Disclosures

A disclosure of information is a protected whistleblower disclosure if a Federal employee, former employee, or applicant for Federal employment discloses information which he or she reasonably believes evidences: (a) a violation of any law, rule, or regulation; (b) gross mismanagement; (c) a gross waste of funds; (d) abuse of authority; or (e) a substantial and specific danger to public health or safety.

### Covered Personnel Actions

The law prohibiting reprisal for whistleblowing requires proof that one or more of the following personnel actions occurred, or failed to occur, because of a protected disclosure:

    (1)   an appointment;
    (2)   a promotion;
    (3)   an action under 5 U.S.C. chapter 75 or other disciplinary or corrective action;

(4)  a detail, transfer, or reassignment;

(5)  a reinstatement;

(6)  a restoration;

(7)  a reemployment;

(8)  a decision about pay, benefits, or awards, concerning education or training if the education
or training may reasonably be expected to lead to an appointment, promotion,
performance evaluation, or other action described in 5 U.S.C. § 2302(a)(2);

(9)  a performance evaluation under 5 U.S.C. chapter 43;

(10) a decision to order psychiatric testing or examination; or

(11) any other significant change in duties, responsibilities, or working conditions.

### *Reporting Your Allegation(s)*

In the section that starts below (pages 6-8), provide the information requested about all disclosures that you
believe led to reprisal by the agency involved. If more space is needed, use extra copies of page 6-8, or the
Continuation Sheet at page 12. **If any of the disclosures were in writing, please provide a copy of the
disclosure with your complaint.**

**IT IS IMPORTANT THAT YOU LIST ALL DISCLOSURES AND PERSONNEL ACTIONS INVOLVED IN YOUR
COMPLAINT.** This is because: (1) failure to list any disclosure or personnel action may delay the processing of
your complaint by OSC; and (2) a comprehensive listing will avoid disputes in any later Individual Right of Action
(IRA) appeal that you may file with the Merit Systems Protection Board (MSPB) about its jurisdiction to hear
case.

Additional allegations of reprisal for whistleblowing may be added to this complaint while it is pending at OSC.
Submission of any such additional allegations to OSC **in writing** will help you if you decide to file any later IRA
appeal with the MSPB. Form OSC-11a is available for that purpose at OSC's web site, under "Forms."

### *Appeal to the Merit Systems Protection Board (MSPB)*

If OSC fails to complete its review of your whistleblower reprisal allegation within 120 days after it receives your
complaint, or if it closes your complaint at any time without seeking corrective action on your behalf, you have the
right to file  IRA appeal with the MSPB. 5 U.S.C. § 1214(a)(3).

### *Recordkeeping*

To establish its jurisdiction over any later IRA appeal that you may file, the MSPB will require you to show that the
appeal relates to the same whistleblower disclosure(s) and personnel action(s) involved in your complaint to OSC.
A copy of the whistleblower reprisal allegations in your complaint, any supporting documentation about those
allegations that you sent with the complaint, and any additional allegation of reprisal that you submitted in writing
to OSC while the complaint was pending, will serve as proof in any IRA of the disclosure(s) and personnel
action(s) involved in your OSC complaint. **IT IS IMPORTANT, THEREFORE, THAT YOU MAKE AND KEEP
COPIES OF ALL THESE DOCUMENT FOR YOUR RECORDS.**

COMPLAINT OF POSSIBLE PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY
Page 6 of 12

**MUST BE COMPLETED FOR ALL DISCLOSURES REPORTED IN THIS COMPLAINT**

| A. WHAT INFORMATION WAS DISCLOSED? *(DESCRIBE WHISTLEBLOWER DISCLOSURE)*. | |
|---|---|
| I reported concerns to my previous supervisor, Dr. Robbi Venditti regarding three Urology patients who had cancer diagnosed over two years prior that remained unaddressed due to the cancelling of consults/appointments directed by Dr. Venditti and Dr. Darren Deering, Chief of Staff for Administrative Medicine Service. The patients had died earlier that month as a result of the untreated cancer. I requested to have staff work on sending the remaining 2,583 unresolved urology patients out to the community through Non VA Care as it did not appear any action was being taken by the providers who were assigned to review cancelled veterans on another list. However, my requests to intervene and assist these at-risk patients were repeatedly denied. | **1. WHEN WAS THE DISCLOSURE MADE? (MO/DA/YR)**<br>05/28/2014<br><br>**2. TO WHOM (NAME AND TITLE) WAS THE DISCLOSURE MADE?**<br>Dr. Robbi Venditti, Former Ass. Chief of Staff<br><br>**3. DISCLOSURE OF INFORMATION EVIDENCED** (*check all that apply*):<br>( ✓ )   VIOLATION OF LAW, RULE, OR REGULATION<br>(    )   GROSS MISMANAGEMENT<br>(    )   GROSS WASTE OF FUNDS<br>( ✓ )   ABUSE OF AUTHORITY<br>( ✓ )   SUBSTANTIAL AND SPECIFIC DANGER TO PUBLICHEALTH OR SAFETY<br>(    )   NONE OF THE ABOVE<br><br>**4. WHAT PERSONNEL ACTION(S) OCCURRED, FAILED TO OCCUR, OR WAS THREATENED BECAUSE OF THE DISCLOSURE?** (*List all applicable personnel action numbers from pages 4-5).*<br>(11)Demotion;(2)Fail to Promote;(8)Detail no pa<br><br>**5. WHEN DID PERSONNEL ACTION(S) OR THREAT(S) OCCUR?  (MO/DA/YR)**<br>03/19/2015;11/05/2015;11/09/2015 |
| **B. WHAT INFORMATION WAS DISCLOSED?** *(DESCRIBE NEXT WHISTLEBLOWER DISCLOSURE).* | |
| I reported to the OIG a list of 128 patients who were awaiting psychotherapy treatment. Ninety-six (96) of the patients were never sent to TriWest for the patients to receive care in the community, despite the clear instructions on the consults to do so. Many of these cases were suicidal and otherwise high risk cases needing urgent attention. | **1. WHEN WAS THE DISCLOSURE MADE? (MO/DA/YR)**<br>07/10/2014<br><br>**2. TO WHOM (NAME AND TITLE) WAS THE DISCLOSURE MADE?**<br>OIG<br><br>**3. DISCLOSURE OF INFORMATION EVIDENCED (**check all that apply**):**<br>( ✓ )   VIOLATION OF LAW, RULE, OR REGULATION<br>(    )   GROSS MISMANAGEMENT<br>(    )   GROSS WASTE OF FUNDS<br>( ✓ )   ABUSE OF AUTHORITY<br>( ✓ )   SUBSTANTIAL AND SPECIFIC DANGER TO PUBLICHEALTH OR SAFETY<br>(    )   NONE OF THE ABOVE<br><br>**4. WHAT PERSONNEL ACTION(S) OCCURRED, FAILED TO OCCUR, OR WAS THREATENED BECAUSE OF THE DISCLOSURE?** (*List all applicable personnel action numbers from pages 4-5).*<br>(11)Demotion;(2)Fail to Promote;(8)Detail no pa<br><br>**5. WHEN DID PERSONNEL ACTION(S) OR THREAT(S) OCCUR?**<br>(MO/DA/YR)<br>03/19/2015;11/05/2015;11/09/2015 |

**KEEP A COPY OF THIS PAGE FOR YOUR RECORDS**

COMPLAINT OF POSSIBLE PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY
Page 7 of 12

**MUST BE COMPLETED FOR ALL DISCLOSURES REPORTED IN THIS COMPLAINT**

| C. WHAT INFORMATION WAS DISCLOSED? | |
|---|---|
| *(DESCRIBE NEXT WHISTLEBLOWER DISCLOSURE)*. | |
| On August 8, 2014, I reported to the OIG the concerns regarding providers having their alerts turned off, which I originally reported to facility leadership on June 27, 2014, resulting in doctors not responding to patient care and follow-up requests. I sent the list of providers to the OIG. | **1. WHEN WAS THE DISCLOSURE MADE? (MO/DA/YR)**<br><br>08/08/2014<br><br>**2. TO WHOM (NAME AND TITLE) WAS THE DISCLOSURE MADE?**<br><br>OIG<br><br>**3. DISCLOSURE OF INFORMATION EVIDENCED *(check all that apply)*:**<br>( ✓ ) VIOLATION OF LAW, RULE, OR REGULATION<br>( ) GROSS MISMANAGEMENT<br>( ) GROSS WASTE OF FUNDS<br>( ✓ ) ABUSE OF AUTHORITY<br>( ✓ ) SUBSTANTIAL AND SPECIFIC DANGER TO<br>      PUBLIC HEALTH OR SAFETY<br>( ) NONE OF THE ABOVE<br><br>**4. WHAT PERSONNEL ACTION(S) OCCURRED, FAILED TO OCCUR, OR WAS THREATENED BECAUSE OF THE DISCLOSURE?**<br><br>(11)Demotion;(2)Fail to Promote;(8)Detail no pay<br><br>**5. WHEN DID PERSONNEL ACTION(S) OR THREAT(S) OCCUR? (MO/DA/YR)**<br><br>03/19/2015;11/05/2015;11/09/2015 |

| D. WHAT INFORMATION WAS DISCLOSED? | |
|---|---|
| *(DESCRIBE NEXT WHISTLEBLOWER DISCLOSURE)*. | |
| On August 20, 2014, I was contacted by the OIG to provide further testimony to the details of mishandling of Urology patients by Dr. Deering and Dr. Venditti, and was contacted on several other occasions to provide additional documents, information and testimony during the subsequent facility investigations by the OIG and Office of the Medical Inspector (OMI).<br><br>(See Continuation Sheets) | **1. WHEN WAS THE DISCLOSURE MADE? (MO/DA/YR)**<br><br>08/20/2014<br><br>**2. TO WHOM (NAME AND TITLE) WAS THE DISCLOSURE MADE?**<br><br>OIG<br><br>**3. DISCLOSURE OF INFORMATION EVIDENCED *(check all that apply)*:**<br>( ✓ ) VIOLATION OF LAW, RULE, OR REGULATION<br>( ) GROSS MISMANAGEMENT<br>( ) GROSS WASTE OF FUNDS<br>( ✓ ) ABUSE OF AUTHORITY<br>( ✓ ) SUBSTANTIAL AND SPECIFIC DANGER TO<br>      PUBLIC HEALTH OR SAFETY<br>( ) NONE OF THE ABOVE<br><br>**4. WHAT PERSONNEL ACTION(S) OCCURRED, FAILED TO OCCUR, OR WAS THREATENED BECAUSE OF THE DISCLOSURE?** *(List all applicable personnel action numbers from pages 4-5)*.<br><br>(11)Demotion;(2)Fail to Promote;(8)Detail no pay<br><br>**5. WHEN DID PERSONNEL ACTION(S) OR THREAT(S) OCCUR?**<br><br>03/19/2015;11/05/2015;11/09/2015 |

**KEEP A COPY OF THIS PAGE FOR YOUR RECORDS**

COMPLAINT OF POSSIBLE PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY
Page 8 of 12

**MUST BE COMPLETED FOR ALL DISCLOSURES INCLUDED IN THIS COMPLAINT**

3.   If you are **not** the person who actually made a disclosure described in boxes A, B, C, D above, please check below to specify the disclosure involved, and provide the name, address, and telephone number of the person who made the disclosure, if known. (If space is needed to identify more than one person, use Continuation Sheet at page 12.)

Disclosure:      A ( )           B ( )           C ( )            D ( )

Name:

Address:

Telephone number:    (      )                                     Ext.

4.   Explain why you believe that the personnel action(s) listed above occurred because of the disclosure(s) that you described. (Be as specific as possible about any dates, locations, names, and positions of all persons mentioned in your explanation. In particular, identify actual and potential witnesses, giving work locations and telephone numbers, if known. Attach a copy of any documents that support your statements. Please provide, if possible, a copy of the notification of the agency's proposal and/or decision about the personnel action(s) covered by your complaint. If more space is needed, continue on page 12.)

1) Witness Jennifer Russoniello, Patient Advocate Supervisor and friend, can attest to the ongoing retaliation and Agency's Prohibited Personnel Practices I have experienced since my whistleblower protected activities.

2) Witness Michelle Arensman, acting Nurse Manager, Utilization Review, can attest to the retaliatory and prohibited personnel actions and threats made by management as a result of whistleblower protected activities, the negative changes to my position and reputation in the organization these actions have had, and the stress and burden that has been placed on me due to management's actions since my OIG involvement and testimony, and OMI testimony.

(See Continuation Sheets)

5.   What action would you like OSC to take in this matter (that is, what remedy are you asking for)?

1) Stop the prohibited personnel actions taken against me as set forth in this OSC complaint with applicable retroactivity, backpay, benefits, interest, and record correction;
2) Although I am pending transfer to a lower position out of the Phoenix VA Health Care System, and VISN 22, due to the inability to continue employment at the Phoenix VA, due to the egregious conditions, I request to be reassigned to a virtual position under VISN 21, or another Veterans Health Administration (VHA) Program office at the rate of Nurse IV Step 12, retroactive to April 5, 2012, with applicable backpay, benefits, interest, and a corrected record;
3) I request compensatory damages, to include medical expenses, in the amount of $300,000;
4) I request full reimbursement of my attorney's fees through the time necessary to complete any settlement negotiations and ensure parties' compliance with the terms of any settlement agreement

**KEEP A COPY OF THIS PAGE FOR YOUR RECORDS**

COMPLAINT OF POSSIBLE PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY
Page 9 of 12

## PART 3: CONSENT TO CERTAIN DISCLOSURES OF INFORMATION

OSC asks everyone who files a complaint alleging a possible prohibited personnel practice or other prohibited activity to select one of three Consent Statements shown below. ***IF YOU DO NOT SELECT ONE OF THE THREE CONSENT STATEMENTS BELOW, OSC WILL ASSUME THAT YOU HAVE SELECTED CONSENT STATEMENT 1.*** Please: (a) select and sign (or check, if filing electronically) one of the Consent Statements below; and (b) keep a copy of the Consent Statement you select (as well as a copy of all documents that you send to OSC) for your own records.

If you initially select a Consent Statement that restricts OSC's use of information, you may later select a less restrictive Consent Statement. If your selection of Consent Statement 2 or 3 prevents OSC from being able to conduct an investigation, an OSC representative will contact you, explain the circumstances, and provide you with an opportunity to select a less restrictive Consent Statement.

You should be aware that the Privacy Act allows information in OSC case files to be used or disclosed for certain purposes, regardless of which Consent Statement you sign. See 5 U.S.C. § 552a(b). Information about certain circumstances under which OSC can use or disclose information under the Privacy Act appears on the next page.

*(Please sign one)*

### Consent Statement 1

I *consent* to OSC's communication with the agency involved in my complaint. I agree to allow OSC to disclose my identity as the complainant, and information from or about me, to the agency if OSC decides that such disclosure is needed to investigate the allegation(s) in my complaint (for example, to request information from the agency, or seek a possible resolution through mediation or corrective action). I understand that regardless of the Consent Statement I choose, OSC may disclose information from my complaint file when permitted by the Privacy Act (including circumstances summarized in Part 5, below).

| | |
|---|---|
| *[signature]* | 3/17/2017 |
| Complainant's Signature for Consent Statement 1 | Date Signed |

### Consent Statement 2

I *consent* to OSC's communication with the agency involved in my complaint, but I do not agree to allow OSC to disclose my identity as the complainant to that agency. I agree to allow OSC to disclose only information from or about me, without disclosing my name or other identifying information, if OSC decides that such disclosure is needed to investigate the allegation(s) in my complaint (for example, to request information from the agency, or seek a possible resolution through mediation or corrective action). I understand that in some circumstances (for example, if I am complaining about my failure to receive a promotion), OSC could not maintain my anonymity while communicating with the agency involved about a specific personnel action. In such cases, I understand that this request for confidentiality might prevent OSC from taking further action on my complaint. I also understand that regardless of the Consent Statement I choose, OSC may disclose information from my complaint file when permitted by the Privacy Act (including circumstances summarized in Part 5, below).

| | |
|---|---|
| | |
| Complainant's Signature for Consent Statement 2 | Date Signed |

### Consent Statement 3

I *do not consent* to OSC's communication with the agency involved in my complaint. I understand that if OSC decides that it cannot investigate the allegation(s) in my complaint without communicating with that agency, my lack of consent will probably prevent OSC from taking further action on the complaint. I understand that regardless of the Consent Statement I choose, OSC may disclose information from my complaint file when permitted by the Privacy Act (including circumstances summarized in Part 5, below).

| | |
|---|---|
| | |
| Complainant's Signature for Consent Statement 3 | Date Signed |

## PART 4: CERTIFICATION AND SIGNATURE

I certify that all of the statements made in this complaint (including any continuation pages) are true, complete, and correct to the best of my knowledge and belief. I understand that a false statement or concealment of a material fact is a criminal offense punishable by a fine of up to $250,000, imprisonment for up to five years, or both. 18 U.S.C. § 1001.

Signature _____          Date Signed  3/17/2017

## PART 5: PRIVACY ACT / PAPERWORK REDUCTION ACT STATEMENTS

*Routine Uses.* Limited disclosure of information from OSC files is needed to fulfill OSC's investigative, prosecutorial, and related responsibilities. OSC has described 18 routine uses for information in its files in the *Federal Register* (F.R.), at 66 F.R. 36611 (July 12, 2001), and 66 F.R. 51095 (October 5, 2001). A copy of the routine uses is available from OSC upon request. A summary of the routine uses appears below.

OSC may disclose informatio from its files in the following circumstances:

1. to disclose that an allegation of prohibited personnel practices or other prohibited activity has been filed;
2. to disclose information to the Office of Personnel Management (OPM) as needed for inquiries involving civil service laws, rules or regulations, or to obtain an advisory opinion;
3. to disclose information about allegations or complaints of discrimination to entities concerned with enforcement of antidiscrimination laws;
4. to the MSPB or the President, when seeking disciplinary action;
5. to the involved agency, MSPB, OPM, or the President when OSC has reason to believe that a prohibited personnel practice has occurred, exists, or is to be taken;
6. to disclose information to Congress in OSC's annual report;
7. to disclose information to third parties as needed to conduct an investigation; obtain an agency investigation and report on information disclosed to OSC's whistleblower disclosure channel; or to give notice of the status or outcome of an investigation;
8. to disclose information as needed to obtain information about hiring or retention of an employee; issuance of a security clearance; conduct of a security or suitability investigation; award of a contract; or issuance of a license, grant, or other benefit;
9. to the Office of Management and Budget (OMB) for certain legislative coordination and clearance purposes;

10. to provide information from an individual's record to a congressional office acting pursuant to the individual's request;

11. to furnish information to the National Archives and Records Administration for records management purposes;

12. to produce summary statistics and work force or other studies;

13. to provide information to the Department of Justice as needed for certain litigation purposes;

14. to provide information to courts or adjudicative bodies as needed for certain litigation purposes;

15. to disclose information to the MSPB as needed in special studies authorized by law;

16. for coordination with an agency's Office of Inspector General or comparable entity, to facilitate the coordination and conduct of investigations and review of allegations;

17. to news media or the public in certain circumstances (except when the Special Counsel determines that disclosure in a particular case would be an unwarranted invasion of personal privacy); and

18. to the Department of Labor and others as needed to implement the Uniformed Services Employment and Reemployment Rights Act of 1994, and the Veterans' Employment Opportunities Act of 1998.

If OSC officials believe that disclosure may be appropriate in a situation not covered by one of OSC's routine uses, or one of the 11 other exceptions to the Privacy Act's general prohibition on disclosure, OSC will seek written authorization from the complainant permitting the disclosure.

*Purposes, Burdens, and Other Information*. An agency may not conduct or sponsor a collection of information, and persons may not be required to respond to a collection of information, unless it: (a) has been approved by OMB, and (b) displays a currently valid OMB control number. The information in this form is collected pursuant to OSC's legal responsibility to investigate: (a) allegations of prohibited personnel practices, to the extent necessary to determine whether there are reasonable grounds to believe that a prohibited personnel practice has occurred, exists, or is to be taken (5 U.S.C. § 1214); and (b) other allegations of prohibited activity (5 U.S.C. § 1216). The information will be reviewed by OSC to determine whether the facts establish its jurisdiction over the subject of the complaint, and whether further investigation and corrective or disciplinary action is warranted. The reporting burden for this collection of information is estimated to be an average of one hour and 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering the data needed, and completing and reviewing the form. Please send any comments about this burden estimate, and suggestions for reducing the burden, to the Office of Special Counsel, Legal Counsel and Policy Division, 1730 M Street, N.W. (Suite 218), Washington, DC 20036-4505. Use of this form to file a complaint alleging a prohibited personnel practice or other prohibited activity is required; use of this to file a complaint alleging only a Hatch Act violation is not required. 5 C.F.R. § 1800.1(d), as amended. As stated in Part 3 of this form, complainants may request that OSC maintain their name, and information provided by them, in confidence.

COMPLAINT OF PROHIBITED PERSONNEL PRACTICE / OTHER PROHIBITED ACTIVITY
Page 12 of 12

## CONTINUATION SHEET

| Part No. | Item/Question No. | Response Continuation |
|----------|-------------------|----------------------|
| | | (See Continuation Sheets) |

**KEEP A COPY OF THIS PAGE FOR YOUR RECORDS IF YOU ARE ALLEGING
REPRISAL FOR WHISTLEBLOWING**



**U.S. OFFICE OF SPECIAL COUNSEL**
1730 M Street, N.W., Suite 218
Washington, D.C. 20036-4505
202-804-7000

Ms. Tiffany Potter
c/o Mr. A. Marques Pitre, Esq.
Pitre & Associates, LLC
1300 Pennsylvania Ave NW, Suite 700
Washington, DC 20004

NOV 2 0 2017

Re: OSC File No. MA-17-2691

Dear Ms. Potter:

On November 3, 2017, we sent you our preliminary determination letter that set forth the U.S. Office of Special Counsel's (OSC) proposed factual and legal determinations regarding your complaint. We received your November 16, 2017, written response to the preliminary determination and thoroughly reviewed all of the information in support of your complaint. Unfortunately, we found no new or additional information or facts that would lead us to believe that our preliminary determination was in error. Among other things, you clarified your employment status prior to your October 28, 2015, detail, and you reiterated your argument that PVAHCS officials coerced your resignation and transfer to VANCHCS, but we still do not believe that the MSPB would find that PVAHCS crossed the demanding legal threshold for coercion. Accordingly, while we understand your concerns and greatly sympathize with your situation, we have made a final determination to close our file on your complaint.

Because you alleged potential violations of section 2302(b)(8) or (b)(9)(A)(i), (B), (C), or (D), you may have a right to seek corrective action from the Merit Systems Protection Board under the provisions of 5 U.S.C. §§ 1214(a)(3) and 1221. You may file a request for corrective action with the Board within 65 days after the date of this letter. The Merit Systems Protection Board regulations concerning rights to file a corrective action case with the Board can be found at 5 C.F.R. part 1209. *It is important that you keep the accompanying letter* because the Merit Systems Protection Board may require that you submit a copy should you choose to seek corrective action there.

Sincerely,

Noah Fortinsky
Attorney
Complaints Examining Unit



**U.S. OFFICE OF SPECIAL COUNSEL**
1730 M Street, N.W., Suite 218
Washington, D.C. 20036-4505
202-804-7000

Ms. Tiffany Potter
c/o Mr. A. Marques Pitre, Esq.
Pitre & Associates, LLC
1300 Pennsylvania Ave NW, Suite 700
Washington, DC 20004

NOV 2 0 2017

   Re: OSC File No. MA-17-2691

Dear Ms. Potter:

   The purpose of this letter is to notify you that you may have a right to seek corrective action from the Merit Systems Protection Board (MSPB).[1]

   In your complaint to the U.S. Office of Special Counsel (OSC), you alleged that Department of Veterans Affairs, Phoenix VA Health Care System (PVAHCS) officials retaliated against you for your disclosures and protected activity, as described by your lengthy complaint attachment with supporting documents that OSC incorporates by reference.

   You allege that in retaliation for the aforementioned, PVAHCS officials (1) forced you to resign on or around April 1, 2017; (2) detailed you to the Chief Nurse IV position for 33 days on October 28, 2015, without any higher-graded compensation; (3) detailed you for 120 days on January 17, 2017, to unclassified duties; (4) required you to perform the duties of Chief Nurse IV from April 5, 2012, until Mach 19, 2015, without any official detail, promotion, or higher-graded compensation; (5) demoted you from Chief Nurse IV to your Nurse Manager position and failed to appropriately compensate you while you acted as Chief Nurse IV; (6) created a hostile work environment; and (7) failed to promote you to the Chief Nurse IV position in August 2015 or the Deputy Associate Chief of Staff/Chief of Purchased Care position in March 2017.

   As we informed you in our closure letter of this date, we have terminated our inquiry into your allegations. Because you alleged that you were the victim of the prohibited personnel practice described in sections 2302(b)(8) or 2302(b)(9)(A)(i), (B), (C), or (D), commonly called reprisal for whistleblowing/protected activity, you may have the following rights.

---

[1] Although an appellant bringing an individual, right of action (IRA) appeal to the MSPB must show that he or she has exhausted OSC procedures, OSC's decision to close its investigation may not be considered in an IRA appeal. *See* 5 U.S.C. § 1221(f)(2); *Bloom v. Dep't of the Army*, 101 M.S.P.R. 79, ¶ 10 (2006). The MSPB may order an appellant to submit a copy of OSC's determination letter, but the order must contain an explanation of why the letter is necessary and give the appellant the opportunity to consent. *See* 5 U.S.C. § 1214(a)(2)(B); *Bloom*, 101 M.S.P.R. 79, at ¶ 10.

**U.S. Office of Special Counsel**
Ms. Tiffany Potter
MA-17-2691 IRA Letter
Page 2 of 2


You may seek corrective action from the MSPB under the provisions of 5 U.S.C. §§ 1214(a)(3) and 1221 (individual right of action) for any personnel action taken or proposed to be taken against you because of a protected disclosure and/or protected activity that was the subject of your complaint to this office.  You may file a request for corrective action with the MSPB within 65 days after the date of this letter.  The Merit Systems Protection Board regulations concerning rights to file an individual right of action with the Board can be found at 5 C.F.R. part 1209.  If you choose to file such an appeal, you should submit this letter to the Board as part of your appeal.  Therefore, ***it is important that you keep this letter*** if you intend to file a request for corrective action with the MSPB.

Sincerely,

Noah Fortinsky
Attorney
Complaints Examining Unit

# UNITED STATES OF AMERICA
# MERIT SYSTEMS PROTECTION BOARD
# DENVER FIELD OFFICE

TIFFANY POTTER,

        Appellant,

    v.

DEPARTMENT OF VETERANS
    AFFAIRS,

        Agency.

DOCKET NUMBER
DE-1221-18-0165-W-1

DATE: December 13, 2018

Marques Pitre, Esquire, Washington, D.C., for the appellant.

Michelle De Vera, Washington, D.C., for the appellant.

Scott MacMillan, Phoenix, Arizona, for the agency.

## BEFORE
David S. Brooks
Administrative Judge

## INITIAL DECISION

introduction

The appellant timely filed this individual right of action (IRA) appeal alleging that in reprisal for whistleblowing, the agency changed her duties, canceled a vacancy, detailed her, and drove her to involuntarily take a geographic reassignment. I found Board jurisdiction, convened a hearing on October 22 and 23, 2018, and received closing briefs on November 14, 2018.

For the following reasons, I am DENYING the appellant's request for corrective action.

ANALYSIS AND FINDINGS

In brief: I find that the appellant met her statutory burden to establish, in part, her alleged protected "whistleblowing" disclosures and activities while she

2

was an employee of the Phoenix V.A. Healthcare System (PVAHCS or "Phoenix VA"). And I find that the appellant met her burden to establish a statutory presumption that her whistleblowing was a contributing factor to *one* of the alleged personnel actions she suffered – her March 2015 change in duties. Thus I find that she established a prima facie case of whistleblower reprisal for that particular claim. 5 U.S.C. § 1221(e)(1).

Although I find the above prima facie claim of whistleblower reprisal, I also find that the agency met its burden to show that it would have taken the same action even absent her whistleblowing. Much of the appellant's whistleblowing was merely her cooperation with investigations undertaken by the Office of Inspector General (OIG or Inspector General), which were ongoing, expansive, and based on far more than anything she alone disclosed; indeed, the OIG investigations seemingly involved more Phoenix VA employees than they did *not* involve. Because I find the agency met its burden of defense for its March 2015 change in the appellant's duties, I must deny the appellant's request for corrective action for the duties change. 5 U.S.C. § 1221(e)(2).

As for the appellant's allegations of whistleblower reprisal in her November 2015 nonselection, January 2017 detail, and April 2017 reassignment, I do not find that she established any prima facie case. Consequently I must deny the appellant's request for corrective action for these claims.

A. Background

I find preponderant evidence of the following.[1]

The appellant began working for the Department of Veterans Affairs (DVA or agency) on December 17, 2004, as a Student Nurse Technician Valor Student.

---

1 A preponderance of the evidence is the degree of relevant evidence that a reasonable person, considering the record as a whole, would accept as sufficient to find that a contested fact is more likely to be true than untrue. 5 C.F.R. § 1201.4(q).

3

*See* Stipulation 1, found at IAF, Tab 42 at 9 (agency); Tab 44 at 16 (appellant).[2] The appellant became a Registered Nurse with the agency on July 9, 2006, at the Puget Sound VA Healthcare System. The appellant transferred to the Phoenix VA on January 3, 2010, as a Nurse II in Quality Management Service. Stipulations 2 and 3. On March 13, 2011, the appellant was promoted to Nurse III in Quality Management Service. Stipulation 3.

The appellant contends she made protected disclosures on: May 28, 2014 (alleged disclosure 1); July 10, 2014 (alleged disclosure 2); August 8, 2014 (alleged disclosure 3); and August 20, 2014 (alleged disclosure 4). IAF, Tab 48 at 2. (Alleged disclosure 5 occurs later in time, and is addressed below). On December 8, 2014, the Phoenix VA's leadership recognized the appellant on its new organization chart as "Chief Nurse Manager," under Purchased Care, and the appellant considered the title to beneficial to her. IAF, Tab 44 at 50 (chart); Tab 61 at 5-6 (appellant's allegation that the agency's March 19, 2015 change to that title was retaliation). On March 19, 2015, the agency took that Chief Nurse Manager title back in a revised organization chart, recognizing the appellant as "Nurse Manager," over Utilization Review (alleged reprisal 1). IAF, Tab 44 at 51 (chart); Tab 61 at 5-6 (allegation). The appellant's pay and official position of record as a Nurse III remained unchanged during those reorganizations. IAF, Tab 42 at 211, 231.

On about August 10, 2015, the agency posted a vacancy for "Registered Nurse, Chief Nurse Administrative Medicine Service." Stipulation 6. The appellant and others applied for the vacancy, and recruitment for the vacancy closed August 24, 2015. Stipulations 6 and 7. But on November 1, 2015, Chief of Staff Darren Deering asked Human Resources to cancel the recruitment effort. Stipulation 8; IAF, Tab 48 at 3 (alleged reprisal 2).

---

2 All stipulations appear at IAF, Tab 42 at 9-10 and Tab 44 at 16-17 (identical numbering). This decision will simply refer to stipulations by their number.

4

More than a year later, the appellant contends, she made another protected disclosure on December 1, 2016.  IAF, Tab 48 at 2-3 (final alleged disclosure 5).  Thereafter, the appellant contends, the agency retaliated against her on January 10, 2017, through Medical Center Director RimaAnn Nelson's decision to detail her to "Unclassified Duties."  IAF, Tab 48 at 3 (alleged reprisal 3).  The appellant lastly contends that the agency retaliated against her by driving her, on March 6, 2017, to notify Nelson that she was transferring out of the Phoenix VA: "It is with great sadness that I respectfully submit notice of my transfer from the position of Nurse Manager at the Phoenix VA to a position I have accepted at the VA Northern California Healthcare System with a release date of 4/1/2017."  *Id.* (final, alleged reprisal 4); Tab 46 at 4.  The appellant went through with transferring to California.  IAF, Tab 62 at 208.

The appellant filed a whistleblower reprisal complaint at the Office of Special Counsel (OSC), exhausted that process, and on February 13, 2018, timely filed the instant Board IRA appeal.  IAF, Tab 2.  I found the appeal timely and within the Board's jurisdiction, for the above enumerated alleged disclosures and reprisals.  IAF, Tabs 26, 30, 48.

B.  Applicable Law, Burdens of Proof, and Summary of Claims

The Whistleblower Protection Act (WPA) prohibits an agency from taking a personnel action because of any whistleblowing "disclosure" or activity.  5 U.S.C. § 2302(b)(8)-(9).  The appellant has the burden to establish, by preponderant evidence, two elements: (1) she made a protected disclosure, and (2) her disclosure was a contributing factor to the agency's decision to take a statutorily covered personnel action against her.  *Id.*; 5 U.S.C. § 1221(e)(1);  5 C.F.R. § 1209.2(e)(1).  If the appellant meets that burden, then she has established a prima facie case of whistleblower reprisal, and the burden passes to the agency, such that the Board will order corrective action, *unless* the agency demonstrates by clear and convincing evidence that it would have taken the same personnel

5

action(s) in the absence of the disclosure(s).  5 U.S.C. § 1221(e)(2); 5 C.F.R. § 1209.2(e)(2).

Regarding element 1 of the appellant's burden, I found Board jurisdiction to review the following alleged protected disclosures:

1. May 28, 2014 report to Robbi Venditti "regarding three Urology patients who had cancer diagnosed over two years prior that remained unaddressed due to the cancelling of consults/appointments directed by Dr. Venditti and Dr. Darren Deering," where there was a "remaining 2,583 unresolved urology patients … as it did not appear any action was being taken by the providers who were assigned to review cancelled veterans on another list."

2. July 10, 2014 report to the Office of Inspector General (OIG) that of 128 patients "who were awaiting psychotherapy," 96 "of the patients were never sent to TriWest for the patients to receive care in the community, despite the clear instructions on the consults to do so," where "[m]any of these cases were suicidal and otherwise high-risk cases needing urgent attention."

3. August 8, 2014 report to OIG, with a "list of providers," of "concerns regarding providers having their alerts turned off … resulting in doctors not responding to patient care and follow-up requests."

4. August 20, 2014 cooperation with OIG "to provide further testimony to the details of mishandling of Urology patients by Dr. Deering and Dr. Venditti."

5. December 1, 2016 complaint with OIG "regarding illegal practices established by Dr. [Carlos] Duarte between April 18, 2016 and December 1, 2016 instructing staff to deny veterans their Choice benefits of receiving timely community care for eligible veterans and other concerns regarding misconduct and Non VA Care Consult management by senior Phoenix VA officials."

IAF, Tabs 26, 30, 48 (internal citations omitted).[3]

---

3 I do not now consider the appellant's claim to have made "at least six disclosures to upper management" and "at least six known protected disclosures to OIG concerning the same issues," for a total of "twelve disclosures."  IAF, Tab 61 at 7.  I found five nonfrivolously alleged disclosures in totem, and the appellant never asked me to reconsider that list, despite the opportunity to do so.  IAF, Tabs 26, 28, 30.  I rule likewise for the appellant's statement in her closing brief that she also made a protected disclosure that there "was a lot of vacancies in the service."  IAF, Tab 61 at 12.

6

Regarding element 2 of the appellant's burden, I found Board jurisdiction to review the following alleged retaliatory personnel actions:

1. March 19, 2015, demotion [more accurately, a change in duties] from Chief Nurse to Nurse Manager.

2. November 5, 2015 failure to fill a [vacancy] for Chief Nurse IV.

3. January 17, 2017 unclassified detail.

4. March 2, 2017 involuntary resignation – by leaving her agency position in Phoenix for an agency position in California – effective April 2017.

*Id.* (internal citations omitted).[4]

I review each of the above two elements in turn, below.

C.  The appellant MET her burden to establish that she engaged in whistleblowing activity, by establishing four of her five whistleblowing allegations.

The first half of the appellant's IRA burden is to establish by preponderant evidence that she engaged in whistleblowing activity protected by the statute and reviewable in an IRA appeal.  5 C.F.R. § 1209.2(e)(1).  I apprised the appellant of her burden and the law relevant to it.  IAF, Tab 4.  Reviewable in an IRA appeal are, *inter alia,* 5 U.S.C. § 2302(b)(8) "disclosures" and 2302(b)(9)(C) Inspector General communications.  5 U.S.C. § 1221(a), (e).   As explained below, I find that the appellant established four of her five allegations of protected whistleblowing: 1, 2, 3, *not 4*, and 5.

1.  The appellant ESTABLISHED that she made a protected disclosure to her supervisor, Venditti, on May 28, 2014.

The appellant's first alleged disclosure was her May 28, 2014 email to her supervisor, Dr. Robbi Venditti, D.O.  IAF, Tab 48 at 2.  The appellant's email said:

---

4 I do not now consider the appellant's claim that the agency retaliated against her "from 2015 through March 2017" by failing to make her a Nurse IV during that time. IAF, Tab 61 at 10.  I found four nonfrivolously alleged reprisals in totem, and I denied the appellant's request to add this alleged reprisal to the list.  IAF, Tabs 26, 28, 30.

7

> I am concerned about these Urology patients. We came across 3 so
> far (not part of the 111 reported to QSI earlier) that died as a result
> of delays. One of them was diagnosed 2 years ago (9/2011) and not
> sent out or addressed until 2 years later (9/2013) and just died earlier
> this month from the cancer. Please make sure that the patients not on
> the "Send to Community" list are followed-up in-house. If they can't
> see them then we should send them out. These deaths were in the
> last 2 months and this worries me. Please let me know if you want
> us to work OT to work down that list as well.

IAF, Tab 44 at 26. I find a protected disclosure in the appellant's May 28, 2014
email.

Under 5 U.S.C. § 2302(b)(8), a protected disclosure is one that the
appellant reasonably believes evidences a violation of any law, rule, or regulation,
gross mismanagement, a gross waste of funds, an abuse of authority, or a
substantial and specific danger to public health or safety. An employee may be
said to have "reasonable belief" when a disinterested observer with knowledge of
the essential facts known to and readily ascertainable by the appellant could
reasonably conclude that the actions of the Government evidence the wrongdoing
in question. 5 C.F.R. § 1209.4(f).

I find that the appellant's May 28, 2014 disclosure to Venditti that in "the
last 2 months," three patients "died as a result of delays," demonstrates the
appellant's reasonable belief of a substantial and specific danger to public health
or safety. 5 U.S.C. § 2302(8)(A)(ii). Notably, although the appellant, post-
sending her May 27, 2014 email, explains that she believes the patient care
problem was "due to the cancelling of consults/appointments directed by Dr.
Venditti and Dr. Deering," her email did not mention Venditti or Deering. IAF,
Tab 9 at 4-5. Nonetheless, I find the appellant's first alleged disclosure is
ESTABLISHED.

8

2. <u>The appellant ESTABLISHED that she made a protected disclosure to Venditti and others on July 10, 2014.</u>

The appellant's second alleged disclosure came in a July 10, 2014 email she sent. IAF, Tab 48 at 2 (referencing Tab 44 at 27 (email)). To clarify, although my order identified the appellant's alleged disclosure to be made "to the Office of Inspector General," *Id.*, at hearing it became apparent that all email recipients (both on the original July 10, 2014 email and its forwarding later on the same day) were agency, not OIG, employees. IAF, Tab 44 at 27-28; IAF, Tab 62 at 310 (Lowe); Tab 63 at 28 (Venditti), 154 (Deering). Thus, I review this alleged disclosure under 5 U.S.C. § 2302(b)(8) ("any disclosure") rather than under 2302(b)(9)(C) (inspector general activity). The appellant's July 10, 2014 email was addressed to Fee Manager Ed Lowe, with a carbon copy to Venditti, and stated:

> Attached is part of the OIG spreadsheet for the patients awaiting psychotherapy. Of the 128 patients reviewed, 96 were never sent to Triwest by the authorization staff although the consult instructed to send to Triwest. 9 cases were sent to Triwest but never received by Triwest or loaded by the Triwest staff into their system. So only 23 of the 128 Psychotherapy patients were processed (oldest consult date 5/7/14). Many of these are suicidal and otherwise high risk cases per OIG notes. Please get the 96 cases sent to Triwest and the 9 other cases re-sent as soon as possible.

IAF, Tab 44 at 27. I find that the appellant's July 10, 2014 disclosure to Lowe and Venditti, that a majority of some group of "suicidal and otherwise high risk" patients were not being referred as instructed, demonstrates the appellant's reasonable belief of a substantial and specific danger to public health or safety. 5 U.S.C. § 2302(8)(A)(ii).

The appellant's second alleged disclosure is ESTABLISHED.

9

3. The appellant ESTABLISHED that she engaged in protected Inspector General activity on August 8, 2014.

The appellant's third alleged disclosure was her August 8, 2014 email to an employee of the Inspector General, Katrina Young.  IAF, Tab 48 at 2; Tab 44 at 38 (email).  The appellant's email said:

> Here's the other email string about the concerns with providers turning off alerts that even intentional alerts are not received by the providers to act on.

IAF, Tab 44 at 38 (with July 2014 email string attached).  The appellant's submissions to the Board describe her concern to be that doctors were "not responding to patient care and follow-up requests."  IAF, Tab 48 at 2.  The July 2014 email string that the appellant attached to her August 8, 2014 email to OIG indicates that the appellant, Venditti, Deering, and others were "brainstorming" for solutions.  IAF, Tab 44 at 39-40.  In the email string, the appellant asked:  "Is there a way for the provider to be taken off automatic alerts and instead only be alerted when someone actually specifically adds them as an alert to a comment? Just trying to brainstorm a better way to avoid [sic] patients like the example below who have needs that are missed."  IAF, Tab 44 at 39-40.  Deering answered the appellant:

> Unfortunately, [the alerts] are all or nothing.  I think we rely to[o] heavily on the consult system to communicate details to providers. All of these alerts cause alert fatigue for providers, so it actually increases the risk of important ones being missed or glossed over when the volume is high. … [I]f I had to choose, I would not want the providers getting 300 a day and being here until 8pm going through them and risking missing one that is critical.

*Id.* at 39.

Notably, the July 2014 email exchange does not indicate that providers were simply turning off their phones and ignoring patients; instead, the appellant told Deering that she was looking for "a better way to avoid" problems, and Deering told the appellant that a system in which every alert goes to providers can actually be counter-productive by "increase[ing] the risk of important ones be

10

missed."    Nonetheless, the WPA protects "cooperating with or disclosing information to the Inspector General," regardless of whether the disclosure was made with any "reasonable belief" of wrongdoing. 5 U.S.C. § 2302(b)(9)(C).

The appellant's third alleged disclosure, to OIG employee Young, is ESTABLISHED.

4.  The appellant did NOT ESTABLISH that she engaged in protected Inspector General activity on August 20, 2014.

The appellant's fourth alleged disclosure related to an August 20, 2014 email she *received* from OIG employee Young. IAF, Tab 48 at 2. Young's email to the appellant simply said: "Can you call [m]e when you get a moment." IAF, Tab 44 at 42. The appellant testified that Young's purpose was to follow up with prior communications they had had. IAF, Tab 62 at 102. Consistent with that, the appellant previously said that she "was contacted on several other occasions to provide additional documents, information and testimony during the subsequent facility investigations by the OIG and the Office of Medical Inspector (OMI)." IAF, Tab 9 at 5.

Although it is clear to me that the appellant was contacted by OIG on August 20, 2014, I was unable to find any clear evidence of what response, if any, the appellant gave to OIG's August 20, 2014 request. As such, I do not find any protected disclosure, per se, within alleged disclosure 4. 5 U.S.C. § 2302(b)(9) (C) ("cooperating with or disclosing information to the Inspector General"). The appellant's fourth alleged disclosure is NOT ESTABLISHED.

5.  The appellant ESTABLISHED that she made a protected disclosure to the Inspector General on December 1, 2016.

The appellant's fifth alleged disclosure was her December 1, 2016 complaint to OIG. IAF, Tab 42 at 2. Although I was unable to find within the record the actual OIG complaint, the appellant pointed to a December 12, 2016 email from OIG that appeared to respond to her actual complaint:

11

> Dear Ms. Potter,
>
> The [OIG] Hotline received your complaint dated Dec 1, 2016. …
>
> * * *
>
> In order to examine the issues you have raised, it may be necessary for the OIG to take actions that will effectively release your identity as the complainant.

IAF, Tab 44 at 89.   According to the appellant, her December 1, 2016 OIG complaint was "regarding illegal practices established by Dr. Duarte between April 18, 2016 and December 1, 2016 instructing staff to deny veterans their Choice benefits of receiving timely community care for eligible veterans and other concerns regarding misconduct and Non VA Care Consult management by senior Phoenix VA officials."   IAF, Tab 42 at 2.   I find that the appellant's December 1, 2016 OIG complaint was plainly protected by 5 U.S.C. § 2302(b)(9) (C) ("disclosing information to the Inspector General"), and is reviewable in this IRA appeal.   5 U.S.C. § 1221(a).   The appellant's fifth alleged disclosure is ESTABLISHED.[5]

In review, I found the appellant established alleged disclosures 1 (May 28, 2014 email to Venditti), 2 (July 10, 2014 email to Venditti and Lowe), 3 (August 8, 2014 disclosure to OIG), *not 4*, and 5 (December 1, 2016 disclosure to OIG).

D. The appellant MET her burden to establish that whistleblowing was a contributing factor to *one* covered personnel action.   She thereby established *one* prima facie case of whistleblower reprisal.

The second half of the appellant's IRA burden is to establish by preponderant evidence that her whistleblowing was a contributing factor to statutorily covered personnel actions.   5 U.S.C. § 1221(e)(1); C.F.R. § 1209.2(e)

---

5 Even if I had found a protected disclosure within (i) the appellant's August 20, 2014 receipt of an email from OIG, or (ii) some specific subsequent interaction she had with OIG, the appellant did not show that anybody knew about either (i) or (ii).  This makes contributing factor to any alleged reprisal improbable.  5 U.S.C. § 1221(e)(1).

12

(1).  I apprised the appellant of that burden and the law relevant to it.  IAF, Tab 4.  As explained below, I find that the appellant established her prima facie burden for alleged whistleblower reprisal number 1 (duties change), but *not for reprisals 2 (her nonselection), 3 (her detail), or 4 (her resignation).*

1.  The appellant ESTABLISHED that her whistleblowing was a contributing factor to the agency's March 2015 change to her duties and responsibilities.

The appellant's first allegation of whistleblower reprisal was the agency's March 19, 2015 change to her duties and responsibilities, which she contended was tantamount to a demotion.  IAF, Tab 48 at 3.  The appellant's duties change was reflected in an agency organizational chart that the agency finalized on March 19, 2015, after comparing it with the preceding organizational chart, approved on December 8, 2014.  IAF, Tab 44 at 50 (December 2014 chart), 51 (March 2015 chart).   Venditti, along with Deering, Grippen, and three other individuals, signed the March 19, 2015 reorganization chart.  IAF, Tab 44 at 51.  The prohibited personnel actions listed in the WPA include a retaliatory "significant change in duties, responsibilities, or working conditions."  5 U.S.C. § 2302(a)(2)(A)(xii).  I find the March 2015 change was sufficiently "significant" to fit 2302(b)(2)(A)(xii)'s description of a significant change in duties, responsibilities, or working conditions.[6]

The remaining issue for the appellant's burden is whether she demonstrated that her whistleblowing was a contributing factor to the agency's March 19, 2015 duties change.  5 U.S.C. § 1221(e)(1).  The appellant may demonstrate that her

---

[6] Although the appellant labeled the duties change a "demotion," that word does not appear in the WPA or Chapter 75, and the appellant never alleged that the agency reduced her grade or pay when it changed her duties in March 2015, which would have been the most appropriate hypothetical circumstance, if ever, to use the word "demotion."  For those reasons, I find appellant's label of "demotion" is not helpful to the Board's analysis.  I refer to the event as simply a change in duties or responsibilities.

13

whistleblowing was a contributing factor in the March 2015 action through, *inter alia*, evidence that the official(s) responsible for the appellant's duties change knew of her whistleblowing, and that they changed her duties within a period of time such that a reasonable person could conclude that the whistleblowing was a contributing factor in the rating.[7]  5 U.S.C. § 1221(e)(1)(A)-(B).  That is known as the "knowledge-timing test."

Applying the knowledge-timing test, I find that three of the appellant's disclosures – 1, 2, and 3, which I found above to be protected whistleblowing – predated the agency's March 19, 2015 change to the appellant's duties and responsibilities, such that the disclosures conceptually could have contributed to the March 9, 2015 agency action.  IAF, Tab 44 at 26 (disclosure 1, May 28, 2014 email to Venditti), 27 (disclosure 2, July 10, 2014 email to Venditti and Lowe), 38 (disclosure 3, August 8, 2014 email to OIG), 51 (March 19, 2015 reorganization chart).  The key issue here is whether those disclosures can be connected to the actions of Venditti, Deering, or Grippen in signing the March 9, 2015 reorganization chart.  *Id.* at 51.

I begin with Venditti.  Because Venditti received disclosures 1 and 2 from the appellant, directly by email less than a year before the March 9, 2015 reorganization, I find the knowledge-timing test satisfied to connect disclosures 1 and 2 to Venditti's action in signing the March 9, 2015 reorganization chart.  But I find no evidence that Venditti learned of the appellant's disclosure 3, namely, her August 8, 2014 email to OIG.  And I find no other persuasive basis to connect the appellant's August 8, 2014 Inspector General disclosure to Venditti's March 19, 2015 approval of the reorganization.  *Rumsey v. Department of Justice*, 120

---

7 The appellant incorrectly describes the knowledge component of the WPA knowledge/timing test to be that the agency "knew *or should have known* of her protected disclosures."  IAF, Tab 61 at 11 (emphasis added); 5 U.S.C. § 1221(e)(1) ("knew of the disclosure").  There is no such thing as negligent retaliation.

14

M.S.P.R. 259, ¶ 26 (2013) (recognizing possible relevance of "nexus" evidence beyond knowledge-timing). In sum, I find a prima facie case that Venditti engaged in whistleblower reprisal in signing the March 9, 2015 reorganization chart, based on disclosures 1 and 2, *but not 3*. 5 U.S.C. § 1221(e)(1).

Second are Deering and Grippen. I find no evidence that Deering or Grippen ever learned of disclosures 1, 2, *or* 3. Therefore, I do not find the knowledge-timing test satisfied for Deering or Grippen. But considering the appellant's claims liberally under *Rumsey*, I find a prima facie case that Deering and Grippen, in cohort with Venditti, engaged in whistleblower reprisal in signing the March 9, 2015 reorganization chart, based on disclosures 1 and 2, *but not 3*. *Id.*

Notably, Venditti, Deering, and Grippen also signed the *prior* reorganization chart in 2014: Venditti on October 7, Deering on November 24, and Grippen on December 8, 2014. IAF, Tab 44 at 50. That circumstance casts doubt on an inference of retaliation. Nonetheless, for purposes of the appellant satisfying her prima facie burden, I find disclosures 1 and 2 are presumably connected to alleged reprisal 1, her March 19, 2015 change in duties and responsibilities. The appellant's prima facie claim that her March 19, 2015 duties change (action 1) was whistleblower reprisal (for disclosures 1 and 2) is ESTABLISHED.

2. The appellant did NOT ESTABLISH that her whistleblowing was a contributing factor to the agency's November 2015 nonselection of her for Chief Nurse.

The appellant's second allegation of whistleblower reprisal was Deering's November 2015 decision to cancel a vacancy for Chief Nurse 4, where the appellant was one of four applicants. IAF, Tab 48 at 3; Tab 44 at 60-61 (automated notice to appellant that "hiring office has decided not to fill the position at this time"). I assume that Deering believed the appellant had probably

15

applied for the vacancy, although Deering testified without dispute that he never confirmed who had actually applied.  IAF, Tab 16 at 55; Tab 63 at 186-87.  The undisputed evidence shows that Deering made his decision to cancel the vacancy by November 1, 2015 at the latest, per an email Deering sent to Human Resources:

> I'm not sure who in HR to ask, but I need to close this cert with a non-selection.

> We need to have more discussion about the best way to structure this service (i.e., what sections should be in this service, where the nurse 4 should report, etc, etc) before we move toward a selection.

IAF, Tab 16 at 55-56.  The appellant has the burden to establish the existence of a personnel action, and to establish that her whistleblowing was a contributing factor to that personnel action.  5 U.S.C. § 1221(e)(1)(A)-(B).  The WPA prohibits a retaliatory failure to appoint or promote, such as the instant failure to select at issue, and I assume that the vacancy cancellation was a failed "personnel action" under WPA.  5 U.S.C. § 2302(a)(2)(A)(i)-(ii).  Nonetheless, for the below reasons, I find the appellant did not meet her burden to establish that her whistleblowing was a contributing factor to the cancellation.  I apply the knowledge-timing test first, and *Rumsey*'s factors second.

a.  The knowledge-timing test fails to establish contributing factor for the nonselection.

Beginning with the knowledge-timing test, the appellant may demonstrate that her whistleblowing was a contributing factor in the November 2015 action by satisfying the knowledge-timing test, but I find she did not satisfy the test.  5 U.S.C. § 1221(e)(1)(A).  Three of the appellant's disclosures predated Deering's November 1, 2015 nonselection, such that the disclosures could potentially have contributed to Deering's action, had Deering known about the disclosures.  *Id.;* IAF, Tab 44 at 26 (May 28, 2014 email to Venditti), 27 (July 10, 2014 email to Venditti and Lowe), 38 (August 8, 2014 email to OIG).  But the appellant did not

16

establish that Deering had any knowledge of any of the appellant's disclosures before he made his decision to cancel the vacancy in November 2015.

Regarding disclosure 1, the appellant's May 28, 2014 email to Venditti about "Urology Con[c]erns," the email was not addressed to Deering or anybody else, Deering denied ever seeing the email, and the appellant adduced no evidence that Deering ever saw or heard about the email. *Id.* at 26; Tab 63 at 196-97 (Deering). In fact, even the email's recipient, Venditti, testified credibly and without dispute that she had no recollection of the email. IAF, Tab 63 at 50 (Venditti). Further, the appellant conceded that she did not believe Venditti had any role in the November 2015 nonselection because Venditti was on an out-of-state detail at the time, which was consistent with Venditti's testimony that she was on detail in Michigan from the end of September 2015 to the end of November 2015. IAF, Tab 62 at 276 (Appellant), Tab 63 at 38 (Venditti).[8] It would then be implausible for the appellant to link her May 28, 2014 email addressed to Venditti with Deering's actions canceling the vacancy in November 2015.

Regarding disclosure 2, the appellant's July 10, 2014 email, the email was addressed to Venditti and three others (Lowe, Ritter, and Telfer), but the appellant adduced no evidence that Deering ever learned of the email, or that Venditti remembered it after the appellant sent it. IAF, Tab 44 at 27.

Regarding disclosure 3, the appellant's August 8, 2014 email to OIG, this email was not addressed to anybody but a single OIG employee, named Young, and the appellant adduced no evidence that Deering or anybody else ever learned of the email. IAF, Tab 44 at 38. Based on the above, I find the appellant did not establish a knowledge-timing nexus between her disclosures and Deering's actions in his November 2015 vacancy cancellation. Nor did the appellant

---

8 Venditti thereafter returned to Phoenix, and transferred to an agency location in El Paso, Texas, in March 2016. IAF, Tab 63 at 38.

17

establish that Deering acted at the behest of somebody else with knowledge of disclosures 1, 2, or 3.  Knowledge-timing fails.

b.  Other factors do not fill knowledge-timing's void to establish a presumption of contributing factor for the nonselection.

Beyond the knowledge-timing test, the factors described in *Rumsey* allow the Board to consider any other relevant evidence of contributing factor, including (i) the strength or weakness of the agency's reasons for taking its action, (ii) whether the whistleblowing was personally directed at the proposing or deciding officials, and (iii) whether those individuals had a desire or motive to retaliate against the appellant.  *Rumsey*, 120 M.S.P.R. 259 at ¶ 26.

i.    *Rumsey*'s factors (i) and (ii)

Regarding *Rumsey*'s factor (i), the agency's reasons for not selecting anybody for Chief Nurse, Deering testified without dispute that he had tried, earnestly but unsuccessfully, to obtain agreement from multiple stakeholders, including the Office of Nursing Services, on the question of to whom the Chief Nurse would report, and that lack of agreement on the answer to that question led Deering to indefinitely delay hiring anybody for the vacant position.  IAF, Tab 63 at 159-62 (Deering).

Regarding *Rumsey*'s factor (ii), whether the appellant's whistleblowing was directed at anyone, I recognize that the appellant identified Deering (as well as Venditti) as a subject of disclosures 1 and 3.  IAF, Tab 44 at 6 at ¶ 2; *Id.* at 38-40. However, the appellant adduced no evidence that Deering (or Venditti) would have understood that the appellant blamed them for the problems underlying those two disclosures, blunting the impact of this factor.

ii.    *Rumsey*'s factor (iii)

Regarding *Rumsey*'s factor (iii), whether Deering (or Venditti) had a desire or motive to retaliate against the appellant, the appellant contends they did, and

18

offers multiple purported items of evidence. I examine the appellant's key examples below, but find the examples insubstantial and illusory.

First, the appellant offered that at Board hearing, "[s]uspiciously, Dr. Deering testified that at the same time the decision was made not to fill the position, 'There was a lot of discussion about whistleblower reports.'" IAF, Tab 61 at 11. That is a classic case of mischaracterizing the testimony:

> A: [The delay in selection for Nurse 4] was about how that was going to report, who the [indiscernible] official should really be, and how we wanted that structured, more than who it was that applied for it.
> *Q: Isn't this the same time that the OIG investigation was going on?*
> A: Yes.
> *Q: So there was a lot of discussion about whistleblowers and who was reporting what to the OIG; is that correct?*
> A: There was a lot of discussion about whistleblower reports.
> Q: Um-hum.
> A: And we had – I had no idea who the whistleblowers were. Until today, I didn't realize that Tiffany was a whistleblower.

IAF, Tab 63 at 245. Deering answered the appellant's leading questions. Although answers to leading questions are entitled to less weight than answers to open-ended questions, there is nothing suspicious in what Deering said. IAF, Tab 61 at 11.

Second, the appellant offered that in September 2014, Deering testified before Congress about the "crisis" that had emerged at the Phoenix VA. IAF, Tab 62 at 119-20 (Appellant); Tab 63 at 187, 210-13 (Deering). From that, she sought to demonstrate Deering's motive to retaliate against her. *Id.* Deering confirmed that his hour and a half of Congressional testimony was a trying experience, in that the congressmen asked him several times why he "still" had his job. IAF, Tab 63 at 211 (Deering). But the appellant adduced no evidence that she was the reason that Congress called Deering to testify, and as I touch on below, I have no reason to assume that the appellant was the only individual who made complaints to OIG. Even if the appellant adduced such evidence of Deering blaming her for

19

having to testify before Congress, I find it implausible that Deering would then sign an organization chart in December 2014 that the appellant considered to be favorable to her – yet he did. That was a logical problem I ignored above for purposes of finding contributing factor between the appellant's disclosures to Venditti and Venditti's endorsement of the organization chart approved in December 2014; I construed the claim liberally in the appellant's favor and ignored that problem, because at least knowledge-timing was clear. But I cannot construe it as liberally when the issue is whether Deering's September 2014 Congressional testimony was a contributing factor to Deering's December 2015 cancellation of a vacancy, and knowledge-timing does not establish a contributing factor.

Third, the appellant offered that on September 24, 2015, less than two months prior to Deering's November 2015 cancellation of the recruitment, the appellant told Marian Tademy, the agency's EEO Program Manager, that "she was being retaliated against for her OIG disclosures," and that Tademy relayed her concerns to Deering. IAF, Tab 61 at 10; Tab 52 at 142-44; Tab 44 at 57. From that, she argues, Deering learned of or confirmed the appellant's whistleblowing and retaliated against her for it in November 2015. For three reasons, I am not persuaded. Reason one: the citation the appellant offers for Tademy purportedly agreeing with her assertions – and relaying the appellant's concerns to Deering – is mistaken, and actually a citation to the appellant's own testimony. *Id.* (citing appellant's testimony found at Tab 62 at 135-36). Reason two: even if I assume the full truth of the appellant's version of events with Tademy, I still find the information the appellant gave Tademy about her whistleblowing was vague, at best; and that is a matter I address in more detail below. Reason three: I find the appellant's arguments here are too logically incoherent and improbable to be worthy of any inference of contributing factor under *Rumsey*. If, as the appellant alleges to have told Tademy, the agency was already retaliating against her by September 24, 2015, then this circumstance would weaken her suggestion that

20

Deering retaliated against her for what he allegedly learned from Tademy after September 24, 2015. If, instead, the appellant meant to contend that Deering did not learn of her whistleblowing until after speaking to Tademy after September 24, 2015: (i) it must be noted that the September 24, 2015 event was not an accepted claim in this case; (ii) even if I had accepted it, I do not actually find preponderant evidence that Tademy learned – much less conveyed to Deering – anything specific about the appellant's whistleblowing; and (iii) this cuts against the appellant's previous arguments that Deering had known of the appellant's whistleblowing for a long time, and had even blamed her for having to testify before Congress a year earlier in September 2014. Any one of the above considerations might not render the purported evidence entirely irrelevant, but I find it inappropriate to presume contributing factor from the evidence before me. I do not read *Rumsey* so broadly as to warrant the bootstrapping urged by the appellant here and in the preceding paragraph.

Fourth, the appellant pointed to numerous times she participated in Phoenix VA's response to Inspector General inquiries, but she did not clearly identify those as bases of her IRA appeal at the jurisdictional phase, and I did not find that the evidence bore out any inference of OIG reprisal by the agency. For example, the appellant adduced testimony from herself and Lowe that on January 23, 2015, (i) the appellant, Lowe, and Venditti met to respond to an anonymous OIG complaint, (ii) Lowe asked the appellant if she was the source of the anonymous complaint, and (iii) the appellant denied being the source. IAF, Tab 62 at 173-74 (Appellant), 312-13, 329 (Lowe); Tab 63 at 56-57 (Venditti). The appellant has written that she was *not* the anonymous source of this OIG complaint, and she recited that writing into the Board record without disputing her prior written assertion. IAF, Tab 62 at 143-44, Tab 44 at 57. Lowe testified that he did not actually believe the appellant was the source and did not doubt her denial. IAF, Tab 62 at 329. Either way, the appellant has not shown that Lowe's question "threw shade" on the appellant and led anybody with management authority to

21

take any of the actions challenged in this appeal. Meanwhile, Venditti testified without dispute that she did not ask any such question about who the source of the complaint was, and that she was not interested in who the source was. IAF, Tab 63 at 57.

For another example of evidence showing that mere participation in responding to OIG inquiries was nothing remarkable at Phoenix VA during the time period at issue, the three key responsible management officials – Venditti, Grippen, and Deering – all testified about the breadth of OIG's inquiries. Venditti testified:

> Q: [W]ere you aware that Ms. Potter was responding to OIG requests to provide information regarding urology patients?
>
> A: I don't remember if I knew it or not, but I'll add saying that a lot of people, even myself was responding to the OIG and supplying information when they asked for it. It was – it was very common occurrence at the Phoenix VA to talk to the OIG.
>
> * * *
>
> I don't recall ever being aware of Ms. Potter having – I mean, besides the fact that the OIG asked – asked a lot of people for stuff. So she would have been asked like I was asked and the other people were asked. There would have been participation. But to actually say this email was sent or that email was sent, I didn't know about any of that until I saw the exhibits for this case.

IAF, Tab 63 at 67, 105-06 (Venditti). Grippen testified:

> Q: And do you recall anyone ever telling you that Ms. Potter had furnished information to the OIG regarding any allegations?
>
> A: Yeah. I mean, she – she was – yeah, IG was investigating multiple things and certainly, she was having interaction with the IG. But I don't recall anyone saying that she had allegedly said something that was not a normal response when it came to the management team.

*Id.* at 131 (Grippen). Deering testified:

> [B]y July, they had already launched an investigation. … And they were all over the facility, interviewing I forget how many staff. They, I think, went through a million emails, they were everywhere.
>
> * * *

22

> So I wasn't aware if Tiffany made any whistleblower type of claims
> or reports to the OIG, I was never aware of that. But I do know that,
> after the IG was the onsite and doing these investigations, they
> frequently worked with our various staff, saying, please, send me this
> copy of whatever or that list of patients or I need an update on this.
> So the IG worked with a lot of our staff across the board very
> closely.

*Id.* at 192, 197 (Deering). I find ample evidence shows that many, if not most Phoenix VA employees had some level of communication with the OIG during the timeframe at issue in this appeal. Yet it would be inappropriate to simply presume that everything under the sun that happened to any Phoenix VA employee for several years was reprisal for their OIG involvement. Instead, I find that more specific evidence is needed.

Fifth, the appellant argued that Deering's alleged retaliatory intent behind his November 2015 vacancy cancellation can be inferred from (i) alleged August 2016 efforts by Duarte to abolish the vacancy, and (ii) the fact that in spring 2017, the agency finally re-advertised the vacancy, a few weeks after the appellant announced her plan to transfer away from Phoenix. IAF, Tab 61 at 7, 15. Quite simply, I find those threads of evidence are too insubstantial and disconnected to be enough to connect any appellant disclosure to Deering's actions in canceling the vacancy in November 2015.

Based on all of the above considerations, I find that the appellant did not establish her entitlement to a statutory presumption that any whistleblowing by her was a contributing factor in Deering's November 2015 nonselection of her (or anybody else, for that matter) for Chief Nurse 4, when he cancelled the vacancy. The appellant's prima facie case that her November 2015 nonselection for Chief Nurse 4 was whistleblower reprisal (for disclosures 1, 2, and 3) is NOT ESTABLISHED.

23

3. The appellant did NOT ESTABLISH that her whistleblowing was a contributing factor to the agency's January 17, 2017 detail of her to unclassified duties.

The appellant's third allegation of whistleblower reprisal was the agency's January 10, 2017 decision detailing her to unclassified duties.  IAF, Tab 48 at 3; Tab 42 at 249 (detail memorandum).  Medical Center Director Nelson first signed the detail notice on January 3, 2017.  IAF, Tab 44 at 92-93.  On January 10, 2017, the agency generated a new version of the notice that added Shawn Bransky to the list of three recipients, dated it for January 10, and issued it to the appellant under Bransky's signature, signing for Nelson.  IAF, Tab 42 at 249-50.  The appellant signed for receipt of the January 10, 2017 version, and there is no indication that the appellant knew about the action before then.  *Id.* at 250.  The detail became effective January 17, 2017.  *Id.* at 249.

The WPA prohibits a retaliatory detail, transfer, or reassignment.  5 U.S.C. § 2302(a)(2)(A)(iv).  The appellant has the burden to establish that her whistleblowing was a contributing factor to that personnel action.  5 U.S.C. § 1221(e)(1)(A)-(B).  I find that the January 17, 2017, action was a detail contemplated by the WPA's list of personnel actions.  But based on the considerations below, I find the appellant did not meet her burden to show that her whistleblowing contributed to her detail.

First and foremost, I find that the appellant did not establish that Nelson, either by January 3 or 10, 2017, when she had the notices of the detail issued, had any knowledge of the appellant's whistleblowing before she made her decision.  To be sure, all of the appellant's alleged disclosures that I found to be protected whistleblowing – disclosures 1, 2, 3, and 5 – predated Nelson's January 3, 2017 decision to detail the appellant, such that the disclosures conceptually (though not necessarily plausibly, based on the significant passage of time) could have contributed to Nelson's action.  But in that vein, the first three disclosures – 1, 2, and 3 – all occurred in 2014, and the appellant provided no evidence that Nelson

24

learned about them, or that Nelson would have any motive to retaliate against the appellant for her years-old involvement in them. IAF, Tab 44 at 26 (disclosure 1), 27 (disclosure 2), 38 (disclosure 3). To the contrary, Nelson testified without dispute that she did not even arrive at the Phoenix VA until October 1, 2016 – more than two years after disclosures 1, 2, and 3. IAF, Tab 62 at 9 (Nelson). As for the last established disclosure, the appellant's December 1, 2016 complaint to the OIG, the appellant did not establish that Nelson knew about this complaint either. IAF, Tab 44 at 87-89. Nelson denied learning about the appellant's December 1, 2016 complaint prior to her January 3, 2017 decision to detail the appellant: "I don't recall any complaint specifically. We have a lot of OIG reports in the queue, but nothing that stands out." IAF, Tab 62 at 27 (Nelson). In the face of that, the appellant contends: "[t]he most compelling evidence that Pentad members were aware of Appellant's disclosures, is that the 'unclassified duties' detail effectively replaced Dr. Duarte as the Associate Chief of Staff … less than two months after she made disclosures implicating him in improper behavior." IAF, Tab 61 at 12. I find that nonsensical, because (i) it is bootstrapping (trying to prove knowledge by timing), and (ii) if, as the agency contends, the agency reassigned her to Duarte's post because he was doing a bad job, that would be a legitimate nonretaliatory reason. I find that knowledge-timing fails.

Beyond knowledge-timing, I have considered *Rumsey*'s factors. *Rumsey*, 120 M.S.P.R. 259 at ¶ 26. As for *Rumsey*'s factor (i), the agency's reasons for the detail, I have considered Nelson's testimony that the detail was the idea of Bransky, acting Deputy Medical Center Director, and Alyshia Smith, Associate Director, Patient Care Services. IAF, Tab 62 at 40 (Nelson); IAF, Tab 42 at 250. Both Smith and Branksy's names appear as carbon copy recipients of Nelson's January 3 and 10, 2017 versions of the detail notice. But the appellant adduced no evidence that Branksy or Smith had any knowledge of any of the appellant's established disclosures. Nelson testified without dispute that in reassigning the

25

appellant to the unclassified duties, she was displacing Duarte from most of the same duties, where Duarte had been unable to demonstrate the subject matter expertise for morning reports that Nelson highly valued and that Nelson had reason to believe the appellant had.  IAF, Tab 62 at 21-23 (Nelson).

As for *Rumsey*'s factor (ii), whether the appellant's whistleblowing was directed at anyone, and factor (iii), whether anyone had a motive to retaliate, I find no evidence to address the possibility that anybody implicated by the appellant's December 1, 2016 OIG complaint might have contributed to Nelson's January 3, 2017 decision to detail the appellant, because the appellant did not provide a copy of the actual content of her December 1, 2016 OIG complaint in this proceeding.  Nonetheless, I have considered the fact that the appellant has, previously in this appeal, identified the subject of her December 1, 2016 complaint to be "illegal practices established by Dr. Duarte between April 18, 2016 and December 1, 2016 instructing staff to deny veterans their Choice benefits of receiving timely community care for eligible veterans and other concerns regarding misconduct and Non VA Care Consult management by senior Phoenix VA officials."  IAF, Tab 48 at 2.  The only part of that passage that is not so overbroad as to be unhelpful to Board review is the appellant's naming of Duarte as a subject of her December 1, 2016 complaint.  But I find that Duarte himself was essentially as much of, if not *more* of, the "victim" of Nelson's January 2017 detail as the appellant herself, because Duarte testified without dispute that he did not learn of his displacement until on or after January 10, 2017, and because Duarte clearly indicated in his testimony that he did not consider his displacement to be "flattering" to him.  IAF, Tab 63 at 12 (Duarte). In other words: I find no evidence that Duarte contributed to the decision to detail the appellant to his duties, and I find no evidence that Duarte would have supported that detail.

For all of the foregoing considerations, I find the appellant did not establish her entitlement to a statutory presumption that any whistleblowing by

26

her was a contributing factor toward her January 2017 detail to unclassified duties.  The appellant's prima facie claim that her January 2017 detail was whistleblower reprisal (for disclosures 1, 2, 3, and 5) is NOT ESTABLISHED.

4.  The appellant did NOT ESTABLISH that her April 2017 transfer to a new, out-of-state position in California was involuntary.

The appellant's fourth allegation of whistleblower reprisal was that the agency made her working conditions intolerable and, thereby, drove her to involuntarily seek and accept a transfer to a new position at a different agency location, in California, effective April 2017.  IAF, Tab 44 at 15 (brief); Tab 46 at 4 (March 6, 2017 appellant letter notifying Nelson of her "transfer" effective April 1, 2017).  The appellant received a tentative job offer on February 8, 2017, and a confirmed job offer on March 9, 2017.  IAF, Tab 45 at 80, 83.  The appellant testified without dispute that her new position (1) was temporary and (2) entailed a loss of two steps in pay from her managerial position in Phoenix to the staff nurse position she was accepting.  IAF, Tab 62 at 201-02 (Appellant).

The threshold issue for the appellant's fourth allegation of whistleblower reprisal is whether her transfer to California was involuntary, because a voluntary transfer is not reviewable in an IRA appeal or any other Board appeal.  *Cf. Heining v. General Services Administration*, 61 M.S.P.R. 539, 551-54 (1994).  The WPA protects employees from retaliatory reductions in pay, reassignments and removals, as well as their constructive equivalents, if the action was voluntary on its face but allegedly involuntary due to, *inter alia*, intolerable working conditions, as the appellant alleges here.  *Id.;* 5 U.S.C. § 2302(a)(2)(A)(iii)-(iv).  I apprised the appellant of her burden to establish the involuntariness of her transfer with preponderant evidence.  IAF, Tab 26 at 6.

The concept of intolerable working conditions is a concept that covers conditions that were, under the totality of the circumstances, made so difficult that a reasonable person in his position would have felt compelled to resign.

27

*Brown v. U.S. Postal Service*, 115 M.S.P.R. 609, ¶ 10 (2011). The related concept of coerced resignation involves an agency, through improper acts, effectively imposing the terms of resignation and giving the employee no realistic alternative but to resign. *Id.* But dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are generally not so intolerable as to compel a reasonable person to resign. *Miller v. Department of Defense*, 85 M.S.P.R. 310, ¶ 32 (2000).

Quite simply, I do not find that the appellant has shown that she suffered anything more than dissatisfaction with work assignment, a feeling of being unfairly criticized, and working conditions that she found difficult or unpleasant. Nor – critically to the equation – do I find that the agency did anything retaliatory or otherwise improperly motivated to cause the appellant's stress. *Brown* at ¶ 10. Deering testified without dispute that the Phoenix VA was dealing with a patient care crisis beginning in 2014. IAF, Tab 63 at 155. Some higher-level management resigned, while others were investigated and later fired. *Id.* I do not doubt that the pressure put on the appellant as a manager during this time, and leading up to her March 2017 decision to transfer to California, was significant. But I cannot find that the pressure rose to the level of being involuntary, or otherwise was retaliatory.

In conclusion for this issue, I find no prima facie case of the personnel action alleged. The appellant's prima facie claim that her April 2017 transfer was involuntary is NOT ESTABLISHED.

E.  For the single claim where the burden passed to the agency (the March 2015 duties change), the agency MET its burden to establish that it would have taken the same action in the absence of the appellant's whistleblowing.

Because the appellant established a prima facie case of whistleblower reprisal, linking disclosures 1 and 2 to the agency's March 19, 2015 change to her duties, the burden shifts to the agency to establish by clear and convincing

28

evidence that it would have taken the same action in the absence of those disclosures.    5 U.S.C. § 1221(e)(2); 5 C.F.R. § 1209.2(e)(2).    Clear and convincing evidence – that measure or degree of proof that produces in the mind of the trier of fact a firm belief as to the allegations sought to be established – is a higher standard than the "preponderance of the evidence" standard.    5 C.F.R. § 1209.4(e); 5 C.F.R. § 1201.4(q).    Evidence only clearly and convincingly supports a conclusion when it does so in the aggregate considering all the pertinent evidence in the record, and despite the evidence that fairly detracts from that conclusion.    *Whitmore v. Department of Labor*, 680 F.3d 1353, 1368 (2012). In determining whether an agency has shown by clear and convincing evidence that it would have taken the same personnel action in the absence of whistleblowing, the Board will consider the following factors: (1) the strength of the agency's evidence in support of its action; (2) the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and (3) any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated. *Carr v. Social Security Administration*, 185 F.3d 1318, 1323 (Fed. Cir. 1999) ("*Carr* factors").

 1.  *Carr* Factor 1, Agency Reasons

    Regarding *Carr* factor 1, strength of the agency's evidence for its action, I find the single most compelling item of evidence is this: the individuals the appellant accuses of retaliating against her on March 19, 2015 are the very same individuals responsible for the December 8, 2014 organization chart and title she preferred and wished had not been changed on March 19, 2015.  IAF, Tab 44 at 26-27.  Venditti had already received the appellant's two disclosures on May 28 and July 10, 2014, and yet that did not prevent Venditti, on October 7, 2014, from signing the organization chart with the title the appellant preferred.  The appellant has produced no evidence of what would lead Venditti, (much less Deering or

29

Grippen), to change her mind about the appellant's May 28 and July 10, 2014 emails – which Venditti had likely already forgotten anyway. I find it inherently implausible that, if Venditti or anyone else were upset with the appellant for her May 28 and July 10, 2014 disclosures, their animus would manifest itself on March 19, 2015, but not in nearly identical, earlier circumstances in December 2014. In other words: although timing considerations were the primary basis by which the appellant satisfied the knowledge-timing test, *other* timing considerations are the primary basis by which the agency established that it would have taken the same action regardless of the appellant's whistleblowing.

Beyond timing considerations, I find that the agency also had strong reasons for conducting its March 19, 2015 reorganization. Where a personnel action is not disciplinary in nature, the Board considers the broader question of whether the agency had legitimate reasons for its action. *Carr*, 185 F.3d at 1323; *Azbill v. Department of Homeland Security*, 105 M.S.P.R. 363, ¶ 18 (2007); *Gonzales v. Department of the Navy*, 101 M.S.P.R. 248, ¶ 12 (2006). Grippen testified without dispute that he came out of retirement in November 2014 to become the interim director of Phoenix VA, because the Phoenix VA experiencing numerous workload problems, but the permanent Phoenix VA director was on administrative leave. IAF, Tab 63 at 120. Grippen testified that "shortly after" seeing the first organization chart, he "start[ed] working on looking at a reorganization that would implement change quicker and as fast as possible." *Id.* at 122. Grippen also testified:

> A: [W]e did multiple draft org charts. … We were trying to implement as much change as possible and looking at restructuring the leadership team and so forth.
>
> * * *
>
> Q: During your time as the director [through November 2015], how many reorganizations did you go through?
>
> A.: Not as many as I would have liked.

30

*Id.* at 123, 142.    Grippen testified that he favored the March 19, 2015's organization chart's inclusion of a co-equal Chief Nurse 4 and a co-equal physician at the top of the chart, because he had used such a model successfully in Muilwaukee.  *Id.* at 124.  But Grippen testified that the Chief Nurse position "would have needed to [have] been competitively announced," and that nobody was performing the duties of "Chief Nurse" prior to the organization chart – or evidently after that either, because of problems Grippen and Deering discussed with the model regarding to whom the Nurse 4 would report, since traditionally nurses report to physicians, but the change would make nurses and physicians "full equals."  *Id.* at 143-44, 148.  I found no reason to doubt Grippen's testimony about these matters.

Deering testified that although the appellant on the December 8, 2014 organization chart was recognized as a "Chief Nurse Manager," this was the result of trying to recognize the appellant's work, but was rebuffed:

> Nurse IV's are hard to get.  They have to go to Nursing Board to get approved.  They can't be approved by us.  So I – what I recall in this process was that we were trying to get Tiffany some recognition for her work.  We couldn't get a Nurse IV, we kept getting told no.  We created this title of chief, as I recall it, chief nurse manager, so at least we could, you know, have that reflected that she's helping manage this area and then ultimately we're told that a chief nurse manager title really is a Nurse IV, basically.  It does – that title, I think, doesn't technically exist in the nursing world, if I recall right, in the VA.  And that's why we had to get rid of that title and then go for the Nurse IV again.
>
> * * *
>
> A large part of why we created this chief nurse manager title was to support her.  She repeatedly came to us saying, she didn't feel like she's being recognized with the work that she's doing, with the appropriate title, and we were trying to create something to make her role supported and that she was in a role that – and a title that reflected what she was doing.

31

IAF, Tab 63 at 159, 172, 207.  I found Deering to be quite credible, consistent in his testimony, and sincere, even in the face of difficult questioning by the appellant.  *Id.* at 213.

Venditti testified without dispute that she understood Grippen to have sent out the March 19, 2015 reorganization chart for comments and received 40 comments, as well as an "okay" from the union.  *Id.* at 43.   Venditti acknowledged that management nonetheless received complaints about the chart from "Tiffany and the nurses," and that Venditti responded by calling for another meeting to take more feedback.  *Id.* at 43-44.  But Venditti also testified, consistently with Deering, that management had originally given the appellant the title of Chief Nurse Manager to try to recognize her work, but was rebuffed:

> Marva Green and Dar[ren] Deering popped into my office.  And they wanted to be refreshed how this chief nurse position got in.  And I restated that it was trying to get Tiffany recognition for being the senior nurse manager and for doing the stuff she had done, because we had been blocked at every avenue on getting a chief nurse position.  And then Marva said, well, let me see the org chart.  So I showed her the org chart, and she said nursing didn't sign off on that; we don't agree with it.  And that was the same time that they had taken the nurse IVs and had changed their title to chief.  And so Marva said it would be confusing to have a nurse III as a chief and have nurse IV as a chief, that I had to do away with the title.

*Id.* at 45-46.   I found Venditti to be calm and consistent in her testimony, and observing Venditti – as well Deering testify – I found it difficult to doubt the sincerity of their testimony, which was overwhelmingly positive despite being in the face of accusations against them.  Having considered the three key witnesses testify about what led to the March 19, 2015 reorganization, I find the agency's specific reasons for the actions it took were strong.

*Carr* factor 1 weighs heavily in the agency's favor.

2.  *Carr* Factor 2, Motive, and Factor 3, Similarly Situated Individuals

Regarding *Carr* factor 2, existence of motive to retaliate, I find the agency's motives to retaliate against the appellant for her 2014 disclosures were

32

negligible at best.  *Carr*, 185 F.3d at 1323.  I find Venditti, as the recipient of the appellant's May 28 and July 10, 2014 emails and the only one shown to have seen the emails, had the *most* motive to retaliate.  IAF, Tab 44 at 26-27.  But when Venditti testified that she did not even remember those emails, I found no reason to disbelieve her.  IAF, Tab 63 at 50.  I realize that such lack of memory by Venditti *today* does not mean Venditti had no memory of it in the months leading up to her March 19, 2015 signature on the organization chart.  But even assuming that Venditti remembered the appellant's emails in the months leading up to her March 19, 2015 approval of the reorganization, I still see little motive for Venditti to have retaliated against the appellant for her emails.  *Carr* factor 2 weighs only negligibly in the appellant's favor.

Regarding *Carr* factor 3, evidence that other individuals who did not blow the whistle were treated similarly, I find no evidence that specifically addresses this factor.  But I do not find it likely that there *would* be such comparators, given the unique stature the appellant had on the organization chart – both the December 8, 2014 version, as well as the March 19, 2015 version.  I find *Carr* factor 3 is neutral for this case.

In sum, I find that the *Carr* factors for which there is evidence lean overwhelmingly in the agency's direction, and that the agency thus met its burden to prove by clear and convincing evidence that it would have changed the appellant's duties on March 19, 2015, even if she had never blown the whistle.  5 U.S.C. § 1221(e)(2).  Thus, I must deny corrective action for the duties change.

## F.  Conclusion

Having reviewed all claims of the appellant, but finding no prima facie cases of whistleblower reprisal for which the agency did not meet its burden of defense, I must deny the appellant's request for corrective action in its entirety.  5 U.S.C. § 1221(e)(1)-(2).

Decision

33

The appellant's request for corrective action is DENIED.


FOR THE BOARD:                    _____/S/_____
                                  David S. Brooks
                                  Administrative Judge

## NOTICE TO APPELLANT

This initial decision will become final on **January 17, 2019**, unless a petition for review is filed by that date.  This is an important date because it is usually the last day on which you can file a petition for review with the Board.  However, if you prove that you received this initial decision more than 5 days after the date of issuance, you may file a petition for review within 30 days after the date you actually receive the initial decision.  If you are represented, the 30-day period begins to run upon either your receipt of the initial decision or its receipt by your representative, whichever comes first.  You must establish the date on which you or your representative received it. The date on which the initial decision becomes final also controls when you can file a petition for review with one of the authorities discussed in the "Notice of Appeal Rights" section, below. The paragraphs that follow tell you how and when to file with the Board or one of those authorities. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

BOARD REVIEW

You may request Board review of this initial decision by filing a petition for review.

If the other party has already filed a timely petition for review, you may file a cross petition for review.  Your petition or cross petition for review must state your objections to the initial decision, supported by references to applicable laws, regulations, and the record.  You must file it with:

The Clerk of the Board
Merit Systems Protection Board

34

1615 M Street, NW.
Washington, DC 20419

A petition or cross petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing. A petition submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and may only be accomplished at the Board's eAppeal website (https://eappeal.mspb.gov).

NOTICE OF LACK OF QUORUM

The Merit Systems Protection Board ordinarily is composed of three members, 5 U.S.C. § 1201, but currently only one member is in place. Because a majority vote of the Board is required to decide a case, *see* 5 C.F.R. § 1200.3(a), (e), the Board is unable to issue decisions on petitions for review filed with it at this time. *See* 5 U.S.C. § 1203. Thus, while parties may continue to file petitions for review during this period, no decisions will be issued until at least one additional member is appointed by the President and confirmed by the Senate. The lack of a quorum does not serve to extend the time limit for filing a petition or cross petition. Any party who files such a petition must comply with the time limits specified herein.

For alternative review options, please consult the section below titled "Notice of Appeal Rights," which sets forth other review options.

### **Criteria for Granting a Petition or Cross Petition for Review**

Pursuant to 5 C.F.R. § 1201.115, the Board normally will consider only issues raised in a timely filed petition or cross petition for review. Situations in which the Board may grant a petition or cross petition for review include, but are not limited to, a showing that:

(a) The initial decision contains erroneous findings of material fact. (1) Any alleged factual error must be material, meaning of sufficient weight to warrant an outcome different from that of the initial decision. (2) A petitioner

who alleges that the judge made erroneous findings of material fact must explain why the challenged factual determination is incorrect and identify specific evidence in the record that demonstrates the error. In reviewing a claim of an erroneous finding of fact, the Board will give deference to an administrative judge's credibility determinations when they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing.

(b) The initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case. The petitioner must explain how the error affected the outcome of the case.

(c) The judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case.

(d) New and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. To constitute new evidence, the information contained in the documents, not just the documents themselves, must have been unavailable despite due diligence when the record closed.

As stated in 5 C.F.R. § 1201.114(h), a petition for review, a cross petition for review, or a response to a petition for review, whether computer generated, typed, or handwritten, is limited to 30 pages or 7500 words, whichever is less. A reply to a response to a petition for review is limited to 15 pages or 3750 words, whichever is less. Computer generated and typed pleadings must use no less than 12 point typeface and 1-inch margins and must be double spaced and only use one side of a page. The length limitation is exclusive of any table of contents, table of authorities, attachments, and certificate of service. A request for leave to file a pleading that exceeds the limitations prescribed in this paragraph must be received by the Clerk of the Board at least 3 days before the filing deadline. Such requests must give the reasons for a waiver as well as the desired length of the pleading and are granted only in exceptional circumstances. The page and word

limits set forth above are maximum limits. Parties are not expected or required to submit pleadings of the maximum length. Typically, a well-written petition for review is between 5 and 10 pages long.

If you file a petition or cross petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record. A petition for review must be filed with the Clerk of the Board no later than the date this initial decision becomes final, or if this initial decision is received by you or your representative more than 5 days after the date of issuance, 30 days after the date you or your representative actually received the initial decision, whichever was first. If you claim that you and your representative both received this decision more than 5 days after its issuance, you have the burden to prove to the Board the earlier date of receipt. You must also show that any delay in receiving the initial decision was not due to the deliberate evasion of receipt. You may meet your burden by filing evidence and argument, sworn or under penalty of perjury (*see* 5 C.F.R. Part 1201, Appendix 4) to support your claim. The date of filing by mail is determined by the postmark date. The date of filing by fax or by electronic filing is the date of submission. The date of filing by personal delivery is the date on which the Board receives the document. The date of filing by commercial delivery is the date the document was delivered to the commercial delivery service. Your petition may be rejected and returned to you if you fail to provide a statement of how you served your petition on the other party. *See* 5 C.F.R. § 1201.4(j). If the petition is filed electronically, the online process itself will serve the petition on other e-filers. *See* 5 C.F.R. § 1201.14(j)(1).

A cross petition for review must be filed within 25 days after the date of service of the petition for review.

37

## NOTICE TO AGENCY/INTERVENOR

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.

notice OF APPEAL rights

You may obtain review of this initial decision only after it becomes final, as explained in the "Notice to Appellant" section above.  5 U.S.C. § 7703(a)(1).  By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file.  5 U.S.C. § 7703(b).  Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction.  If you wish to seek review of this decision when it becomes final, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements.  Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case.  If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

**(1) Judicial review in general**.  As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be received by the court within **60 calendar days** of the date this decision becomes final.  5 U.S.C. § 7703(b)(1)(A).

38

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

**(2) Judicial or EEOC review of cases involving a claim of discrimination**. This option applies to you only if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination. If so, you may obtain judicial review of this decision—including a disposition of your discrimination claims—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** after this decision becomes final under the rules set out in the Notice to Appellant section, above. 5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. ____ , 137 S. Ct. 1975 (2017). If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a courtappointed lawyer and

39

to waiver of any requirement of prepayment of fees, costs, or other security.  *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of your discrimination claims only, excluding all other issues.  5 U.S.C. § 7702(b)(1).  You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** after this decision becomes final as explained above.  5 U.S.C. § 7702(b)(1).

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

<div align="center">

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C.  20013

</div>

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

<div align="center">

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C.  20507

</div>

**(3) Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012**.  This option applies to you only if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D).  If so, and you wish to challenge the Board's rulings on your whistleblower claims only, excluding all other issues, then you may file a petition for judicial review with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.  The court of appeals must receive your petition for

review within **60 days** of the date this decision becomes final under the rules set out in the Notice to Appellant section, above.  5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx

# United States Court of Appeals for the Federal Circuit

———————————

**TIFFANY POTTER,**
*Petitioner*

**v.**

**DEPARTMENT OF VETERANS AFFAIRS,**
*Respondent*

———————————

2019-1541

———————————

Petition for review of the Merit Systems Protection Board in No. DE-1221-18-0165-W-1.

———————————

Decided: February 13, 2020

———————————

A. MARQUES PITRE, Pitre & Associates, LLC, Washington, DC, argued for petitioner.

AMANDA TANTUM, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent. Also represented by JOSEPH H. HUNT, CLAUDIA BURKE, ROBERT EDWARD KIRSCHMAN, JR.

———————————

Before PROST, *Chief Judge*, MOORE and HUGHES, *Circuit Judges*.

The administrative judge also determined that the Board had jurisdiction over four alleged reprisals by the Phoenix DVA: (1) the March 2015 title change from Chief Nurse to Nurse Manager; (2) the November 2015 failure to hire a Chief Nurse IV; (3) the January 2017 unclassified duties detail; and (4) the March 2017 "involuntary resignation."

Following a hearing on the merits, the administrative judge concluded that Ms. Potter had established that four of the five alleged whistleblowing disclosures and activities, i.e., all disclosures except the August 20, 2014 cooperation with OIG, constituted "protected" disclosures within 5 U.S.C. § 2302(b)(8) and § 2302(b)(9). *Potter v. Dep't of Veterans Affairs*, No. DE-1221-18-0165-W-1, slip op. at 6–11 (M.S.B.P. Dec. 13, 2018) ("*Decision*"). The administrative judge then determined that according to the knowledge-timing test of 5 U.S.C. § 1221(e)(1), Ms. Potter had only met her burden of showing that these protected disclosures contributed to the first alleged reprisal, i.e., the March 2015 title change. *Id*. at 10–27. In other words, the administrative judge found that Ms. Potter had shown only one prima facie case of whistleblower reprisal. The administrative judge ultimately denied corrective action for this prima facie case because the government met its burden to show that the Phoenix DVA would have taken the same action even if Ms. Potter had not made the protected disclosures. *Id*. at 27–32.

---

not proper for this court to review that jurisdictional order in the first instance on appeal. *See, e.g.*, *Wallace v. Dep't of the Air Force*, 879 F.2d 829, 832 (Fed. Cir. 1989) ("[O]bjections to the proceedings of an administrative agency [must] be made while it has an opportunity for correction in order to raise issues reviewable by the courts.").

The administrative judge's initial decision became the final decision of the Board. Ms. Potter now petitions for review. We have jurisdiction under 28 U.S.C. § 1295(a)(9).

## III

On review to this court, a final decision of the Board will be set aside only if the decision is: "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c).

## A

Ms. Potter first challenges the administrative judge's conclusion that she did not establish a prima facie case of whistleblower reprisal with respect to the agency's November 2015 failure to hire a Chief Nurse IV. On appeal, the parties agree that the administrative judge's fact finding related to this alleged reprisal is not supported by substantial evidence. More particularly, the parties agree that the administrative judge incorrectly found that Dr. Deering did not have knowledge of Ms. Potter's second protected disclosure, i.e., her July 10, 2014 email. *See Decision*, at 15–16; *see* Petitioner's Br. 20; Respondent's Br. 38–39. The administrative judge relied on this erroneous fact finding in determining that Ms. Potter had not satisfied the knowledge-timing test under 5 U.S.C. § 1221(e)(1) for the November 2015 failure to hire. *See Decision*, at 15–16. Therefore, the administrative judge concluded that Ms. Potter had failed to establish a prima facie case of whistleblowing reprisal for the November 2015 failure to hire. *Id.* at 14–22.

Because we agree with the parties that the record clearly shows that Dr. Deering not only had knowledge of Ms. Potter's email, but also that he responded to it, J.A. 238–42; *see also Decision*, at 8, we determine that the administrative judge's fact finding is not supported by

substantial evidence.  We therefore vacate the administra-
tive judge's determination that Ms. Potter did not make a
prima facie case that her whistleblowing was a contrib-
uting factor to the agency's November 2015 nonselection of
her for Chief Nurse IV and remand to the Board.

On remand, the Board should consider whether, in
view of Dr. Deering's knowledge of Ms. Potter's July 10,
2014 email, Ms. Potter presented evidence sufficient to sat-
isfy the knowledge-timing test, or if Ms. Potter otherwise
presented evidence sufficient to demonstrate a prima facie
case of whistleblower reprisal.  *See* 5 U.S.C. § 1221(e)(1).  If
the Board finds such a prima facie case, then the Board
should additionally consider whether the government can
meet its burden of showing that it would have taken the
same November 2015 personnel action regardless of
Ms. Potter's protected disclosure.  *See* 5 U.S.C. § 1221(e)(1);
*see also Carr v. Soc. Sec. Admin.*, 185 F.3d 1318, 1323 (Fed.
Cir. 1999).

Despite agreeing that the administrative judge erred
in analyzing Dr. Deering's knowledge of the July 10, 2014
email, the government argues that remand is not required.
The government concedes that when the record is properly
considered, Ms. Potter has "likely" established a prima fa-
cie case.  Respondent's Br. 38–39.  The government then
urges us to find in the first instance, that even if Ms. Potter
has established a prima facie case, the agency would have
nevertheless taken the November 2015 personnel action
regardless of Ms. Potter's protected disclosure.  *Id.* 37–42.
We decline to engage in such fact finding on appeal.

The government argues that our decision in *McCarthy
v. Merit Systems Protection Board*, 809 F.3d 1365 (Fed. Cir.
2016), permits us to rely on the administrative judge's fact
finding to resolve this appeal.  *See* Respondent's Br. 40.
More particularly, the government quotes *McCarthy*'s
statement that this court may "affirm the agency on
grounds other than those relied upon in rendering its

UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD
DENVER FIELD OFFICE

| | | |
|---|---|---|
| TIFFANY POTTER, | ) | |
|     Appellant | ) | |
| | ) | DOCKET NUMBER |
| v. | ) | DE-1221-18-0165-W-1 |
| | ) | |
| DEPARTMENT OF VETERANS | ) | Administrative Judge David Brooks |
|   AFFAIRS, | ) | |
|     Agency | ) | Date:  November 14, 2018 |
| _____ | ) | |

## THE AGENCY'S CLOSING BRIEF

In this appeal, Appellant Tiffany Potter ("Potter") alleges that she engaged in protected disclosures and/or OIG cooperation on five separate occasions: 1) Potter's May 28, 2014 report to her supervisor Dr. Robbi Venditti ("Dr. Venditti") regarding cancellations of appointments and other issues involving urology patients; 2) Potter's July 10, 2014 report to OIG of a waitlist involving patients seeking psychotherapy treatment; 3) Potter's August 8, 2014 report to OIG that certain providers had turned their alerts off; 4) Potter's August 20, 2014 cooperation with OIG regarding the urology patients described in #1, above; and 5) Potter's December 1, 2016 report to OIG that Dr. Carlos Duarte was improperly denying veterans their benefits and other allegations of misconduct/mismanagement related to care in the community between April 18, 2018 and December 1, 2018. [*See* **T48.2**].

The Board has accepted jurisdiction over the following non-frivolous personnel actions based on the above-referenced protected disclosures/activity: 1) Potter's purported demotion from Chief Nurse Manager to Nurse Manager on or about March 14, 2015; 2) the Agency's cancellation of a Chief Nurse IV recruitment with a non-selection on or about November 5, 2015; 3) The Agency's placement of Potter in an unclassified detail on or about January 17, 2017; and 4) Potter's contention that her transfer to a VA facility in Northern California (without any break in service) was involuntary and constituted a forced or constructive transfer or resignation. [**T.48.3**].

## LEGAL STANDARDS

An IRA appellant establishes a *prima facie* case by demonstrating—by a preponderance of the evidence, i.e., the degree of relevant evidence that a reasonable person would accept as sufficient to find a contested fact is more likely to be true than untrue—that (1) she made a

protected disclosure[1], and (2) the disclosure was a "contributing factor" in the agency's decision to take the personnel action. 5 U.S.C. § 1221(e); 5 C.F.R. §§ 1209.4(c), 1209.7; *see also Yunus v. Dept. of Veterans Affairs*, 242 F.3d 1367, 1371 (Fed. Cir. 2001).  An appellant can establish that a protected disclosure/activity was a contributing factor in a personnel practice via circumstantial evidence, *i.e.,* the official taking the personnel action knew of the protected disclosure, and the personnel action was temporally correlated with the disclosure. 5 U.S.C. § 1221(e). But even if an appellant makes this *prima facie* showing, the Board will not order corrective action if the agency shows—by clear and convincing evidence, i.e., a higher standard than preponderance of the evidence[2]—that it would have taken the personnel action in the absence of the petitioner's whistleblowing. *Id.;* 5 C.F.R. § 1209.7(b); *Fellhoelter v. Dep't of Agriculture*, 568 F.3d 965, 970-71 (Fed. Cir. 2009).

In evaluating whether the Agency has met its burden of establishing by clear and convincing evidence that it would have taken the personnel action anyway, the Board will analyze: "[1] the strength of the agency's evidence in support of its personnel action; [2] the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and [3] any evidence that the agency takes similar actions against employees who are not whistle blowers but who are otherwise similarly situated." *Carr v. Soc. Security Admin.,* 185 F.3d 1318, 1323 (Fed. Cir. 1999).

### A. Potter's Change in Job Title And Certain Duties in March 2015 Occurred As Part of an Organizational Restructuring And Potter Was Never Demoted.

On appeal, Potter asserts that she was demoted in March 2015 because of her whistleblower disclosures and OIG cooperation in 2014**.** *See* Whistleblower Disclosures #'s 1 through 4, *supra*. Specifically, according to Potter, her "demotion" in reflected on an organizational chart that was signed by the upper-level management of the Phoenix VA Health Care System ("PVAHCS") on

---

[1] Protected whistleblowing occurs when an appellant makes a disclosure that he/she reasonably believes evidences a violation of law, rule, or regulation, gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial orspecific danger to public health and safety. *See* 5 U.S.C. § 2302(b)(8)(A); *Chambers v. Department of the Interior*, 515 F.3d 1362, 1367 (Fed. Cir. 2008).The proper test for determining whether an employee had a reasonable belief that his/her disclosures were protected is whether a disinterested observer with knowledge of the essential facts known to, and readily ascertainable by, the employee could reasonably conclude that the actions evidenced one of the categories of wrongdoing listed in 5 U.S.C. § 2302(b)(8)(A). *See Lachance v. White*, 174 F.3d 1378, 1381 (Fed. Cir. 1999), *cert. denied*, 528 U.S. 1153(2000).

[2] Clear and convincing evidence is that measure or degree of proof that produces in the mind of the trier of fact a firm belief as to the allegations sought to be established. 5 C.F.R. § 1209.4(e).

2

March 19, 2015 **[T16.66].** Potter also contends that there was a significant reduction in her job duties at this time, and that unspecified co-workers allegedly believed Potter had been demoted in March 2015.

          1.   <u>Potter's Change in Job Title</u>.

        To start, it is undisputed that Potter's job title on her SF-50's ("RN, MGR/HEAD NURSE") did not change at any time from May 2014 until her transfer to Northern California in April 2017. **[T42.211, 42.220-248; HT (Potter) at p. 237].** Additionally, Potter did not experience **any reduction** in Grade, Steps, or pay at any time while she worked at PVAHCS **[Id.]**. Potter's argument that she was demoted is almost entirely predicated on a well-meaning gesture by Dr. Venditti and Dr. Deering to give Potter the job title of "Chief Nurse Manager" for approximately 4 months between December 2014 and March 2015.

        On or about December 14, 2014, Dr. Venditti, Chief of Staff Darren Deering ("Dr. Deering"), Interim Medical Center Director Glen Grippen ("Grippen") (and others) signed an Organizational ("Org.") Chart in which Potter's position was designated for the first time with the working title of "Chief Nurse Manager" instead of Nurse Manager. **[T16.77;** *cf.* **T16.92; HT (Venditti) p. 29-30]**. It is important to note that this purportedly beneficial change in Potter's working job title (without any change to her Grade, Steps, or job title in her SF-50) occurred **after** Potter's whistleblower disclosures/cooperation in May, July, and August of 2014 **[T16.92; T16.77; T16.66].**

        Dr.'s Venditti and Deering testified that Potter desired and was given the title Chief Nurse Manager in recognition of the hard work and leadership that she had in purchased care at that time, and the fact that the nursing service had not allowed the creation of a Chief Nurse IV position in purchased care because it lacked sufficient complexity. **[HT (Venditti) at p. 33-34, 42; HT (Deering) at p. 169, 2015-06; HT (Potter) at p. 253]**.

        Dr. Venditti testified that around this same time (late-2014/early 2015), all Nurse IV positions in Phoenix began using the "Chief Nurse." **[HT (Venditti) at p. 42-43, 63;** *see also*, **T15.152, 155, 156-57].** When Nursing leadership found out that Potter was using the job title "Chief" it believed that her use of "Chief" in her job title as a Nurse III created confusion. **[Id.; HT (Grippen) at p. 142-43; HT (Venditti) at p. 42].** Additionally, a Nurse Manager could not report directly to another Nurse Manager and as part of the reorganization, and Potter (among others) believed that it was more beneficial for the service two have two nurse managers instead of a single nurse manger (Potter) and an RN who was a direct report of that nurse manager. **[HT**

**at p. 41-42].** In short, given the foregoing, Potter no longer was allowed to use the title of "Chief Nurse Manager[3] following March 19, 2015 reorganization (discussed below).

2. The March 19, 2015 Reorganization and the Change in Potter's Duties.

After Grippen began working interim director in Phoenix on November 17, 2014, he sought to reorganize the Phoenix VA Medical System. **[HT (Grippen) at p. 117-119].** Because of issues with the waitlist crisis and delays in patient care, the Administrative Medicine Service and its purchased care functions were given a high priority in these reorganization efforts. **[Id.].** Dr. Venditti, Dr. Deering and Grippen testified that there was a lot of growth occurring in purchased care due to the Phoenix wait list crisis that had garnered national attention, and there were ongoing efforts to organize this department in a manner that would optimize its operations. **[HT (Venditti) at p. 28, 36, 46; HT (Deering) at p. 152-153, 153; HT (Grippen) at p. 119-121]**.

On March 19, 2015, a new org chart was issued, in which Potter was made the "Nurse Manager "of "Utilization Review" and the Nurse Manager that previously reported to Potter on the December 14, 2014 Org Chart **[T16.77; T44.51]** (Melissa Pacheco), was now in charge of "NVCC Consults/Veterans Choice Coordination," reported to Deputy Associate Chief of Staff ("ACOS"), Chief Physician (i.e. Dr. Venditti) and not Potter as an RN. Dr.'s Deering and Venditti testified that the reason two nurse managers were created was to split the workload. **[HT (Deering) at p. 165-66; HT (Venditti) at p. 45].** It is important to note that Potter testified that her actual job duties did not change following the March 2015 re-organization, because Potter and Melissa Pacheco continued to operate in the same manner and perform the same job duties that they performed prior to the reorganization. **[HT (Potter) at p. 251; see also, T51.21-24; HT (Venditti) at p. 45-46, 88].** Deering testified that he recalled Potter expressing the feeling that she had been demoted, but that was never the intent of this organizational restructuring, and that was the "opposite" of what he intended. **[HT (Deering) at p.168].** Deering was also open minded to Potter's concerns about her job title and the fact that Potter believed she was not being properly valued in the organization. **[See T52 generally; p. 11].** It is also undisputed that Deering and Grippen met with Potter on multiple occasions in 2015 to discuss her concerns about the re-

---

[3] Potter identifies Greg Crenshaw as a possible comparator who was allowed to keep Chief in his job title. Crenshaw was not an RN, and therefore his use of the title "Chief" did not create the same confusion (or opposition from the nursing service) that occurred with Potter's title of "Chief Nurse Manager." **[HT (Deering) at p. 166, 219-20].**

4