## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

TIFFANY M. POTTER,

Petitioner

v.

DEPARTMENT OF VETERANS AFFAIRS,

Respondent

**Petition for Review from The Merit Systems Protection Board
Case No. DE-1221-18-0165-M-1
Initial Decision of David S. Brooks, Administrative Judge**

## PETITIONER'S SECOND CORRECTED OPENING BRIEF

A. MARQUES PITRE
PITRE & ASSOCIATES, LLC
Ronald Reagan Building and
International Trade Center
1300 Pennsylvania Avenue, N.W.
Suite 700
Washington, D.C. 20004
 (202) 204-3006
ampitre@ampitreassociates.com

*Attorney for Petitioner*

June 3, 2021

**CERTIFICATE OF INTEREST**

Counsel for Petitioner, Tiffany M. Potter, certifies the following:

1. The full name of every party represented by me is:

   Tiffany M. Potter.

2. The names of the real parties in interest, if different from the parties named above, are:

   N/A.

3. The names of all parent corporations and any publicly held companies that own 10% or more of the stock of the party represented by me are:

   N/A.

4. The names of all law firms and the partners and associates that appeared for Petitioner in the trial court or agency or are expected to appear in this court are:

   N/A.

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

   N/A.

6. The names of all organizational victims in criminal cases and debtors and trustees in bankruptcy cases are:

N/A.

Date: <u>June 3, 2021</u>                              Respectfully submitted,


                                                        /s/ A. Marques Pitre
                                                        _____
                                                        A. MARQUES PITRE
                                                        Pitre & Associates, LLC
                                                        Ronald Reagan Building and
                                                        International Trade Center
                                                        1300 Pennsylvania Avenue, N.W., Suite 700
                                                        Washington, DC 20004
                                                        Phone: 202-204-3006
                                                        Direct: 202-840-6797
                                                        Email: ampitre@ampitreassociates.com

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST .................................................................. ii

TABLE OF CONTENTS ....................................................................... iv

TABLE OF AUTHORITIES ................................................................... v

STATEMENT OF RELATED CASES ..................................................... vi

JURISDICTIONAL STATEMENT ........................................................ vi

STATEMENT OF THE ISSUES ........................................................ viii

STATEMENT OF THE CASE .............................................................. 1

SUMMARY OF THE ARGUMENT ..................................................... 10

ARGUMENT..................................................................................... 11

   A.Legal Standard.............................................................................. 11

   B.The Board's Final Decision is Unsupported by Substantial Evidence......... 11

   C.The Board's Final Decision is Based on an Abuse of Discretion or is Otherwise not in Accord with the Law ....................................................... 17

CONCLUSION ................................................................................ 31

ADDENDUM ................................................................................... 35

# TABLE OF AUTHORITIES

**CASES**

*Carr v. Soc. Sec. Admin.*, 185 F.3d 1318 (Fed. Cir. 1999) ..................................... 18

*Chambers v. Dep't of the Interior*, 116 M.S.P.R. 24 (2011) .................................. 28

*Colorado v. New Mexico*, 467 U.S. 310 (1983) ..................................................... 13

*Costin v. Dep't of Health and Human Serv.*, 72 M.S.P.R. 525 (1996).................. 28

*Miller v. Dep't of Justice*, 842 F.3d 1252 (Fed. Cir. 2016) ................. 14, 23, 24, 30

*Miller v. Dep't of Veterans Affairs,* 92 M.S.P.R. 610 (2002)..................... 23, 28, 29

*Powers v. Dep't of the Navy*, 69 M.S.P.R. 150 (1995)........................................... 28

*Price v. Symsek*, 988 F.2d 1187 (Fed. Cir. 1993) .................................................. 13

*Rumsey v. Dep't of Justice*, 120 M.S.P.R. 259 (2013) ........................................... 29

*Scott v. Dep't of Justice*, 69 M.S.P.R.  211 (1995)................................................. 28

*Terban v. Dep't of Energy*, 216 F.3d 1021 (Fed. Cir. 2000) .................................. 12

*Whitmore v. Dep't of Labor*, 680 F.3d 1353 (Fed. Cir. 2012)................... 13, 18, 28

*Wojcicki v. Dep't of the Air Force*, 72 M.S.P.R. 628 (1996) ................................. 28

**STATUTES**

5 U.S.C. § 7703 ........................................................................................................ 1

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Ms. Potter filed an Appeal before this court under the same caption as this matter on March 22, 2019; the case number for this prior proceeding was 19-1541; the panel consisted of Chief Judge Sharon Prost, and Circuit Judges Todd M. Hughes and Kimberly A. Moore; and a decision was issued on February 13, 2020.

## JURISDICTIONAL STATEMENT

The Merit Systems Protection Board had jurisdiction over Ms. Potter's Individual Right of Action (IRA) appeal pursuant to 5 U.S.C. §1221(a). After this Court affirmed-in-part, vacated-in-part, and remanded the Board's December 13, 2018 Initial Decision ("ID #1"), which concluded that the Board's determination that Ms. Potter did not establish a prima facie whistleblower reprisal claim related to her November 2015 nonselection was not supported by substantial evidence, Ms. Potter's IRA appeal was remanded to the Board for further proceedings related to the November 2015 failure to hire.

On September 16, 2020, the Board issued an Initial Decision ("ID #2") on the November 2015 failure to hire, which became final on October 21, 2020, with a finding that (1) Ms. Potter established her prima facie claim of whistleblower reprisal for the November 2015 nonselection, but (2) the Agency met its burden to

show that it would have taken the same actions absent her whistleblowing, and again denied Ms. Potter's request for corrective action in its entirety.

This court has jurisdiction over this appeal pursuant to 5 U.S.C. § 7703(b)(1)(A).

**STATEMENT OF THE ISSUES**

1.  Whether the Board erred in finding that the Agency met their burden to establish by clear and convincing evidence that it would have taken the same actions absent Ms. Potter's protected disclosures?

# STATEMENT OF THE CASE

Ms. Potter submits this Second Appeal of the Final Order issued by the Merit Systems Protection Board ("MSPB" or "Board") in Ms. Potter's Individual Right of Action (IRA) appeal in accordance with 5 U.S.C. § 7703. The Board's findings were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; or, unsupported by substantial evidence; and should therefore be vacated.

## 1. Procedural History

On March 17, 2017, Ms. Potter, filed a Complaint with the U.S. Office of Special Counsel ("OSC") against officials at the Department of Veteran's Affairs, Phoenix VA Health Care System ("Phoenix VA" or "Agency") for engaging in prohibited personnel practices and activities which included: (1) detailing Ms. Potter to the Chief Nurse IV position for 33 days on October 28, 2015, without any higher-graded compensation; (2) detailing Ms. Potter for 120 days on January 17, 2017, to unclassified duties; (3) requiring Ms. Potter to perform the duties of Chief Nurse IV from June 3, 2012, until March 19, 2015, without any official detail, promotion, or higher-graded compensation; (4) demoting Ms. Potter from Chief Nurse IV to a Nurse Manager position in March 2015; (5) failing to promote or hire Ms. Potter as the Chief Nurse IV in November 2015, or the equivalent position of Deputy Associate Chief of Staff/Chief of Purchased Care position in March 2017; and (6)

forcing Ms. Potter to resign from the Phoenix VA in retaliation for her whistleblowing and protected activity.

On November 15, 2017, the OSC issued a Final Decision and decided to take no further action on Ms. Potter's Complaint, erroneously concluding that Ms. Potter was never demoted, that Ms. Potter was not entitled to additional compensation while she acted as Chief Nurse IV, and that Ms. Potter voluntarily resigned her position at the Phoenix VA.

On January 24, 2018, Ms. Potter filed an Individual Right of Action (IRA) Appeal with the Board seeking Corrective Action.

On December 13, 2018, the Board issued its Initial Decision, which was scheduled to become final on January 17, 2019, finding that: (1) Ms. Potter met only four of five whistleblowing allegations; (2) Ms. Potter established whistleblowing was a contributing factor to only one of three covered personnel actions, thereby ruling that she established only one prima facie case of whistleblower reprisal; (3) Ms. Potter did not establish that her April 2017 transfer to an out-of-state position in California was involuntary; (4) the Agency met its burden by clear and convincing evidence that it would have taken the same action on the one accepted prima facie case of whistleblower reprisal; and (5) Ms. Potter being forced to perform duties above and beyond the scope of work as outlined within the Functional Statement of her position of record, without additional compensation, could not be considered

"intolerable and coercive" working conditions in support of her involuntary resignation.

On March 22, 2019, Ms. Potter filed an appeal with this Court for review of the Board's December 13, 2018 Initial Decision, and this Court concluded that the Board's finding that Ms. Potter did not establish a prima facie whistleblower reprisal claim related to her November 2015 nonselection was not supported by substantial evidence, thus Ms. Potter's IRA appeal was remanded to the Board for further proceedings related to the November 2015 failure to hire.

On September 16, 2020, the Board issued an Initial Decision ("ID #2") on the remanded November 2015 failure to hire issue, which became final on October 21, 2020, with a finding that (1) Ms. Potter established her prima facie claim of whistleblower reprisal for the November 2015 nonselection, but (2) the Agency met its burden to show that it would have taken the same actions absent her whistleblowing, and again denied Ms. Potter's request for corrective action in its entirety.

Ms. Potter now timely submits this appeal for review of ID #2.

## 2. Statement of Facts

A.     Ms. Potter began working for the Department of Veterans Affairs ("DVA" or "Agency") on December 17, 2004, as a Student Nurse Technician Valor

Student. Appx0746.[1]  Ms. Potter became a Registered Nurse with the Agency on July 9, 2006, at the Puget Sound VA Healthcare System. *Id.* Ms. Potter transferred to the Phoenix VA on January 3, 2010, as a Nurse II in Quality Management Service. *Id.* On March 13, 2011, Ms. Potter was promoted to Nurse III in Quality Management Service, and then to a Nurse Manager in September 2011. *Id.*

B.    In April 2012, Ms. Potter began performing the duties of Chief Nurse IV due to an organizational change which removed Gail Smith as her Chief Nurse. Appx0111-112. In 2013, Dr. Robbi Venditti ("Dr. Venditti") attempted to get a Chief Nurse IV position classified and posted for Ms. Potter to apply for, and hopefully fill. Appx0451-452. In 2014, Dr. Venditti was promoted from Chief of Purchased Care to Associate Chief of Staff, and Ms. Potter took over additional responsibilities as the Chief of Purchase Care in addition to Chief Nurse IV. Appx0124.

C.    On May 28, 2014, Ms. Potter made a report to Dr. Venditti about her concerns about treatments for Urology patients diagnosed with cancer that had gone unaddressed for over two years due to the cancelling of consults/appointments, which resulted in three patient deaths. Appx0748. On July 10, 2014, Ms. Potter reported a list of one hundred and twenty-eight (128) patients who were awaiting psychotherapy treatment - ninety-six (96) of which were never sent to TriWest for care despite clear instructions on their consults to do so - to the Office of Inspector

---

[1] All stipulations appear at Appx0746-0747.

General ("OIG"). Appx0749. That same day, Ms. Potter emailed Dr. Venditti, Dr. Darren Deering ("Dr. Deering"), and Dr. Blanca Vela, to report her concerns about the patient care delays. Appx0748; Appx0750-753. On August 7 and 8, 2014, Ms. Potter reported the fatal mishandling of Urology patients and her concerns about providers turning off their alerts, which resulted in patient care and follow-up requests going unanswered, to OIG. Appx0754-763. Ms. Potter originally reported this concern to facility leadership on June 27, 2014. Appx0737.

D. On August 20, 2014, Ms. Potter began communicating with OIG to provide further testimony regarding the mishandling of Urology patients by Dr. Deering and Dr. Venditti. Appx0764. Then, on January 23, 2015, Dr. Venditti and Edmund Lowe ("Mr. Lowe") accused Ms. Potter of filing an anonymous OIG hotline complaint regarding significant delays by non-VA Care admin staff. Appx0201-202.

E. On October 28, 2014, Ms. Potter received a Temporary Detail as Acting Chief of Purchased Care. Appx0769-770.

F. On January 29, 2015, the OIG released the results of its review of the Phoenix VA's Urology Department, which included a significant amount of information that Ms. Potter provided to the OIG. Appx0331.

G. On March 19, 2015, former Phoenix VA Medical Center Director, Glenn Grippen ("Mr. Grippen"), approved an organizational chart ("Org. Chart") reassigning Ms. Potter from Chief Nurse Manager to Nurse Manager. As a result,

Ms. Potter lost oversight of the department and went from managing 45 full-time employees to supervising only 14 full-time employees and was no longer able to report further concerns to the OIG as she was no longer privy to the handing of patient care referrals. Appx0801.

H.     On April 14 and 29, 2015, Mr. Grippen and Dr. Deering informed Ms. Potter that the Chief Nurse IV position was being urgently expedited to be filled, and that Mr. Grippen would write a letter requesting a rushed recruitment as the position was essential to the department. This urgency action was done with the hope that it would resolve Ms. Potter's complaint of retaliation. Appx0150-151. However, on May 29, 2015, Mr. Lowe told Ms. Potter that her staff held animosity towards her due to her involvement with the OIG investigation. Appx0165-166; Appx0342-347.

I.     On August 10, 2015, the Chief Nurse IV of Administrative Medicine Service position was posted for recruitment. Ms. Potter applied and was considered a highly qualified candidate. Appx0163-0164.

J.     On September 28, 2015, Ms. Potter informed Dr. Deering that she could no longer perform the duties of a Chief Nurse IV without the official title and requested a detail (or for the Agency to complete the hiring process) to that position or to the position Chief of Purchased Care, for which she was also performing the duties. Appx0767-768.

K.      On November 1, 2015, after being informed that Ms. Potter's complaint against the agency became formal, Dr. Deering canceled the Chief Nurse IV recruitment, and also cancelled the Chief of Purchased Care recruitment after Ms. Potter inquired about applying to that position as well. Appx0169-170; Appx0558-560; Appx0747; Appx0804-806.

L.      On February 28, 2017, Ms. Potter emailed Rima Ann O. Nelson ("Ms. Nelson"), Medical Center Director, regarding the retaliatory actions against her due to her participation in the OIG investigation, the unsuitable detail that she was assigned, and the effect it was having on her health, family life, and education. Appx0795-800.

M.      On March 2, 2017, as her only way to escape the retaliation against her at the Phoenix VA, Ms. Potter accepted a temporary, lower-level position, which equated to a demotion, at the VA Northern California Health Care System, VISN 21, where she relocated without her husband and young children, for a reduced salary, and lost two steps from her SF-50. Appx0229-230.

N.      On March 3, 2017, Ms. Potter spoke to Ms. Nelson to inform her that she had no choice but to resign due to the hostile work environment, the illegal actions she was being required to perform, and the retaliation against her from Phoenix VA leadership. *Id.*

O.   On March 9, 2017, after learning from HR that Ms. Potter was resigning, Dr. Smith requested that the Chief Nurse IV position be issued as an Automated Request for Personnel Action ("ARPA") and that it be posted immediately for recruitment. That same day, the Chief Nurse IV position was re-posted for recruitment after 1 year, 4 months, and 4 days (or 490 days) of being originally cancelled. Appx0083-84; Appx0812. Ms. Potter then filed a Complaint with the U.S. Office of Special Counsel ("OSC") presenting these allegations against the DVA on March 21, 2017. Appx0837-0863.

P.   On November 20, 2017, the OSC issued a letter notifying Ms. Potter that the OSC had terminated the inquiry into her allegations, and that she may seek corrective action from the MSPB within 65 days of the date of the letter. Appx0899-890.

Q.   On February 13, 2018, Ms. Potter timely filed her Individual Right of Action (IRA) Appeal with the MSPB's Denver Field Office. Appx0864. The hearing for this matter took place on October 22 and 23, 2018, and the Record closed on November 14, 2018. The Board issued ID #1 on December 13, 2018 and determined that it would become final on January 17, 2019. Appx0906.

R.   On March 22, 2019, Ms. Potter filed an appeal with this Court for review of the Board's December 13, 2018 Initial Decision. With regards to the Board's decision related to the November 2015 failure to hire, this Court found that

the administrative judge erred in not analyzing Dr. Deering's knowledge of the July 10, 2014 email when considering whether, by a preponderance of the evidence, Ms. Potter had shown that her protected disclosure contributed to the agency's alleged reprisal. And by not doing so, the administrative judge did not resolve the separate question of whether, by clear and convincing evidence, the agency established that it would have taken the November 2015 personnel action regardless of Ms. Potter's second protected disclosure. Therefore, because the administrative judge never considered whether the agency would have taken the same November 2015 personnel action absent Ms. Potter's second protected disclosure, this Court remanded the November 2015 failure to hire issue to the Board for further proceedings. Appx0946.

S. On September 16, 2020, the Board issued an Initial Decision (ID #2) on the remanded November 2015 failure to hire issue, which became final on October 21, 2020. The administrative judge stated the burdens of proof applicable to Ms. Potter and the Agency as follows:

> The appellant has the burden to establish, by preponderant evidence, two elements: (1) she made a protected disclosure, and (2) her disclosure was a contributing factor to the agency's decision to take a statutorily covered personnel action against her. *Id.*; 5 U.S.C. § 1221(e)(1); 5 C.F.R. § 1209.2(e)(1). One way the appellant may demonstrate her disclosure was a contributing factor is by evidence that (A) the official taking the personnel action knew of the disclosure, and (B) the personnel action occurred within a

period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action. 5 U.S.C. § 1221(e)(1)(A)-(B).

If the appellant meets her burden as described above, then she has established a prima facie case of whistleblower reprisal, and the burden passes to the agency, such that the Board will order corrective action, unless the agency demonstrates by clear and convincing evidence that it would have taken the same personnel action in the absence of the disclosure. 5 U.S.C. § 1221(e)(2); 5 C.F.R. § 1209.2(e)(2).

The administrative judge then found that (1) Ms. Potter established her prima facie claim of whistleblower reprisal for the November 2015 nonselection, but (2) the Agency met its burden to show that it would have taken the same actions absent her whistleblowing, and again denied Ms. Potter's request for corrective action in its entirety; for which this Petition for Review is hereby timely submitted in response.

## SUMMARY OF THE ARGUMENT

The Board correctly concluded that Ms. Potter met her burden to establish a prima facie case that her July 10, 2014 disclosure was a contributing factor to her November 2015 nonselection, however, it erred in finding that the Agency met its burden to show by clear and convincing evidence that it would have taken the same actions absent Ms. Potter's whistleblowing.

In analyzing the Agency's burden of proof, the Board misapplied the *Carr* factors when considering: (1) the strength of the Agency's evidence in support of its action; (2) the existence and strength of any motive to retaliate against Ms. Potter;

and (3) failed to effectively assess the Agency's burden of conclusively proving that it has treated similarly situated employees who have not blown the whistle similarly to Ms. Potter. Additionally, the Board failed to consider substantial evidence that fairly detracted from the weight of the Agency's proffered reasons for the November 1, 2015 failure to hire.

Therefore, since the Board did not correctly apply the *Carr* standards in its finding that the Agency met the clear and convincing evidence burden of proof and did not take into consideration substantial evidence that fairly detracted from the weight of the evidence provide by the Agency for its actions, the Board's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, is unsupported by substantial evidence, and its decision should be vacated.

## ARGUMENT

### A.  Legal Standard

Under 5 U.S.C. § 7703, the Court may set aside a final decision of the Board if the decision is "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703 (c) (1994).[2]

### B. The Board's Final Decision is Unsupported by Substantial Evidence.

---

[2] *Terban v. Dep't of Energy*, 216 F.3d 1021, 1024 (Fed. Cir. 2000).

1. <u>The Board's finding that the Agency met its burden of proof and would have taken the same actions absent Potter's whistleblowing does not hold sufficient weight to overcome the burden of clear and convincing Evidence, and therefore was arbitrary and capricious, and failed to consider evidence that detracted from the weight of Agency's proffered reasoning for its action, and thus, is unsupported by substantial evidence.</u>

The administrative judge found that Ms. Potter proved by a preponderance of the evidence that her July 10, 2014 disclosure was protected and was a contributing factor to her November 2015 nonselection to the Chief Nurse IV position; and therefore, she established a prima facie case of whistleblower reprisal. Appx0004. The DVA also conceded the same. *Id*. However, the Board's finding that the DVA met its burden to demonstrate that it would have taken the same action absent the appellant's disclosure failed to appropriately apply the *Carr* factors when considering: (1) the strength of the Agency's evidence in support of its action; (2) the existence and strength of any motive to retaliate against Ms. Potter; and (3) failed to effectively assess the Agency's burden of conclusively proving that it has treated similarly situated employees who have not blown the whistle similarly to Ms. Potter. Additionally, the Board failed to consider substantial evidence that fairly detracted from the weight of the Agency's proffered reasons for its actions.

The burden lies with the employee to "prove by a preponderance of the evidence that he or she made a protected disclosure under § 2302(b)(8) that was a

contributing factor to the employee's [personnel action]".[3] Once that was accomplished, the burden shifts to the DVA to prove by "Clear and convincing evidence" that they "would have taken the same personnel action" despite Potter's whistleblower disclosures. *Id.* "'Clear and convincing' evidence has been described as evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is 'highly probable.'"[4] It "imposes a heavier burden upon a litigant than that imposed by requiring proof by preponderant evidence but a somewhat lighter burden than that imposed by requiring proof beyond a reasonable doubt."[5] Evidence only clearly and convincingly supports a conclusion when it does so in the aggregate considering all the pertinent evidence in the record, and despite the evidence that fairly detracts from that conclusion.[6]

In the instant matter, the Board failed to consider substantial evidence in the record that fairly detracted from the weight of the Agency's reasoning for its decision to cancel the recruitment of the Chief Nurse IV position on November 1, 2015, and

---

[3] *Whitmore v. Dep't of Labor*, 680 F.3d 1353, 1367 (Fed. Cir. 2012).

[4] *Price v. Symsek*, 988 F.2d 1187, 1191 (Fed. Cir. 1993) (quoting *Buildex, Inc. v. Kason Indus., Inc.*, 849 F.2d 1461, 1463 (Fed. Cir. 1988)); *see also Colorado v. New Mexico*, 467 U.S. 310, 316 (1983).

[5] *Price*, 988 F.2d at 119.

[6] *Whitmore,* 680 F.3d at 1368.

its failure to hire regarding the same, and thus, its finding was an abuse of discretion and unsupported by law.[7]

For example, after Ms. Potter's May 28, 2014 and August 7 and 8, 2014 protected disclosures, and Ms. Potter's further participation in the OIG investigation beginning in August 20, 2014, but prior to the November 1, 2015 failure to hire, the following occurred: (1) On January 23, 2015, Mr. Lowe informed Ms. Potter that staff had animosity against nurses, and particularly against her, due to her participation in OIG complaints (Appx0122); (2) On January 29, 2015, the OIG released the results of its review of the Phoenix VA's Urology Department, which included a significant amount of information that Ms. Potter provided to the OIG (Appx0331); (3) On March 19, 2015, Mr. Grippen approved an Org Chart reassigning Ms. Potter from Chief Nurse Manager to Nurse Manager, which removed her from the oversight of the department and prevented her from being able to report further concerns to the OIG as she was no longer privy to the handing of patient care referrals (Appx0801); (4) On April 1, 2015, Mr. Grippen expressed to staff that he wanted "to resolve more issues in-house and try to resolve things before

---

[7] "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. Any determination by an AJ that is based on findings made in the abstract and independent of the evidence which fairly detracts from his or her conclusions is unreasonable and, as such, is not supported by substantial evidence." *Miller v. Dep't of Justice*, 842 F.3d 1252, 1258 (Fed. Cir. 2016) (citing *Whitmore*, 680 F.3d at 1376).

they went out to the media." (Appx0151); (5) On September 24, 2015, Ms. Potter participated in ADR Mediation, where she informed Ms. Marian Tademy (EEO Program Manager) that she was being retaliated against for her OIG disclosures (Appx0088). Ms. Tademy testified that she spoke to Dr. Deering and Mr. Grippen about these concerns (Appx0130); (6) On September 28, 2015, Ms. Potter informed Dr. Deering that she could no longer perform the duties of a Chief Nurse IV without the official title, and requested a detail to that position; however, that request was denied (Appx0091); and (7) On November 1, 2015, after being informed that Ms. Potter's EEO complaint against the Agency became formal, Dr. Deering canceled the Chief Nurse IV recruitment, and also cancelled the Chief of Purchased Care recruitment after Ms. Potter inquired about applying to that position as well. Appx0169-170; Appx0558-560; Appx0747; Appx0804-806. On November 5, 2015, Ms. Potter was notified that the Chief Nurse IV position was cancelled for recruitment. Appx0255-256. Ms. Potter proffers this was suspicious considering Dr. Deering testified that at the same time the decision was made not to fill the position, "there was a lot of discussion about whistleblower reports." Appx0196. Moreover, Ms. Potter testified that she had been performing the duties of Chief Nurse IV with the direction and approval from Dr. Venditti and Dr. Deering, but shortly before the change to the org. chart on March 19, 2015, Dr. Deering was required to participate in Congressional Hearings for the OIG investigation, which included information

from her protected disclosures. Appx0191. As a result, Dr. Venditti was detailed to another agency because of her involvement in the Phoenix VA "scandal." Appx0089-0090. In response to questions regarding the Phoenix VA "scandal", Dr. Deering testified that Congress asked him, "why hasn't he been fired yet?"; and he also testified to the fact that he had been receiving death threats; how as a result of the "scandal" upper management was either fired or put on leave, and how "the crises" eventually led to his removal. Appx0191-192; Appx0221. He also testified, "I was feeling frustrated because people were going to the OIG and I just wished they would come to me and say here's what it is so we could tackle it together. But, you know, when the OIG gets involved, it just adds multiple layers of complexity trying to solve the problem." Appx0193.

Finally, the Board included in its analysis factors completely unrelated to those facts for which a *Carr* analysis would rely. For example, the Board cited to the removal of Dr. Deering in June 2016, in an action evidently related to the "crisis" that had emerged at the Phoenix VA (Appx0011); and Ms. Potter's tentative job offer in California on February 8, 2017 (*Id.*); and the fact that she received a confirmed job offer March 9, 2017. (*Id.*) It is unclear how those facts, which all took place after Dr. Deering's November 1, 2015 decision to cancel the recruitment, would assist the Board in concluding that the Agency met its clear and convincing evidence burden.

The Board's findings were made in the abstract, independent of evidence which fairly detracts from its conclusion, therefore it was unreasonable, not supported by substantial evidence, and should be vacated.

## C. The Board's Final Decision is Based on an Abuse of Discretion or is Otherwise not in Accord with the Law

1. The Board's conclusion that *Carr* factor 1 weighed heavily in favor of the Agency was not in accord with the law and is unsupported by substantial evidence.

In *Whitmore*, when discussing the clear and convincing evidence burden, the Court stated:

> "Clear and convincing evidence" is a high burden of proof for the Government to bear. It is intended as such for two reasons. First, this burden of proof comes into play only if the employee has established by a preponderance of the evidence that the whistleblowing was a contributing factor in the action — in other words, that the agency action was "tainted." Second, this heightened burden of proof required of the agency also recognizes that when it comes to proving the basis for an agency's decision, the agency controls most of the cards — the drafting of the documents supporting the decision, the testimony of witnesses who participated in the decision, and the records that could document whether similar personnel actions have been taken in other cases. In these circumstances, it is entirely appropriate that the agency bear a heavy burden to justify its actions.[8]

---

[8] *Whitmore*, 680 F.3d at 1367 (quoting 135 Cong. Rec. H747-48 (daily ed. Mar. 21, 1989) (explanatory statement on Senate Amendment to S. 20)).

In determining whether an agency has shown by clear and convincing evidence that it would have taken the same personnel action in the absence of whistleblowing, the Board will consider the following factors: (1) the strength of the agency's evidence in support of its action; (2) the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and (3) any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated.[9]

First, the AJ in his analysis of the *Carr* factors mischaracterizes, and therefore misapplies, the first factor of the test by incorrectly stating that "the first factor is the strength of the agency's *reasons* for its action." (emphasis added). Appx0012. Application of the first *Carr* factor does not call for an analysis of the agency's reasons – it calls for an analysis of the agency's *evidence* – and the record reflects that the Agency did not provide one piece of credible evidence to substantiate their claims that they would have still cancelled their recruitment efforts for the Chief Nurse IV position, notwithstanding Ms. Potter's whistleblower disclosures. Instead, the Board is simply relying on the Agency's word, even though their word is contradicted by, and in clear conflict with, Ms. Potter's evidence.

The only evidence the Agency provided is one email from Dr. Deering to

---

[9] *Carr v. Soc. Sec. Admin.*, 185 F.3d 1318, 1323 (Fed. Cir. 1999) ("*Carr* factors").

Human Resources requesting that the recruitment effort be cancelled, which stated, "We need to have more discussion about the best way to structure this service (*i.e.*, what sections should be in this service, where the nurse 4 should report, etc[.]) before we move toward a selection." Appx0804-806. Dr. Deering appeared to corroborate this reasoning when he testified that he did not initially fill the position due to reorganization, and they were unsure who the position would report to. Appx0602-605. However, Mr. Grippen testified that in 2015, while he was the Director, he considered filling the Chief Nurse IV position to be a priority. Appx0504-505. He also stated that, during that time, even though there were several reorganizations happening, there were not any impediments on hiring, and in fact, the department "increased staffing levels multiple times." Appx0520.

Moreover, even though the Agency claims that the basis of its decision to cancel the Chief Nurse IV position was due to a reorganization of departments, the Agency has provided zero evidence to show how reorganizations of the department prevented them from filling a universally agreed upon "essential" and "critically important" position, such as Chief Nurse IV, until March 9, 2017, *after* learning of Ms. Potter's resignation/transfer from the Agency. They similarly have provided no evidence to show that the position needed reclassifying after already being classified in August 2015. There is not one email, one document, or one copy of the "reworded" Functional Statement in the record to show that the position was ever

sent back to VISN for reclassification. According to Dr. Duarte, during his time as the ACOS, he was not aware of the Chief Nurse IV going through reclassification. Appx0713-714. Additionally, Dr. Deering testified that [if the position was not reclassified] since it had already gone through the classification process at VISN, it could have been reposted for fulfillment at any time. Appx0714-716. Yet, the Agency relies on the Board to believe that it took them one year, ten months, and 10 days, or exactly 681 days - the length of time between April 29, 2015 (when Mr. Grippen said he would expediate the fulfillment of the Chief Nurse IV position) and March 9, 2017 (the date the position was reposted) - to figure out the simple task of who the Chief Nurse IV position was "going to report to." Appx0801.

Despite the fact that the record is flush with evidence showing that before and during this time period, Ms. Potter was intermittently performing the duties of a Chief Nurse IV and reporting to several different management officials without complication. Despite that fact, the AJ was convinced and relied soley on the testimony of Dr. Deering, even though he conceded his recollection of the "precise series of events leading up to his November 2015 decision to cancel the vacancy" was "admittedly less than certain". Appx0013-14. However, he explained away that lack of recollection by stating, "[b]ut that was hardly surprising: the appellant did not challenge Deering's November 2015 vacancy cancellation until (i) sixteen

months after Deering's decision and (ii) ten months after Deering's removal, and Deering's decision was never overtly personal to the appellant or any individual. That passage of time, along with Deering's departure from the agency, gives me no reason to assume that Deering would have a firm handle of the nuances of his decision to cancel a vacancy in November 2015. I simply find no basis to conclude that Deering's November 2015 decision stood out in his memory in the same manner as it did for the appellant." This analysis completely ignores the fact that Ms. Potter, upon learning that the Chief Nurse IV position was reposted for recruitment on March 9, 2017 - the same day she resigned from the Phoenix VA - filed her Complaint with OSC on March 21, 2017, a mere 11 days after the Agency's last retaliatory act. Appx0837-0863. Additionally, his finding that Deering's decision was "never overtly personal to the appellant or any individual" is also contradicted by the record. In fact, the AJ cited just how personal it was to Ms. Potter when discussing why Ms. Potter was the most qualified candidate for the position.[10] The record shows that Ms. Potter helped draft the Functional Statement that would be used to get the Chief Nurse IV position certified at the VISN. Appx0202-203. On August 10, 2015, the position was posted to USAJOBS, and Ms. Potter applied and

---

[10] Also, according to Deering: "I can't imagine somebody that would've been more qualified for it off the top of my head, but I don't think I ever promised that position to anyone", (Appx0545), "hard to find anyone more qualified", (Appx0572) "couldn't think of anybody more qualified", Appx0598, "don't know of anyone else . . . more qualified", (Appx0010).

was deemed a "Highly Qualified," "Priority A" candidate, and had already been performing the duties of the position since 2012. Appx0111-112; Appx0164-165.

The AJ further justified his reliance on Dr. Deering's testimony by stating "I found Deering's overall picture of events to be consistent, both internally and when compared with the testimony of Venditti and Grippen." Appx0014. He then referenced Dr. Venditti's testimony that "12/8/14 [organization chart] … was trying to get Tiffany recognition . . . because we had been blocked at every avenue on getting a chief nurse position", and that "Darren had went to other nurse executives and was told the same thing, that there was not enough complexity in the department. For a nurse 4." *Id.* However, this analysis overlooks the fact that these statements referenced a period of time prior to the Nurse IV position being approved by VISN and advertised for recruitment in August of 2015. Therefore, they had no relation to Dr. Deering's decision to cancel the recruitment on November 1, 2015. The AJ also claimed that he found no basis to doubt Dr. Deering's testimony because "based on the agency's actions in March 2017 to re-post the vacancy, since Deering had been gone from the agency for nine months by that time and has not been shown to have any role in the agency's March 2017 actions." Appx0015. However, this reasoning is not in accord with the law.

When confronted with a weak evidentiary showing by the Agency, the Court in *Miller* stated, "To be clear, we do not hold that testimony must be corroborated

to support a showing of independent causation, although that is one of many ways that the Government could have made its weak evidentiary showing stronger . . . ."[11] Moreover, the court in *Whitmore* invalidated a similar argument used by the AJ and admonished the lack of direct evidence and "dismissive approach to the retaliatory motive *Carr* factor merely because a supervisor isn't directly involved."[12] Considering the suspect timing and the lack of evidence to support their claim that there was a reclassification of the position prior to the posting, that there was further discussion of whom the position would report to, or that the department needed to be reorganized before the position could be filled, the AJ should have found, as the Court did in *Miller*, that the Agency didn't present any robust evidence, and thus, as a matter of law, didn't meet their burden of providing "clear and convincing evidence" that they would have not selected Ms. Potter for the Chief Nurse IV position in November 2015 (or thereafter) despite her whistleblower disclosures and activities.[13] The AJ's reliance solely on Dr. Deering's testimony and the fact that he

---

[11] *Miller v. Dep't of Justice*, 842 F.3d at 1261 (finding that the government did not present *strong* evidence of independent causation and as such, the first *Carr* factor did not cut in the governments favor) (emphasis added).

[12] *See Miller v. Dep't of Veterans Affairs,* 92 M.S.P.R. 610 (2002) (*citing Whitmore,* 680 F.3d at 1370-72) ("[t]hose responsible for the agency's performance overall may well be motivated to retaliate even if they are not directly implicated by the disclosures.").

[13] *See Miller v. Dep't of Justice*, 842 F.3d at 1260-1261 ("The Government also failed to present any documentary evidence supporting its position. Mr. Miller was repeatedly reassigned over the course of a four-and-a-half year period, and for each step, the Government did not present a single email, memorandum, or personnel

was no longer at the Agency when the vacancy was reposted is misplaced and does

not meet the burden of proof required to cut in the Agency's favor.[14]

    2.   <u>The Board's finding that *Carr* factor 2 weighed only modestly in Ms. Potter's favor is unsupported by any substantial evidence within the record.</u>

Second, even though the Board found that "Deering had an ostensible motive

to retaliate against the appellant for her disclosure, because the problems she raised

tended to reflect unfavorably upon Deering's management and put Deering in the

place of having to choose between working to try to address her concerns, or doing

nothing and fearing further consequences," (Appx0015), he nevertheless arbitrarily

found that the "existence of agency motive to retaliate, comes down to [only]

Deering's motive to retaliate against the appellant for her July 10, 2014 disclosure."

*Id.* This conclusion is unsupported by any substantial evidence within the record.

As previously shown, Dr. Deering and other VA management officials were also

copied on the emails containing Ms. Potter's protected whistleblowing disclosures.

The AJ's analysis that Dr. Deering's motive to retaliate against Ms. Potter weighs

---

action form documenting or providing the bases for the agency's action. Common sense tells us that these repeated reassignments, occurring over a significant span of time, are the types of personnel actions for which papers would normally attach.")

[14] *See Id.* at 1261 ("[E]ven taking the Warden's testimony at face value, we conclude that his bare testimony about what OIG directed him to do affords only minimal support for Mr. Miller's removal when considered in light of the remainder of the record in this case . . . there is a significant weakness in the quantum of the Government's evidence going towards the first *Carr* factor.")

only modestly in Ms. Potter's favor because he expressed gratitude to Ms. Potter for her disclosures, he pledged to take corrective action, and he approved a new organization chart in December 2014, which Ms. Potter considered to be favorable, is flawed because it ignores the chronological order of events that occurred prior to the November 2015 cancellation.

As explained above in Section B, after Dr. Deering signed off on the December 14, 2014 org. chart, but prior to the nonselection, the following events occurred: (1) On January 23, 2015, Mr. Lowe informed Ms. Potter that staff had animosity against nurses, and particularly against her, due to her participation in OIG complaints (Appx0122); (2) On January 29, 2015, the OIG released the results of its review of the Phoenix VA's Urology Department, which included a significant amount of information that Ms. Potter provided to the OIG (Appx0331); (3) On March 19, 2015, Mr. Grippen approved an Org Chart reassigning Ms. Potter from Chief Nurse Manager to Nurse Manager, which removed her from the oversight of the department and prevented her from being able to report further concerns to the OIG as she was no longer privy to the handing of patient care referrals (Appx0801); (4) On April 1, 2015, Mr. Grippen expressed to staff that he wanted "to resolve more issues in-house and try to resolve things before they went out to the media." (Appx0151); (5) On September 24, 2015, Ms. Potter participated in ADR Mediation, where she informed Ms. Marian Tademy (EEO Program

Manager) that she was being retaliated against for her OIG disclosures (Appx0088). Ms. Tademy testified that she spoke to Dr. Deering and Mr. Grippen about these concerns (Appx0130); (6) On September 28, 2015, Ms. Potter informed Dr. Deering that she could no longer perform the duties of a Chief Nurse IV without the official title, and requested a detail to that position; however, that request was denied (Appx0091); and (7) On November 1, 2015, after being informed that Ms. Potter's EEO complaint against the agency became formal, Dr. Deering canceled the Chief Nurse IV recruitment, and also cancelled the Chief of Purchased Care recruitment after Ms. Potter inquired about applying to that position as well. Appx0169-170; Appx0558-560; Appx0747; Appx0804-806. On November 5, 2015, Ms. Potter was notified that the Chief Nurse IV position was cancelled for recruitment. Appx0255-0256. Ms. Potter proffers this was suspicious considering Dr. Deering testified that at the same time the decision was made not to fill the position, "there was a lot of discussion about whistleblower reports." Appx0622. Moreover, Ms. Potter testified that she had been performing the duties of Chief Nurse IV with the direction and approval from Dr. Venditti and Dr. Deering, but shortly before the change to the org. chart on March 19, 2015, Dr. Deering was required to participate in Congressional Hearings for the OIG investigation, which included information from her protected disclosures. Appx0330. As a result, Dr. Venditti was detailed to another agency because of her involvement in the Phoenix

VA "scandal." Appx0168-169. In response to questions regarding the Phoenix VA "scandal", Dr. Deering testified that Congress asked him, "why hasn't he been fired yet?"; and he also testified to the fact that he had been receiving death threats; how as a result of the "scandal" upper management was either fired or put on leave, and how "the crises" eventually led to his removal. Appx0587-588; Appx0713. He also testified, "I was feeling frustrated because people were going to the OIG and I just wished they would come to me and say here's what it is so we could tackle it together. But, you know, when the OIG gets involved, it just adds multiple layers of complexity trying to solve the problem." Appx0595.

Thus, there is ample evidence to deduce that Dr. Deering and other Agency Management Officials had more than enough motive to retaliate against Ms. Potter, and even if the AJ arbitrarily concluded that Dr. Deering was not motivated by actions taken against him personally, it is well established that "[m]otive may be imputed upon a deciding official for a variety of reasons, including the general desire senior managers have to appear competent."[15] Therefore, the action of Agency

---

[15] *See Whitmore*, 650 F.3d at 1370-71 ("When a whistleblower makes . . . highly critical accusations of an agency's conduct, an agency official's merely being outside that whistleblower's chain of command, not directly involved in alleged retaliatory actions, and not personally named in the whistleblower disclosure is insufficient to remove the possibility of a retaliatory motive or retaliatory influence on the whistleblower's treatment."); *See also Chambers v. Dep't of the Interior*, 116 M.S.P.R. 24, ¶ 69 (2011) (finding proposing and deciding officials had motive to retaliate because they were high level officials and the disclosures "reflected on both of them as representatives of the general institutional interests of the agency");

officials in the reposting of the Chief Nurse IV position on the same day Ms. Potter resigned on March 9, 2017, (Appx0083-84), should have been considered in the analysis of *Carr* factor 2. The fact that the Chief Nurse IV position was hastily reposted for recruitment on the same day that the Agency learned of Ms. Potter's resignation is extremely suspicious and should have weighed heavily in Ms. Potter's favor.[16]

Therefore, finding that *Carr* factor 2 only *modestly* weighed in Ms. Potter's favor is unsupported by substantial evidence within the record, and thus, the decision should be vacated.

3. The Board's Analysis of *Carr* Factor 3 is Not in Accordance with the Law.

The AJ's finding concerning *Carr* factor 3, which was based on the arbitrary analysis that because neither party had submitted evidence for this factor, it was therefore unlikely that there *would* be similarly situated individuals who did not blow the whistle and were treated similarly, is nonsensical at best. Appx0016. The Court

---

*Miller v. Dep't of Veterans Affairs*, 92 M.S.P.R. 610, ¶ 20 (2002) (finding that when misconduct was directed and condoned by the proposing official, a motive to retaliate may be imputed upon the deciding official).

[16] *See e.g., Scott v. Dep't of Justice*, 69 M.S.P.R. 211 (1995); *Powers v. Dep't of the Navy*, 69 M.S.P.R. 150 (1995); *Wojcicki v. Dep't of the Air Force*, 72 M.S.P.R. 628 (1996) (two months between protected disclosure and non-selection for position); *Costin v. Dep't of Health and Human Serv.*, 72 M.S.P.R. 525 (1996) (closeness in time between disclosure and non-referrals found suspicious).

in *Miller* deemed *Carr* factor 3 important in determining whether an agency has shown by "clear and convincing" evidence that it would have taken the same personnel action in the absence of whistleblowing. In fact, the Court stated that even while "the absence of any evidence relating to *Carr* factor three can effectively remove that factor from the analysis, we further explained that the Government's failure to produce evidence on this factor 'may be at the agency's peril' considering the Government's advantage in accessing this type of evidence."[17]

Notably, even though the AJ recognized that Courts have determined the introduction of evidence showing that the Agency treated similarly situated employees (*i.e.*, other individuals who were not whistleblowers) similarly to Ms. Potter would be highly beneficial in determining whether the Agency has met its "Clear and convincing" evidence burden of proof, the AJ subsequently absolves the Agency from this burden by concluding, without any supportive evidence, that there wouldn't be other comparators because of the "unique stature" of Ms. Potter on the organizational chart, (Appx0932), and that even though the record contains evidence that three other individuals also applied for the vacancy, and thus were also affected

---

[17] *Miller v. Dep't of Veterans Affairs*, 92 M.S.P.R. 610 (2002) (*citing Whitmore*, 680 F.3d at 1374) ("[T]he absence of any evidence concerning *Carr* factor three may well cause the agency to fail to prove its case overall.") (internal citations omitted); *see also Rumsey v. Dep't of Justice*, 120 M.S.P.R. 259 (2013) (*citing Whitmore*, 680 F.3d at 1367 ("discussing legislative history showing that Congress intended the clear and convincing evidence standard to be a heavy burden to meet").

by Deering's November 2015 vacancy cancellation, the AJ stated, "neither party adduced any evidence as to those other applicants' qualifications or status as whistleblowers or non-whistleblowers." Appx0016. The burden of producing evidence on the three additional applicant's qualifications, and their status as whistleblowers or non-whistleblowers, should have been placed solely on the Agency, as "the Government has the advantage in accessing this type of evidence."[18] The AJ's failure to apply the standard in *Miller,* that recognizes the Agency was in the best position to provide evidence of the existence of other similarly situated applicants with the same experience, expertise, and/or knowledge of the role of a Chief Nurse IV, who were not themselves whistleblowers, but treated similarly to Ms. Potter, was not in accord with the law.

Finally, Ms. Potter testified that there were similarly situated individuals who were not whistleblowers, that were treated differently than her during the time period in which she made her protected disclosures; Mr. Gregory Crenshaw, who she testified was given the title of "Chief" when he was unqualified to possess it; Ms. Leslie Lockridge and Ms. Ann Wilford, who were both hired as Chief Nurse IV's despite ongoing reorganizations within the Agency. Appx0236-237; Appx0295. The Agency produced no evidence to contradict Ms. Potter's assertions.

---

[18] *Miller v. Dep't of Justice*, 842 F.3d at 1262.

Therefore, in concluding that there were no applicable comparators by removing consideration of the three additional applicants for the 2015 Chief Nurse IV vacancy because "neither party adduced any evidence as to those other applicants' qualifications or status as whistleblowers or non-whistleblowers;" ignoring Ms. Potter's testimony as to the three similarly situated employees who were not whistleblowers, whom she believed were treated differently; and removing the Agency's obligation to produce evidence of the whistleblower or non-whistleblower status of the individual who was ultimately hired for the Chief Nurse IV position in 2017, the AJ's finding that *Carr* factor 3 was neutral was not in accord with the law, was an arbitrary and capricious, and an abuse of discretion. This factor should have also weighed heavily in favor of Ms. Potter and therefore, the Board should have found the Agency failed to meet their burden by clear and convincing evidence that they would have taken the same personal action absent Ms. Potter's whistleblowing, and thus, the Board's decision should be vacated.

## CONCLUSION

For the foregoing reasons, this Court should find that the Board's findings on the claims herein did not meet the clear and convincing evidence burden. Rather they were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law which should be vacated and remanded to the Board for a decision comporting with the precepts delineated herein.

Respectfully submitted,

/s/ A. Marques Pitre

_____

A. MARQUES PITRE, Esq.
Pitre & Associates, LLC
Ronald Reagan Building and
International Trade Center
1300 Pennsylvania Avenue, N.W.,
Suite 700
Washington, DC 20004
Phone: 202-204-3006
Direct: 202-840-6797
Email: ampitre@ampitreassociates.com

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Federal Circuit Rule 32(a). This brief contains 7,822 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

3. This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2020 in 14-point Times New Roman font.

Date: <u>June 3, 2021</u>   Respectfully submitted,

       /s/ A. Marques Pitre
       _____
       A. MARQUES PITRE
       Pitre & Associates, LLC
       Ronald Reagan Building and
       International Trade Center
       1300 Pennsylvania Avenue, N.W., Suite 700
       Washington, DC 20004
       Phone: 202-204-3006
       Direct: 202-840-6797
       Email: ampitre@ampitreassociates.com

# CERTIFICATE OF SERVICE

I certify that, on this 3rd day of June 2021, I served a copy of *Petitioner's Second Corrected Opening Brief* electronically via the Court's CM/ECF system, which gave notice to all counsel of record.

Respectfully submitted,

/s/ A. Marques Pitre

_____

A. Marques Pitre, Esq.

**ADDENDUM**